**GUTRIDE SAFIER LLP**
SETH A. SAFIER (State Bar No. 197427)
MARIE A. MCCRARY (State Bar No. 262670)
HAYLEY REYNOLDS (State Bar No. 306427)
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 336-6545
Facsimile:  (415) 449-6469

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DAVID SWARTZ, as an individual, on behalf of himself, the general public and those similarly situated,<br><br>    Plaintiff,<br><br>        v.<br><br>DAVE'S KILLER BREAD, INC. AND FLOWERS FOODS, INC.,<br><br>    Defendants. | CASE NO. 4:21-cv-10053-YGR<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; FALSE ADVERTISING; FRAUD, DECEIT, AND/OR MISREPRESENTATION; UNFAIR BUSINESS PRACTICES; AND UNJUST ENRICHMENT**<br><br>JURY TRIAL DEMANDED |

First Amended Class Action Complaint

**INTRODUCTION**

1.     Plaintiff David Swartz, by and through his counsel, brings this class action against Defendants Dave's Killer Bread, Inc. and Flowers Foods, Inc. (collectively, "Defendants") to seek redress for their unlawful and deceptive practices in labeling and marketing their consumer food products sold under the brand name Dave's Killer Bread.

2.     Consumers are increasingly health conscious and, as a result, many consumers seek foods high in protein. To capitalize on this trend, Defendants prominently label some of their consumer food products as providing specific amounts of protein per serving depending on the product, such as "5g PROTEIN" on the front labels of both the Dave's Killer Bread 21 Whole Grains and Seeds bread and the Dave's Killer Bread Good Seed bread. Consumers, in turn, reasonably expect that each product will actually provide the amount of protein per serving claimed on the front of the product package.

3.     However, the Food and Drug Administration ("FDA") prohibits such front label claims about the amount of protein, unless manufactures also provide additional information in the nutrition fact panel about how much of the recommended daily value for protein that the product will actually provide. 21 C.F.R. §§ 101.9(c)(7)(i), 101.13 (b), (n). That is because the FDA recognizes that (1) when manufacturers tout an amount of protein on the front label, that amount is likely to be material to purchasing decisions, even though reasonable consumers may not know the total amount of protein they need to ingest on a daily basis, and (2) not all proteins are the same in their ability to meet human nutritional requirements, so a simple statement about the number of grams does not actually inform consumers about how much usable protein they are receiving. Some proteins are deficient in one or more of the nine amino acids essential to human protein synthesis and/or are not fully digestible within the human gut. When a human body uses up the least prevalent essential amino acid from a food product, protein synthesis shuts down and all of the remaining amino acids from that protein source degrade mostly into waste. Likewise, whatever portion of a protein source is not digestible is similarly unavailable for protein synthesis. A protein's ability to support human nutritional requirements is known as its "quality."

4.     The FDA required method for measuring protein quality is called the "Protein

Digestibility Corrected Amino Acid Score"—known by its acronym PDCAAS (pronounced Pee-Dee-Kass). It combines a protein source's amino acid profile and its percent digestibility into a discount factor ranging from 0.0 to 1.0 that, when multiplied by the total protein quantity, shows how much protein in a product is actually available to support human nutritional requirements. The regulations term this the "corrected amount of protein per serving." 21 C.F.R. § 101.9(c)(7)(ii). For example, a PDCAAS of .5 means that only half of the protein in that product is actually available to support human protein needs. If the product contained 10 grams total protein per serving, the corrected amount of protein would be only 5 grams per serving.

5.      Because protein products can vary widely in their ability to support human protein needs (even between two comparator products with the same total protein quantity), the FDA prohibits manufacturers from advertising or promoting their products with a protein claim unless they have satisfied various requirements, of which two are most important here.  First, the manufacturer must calculate the "corrected amount of protein per serving" based on the quality of the product's protein using the PDCAAS method. Second, the manufacturer must use the PDCAAS computation to provide "a statement of the corrected amount of protein per serving" in the nutrition facts panel ("NFP") "expressed as" a percent daily value ("%DV") and placed immediately adjacent to the statement of protein quantity. 21 C.F.R. § 101.9(c)(7)(i)-(iii). The %DV is the corrected amount of protein per serving divided by the daily reference value for protein of 50 grams. *Id.* Using the same example of a product containing 10 grams total protein per serving with a PDCAAS of .5, the %DV is 10% (5g/50g). Had all of the protein in the product been useful in human nutrition, the %DV would be 20% (10g/50g). The FDA regulations that govern nutrient content claims are also clear that the manufacturer may not make any front label claims about the amount of protein in the product unless it complies with these two requirements. *See* 21 C.F.R. § 101.13(b) ("a nutrient content claim[] may not be made on the label…unless the claim is made in accordance with this regulation [i.e., § 101.13]…" and (n)  ("[n]utrition labeling in accordance with § 101.9…shall be provided for any food for which a nutrient content claim is made"); *accord* 58 Fed. Reg. 2302, 23310 (manufacturer can only make "a nutrient content claim . . . on the label

or in labeling of a food, provided that the food bears nutrition labeling that complies with the requirements in proposed § 101.9.").

6. The primary protein sources in Defendants' products are wheat and oats. Both are low quality proteins with PDCAAS scores that range between 0.4 and 0.5. Accordingly, although Defendants advertises its products with a "5g PROTEIN" claim, it actually provides, in a form humans can use, as little as 2 grams of protein, i.e., less than half the protein consumers reasonable expect to receive based on the label. Nevertheless, Defendant failed to provide in the NFP a statement of the corrected amount of protein per serving calculated according to the PDCAAS methodology and expressed as a %DV. Accordingly, the protein claims on the front of the package, such as "5g PROTEIN" are unlawful and in violation of parallel state and federal laws. 21 C.F.R. § 101.9(c)(7)(i), 101.13(b), (n). The failure to include a statement of the corrected amount of protein inside the NFP also rendered the NFP itself unlawful. *Id*. § 101.9(c)(7)(i).

7. Moreover, because Defendants' protein claim is in the form of a quantitative amount appearing alone, without any information about protein quality, it is also separately actionable as misleading. Consumers reasonably expect that Defendant's products will actually provide nutritionally the full amount of protein per serving claimed on the front of the product package and stated in the protein quantity section of the NFP. But Defendant's products do not do so on account of their low protein quality. Had Defendant included a statement of the corrected amount of protein per serving in the NFP, as it was required to do under the law, it would have revealed that the product provides nutritionally as little as half of their total protein quantity. That information was material to reasonable consumers.

8. Defendants' unlawful and misleading protein claims caused Plaintiff and members of the class to pay a price premium for the products.

## PARTIES

9. Plaintiff David Swartz is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Oakland, California. His permanent home is in Oakland and he intends to remain in Oakland, and he is therefore domiciled in California.

10. Defendant Dave's Killer Bread, Inc. ("DKB") is a corporation existing under the

laws of Oregon with its principal place of business in Milwaukie, Oregon. DKB (formerly named AVB, Inc. until 2016) has been manufacturing, marketing, and selling the Dave's Killer Bread products since 2005.

11. Defendant Flowers Foods, Inc. ("Flowers Foods") is a corporation existing under the laws of Georgia with its principal place of business in Thomasville, Georgia. Flowers Foods acquired DKB in 2015 and identifies itself as the producer of the Dave's Killer Bread products.

12. With respect to the allegations herein, DKB and Flowers Foods were and are alter egos.

13. With respect to the allegations herein, DKB and Flowers Foods were each other agents and, in doing the things herein alleged, were acting within the scope and course of their authority as such agents.

14. With respect to the allegations herein, each of the Defendants was a member of, and engaged in, a joint venture, partnership and common enterprise, and acting within the course and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

15. With respect to the allegations herein, the acts and omissions of each of the Defendants concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

16. With respect to the allegations herein, each of the Defendants ratified each and every act or omission complained of herein. At all times herein mentioned, each of the Defendants aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiff and Defendants are citizens of different states.

18. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engages in other persistent

courses of conduct in, and/or derive substantial revenue from products provided to persons in the State of California. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

20.     In accordance with California Civil Code Section 1780(d), Plaintiff concurrently files herewith a declaration establishing that, at various times throughout the class period, he purchased Dave's Killer Bread 21 Whole Grains and Seeds bread and Dave's Killer Bread Good Seed Organic bread in grocery stores in Oakland, California. (Plaintiff's declaration is attached hereto as Exhibit A.)

21.     Plaintiff accordingly alleges that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

22.     Defendants manufacture, distribute, market, advertise and sell a variety of flavors of bread under the brand name "Dave's Killer Bread." Most of these products have packaging that predominately, uniformly, and consistently states on the principal display panel of the product labels that they contain and provide a certain amount of protein per serving. Plaintiff has attached as Exhibit B a non-exhaustive list of the Dave's Killer Bread products that make protein claims on the front of the product packages. The products listed in Exhibit B, and any other Dave's Killer Bread brand product that claims a specific amount of protein on the front of its label, will hereinafter be referred to as the "Products."

23.     The representations on the front of the packages that the Products contain and provide a specific amount of protein per serving was uniformly communicated to Plaintiff and every other person who purchased any of the Products. The NFP on the Products uniformly and consistently failed to provide any referenced percent daily value of the Products' protein content throughout the Class Period. The front and back panels of the Products have appeared consistently throughout the Class Period in the general form of the following examples:

First Amended Class Action Complaint



First Amended Class Action Complaint



24.     As described in detail below, Defendants' front label protein claims, which adver-tise the Products as containing and providing specific amounts of protein per serving, are unlawful because Defendants did not: (1) calculate the "corrected amount of protein per serving" based on the quality of the product's protein using the PDCAAS method; and (2) provide a statement of that corrected amount of protein per serving in the NFP, expressed as %DV. 21 C.F.R. § 101.9(c)(7)(i) & (iii). Defendants' failure to comply with § 101.9 also makes the front label claims unlawful under §§ 101.13(n) and (b). The unlawful front label protein claims induced consumers to purchase the Products at a premium price. Had Defendants not included a protein claim on the

front label of its Products, as required by FDA regulations, reasonable consumers would not have purchased or would have paid less for the Products.

25. Defendants' failure to provide the required statement of the corrected amount of protein per serving, as well as Defendants' prominent front label protein claims made in the absence of any statement of the corrected amount of protein in the NFP, deceived and misled reasonable consumers into believing that a serving of the Products will provide the grams of protein represented on the label, when that is not true. Had Defendant complied with the law, the statement of the corrected amount of protein would have revealed the Products provide significantly less protein than claimed because Defendants use low quality proteins in its products, such as wheat and oats. The absence of this information also allowed Defendants to charge a price premium. Had reasonable consumers been informed of the true amount of protein that the products provided through a statement of the corrected amount of protein per serving, as required by FDA regulations, they would not have purchased or would have paid less for the Products.

**Consumer Demand for Protein**

26. Many American consumers are health conscious and seek wholesome, natural foods to keep a healthy diet, so they routinely rely upon nutrition information when selecting and purchasing food items. This is especially true in the community of athletes, registered dietitians, and coaches, to which Defendants market. As noted by FDA Commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet." Indeed, the FDA recommends relying on Nutrition Facts Labels as the primary tool to monitor the consumption of protein.[1]

27. Protein is found throughout the body—in muscle, bone, skin, hair, and virtually every other body part or tissue. The health benefits of protein are well studied and wide ranging. Scientific studies have confirmed that protein can assist in weight loss, reduce blood pressure, reduce cholesterol, and control for risk factors for cardiovascular diseases. The National Academy

[1] FDA Protein Fact Sheet, https://www.accessdata.fda.gov/scripts/InteractiveNutritionFactsLabel/factsheets/Protein.pdf

of Medicine recommends that adults get a minimum of .8 grams of protein for every kilogram of body weight per day, or just over 7 grams for every 20 pounds of body weight.[2] For a 140-pound person, that means about 50 grams of protein each day. For a 200-pound person, that means about 70 grams of protein each day.

28.     Athletes and fitness enthusiasts typically consume much higher amounts of protein each day; typically between 1 to 1.5 grams of protein for every pound of body weight.

29.     The health benefits of protein are just as important, if not more important, for children. Children are in a relative state of constant growth and rely on protein as the building block of muscle, bone, skin, hair, and virtually every other body part or tissue. The National Academies of Science recommends the following amounts of daily intake of protein based on age group: 1-3 years old: 13 g of protein per day; 4-8 years old: 19 g of protein per day; 9-13 years old: 34 g of protein per day.[3]

30.     Protein *quantity* by itself does not tell the full story from a human nutritional standpoint. A protein's *quality* is also critical because humans cannot fully digest or utilize some proteins. Proteins are not monolithic. They are simply chains of amino acids, and different types of amino acids chained together in different ways will make different types of proteins. Further, the makeup of the protein changes the function of that protein in the human body, and certain types of proteins are more easily digested and used by humans than others.

31.     All of a human's proteins are formed through the process of protein synthesis within their own bodies. That is, although humans consume dietary proteins, they digest those proteins, break them down into their constituent amino acids, and then use those amino acids as building blocks to synthesize the human proteins necessary for life, tissue repair, and other functions. Of the twenty total amino acids, humans can produce only eleven of them on their own. Humans cannot produce, under any circumstances, nine of the amino acids required for protein synthesis. These nine amino acids are called the "essential amino acids" and they must be supplied through the diet.

---

[2] National Academies of Medicine. *Dietary Reference Intakes for Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (Macronutrients).*
[3] *Id.*

First Amended Class Action Complaint

32.     All nine essential amino acids are necessary for protein synthesis to take place. Lacking even one essential amino acid will prevent protein synthesis from occurring, and the rest of the proteins will degrade into waste. Accordingly, once the body uses up the limiting essential amino acid from a protein source, the remainder of that protein becomes useless to human protein synthesis and has little nutritional value. As the FDA has explicitly recognized, "[b]ecause excess amino acids are not stored in the body, humans need a constant supply of good quality dietary proteins to support growth and development." 58 Fed. Reg. 2079 at 2101. High-quality proteins, therefore, are those that contain all nine essential amino acids because they have a greater effect on protein synthesis and are fully digestible. A dietary protein containing all of the essential amino acids in the correct proportions is typically called a "complete protein."

33.     A protein source's digestibility also affects the amount of useable protein a person receives from consuming it. Many plant-based proteins are only 85% digestible, meaning 15% of the protein from that source will simply pass through the body without ever being absorbed at all.

34.     As the FDA has stated in official guidance, "Accurate methods for determining protein quality are necessary because different food protein sources are not equivalent in their ability to support growth and body protein maintenance." 56 Fed. Reg. 60366, § B. The Protein Digestibility Corrected Amino Acid Score ("PDCAAS") is the FDA mandated measure of protein quality, and it accounts for both the amino acid profile and the digestibility of the protein. 21 C.F.R. § 101.9(c)(7)(ii). The PDCAAS method requires the manufacturer to determine the amount of essential amino acids that the food contains and then combine that into a discount factor score based on humans' ability to digest the amino acid profile.

35.     Defendants uses plant-based proteins in its products. Because of the differences in benefits depending on the amino acid composition of a protein, the source of protein is important. Whey protein is animal-based and contains all nine essential amino acids. It has a high biological value and is fully digestible by humans. Thus, whey protein has a PDCAAS of 1.0. Plant protein contains higher levels of antioxidants, but rarely contains all nine essential amino acids. Further, plant proteins such as wheat and oat proteins, which Defendants uses in its Products according to the ingredient lists, are not fully digested by humans. Both types of proteins also typically have a

First Amended Class Action Complaint

PDCAAS of between 0.4 and 0.5, meaning only 40-50% of the protein from those sources will be digested and available to humans.

36.     Accordingly, Defendants' use of low quality proteins, even in combination with some higher quality proteins, means that they actually provide far less protein to humans than the Product labels claim.

**Federal and State Regulations Governing Food Labeling**

37.     Identical federal and California laws regulate the content of labels on packaged food. The requirements of the federal Food, Drug & Cosmetic Act ("FDCA"), and its labeling regulations, including those set forth in 21 C.F.R. §§ 101, 102, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."). The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, no state imposes different requirements on the labeling of packaged food for sale in the United States.

38.     According to FDA regulations, "[a] statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as a Percent of Daily Value . . . ***shall*** be given if a protein claim is made for the product . . ." 21 C.F.R. 101.9(c)(7)(i) (emphasis added). If a manufacturer does not want to perform PDCAAS and provide a statement of the corrected amount of protein per serving in the NFP, then it shall not make any protein claims.

39.     The regulation governing nutrient content claims, section 101.13, also makes this plain. Section 101.13(n) provides that "[n]utrition labeling in accordance with § 101.9 . . . shall be provided for any food for which a nutrient content claim is made" and § 101.13(b) states "a nutrient content claim[] may not be made on the label . . . unless the claim is made in accordance with this regulation [i.e., § 101.13] . . . ." In other words, a manufacturer may not make any protein nutrient content claims on the front labels of their products unless they have complied with the requirements for protein labeling in the nutrition facts panel pursuant to section 101.9(c)(7).

Indeed, the FDA made clear when promulgating § 101.13(n) that it means that a manufacturer can only make "a nutrient content claim . . . on the label or in labeling of a food, provided that the food bears nutrition labeling that complies with the requirements in proposed § 101.9." 58 Fed. Reg. 2302, 23310.

40.  Further, FDA regulations require the %DV for protein to be calculated using PDCAAS, a method that accounts for both protein quantity and protein quality. 21 C.F.R. § 101.9(c)(7)(ii); FDA Food Labeling Guide, p. 29, Question N.22.[4] The first step is to calculate the "corrected amount of protein per serving" by multiplying protein quantity by the PDCAAS quality value, and then dividing that "corrected amount" by 50 grams (the "recommended daily value" for protein) to come up with the %DV. *Id.*

41.  Defendants' products all make protein claims on the front label, but fail, uniformly to provide a statement of the corrected amount of protein per serving in the NFP calculated according to the PDCAAS method. The protein claims on the front are, therefore, unlawful, and were never permitted to be on the label in the first instance under §§ 101.9(c)(7)(i), 101.13(n), and 101.13(b).

42.  Defendants' failure to include a statement of the corrected amount of protein per serving expressed as a %DV in the NFP also renders the NFP itself unlawful under §§ 101.9(c)(7)(i)-(iii).

43.  Defendants' use of a front-label protein claim, while failing to include the required statement of the corrected amount of protein per serving in the NFP calculated using the PDCAAS method and expressed as a %DV, is also misleading. By failing to provide it, Defendants misled consumers into believing that the Products provide a higher amount of protein than they really do. It also enabled Defendants to conceal the fact that their Products consist of low quality proteins that simply do not provide all of the protein that the quantity figure alone represents. Indeed, when promulgating 21 C.F.R. § 101.9(c)(7), the FDA explained in published guidance that "[i]nformation on protein quantity alone can be misleading on foods that are of low protein quality." It

---

[4] Guidance for Industry: A Food Labeling Guide ("FDA Food Labeling Guide") p. 29, Question N22, U.S. Food & Drug Administration, https://www.fda.gov/media/81606/download (last accessed February 18, 2020).

First Amended Class Action Complaint

also explained that it was prohibiting manufacturers from making any protein claims at all *unless* the manufacturer provides a statement of the corrected amount of protein per serving in the NFP based on PDCAAS because "nutrition labeling must allow consumers to readily identify foods with particularly low quality protein to prevent them from being misled by information on only the amount of protein present." 58 Fed. Reg. 2079 at 2101-2.

44.    Similarly, 21 C.F.R. § 101.13(i)(3) prohibits manufacturers from making a claim on the front of a product's package about the "amount or percentage of a nutrient," such as protein, if the statement is "false or misleading in any respect." If it is, then "it may not be made on the label." 21 C.F.R. § 101.13(b). This is true even if the same amount appears in the nutrition facts panel. 21 C.F.R. § 101.13(c). Since the omission of the %DV from the nutrition facts panel rendered the front label protein claim misleading, the protein claim was not permitted to be on the front label.

45.    Under the FDCA, the term false has its usual meaning of "untruthful," while the term misleading is a term of art that covers labels that are technically true, but are likely to deceive consumers.

**Defendants' Marketing and Labeling of the Products Violates State and Federal Food Labeling Laws**

46.    Defendants' Products are unlawful, misbranded, and violate the Sherman Law, California Health & Safety Code § 110660, et seq. Defendants make protein nutrient content claims on the front of their Product packages even though they uniformly fail to provide a statement of the corrected amount of protein per serving in the NFP calculated according to the PDCAAS method and expressed as a %DV as required by 21 C.F.R. § 101.9(c)(7)(i). Defendants' failure to comply with this requirement renders its front label protein claim unlawful per se and the product misbranded pursuant to § 101.13(n) and (b), as well as under § 101.9(c)(7)(i) itself. Defendants' omission of the %DV from the NFP despite the fact that it makes front label protein claims is also unlawful and in violation of § 101.9(c)(7)(i)-(iii).

47.    Defendants' standalone, front label protein quantity claim is also misleading, and therefore prohibited by sections 101.13(i)(3), (b), and (n) due to Defendants' failure to include a

statement of the corrected amount of protein per serving in the NFP calculated using the PDCAAS method and expressed as a %DV. Consumers have a "limited knowledge and understanding of the amount of [protein] that [is] recommended for daily consumption," let alone an understanding of the science behind protein quality and how different types of proteins are used and absorbed in the body. 56 Fed. Reg. 60421. The FDA requires a statement of the corrected amount of protein per serving in the NFP precisely to ensure that "consumers are not misled by information on only the amount of protein present" in a product with low quality protein. 58 Fed. Reg. 2079 at 2101-2. Defendant's failure to provide it rendered the label misleading.

48.     Defendants' marketing, advertising, and sale of the Products violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et. seq.*), including but not limited to:

      a.  Section 110390, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product;

      b.  Section 110395, which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely or misleadingly advertised food; and

      c.  Sections 110398 and 110400, which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or misleadingly advertised.

49.     Defendants' marketing, advertising, and sale of the Products violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et. seq.*), including but not limited to:

      a.  Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));

      b.  Section 110705 (a food is misbranded if words, statements and other information required by the Sherman Law to appear food labeling is either missing or not sufficiently conspicuous);

c. Section 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded;

d. Section 110765, which makes it unlawful for any person to misbrand any food; and

e. Section 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

50. Defendants have violated 21 U.S.C. § 343(a), and the standards set by FDA regulations, including but not limited to 21 C.F.R. § 101.13(i)(3), (b), (c) and (n); and 21 C.F.R. § 101.9 (c)(7), which have been incorporated by reference in the Sherman Law, by failing to include on their product labels the nutritional information required by law.

51. A reasonable consumer would expect that the Products provide what Defendants identifies them to provide on the product labels and that the labels would not be contrary to the policies or regulations of the State of California and/or the FDA. For example, a reasonable consumer would expect that when Defendants labels its Products with "5g PROTEIN" per serving, as it claimed on the Dave's Killer Bread 21 Whole Grains and Seeds bread and Good Seed bread product labels, the Products would provide 5 grams of protein per serving in a form their bodies could use as protein. Because Defendants did not conduct PDCAAS analysis and provide a statement of the corrected amount of protein per serving, expressed as a %DV, consumers have no idea that the Products provide significantly less protein.

52. Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendants' food labeling claims, especially at the point of sale. Reasonable consumers do not walk around with the PDCAAS values for various protein sources stored in their heads. They would not know the true amount of protein the Products provide nutritionally merely by looking elsewhere on the product package. Its discovery requires investigation well beyond the grocery store aisle and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain that a serving of a Product does not provide the number of grams of protein that is represented on the front of the product package. An average consumer also lacks the specialized knowledge necessary to

determine the PDCAAS for the Products. The average reasonable consumer had no reason to suspect that Defendants' representations on the packages were misleading. Therefore, consumers had no reason to investigate whether the Products actually do provide the amount of protein per serving that the labels claim they do and reasonably relied on Defendants' representations regarding the nature of the Products.

53. Defendants intend and know that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendants have done with the claims on the Products that they contain and provide specific amounts of protein per serving.

**Defendants Misleadingly Market the Products to Increase Profits and Gain a Competitive Edge**

54. In making false, misleading, and deceptive representations, Defendants distinguishes the Products from their competitors' products. Defendants knew and intended that consumers would purchase, and pay a premium for, products labeled with a protein claim. By using this branding and marketing strategy, Defendants are stating that the Products are superior to, better than, and more nutritious and healthful than other products that do not make protein claims, or that properly provide the required statement of the corrected amount of protein in the product as determined by the PDCAAS method and express as a %DV and otherwise do not mislead consumers about the amount of protein their products actually provide.

**Defendants Intend to Continue to Market Products as Containing More Protein than the Products Actually Contain**

55. Because consumers pay a price premium for products that make protein claims, and also pay a premium for products that provide more protein, by labeling their Products as containing more grams of protein per serving than they actually provide, Defendants are able to both increase their sales and retain more profits.

56. Defendants engaged in the practices complained of herein to further their private interests of: (i) increasing sales of the Products while decreasing the sales of competitors that do not misrepresent the number of grams of protein contained in their products, and/or (ii)

commanding a higher price for their Products because consumers will pay more for the Products due to consumers' demand for products containing more protein.

57. The market for protein products is continuing to grow and expand, and because Defendants knows consumers rely on representations about the number of grams of protein in food products, Defendants have an incentive to continue to make such unlawful and misleading representations. In addition, other trends suggest that Defendants have no incentive to change their labeling practices.

58. For example, one market analysis revealed that between 2013-2017, product launches with a protein claim grew 31%.[5]

59. To capitalize on the growing market, Defendants continue to launch new product lines and flavors to diversify their portfolio to maintain their competitive edge. Moreover, Defendants have continued to replicate their misrepresentations on new products. It is therefore likely that Defendants will continue to misleadingly advertise the Products and perpetuate the misrepresentations regarding the protein in the Products.

## PLAINTIFF'S EXPERIENCES

60. Plaintiff purchased the Dave's Killer Bread 21 Whole Grains and Seeds bread and Dave's Killer Bread Good Seed Organic bread at a Safeway store and at a Whole Foods store in Oakland, California during the Class Period.

61. Plaintiff made each of his purchases after reading and relying on the truthfulness of Defendants' front labels that promised the Products provided a specific number of grams of protein per serving. For example, he purchased the Dave's Killer Bread 21 Whole Grains and Seeds bread relying on the representation of "5g PROTEIN" per serving on the front of the product package. Plaintiff was attracted to the Products and decided to purchase the Products (as opposed to alternatives) specifically because of the protein claim. He relied on the protein representation for each product that he purchased and purchased each product because of the protein representations. He also believed in the truth of each representation, i.e., that the product

---

[5] https://www.bakeryandsnacks.com/Article/2018/11/26/10-key-snack-trends-to-watch?utm_source=copyright&utm_medium=OnSite&utm_campaign=copyright

First Amended Class Action Complaint

would actually provide the specific amount of protein on the front label in a form the body could utilize as protein.

62.     Moreover, had Defendants adequately disclosed the corrected amount of protein per serving for each Product expressed as a %DV, as FDA regulations require, Plaintiff would not have purchased the Products or would have, at minimum, paid less for them. Plaintiff regularly checks the NFP before purchasing food products and uses that as a basis for buying and/or comparing similar products. He looked at and read the NFP on the Products before purchasing them for the first time.

63.     When he purchased the bread, relying on the representation of "5g PROTEIN" per serving, Plaintiff was selecting a product for purchase preferentially based on the grams of useable protein per serving. Had he seen that the product provided only 5% (or less) of the daily value for protein—i.e., only approximately 2.5 grams or less corrected amount of protein per serving—he would not have purchased the product or, at a minimum would have paid less for it. Plaintiff would also have used the information as a basis to compare similar products and would have chosen instead to purchase one with a higher %DV. Without the statement of the corrected amount of protein per serving in the form of a %DV, the only information plaintiff had about the Products was the 5 gram protein quantity claim, and he believed he was receiving a product providing the full amount of that quantity in a form the body could use. Because the Products did not provide any statement of the corrected amount of protein per serving, he did not have any reason to believe that the Products provided less protein than the amount represented in the NFP and on the front of the label.  Nor did he have any reason to know the Products consisted of anything other than high quality proteins, and did in fact believe he was receiving 5 grams of high quality protein.

64.     Plaintiff not only purchased the Products because the labels said that they provided a specified amount of protein per serving, but he also paid more money for the Products than he would have paid had the product not unlawfully contained a protein claim, or had that protein claim not been misleading regarding the number of grams of protein it provided.

65.     Had Defendants not misrepresented (by omission and commission) the true nature of the Products, Plaintiff would not have purchased them or, at a very minimum, he would have paid less for the Products.

66.     Plaintiff continues to desire to purchase protein products, including those marketed and sold by Defendants and would like to purchase products that provide, for example, 5 grams of useable protein per serving. Plaintiff regularly visits stores where Defendants' Products and other protein products are sold. Because Plaintiff does not know the formula for Defendants' products, which can change over time, and cannot test whether the Products provide the amount of digestible protein that is represented on the label without first purchasing the Product, Plaintiff will be unable to rely on Defendants' labels when shopping for protein products in the future absent an injunction that prohibits Defendants from mislabeling their Products. Plaintiff would also be forced to retest and/or reanalyze each Product at each time of purchase because a Product's ingredient list and labeling would not reveal any changes in the amount of digestible protein, even if such changes took place. In addition, at present Plaintiff cannot rely on the accuracy of Defendants' labels for the entire line of Products, which Plaintiff is also interested in purchasing with labeling that comports with regulations. Should Defendants begin to market and sell a new line of products, Plaintiff could also be at risk for buying another one of Defendants' products in reliance on the same or similar misrepresentation and omissions. And because of Defendants' unlawful and misleading labels on its Products, Plaintiff cannot make informed choices between protein products offered by Defendants and protein products offered by other manufacturers, such as choices based on price and relative nutritional content.

67.     Plaintiff and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under state law and the products are misbranded; therefore, the Products are worth less than what Plaintiff and members of the Class paid for them and/or Plaintiff and members of the Class did not receive what they reasonably intended to receive.

## CLASS ALLEGATIONS

68.     Plaintiff brings this class action lawsuit on behalf of himself and a proposed class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to represent the following group of similarly situated persons, defined as follows:

> The Class: All persons in the State of California who purchased the Products between December 29, 2017 and the present.

69.     This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

70.     Numerosity: Plaintiff does not know the exact size the Class, but he estimates that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of its claims in a class action rather than in individual actions will benefit the parties and the courts.

71.     Common Questions Predominate: This action involves common questions of law and fact to the potential Class because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that the Products contained the amount of protein as represented on the Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

    a.  What is PDCAAS for the protein in the Products;

    b.  Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are unlawful.

    c.  Whether Defendant's actions violate California laws invoked herein;

    d.  Whether labeling the Products with a protein claim causes the Products to command a price premium in the market;

    e.  Whether Defendant's failure to provide a statement of the corrected amount of

protein per serving in the Products, despite prominent front label protein claims, was likely to deceive reasonable consumers;

    f.   Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

    g.   The amount of profits and revenues Defendant earned as a result of the conduct;

    h.   Whether Class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

    i.   Whether Class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

72.    Typicality: Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendants in violation of law as complained of herein. Further, the damages of each member of the Class were caused directly by Defendants' wrongful conduct in violation of the law as alleged herein.

73.    Adequacy of Representation: Plaintiff will fairly and adequately protect the interests of all class members because it is in his best interests to prosecute the claims alleged herein to obtain full compensation due to him for the unfair and illegal conduct of which he complains. Plaintiff also has no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiff has retained highly competent and experienced class action attorneys to represent their interests and that of the class. By prevailing on their own claims, Plaintiff will establish Defendants' liability to all class members. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

74.    Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendants and result in the

impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

75.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

Plaintiff does not plead, and hereby disclaim, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiff relies on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

## PLAINTIFF'S FIRST CAUSE OF ACTION
### (Unlawful, unfair, and fraudulent trade practices violation of Business and Professions Code § 17200, *et seq.*)
### On Behalf of Plaintiff and the Class

76.    Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

77.    Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendants have engaged, and continues to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

78.    In particular, Defendants have engaged, and continue to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the advertising provisions of the Sherman

Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110760, 110765, and 110770; and (v) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq.* and FDA regulations, including but not limited to 21 C.F.R. 21 C.F.R. § 101.9 (c)(7), which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

79.     In particular, Defendants have engaged, and continues to engage in, unlawful, unfair and/or fraudulent practices by, without limitation, the following: (i) making a protein nutrient content claim on the front of the package without complying with the regulatory requirements for making a protein claim set forth in 21 C.F.R. §§ 101.9(c)(7)(i)-(iii), 101.13(b) and (n), which are incorporated by reference into California's Sherman law; (ii) failing to provide a statement of the corrected amount of protein per serving in the NFP, calculated according to the PDCAAS method and expressed as a %DV, as required by 21 C.F.R. §§ 101.9(c)(7)(i)-(iii), which are also so incorporated into the Sherman Law; and (iii) misleading reasonable consumers regarding the amount of protein the Products provide nutritionally in a form that humans can use by omitting a statement of the corrected amount of protein per serving in the NFP, calculated according to the PDCAAS method and expressed as a %DV, which omission, renders the front label protein nutrient content claim misleading in violation of 21 C.F.R § 101.13(i)(3) and §§ 101.13(c) & (b), all of which are also incorporated into the Sherman Law.

80.     Plaintiff and those similarly situated relied to their detriment on Defendants' unlawful, unfair, and fraudulent business practices. Had Plaintiff and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of the Products, or (iii) paying less for the Products.

81.     Defendants' acts and omissions are likely to deceive the general public.

82.     Defendants engaged in these deceptive and unlawful practices to increase their profits. Accordingly, Defendants have engaged in unlawful trade practices, as defined and

prohibited by section 17200, *et seq.* of the California Business and Professions Code.

83.     The aforementioned practices, which Defendants have used to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

84.     As a direct and proximate result of such actions, Plaintiff and the other Class members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiff and Class members lost the amount they paid for the Products.

85.     As a direct and proximate result of such actions, Defendants have enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

86.     Plaintiff seeks, on behalf of himself and those similarly situated, equitable relief, including restitution for the premium and/or the full price that they and others paid to Defendants as result of Defendants' conduct. Plaintiff and the Class lack an adequate remedy at law to obtain such relief with respect to their "unlawfulness" claims in this UCL cause of action because the California Sherman Law does not provide a direct cause of action, so Plaintiff and the Class must allege those violations as predicate acts under the UCL to obtain relief.

87.     Plaintiff also seeks equitable relief, including restitution, with respect to his UCL "fraudulent" prong claims.  Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed. Plaintiff and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiff may not be able to establish each Class member's individualized understanding of Defendants' misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or

injury by absent class members. *See, e.g., Stearns v Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class). In addition, Plaintiff and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiff is unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Defendants acted in good faith.

88. Plaintiff also seeks, on behalf of himself and those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

89. Plaintiff seeks, on behalf of himself and those similarly situated, an injunction to prohibit Defendants from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which they were not entitled. Plaintiff, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**PLAINTIFF'S SECOND CAUSE OF ACTION**
**(Violation of the Consumers Legal Remedies Act (the "CLRA"), California Civil Code §**
**1750, *et seq.*)**
**On Behalf of Plaintiff and the Class**

90. Plaintiff realleges and incorporates the paragraphs of this Class Action Complaint as if set forth herein.

91. Defendants' actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

92. Plaintiff and other class members are "consumers" as that term is defined by the

CLRA in California Civil Code § 1761(d).

93.     The Products that Plaintiff (and other similarly situated class members) purchased from Defendants were "goods" within the meaning of California Civil Code § 1761(a).

94.     Defendants' acts and practices, set forth in this Class Action Complaint, led customers to falsely believe that the Products provided the amount of protein claimed on the product package. By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Defendants have violated, and continue to violate, § 1770(a)(2), § 1770(a)(5), § 1770(a)(7), § 1770(a)(8), and § 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(2), Defendants' acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold. In violation of California Civil Code §1770(a)(5), Defendants' acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code §1770(a)(7), Defendants' acts and practices constitute improper representations that the goods it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8), Defendants have disparaged the goods, services, or business of another by false or misleading representation of fact. In violation of California Civil Code §1770(a)(9), Defendants have advertised goods or services with intent not to sell them as advertised.

95.     Plaintiff requests that this Court enjoin Defendants from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendants are not restrained from engaging in these types of practices in the future, Plaintiff and the other members of the Class will continue to suffer harm. Plaintiff and those similarly situated have no adequate remedy at law to stop Defendants' continuing practices.

96.     Defendants were provided with notice and a demand to correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the aforementioned notice and demand, Defendants failed to do so in that, among other things, they failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Accordingly,

First Amended Class Action Complaint

Plaintiff seeks, pursuant to California Civil Code § 1780(a)(3), on behalf of himself and those similarly situated class members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices.

97.     Plaintiff also requests that this Court award him costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

**PLAINTIFF'S THIRD CAUSE OF ACTION**
**(False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))**
**On Behalf of Plaintiff and the Class**

98.     Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

99.     Beginning at an exact date unknown to Plaintiff, but within three (3) years preceding the filing of the Class Action Complaint, Defendants made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Products.

100.     Defendants made representations and statements (by omission and commission) that led reasonable customers to believe that the Products that they were purchasing provided more grams of protein per serving than the Products actually provided. Further, Defendants had a duty to disclose the corrected amount of protein per serving in the NFP, as calculated according to the PDCAAS method, which Defendants failed to do.

101.     Plaintiff and those similarly situated relied to their detriment on Defendants' false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, refraining from purchasing Defendants' Products or paying less for them.

102.     Defendants' acts and omissions are likely to deceive the general public.

103.     Defendants engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits. Accordingly, Defendants have engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

First Amended Class Action Complaint

104. The aforementioned practices, which Defendants used, and continue to use, to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

105. As a direct and proximate result of such actions, Plaintiff and the other Class members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

106. Plaintiff seeks, on behalf of himself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiff, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action will not succeed. Plaintiff and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiff may not be able to establish each Class member's individualized understanding of Defendants' misleading representations as described in this Complaint, but the FAL does not require individualize proof of deception or injury by absent class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'").

107. Plaintiff seeks, on behalf of himself and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

108. Plaintiff seeks, on behalf of himself and those similarly situated, an injunction to prohibit Defendants from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendants, unless and until

First Amended Class Action Complaint

enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which they are not entitled. Plaintiff, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**PLAINTIFF'S FOURTH CAUSE OF ACTION**
**(Common Law Fraud, Deceit and/or Misrepresentation)**
**On Behalf of Plaintiff and the Classes**

109.     Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

110.     Defendants have fraudulently and deceptively informed Plaintiff that the Products provide more grams of protein than they actually provide in a form useful to the human body. Defendants made quantitative protein claims on the front of all of the Product packages while failing to list provide a statement of the corrected amount of protein per serving in the NFP, calculated according to the PDCAAS method, as it was required to do.

111.     These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendants, not reasonably known to Plaintiff, and material at the time they were made. Defendants knew or should have known the composition of the Products, and knew or should have known that the Products did not contain or provide the amount of protein represented on the label. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to purchase Defendants' Products. In misleading Plaintiff and not so informing Plaintiff, Defendants breached their duty to them. Defendants also gained financially from, and as a result of, their breach.

112.     Plaintiff and those similarly situated relied to their detriment on Defendants' misrepresentations and fraudulent omissions. Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted

differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of them, or (iii) paying less for the Products.

113. By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiff and those similarly situated to alter their position to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiff and those similarly situated to, without limitation, purchase the Products.

114. Plaintiff and those similarly situated justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants.

115. As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiff and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Products.

116. Defendants' conduct as described herein was wilful and malicious and was designed to maximize Defendants' profits even though Defendants knew that they would cause loss and harm to Plaintiff and those similarly situated.

**PLAINTIFF'S FIFTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**On Behalf of Plaintiff and the Class**

117. Plaintiff realleges and incorporates by reference all paragraphs alleged herein

118. Plaintiff and members of the Class conferred a benefit on the Defendants by purchasing the Products

119. Defendants have been unjustly enriched in retaining the revenues from Plaintiff's and Class members' purchases of the Products, which retention is unjust and inequitable, because Defendants falsely represented that the Products contained and provided specific amounts of protein per serving, when, in fact, the Products contained less protein than represented, and provided even less. This harmed Plaintiff and Class members because they paid a price premium as a result.

120. Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff and Class members is unjust and inequitable, Defendants must pay restitution and nonrestitutionary disgorgement of profits to Plaintiff and the Class members for their unjust

enrichment, as ordered by the Court. Plaintiff and those similarly situated have no adequate remedy at law to obtain this restitution.

121.    Plaintiff, therefore, seeks an order requiring Defendants to make restitution and nonrestitutionary disgorgement of profits to him and other members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and those similarly situated, respectfully requests that the Court enter judgement against Defendants as follows:

A.    Certification of the proposed Class, including appointment of Plaintiff's counsel as class counsel;

B.    An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    An award of compensatory damages in an amount to be determined at trial, except for those causes of action where compensatory damages are not legally available;

D.    An award of statutory damages in an amount to be determined at trial, except for those causes of action where statutory damages are not legally available;

E.    An award of punitive damages in an amount to be determined at trial, except for those causes of action where punitive damages are not legally available;

F.    An award of treble damages, except for those causes of action where treble damages are not legally available;

G.    An award of restitution in an amount to be determined at trial;

H.    An award of nonrestitutionary disgorgement of profits in an amount to be determined at trial;

I.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

J.    For reasonable attorneys' fees and the costs of suit incurred; and

K.    For such further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: June 17, 2022

**GUTRIDE SAFIER LLP**

*/s/ Seth Safier          /s/*
Seth A. Safier, Esq.
Marie McCrary, Esq.
Hayley Reynolds, Esq.
100 Pine Street, Suite 1250
San Francisco, CA 94111

DocuSign Envelope ID: 7AA0F0AC-8112-4B66-8278-41CDA001C8CE

## EXHIBIT A

I, David Swartz, declare:

1.      I am the Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.      I submit this Declaration pursuant to California Civil Code § 1780(d), California Code of Civil Procedure § 2015.5, and 28 U.S.C. § 1746.

3.      I purchased Dave's Killer Bread products, including Good Seed and 21 Whole Grains and Seeds, on multiple occasions during the last three years from retail stores (including Safeway) in Oakland, California.

I declare under penalty of perjury under the laws of California and of the United States of America that the foregoing is true and correct.

Executed in Oakland, California on 9/10/2021



_____

David Swartz

SWARTZ DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION

## EXHIBIT B

| Product | Protein Label Claim |
| --- | --- |
| **Killer Breads** | |
| 21 Whole Grains and Seeds | 5g protein |
| Good Seed | 5g protein |
| Powerseed | 5g protein |
| 100% Whole Wheat | 4g protein |
| Righteous Rye | 5g protein |
| **Thin Sliced Bread** | |
| 21 Whole Grains and Seeds Thin-Sliced | 3g protein |
| Good Seed Thin-Sliced | 3g protein |
| Powerseed Thin-Sliced | 3g protein |
| Sprouted Whole Grains Thin-Sliced | 3g protein |
| **Breakfast Bagels** | |
| Epic Everything Bagels | 13g protein |
| Plain Awesome Bagels | 11g protein |
| Cinnamon Raisin Remix Bagels | 12g protein |
| Boomin' Berry Bagels | 11g protein |
| **Burger Buns** | |
| 21 Whole Grains and Seeds Burger Buns | 6g protein |
| Burger Buns Done Right | 6g protein |