# EXHIBIT 4

## REDACTED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID SWARTZ, as an individual, on behalf of himself, the general public and those similarly situated,

         Plaintiff,

   v.

DAVE'S KILLER BREAD, INC. AND FLOWERS FOODS, INC.,

         Defendant.

Case No. 4:21-cv-10053-YGR

Honorable Yvonne Gonzalez Rogers

**EXPERT DECLARATION OF DR. RAN KIVETZ**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – UNDER PROTECTIVE ORDER**

## TABLE OF CONTENTS

ASSIGNMENT AND QUALIFICATIONS .............................................................................. 1

EXECUTIVE SUMMARY ...................................................................................................... 6

(1) The Weir Proposed Conjoint Survey is *Invalid and Irrelevant* Because it Fundamentally Fails to Test the Plaintiff's Theory of Liability ...................... 9

(2) The Weir Proposed Conjoint Survey is Scientifically Invalid, and it Cannot Yield Valid and Reliable Estimates of Consumer Willingness-to-Pay or Any Alleged "Price Premium" ......................................................................... 10

(3) Mr. Weir's Proposed "Market Simulation" is *Not* a Valid *Market* Simulation, as it Fails to Account for Any Market Competition ....................................... 13

(4) Mr. Weir's Proposed Calculation of an Alleged "Price Premium" Fails to Incorporate *Any* Necessary Supply-Side Equilibrium Analysis, and Mr. Weir's Claim that his Methodology Accounts for Supply-Side Factors Reveals a Fundamental Misunderstanding of Marketing and Econometrics ..................................................................................................... 13

(5) The Weir Proposed Conjoint Survey Would Fail to Represent the Relevant Consumer Universe ...................................................................................... 14

(6) The Weir Proposed Conjoint Survey's Fatal Flaws and the Failure to Incorporate Market Competition or Supply-Side Equilibrium Analysis Render Mr. Weir's Damages Model Unreliable and Invalid ......................... 14

(7) Mr. Weir's Discussion of Product Differentiation is Unscientific and Irrelevant, and *None* of the Underlying Sources he Cites Supports the Notion that a Protein Label Statement is a Differentiator that Generates an Alleged "Price Premium" ......................................................................................... 15

A.    OVERVIEW OF THE WEIR PROPOSED CONJOINT SURVEY ......................... 15

B.    A BRIEF PRIMER ON CONJOINT ANALYSIS ...................................................... 20

C.    THE WEIR PROPOSED CONJOINT SURVEY IS *INVALID AND IRRELEVANT* BECAUSE IT FUNDAMENTALLY FAILS TO TEST THE PLAINTIFF'S THEORY OF LIABILITY ................................................................. 25

D.    THE WEIR PROPOSED CONJOINT SURVEY IS SCIENTIFICALLY INVALID, AND IT CANNOT YIELD VALID AND RELIABLE ESTIMATES OF CONSUMER WILLINGNESS-TO-PAY OR ANY ALLEGED "PRICE PREMIUM" ................................................................................................................ 34

      D.1.    The Weir Proposed Conjoint Survey Grossly Violates Marketplace Conditions, Artificially Focuses Participants on the "5g Protein" Statement, and Creates Severe Demand Effects ............................................. 36

D.1.1. *Mr. Weir fails to justify his selection of attributes and levels (particularly for price), and his included attributes and label statements result in* **contradictory and confusing** *product profiles* ......................................... 40

D.1.2. *The Weir Proposed Conjoint Survey artificially highlights the "5g Protein" statement by omitting many relevant attributes and representations* ......................................................................................... 48

D.1.3. *The Weir Proposed Conjoint Survey artificially highlights the "5g Protein" statement by presenting it outside the context of any packaging* ................................................................................................. 53

D.1.4. *The Weir Proposed Conjoint Survey's design and instructions are highly leading and unrealistic, further highlighting the "5g Protein" statement* .............................................................................................. 57

**D.2.    The Weir Proposed Conjoint Survey Will Inflate Consumers' WTP for the "5g Protein" Statement by Always Presenting the Price Attribute Last** ....... 62

**D.3.    Mr. Weir's Eight (8) "Cognitive Interviews" are Unscientific, Undisclosed, Unrepresentative, and Uninformative, and Neither These Interviews Nor his Proposed "Pretesting" Can Validate Whether the Proposed Conjoint Survey is Realistic, Non-Leading, or Unbiased** ................................................ 64

**E.    MR. WEIR'S PROPOSED "MARKET SIMULATION" IS *NOT* A VALID *MARKET* SIMULATION, AS IT FAILS TO ACCOUNT FOR ANY MARKET COMPETITION** ............................................................................................... 72

**E.1.    The Importance of Incorporating Competition in Estimating Consumer WTP or Valuation Using Conjoint Surveys Such as the Weir Proposed Conjoint Survey** ......................................................................................... 72

**E.2.    Mr. Weir's Conjoint Approach Does *Not* Involve *Market* Simulations and Ignores Competitive Forces** ................................................................... 75

**F.    MR. WEIR'S PROPOSED CALCULATION OF AN ALLEGED "PRICE PREMIUM" FAILS TO INCORPORATE *ANY* NECESSARY SUPPLY-SIDE *EQUILIBRIUM ANALYSIS*, AND MR. WEIR'S CLAIM THAT HIS METHODOLOGY ACCOUNTS FOR SUPPLY-SIDE *FACTORS* REVEALS A FUNDAMENTAL MISUNDERSTANDING OF MARKETING AND ECONOMETRICS** ...................................................................................... 79

**F.1.    The Importance of Incorporating Supply-Side Analysis When Using Conjoint Analysis to Estimate an Alleged "Price Premium" and Related Damages** ............................................................................................... 80

**F.2.    Mr. Weir's Proposed Analysis Completely Ignores A Supply-Side Equilibrium Analysis** ......................................................................... 86

**G.    THE WEIR PROPOSED CONJOINT SURVEY WOULD FAIL TO REPRESENT THE RELEVANT CONSUMER UNIVERSE** ................................... 95

**H.    THE WEIR PROPOSED CONJOINT SURVEY'S FATAL FLAWS AND THE FAILURE TO INCORPORATE MARKET COMPETITION OR SUPPLY-SIDE EQUILIBRIUM ANALYSIS RENDER MR. WEIR'S DAMAGES MODEL UNRELIBALE AND INVALID** ................................................................ 101

**I.    MR. WEIR'S DISCUSSION OF PRODUCT DIFFERENTIATION IS UNSCIENTIFIC AND IRRELEVANT, AND *NONE* OF THE UNDERLYING SOURCES HE CITES SUPPORTS THE NOTION THAT A PROTEIN LABEL STATEMENT IS A DIFFERENTIATOR THAT GENERATES AN ALLEGED "PRICE PREMIUM"** ............................................................................ 103

**EXHIBIT A: CURRICULUM VITAE OF DR. RAN KIVETZ** ........................................... 111

**EXHIBIT B: LIST OF CASES IN WHICH DR. RAN KIVETZ PROVIDED SWORN TESTIMONY IN DEPOSITION AND/OR TRIAL DURING THE PAST FOUR YEARS** ......................................................................................................... 139

**EXHIBIT C: DOCUMENTS MADE AVAILABLE TO DR. KIVETZ IN CONNECTION WITH PREPARATION OF THIS *EXPERT DECLARATION*** ... 141

**EXHIBIT D: EXAMPLES OF DAVE'S KILLER BREAD PACKAGING** ....................... 143

**EXHIBIT E: EXAMPLES OF OROWEAT AND WHOLE FOODS 365 BREAD PACKAGING** ............................................................................................... 149

## ASSIGNMENT AND QUALIFICATIONS

1.      My name is Dr. Ran Kivetz.  I have been asked by counsel for the Defendants, Dave's Killer Bread, Inc. and Flowers Foods, Inc. ("Dave's Killer Bread," "Dave's," or "Flowers"), to evaluate the opinions outlined in the November 17, 2023 Declaration of Colin B. Weir (the "Weir Declaration"), submitted on behalf of the Plaintiff, regarding the conjoint survey he proposes to conduct (the "Weir Proposed Conjoint Survey") and his accompanying proposed approach to calculate damages on a classwide basis[1] due to the alleged technical regulatory violation.  By "alleged technical regulatory violation," I refer to the allegation that Dave's failed to comply with applicable FDA requirements because it specified the total amount of protein (*e.g.*, "5g PROTEIN") on the front label of the disputed Dave's Killer Bread products[2] *without also* indicating the amount of protein expressed as a percent daily value ("%DV") on the Nutrition Facts Panel ("NFP" or "nutrition label"), calculated using the PDCAAS method.[3]

---

[1] *See* June 17, 2022 First Amended Class Action Complaint for Violation of the California Consumers Legal Remedies Act; False Advertising; Fraud, Deceit, and/or Misrepresentation; Unfair Business Practices; and Unjust Enrichment in the matter of *Marie Falcone v. Dave's Killer Bread USA, Inc.*, Case No. 3:19-cv-00723-L-DEB ("*Complaint*"), ¶ 68 for the Plaintiff's definition of the proposed class: "All persons in the state of California who purchased the Products between December 29, 2017 and the present."  *See also* November 17, 2023 Plaintiff's Motion for Class Certification ("Plaintiff's Class Certification Motion").

[2] The disputed products consist of: five varieties of Dave's "Killer Breads" (21 Whole Grains and Seeds, Good Seed, Powerseed, 100% Whole Wheat, Righteous Rye); four varieties of Dave's "Thin Sliced Bread" (21 Whole Grains and Seeds Thin-Sliced, Good Seed Thin-Sliced, Powerseed Thin-Sliced, Sprouted Whole Grains Thin-Sliced); four varieties of Dave's "Breakfast Bagels" (Epic Everything, Plain Awesome, Cinnamon Raisin Remix, Boomin' Berry); and two varieties of Dave's "Burger Buns" (21 Whole Grains and Seeds, Burger Buns Done Right); *see, e.g.*, June 17, 2022 First Amended Class Action Complaint for Violation of the California Consumers Legal Remedies Act; False Advertising; Fraud, Deceit, and/or Misrepresentation; Unfair Business Practices; and Unjust Enrichment in the matter of *Marie Falcone v. Dave's Killer Bread USA, Inc.*, Case No. 3:19-cv-00723-L-DEB ("*Complaint*"), ¶ 22 & Exhibit B.

[3] *See, e.g., Complaint*, ¶¶ 4 – 6.  The PDCAAS method refers to "Protein Digestibility Corrected Amino Acid Score"; *see id.*, ¶ 4.  *See also* Plaintiff's Class Certification Motion, p. 1.

---

2.      I am the Philip H. Geier Professor of Marketing at Columbia University Business School.  A copy of my curriculum vitae, which includes a complete list of my publications, is attached as Exhibit A.

3.      I earned a Ph.D. in Business from Stanford University, Graduate School of Business; a Master's degree in Psychology from the Stanford University Psychology Department; and a Bachelor's degree from Tel Aviv University with majors in Economics and Psychology.

4.      My field of expertise encompasses consumer psychology and behavior; survey methods (including conjoint analysis); marketing management; behavioral economics; human judgment, perception, and decision making; the marketing of high-technology products; consumer and sales incentives; advertising; and branding.  Most of my research has focused on buyers' purchase behavior; survey design; and the effect of product characteristics (*e.g.*, brand, features, quality, price), the competitive context, and marketing activities (*e.g.*, promotions, incentives, loyalty programs, advertising, branding) on purchase decisions and perceptions.

5.      I have received multiple research awards and nominations, including: (*i*) the "*Ferber Award*" from the Association for Consumer Research, which is the largest association of consumer researchers in the world; (*ii*) the "*Best Competitive Paper Award*" from the Society of Consumer Psychology, which is the premier association of consumer psychologists in the world; (*iii*) the "*Early Contribution Award*" from the Society of Consumer Psychology; (*iv*) five finalist nominations, for the 2016, 2011, 2009, 2007, and 2005 "*O'Dell Award*," given to the *Journal of Marketing Research* (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years; (*v*) two finalist nominations for the 2007 and the 2005 "*Green Award*," given to the *Journal of Marketing Research* article published in the prior year that "demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing"; (*vi*) three finalist nominations for the awards for the "*Best Article*" published in the *Journal of Consumer Research* between 2002 and 2005, between 2006 and 2009, and between 2011 and 2014; (*vii*) having my research selected by *The New York Times* in its *Annual Year in Ideas* as one of the "Best Ideas in 2006"; (*viii*) being

rated as the fourth most prolific scholar in the leading marketing journals during 1982 – 2006;[4] and (*ix*) being ranked by the American Marketing Association as one of the Top 50 most productive scholars in the premier marketing journals during 2009 – 2013 and during 2010 – 2014.

6. At Columbia University, I have taught MBA and Executive MBA courses on Marketing Strategy and Management, Customer Centricity and Innovation, High-Technology Marketing and Entrepreneurship, and Marketing of a Nation, covering such topics as conjoint analysis, developing marketing strategies, buyer behavior, customer segmentation, customer acquisition and retention, competitive strategies, branding, pricing, advertising, sales promotions, and behavioral economics. In addition to teaching MBA and Executive MBA courses, I have guided and supervised numerous MBA student teams in their work on company and industry projects dealing with a variety of markets. I also have taught in various executive education programs, including programs for senior executives, programs for marketing managers in high-technology companies, programs for marketing managers in pharmaceuticals, programs in entrepreneurship, programs on marketing and innovation, and programs on customer centricity.

7. I have taught several doctoral courses at Columbia University. One doctoral course, titled "Bridging Behavioral Economics and Marketing Science," examines human judgment and decision making and its application to marketing science. The course focuses on understanding, predicting, and quantitatively modeling (including by employing conjoint analysis models) different phenomena and biases in judgment and decision making. A second doctoral course deals with consumer behavior, covering such topics as the processes underlying choices and judgments, and their influence on purchase decisions, attitudes, and persuasion. Both of these courses focus on modeling the various stages involved in a research project, including defining the problem to be investigated, selecting and developing the research approach, data collection and analysis, and deriving conclusions. I have guided and supervised

---

[4] Seggie, Steven H. and David A. Griffith (2009), "What Does It Take to Get Promoted in Marketing Academia? Understanding Exceptional Publication Productivity in the Leading Marketing Journals," *Journal of Marketing,* 73(1), 122 – 132.

numerous Ph.D. students in their research.  I have also served as the advisor for multiple Ph.D. students who are or were professors at such institutions as University of Chicago Booth School of Business, Harvard Business School, National University of Singapore (NUS), Tsinghua University, and The Wharton School at the University of Pennsylvania.

8.      I have conducted, supervised, and evaluated well over 1,000 marketing research surveys, including many related to consumer behavior and decision making, likelihood of confusion, sales promotions, marketing strategies, branding, trademark, and advertising-related issues.

9.      I serve on three editorial boards and as a frequent reviewer, including for leading journals in our field, such as the *Journal of Marketing Research*.  I have served as a Guest Editor for the *Journal of Marketing Research* and as a Guest Associate Editor for *Marketing Science* and *Management Science*.  I have served on the editorial board of, and received the "*Outstanding Reviewer Award*" from, the *Journal of Consumer Research*.  I have also served on the editorial boards of the *Journal of Consumer Psychology* and the *International Journal of Research in Marketing*.  I am a frequent reviewer of articles submitted to journals in other fields, such as psychology, decision making, and economics.  As a reviewer, I am asked to evaluate the research of scholars wishing to publish their articles in leading scholarly journals.

10.      I have worked as a consultant for companies and organizations on a variety of topics, including strategy, marketing, consumer behavior and perception, promotions, branding, advertising, and incentives.  Additionally, I have served as an expert in litigation and adversarial proceedings, including in front of the National Advertising Division of the Better Business Bureaus National Programs ("NAD"), involving various marketing and buyer behavior issues, false advertising, market surveys, patent infringement, trademark and trade dress related matters, branding, retailing, promotions, and other areas.  I have also been invited to present at the annual NAD Law Conference, and I have served as an expert witness for the Federal Trade

Commission.  My opinions and testimony have been favorably cited and relied upon by courts across the United States.[5]

11.    A list of cases in which I provided sworn testimony at trial and/or by deposition during the past four years is included in Exhibit B.  I am being compensated in this matter at a rate of $950 an hour.  My compensation does not depend in any way on my opinion or the outcome of this matter.

12.    My analyses are based on, inter alia, the brands, products, packaging, advertising, and websites relevant to the market for bread/bakery products; existing scientific research and treatises regarding survey design, consumer behavior, and decision making; academic literature and general principles of marketing and psychology; internal research conducted on behalf of Dave's Killer Bread in the normal course of business; third-party industry research; deposition testimonies; and other publicly available websites and sources.[6]  I also visited several online stores

[5] *See, e.g., The People of the State of California v. Kohl's Department Stores, Inc. et al.*, Case No. BC643037 (Superior Court of the State of California, County of Los Angeles 2021) (noting, *e.g.*, that: "As carefully reviewed by Kohl's rebuttal expert, Ran Kivetz, Ph.D., who the Court found highly competent and entirely credible based on his outstanding academic credentials, his thorough research into Dr. Compeau's reports and his appearance and candor while testifying[.]"; and "[t]he Court accepts as entirely credible and supported by sound scientific analysis, the conclusion of Dr. Kivetz, that none of the articles referenced in Dr. Compeau's reports provide valid scientific evidence for [Dr. Compeau's] opinion [.]"); *Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F.Supp.2d 1009, 1019 (N.D. Illinois, 2013) (upholding the methodology, questions, and coding of my survey and denying Bissell's motion to exclude my expert report); *Masimo Corporation et al. v. Apple, Inc.*, 8:20-cv-00048-JVS (C.D. Cal., May 4, 2023, Order Granting-In-Part and Denying-In-Part Apple's Rule 50(a) Motion and Denying Plaintiffs' Rule 50(a) Motion) (finding that "no reasonable juror could find for Plaintiffs regarding whether the alleged [business] category trade secrets were generally known" and citing to my testimony as evidence that the Plaintiffs' alleged business and marketing trade secrets were generally known prior to the alleged misappropriation at issue: "Kivetz testified that Kiani's description of B1 is the well-known concept 'exactly the fourth principle of leveraging synergies for network effects. […] Even Palmatier [Plaintiffs' marketing expert] conceded […] that every constituent part of B1 is generally known.'").

[6] As part of my work in this case, I conducted four empirical consumer surveys to determine whether the alleged technical regulatory violation commonly caused the putative class members to purchase, or to pay a higher price (*i.e.*, an alleged "price premium"), for the disputed Dave's Killer Bread products.  I tested both the counterfactual, "but-for" world in which Dave's were to include the %DV for protein on the nutrition label (while retaining the protein claim on the front label) *and* in which Dave's were to remove the front label protein claim (*without* including the

across northern, central, and southern California that sell packaged bread and bakery products, including Dave's products.  In conducting my analysis, I reviewed certain documents, including, but not limited to, documents that were made available to me in connection with the preparation of this *Expert Declaration*.[7]  Those documents are referenced herein and/or listed in Exhibit C.

13.     I have personal knowledge of the matters set forth in this report and, if called to testify at a hearing or trial in this matter, would so state.

14.     Any, and all, of the opinions expressed herein are held to a reasonable degree of professional certainty.  The information on which I relied consists of the type of information that is reasonably relied upon in my field of expertise.

## EXECUTIVE SUMMARY

15.     I understand that the Plaintiff alleges that Dave's Killer Bread did not comply with FDA regulations because its product packaging included front label statements specifying the amount of protein in the product (*e.g.*, "5g PROTEIN") *while* not including a statement of the %DV for protein (calculated using the PDCAAS method) in the NFP on the back label[8] (hereinafter, the "alleged technical regulatory violation").[9]  According to the Plaintiff, the alleged

---

%DV for protein on the nutrition label).  My surveys tested Dave's 21 Whole Grains and Seeds sliced bread package; Dave's Epic Everything bagels package; and Dave's Burger Buns Done Right hamburger buns package.  The results of these surveys unambiguously demonstrate, among other things, that the alleged technical regulatory violation does *not* materially increase consumers' likelihood of purchasing or their willingness-to-pay (WTP) for the disputed Dave's products, and thus commands *no* alleged "price premium."  However, I am informed by counsel for Dave's that I will present and discuss these surveys in a subsequent expert report or expert declaration in this matter if called upon, as this *Expert Declaration* is limited to the matters at issue in the Plaintiff's Class Certification Motion.  Therefore, I will not further discuss or reference my empirical surveys in this *Expert Declaration*.

[7] I received research assistance from support staff at my direction and guidance.

[8] *See, e.g., Complaint*, ¶¶ 4 – 6.  The PDCAAS method refers to "Protein Digestibility Corrected Amino Acid Score"; *see id.*, ¶ 4.  *See also* Plaintiff's Class Certification Motion, p. 1.

[9] In particular, the FDA regulation that the Plaintiff accuses Dave's Killer Bread of violating is 21 C.F.R. § 101.9(c)(7)(i) & (ii); *see, e.g.*, Plaintiff's Class Certification Motion, p. 1 ("FDA regulations *prohibit* manufacturers from making *any* protein claims on a product unless the manufacturer has: (1) calculated the 'corrected amount of protein per serving' based on the *quality* of the product's protein using the Protein Digestibility Corrected Amino Acid Score

---

technical regulatory violation commonly caused the putative class members to purchase, and pay a higher price (*i.e.*, an alleged "price premium"), for the disputed products.

16.    I understand that the Plaintiff alleges that the omission of the (PDCAAS-calculated) %DV for protein from the Nutrition Fact Panel was material, insofar as such information would have allegedly "clarified" to consumers that the amount of digestible protein per serving was less than the total number of grams stated on the front label and on the nutrition label.  For example, in his operative Complaint, the Plaintiff states the following theory:[10]

> Consumers reasonably expect that Defendant's products will actually provide nutritionally the full amount of protein per serving claim on the front of the product package and stated in the protein quantity section of the NFP.  But Defendant's products do not do so on account of their low protein quality.  **Had Defendant included a statement of the corrected amount of protein per serving in the NFP, as it was required to do under the law, it would have revealed that the product provides nutritionally as little as half of their total protein quantity. That information was material to reasonable consumers.**

And:[11]

> Had Defendant complied with the law, the statement of the corrected amount of protein would have revealed the Products provide significantly less protein than claimed because Defendants use low quality proteins in its products, such as wheat and oats.  **The absence of this information also allowed Defendants to charge a price premium.  Had reasonable consumers been informed of the true amount of protein that the products provided through a statement of the corrected amount of protein per serving, as required by FDA regulations, they would not have purchased or would have paid less for the Products**.

And:[12]

> Had Defendants adequately disclosed the corrected amount of protein per serving for each Product expressed as a %DV, as FDA regulations require, Plaintiff would not have purchased the Products or would have, at minimum, paid less for them.

---

('PDCAAS'); and (2) provided a statement of that corrected amount of protein expressed as a percent daily value ('%DV') in the nutrition facts panel ('NFP'), which Defendants never did").

[10] *Complaint*, ¶ 7 [emphasis added].

[11] *Id.*, ¶ 25 [emphasis added].

[12] *Id.*, ¶ 62.

---

17.     Similarly, the Court noted in its Order, citing to the First Amended Complaint that the Plaintiff had alleged:[13]

> Had defendants disclosed the %DV on the nutrition label, plaintiff would not have purchased defendants' products or would have paid less for them.

And, regarding the Plaintiff's allegations of his reliance on the Nutrition Facts Panel (or nutrition label), the Court stated:[14]

> Plaintiff alleges that he read the nutrition label.  Had it included %DV, he would have understood that there were less than five grams of usable protein per serving and would have either not purchased or spent less on the product.

18.     In his Class Certification Motion, the Plaintiff then states the following theory of liability, based on the presence of the front label protein claim or statement:[15]

> Plaintiff's theory of liability is that the protein claim was unlawful, should never have been on the label, and that it allowed Defendants to charge consumers more for its Products than it could have without its protein advertising claims.

19.     Regardless of which theory the Plaintiff may ultimately espouse, my understanding is that the front label protein statement at issue is allegedly a technical regulatory violation, and allegedly "unlawful," specifically due to the nutrition label's failure to disclose the %DV for protein (as calculated based on the PDCAAS method).  I understand that under the Plaintiff's theory, had the nutrition label included a value for %DV for protein, Dave's would have been compliant with the FDA regulation at issue.  Hence, to the best of my understanding, the Plaintiff's allegations are predicated on the ***conjunction of the front label protein statement and the Nutrition Facts Panel on the back label***.  As the Court noted regarding the Plaintiff's claims based on the "front label nutrient content claim":[16]

> The claims alleged in the amended complaint rely on the relationship between the front label and nutrition label.

---

[13] January 9, 2023 Order Denying Motion to Dismiss ("January 9, 2023 Order"), p. 2.

[14] *Id.*, p. 3.

[15] Plaintiff's Class Certification Motion, p. 18.  I understand that, contrary to his operative *Complaint*, the Plaintiff now disclaims his UCL *unfair* and *fraudulent* prongs, and seeks to certify only the *unlawful* prong claim; *see id.*, p. 13.

[16] January 9, 2023 Order Denying Motion to Dismiss ("January 9, 2023 Order"), p. 4.

The Court further stated:[17]

> The regulations require that such a statement be contextualized for consumers by the addition of %DV corrected protein on the nutrition label. Because defendants do not provide %DV corrected protein, and the front label claim is based on total rather than corrected protein, plaintiff alleges he was misled into believing the product provided more digestible protein than it does.

20. Based on the materials on which I have relied, the scientific analyses I have conducted, and my background and expertise, I have reached the following conclusions.

### (1) The Weir Proposed Conjoint Survey is *Invalid and Irrelevant* Because it Fundamentally Fails to Test the Plaintiff's Theory of Liability [18]

- Even assuming for the sake of argument that the Weir Proposed Conjoint Survey did not suffer from multiple fatal flaws (which it does) that render it invalid, Mr. Weir's conjoint approach would still be incapable of determining whether consumers paid any purported "price premium" as a result of the alleged technical regulatory violation.

- Mr. Weir's proposed survey does *not* test a theory of liability in which remedying the alleged technical regulatory violation involves adding a %DV statement to the nutrition label; in fact, Mr. Weir plans not to show the nutrition label at all. Rather than comparing the effect of including *versus* omitting the %DV protein statement on the back of the packaging, Mr. Weir intends to impose what he presumes is the correct counterfactual, or "but-for" product (*i.e.*, a product that makes *no* protein statement, supposedly on the front label based on the Plaintiff's preferred interpretation of his theory). Even if Dave's could have *theoretically* removed the front label protein statement, this does not justify applying a conjoint model that forces on participants a "but-for" world favored by the Plaintiff, when Dave's has recourse instead to simply add the %DV for protein to the nutrition label (as it in fact did in 2023).

- Critically, the Weir Proposed Conjoint Survey even fails to test a theory of liability based on removing the front label protein statement. This is because Mr. Weir's proposed survey—which will show participants product *"profiles"* with and without the "5g Protein" label statement—would attempt to measure an alleged "price premium" for the presence versus **total absence** of a protein statement (*i.e.*, "5g Protein" vs. no mention of protein at all). However, even under the Plaintiff's interpretation, a "5g Protein" statement would still (lawfully) appear in the nutrition label. Mr. Weir's proposed conjoint survey would result in an invalid and overstated "price premium" estimate, and he proposes no mechanism to apportion an alleged "price premium" attributable to consumers who saw "5g Protein" both on the front label and on the nutrition label versus those who only saw or would see "5g Protein" on the nutrition label.

- Mr. Weir's claim at his deposition that he can account for the above issue in his "market" simulation by holding constant the nutrition label between the real and "but-for" worlds

---

[17] *Id.*, pp. 2 – 3.

[18] *See* Section C of this *Expert Declaration*.

does *not* in any way address this issue.  It is impossible for Mr. Weir to disentangle, through his "market" simulation, the appearance of "5g Protein" on the front label from its appearance on the nutrition label, for the simple reason that *his conjoint survey itself will not specify this information to participants*.  Any analysis conducted using the conjoint data as input will therefore consist of "garbage in, garbage out" ("GIGO")[19] and will generate invalid estimates.

- Overall, Mr. Weir's approach fails to test the Plaintiff's theory of liability, whether as understood by Dave's (*i.e.*, based on the absence of a %DV statement, given the presence of a front label statement) or as interpreted by the Plaintiff (*i.e.*, based on the presence of the front label statement, given the absence of a %DV statement).[20]  Even if Mr. Weir were to try to amend his proposed design, I am not aware of any means by which his approach could accommodate either theory in a scientifically valid and reliable way.

### (2) The Weir Proposed Conjoint Survey is Scientifically Invalid, and it Cannot Yield Valid and Reliable Estimates of Consumer Willingness-to-Pay or Any Alleged "Price Premium" [21]

**(a) The Weir Proposed Conjoint Survey grossly violates marketplace conditions, artificially focuses participants on the "5g Protein" statement, and creates severe demand effects and focalism biases.[22]**

- Mr. Weir fails to justify his limited selection of attributes and attribute levels.  For example, the Weir Declaration does not specify which prices will be used or whether different brands

---

[19] *See, e.g.*, https://www.oxfordreference.com/view/10.1093/oi/authority.20110803095842747 ("Used to express the idea that in computing and other spheres, incorrect or poor quality input will always produce faulty output (often abbreviated as *GIGO*).  The saying is recorded from the mid 20th century.").

[20] Nor can Mr. Weir's proposed survey assess the materiality (or lack thereof) of the alleged technical regulatory violation.  Mr. Weir's approach does not even come close to following the standard design of a materiality survey, and would instead force participants to focus on (and make tradeoffs among) a narrow, unrealistic, and biased subset of attributes and supposed packaging statements.  In a proper, standard materiality survey, one group of participants would indicate their likelihood of purchasing a disputed Dave's Killer Bread product (*i.e.*, displaying the front label protein statement and *not* displaying a %DV for protein on the nutrition label), while a second group of participants would indicate their likelihood of purchasing an otherwise identical product except without the alleged technical regulatory violation (*e.g.*, by adding the %DV for protein to the nutrition label).

[21] *See* Section D (Subsections D.1 – D.3) of this *Expert Declaration*.

[22] *Demand effects*, which generate predictable, yet biased, responses, relate to the phenomenon whereby survey participants use cues provided by the survey procedure, stimuli, and/or questions to figure out the purpose of the study and the answers expected by the researcher.  A *"focalism"* bias (or *"focusing illusion"*) occurs when participants are manipulated to focus on specific aspects presented to the survey—and not enough on other information that is made less salient or unavailable—in turn causing specific aspects to receive more attention and weight than they do under actual marketplace conditions.  *See* Subsection D.1 for discussion and references.

will be shown with different price ranges, and the price distribution shown in Mr. Weir's illustrative choice task is unrealistic.

- Given the importance of pricing to Mr. Weir's proposed survey and analysis, as well as to his purported "consideration" of supply factors, it is inexplicable that Mr. Weir would propose a conjoint survey without conducting the proper due diligence, such as a rigorous analysis of pricing data, and *without providing documentation* of any analysis. Mr. Weir's undisclosed and unsystematic approach to arriving at a price range (as confirmed by his deposition testimony)[23] further undermines his entire conjoint and damages approach.

- Mr. Weir's proposed conjoint survey will result in **contradictory and confusing product "profiles,"** including showing bread brands (*e.g.*, O Organics) that shoppers would never encounter in the actual marketplace. The fact that some product "profiles" will appear to participants as "missing" certain attribute levels (or label statements) further distorts the potential meaning that participants could take away, including with respect to "5g Protein" (*e.g.*, If the "5g Protein" statement is missing, does this mean the product in question has *no* protein? What does it mean that an "O Organics"-branded profile will sometimes appear with and other times without a "USDA Organic" statement?).

- Mr. Weir's proposed conjoint survey would omit many relevant packaged bread attributes and representations on which consumers (including the named Plaintiff himself) can and do rely in the marketplace. Such information includes, but is not limited to: packaging appearance; the visual look of the actual bread; the product name; bread type; presence of toppings; size and location of label claims and imagery; the Nutrition Facts Panel (nutrition label); the amount of fiber, calories, carbohydrates, sugar, fat, cholesterol, sodium, and other ingredients; brand mission or heritage; expiration date; and more. Omitting relevant information severely distorts marketplace conditions and invalidates any damages estimates based on the survey's results.[24]

- Despite the fact that the "5g Protein" statements (on the front label and on the nutrition label) appear in the *context* of Dave's Killer Bread packaging, and despite the importance of both the packaging (through which the products are visible) and the location of label statements in this litigation, Mr. Weir will not show *any* packages and will ignore the reality of consumers' exposure to the nutrition label. Such a decontextualized presentation (repeated across 13 choice tasks) distorts participants' attention to and interpretation of various attribute levels (including "5g Protein") and bears *no* resemblance to consumers' purchase decisions in the real world.

---

[23] *See* Subsection D.1.1 for further discussion.

[24] As one industry guide cautions: "Clients often want to know "Which attributes are most important?" but CA [conjoint analysis] can only answer this with regard to the relative utilities of the attributes and features tested. Including (or omitting) a very popular or unpopular level on one attribute will alter the "importance" of every other attribute!"; Chapman, Chris (2013), "9 Things Clients Get Wrong About Conjoint Analysis," in Orme, Bryan (ed.), *Proceedings of the 2013 Sawtooth Software Conference*, Dana Point, CA.

- The Weir Proposed Conjoint Survey's "within-subjects" design[25] and instructions are highly leading and unrealistic, further highlighting the "5g Protein" statement. Mr. Weir's repeated directive that participants assume any features not shown in the choice task are the same across all choice "profiles" is improper and contrived. Despite the fact that taste/flavor was apparently raised by participants in Mr. Weir's own "cognitive interviews" as a relevant feature associated with different brands, the Weir Proposed Conjoint Survey would force participants to disentangle their associations and to treat an otherwise important attribute as if it were not a differentiator at all.

- Asking participants which bread they would merely be *willing* to buy (while telling them to assume they will purchase a bread package, that the products shown were their only options, and that the prices shown are the best available) will artificially decrease the weight of the price attribute and inflate participants' willingness to buy, thereby upward biasing the alleged "price premium" estimate for "5g Protein."

**(b) The Weir Proposed Conjoint Survey will inflate consumers' willingness-to-pay (WTP) for the "5g Protein" statement by always presenting the price attribute last.**

- Because the order in which attributes are presented in a conjoint task can affect the attributes' measured importance (particularly for the price attribute), conjoint analysis scholars have recommended that the order of attributes be randomized across participants. Mr. Weir's failure to rotate the position of the price attribute violates a basic principle of survey design and will artificially lower participants' price sensitivity—thereby upward biasing the estimated WTP and valuation attributed to the "5g Protein" statement.

**(c) Mr. Weir's eight (8) "cognitive interviews" are unscientific, undisclosed, unrepresentative, uninformative, and neither these interviews nor his proposed "pretesting" can validate whether the proposed conjoint survey is realistic, non-leading, or unbiased.**

- As made clear in his declaration and underscored by his deposition testimony, Mr. Weir failed to disclose basic, critical information about his "cognitive interviews," including what questions participants were asked and what they actually said (*i.e.*, participants' verbatim responses). It is illogical and unscientific for Mr. Weir to imply that he can draw any conclusions about consumers' purchase preferences and perceptions from ***eight interviews using a non-disclosed and "confirmatory"***[26] ***method***, which cannot possibly yield reliable, generalizable, and relevant scientific evidence.

---

[25] That is, a research design in which participants provide a response to an outcome variable or measure (*e.g.*, choice of a bread product) while being exposed to different *levels* of a tested variable (*e.g.*, whether a certain statement is present vs. absent on a label). For example, in Mr. Weir's proposed conjoint survey, the *same* participant would make a series of 13 choices after viewing product "profiles" (representing bread products) both with and without "5g Protein." By contrast, in a "between-subjects" design, different groups of participants would be exposed to just one level of a tested variable (*e.g.*, participants would view *either* a Dave's package with "5g Protein" on the front label but *without* the %DV for protein on the nutrition label, *or* an otherwise identical package with the %DV for protein added to the nutrition label).

[26] Mr. Weir admitted that his interviews were of a "confirmatory nature" to validate his selection of attributes and attribute levels; *see, e.g.*, Weir Deposition, pp. 123 & 125.

- Mr. Weir's undisclosed, unstructured, and unobjective interview approach guaranteed that *no other individual except for Mr. Weir himself could assess, evaluate, or replicate the "cognitive interviews" as summarized in the Weir Declaration*.
- Similarly, Mr. Weir's proposed "pretesting" can neither detect demand effects and biases inherent in the survey's design nor validate whether the survey is realistic or non-leading.

### (3) Mr. Weir's Proposed "Market Simulation" is *Not* a Valid *Market* Simulation, as it Fails to Account for Any Market Competition [27]

- Contrary to his characterization, Mr. Weir's proposed "market simulation" (in reality what is known as a "50/50 two-product" simulation) fails to simulate anything approximating a realistic market with multiple competitors.  Instead, the *only* products specified in Mr. Weir's "simulator" will be *two Dave's Killer Bread products*: (*i*) a Dave's product with a "5g Protein" statement; and (*ii*) the same Dave's product without the "5g Protein" statement. There is no situation in which an actual consumer would encounter only two bread products, comprised exclusively of a Dave's product with "5g Protein" and the same product without "5g Protein."
- Notably, because Mr. Weir's survey does not even specify for participants where the "5g Protein" statement appears, the removal of "5g Protein" would presumably apply to both the front label and the nutrition label, resulting in *an impossible "but-for" product that consumers would never see* (*i.e.*, because even if Dave's had removed "5g Protein" from the front label, it would have kept "5g Protein" on the nutrition label).
- Contrary to Mr. Weir's contention, neither including a price range that happens to ostensibly "reflect" other brands nor supposedly holding competitive offerings constant between the real and "but-for" worlds suffices to account for competition.  Mr. Weir's proposed simulation approach is diametrically opposed to well-accepted principles in the conjoint literature (including by the same sources cited in the Weir Declaration), which make clear that it is necessary to include relevant competitive offerings *in the market simulator itself*.

### (4) Mr. Weir's Proposed Calculation of an Alleged "Price Premium" Fails to Incorporate *Any* Necessary Supply-Side Equilibrium Analysis, and Mr. Weir's Claim that his Methodology Accounts for Supply-Side Factors Reveals a Fundamental Misunderstanding of Marketing and Econometrics [28]

- Both academic researchers and courts have emphasized the importance of incorporating supply-side analysis when using conjoint analysis to estimate alleged "price premia" and damages.  Such supply-side analysis consists of a profit-maximizing equilibrium analysis that examines how supply (from both Dave's Killer Bread and its competitors) would have shifted in response to the alleged drop in demand due to Dave's Killer Bread addressing or "curing" the alleged technical regulatory violation (*e.g.*, by adding a back-of-pack %DV to the nutrition label, or by removing the front label protein statement).
- Mr. Weir's proposed estimation of an alleged "price premium" fails to include any *supply-side equilibrium analysis*, and would instead assume no competitive reaction and a "vertical

---

[27] *See* Section E (Subsections E.1 – E.2) of this *Expert Declaration*.

[28] *See* Section F (Subsections F.1 – F.2) of this *Expert Declaration*.

supply curve" in the "but-for" world (*i.e.*, a constant quantity sold regardless of price). This means that the alleged "price premium" estimated and any resulting damage calculations are based on an unrealistic assumption and are highly likely to overstate the value for consumers of "5g Protein."

- Contrary to Mr. Weir's assertion, using historical prices and quantity supplied in the real world is distinct from the *counterfactual ("but-for") market* equilibrium price to be estimated, and does *not* serve to account for supply-side factors.

### (5) The Weir Proposed Conjoint Survey Would Fail to Represent the Relevant Consumer Universe [29]

- Mr. Weir's proposed survey universe—California adults who purchased or considered purchasing Dave's packaged bread *in the past five years*—would be both overinclusive and underinclusive, and would fail to represent the mindset, perceptions, and purchase decisions of the putative class members when they purchased Dave's products.

- Mr. Weir's proposed survey fails to base his qualification criteria on ***prospective purchasers*** of packaged sliced bread products, instead potentially qualifying respondents who had purchased or even ***considered purchasing*** Dave's bread as long as five years ago, even if they had no intention to purchase Dave's (or packaged bread) in the imminent future. Moreover, while many of the putative class members were likely repeat purchasers of Dave's, at least some would have purchased the disputed products for the first time; a valid survey must include and represent such first-time purchasers.

- The use of past purchase consideration is particularly nonstandard and made even more leading by imposing a distant timescale over which participants would not be able to reliably remember their preferences.

### (6) The Weir Proposed Conjoint Survey's Fatal Flaws and the Failure to Incorporate Market Competition or Supply-Side Equilibrium Analysis Render Mr. Weir's Damages Model Unreliable and Invalid [30]

- The Weir Proposed Conjoint Survey's severe flaws and one-sided biases would result in an unreliable and invalid alleged "price premium" estimate. Consequently, Mr. Weir's damages estimates would be unscientific, unreliable, and artificially inflated.

- Even setting aside the Weir Proposed Conjoint Survey's fatal flaws, any "price premium damages" calculated by Mr. Weir would be invalid and *not* relevant, as they fail to test the Plaintiff's theory of liability (both as understood by Dave's and as interpreted by the Plaintiff).

---

[29] *See* Section G of this *Expert Declaration*.

[30] *See* Section H of this *Expert Declaration*.

**(7) Mr. Weir's Discussion of Product Differentiation is Unscientific and Irrelevant, and _None_ of the Underlying Sources he Cites Supports the Notion that a Protein Label Statement is a Differentiator that Generates an Alleged "Price Premium"** [31]

- _None_ of the sources Mr. Weir cites regarding "product differentiation" are relevant to the alleged technical regulatory violation in this litigation, and none substantiates the notion that a front label protein statement without a %DV in the nutrition label is (or even was recognized by Dave's as) a meaningful differentiator that allows Dave's Killer Bread to charge a price premium. Rather, if anything, the sources suggest that the actual protein content may be relevant to some consumers without any consideration of the %DV for protein.

21.    Next, I provide an overview of the Weir Proposed Conjoint Survey before evaluating that survey in light of fundamental principles of survey design and statistical analysis.

## A.    OVERVIEW OF THE WEIR PROPOSED CONJOINT SURVEY

22.    By its description, the Weir Declaration attempts to analyze whether alleged "price premium damages"[32] due to "Defendants' conduct of labeling its Products with the Protein Claim"[33] can be computed in a common manner across the putative class members.[34] Mr. Weir defines such alleged "price premium damages" as follows:[35]

> […] wherein consumers would receive the value of the price premium they paid solely as a result of Defendants' conduct of labeling its Products with the Protein Claim.

Specifically, Mr. Weir's proposed methodology to calculate the alleged "price premium" consists of conducting a _choice-based conjoint ("CBC")_ survey.[36] His intended analysis plan would use the CBC survey's data to ostensibly estimate an alleged "price premium that

---

[31] _See_ Section I of this _Expert Declaration_.

[32] Weir Declaration, ¶ 11.

[33] _Ibid._

[34] _See id._, ¶ 36 ("All relevant data needed to complete the conjoint analysis will be Class-wide, common evidence"). Mr. Weir states that he was engaged by the Plaintiff's counsel to "[…] ascertain whether it would be possible to calculate damages arising from Plaintiff's theory of liability on a class-wide basis using common evidence, and if so, to provide a framework for the calculation of damages suffered by the proposed class of consumers as a result of the use of the Claim"; _id._, ¶ 7.

[35] _Id.,_ ¶ 11.

[36] _See, e.g., ibid._

purchasers paid solely as a result of the challenged Claim,"[37] by comparing a purported estimated "economic market value"[38] for the "challenged Claim" (*e.g.*, "5g Protein") with the supposed estimated "economic market value" for the claim "in the market scenario where the Claim is removed."[39]  Mr. Weir then proposes to calculate alleged "price premium damages" by multiplying historical dollar sales by his estimated "price premium" percentage.[40]

23.    Mr. Weir indicates that he will sample panelists from Dynata[41] who are adult (18+) California residents[42] and who report, among other things, that they "had purchased or considered purchasing Dave's Killer Bread in the past five years."[43]

24.    According to Mr. Weir, his survey's participants will be asked to make a series of 13 choices,[44] 12 of which will be used in his estimation.[45]  Participants would be instructed to assume multiple hypotheticals or assumptions regarding the product options and choice sets shown, including that "Any features not shown in the exercise are assumed to be the same across the possible choices presented,"[46] "Assume that all of the packages of bread are of the flavor/variety you prefer,"[47] "Each package of bread shown contains approximately 25 ounces,"[48] and "Please assume that the price shown with each hypothetical package of bread presented is the

---

[37] *Id.*, ¶ 74.

[38] *Ibid*.

[39] *Ibid*.

[40] *Id.*, ¶¶ 75 & 102.  Mr. Weir's purported "price premium" percentage would be the estimated percentage price difference between a Dave's product with the challenged claim (*e.g.*, "5g Protein") versus one without this claim.

[41] *Id.*, ¶ 63.

[42] *Id.*, ¶ 60.

[43] *Ibid*.

[44] *Id.*, ¶ 54.

[45] *Ibid.*

[46] *See id.*, Exhibit 3, p. 57.

[47] *See ibid*.

[48] *See ibid*.

best price available for this particular bread."[49]  The proposed survey would then "introduce[]"[50] participants to three attributes and their levels: (*1*) Brand (four possible brands: Dave's Killer Bread, Oroweat, O Organics, 365),[51] (*2*) Label Statements (eight possible statements: 5g Protein, USDA Organic, No Artificial Ingredients, Good Source of Fiber, NON-GMO, No High Fructose Corn Syrup, 22g Whole Grains, Heart Healthy),[52] and (*3*) Price ($4.49 – $7.49).[53]  The Weir Declaration does *not* specify the number or identity of the levels for the Price attribute,[54] nor does it explicitly state how many of the eight different label statements will describe each option.

25.    Mr. Weir states that "the attributes will be shown in a randomized order that will difer [*sic*] for each respondent";[55] he then states that "Brand will always be shown first, and price will always be anchored last"[56] (effectively meaning *no* randomization of attributes).

26.    In each of the 13 choice tasks, participants would view a set of three options or product "profiles," ostensibly representing different bread products.  Each of the three options would be described in terms of the brand, label statements, and price.[57]  Participants would then be asked to " choose the bread that you most prefer **if there were no other options available AND all other features not mentioned in the exercise were the same across the breads shown**" (emphases in the original),[58] followed by: " Assuming you were actually shopping for a

---

[49] *See id.*, p. 59.

[50] Weir Declaration, ¶ 51.

[51] *Id.*, ¶ 53.

[52] *Ibid.*  Participants will be told: "Some of the packages of bread you will see will make one or more of these statements on the packaging"; *ibid.*

[53] *Ibid.*  Participants will be told: "The price of the package of the packages [*sic*] of bread, ranging from $4.49 to $7.49"; *ibid.*

[54] Mr. Weir subsequently testified at his deposition that he plans to apparently include seven levels for price, broken into 50-cent increments (a plan that was never specified in his declaration); *see* Weir Deposition, p. 249.

[55] Weir Declaration, ¶ 54.

[56] *Ibid.*

[57] *Ibid.*

[58] *Id.*, Exhibit 3, p. 58.

package of bread and the options presented were your only options, **would you be willing to buy the bread that you chose?**" (emphases in the original)[59]  Figure 1 below reproduces a sample choice task, as depicted in the Weir Declaration, representing what participants would see.

**Figure 1: Sample CBC Choice Task in the Weir Proposed Conjoint Survey** [60]



27.     Mr. Weir asserts that the other (*i.e.*, non-"5g Protein") attribute levels in the conjoint task are "distractor attributes, selected to be believable and understandable."[61]  Mr. Weir further claims that the choice of attributes was based on multiple sources, including "a review of

---

[59] *Ibid.*

[60] *Ibid.*

[61] *Id.*, ¶ 52.

Dave's Killer Bread and competitor labels, the cognitive interviews, the documentary evidence, a review of Defendants' and competitor's websites, retailer websites and the testimony of Dan Letchinger"[62]—but does not specify how these specific attributes and their levels were actually chosen or what criteria were used.

28.     To measure an alleged "price premium" for what Mr. Weir calls the "Protein Claim,"[63] he proposes to conduct a purported "market simulation" using Sawtooth Software based on the data that will ostensibly be generated from his proposed conjoint survey.[64]  Mr. Weir claims that in his "market simulation" he will "compare a benchmark Dave's Killer Bread Product that uses the Claim to an otherwise identical Product that does not use the Claim."[65]  He describes using a model that would simulate the purported "market" with these two products, adjusting the prices to "obtain equal market acceptance"[66] (*i.e.*, to have equal predicted choice shares), thereby identifying a price premium at the supposed "market equilibrium."[67]  He also indicates that the resulting alleged "price premium" statistics would be reported as a percentage of the sales price attributable to the protein statement.[68]

29.     Finally, Mr. Weir states that he has already conducted eight (8) so-called "cognitive interviews,"[69] over the phone to ostensibly gain "a better understanding of the drivers of consumer choices underlying bread purchases." [70]  According to Mr. Weir, he "identified"[71] a number of things through these interviews, including: (*i*) that "brand and packaging were the

---

[62] *Id.*, ¶ 53 & FN 29.  It is not clear what "documentary evidence" Mr. Weir refers to.

[63] *E.g., id.*, ¶ 100.

[64] *Id.*, ¶ 64.

[65] *Id.*, ¶ 77.

[66] *Ibid.*

[67] *Ibid.*

[68] *Id.*, ¶ 75.

[69] *Id.*, ¶ 37 – 38.

[70] *Id.*, ¶ 39.

[71] *Id.*, ¶ 40.

starting point for many bread purchases";[72] (*ii*) that "bread purchasers, to the extent they have prior experience with a brand, associate and recall the flavor of the bread associated with different brands";[73] (*iii*) that "[a]ll of the respondents indicated that they were aware of protein claims on bread, and that protein claims were a reason they chose to purchase Dave's Killer Bread";[74] and (*iv*) that "[r]espondents indicated that their views on various bread attributes, including protein (as well as whole grains, organic, fiber, and non-GMO), would not vary based upon the size of the packaging (e.g., single or double loaf), flavor, price, or over the course of the past five years."[75]  Mr. Weir also states that he intends to pretest his proposed conjoint survey with 10 participants[76] to, among other things, test for "demand artifacts"[77] and "whether or not that [*sic*] respondents understood the questions, instructions, and descriptions presented in the questionnaire and that the interview flowed smoothly."[78]

30.    Before evaluating the Weir Proposed Conjoint Survey in detail, I first briefly review the goals and methodology of conjoint analysis.

## B.    A BRIEF PRIMER ON CONJOINT ANALYSIS

31.    Conjoint analysis is a survey-based statistical method that can be used to quantify consumers' valuation of different attributes of a product or service.  Modern conjoint analyses predominantly employ a *choice-based conjoint ("CBC")* approach.  As I have taught my MBA students at Columbia University Business School, a valid and reliable CBC study requires not only careful design and sophisticated econometric modeling, but also necessitates sufficient consideration of the methodological challenges that may arise given the particular facts of a case (*e.g.*, the products, packaging, webpages, and alleged misrepresentations or violations at issue).

---

[72] *Ibid*.

[73] *Ibid*.

[74] *Id.*, ¶ 41.

[75] *Id.*, ¶ 43.

[76] *Id.*, ¶ 56.

[77] *Id.*, ¶ 58.

[78] *Id.*, ¶ 59.

In situations where such challenges are insurmountable (*e.g.*, there are too many relevant product attributes to realistically capture in a CBC task), a conjoint survey would be *inappropriate* to conduct, and the survey practitioner should turn to other research methodologies.

32.    The mere fact that conjoint analysis as a methodology has been used in academic, industry, and litigation contexts cannot serve to axiomatically validate the appropriateness of using conjoint analysis in a specific individual case.  Indeed, the same methodology has also been rejected and/or criticized by courts when the conjoint analysis in question exhibited severe deficiencies that rendered the resulting estimates unreliable.[79]  Reiterating that "there is no substitute for *careful* conjoint design,"[80] one peer-reviewed article on conjoint analysis cautions that "careful studies make all the difference between realistic predictions of demand and useless results."[81]

33.    CBC analysis conducted for purposes of valuing a product feature (or packaging/advertising claim), including to estimate damages, should consist of the following three steps (*see* Figure 2 below):[82]

(<em>Continues on next page</em>)

---

[79] *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 427 F. Supp. 3d 374 (S.D.N.Y. 2019); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 500 F. Supp. 3d 940 (N.D. Cal. 2020); *Adams v. Target Corp.*, 2014 WL 12558858 (C.D. Cal. Nov. 25, 2014).

[80] Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi (2014b), "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, 12(4), 421 – 456, p. 432 [emphasis added].

[81] *Id.*, p. 433.  Another industry guide writes: "Conjoint analysis addresses big issues with specific answers.  As a result, **when it fails, it often fails spectacularly.  […] Conjoint failures are generally the result of researchers who fail to properly design their conjoint studies or correctly interpret the output**.  Powerful, user-friendly software gives us opportunities to make mistakes we may not even be aware of" [emphases added]); McCullough, Dick (2002), "A User's Guide to Conjoint Analysis," *Marketing Research*, 14(2), 18 – 23, p. 19.

[82] *See, e.g.*, Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi (2014a), "Valuation of Patented Product Features," *The Journal of Law and Economics*, 57(3), 629 – 663;, pp. 629 – 631, 638 – 640, & 661 – 662; Allenby et al. (2014b), pp. 432 – 433; Orme, Bryan K. (2010), *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research (2nd Ed.)*, Madison, WI: Research Publishers LLC.

**Figure 2: Key Steps in Conducting a Proper Choice-Based Conjoint (CBC) Analysis for Estimating Alleged "Price Premia"**

```
┌─────────────────────────────────────┐
│         1. PREFERENCES              │
│   Measure consumer preferences and   │
│   derive "partworths" via CBC Survey │
└─────────────────────────────────────┘
                 │
                 ▼
┌─────────────────────────────────────┐
│         2. MARKET SIMULATOR         │
│  Simulate choices among competitor   │
│  offerings in the marketplace to     │
│  estimate WTP                        │
└─────────────────────────────────────┘
                 │
                 ▼
┌─────────────────────────────────────┐
│       3. EQUILIBRIUM ANALYSIS       │
│  Conduct supply-side equilibrium     │
│  analysis to calculate alleged price │
│  premia for attribute(s)             │
└─────────────────────────────────────┘
```

<u>Step 1</u>: **Measuring consumer preferences via a realistic CBC survey.** A conjoint survey is conducted to measure consumers' preferences by varying the relevant product features and asking participants to choose among realistic sets of options. The survey's ability to accurately capture consumers' preferences depends on many factors, such as the sample's representativeness and whether the survey task approximates marketplace conditions (*e.g.*, whether the survey includes competitors, incorporates the full set of relevant attributes and packaging claims, uses realistic stimuli, and depicts advertising claims in the context in which consumers encounter them). The choices made by survey participants in the conjoint task are then analyzed (or decomposed) to estimate relative values or utilities that consumers place on different attribute levels (*i.e.*, the "partworths").[83]

<u>Step 2</u>: **Employing a *market simulator* to simulate choices and market shares in the marketplace.** A market simulator, one which includes a representative set of realistic competitive offerings, is used to estimate any (actual or counterfactual) "willingness-to-pay" (WTP) in dollars for a given feature or attribute.

<u>Step 3</u>: **Conducting a *supply-side "equilibrium" analysis*.** An equilibrium analysis should be conducted to calculate any alleged incremental profits or "price premium" solely

---

[83] This decomposition or estimation analysis is typically conducted using Hierarchical Bayes. Hierarchical Bayes estimation methods allow the researcher to capture differences in preferences across individual consumers. *See, e.g.*, https://sawtoothsoftware.com/resources/technical-papers/cbc-technical-paper; Allenby et al. (2014a), p. 650 ("In almost all choice-based conjoint settings, hierarchical Bayes methods are used to estimate the choice model parameters"); Allenby et al. (2014b), p. 435 ("Bayesian hierarchical methods are now by far the dominant method for use in analysis of choice-based conjoint data.").

due to a specific product feature or attribute. According to basic economic theory, *market* prices (*i.e.*, market-clearing or market equilibrium prices) are determined by the intersection of supply and demand. Therefore, an equilibrium analysis must incorporate not only the consumer demand curve (estimated from the conjoint analysis), but also the *market supply curve*, which is based on *supply-side factors* such as the type of market competition, the set of competitor product offerings, the competitors' costs of goods sold, and the competitors' dynamic reactions. For example, in a case involving allegedly deceptive (or unlawful) advertising claims, a supply-side equilibrium analysis should incorporate competitive reactions (*e.g.*, in terms of pricing, product features, and amount of product supplied) to the removal of the alleged deception (or violation) in a counterfactual ("but-for") world.

34.    Mr. Weir's proposed conjoint survey and analysis fails at each of the above steps. In particular, Mr. Weir's approach *cannot* identify the market-clearing price needed to estimate damages, as doing so requires: (*i*) incorporating realistic product options, depicting the protein statements in the context in which they actually appear in the marketplace (*i.e.*, amount of grams on the front label and nutrition label, and %DV on the nutrition label), and using a valid control or benchmark for the "but-for" (counterfactual) world (which the Weir Proposed Conjoint Survey will *not*, and cannot, do); (*ii*) employing a market simulator to simulate choices within a *competitive* market (which Mr. Weir will *not* do); and (*iii*) conducting an equilibrium analysis that actually incorporates supply-side factors (which Mr. Weir's stated approach would *not*, and could *not*, do).

35.    To reach valid and reliable conclusions about consumers' preferences and willingness to pay any alleged "price premium" for the disputed Dave's Killer Bread products, a survey expert must follow several well-accepted principles in designing the conjoint survey,[84] including, but not limited to:

(*i*)    the definition of the relevant universe and the construction of a representative sample;

(*ii*)    the use of a survey methodology that approximates the putative class members' state of mind and purchase decisions in the actual marketplace;

(*iii*)    the use of questions and stimuli that avoid leading the participants and inducing demand effects and "focalism" illusion, which, individually and collectively,

---

[84] *See also* the factors listed in the *Manual for Complex Litigation* (2004), Federal Judicial Center, Fourth, Section 11.493, p. 103. *See also* Diamond, Shari S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Federal Judicial Center.

upward bias and invalidate the estimated preferences, WTP, and alleged "price premium"; and

(*iv*)    the reliance on appropriate statistical techniques and econometric analyses to reach reliable and valid conclusions about any alleged "price premium."

36.    Mr. Weir's conjoint approach violates numerous principles and requirements of scientific surveys, including those listed above.  In particular:

(*i*)    as a critical threshold matter, Mr. Weir's proposed conjoint survey is completely **invalid and irrelevant**, as it does *not* test the Plaintiff's theory of liability; the survey instead would compare choices for products with *versus* without *any* "5g Protein" statement, despite the fact that even under the Plaintiff's interpretation of liability, a "5g Protein" statement would still be included on the nutrition label (which participants would be prevented from seeing in Mr. Weir's proposed survey);

(*ii*)    the Weir Proposed Conjoint Survey's design and choice stimuli are in themselves fatally flawed and invalid, as they, among other things: include unjustified attribute levels, particularly for price (for which Mr. Weir provides *no* documentation of any systematic analysis); present contradictory and confusing product profiles; omit multiple relevant product attributes and packaging claims; use highly unrealistic (distorted) product representations, outside the context of any packaging (a context that is essential in this litigation); rely on a leading and contrived survey design and task instructions; and will inflate consumers' WTP or valuation for the "5g Protein" statement by always presenting the price attribute last;

(*iii*)    Mr. Weir's proposed "market" simulation is *not* a valid market simulation, as it fails to incorporate *any* competition;

(*iv*)    Mr. Weir's proposed calculation of an alleged "price premium" fails to incorporate *any* supply-side equilibrium analysis, and his claim that he "considered"[85] supply-side factors reveals a fundamental misunderstanding of econometrics and key marketing principles; and

---

[85] Weir Declaration, ¶ 80.

(*v*)    Mr. Weir's proposed conjoint survey would fail to represent the relevant

consumer universe.

37.    My professional opinion is that the Weir Proposed Conjoint Survey and any WTP

or alleged "price premia" estimates, along with any concomitant damages calculations derived

thereof, would be scientifically invalid, fatally flawed, upward biased, and fundamentally

irrelevant (*i.e.*, divorced from the Plaintiff's theory of liability, whether as understood by Dave's

or as interpreted by the Plaintiff).  Such unscientific damages estimates *cannot* support valid,

reliable, or informative conclusions regarding any injury (much less purported common injury)

allegedly suffered by the putative class members.

## C.    THE WEIR PROPOSED CONJOINT SURVEY IS *INVALID AND IRRELEVANT* BECAUSE IT FUNDAMENTALLY FAILS TO TEST THE PLAINTIFF'S THEORY OF LIABILITY

38.    In the current litigation, the Plaintiff alleges that the disputed Dave's Killer Bread

products violated FDA regulations by including a front label protein statement (*e.g.*, "5g

PROTEIN") without specifying the PDCAAS-calculated %DV for protein in the nutrition label.[86]

According to the Plaintiff, Dave's failure to comply with the FDA's requirement induced the

putative class members to purchase, or pay an alleged "price premium" for, the disputed bread

products.[87]  For example, the Plaintiff asserts:[88]

> Plaintiff's theory of liability is that the protein claim was unlawful, should never
> have been on the label, and that it allowed Defendants to charge consumers more
> for its Products than it could have without its protein advertising claims.

Similarly, Mr. Weir states in his declaration:[89]

> Plaintiff alleges that the Defendants' failure to comply with the FDA requirements
> and its use of the Protein Claim on the Class Products resulted in members of the
> class not receiving the Protein per serving claimed on the front of the package, and
> among other things, paying more for their Products than the actual value received
> at the time and point of purchase.

---

[86] *See, e.g., Complaint*, ¶¶ 4 – 6.  *See also* Plaintiff's Class Certification Motion, p. 1.

[87] *See, e.g.*, *Complaint*, ¶¶ 8 & 25.

[88] Plaintiff's Class Certification Motion, p. 18.

[89] Weir Declaration, ¶ 6.

39.     Critically, however, my understanding is that the front label protein statement challenged by the Plaintiff is alleged to be technically "unlawful" specifically due to the nutrition label's failure to disclose the %DV for protein (as calculated based on the PDCAAS method).  Had the nutrition label included a value for %DV for protein, I understand that under the Plaintiff's theory the label would have been compliant with the FDA regulation at issue.  Hence, to the best of my understanding, the Plaintiff's allegations are predicated on the ***conjunction of the front label protein statement and the Nutrition Facts Panel on the back label***.  As the Court noted regarding the Plaintiff's claims based on the "front label nutrient content claim":[90]

> The claims alleged in the amended complaint rely on the relationship between the front label and nutrition label.

The Court further stated:[91]

> The regulations require that such a statement be contextualized for consumers by the addition of %DV corrected protein on the nutrition label.  Because defendants do not provide %DV corrected protein, and the front label claim is based on total rather than corrected protein, plaintiff alleges he was misled into believing the product provided more digestible protein than it does.

40.     I understand that the Plaintiff alleges that the omission of the (PDCAAS-calculated) %DV for protein from the Nutrition Fact Panel was material, insofar as such information would have allegedly "clarified" to consumers that the amount of digestible protein per serving was less than the total number of grams stated on the front label and on the nutrition label.  For example, as the Court noted, citing to the First Amended Complaint:[92]

> Had defendants disclosed the %DV on the nutrition label, plaintiff would not have purchased defendants' products or would have paid less for them.

And, regarding the Plaintiff's reliance on the Nutrition Facts Panel (nutrition label):[93]

> Plaintiff alleges that he read the nutrition label.  Had it included %DV, he would have understood that there were less than five grams of usable protein per serving and would have either not purchased or spent less on the product.

---

[90] January 9, 2023 Order, p. 4.

[91] *Id.*, pp. 2 – 3.

[92] *Id.*, p. 2.

[93] *Id.*, p. 3.





94 *See*

95

96



",103

42.     As I discuss below, the Weir Proposed Conjoint Survey fundamentally fails to test the Plaintiff's theory of liability—even a theory (that the Plaintiff now appears to endorse) that is



---

103 *Id.*, p. 109.

based on Dave's removing the front label protein statement, as opposed to including the %DV for protein on the nutrition label.  Hence, even assuming for the sake of argument that the Weir Proposed Conjoint Survey did not suffer from multiple fatal flaws (which it does), Mr. Weir's conjoint approach would still be incapable of determining whether consumers paid any purported "price premium" as a result of the alleged technical regulatory violation.

43.     ***First***, Mr. Weir's proposed conjoint survey does *not* test a theory of liability in which remedying the alleged technical regulatory violation involves adding a %DV statement to the nutrition label.  In fact, despite the fact that, in the actual marketplace, consumers (including the named Plaintiff) could read the nutrition label on the back labels of Dave's breads, bagels, and buns, and despite the centrality of the NFP in this litigation, the Weir Proposed Conjoint Survey would ***not show the nutrition label to participants at all***.  What Mr. Weir intends to calculate is *not* a price premium based on an analysis of differences in demand for (*i*) a Dave's product with the front label protein statement and *without* a %DV statement on the nutrition label versus (*ii*) a Dave's product with the front label protein statement and *with* a %DV statement.  Instead, Mr. Weir defines his proposed "damages calculation"[104] as:[105]

> Price Premium Damages -- wherein consumers would receive the difference in the economic value of the Products at the time and point of sale with the Protein Claim compared to the value of an otherwise identical unit of the Product without the Protein Claim.

44.     Thus, rather than "curing" the alleged technical regulatory violation by comparing the effect of including *versus* omitting the %DV protein statement on the back of the packaging, Mr. Weir intends to impose what he presumes is the correct counterfactual, or "but-for" product (*i.e.*, a product that makes *no* protein statement, supposedly on the front label based on the Plaintiff's preferred interpretation of his theory).  It is completely unrealistic and biased to assume as the baseline of comparison a Dave's product that removes the front label protein statement, when Dave's has recourse to keep this statement and simply add a %DV for protein to the nutrition label—thereby ensuring compliance with the FDA's regulation and curing the

---

[104] Weir Declaration, ¶ 100.

[105] *Ibid*.

alleged technical regulatory violation.  Even if Dave's could have *theoretically* removed the front label protein statement from all of its packaging as an alternative remedy, this does not justify applying a conjoint model that takes as given the interpretation that favors the Plaintiff.  Mr. Weir essentially forced on participants a "but-for" world that in reality would never manifest, because (to the best of my understanding) there is no counterfactual world in which Dave's would be compelled to remove the protein statement from its front labels.  Indeed, Dave's more recent labels (as of 2023) include the %DV for protein on the nutrition label, with no change to the front label protein statement.[106]

45.     Therefore, consistent with the facts of this litigation and with marketplace reality, the appropriate counterfactual (or "but-for") product, which Mr. Weir opted not to test, is one that realistically represents what Dave's Killer Bread would do to comply with the FDA's requirement—namely, add a %DV protein statement to the nutrition label.

46.     **Second**, even assuming for the sake of argument that the *only* way of remedying the alleged technical regulatory violation was to remove the front label protein statement (which is *not* the case), **the Weir Proposed Conjoint Survey would <u>still</u> fail to test even this theory of liability**.  This is because, despite Mr. Weir's assertion at his deposition,[107] his proposed conjoint approach would attempt to test a supposed "price premium" for the presence versus **total absence** of a protein statement (*i.e.*, "5g Protein" vs. *no mention of protein at all*)—despite the fact that even under the Plaintiff's interpretation of their theory of liability,[108] **a protein statement quantifying the amount of total protein would still (lawfully) appear in the nutrition**

---

[106] *See, e.g.*, Letchinger Deposition, pp. 53, 57, & 61.

[107] *See, e.g.*, Weir Deposition, p. 89 ("Q. All right. And as we discussed earlier, all of the work that you've just described and is proposed in the declaration is seeking to compare the real world with the package as is [*sic*] with the but-for world that simply would remove the front of the pack protein content statement, correct? A. Correct."); *see also id.*, p. 54.  Nor does Mr. Weir's subsequent testimony that he views the "5g Protein" statement on the nutrition label as only "a nutrition facts panel statement" and not as a front label statement (p. 221) address the issue, as Mr. Weir does not and cannot know based on his design whether participants interpreted "label statement" to apply to *any* statement on the label, including on the nutrition label.

[108] As articulated in the Plaintiff's Class Certification Motion.

**label**.  In fact, I understand that FDA's regulations *require* that a protein amount (*e.g.*, "5g") be displayed on the nutrition label (if the product indeed contains protein), even if a protein statement is never made on the front label or anywhere else on the package.[109]

47.     The Weir Proposed Conjoint Survey will represent "5g Protein" to participants as merely one of eight different so-called "label statements" appearing "on the packaging,"[110] with no mention (as Mr. Weir admitted)[111] of where exactly these statements appear; moreover, the proposed survey will *not* show or expose participants to *any* nutrition facts panel (or any packaging at all).  This ***directly contradicts the Plaintiff's theory of liability*** even under the Plaintiff's own interpretation, under which consumers would still be exposed to a (lawfully appearing) "5g Protein" statement on the nutrition label of Dave's Killer Bread packaging.  That is, any consumers who saw the nutrition label on the disputed products—as the named Plaintiff asserted that he did[112]—could have been exposed to and could have read the "5g Protein" statement, regardless of whether Dave's had retained or removed the "5g Protein" front label

---

[109] *See, e.g.*, 21 C.F.R. § 101.9(c)(7).

[110] Weir Declaration, ¶ 53 ("Some of the packages of bread you will see will make one or more of these statements on the packaging"; a table of eight statements, including "5g Protein," would then be presented to participants).

[111] *See, e.g.*, Weir Deposition, p. 213.

[112] *See Complaint*, ¶¶ 62 – 63 ("Plaintiff regularly checks the NFP before purchasing food products and uses that as a basis for buying and/or comparing similar products. He looked at and read the NFP on the Products before purchasing them for the first time. […] Had he seen that the product provided only 5% (or less) of the daily value for protein—i.e., only approximately 2.5 grams or less corrected amount of protein per serving—he would not have purchased the product or, at a minimum would have paid less for it. Plaintiff would also have used the information as a basis to compare similar products and would have chosen instead to purchase one with a higher %DV. […]").  *See also*

statement.[113]  Hence, it is simply ***false*** that "5g Protein" would never appear on any of the breads supposedly represented by the "profiles" (including Dave's Killer Bread) that will be shown to participants in the Weir Proposed Conjoint Survey.  Further, as I explain in Subsection D.1.1, the fact that participants will be exposed in Mr. Weir's CBC task to certain product profiles with a "5g Protein" label statement and others without this statement (including within the same choice set) is itself confusing, and may even lead some consumers to believe that the bread profiles without "5g Protein" *have no protein at all*.

48.    Mr. Weir's fundamentally flawed and erroneous representation of the "5g Protein" statement extends to his analysis of the conjoint data, which would consist of "garbage in, garbage out" (GIGO) and result in an invalid and overstated estimate of a supposed "price premium" in this litigation.  For example,  Mr. Weir's so-called "market simulation" would "compare a benchmark Dave's Killer Bread Product that uses the Claim to an otherwise identical Product that does not use the Claim."[114]  Even setting aside that Mr. Weir will in actuality *not* conduct any *market* simulation (*see* Subsection E), the "simulation" described in the Weir Declaration would be ***premised on the <u>wrong</u> comparison***, because a product "that does not use the Claim"[115] ***does not and would never exist***—even under the Plaintiff's interpretation whereby the front-of-label protein statement is separately unlawful.  Mr. Weir fails to acknowledge the critical issue of his treatment of the "5g Protein" statement, and he proposes *no* mechanism by which to apportion an alleged "price premium" attributable to consumers who saw the "5g Protein" on *both* the front label *and* the nutrition label (*i.e.*, on a disputed package) versus those who saw the "5g Protein" *only* on the nutrition label (*i.e.*, on a non-disputed package in the "but-for" world, according to the Plaintiff's interpretation).

---

[113] ████████████████████████████████████████████
████████████████████████████████████████████████████

[114] Weir Declaration, ¶ 77.

[115] *Ibid*.

49.    Importantly, Mr. Weir's claim at his deposition that he addresses this issue by simply "holding constant" the nutrition label between the real world and the "but-for" world[116] does *not* in fact address this issue.  There is *no way* for Mr. Weir to disentangle the appearance of "5g Protein" on the front label from its appearance on the nutrition label, for the simple reason that *his conjoint survey itself will not specify this (critical) information to participants*.

50.    **Overall, Mr. Weir's approach <u>fails to test the Plaintiff's theory of liability</u>, whether as understood by Dave's (i.e., based on the absence of a %DV statement, given the presence of a front label statement) or as interpreted by the Plaintiff (i.e., based on the presence of the front label statement, given the absence of a %DV statement).**  In fact, it is my professional opinion that the CBC survey proposed by Mr. Weir **<u>cannot be used to test the relevant theory in this case</u>**, including the Plaintiff's preferred interpretation.  Even if Mr. Weir acknowledges this issue and were to try to amend his proposed survey design,[117] I am not aware of **any means by which Mr. Weir's approach could accommodate either theory in a scientifically valid and reliable way**.[118]  Nor did the Weir Declaration at any point propose or even discuss the possibility of doing so.  Therefore, as a critical threshold matter, the Weir Proposed Conjoint Survey is **fundamentally irrelevant, would fail to measure any damages (let alone classwide) attributable to the Plaintiff's theory of liability, and cannot be rectified**.

---

[116] *See, e.g.*, Weir Deposition, pp. 54 – 55 & 92.

[117] When asked at his deposition about testing a theory of liability based on the presence versus absence of the %DV for protein, Mr. Weir claimed that such a test "could be easily incorporated into the conjoint survey"; *id.*, p. 93.  When asked how he would go about doing so, Mr. Weir admitted that he was not sure how he would modify the survey to "accomplish the goal" of testing the difference between a nutrition label with *only* the numerical protein claim versus with both the protein claim and a %DV for protein; *id.*, p. 239 ("Q. And so in order to, you know, modify your study, you would need somehow to test the difference between the nutrition facts panel saying protein 5g on its own and protein 5g with the percent DV, correct? A. That hasn't been part of the scope of my work so far, so I'm not sure how I would design the survey to accomplish that goal" [objection omitted]).

[118] As just one example, given Mr. Weir's proposed approach, I am not aware of any method that he could adopt that would show the nutrition label to participants in a reliable and valid manner.

**D.    THE WEIR PROPOSED CONJOINT SURVEY IS SCIENTIFICALLY INVALID, AND IT CANNOT YIELD VALID AND RELIABLE ESTIMATES OF CONSUMER WILLINGNESS-TO-PAY OR ANY ALLEGED "PRICE PREMIUM"**

51.    Mr. Weir opines that his proposed conjoint survey will be used to calculate a price premium that "will apply to all Class Members market-wide regardless of the absolute price they paid, and regardless of any individual Class Member's subjective valuation of the Products."[119] However, Mr. Weir's opinion is erroneous because his proposed conjoint survey is fatally flawed and *not* properly designed, and therefore would *not* provide a reliable or accurate measurement of any alleged "price premia" that could apply to the putative class members.

52.    In defending his proposed conjoint approach, Mr. Weir cites three conjoint analysis studies published in academic journals.[120]  While academic studies may use conjoint analysis to draw conclusions about the relative importance of certain product attributes, such research ***typically does <u>not</u> use conjoint analysis to estimate a price premium***, let alone reach conclusions regarding monetary damages.[121]  In fact, the one research paper cited by Mr. Weir that draws conclusions about a price premium[122] (which was conducted in Japan among 265 Japanese university students)[123] used a disfavored "ratio of coefficients" method that has since been identified by both industry experts and academic scholars as *inappropriate* for drawing

---

[119] Weir Declaration, ¶ 79.

[120] *Id.*, ¶¶ 31 – 33.  Mr. Weir then alludes to "extensive" "use of conjoint analysis in similar applications" (¶ 34) without providing any citations or substantiation.

[121] At his deposition, Mr. Weir repeatedly emphasized the importance of the "research objective"; *e.g.*, Weir Deposition, p. 292 ("Context is everything, and your research objective is everything"); *see also id.*, pp. 177, 179, 180, 187, 191, 228, 237, & 279.  It is therefore illogical that Mr. Weir would ignore the most basic research objectives in academic literature when justifying his choice of using conjoint analysis for purposes of estimating alleged price premia and calculating monetary damages.

[122] Weir Declaration, ¶ 27 (citing to Hirogaki, Mitsunori (2013), "Estimating Consumers' Willingness to Pay for Health Food Claims: A Conjoint Analysis," *International Journal of Innovation, Management and Technology*, 4(6), 541 – 546).

[123] Hirogaki (2013), p. 541.

valid conclusions.[124]  Neither of the other two articles cited by Mr. Weir calculate a price premium,[125] and both relied on an outdated ratings-based conjoint method that is now rarely used and that would be inappropriate for purposes of damages estimation.[126]  Moreover, none of the

[124] Orme, Bryan K. (2010), "Interpreting the Results of Conjoint Analysis," Chapter 9, in *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, Second Edition, Madison, Wis.: Research Publishers LLC.  *See also* Allenby et al. (2014a, b).

[125] *See* Drewnowski, Adam, Howard Moskowitz, Michele Reisner, and Bert Krieger (2010), "Testing Consumer Perception of Nutrient Content Claims Using Conjoint Analysis," *Public Health Nutrition*, 13(5), 688 – 694; Gadioli, Izabel Lucena et al. (2013), "Evaluation of Packing Attributes of Orange Juice on Consumers' Intention to Purchase by Conjoint Analysis and Consumer Attitudes Expectation," *Journal of Sensory Studies*, 28(1), 57 – 65.  Specifically, Drewnowski et al. (2010) asked 320 participants to subjectively rate the "healthfulness" of hypothetical food products described by different combinations of 2 to 4 messages (*e.g.*, "This product is high in fibre").  Referring to their results as "exploratory data" (p. 693), the authors note the potential utility of conjoint as a tool for "the future ***testing*** of nutrition and health claims" [emphasis added] (p. 693) and to "better understand reactions to concepts in ***product development***" [emphasis added] (p. 694)—purposes distinct from calculating alleged price premia or monetary damages.  In fact, the authors also acknowledge key limitations to their study: "First, the study was based on a hypothetical food product as opposed to a specific food or beverage. The present results must therefore be treated as a general response to nutrient content claims, and **not a response that is tied to a specific product**. […] Second, the test messages were presented in **text format and were not integrated into graphics, labels or logos**. **Placement of nutrition content claims relative to other advertising copy may well influence consumer response**" [emphases added]; Drewnowski et al. (2010), p. 693.  Gadioli et al. (2013) asked 144 consumers in Brazil to evaluate, among other things, their purchase intention for multiple packages of orange juice with certain information/features (*e.g.*, "Without added preservative"), and reported differential effects of features on different "clusters"; *see, e.g.*, pp. 59 – 62.  Contrary to Mr. Weir's claim at his deposition (Weir Deposition, pp. 176 – 177), the fact that he included brand logos does *not* mean that his conjoint task presents information in a way that is somehow "integrated into graphics, labels or logos" (Drewnowski et al. 2010, p. 693); to the contrary, the label statements (*i.e.*, "test messages" referred to by Drewnowski et al.) that Mr. Weir plans to test will specifically *not* be integrated as part of graphics, labels, or logos, and Mr. Weir will *not* place any "nutrient content claims relative to other advertising copy" (*ibid*.), as Drewnowski et al. caution.  Note that prior to learning about Drewnowski et al.'s cautionary note, Mr. Weir asserted that presenting label statements in text format rather than integrating them into graphics labels supposedly "helps to reduce bias by making sure that nothing is presented in a way that stands out or is given undue attention"; Weir Deposition, pp. 173 – 174.

[126] *See, e.g.*, Eggers, Felix, Henrik Sattler, Thorsten Teichert, and Franziska Völckner (2022), "Choice-Based Conjoint Analysis," in *Handbook of Market Research*, Springer; McCullough (2002); Raghavarao, Damaraju, James B. Wiley, and Pallavi Chitturi (2010), *Choice-Based Conjoint Analysis: Models and Designs*, Chapman and Hall/CRC; Rao, Vithala R. (2010), "Conjoint Analysis," in *Wiley International Encyclopedia of Marketing*, Sheth, Jagdesh N. and Naresh K. Malhotra (eds.), John Wiley and Sons.  Sawtooth Software, the leading provider of

three conjoint academic studies referenced in the Weir Declaration attempted to study a label statement (such as "5g Protein") when that statement also appears elsewhere on the packaging or in conjunction with a different area of the package (*e.g.*, the nutrition label). Overall, the three academic conjoint studies cited by Mr. Weir do *not* relate to key issues and facts of this case, and do *not* at all justify his proposed approach in this litigation.

53.    Mr. Weir also points to instances of courts accepting conjoint analysis.[127] However, as noted earlier, the same methodology has also been rejected or criticized by courts when the conjoint analysis in question exhibited severe deficiencies that rendered it unreliable.[128] What matters is whether a specific conjoint analysis study (whether proposed or conducted) is appropriate and valid given the particulars of the theory, products, and packages being tested.

54.    As I detail in the next subsections, Mr. Weir's design of his proposed CBC survey in the present matter is fatally flawed and biased in favor of the Plaintiff. Even if Mr. Weir were to try to amend the details of certain aspects of his proposed survey, the nature and severity of such flaws mean that his proposed survey and approach *cannot* be corrected to remove the underlying severe biases.

**D.1.    The Weir Proposed Conjoint Survey Grossly Violates Marketplace Conditions, Artificially Focuses Participants on the "5g Protein" Statement, and Creates Severe Demand Effects**

55.    A key and fatal methodological flaw that Mr. Weir's proposed conjoint survey suffers from is its complete disassociation from anything consumers would or even could

---

conjoint analysis software (which enables both ratings-based and choice-based conjoint), notes on their website that ratings-based conjoint originated in the 1970s, and their "legacy" ratings-based module is used in less than 2% of their users' conjoint analysis projects; *see* https://sawtoothsoftware.com/conjoint-analysis/cva. Ratings-based conjoint has also been characterized as "old school" and as more suitable for "simple, non-computer-based projects" that are "common for students learning conjoint for the first time"; *see* https://dobney.com/Conjoint/conjoint_flavours.htm.

[127] Weir Declaration, ¶ 26.

[128] *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 427 F. Supp. 3d 374 (S.D.N.Y. 2019); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 500 F. Supp. 3d 940 (N.D. Cal. 2020); *Adams v. Target Corp.*, 2014 WL 12558858 (C.D. Cal. Nov. 25, 2014).

realistically encounter in the marketplace. A survey conducted for litigation, including a conjoint survey, should be designed to mirror as closely as possible essential characteristics of the marketplace.[129] Indeed, the purpose of a survey is to provide a reliable estimate of consumers' perceptions, purchase behaviors, and/or willingness-to-pay in a relevant (real) marketplace. The selection of a suitable survey method should be based primarily on the marketplace-resemblance criterion, instead of choosing a particular method merely for convenience or because an alternative methodology might produce "unfavorable" results.

56.    Failure to properly replicate marketplace conditions—for example, by inadequately or inaccurately (or not at all) representing the disputed products' packaging in a conjoint survey—can induce severe ***demand effects***[130] and ***focalism***,[131] such that participants are

---

[129] *See also, e.g.*, McCarthy, J. Thomas (2007), *McCarthy on Trademarks and Unfair Competition* (*McCarthy*), §32:163; Simonson, Itamar and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. and Jerre B. Swann (eds), Chicago, IL: American Bar Association, pp. 243 – 259; Winer, Russell (1999), "Experimentation in the 21st Century: The Importance of External Validity," *Journal of the Academy of Marketing Science*, 27(3), 349 – 358.

[130] "*Demand effects*" (also referred to as "demand characteristics") refer to the phenomenon whereby survey participants use cues provided by the survey's questions, answer choices, and/or stimuli to figure out the purpose of the study and provide the answers expected by the researcher. *See, e.g.*, Orne, Martin T. (1962), "On the Social Psychology of the Psychological Experiment," *American Psychologist*, 17(11), 776 – 783; Darley, William K. and Jeen-Su Lim (1993), "Demand Artifacts in Consumer Research: An Alternative Perspective," *Journal of Consumer Research*, 20(3), 489 – 495; *see also* Simonson and Kivetz (2012). The participants then tend to provide (what they perceive as) the expected answers, to make sure that the results "come out right." Courts have recognized the importance of demand effects, and such problems have contributed to the rejection of surveys. *See, e.g.*, *In Re: KIND LLC "Healthy and All Natural Litigation,"* 15-md-02645 (NRB) (S.D.N.Y. Sep. 2022); *Simon Property Group L.P. v. MySimon, Inc*., 104 F. Supp. 2d 1033, 2000, U.S. Dist. S.D. Indiana; *Kargo Global, Inc. v. Advance Magazine Publishers, Inc*., "Opinion & Order," No. 06 Civ. 550 (U.S. SDNY; Aug. 2007); *Government Employees Insurance Company v. Google Inc., et al.,* East. Dist. of Virginia, 2005 U.S. Dist. LEXIS 18642, 77 U.S.P.Q.2D (BNA) 1841; *THOIP v. The Walt Disney Co. et al*., OPINION AND ORDER(No. 08 Civ. 6823, S.D. NY, Feb. 2010).

[131] Research in psychology indicates that when survey participants are manipulated to focus on specific aspects, such aspects receive more attention and weight than they do under real marketplace conditions. Diverse lines of research have provided evidence for such a **"focusing illusion"** or **"focalism" bias**, which causes survey participants to focus too much on the information that is presented to them and not enough on the effects of other (less salient or unavailable) information. *See, e.g.*, Schkade, David and Daniel Kahneman (1998), "Does Living

led to focus on specific aspects and to select the "expected" (or obvious) answers. In the context of this litigation, this means that a survey whose stimuli (*e.g.*, the displayed products being tested) deviates from what consumers would encounter in the marketplace would yield biased estimates that are unrepresentative of consumers' true incremental WTP, if any, for a disputed Dave's Killer Bread product (*e.g.*, compared to the same product if the alleged technical regulatory violation were "cured").

57. A CBC task can be invalid by inducing a "focalism" bias, such as by artificially requiring participants to consider and choose among product "profiles" and attributes (or claims): (*i*) that participants would *not* otherwise consider; and (*ii*) that exclude information about relevant other product attributes and claims. The concern with focalism is supported by research on conjoint analysis; in fact, simply mentioning an attribute or claim in the conjoint task can make it appear important, even if this attribute is actually ignored in consumers' actual choices in the marketplace. For example, Professor Huber writes the following:[132]

> **Simply mentioning an attribute increases its importance, raising the specter of attributes appearing important that otherwise would be ignored in the market choices**. One way to limit this problem is to load the task with enough attributes so the unimportant ones are ignored in the task process. This task simplification screening is particularly strong in full-profile ratings and choices. [Emphasis added]

58. Here, Mr. Weir elects not to compare an *actual product* with *versus* without the %DV for protein on the nutrition label, but instead has chosen for his proposed CBC survey a limited set of **only two** (non-price) attributes (*i.e.*, brand and "label statements," the latter of

---

in California Make People Happy? A Focusing Illusion in Judgments of Life Satisfaction*,*" *Psychological Science*, 9(5), 340 – 346; Kahneman, Daniel, Alan B. Krueger, David Schkade, Norbert Schwarz, and Arthur A. Stone (2006), "Would You Be Happier If You Were Richer? A Focusing Illusion," *Science,* 312(5782), 1908 – 1910; Wilson, Timothy D., Thalia Wheatley, Jonathan M. Meyers, Daniel T. Gilbert, and Danny Axsom (2000), "Focalism: A Source of Durability Bias in Affective Forecasting," *Journal of Personality and Social Psychology*, 78(5), 821 – 836; *see also* Kivetz, Ran and Itamar Simonson (2000), "The Effects of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37(4), 427 – 448 (This article was a finalist for the 2005 *O'Dell Award* for the article that has had the greatest impact on the marketing field in the previous five years).

[132] Huber, Joel (1997), "What We Have Learned from 20 Years of Conjoint Research," *Research Paper Series*, Sequim, WA: Sawtooth Software, Inc., p. 10.

which includes only eight possible statements), and compares contrived, hypothetical product profiles (in a table format) that either *entirely include or exclude* a protein statement (*i.e.*, "5g Protein"). However, in the context of the disputed Dave's Killer Bread products, multiple other (*i.e.*, non-challenged) elements and claims appearing on the packaging shape consumers' perceptions and purchase decisions. A conjoint survey that fails to include a representative set of relevant attributes and claims deprives participants of the information to which they would otherwise have access in the real world. Excluding important attributes and claims while focusing participants on other attributes (in a way that makes the latter more salient than they would otherwise appear in reality) would generate demand and focalism biases, thereby invalidating the survey by *systematically <u>overestimating</u> and even artificially creating an alleged "price premium" for the included attributes or statements* (*e.g.*, *"5g Protein"*).

59.    Mr. Weir does not intend to test realistic bread, bagel, or burger bun packages (or any packages at all). Instead, in his proposed survey, participants will be shown product "profiles" represented as having varying combinations of attributes or statements that do *not* come close to resembling the information consumers consider when buying bread products in the real marketplace. Mr. Weir's assumption that showing incomplete and unrealistic product profiles in his survey would be sufficient to provide participants with realistic choices is contradicted by well-established literature in marketing and conjoint analysis, as well as by survey treatises and court decisions.[133] The adoption of Mr. Weir's approach would yield invalid and grossly upward-biased WTP and alleged "price premium" estimates, which cannot be corrected or adjusted.

60.    Next, I explain the multiple ways in which the Weir Proposed Conjoint Survey deviates from essential marketplace conditions and artificially focuses participants on the "5g Protein" statement, namely, by: (*1*) failing to justify his choice of attributes or levels (particularly for price, for which Mr. Weir provides no documentation of any systematic analysis), while

---

[133] *See, e.g.*, *McCarthy* (2007), §32:163; Simonson and Kivetz (2012); Winer (1999); *Simon Property Group L.P. v. MySimon, Inc*., 104 F. Supp. 2d 1033; 2000, U.S. Dist. S.D. Indiana; *Kargo Global, Inc. v. Advance Magazine Publishers, Inc*., "Opinion & Order," 06 Civ. 550 (U.S. SDNY; Aug. 2007); *THOIP v. The Walt Disney Co. et al*., OPINION AND ORDER, (08 Civ. 6823; S.D. NY; Feb. 2010).

using attributes and levels that will result in contradictory and confusing product profiles, including showing packaged bread brands that shoppers would never encounter; (*2*) omitting many relevant bread attributes and representations that consumers can and would otherwise rely on in the marketplace; (*3*) presenting stimuli outside of any packaging context; and (*4*) using highly leading and unrealistic design and task instructions that force participants to adopt contrived assumptions and hypotheticals about product profiles and choices.

D.1.1. *Mr. Weir fails to justify his selection of attributes and levels (particularly for price), and his included attributes and label statements result in **contradictory and confusing** product profiles*

61.    Because participants' choices and valuations are sensitive to both how many and which attributes are included in a conjoint task, the choice of attributes and claims is crucial. Leading authorities on conjoint analysis, including an authority cited by Mr. Weir,[134] have widely recognized the importance of selecting realistic stimuli and including important features, stating: "Defining proper conjoint attributes and levels is arguably the most fundamental and critical aspect of designing a good conjoint study."[135]  Not only is Mr. Weir's justification of conjoint attributes and levels (or claims) fundamentally lacking, but also the ranges/levels he specifies for key attributes (Price and Brand) are unjustified and problematic.

62.    ***First***, in justifying his choice of attributes for his proposed CBC study, Mr. Weir states that he based the attribute selection on "a review of Dave's Killer Bread and competitor labels and websites, the cognitive interviews, the documentary evidence, and the deposition of Dave's Killer Bread employees."[136]  However, Mr. Weir fails to provide any details or

---

[134] Mr. Weir cites Bryan Orme, the president of Sawtooth Software; Weir Declaration, ¶¶ 20, 66 & 68.

[135] Orme, Bryan (2002), "Formulating Attributes and Levels in Conjoint Analysis," *Research Paper Series*, Sequim, WA: Sawtooth Software, Inc., p. 1.  *See also* Green, Paul E., and Venkatachary Srinivasan (1978), "Conjoint Analysis in Consumer Research: Issues and Outlook," *Journal of Consumer Research*, 5(2), 103 – 123; Green, Paul E., Abba M. Krieger, and Pradeep Bansal (1988), "Completely Unacceptable Levels in Conjoint Analysis: A Cautionary Note," *Journal of Marketing Research*, 25(3), 293 – 300.

[136] Weir Declaration, ¶ 47, FN 23.

explanation of the criteria he used in determining which attributes to ultimately include. His review of materials identified **only two (2)** non-price attributes for inclusion in his proposed conjoint survey: Brand and Label Statements (*i.e.*, the focal attribute).[137]

63.    **Second**, Mr. Weir's non-focal attributes (*i.e.*, those other than the "Label Statements" attribute for which he intends to calculate an alleged "price premium") were evidently *not* chosen to represent product attributes that are important to consumers or to make the product options ("profiles") realistic and representative of actual real-world products. Instead, Mr. Weir states that he chose non-focal attributes as *distractors* that were "selected to be believable and understandable."[138] Mr. Weir's assertions reveal a fundamental misunderstanding of the goals of conjoint analysis. Contrary to Mr. Weir's assertion,[139] the goal of including other attributes is *not* to serve as "distractors" that "disguise" the research purpose and sponsor from participants, or to seem "believable and understandable."[140] Rather, the goal, based on the scientific literature, should have been to **accurately represent a <u>real</u> market and <u>realistic</u> products**, and thereby simulate the choices and WTP that consumers would reveal in the actual, relevant marketplace.[141]

64.    In other words, for the conjoint analysis to provide valid estimates of consumers' valuations in the actual marketplace, the non-focal attributes included in the survey must **represent relevant tradeoffs that consumers actually make in the marketplace** (*i.e.*, as opposed to distracting participants, obscuring aspects of the survey, or persuading participants to perceive a fundamentally unrealistic task as plausible or believable).[142] Therefore, while not every

---

[137] *See, e.g., id.*, ¶¶ 51 & 53.

[138] *Id.*, ¶ 52.

[139] *Ibid.* ("The main attribute/level of interest is the Claim. The other attributes are distractor attributes, and were selected to be believable and understandable.").

[140] *Ibid.*

[141] *See, e.g.*, Huber (1997).

[142] Mr. Weir's claim at his deposition that choosing "reasonable attributes" means including attributes that are "plausible and understandable" (Weir Deposition, p. 186)—rather than the most relevant and important attributes—reflects a personal opinion and is *not* substantiated by the literature.

possible feature or competitive product needs to be included in the conjoint study, those that are *most relevant* to accurately simulating the market (*e.g.*, the most important product attributes/claims and the primary competitor brands/products) must be included.[143]

65.     ***Third***, regarding the price levels to be used in the conjoint task itself, Mr. Weir indicates only that each product profile will have one price "ranging from $4.49 to $7.49,"[144] but does not specify what these prices would actually be or whether different brands will be shown with different price ranges.[145]  The sample conjoint choice task shown in the Weir Declaration lists the prices $4.49, $6.99, and $7.49 for Products A ("Dave's Killer Bread"), B ("O Organics"), and C ("365"), respectively,[146] with no justification for these prices.[147]  In fact, such a price distribution—in which the *store brands* O Organics and 365 are priced at a 56% and 67% markup, respectively, relative to Dave's Killer Bread, a major name brand in California—is unrealistic.

66.     At his deposition, Mr. Weir testified that he based his price range on IRI sales data, retailer websites, and in-store prices.[148]  Mr. Weir then stated that when inspecting the IRI sales data, he dropped as "outliers" prices within the "lowest 2 ½ percent and the highest 2 ½

---

[143] At his deposition, Mr. Weir referred to conjoint analysis as a "parsimonious model" that is "rarely intended to include every possible element of a product"; *id*., p. 177.  This "straw man" statement misses the point.  I agree with the notion that a proper conjoint survey need not include every aspect or attribute that describes a product.  However, as noted previously, it is well-established in the conjoint literature that *the most important product attributes and representations* must be included to accurately assessing consumers' valuation of different product features and attributes.

[144] Weir Declaration, ¶ 53.

[145] Mr. Weir subsequently testified at his deposition that he plans to apparently include seven levels for price, broken into 50-cent increments (a plan that was never specified in his declaration); *see* Weir Deposition, p. 249.

[146] Weir Declaration, ¶ 54.

[147] Mr. Weir only states vaguely, with no further details or analysis, that "[t]he price points in the conjoint survey were derived from a review of historic, through the register transaction data from Information Resources, Inc.; a market scan of prices presently in the market; the cognitive interviews; and documentary evidence"; *ibid.* & FN 30.

[148] Weir Deposition, pp. 143 & 306 – 307.

percent"[149] by sorting and visualizing the data.  In addition, Mr. Weir testified that his store visits were conducted at two grocery stores (Roche Brothers and Whole Foods) in *Boston*,[150] and that he only entered a Los Angeles zip code when searching on retailer websites.[151]  Given the importance of pricing to Mr. Weir's proposed survey and analysis (as he admitted),[152] as well as his purported "consideration" of supply factors, ***it is inexplicable that Mr. Weir would propose a conjoint survey without conducting the proper due diligence, such as a rigorous and systematic analysis of pricing data***.  Such an undocumented and unsystematic approach further undermines the credibility of, and invalidates, Mr. Weir's entire conjoint survey and damages estimation approach.

67.     ***Fourth***, regarding the brands to be presented in his conjoint study, Mr. Weir proposed four brands: Dave's Killer Bread, Oroweat, O Organics, and 365.[153]  However, Mr. Weir does not explain how these brands were chosen and provides no citations or justification for selecting these particular brands.  This is highly problematic, because if consumers do not see their preferred brand in the conjoint task, they will be less likely to choose based on brand in the conjoint task than in the real world, and they will be induced to artificially focus instead on other attributes, including the "5g Protein" statement.

68.     In fact, the selection of brands—specifically O Organics and 365—in the Weir Proposed Conjoint Survey is highly problematic.  I understand that O Organics, an Albertsons

---

[149] *Id.*, p. 308 ("Q. So how many would qualify as an outlier? A. Typically drop the lowest 2 ½ percent and the highest 2 ½ percent. Q. Did you do that calculation here to come up with $4.49 to $7.49? A. I don't know if I did the calculation, per se, but you can sort the data and visualize that, yes. Q. In your brain? A. Yes.").

[150] *Id.*, pp. 90 & 326 – 327 ("Q. Just those two, those are the only ones you went to? A. Correct. Q. And those are located here in Massachusetts? A. Yes. Q. And what's the class here? A. California.").

[151] *Id.*, p. 327.

[152] *Id.*, p. 313 ("Q. The pricing is really important, Mr. Weir, isn't it? A. I believe it's important to get the pricing correct, yes. Q. It impacts your conjoint survey. It impacts your market simulation. You're using that for your supply side. Pricing is super important here, isn't it, sir? A. I've agreed with you that I believe it's important to get the pricing correct.").

[153] Weir Declaration, ¶ 53.

store brand, discontinued its packaged slice bread products in 2022.[154]  Hence, consumers who are presently in the market for packaged sliced bread would simply never encounter an O Organics-branded sliced bread product.  Mr. Weir's proposed conjoint survey would therefore show participants a discontinued product that would be ***irrelevant*** for their purchase decisions in the actual marketplace.

69.     Further, even setting aside this issue, the O Organics and 365 brands would be sold at Albertsons Companies and Whole Foods stores, respectively; however, as I discuss further in Section G, the Weir Proposed Conjoint Survey fails to include *any* necessary question to screen for whether potential participants shop at Albertsons Companies[155] or Whole Foods.  Consumers who do not shop at Albertsons Companies or Whole Foods would *not* be likely to ever encounter the O Organics or 365 brands of packaged bread, respectively.  Moreover, consumers who shop for sliced bread at Whole Foods would *not* encounter the Oroweat or O Organics brands in the same store, while shoppers at non-Whole Foods retailers would *not* encounter 365.  Therefore, Mr. Weir's proposed conjoint survey will force participants to make a series of 13 choices involving four brands, two of which are store brands that *they may never encounter or consider*, and one of which is discontinued.  Such choices would *not* resemble the real-world purchase decisions that shoppers of packaged sliced bread actually make in the marketplace.

70.     ***Fifth***, the Weir Proposed Conjoint Survey would present participants with "label statements" that are ***contradictory and confusing*** in multiple ways.  For example, the fact that some product "profiles" will appear to participants as "missing" certain attribute levels (or

---

[154] *See* February 8, 2024 Declaration of Dan Letchinger in Support of Flowers Foods, Inc.'s and Dave's Killer Bread, Inc.'s Opposition to Plaintiff's Motion for Class Certification ("Letchinger Declaration"), ¶ 14 ("I am informed and understand that O Organics sliced bread is not being sold currently in California and was discontinued in that market sometimes during 2022").

[155] That is, any of the Albertsons-affiliated grocery chain retailers in California that operate under the following company banners: Albertsons, Andronico's, Pavilions, Safeway, and Vons. *See, e.g.*, https://s29.q4cdn.com/239956855/files/doc_financials/2022/q2/ALBCIV193194_ACIInvestorRelations_Q2_FactSheet_FINAL.pdf (Albertsons Companies Factsheet).

claims)[156] further distorts the potential meaning that participants could take away with respect to these levels, including the "5g Protein" statement.  To illustrate the "missing" attribute levels problem, consider the "5g Protein" statement, which appears in Figure 3 below (reproduced from the Weir Declaration) in the "Dave's Killer Bread" and "365 Whole Foods Market" product profiles, but not in the "O Organics" profile.  It is entirely unclear based on Mr. Weir's construction of his CBC design how a participant who views this sample choice task would or should interpret the *absence* of "5g Protein" for the O Organics product.  That is, would (or should) the fact that "5g Protein" is missing from O Organics mean: (*i*) simply that this statement happens to be absent from the O Organics product label; (*ii*) that the underlying *feature or attribute* itself is absent in the O Organics product (*i.e.*, that unlike Dave's Killer Bread and 365, the O Organics product simply has *no* grams of protein at all); (*iii*) that the O Organics product has a smaller but undisclosed amount of protein; or (*iv*) any other possible reason that a consumer might infer for the absence of the "5g Protein" label?

(*Continues on next page*)

---

[156] At his deposition, Mr. Weir claimed that participants would see a supposed "blank" if a label statement is not displayed; when asked to explain how this "blank" would appear to participants, Mr. Weir characterized the "blank" as being there "conceptually" and "by virtue of the fact that the 5g protein claim is not present there"; Weir Deposition, pp. 207 – 208.  Mr. Weir then admitted that he is not measuring whether participants "interpret the absence of the claim in any particular way"; *id*., p. 209.

**Figure 3: Sample CBC Choice Task in the Weir Proposed Conjoint Survey** [157]



71.     In fact, because the Weir Proposed Conjoint Survey does *not* depict any realistic representation of the product packaging on which the label statements could appear, it is likely that at least some (if not many) participants would hold the second interpretation—that is, to assume that a "missing" statement means that the underlying attribute itself (rather than simply the label statement) is absent from that product (*e.g.*, the bread does not provide any protein). Such an interpretation—which Mr. Weir fails to even mention—would further artificially inflate

---

[157] Weir Declaration, ¶ 53.  I highlighted the "5g Protein" statement in red rectangles and the two "Organic" mentions in green rectangles.

the estimated "importance" ascribed to (and the purported increased willingness to pay for) the "5g Protein" statement.

72.    Similarly, consider the use of the "USDA Organic" statement, one of the eight label statements that will be used in Mr. Weir's proposed conjoint study.  What would consumers take away from the fact that the statement "USDA" Organic will not always accompany the "O Organics" product profile—a brand that (as many consumers are likely to be aware of) specifically promotes itself as selling only organic products (*see, e.g.*, Figure 3 above)? That "O Organics" will always have an organic designation embedded in its name and yet would sometimes appear with and sometimes without "USDA Organic" is contradictory and likely to confuse participants.  Further, Mr. Weir's conjoint model would then presumably count the O Organics product profile shown in Figure 3 as *not* having the organic statement, despite the fact that the product profile would clearly be represented to participants as organic.

73.    ***Finally***, Mr. Weir provides *no* justification for the many attributes and claims he chose to omit from his proposed survey (as I detail subsequently).  While it may be reasonable to omit certain *non*-important attributes from a conjoint survey, the logistical benefits of including fewer attributes *cannot* justify the exclusion of important product attributes and packaging claims; such an omission fundamentally biases the results in the Plaintiff's favor.  As one industry guide notes:[158]

> Clients often want to know "Which attributes are most important?" but CA [conjoint analysis] can only answer this with regard to the relative utilities of the

---

[158] Chapman (2013); *see also* Huber (1997).  Mr. Weir's rejection of the premise that conjoint analysis measures *relative utilities* is erroneous and is at odds with established literature in the field; *see, e.g.*, Weir Deposition, pp. 256 – 257 ("Q. But none of the elements of value or utility is being fed into the market simulator except for the attributes that you've identified in your survey. A. Yeah. The problem is you're still stuck on the idea that you can only measure the value of the things relative to the other things in the survey, and I reject that premise. You get independent valuations and information about each of the attributes within the survey. […] Q. But the entire price or utility or value of the bread as you're presenting it in the survey aspect is relative to the attributes that you're including in the survey. A. No, it's not because we expressly tell people to think and be aware of the fact that there are other attributes that aren't there. […]"); p. 187 ("Q. Is it true the conjoint is testing the relative utility of, in this case, protein against the other attributes and attribute levels that you selected? A. I don't believe that's correct.").

attributes and features tested.  Including (or omitting) a very popular or unpopular level on one attribute will alter the "importance" of every other attribute!

74.    Nor can simply adding a small handful of additional attributes correct the invalid nature of the survey.  If the set of attributes and claims that typically characterizes the products at issue is too large to be realistically included in the CBC survey, then the appropriate course of action would be to consider an alternative survey methodology altogether, rather than (as Mr. Weir proposes) design and deploy a contrived survey whose methodology is fatally flawed.

D.1.2.  *The Weir Proposed Conjoint Survey artificially highlights the "5g Protein" statement by omitting many relevant attributes and representations*

75.    A major deficiency of the Weir Proposed Conjoint Survey is its omission of relevant attributes.  Excluding from a conjoint survey attributes and representations that are valuable to consumers yields biased and invalid estimates of the overall market value of the product and of any alleged "price premia" for specific product attributes or packaging claims. As detailed below, the Weir Proposed Conjoint Survey grossly violates marketplace conditions by artificially highlighting the "5g Protein" statement in the CBC task to the exclusion of many relevant product attributes and claims upon which consumers rely when making real world purchase decisions.

76.    ***First***, the Weir Proposed Conjoint Survey purports to address all omitted product attributes by simply instructing participants that: "Any features not shown in the exercise are assumed to be the same across the possible choices presented."[159]  This blanket instruction fails to address the issue of omitted attributes for a simple reason: In the actual marketplace, packaged bread products *do* differ on multiple other attributes that consumers could and likely do care about.  In fact, trading off the attributes specified in the Weir Proposed Conjoint against other omitted attributes and features is a relevant aspect of consumers' real-world purchase decisions, and omitting these other attributes from the conjoint survey deviates from marketplace conditions and induces a focalism bias.  Strikingly, Mr. Weir himself noted the importance of packaging, stating that his cognitive interviews (of eight respondents) revealed that "brand and packaging

---

[159] Weir Declaration, Exhibit 3, p. 57.

were the starting point for many bread purchases";[160] ***yet, participants in his proposed CBC survey will never see any packaging at all***.[161]

77.    ***Second***, the Weir Proposed Conjoint Survey omits, without explanation or justification, product aspects and claims that are often prominently displayed on bread product packages (of both Dave's Killer Bread and competitors) that are plausible differentiators and purchase motivators for consumers.  Exhibit D shows examples of some disputed Dave's Killer Bread product packages, each of which features a wide range of *non*-challenged claims and representations—but all of which the Weir Proposed Conjoint Survey omits and would prevent participants from seeing.  Similarly, Exhibit D shows examples of product packages for two of the three (non-discontinued) *competing brands* that Mr. Weir intends to include in his proposed survey (*i.e.*, Oroweat and 365).  As the figures in Exhibits D and E demonstrate, the choice tasks presented to participants in the Weir Proposed Conjoint Survey would inappropriately *exclude*:[162]

- *any* depiction of the visual appearance of the packaging (*e.g.*, the design, formatting, colors, aesthetics, imagery, and "look and feel" of the package);

- *any* depiction of the visual appearance of the bread themselves, which can convey important information to a consumer about the type of bread (*e.g.*, multigrain, sourdough, rye, sprouted, etc.), the texture, the presence of any toppings (*e.g.*, seeds, nuts), the shape, the thickness, and the freshness;[163]

- *any* depiction of the actual product name (*e.g.*, "21 Whole Grains and Seeds" [Dave's Killer Bread]; "22 Grains & Seeds" [Oroweat]; "Organic Ancient Grains Sandwich

---

[160] Weir Declaration, ¶ 40.

[161] I discuss the Weir Proposed Conjoint Survey's failure to show any product packaging in greater detail in the next subsection.

[162] *See, e.g.*, Weir Declaration, ¶¶ 53 – 54.  *Cf.* Exhibits D and E to this *Expert Declaration*.

[163] ███████████████████████████████████████████████████

Bread" [365]);

- *any* information about the type of bread (*e.g.*, whole grain, multigrain, sourdough, rye, sprouted, etc.) or flour (*e.g.*, bleached, enriched, etc.);

- *any* information about the number of slices of bread in the package (in fact, the survey does not even represent to participants whether the breads they are choosing among are sliced or unsliced loafs);

- *any* depiction of the size and location of different label statements and imagery;

- *any* depiction of the **nutrition label** (located on the side or back of the packaging) or the information conveyed by the NFP; this omission is especially egregious given that the nutrition label is central to the issues in this litigation;

- *any* information about the amount (in grams) of fiber (instead including only the general label statement "Good Source of Fiber"[164]—despite the fact that at least some consumers may perceive all breads to be a relatively "good" source of fiber);

- *any* information about the amount of calories;

- *any* information about the amount of carbohydrates (which I understand are high in bread products in general);[165]

- *any* information about the amount of other nutrients, such as Omega-3;

- *any* information about the amount of ingredients such as sugar, fat, cholesterol, and sodium;

- *any* information about other toppings, such as seeds, oats, or nuts;

- *any* information about the brand's heritage, story, or mission/vision (*e.g.*, in the case of Dave's Killer Bread, language printed on both sides of its sliced bread packaging informs consumers about the founder's story and the brand's commitment to "second chances" through employing individuals with a criminal background);

- *any* information about the expiration date (which can be informative to consumers of a bread's freshness).

78.    The Weir Proposed Conjoint Survey completely ignores and omits—and thus prevents participants from considering in their CBC choices—all of these factors.  Indeed, as I

---

[164] I understand that the FDA has specific requirements for labeling a food product with a "Good Source" claim; *see, e.g.*, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/cfrsearch.cfm?fr=101.54 ("(1) The terms 'good source,' 'contains,' or 'provides' may be used on the label and in the labeling of foods, except meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that the food contains 10 to 19 percent of the RDI or the DRV per reference amount customarily consumed").  However, consumers would *not* commonly hold this definition when evaluating claims such as "Good Source of Fiber."

[165] *See, e.g.*, https://www.medicalnewstoday.com/articles/161547.

detail in the next subsection, ***the proposed survey does not even purport to show participants the product packaging*** as consumers would actually view them in the real marketplace. Critically, the attributes, benefits, and representations outlined above (*see also* Exhibits D and E)—which are not at issue in this litigation—differentiate among packaged bread products and can influence consumers' purchase decisions. Such attributes, benefits, and representations are clearly visible or accessible to consumers during the purchase decision process in the actual marketplace. Omitting such information from the conjoint task—as Mr. Weir's proposed survey would do—severely distorts marketplace conditions and invalidates any damage estimates based on the survey's results.

79.    ***Third***, Mr. Weir's proposed conjoint task focuses participants' attention on a limited set of product attributes,[166] including "Label Statements" (one of which is "5g Protein"). As detailed earlier, the packaging of both Dave's Killer Bread and competitors' bread products contain a large variety of (non-challenged) attributes, claims, and representations. However, the Weir Proposed Conjoint Survey (*see*, *e.g.*, Figure 3 above) presents only one attribute ("Label Statements")[167] in addition to brand and price. As a result, the "Label Statements" attribute—and specifically the "5g Protein" statement—would be overrepresented in Mr. Weir's proposed CBC task compared to its relative prevalence and prominence in the marketplace.

80.    The severe (and invalidating) demand effect in the Weir Proposed Conjoint Survey is exacerbated by the fact that (as I discuss further in Subsection D.1.4) participants will be asked to make ***13 choices***, each between three bread product "profiles." Thus, over the course of multiple repetitive choices, participants could easily infer that if protein were not important, then the researcher would not create a survey that: (*i*) highlights the same set of label statements (one of which is "5g Protein") over and over; and (*ii*) focuses on a narrow set of attributes and statements at the expense of many other attributes, benefits, and representations (which

---

[166] The conjoint design will create each "product profile" by picking one brand, one price, and displaying "one or more" (but otherwise unspecified number of) label statements (including "5g Protein"). *See* Weir Declaration, ¶ 53.

[167] The "Label Statements" attribute may consist of eight levels, corresponding to each of the specific statements pre-selected by Mr. Weir (*e.g.*, "5g Protein," "USDA Organic," etc.).

consumers encounter and rely on when making real-world purchase decisions in the category). The demand effect and focalism bias generated by the Weir Proposed Conjoint Survey would artificially sensitize participants to protein, leading to a gross overestimation of any supposed WTP or alleged "price premium" paid due to this attribute.

81.     ***In summary***, by inappropriately excluding many attributes, claims, and purchase considerations, the Weir Proposed Conjoint Survey would artificially increase the weight of the survey's included attributes and label statements in participants' choices (including "5g Protein")—compared to their actual importance (or lack thereof) in real-world purchase decisions.[168]  In effect, the survey that Mr. Weir proposes to conduct would put "blinders" on participants by inappropriately constraining the factors they can weigh in their choices, while simultaneously forcing participants to focus on a narrow set of attributes, and specifically the "5g Protein" statement.  Such a flawed survey approach would generate invalid and upward-biased estimates for "5g Protein" (compared to no "5g Protein") that do *not* reflect or predict consumers' actual WTP or valuation in the real world.

82.     The Weir Proposed Conjoint Survey's improper "narrowing" of participants' attention to label statements that include "5g Protein" is akin to a scenario in which prospective car purchasers are asked to choose among different car models but are only informed about the cars' brands, prices, and whether or not each car has a cupholder (of varying sizes, functionalities, or quality).  When forced to make tradeoffs among such a limited attribute set (one that omits many relevant attributes on which consumers would rely in the marketplace when purchasing a car), it is not surprising that a consumer would suddenly "value" and express a high WTP for the presence of a cupholder (or for a larger, more functional, or higher quality cupholder)—even though that consumer may not have otherwise thought about a cupholder at all.  Such a "cupholder effect" would not reflect consumers' actual valuation of this feature, but would instead be an artifact of the "tunnel vision" created by presenting consumers with a highly constrained and unrepresentative choice and attribute set.

---

[168] For relevant academic research, *see, e.g.*, Huber (1997); Kahneman et al. (2006); Kivetz and Simonson (2000); Schkade and Kahneman (1998); Wilson et al. (2000).

D.1.3.   *The Weir Proposed Conjoint Survey artificially highlights the "5g Protein" statement by presenting it outside the context of any packaging*

83.      The Weir Proposed Conjoint Survey will further induce severe demand and focalism biases by presenting stimuli in a completely **decontextualized, unrealistic, and inaccurate manner**.  Such a presentation is diametrically opposed to the fundamental survey principle that a challenged representation should be evaluated in the context in which it appears and in which consumers encounter that representation (*e.g.*, on a product package).

84.      **First,** the ability to see and inspect the actual bread inside its packaging likely plays a key role in many consumers' purchase decisions.  Considerable research has established the importance of packaging and product appearance in consumer perceptions and purchases.[169]  The importance of packaging appeal and product appearance/design in customers' purchase decisions, as well as in brand differentiation and positioning, is well-documented in academic literature.[170]  Given that the brands included in the Weir Proposed Conjoint Survey sell sliced bread in transparent packages, it is especially critical that participants be exposed to a visual representation of the breads themselves.  The Weir Proposed Conjoint Survey will completely fail to do so, and Mr. Weir's survey approach cannot be corrected or adjusted to rectify this severe shortcoming.

85.      **Second,** although the visual appearance of Dave's products and packages is a prominent factor that likely affects many consumers' purchase decisions, the Weir Proposed Conjoint Survey will *not* display any visual images other than standalone brand logos in the CBC

---

[169] *See, e.g.*, Winer, Russ and Ravi Dhar (2011), *Marketing Management* (4th ed.), Upper Saddle River, NJ: Pearson Prentice Hall; Creusen, Marielle E. H. and Jan P. L. Schoormans (2005), "The Different Roles of Product Appearance in Consumer Choice," *Journal of Product Innovation Management*, 22(1), 64 – 81; Bloch, Peter H. (1995), "Seeking the Ideal Form: Product Design and Consumer Response," *Journal of Marketing*, 59(3), 16 – 29.  In many cases, packaging (part of the *Product* and *Promotion* elements of the marketing mix) forms a crucial aspect of the product's marketing, branding, and positioning.  Indeed, two of the primary objectives of the product's packaging and labeling are to identify the brand and to convey descriptive and persuasive information; Kotler, Philip and Kevin L. Keller (2009), *Marketing Management*, 13th Ed., Upper Saddle River, NJ: Pearson Prentice Hall, p. 339.

[170] *See, e.g.*, Winer and Dhar (2011); Peter, J. Paul and Jerry C. Olson (2008), *Consumer Behavior and Marketing Strategy* (8th ed.), Boston, MA: McGraw-Hill/Irwin; Cruesen and Schoormans (2005); Bloch (1995).

choice tasks.[171]  Figure 4a below shows a photo taken of the Dave's Killer Bread 21 Whole

Grains and Seeds product sold in the marketplace, whereas Figure 4b below shows an example

of how this product would presumably be presented to participants in the Weir Proposed

Conjoint Survey.



| **Figure 4a: Photo Showing the Front View of a Dave's Killer Bread Sliced Bread Package Sold in the Marketplace** [172] | **Figure 4b: Dave's Killer Bread Product Hypothetical Sample "Profile" as it Would be Shown to Participants in the Weir Proposed Conjoint Survey** [173] |





86.     When a study only shows participants a written list of product descriptions (or

displays a truncated, distorted, and/or unrealistic visual representation of the product), the salient

---

[171] *See* Weir Declaration, ¶¶ 50 – 54; *see also id.*, Exhibit 3.  Mr. Weir also confirmed at his deposition that he will *not* show any product packaging; *see, e.g.*, Weir Deposition, p. 172.

[172] Image not to scale.  *See, e.g.*, https://www.safeway.com/shop/product-details.960038380.html (Oakland, CA).  Price omitted.

[173] Based on the sample CBC choice task shown in Weir Declaration, ¶ 54.

visual and textual cues that consumers use in their purchasing decisions are artificially excluded and distorted, inflating the measured importance of the tested (and focused on) attribute or statement. Relatedly, academic writing on conjoint analysis has found that estimates from conjoint surveys can be highly sensitive to "image realism."[174] Indeed, one of the conjoint studies cited in the Weir Declaration noted, as a key limitation of the research, the fact that "the test messages were presented in text format and were not integrated with graphics, labels or logos,"[175] and that the "[p]lacement of nutrition content claims relative to other advertising copy may well influence consumer response."[176]

87.     Importantly, consumers form perceptions of a challenged claim (if they even pay attention to the claim) in the context in which it appears. As Mr. Weir clearly recognizes,[177] the alleged violation at issue relates to a (front label) protein statement on the disputed Dave's Killer Bread products' *packaging* or *label*. Hence, by Mr. Weir's own admission, a conjoint study conducted in this litigation should relate to the protein statement *on the product's label*. It is striking that the Weir Proposed Conjoint Survey does *not* even attempt to examine consumers' valuations *within the context of the actual packaging*. By presenting, for example, the "5g Protein" statement outside the context of an actual, realistic package, the Weir Proposed Conjoint Survey would distort participants' comprehension and interpretation of this attribute

---

[174] *See* Hauser, John R., Felix Eggers, and Matthew Selove (2019), "The Strategic Implications of Scale in Choice-Based Conjoint Analysis," *Marketing Science*, 38(6), 1059 – 1081. For example, the authors of this article write: "Our results suggest that when equilibrium prices are used to replace WTP calculations, equilibrium-price estimates are extremely sensitive to craft. **Image realism**, incentive alignment, and likely other seemingly minor craft investments have impacts in the range of tens to hundreds of millions of dollars" (emphasis added); p. 1075; *see also* p. 1059 ("We demonstrate empirically that **image realism** and incentive alignment affect scale sufficiently to change strategic decisions and affect patent/copyright valuations by hundreds of millions of dollars [emphases added]").

[175] Drewnowski et al. (2010), p. 693.

[176] *Ibid*.

[177] *See, e.g.*, Weir Declaration, ¶ 5 ("I have been advised by Counsel for Plaintiff that Swartz and other class members purchased certain **Dave's Killer Breads [*sic*] products that prominently displayed labels** claiming that the Products contained a specific level of protein per serving […]" [emphasis added]).

level.  Further, by repeatedly focusing participants on the protein statement across the multiple

(13) conjoint choices, the survey would artificially increase, and virtually *guarantee*,

participants' attention to this attribute—thereby artificially inflating the measured WTP.

88.    **Second,** the Weir Proposed Conjoint Survey fails to realistically present the

at-issue protein statement, leading participants to overweigh this statement relative to how

consumers would weigh such a statement when encountering a real package in the marketplace.

In Mr. Weir's proposed survey, and as shown in Figure 4b above, the label statements are

presented using a textual description in a table, *using the same font typeface and font size for all

statements presented* (both within a single product profile and across profiles).  In particular, the

specific protein statement (*e.g.*, "5g Protein")—which in actuality appears on the front labels of

the disputed Dave's Killer Bread sliced bread products in smaller font in the lower left area—

would be comparable in size, location, typeface, and prominence to all other statements shown in

Mr. Weir's proposed survey, such as an organic claim.  By contrast, as shown in Figure 4a, an

"organic" claim (*i.e.*, "USDA Organic" and "Organic Bread"), as well as the "21 Whole Grains

and Seeds" statement—which would not even be shown to participants in the Weir Proposed

Conjoint Survey—are more prominently displayed on the front label.  Such an artificial

equivalence between the statements shown in the proposed survey leads participants to overweigh

less conspicuous label statements relative to more prominent representations (*e.g.*, an "organic"

claim, "21 Whole Grains and Seeds") that consumers would be exposed to in the actual

marketplace.  This is another severe bias in Mr. Weir's proposed conjoint survey, which would

cause participants' responses to systematically deviate from consumers' choices and information

processing in the real world.[178]

---

[178] In fact, Mr. Weir's proposed conjoint survey would be agnostic to, and would estimate the same alleged "price premium" for, a protein statement that appears in fine print on the package versus a protein statement that occupies the entire principal display panel (PDP) on the front.  *See, e.g.*, Weir Deposition, pp. 214 – 215 ("Q. So if the label statement '5g of protein' were simply very, very small front on the end of the bread, as I'm holding up here – You can see my hand in the bread, Mr. Weir? A. Yes. Q. – versus my entire hand on the front of the package, your survey is going to have the exact same price premium for those two things, correct? A. I don't know whether

89.     ***Third,*** because Mr. Weir's proposed survey would not include any depiction of the packaging, it would *not* and could *not* measure the effect of "curing" the alleged technical regulatory violation by adding the %DV for protein to the nutrition label.  The lack of context in Mr. Weir's proposed conjoint survey deviates sharply from marketplace conditions and would "measure" an alleged "price premium" estimate that ignores the reality of consumers' exposure to the nutrition label—***the exact issue that is central to the Plaintiff's theory of liability***.

90.     ***Overall***, the Weir Proposed Conjoint Survey would test consumers' valuations of a "5g Protein" statement using a highly artificial, decontextualized task that fails to present participants with *any* stimulus that approaches a commercially viable bread product or package.  Mr. Weir's proposed survey, which does not even approach mirroring consumers' marketplace experiences, would thus be fundamentally invalid and unreliable, and would fail to predict or quantify actual consumer preferences, demand, or WTP.

D.1.4.  *The Weir Proposed Conjoint Survey's design and instructions are highly leading and unrealistic, further highlighting the "5g Protein" statement*

91.     Additional aspects of the Weir Proposed Conjoint Survey—specifically, its design and instructions—are also leading and further invalidate the survey.

92.     ***First***, the Weir Proposed Conjoint Survey's "within-subjects" design is fundamentally leading and would bias upwards the WTP estimates.  Mr. Weir's procedure and questions are such that the survey's purpose and hypotheses would be obvious to participants.  The survey explicitly emphasizes the "Label Statements" attribute (including specifically the "5g Protein" statement) by repeatedly varying whether a given statement appears or not in the product profile across the three options in each of the 13 choice tasks presented to each participant.  This methodology is akin to a "*within-subjects*" research design, in which participants provide a response to an outcome measure (*e.g.*, choice of a bread product) while being exposed to different *levels* of the variable of interest (*e.g.*, "5g Protein" vs. no protein statement).  Such a within-subjects design not only focuses participants on the tested statement,

---

my survey would or would not because that's not the circumstances for the Dave's Killer Bread product that we're modeling today.").

but also leads participants to (over)weigh this information in a manner that does not represent consumers' actual purchase decision-making in the real marketplace.

93.    One major drawback of such a within-subjects design is that it reveals to participants the factor being investigated and the research hypothesis.[179]  Indeed, there is no doubt that such a design would make it obvious to participants that the survey is testing their beliefs, at least in part, about the importance and desirability of certain statements.  This, in turn, is likely to lead participants to guess and respond according to their lay theories about this topic, as opposed to exhibiting their true preferences, choices, and WTP or valuation in the actual marketplace.[180]

94.    **Second,** the instructions that Mr. Weir plans to present to participants prior to the choice tasks further exacerbate the survey's focalism bias.  According to Mr. Weir, after being instructed to make a series of assumptions (*e.g.*, that any features not shown are the same across all choice options), participants would then be "introduced to the levels of each attribute, and provided with some basic information about those levels."[181]  In Exhibit 3 of his declaration, Mr. Weir attaches "Survey Programming Notes" that indicate how the above instructions will be worded.  For example, participants will initially read the introduction below:[182]

> Now imagine that **you are going to purchase a package of bread**.
>
> The following questions will involve a series of exercises.  In each exercise, you will make **two** choices.
>
> - First, **you will be shown packages of bread with different features and prices**.  You will be asked to **choose the bread with the set of features and prices shown that you most prefer**.

---

[179] *See, e.g.*, Kahneman, Daniel and Amos Tversky (1996), "On the Reality of Cognitive Illusions," *Psychological Review*, 103(3), 582 – 591; Kivetz and Simonson (2000).

[180] By contrast, in a "between-subjects" design, different groups of participants would be exposed to just one level of a variable.  For example, one group of participants would indicate their likelihood of purchasing a disputed Dave's Killer Bread product that is sold in a package which displays a front label protein claim and no %DV for protein, and a second group of participants would indicate their likelihood of purchasing an otherwise identical product, except that the %DV for protein has been added to the nutrition label.

[181] Weir Declaration, ¶ 53.

[182] *Id.*, Exhibit 3, p. 57.  Emphases in the original.

- You will next be asked whether, assuming you were really shopping for a package of bread and the options presented were your only options, you would be willing to buy **the bread that you chose**.

Followed by:[183]

For the purpose of these exercises, you should assume:

- Any features not shown in the exercise are assumed to be the same across the possible choices presented.

- Assume that all of the packages of bread are of the flavor/variety you prefer.

Each package of bread shown contains approximately 25 ounces.

And:[184]

The packages of bread that will be shown to you include one or more features within each of the following categories:

Brand
Label Statements
Price

Other than the features within each of the above categories, please assume that all other features will be the same across the packages of bread you will be shown.

We will now introduce you to the features of the packages of bread that will vary, and among which you will be asked to choose.

95.     Mr. Weir apparently also intends to include a "Choice Exercise Tutorial"[185] in which participants will be shown a sample choice task, after which they will again be told the following instructions:[186]

On each of the pages that follow there will be three hypothetical packages of bread presented, each with a different set of features. You will be asked to choose the bread that you most prefer **if there were no other options available AND all other features not mentioned in the exercise were the same across the breads shown**.

- Please assume that the price shown with each hypothetical package of bread presented is the best price available for this particular bread

Once you have chosen one of the packages of bread shown as your most preferred option you will then be asked a second question:

---

[183] *Ibid*.

[184] *Id*., pp. 57 – 58.

[185] *Id*., p. 58.

[186] *Id*., pp. 58 – 59. Emphases in the original.

- "Assuming you were actually shopping for a package of bread and the options presented were your only options, **would you be willing to buy the bread that you chose?**"

There will be thirteen of these choice exercises, after which the survey will conclude.

96.     The above sequence of instructions is highly leading, unrealistic, and focuses participants on the limited set of attributes and statements included in the conjoint task, to the exclusion of all other relevant product attributes and packaging statements.  Mr. Weir's directive that participants assume that any features not shown in the choice task are the same is *repeated three different times in close succession*.[187]  Such a directive is improper and contrived, effectively prompting participants to ignore (or suppress) any preexisting attitudes or opinions that they may actually hold about a given product or brand, product category, and/or specific statements.  The Proposed Weir Conjoint Survey will measure consumers' preferences based on an artificial and unrealistic assumption that everything else about the products is the same (except for price and a small number of label statements); however, in the actual marketplace, consumers do not encounter or make such bread product choices.  Consequently, the Weir Proposed Conjoint Survey would artificially inflate participants' attention—and ascribed importance—to those attributes that Mr. Weir deemed relevant and included in his survey.

97.     Mr. Weir's instruction that participants assume that "all of the packages of bread are of the flavor/variety you prefer"[188] is also improper and unrealistic, and stands in contrast to Mr. Weir's own "findings" from his limited "cognitive interviews" in which he states that: "I also identified that bread purchasers, to the extent they have prior experience with a brand, associate and recall the flavor of the bread associated with different brands."[189]  Despite the fact

---

[187] *Id*., pp. 57 & 58 ("Any features not shown in the exercise are assumed to be the same across the possible choices presented"; "Other than the features within each of the above categories, please assume that all other features will be the same across the packages of bread you will be shown"; "You will be asked to choose the bread that you most prefer **if there were no other options available AND all other features not mentioned in the exercise were the same across the breads shown**").  Emphases in the original.

[188] Weir Declaration, Exhibit 3, p. 57.

[189] Weir Declaration, ¶ 40.

that "Taste/Flavors"[190] was directly raised by Mr. Weir's own interviewees as a feature they "were interested in",[191] the Weir Proposed Conjoint Survey would prompt participants to disentangle their association of brand and flavor, and to treat an otherwise important feature as if it were *not* relevant or a differentiator at all. Doing so directly inflates the effect of the attributes and statements Mr. Weir does *choose* to include in his proposed conjoint survey.

98.    Likewise, Mr. Weir's directives that participants assume that the three options presented in each choice task are the only available options and that the price shown "is the best price available"[192] are unrealistic and do *not* resemble the conditions under which consumers shop for sliced bread in the marketplace. That is, consumers in actuality are well aware that they can choose among multiple different sliced bread products, and that prices vary across retailers, locations, and over time.

99.    Moreover, asking participants to both assume that they "are going to purchase a package of bread"[193] and subsequently telling them that the products shown in the exercise were their "only options"[194] all but inform the participant that they should acquiesce to the question of whether they "would be willing to buy the bread that [they] chose"[195] (*i.e.*, presumably representing the bread that they "most prefer").[196] In fact, it is noteworthy that Mr. Weir does not even ask participants whether they would actually buy the product, but instead asks whether they would be merely ***willing to buy*** their chosen bread. There is no doubt that the Weir Proposed Conjoint Survey will artificially decrease the weight of the price attribute and inflate participants' willingness to buy, in turn inflating the estimate of the alleged "price premium" attributable to the "5g Protein" statement.

---

[190] *Ibid*.

[191] *Ibid*.

[192] Weir Declaration, Exhibit 3, pp. 58 – 59.

[193] *Id.*, p. 57.

[194] *Id.*, p. 59.

[195] *Ibid*.

[196] *Id.*, p. 58.

100.    ***In summary***, beyond its egregious violation of marketplace conditions, Mr. Weir's conjoint task is leading, conducive to demand effects and focalism bias, and *cannot* yield valid and reliable estimates of any WTP or alleged "price premium" paid by the putative class members. The design of Mr. Weir's conjoint survey introduces serious systematic bias into the estimation of the effects, if any, of a protein statement (which, again, is not even appropriately tied to the theory of liability in this litigation).  In fact, it is entirely possible that at least some consumers making purchase decisions in the actual marketplace may not have considered (or even paid attention to) the amount of protein prior to purchasing a disputed Dave's product.  Mr. Weir has neither factored, nor given any indication that he would factor, this consideration into his proposed survey. Instead, the Weir Proposed Conjoint Survey will induce demand and focalism effects that will bias upward the estimated consumer WTP for "5g Protein" by inducing participants to pay attention to and treat this attribute level as important in their choices—even if they would otherwise not rely on it when making actual choices in the real marketplace.

## D.2.    The Weir Proposed Conjoint Survey Will Inflate Consumers' WTP for the "5g Protein" Statement by Always Presenting the Price Attribute Last

101.    It is well-established that the order in which survey participants are presented with information can influence their evaluation and weighing of that information.[197]  For example, to avoid the primacy effect,[198] a basic principle of survey design is to counterbalance the order of the answer choices or items presented to participants in closed-ended questions.  A primacy effect, as opposed to a recency effect, is more likely when participants answer a written survey (*e.g.*, over the Internet, as will be done in the Weir Proposed Conjoint Survey), in which they *read* the questions, as opposed to a phone-based or face-to-face interview, in which participants *hear* the question.

---

[197] Murdock Jr, Bennet B. (1962), "The Serial Position Effect of Free Recall," *Journal of Experimental Psychology*, 64(5), 482 – 488; Klatzky, Roberta L. (1975), *Human Memory: Structures and Processes*, San Francisco, CA: W.H. Freeman & Co.

[198] *See, e.g.*, Malhotra, Naresh K. (2004), *Marketing Research*, Upper Saddle River, NJ: Prentice Hall; *see also* Dhar, Ravi and Itamar Simonson (1992), "The Effect of the Focus of Comparison on Consumer Preferences," *Journal of Marketing Research*, 29(4), 430 – 440.

102.    In conjoint analysis, the order in which attributes are presented in each product "profile" can affect the attributes' measured importance.[199]  Moreover, the primacy effect has been shown to be particularly strong for the *price* attribute.[200]  Accordingly, conjoint analysis scholars have recommended that the order of attributes be randomized across participants.[201]

103.    Contrary to Mr. Weir's claim that "the attributes will be shown in a randomized order that will difer [*sic*] for each respondent,"[202] his proposed survey's attributes will in fact *not* be randomized, as "[b]rand will always be shown first, and price will always be anchored last"[203]—leaving only the "Label Statements" attribute in between.[204]  Mr. Weir's failure to rotate the position of the price attribute violates a basic principle of survey design.[205]  By always presenting price as the last attribute, the Weir Proposed Conjoint Survey will artificially lower participants' price sensitivity (or weight assigned to price).  This survey flaw in turn will *upward* bias the estimated WTP and alleged valuation attributed to the "5g Protein" statement, as well as for the other attributes and statements included in the survey, at the expense of multiple omitted attributes and statements (*see* Subsection D.1.2).

---

[199] Johnson, Richard M. (1989), "Assessing the Validity of Conjoint Analysis," *Sawtooth Software Conference Proceedings*, pp. 273 – 274 & 279.

[200] Chrzan, Keith (1994), "Three Kinds of Order Effects in Choice-Based Conjoint Analysis," *Marketing Letters*, 5(2), 165 – 172.  Mr. Weir admitted at his deposition that he had never heard that presenting price last could lower the estimated utilities or importance of price in a conjoint task; Weir Deposition, p. 245.

[201] *See*, *e.g.*, Green and Srinivasan (1978).

[202] Weir Declaration, ¶ 54.

[203] *Ibid*.

[204] At his deposition, Mr. Weir claimed that presenting price as the last attribute is purportedly supported by "the literature" because "people are going to see the product, and down below it is typically the shelf price"; Weir Deposition, p. 241.  This argument does *not* justify always displaying the price attribute last in a conjoint survey, given that the literature has found order and primacy effects particularly for this attribute. Moreover, it is worth noting that Mr. Weir's presentation does not remotely resemble how packaged bread products appear on store shelves in the first place.  As Mr. Weir also acknowledged, "people might notice price first" when they look for bread in the store; *ibid*.

[205] *E.g.*, Diamond (2011), 395 – 396.

### D.3.    Mr. Weir's Eight (8) "Cognitive Interviews" are Unscientific, Undisclosed, Unrepresentative, and Uninformative, and Neither These Interviews Nor his Proposed "Pretesting" Can Validate Whether the Proposed Conjoint Survey is Realistic, Non-Leading, or Unbiased

104.    Mr. Weir states that he has conducted "eight in-depth interviews of approximately 30 minutes in duration,"[206] from which Mr. Weir states that he "gained a better understanding of the drivers of consumer choices underlying bread purchases."[207]  Mr. Weir then uses these eight (8) interviews to draw multiple conclusions, regarding not only the appropriateness of the conjoint design,[208] but even questions regarding consumer purchase drivers and recall:

> I identified that brand and packaging were the starting point for many bread purchases.[209]

> I also identified that bread purchasers, to the extent they have prior experience with a brand, associate and recall the flavor of the bread associated with different brands.[210]

> I compiled a list of common bread "features" that purchasers sometimes consider, such as brand, packaging, various label claims, and price."[211]

> All of the respondents indicated that they were aware of protein claims on bread, and that protein claims were a reason they chose to purchase Dave's Killer Bread.[212]

> Respondents reported typically paying above $4 and a max of about $7.50 for a single loaf of bread.[213]

105.    The Weir Declaration *fails to disclose basic, critical information* about how the interviewees were selected or recruited, what exact questions they were asked, and even *what the interviewees actually said*.  This makes it impossible to evaluate the methodology and results of

---

[206] Weir Declaration, ¶ 38.

[207] *Id.*, ¶ 39.

[208] As I noted previously, it is inexplicable that despite apparently finding that flavor and packaging are relevant to his interviewees, Mr. Weir nevertheless chose to *omit* these attributes in his proposed conjoint.

[209] Weir Declaration, ¶ 40.

[210] *Ibid.*

[211] *Ibid.*

[212] *Id.*, ¶ 41.

[213] *Id.*, ¶ 42.

these "cognitive interviews," and the Weir Declaration's lack of disclosure and transparency[214]

raises a red flag that, for this reason alone, precludes reaching conclusions from these interviews.

Nevertheless, it is important to note that any direct questions that Mr. Weir posed to interviewees

would be incapable of identifying which attributes consumers do, and do not, consider when

purchasing bread.  Determining which attributes influence consumers' purchase decisions would

require a well-conducted and objective materiality survey, including the use of a proper control,

which Mr. Weir did not do and does not propose to do.  Further, any conclusions about

consumers' recall, beliefs, comprehension, perceptions, or expectations regarding bread

purchases would require a well-conducted and objective perception survey, which Mr. Weir

again did not do and does not propose to do.  It is illogical and unscientific for Mr. Weir to imply

that he can draw any conclusions about consumers' purchase preferences and perceptions (*e.g.*,

"the drivers of consumer choices underlying bread purchases")[215] from ***eight interviews using a***

***non-disclosed "qualitative research"[216] method***, which cannot possibly yield reliable,

generalizable, and relevant scientific evidence.

106.    Mr. Weir even relies on his unscientific and uninformative cognitive interviews to

draw conclusions about whether self-reported preferences regarding bread products have changed

*over a period of five years* or as a function of various attributes:[217]

> Respondents indicated that their views on various bread attributes, including
> protein (as well as whole grains, organic, fiber, and non-GMO), would not vary
> based upon the size of the packaging (e.g., single or double loaf), flavor, price, or
> over the course of the past five years.

---

[214] As of the signing of this *Expert Declaration*, Mr. Weir (through opposing counsel) never
provided any supplementary materials regarding his "cognitive interviews," and Mr. Weir's
deposition testimony makes clear that he did not take any steps to preserve or document his
"cognitive interviews" in a manner suitable for independent evaluation or replication.

[215] Weir Declaration, ¶ 39.

[216] *Id.*, ¶ 37.

[217] *Id.*, ¶ 43.  Mr. Weir then claims that he "confirmed these findings by reviewing documents
produced in the normal course of this litigation" (¶ 44)—an assertion for which he provides *no*
substantiation at all.

Asking eight people whether *they think* their (undefined) "views" about bread attributes have changed over the course of *five years*[218] or would change if other factors such as size and price were different, and subsequently drawing conclusions about the projectability of the results to the putative class, is illogical and completely inappropriate.  Scientific evidence must be based on a scientific test of a hypothesis or claim, and cannot be based on the speculation or introspection of a handful of participants in qualitative interviews (and the interviewer's subjective interpretations of such introspections).  In fact, it is highly unlikely that consumers' actual preferences and views regarding various attributes of bread products would have remained constant over time and across different consumers.  ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████      ██████████████████████████████████

████████████████████████████████████████████████████ .[220]

107.    Notably, Mr. Weir's deposition further underscores the nontransparent and unscientific nature of Mr. Weir's "cognitive interviews."  For example, Mr. Weir admitted: (*i*) that he did not take any steps to preserve a record of his scheduled interviews via the

---

[218] Among other reasons, such a question (whose wording Mr. Weir fails to disclose) raises severe issues given the limitations of human memory.  *See also* Section G for further discussion related to this point.



"Respondent.io" platform;[221] (*ii*) that he did not record or transcribe participants' verbatim responses, but instead took notes in his declaration that were intended to reflect the "spirit" of what participants said;[222] (*iii*) that he did not write anything down to prepare for the interviews, which were unscripted;[223] (*iv*) that he himself *prompted* participants about various topics (including potential attributes) if the participant did not volunteer a particular response;[224] (*v*) that he does not remember how many participants proactively identified certain concepts or attributes and how many were prompted by him,[225] including specifically related to protein;[226] (*vi*) that he could not comment on whether participants were referring specifically to a protein *label statement* on packaged bread as opposed to bread having protein in general;[227] (*vii*) that he did not

---

[221] *See* Weir Deposition, pp. 102 – 103 & 110.

[222] *E.g., id.*, pp. 133 – 134 ("Q. They used those words, 'protein representation'? A. Oh, I don't know if they used that exact word, but that was the spirit of what they were saying. Q. What words did they use, Mr. Weir? A. I don't have verbatim responses from them. Q. What words did they use? A. I don't have verbatim responses. Q. Well, tell me what you do remember these individuals saying, without you prompting, about protein and the importance of it to their purchase? A. That protein claims were a reason that they chose to purchase Dave's Killer Bread. Q. Did they use the word 'claims'? A. I don't recall.").

[223] *Id.*, pp. 117 & 118.

[224] *E.g., id.*, pp. 116 – 117 ("[...] And then I would ask them for attributes of bread that they would consider when they make their purchasing decisions for bread. If people were not technically loquacious, I would use my background having reviewed documents in this case, Dave's labels, and other documentary evidence that I put in my head. I think I list here some of the examples, and then I would ask them, Okay. If you haven't already mentioned brand, does brand matter to you? **If you haven't already mentioned protein claims, would a protein claim matter to you?**" [emphasis added]) & 123 ("Q. Now, you indicated that during these conversations, if a particular consumer did not identify one of the attributes or characteristics that you had identified, then you would prompt them by asking the question in order to get their perspective on it; is that right? A. Yes.").

[225] *E.g., id.*, pp. 124 & 127.

[226] *E.g., id.*, pp. 129 & 137 ("A. 41, 'All of the respondents indicated that they were aware of protein claims on bread and that protein claims were a reason they chose to purchase Dave's Killer Bread.' Q. All eight? A. Uh-huh. Q. And how many were prompted by you to say that? A. I don't recall, but many of them volunteered that information. Q. Now we're at 'many.' How many is many? A. I don't have a precise number.").

[227] *Id.*, pp. 134 – 135 (*e.g.,* "Q. So when you used 'protein claims' here, it's just as possible that what the interviewees were referencing is simply that the bread had protein, not necessarily anything on the label? A. I used the lowercase C there purposefully, not intending to say that they

distinguish to participants the difference between a protein statement on the nutrition label versus a protein statement elsewhere on the packaging;[228] (*viii*) that he purportedly "tabulated" results only "as to the protein issue";[229] (*ix*) that he did not recall the gender distribution[230] (which was not documented in his declaration); (*x*) that he based his claim that all eight interviewees had "recently" purchased Dave's on his memory and did not note that information;[231] (*xi*) that when asking about prices, he does not "believe" he distinguished between what participants paid for Dave's versus for other brands;[232] (*xii*) that he did not ask participants about flavor or what flavors of bread they buy, and instead asked them to confirm that their views would not change based on flavor (among other attributes) over the past five years;[233] (*xiii*) that he did not list any other brands named by interviewees;[234] and (*xiv*) that his interviews were of a "***confirmatory nature***"—that is, they served to "confirm" his attribute selection.[235]

108.    In short, Mr. Weir's undisclosed, unstructured, unrepresentative, and unobjective interview approach guaranteed that ___no other individual___ **except for Mr. Weir himself could assess,**

---

were referencing the specific challenge[d] claim. Q. Or anything on the label is my question, Mr. Weir. So what I'm asking you, again, is when they're referencing protein, as you reflect it in Paragraph 41, it may have nothing to do with the label but may be referring to the actual protein content of the food? A. Again, I'm not offering a specific opinion about that one way or the other, just that they independently verified that protein was one of the reasons they purchased Dave's Killer Bread.").

[228] *Id.*, p. 131.

[229] *Id.*, p. 137.

[230] *Id.*, p. 119.

[231] *Id.*, p. 121.

[232] *Id.*, p. 140.

[233] *Id.*, pp. 148 – 149.

[234] *Id.*, pp. 158 – 159.

[235] *Id.*, pp. 123 ("I was certainly not hoping to be able to present quantitative results. This is just generally to **confirm the research as to whether the attributes and levels that were being selected for purposes of the survey were reasonable and were supported by consumers in the marketplace**" [emphasis added]) & 125 ("Given the sources of information and the general nature of this type of work, no, I don't think that that's relevant to sort of the **confirmatory nature of these interviews in terms of the attribute and level selection for the conjoint**" [emphasis added]).

---

*evaluate, or replicate the cognitive interviews as summarized in the Weir Declaration*.  Such a complete lack of transparency regarding critical elements is unscientific and by itself suffices to invalidate Mr. Weir's cognitive interviews.

109.    Mr. Weir also states in his declaration that in the future, "the conjoint questionnaire will be pretested with 10 respondents,"[236] and describes what he intends to test in his pretest interviews:[237]

> Through pretest interviews, I will test that respondents did not have difficulty with the questions and instructions; that they understood the choice exercise they were asked to perform; and that they looked at all or almost all of the features in making their choices; that they understood the written description of each feature; and found the choices realistic or plausible.
>
> Additionally, I will test for demand artifacts, asking respondents about their beliefs about the sponsor and purpose of the survey.

Mr. Weir also intends to use these pretests to draw conclusions about the comprehensibility and reliability of his survey.[238]

110.    The Weir Declaration does not specify what "pretesting" questions will be asked to gauge interviewees' feedback and purported understanding of the conjoint survey questions. However, any direct questions that Mr. Weir would pose to interviewees would be incapable of identifying whether they are in fact "led" in certain ways by the survey questions, stimuli, or overall design.  As discussed previously, a major survey flaw—which Mr. Weir's proposed "pretesting" is incapable of addressing—is that multiple aspects of his conjoint survey would bias participants towards placing a greater weight on the "5g Protein" label statement in their choices, even if consumers in the actual marketplace would otherwise ignore or put less weight on this statement.  Mr. Weir fails to provide any assurance that his "pretesting" would identify

---

[236] Weir Declaration, ¶ 56.

[237] *Id.*, ¶¶ 57 – 58.

[238] *Id.*, ¶ 59 ("Pretesting will reveal whether or not that [*sic*] respondents understood the questions, instructions, and descriptions presented in the questionnaire and that the interview flowed smoothly. Based on my review of the pretest, I will either conclude that the survey instrument was reliable, or make any survey question wording changes to the survey questionnaire indicated by the pretest prior to conducting the full study.").

these kinds of biases, which would be inherent and uncorrectable in his conjoint design. Further, such serious demand and focalism biases have nothing to do with any beliefs about "the sponsor and purpose of the survey"[239] that Mr. Weir plans to assess, and therefore, could not be detected by his intended questions.

111.    Mr. Weir's "pretests" would *not* determine the reliability of the survey in general; instead, his approach is akin to outsourcing the task of the survey expert to survey participants. Academic research indicates that such a method would *not* be effective in identifying demand effects and other biases. For example, participants' reactions to leading survey questions can reflect a number of background considerations (*e.g.*, social desirability and need for consistency) and guessing behavior, whereas the true influence, if any, of various attributes and claims in the actual marketplace is difficult for survey participants to accurately identify, predict, and verbalize.[240] Hence, directly eliciting participants' opinions about whether they found a question leading or biasing in no way demonstrates that the question itself is actually non-leading or unbiased. It is highly inappropriate to draw conclusions, as Mr. Weir states he would do, from 10 (or any number of) participants regarding such topics (and crucial conjoint design decisions) as: whether a particular question is neutral and unbiased; and/or whether the choices presented in the conjoint are "realistic or plausible."[241] Survey participants are not consumer scientists or marketing experts, but would instead rely on their own (idiosyncratic) lay theories and projections about a given topic.

---

[239] *Id.*, ¶ 58.

[240] Even when survey participants have no reason to believe that their answer choices will be identifiable or disclosed by others, they may nevertheless be driven to respond in a way that aligns positively with their self-beliefs or self-perceptions (*e.g.*, the desire or need to appear logical or express logical perceptions). *See, e.g.*, Fiske, Susan T. and Shelley E. Taylor (1991), *Social Cognition* (2nd ed.), New York, NY: McGraw-Hill; Nisbett, Richard E. and Timothy D. Wilson (1977), "Telling More Than We Can Know: Verbal Reports on Mental Processes," *Psychological Review*, 84(3), 231 – 259; Wilson, Timothy D. and Daniel T. Gilbert (2003), "Affective Forecasting," in *Advances in Experimental Social Psychology Vol. 35*, Zanna, Mark P. (ed.), San Diego, CA: Elsevier, pp. 345 – 411; Wilson, Timothy D. and Jonathan W. Schooler (1991), "Thinking Too Much: Introspection Can Reduce the Quality of Preferences and Decisions," *Journal of Personality and Social Psychology*, 60(2), 181 – 192.

[241] Weir Declaration, ¶ 57.

112.    Contrary to Mr. Weir's opinion, his "cognitive interview" and "pretesting" approach *cannot* detect whether his conjoint survey is realistic, leading, or susceptible to demand effects and other severe biases.  Using these qualitative interviews to validate that his conjoint survey is comprehensive, unbiased, and/or neutral would be highly problematic and non-diagnostic for multiple other reasons, including:

(*i*)    the use of an extremely small sample size (*i.e.*, only *eight* cognitive interviews and only *10* proposed pre-test participants);

(*ii*)    the lack of any systematic procedure or objective standards by which to assess whether a question is appropriately designed and worded; and

(*iii*)    the fact that Mr. Weir himself has conducted the "cognitive interviews" and plans to conduct the pretest interviews (*i.e.*, thereby violating the "double-blind" procedure).[242]

113.    Overall, Mr. Weir's "cognitive interviews" and "pretesting" approaches are entirely inadequate and are *incapable* of demonstrating that his proposed conjoint survey's procedures, stimuli, and questions are realistic, clear, non-leading, unbiased, and/or reliable.

---

[242] In a double-blind interview or procedure, both the interviewer and the respondent are blind to the sponsor of the survey and its purpose; *see, e.g.*, Diamond (2011), pp. 410 – 411.  Such a procedure ensures that the interviewer does not do or communicate anything (even unconsciously) to sway participants' responses.  By contrast, a survey interviewer who is not blind to the research hypothesis may, for example, convey a range of communications (including unconscious cues) that induce participants to answer in a specific (*i.e.*, "desired") way.  According to a large body of literature on social desirability, self-presentation, and impression management, people have an inherent desire to appear reasonable (among other self-enhancement motives); *see, e.g.*, Fiske and Taylor (1991); *see also, e.g.*, Dhar, Ravi and Klaus Wertenbroch (2012), "Self-Signaling and the Cost and Benefits of Temptation in Consumer Choice," *Journal of Marketing Research*, 49(1), 15 – 25; Gneezy, Ayelet, Uri Gneezy, Gerhard Riener, and Leif D. Nelson (2012), "Pay-What-You-Want, Identity, and Self-Signaling in Markets," *Proceedings of the National Academy of Sciences*, 109(19), 7236 – 7240; McManus, T. Clay and Justin M. Rao (2015), "Signaling Smarts? Revealed Preferences for Self and Social Perceptions of Intelligence," *Journal of Economic Behavior & Organization*, 110, 106 – 118; Touré-Tillery, Maferima and Ayelet Fishbach (2015), "It Was(n't) Me: Exercising Restraint When Choices Appear Self-Diagnostic," *Journal of Personality and Social Psychology*, 109(6), 1117 – 1131.  Hence, participants interviewed by Mr. Weir would be likely to be led to provide easily justifiable (and biased) responses in order to appear logical or reasonable in front of the interviewer (*i.e.*, *Mr. Weir*).

### E.     MR. WEIR'S PROPOSED "MARKET SIMULATION" IS *NOT* A VALID *MARKET* SIMULATION, AS IT FAILS TO ACCOUNT FOR ANY MARKET COMPETITION

114.     In addition to relying on data from an invalid conjoint survey, Mr. Weir's proposed data analysis and modeling approach is also fatally flawed.  Critically, Mr. Weir's proposed calculation of an alleged "price premium" would rely on an overly simplistic and abstract "market simulation" that is *not* a true *market* simulation, as it fails to incorporate any *competitive offerings* and therefore does not simulate any *market-relevant* WTP.  Thus, Mr. Weir's conjoint survey and related estimates *cannot* be used to reliably calculate damages either classwide or on an individualized basis.

### E.1.     The Importance of Incorporating Competition in Estimating Consumer WTP or Valuation Using Conjoint Surveys Such as the Weir Proposed Conjoint Survey

115.     To estimate consumers' willingness-to-pay (WTP) for, or valuation of, an attribute level, product feature, or packaging claim using conjoint analysis,[243] researchers should

---

[243] Inexplicably, Mr. Weir testified at his deposition that "other than the willingness to pay of the marginal consumer," his study is *not* "making calculations of willingness to pay"; Weir Deposition, p. 284; *see also id.*, pp. 299, 302, & 303 – 305.  Mr. Weir then goes on to argue that Bryan Orme's warnings about the inaccuracy of a two-product approach to simulation do not apply to his analysis, because Mr. Weir claims that he will be estimating "willingness to pay of the marginal consumer" while Mr. Orme's critique applies to "individual willingness to pay" (*id.*, p. 302). This is simply wrong, and Mr. Weir provides no substantiation for his erroneous interpretation.  In fact, Mr. Orme's critique clearly applies to calculations of marginal willingness-to-pay (WTP).  For example, Mr. Orme describes the inadequate "two-product approach" proposed by Mr. Weir as generating a single WTP estimate, not individual WTP: "The **two-product market simulation approach** [emphasis in the original] simulates respondents choosing between just two versions of the product: one with and one without the enhanced feature. The price for the enhanced version of the product is adjusted upward via trial and error (or using our simulator's =SOLVEFORSHARE function) until the shares are distributed 50/50. ***The price difference that equalizes the shares of preference is taken as WTP*** [emphasis added]"; Orme, Bryan (2021), "Estimating Willingness to Pay (WTP) Given Competition in Conjoint Analysis," *Research Paper Series*, Provo, UT: Sawtooth Software, Inc., p. 3.  Further , Mr. Orme specifically criticizes the "two-product approach" for failing to account for, among multiple other things, the fact that "WTP primarily should consider the respondents likely to switch to or away from the firm's product (those on the cusp of buying)"; *id.*, p. 6.  In other words, Mr. Orme's critique of Mr. Weir's approach specifically states that it fails to account for the *marginal consumer* (*i.e.,* the consumer "on the cusp of buying"), directly contradicting Mr. Weir's characterization in his deposition testimony.

employ a "market simulation" that uses as input the utilities ("partworths") derived from participants' choices in the conjoint survey (these partworths signify the value participants place on each level of each attribute).[244]  However, such simulations will fail to account for market competition (and therefore, will not be real *market* simulations) if they do not incorporate a representative set of competitor offerings in the marketplace.

116.    The importance of estimating consumer WTP or valuation by simulating demand *while accounting for (or modeling) the competition* and the various actual competing products and brands offered in the marketplace has been emphasized by both academic scholars and industry experts.[245]  This point is made in writings on conjoint analysis, including by the CEO and President of Sawtooth Software (the software that Mr. Weir plans to use):[246]

> In a vacuum, WTP may measure what economists call the "maximum price," but **in a competitive environment what customers are willing to pay will likely be less.  Using a more complete competitive context than just two product alternatives, we find that market simulations allow us to estimate WTP for a feature more realistically (Orme 2001): on average 14% to 20% lower WTP than the two-product or algebraic approaches** (respectively) according to a meta study of 9 CBC datasets (Orme 2021). […] [Emphasis added]

---

[244] *See*, *e.g.*, Orme, Bryan K. (2010), "Interpreting the Results of Conjoint Analysis"; Orme (2010), "Market Simulators for Conjoint Analysis."  Note that Mr. Weir, who cites Orme's (2010) chapter on "Market Simulators for Conjoint Analysis," appears to recognize this point; *see* Weir Declaration, ¶ 71 & FN 36.

[245] *See*, *e.g.*, Orme (2010); *see also* Ofek, Elie, and V. Srinivasan (2002), "How Much Does the Market Value an Improvement in a Product Attribute?", *Marketing Science*, 21(4), 398 – 411.

[246] Orme, Bryan K. and Keith Chrzan (2021), *Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros, Second Edition*, Orem, Utah: Sawtooth Software, Inc., p. 203.  Mr. Weir states that he "will use Sawtooth Software for the programming of the questionnaire, data collection, and analysis of the survey results" and that "Sawtooth Software is the leading provider of conjoint analysis survey software"; Weir Declaration, ¶ 62.  *See also* Orme (2010), "Interpreting the Results of Conjoint Analysis"; Orme, Bryan K. (2001), "Assessing the Monetary Value of Attribute Levels with Conjoint Analysis: Warnings and Suggestions," Sawtooth Software, Inc., p. 4.

117.    The fallacy of estimating consumers' WTP without including *in the simulator itself* the competitive offerings available in the marketplace can be illustrated using the following example from a book on conjoint analysis cited by Mr. Weir:[247]

> What is your willingness to pay for a color monitor for your laptop computer versus a monochrome screen? Assume we conducted a conjoint analysis including monochrome versus color monitors. If we computed your willingness to pay for color over monochrome, we would likely find that the incremental value of color over monochrome is worth a thousand dollars or more. But how meaningful is this information to a laptop manufacturer given the fact that laptops with color monitors are readily available on the market at quite inexpensive prices?

Similarly, academic writing on valuation in conjoint analysis states:[248]

> Most practitioners of conjoint are aware that, for realistic market simulations, the major competing products must be used.

Overall, leading scholars and practitioners of conjoint analysis—including those cited by Mr. Weir himself as authoritative sources—agree that reliably measuring consumer WTP (and

---

[247] Orme (2010), p. 87; cited in Weir Declaration, ¶ 27 & FN 22, ¶ 30 & FN 23.  *See also* Orme (2001), pp. 3 – 4 (discussing the example of "Gilligan's Island"; *e.g.*, "Now, imagine that one day a seaworthy boat with capacity for two passengers pulls into the lagoon and offers passage back to civilization for a price to be negotiated. What is the dollar-value of rescue versus remaining on the island for Mr. and Mrs. Howell? Mr. Howell might pull out his checkbook and offer the crew millions of dollars. Under the assumption of no competition, the dollar equivalent utility of rescue is astronomically high. […] Now, assume that just as Mr. Howell and the first crew are preparing to shake on the deal, a second equally seaworthy ship pulls into the lagoon and offers its services for a fixed $5,000. Ever the businessman, Mr. Howell will choose the $5,000 passage to freedom. […] The amount Mr. Howell would be projected to pay under the assumption of no competition is indeed very different from the amount he *will* pay given the appearance of another boat. If the first boat crew were to have administered a conjoint interview to Mr. Howell and computed his willingness to pay under the first method reviewed in this article, they would have concluded that he was willing to pay very much more than $5,000. But, how meaningful is that information in light of the realities of competition? The realistic problem for the boat captain is to figure out what price the market will bear, given the existence of competitive offerings.").

[248] Allenby et al. (2014b), p. 433.  *See also* Allenby et al. (2014a) (*e.g.*, "To compute equilibrium outcomes, we will have to make assumptions about cost, the nature of competition, and the set of competitive offers. Conjoint studies have to be designed with this in mind. In particular, greater care to **include an appropriate set of competitive brands**, handle the outside option appropriately, and estimate price sensitivity precisely must be exercised" (p. 631; emphasis added).

alleged "price premium") requires accounting for competition and the various brands and products offered in the relevant marketplace.

### E.2.    Mr. Weir's Conjoint Approach Does *Not* Involve *Market* Simulations and Ignores Competitive Forces

118.    Throughout his declaration, Mr. Weir repeatedly characterizes his proposed conjoint analysis as a methodology to calculate "price premium damages."[249]  Mr. Weir asserts that he "will conduct the measurement of the price premium using a market simulation tool"[250] using the data from his conjoint survey.  Mr. Weir further asserts that this will allow him to estimate a price premium that represents the *market value* of the "challenged Claim":[251]

> The market simulation provides a statistically robust estimate of any price premium that purchasers paid solely as a result of the challenged Claim. The market simulation enables the calculation of the **economic market value** of the Claim in the **market scenario** where the Claim is removed, holding all else equal. The results of the simulator are **a market wide result**, not an average of individual preferences.  [Emphases added]

119.    Critically, the actual market in this case is *not* composed solely of a Dave's Killer Bread product but rather includes multiple competing brands and products, as Mr. Weir recognizes by incorporating competitor brands in his conjoint choice task (*i.e.*, Oroweat, O Organics, and 365).[252]  Nevertheless, Mr. Weir's claim that he will perform a "market simulation"[253] is erroneous, as **no such _market_ simulation** would actually be conducted under Mr. Weir's approach.  This is because a market simulation, by definition, must simulate not only the product or brand at issue but also the other (competing) products and brands that constitute the *market*.  Indeed, the packaged sliced bread category consists of multiple different competitor

---

[249] *E.g.*, Weir Declaration, ¶¶ 11, 25, 100 – 102, & 105.

[250] *Id.*, ¶ 70.

[251] *Id.*, ¶ 74.

[252] *Id.*, ¶ 53.

[253] *E.g., id.*, ¶ 64.

brands, which often vary by retailer (*e.g.*, Whole Foods 365; Food For Life; Oroweat, Pepperidge Farm; and more).[254]

120.    In his declaration, Mr. Weir describes a price premium estimation approach that explicitly would *not* include any competitor products:[255]

> For the market simulation, I will compare a **benchmark Dave's Killer Bread Product** that uses the Claim to **an otherwise identical Product that does not use the Claim**. I will then use the market simulator to simulate a condition where the price of the second product is reduced to the level where both products obtain equal market acceptance. At this market equilibrium, the market is indifferent as between the bread with the Claim at a higher price, and the bread without the Claim at a reduced market value. The price premium will equal the difference between the price in the real world and the but-for price that compensates for the change in labeling. The simulation will be run using the randomized first choice model. [Emphasis added]

121.    That is, the *only* products specified in Mr. Weir's "market" simulation will be ***two Dave's Killer Bread*** products (*i.e.*, a Dave's Killer Bread product with a "5g Protein" statement and the same Dave's Killer Bread product that does not display a "5g Protein" statement).  Such a simulation is called a ***"50/50" simulation*** because the price is adjusted until the simulator predicts equal choices of the two products, and the price difference is then treated as the value attributed to the challenged claim.  In other words, Mr. Weir's "50/50" simulation would attempt to estimate the price differential at which consumers would be indifferent between the supposedly inferior option (a Dave's Killer Bread product without a "5g Protein" statement) and the supposed superior and allegedly "unlawful" product (displaying "5g Protein") if these two products were the *only* products available.

122.    This approach will *not* approximate a realistic market and, contrary to Mr. Weir's claims, would not identify a market equilibrium.  There is no situation in which an actual

---

[254] In fact, one of the screening questions that Mr. Weir intends to ask in his proposed conjoint survey lists 14 different brands of bread (including Dave's Killer Bread); *see id*., Exhibit 3, pp. 55 – 56.

[255] Weir Declaration, ¶ 77.  Note that the "randomized first choice" (RFC) model that Mr. Weir refers to is the standard method for generating choice shares in conjoint simulators, simply adding a degree of random variation or error around the partworths obtained from the conjoint survey before choice shares are calculated; *See, e.g.*, Orme, Bryan and Joel Huber (2000), "Improving the Value of Conjoint Simulations," *Marketing Research*, 12(4), 12 – 20.

consumer would encounter only two bread products, comprised exclusively of a Dave's Killer Bread product with "5g Protein" and the same Dave's Killer Bread product without "5g Protein." Notably, as I discussed in Section C, because the Weir Proposed Conjoint Survey does not even specify where the "5g Protein" statement appears, the removal of "5g Protein" would presumably apply to both the front label and the nutrition label, resulting in ***an impossible "but-for" product that consumers would never see*** (*i.e.*, because even if Dave's Killer Bread had removed "5g Protein" from the front label, it would have still retained the "5g Protein" statement on the nutrition label).[256] Mr. Weir's simulation approach would estimate *some* kind of price equivalence, but it would not estimate any alleged market "price premium" *in the relevant market*, since there is nothing approximating a realistic competitive market in his proposed simulation.

123.    In fact, the authors of a 2021 textbook state that the two-product "50/50" approach proposed by Mr. Weir is *less realistic*, and is specifically likely to *overestimate* consumers' WTP, compared to a simulation that includes competitors.[257] Orme and Chrzan unequivocally endorse using a competitive market simulation (*e.g.*, a simulation that includes competitors) instead of Mr. Weir's "50/50 two-product simulation" approach, because the former is "more realistic and defensible."[258]

124.    Mr. Weir's proposed simulation approach is therefore unfounded, is diametrically opposed to well-accepted principles in the conjoint literature (and to basic marketplace reality), and reveals a fundamental lack of understanding regarding proper estimation of any "market price

---

[256] At his deposition, Mr. Weir claimed to address this issue by claiming that the nutrition label is held constant between the real and "but-for" worlds in his "market" simulator; Weir Deposition, p. 219. As I noted previously, this in *no* way distinguishes between the front label protein claim that Mr. Weir is intending to test and the protein statement in the nutrition label.

[257] Orme and Chrzan (2021), p. 203.

[258] *Id.*, pp. 206 – 207 ("Methods for using choice model data to estimate respondents' willingness to pay for features range from very straightforward division of one utility by another, to simulation approaches involving a rich set of competitors (and the None alternative), to complex models requiring specialized software that produce model coefficients defined in WTP space. **In our experience, the competitive market simulation approach to estimating WTP is not only straightforward for practitioners, but leads to more realistic and defensible results than the algebraic and 50/50 two-product simulation approaches**" [emphasis added]).

premium" using conjoint analysis.  It is simply not possible to estimate what the "but-for" price would have been in a competitive market without directly taking into account consumers' ability to switch to a competitor product by including competitors in the simulation.  The failure of Mr. Weir's proposed "simulation" to estimate any sort of price difference in the context of a market that includes *multiple* competing brands and products is a fatal flaw that renders invalid Mr. Weir's estimation of any supposed "price premium"—and by extension any accompanying alleged damages—unreliable and invalid.

125.    At his deposition, Mr. Weir contended that his simulation purportedly takes into account competition by including a price range in the survey that is ostensibly "reflective both of Dave's products and many others"[259] and because his simulation holds all competitive offerings equal between the real world and the "but-for" world.[260]  Such a contention is *scientifically erroneous*.  Simply using a price range that happens to overlap with other products and holding constant everything between the real and "but-for" worlds except for the focal attribute of interest do *not* suffice to account for competition; rather, as the conjoint literature makes clear, it is necessary to include ***relevant competitive offerings in the market simulator itself***.[261]

126.    Finally, it is noteworthy that Mr. Weir's method for estimating partworths in his proposed conjoint survey does *not* appear to incorporate any interaction effects between the factors (*i.e.*, product attributes or packaging claims) shown to participants.[262]  That is, it seems that Mr. Weir's conjoint analysis and utility model will be "additive"[263] and will *presuppose* (by

---

[259] Weir Deposition, p. 285.

[260] *See, e.g., id.*, pp. 288, 292 ("[W]e do provide competitive context and competitive data, and we hold that level of competition constant in the market simulation, and that is sufficient for a historic analysis for products that have already been sold to measure a singular change in a but-for world"), & 294.

[261] *See, e.g.*, Allenby et al. (2014a); Allenby et al. (2014b); Orme (2001).

[262] The Weir Declaration never discusses this issue and provides *no* plan to account for possible interaction effects.

[263] An additive CBC utility model defines the utility of a product as the sum of the utilities of each of the parts.  For example, a model based on the utility of the Dave's Killer Bread *brand* (DKBB) and a protein statement (P) would be written as $U = w1*DKBB + w2*P$.  To estimate the interaction effect, the model must be specified to include the interaction, as $U = w1*DKBB +$

design) that the effect on consumer choice of the protein statement cannot be affected by the presence *versus* absence of other claims or product aspects (*e.g.*, brand or other claims). Specifically, Mr. Weir's approach appears to assume that *no* interactions can occur between any of the product or package aspects—even if consumers' preferences do reflect such interactions.[264] As is well-known among researchers, if there are significant interaction effects in the data, fitting a model without these interactions could yield biased results.[265]

### F.   MR. WEIR'S PROPOSED CALCULATION OF AN ALLEGED "PRICE PREMIUM" FAILS TO INCORPORATE *ANY* NECESSARY SUPPLY-SIDE *EQUILIBRIUM ANALYSIS*, AND MR. WEIR'S CLAIM THAT HIS METHODOLOGY ACCOUNTS FOR SUPPLY-SIDE *FACTORS* REVEALS A FUNDAMENTAL MISUNDERSTANDING OF MARKETING AND ECONOMETRICS

127.    Both academic researchers and courts have emphasized the importance of incorporating supply-side analysis when using conjoint analysis to estimate alleged "price premia" and damages.  Such supply-side analysis requires a profit-maximizing equilibrium analysis that examines how supply (from both Dave's Killer Bread and its competitors) would

---

w2*P + w3*(DKBB*P), where w3 provides the measurement of the effect (or weight) of the difference in how participants value the protein statement when the product is branded Dave's Killer Bread, as opposed to across all brands.  Further, estimating the model requires a set of product "profiles" in the CBC task that are designed to distinguish between the main effects and interactions.  This is *not* what Mr. Weir's (apparently) additive conjoint model would do; hence, it would not estimate the value of a protein statement specifically on the disputed Dave's Killer Bread packages.

[264] Mr. Weir then claimed at his deposition that he would check for interactions "as a regular course of my work" (Weir Deposition, p. 226)—yet never reported such a supposed plan in his declaration.  Moreover, Mr. Weir's proposed post hoc approach (by running a test to check for interactions after collecting the data) does not serve to properly account for interactions; doing so requires designing the product profiles presented in the survey *in advance* to ensure that the study design enables testing specific interactions.  *See, e.g.*, Orme and Chrzan (2021), p. 27 ("[…] properly designed choice experiments provided new opportunities exceeding traditional card-sort conjoint—e.g., to estimate the None parameter, **interactions** and cross effects—but **only if the sets were designed in the right kinds of ways to permit these higher-level effects to be estimated** with adequate precision" [emphasis added]); *see also id*., pp. 28 – 32 & 40 – 41.

[265] This principle also applies to CBC, which will be used in the Weir Proposed Conjoint Survey; *see, e.g.*, "The CBC System for Choice-Based Conjoint Analysis"; *Sawtooth Software Technical Paper Series*, http://www.sawtoothsoftware.com/download/techpap/cbctech.pdf.

---

have shifted in response to any alleged drop in demand due to Dave's Killer Bread addressing or "curing" the alleged technical regulatory violation (*e.g.*, by adding a back-of-pack %DV to the nutrition label, or by removing the front label protein statement).  However, Mr. Weir's proposed estimation of an alleged "price premium" fails to include any *supply-side equilibrium analysis*. This means that the alleged "price premium" estimated and any resulting damage calculations are based on an unrealistic assumption and are invalid.

**F.1.   The Importance of Incorporating Supply-Side Analysis When Using Conjoint Analysis to Estimate an Alleged "Price Premium" and Related Damages**

128.    Academic research indicates that price premium and damages estimates are invalid (and biased upward*)* when the conjoint practitioner fails to conduct a *supply-side equilibrium analysis*.[266]  Determining the price premium, if any, of an attribute or packaging/advertising claim requires not only understanding differences in consumer demand (due to that attribute or claim) but also, crucially, how the competitive marketplace (*i.e.*, the supply side) would *respond* to the alleged change in consumer demand in the "but-for" (counterfactual) world.

129.    At the most basic level, the determination of an alleged price premium requires a reliable estimate of the supply curve: how much of the products in a market would be produced for sale by firms at a given price.  This is crucial because, per basic economic theory,[267] the *market equilibrium price* (or market-clearing price) that is actually charged is the profit-maximizing price that is determined by the intersection of the demand and supply curves (*i.e.*, labeled as "P" in Figure 5 below).  In other words, firms charge the highest price at which enough consumers are still willing to buy (*i.e.*, as determined by the demand curve) the quantity of the product that the firm is willing to supply at that price (*i.e.*, as determined by the supply curve).

(*Continues on next page*)

---

[266] *E.g.*, Allenby et al. (2014a, b).

[267] *See, e.g.*, Mankiw, N. Gregory (2018), *Principles of Microeconomics*, Boston, MA: Cengage Learning.

**Figure 5: Market Equilibrium for a Hypothetical Supply and Demand Curve**



130.    In Mr. Weir's approach, the alleged "price premium" is defined as the difference between the real-world price and the "but-for price that compensates for the change in labeling."[268]  In a counterfactual "but-for" world in which the alleged technical regulatory violation is rectified, consumers' willingness-to-pay for the product—per Mr. Weir's and the Plaintiff's theory—would be lower.  According to the Plaintiff's theory, this decrease in WTP for the "inferior" product (*i.e.*, the product without the technical regulatory violation) would cause the entire demand curve to shift downward relative to the demand observed in the real (or actual) world.  Figure 6 below illustrates a hypothetical shift in demand from the real world to the "but-for" world, including the resulting *but-for market equilibrium price* ("P$_{BF}$").

(<em>Continues on next page</em>)

---

[268] Weir Declaration, ¶ 72.

**Figure 6: New Market Equilibrium Due to a Hypothetical Shift in Demand from the Real World (R) to the Counterfactual "But-For" (BF) World**



**Quantity (Volume)**

131.    Note that, as shown in Figure 6, although the supply curve itself would not shift, suppliers in the "but-for" world would nevertheless *reduce* the quantity of product they are willing to produce due to the shift in demand, leading to a market equilibrium price of "$P_{BF}$" and a market equilibrium quantity of "$Q_{BF}$." That is, consistent with the law of supply,[269] a firm would *not* willingly produce a quantity of their product that resulted in the marginal product (*i.e.*, incremental or additional unit) losing money, but would instead reduce the quantity produced if the price that consumers were willing to pay did not justify the firm's costs. The alleged "price premium" paid by consumers due to the presence (vs. absence) of the alleged deception (or technical regulatory violation) is equal to the difference between the price paid for the product in the real world ("$P_R$") and the price paid for an otherwise identical product without the alleged technical regulatory violation in the "but-for" world ("$P_{BF}$").[270] Therefore, as Figure 6 makes clear, estimating the

---

[269] That is, a basic principle of microeconomics according to which, all else equal, the quantity of a product/service supplied will rise or fall as the market price rises or falls, respectively; *see, e.g.*, Mankiw (2018). A decrease in the price of a product, therefore, will disincentive (profit-maximizing) suppliers from producing the same amount.

[270] To calculate damages, one would then multiple the price premium ($P_R - P_{BF}$) by the historical quantity that was sold in the *real world* ($Q_R$); that is: ($P_R - P_{BF}$) × $Q_R$.

market equilibrium price for a given version of the product requires identifying the actual supply curve. ***Without the supply curve, the correct "but-for" equilibrium price (e.g., the price at which the demand curve for the supposedly lawful or "inferior" product intersects the supply curve) cannot be determined.***

132.    As detailed in research on using conjoint for determining economic value:[271]

> Neither WTP [willingness to pay] nor WTB [willingness to buy] take into account equilibrium adjustments in the market as one of the products is enhanced by addition of a feature. For this reason, we cannot view WTP as what a firm can charge for a feature-enhanced product, nor can we view WTB as the market share that can be gained by feature enhancement. Computation of changes in the market equilibrium due to feature enhancement of one product is required to develop a measure of the economic value of the feature. In many cases, WTP will overstate the price premium afforded by feature enhancement, and WTB will also overstate the impact of feature enhancement on market share.

Further, non-monopolistic firms[272] engage in competition, setting prices in response to both competitor prices and market constraints, such as the cost of goods sold. Hence, simply calculating a conjoint-based alleged "price premium" to measure consumers' demand-side preferences while (unrealistically) assuming a static market would neglect additional relevant supply-side factors—such as competitor prices and the cost of raw materials—that determine the market equilibrium.[273]

133.    The necessity of fully and accurately incorporating supply-side factors to estimate a market (equilibrium) price premium is emphasized in the academic literature on using conjoint analysis to estimate the value of product features or attributes:[274]

> Clearly, estimates of the demand or consumer valuation of product features are a vital part of the problem of patent valuation. However, our perspective is that the economic valuation of a patent does not end with a calibration of consumer demand for product features. The economic value of a patent should be based on the incremental profits that can accrue to firms that enhance their products with the

---

[271] *See* Allenby et al. (2014a), pp. 649 – 650.

[272] That is, firms that operate in markets where there are multiple firms offering competing products and/or services; this is the case in the present litigation.

[273] *See* Allenby et al. (2014a).

[274] *Id.*, p. 630.

features enabled by the patents. **These incremental profits are based not just on consumer valuation of features (demand) but also on cost and competitive factors (supply). Therefore, incremental-profit calculations should be based on equilibrium profits. That is to say, we should consider equilibrium in the industry prior to addition of the product features enabled by the patent and then recompute the industry equilibrium after products are enhanced with the features covered by the patent**. [Emphasis added]

And:[275]

We define the market value of a product or feature enhancement as the change in the equilibrium profits that would prevail with and without the enhancement. In order to compute changes in equilibrium profits, a valid demand system must be constructed to value the feature. **The demand system must be supplemented by information on competitive offerings and cost.** In many situations, demand data is either not available or not informative with respect to demand for a product feature. Conjoint methods can be used to construct **the demand system** via a set of designed survey-based experiments. [Emphasis added]

And:[276]

Valuation of product features is typically conducted via market share simulations and Willingness To Pay (hereafter WTP) calculations. Obviously, these calculations do not directly relate to the value of the product feature to the firm. The only sensible metric for assessing firm value is profit. **In calculating changes in profits that can be ascribed to the product feature, competitive response must be considered, necessitating some sort of equilibrium computation. To compute equilibrium outcomes, we will have to make assumptions about cost, the nature of competition, and the set of competitive offers**. [Emphasis added]

134.    A recent academic article similarly states:[277]

It should be emphasized that conjoint analysis can only estimate demand. **Conjoint survey data, alone, cannot be used to compute market equilibrium outcomes such as market prices or equilibrium product positioning in characteristics space**. Clearly, **supply assumptions and cost information must be added to conjoint data in order to compute equilibrium quantities**. Conjoint practitioners have chosen the unfortunate term "market simulation" to describe demand predictions based on conjoint analyses. These practices are not simulations of any market outcome and must be understood for their limitations as we discuss below. [Emphases added]

---

[275] Allenby et al. (2014b), p. 421.

[276] *Id.*, p. 423.

[277] Allenby, Greg M., Nino Hardt, and Peter E. Rossi (2019), "Chapter 3 – Economic Foundations of Conjoint Analysis," in *Handbook of the Economics of Marketing*, pp. 151 – 192 (p. 153).

Likewise, a Sawtooth reference guide (in the same chapter on "market simulators" cited in the Weir Declaration)[278] cautions as follows:[279]

> The market simulator focuses on the demand side of the marketing equation; but it is also important to pay attention to the supply side and take the costs of producing different products/services into consideration.

And, with respect to interpreting the output of conjoint market simulators:[280]

> [C]onjoint utilities cannot account for many real-world factors that shape market shares, such as length of time in the market, distribution, out-of-stock conditions, advertising, effectiveness of sales force, and awareness. Conjoint analysis predictions also assume that all relevant attributes that influence share have been measured. Therefore, **the share of preference predictions usually should not be interpreted as market shares**, but as relative indications of preference.
>
> **Divorcing oneself from the idea that conjoint simulations predict market shares is one of the most important steps to getting value from a conjoint analysis study and the resulting simulator.** [Emphases added]

135. Courts have excluded conjoint analysis studies that failed to incorporate supply-side equilibrium analysis.[281]

---

[278] Weir Declaration, ¶ 73 & FN 37.

[279] Orme (2010), "Market Simulators for Conjoint Analysis," p. 92.

[280] *Id.*, p. 102.

[281] For example, in *In re General Motors LLC Ignition Switch Litigation*, the Court excluded an expert's conjoint model; in his Order denying the plaintiffs' motion for reconsideration, the Judge remarked: **Noting that other courts had rejected conjoint analyses in similar circumstances, the Court held that Boedeker's conjoint analysis is insufficient evidence of diminution in value because it focuses entirely on consumers' willingness to pay and ignores producers' willingness to sell.** Without any evidence of the shape of the supply curve, the Court held, no reasonable jury could determine the price at which the supply and demand curves for vehicles with a known defect intersect — let alone conclude that that price would be lower than the one Plaintiffs paid, resulting in damages" [emphasis added; FNs omitted]); *In re Gen. Motors LLC Ignition Switch Litig.*, 427 F. Supp. 3d 374 (S.D.N.Y. 2019) *384. *See also In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212 (S.D.N.Y. 2019) *239 – 240 ("Needless to say, however, **merely including a section titled "Consideration of the Supply Side" in an expert report** — as Boedeker does here, see Boedeker Declaration 22 — **does not cut it if the analysis reflected in that expert report does not actually include meaningful consideration of supply-side factors**. That is the case here. Boedeker's key supply-side assumptions are (1) that New GM's marginal costs would be the same in the but-for world where it disclosed the defects at the point of sale and (2) that the supply — that is, the number of cars New GM would sell — would also be the same. See Boedeker Declaration ¶¶ 67-68 (explaining that his model "quantif[ies] the new equilibrium price where all the purchasers of defective

136.    *In summary*, academic scholars and industry experts on conjoint analysis have recognized and demonstrated that failure to adequately incorporate supply-side factors when estimating a counterfactual (but-for) "market price premium" (*e.g.*, if Dave's Killer Bread packaging had included a %DV for protein on the nutrition label or had not displayed a front label protein statement) leads to invalid results and biased estimates.  Similarly, courts have excluded conjoint surveys and damages models for failing to conduct supply-side equilibrium analysis.

### F.2.    Mr. Weir's Proposed Analysis Completely Ignores Supply-Side Equilibrium Analysis

137.    Mr. Weir intends to use conjoint analysis to measure the monetary value of displaying "5g Protein" on the packaging of the disputed Dave's Killer Bread products.  Further, to measure consumers' valuation of (and alleged "price premium") for the protein statement, Mr. Weir will attempt to "simulate" a counterfactual world in which the Dave's Killer Bread packaging does *not* display "5g Protein" and compare the predicted market share of that counterfactual ("but-for") product with the market share of the disputed product with "5g Protein."[282]

138.    In his declaration, Mr. Weir claims that his proposed conjoint methodology is "designed to measure the true market value of the price premium attributable to the Claim, incorporating the supply side."[283]  Mr. Weir elaborates:[284]

---

vehicles in the actual-world would also buy in the but-for-world").  But those assumptions are undermined by Plaintiffs' own evidence, including Boedeker's report and testimony themselves.  See 7/5/18 Boedeker Dep. 62-63; see also Boedeker Rebuttal Report ¶ 387 (**acknowledging that an assumption of inelastic supply would be 'fundamentally flawed'** because it would 'mean[ ] that a given product is supplied by the manufacturer in the same quantity no matter what the price is'); 6/28/18 Gans Dep. 281:6-10 (conceding that it is 'highly unlikely that GM  ... would have wanted to sell the same amount of cars at the price implied by Mr. Boedeker's "but-for" analysis'"  [emphases added]).

[282] *See, e.g.*, Weir Declaration, ¶¶ 74 ("The market simulation enables the calculation of the economic market value of the Claim in the market scenario where the Claim is removed, holding all else equal."), 77 ("The price premium will equal the difference between the price in the real world and the but-for price that compensates for the change in labeling.") & 72 (describing a market simulation as "a 'choice laboratory' for estimating consumers' utilities for multiple real-world possibilities (e.g., any market price premium paid as a result of a challenged claim)").

[283] *Id.*, ¶ 83.

[284] *Id.*, ¶ 84 – 86.

---

I conducted research of actual retail sales and market data and included these real-world price points in the survey. These real-world transactions occurred at prices that *already* reflect the supply side factors then extant in the marketplace. I also considered that variability in pricing at the retail level showed that Defendant's and retailers' pricing was responsive to changing market forces.

Another important supply-side factor that I accounted for was the fact that the quantity of the Products supplied is a known quantity, and fixed as a matter of history.

Similarly, another important supply-side factor that I considered was that, as I discuss below, the market for the Class Products is an "ordinary" and mature market, subject to competitive pressures that both competitors and retailers identified as risks to their business.

139.    Mr. Weir's aforementioned statements reveal a fundamental misunderstanding of what it means to account for supply-side factors when using conjoint analysis to estimate an alleged "price premium" and damages.  As I describe next, Mr. Weir's points are simply irrelevant and do *not* in fact address the bias and inadequacy of estimating an alleged "price premium" without conducting a supply-side equilibrium analysis.

140.    It is important to first clarify the distinction between the *historical* market equilibrium price that actually occurred and the *counterfactual* ("but-for") market equilibrium price to be estimated.  The quantity of the disputed Dave's Killer Bread products (with the alleged technical regulatory violation) and of the competing products sold during the putative class period, and the prices (at the actual historical market equilibrium), are a matter of historical fact and are, at least in theory, ascertainable.  ***What is not known is the counterfactual***: What would have happened instead in the "but-for" world in which the alleged technical regulatory violation was addressed or "cured" during the putative class period?  Mr. Weir has not proposed any methodology that would allow estimating the market equilibrium price for the Dave's Killer Bread product if it were to use packaging that complied with the regulation at issue, taking into account that the quantity of Dave's Killer Bread products sold and the competitors' product and pricing strategies would likely have also been different in this "but-for" world (*i.e.*, if indeed demand were significantly different in this "but-for" world).

141.    Importantly, *historical* equilibrium prices, quantities sold, and revenues do *not* account for the equilibrium reactions of the various suppliers in the counterfactual "but-for" scenario in which Dave's Killer Bread had used different packaging claims.  To be sure, Mr. Weir can use quantities sold as part of his ultimate damages calculation, but he cannot use this information to determine the equilibrium (between supply and demand) in the "but-for" world, and relatedly, to estimate the equilibrium price in the "but-for" world.  It is wrong to simply assume that suppliers' pricing, offerings, and quantities sold would have remained the same in the "but-for" world; any price premium estimate based on such an assumption would be invalid, unreliable, and likely inflated.[285]  Despite his claims to do so, as further explained below, Mr. Weir's intended analysis would *not* account for the necessary supply-side factors and equilibrium.

142.    ***First***, Mr. Weir argues that he will account for supply-side factors because he "conducted research of actual retail sales and market data and included these real-world price points in the survey."[286]  Using realistic prices in a conjoint is certainly important, but it does not account for the supply side factors and the necessary equilibrium analysis.  The actual historical market prices that prevailed during the putative class period are relevant to the historical market equilibrium (*i.e.*, for the actual market in which the disputed products were sold) but are ***not determinative of the counterfactual market equilibrium*** (*i.e.*, for the "but-for" market in which either the %DV for protein was included in the nutrition label or the protein statement was removed from the front label).  In fact, the premise of the Plaintiff's allegations is that the price in the "but-for" world would have been different (*i.e.*, lower), and Mr. Weir proposes to estimate the alleged "price premium" based on this assumed difference.[287]

---

[285] *See, e.g.*, Allenby et al. (2014a, b).

[286] Weir Declaration, ¶ 84.  Note that Mr. Weir does not state what those "real-world" prices were, and does not indicate what are the "real-world" prices that he will use in his "market simulation"; *see, e.g.*, ¶ 76 ("I will ground my analysis of the conjoint data in market reality by relying on the actual prices advertised and actual sales price data in selecting a market-based product price point for the simulation analysis.").

[287] *See, e.g., id.*, ¶ 77 ("The price premium will equal the difference between the price in the real world and the but-for price that compensates for the change in labeling.").

143.    For these reasons, using the prices in the historical market in the conjoint survey cannot account for the *supply-side factors* that could have led those prices to be different in the counterfactual market equilibrium.  Consequently, Mr. Weir's use of actual market prices that prevailed during the putative class period to set the price range in his conjoint survey completely fails to incorporate the appropriate supply-side equilibrium analysis.

144.    ***Second***, Mr. Weir asserts that, in regard to accounting for supply-side factors, "the quantity of the Products supplied is a known quantity, and fixed as a matter of history."[288] However, the necessary supply-side equilibrium analysis is *not* intended to estimate the actual historical amount of units sold, which should serve as one of the "*factors*" in the damages calculation (*i.e.*, the "product"); the past amount of units sold is a matter of historical record and is equal to Dave's Killer Bread's sales of the disputed products during the putative class period. In Mr. Weir's approach to damages estimation, the actual historical quantity sold will be multiplied by an estimated alleged "price premium" calculated in percentage terms.[289]  Using the actual historical quantity sold in this calculation cannot substitute for using a dynamic supply-side equilibrium analysis to determine an accurate "market price premium."

145.    Instead, an equilibrium analysis is needed to accurately estimate the alleged *counterfactual ("but-for") market equilibrium **price***, taking into account how the market as a whole, including competitors, would react to a supposed drop in demand due to eliminating the alleged technical regulatory violation on Dave's Killer Bread's packaging.  Such an equilibrium analysis would use econometric models to estimate what the new *optimal* (*i.e.*, profit-maximizing) price would be for each brand to charge, taking into account the relevant supply-side factors (*e.g.*, cost of raw materials) that determine the market equilibrium.[290]  The reasonable assumption, as

---

[288] *Id.*, ¶ 85.

[289] *See, e.g., id.*, ¶ 102 (equation in which the "market price premium" is referred to as "*Price Premium %*" and multiplied by "*Total Sales of the Products*" to calculate damages).

[290] *See, e.g.*, Allenby et al. (2014a), p. 649.

Mr. Weir's own discussion of significant price competition in the category acknowledges,[291] is that if Dave's Killer Bread had used not used an "unlawful" statement on its packaging (*e.g.*, by adding the %DV for protein on the nutrition label or by removing the front label protein statement) and *if* that had resulted in lower demand for the product, then each brand would have then charged a potentially different optimal price. As a result, the estimated counterfactual price for the alternative Dave's Killer Bread product (*i.e.*, for which the alleged regulatory violation was remedied) must take this competitor reaction into account. Absent an equilibrium analysis that accounts for these supply-side factors, any alleged "price premium" estimate would reflect marketplace conditions (*e.g.*, lack of competitor response) that are unrealistic in the simulated counterfactual "but-for" world.

146. Importantly, in the counterfactual "but-for" world, the market equilibrium price that Dave's Killer Bread would charge would depend on the quantity of the product that could be sold at different prices. Using the actual *historical* quantity of Dave's Killer Bread products sold as the assumed *counterfactual* quantity for an alternative ("lawful") Dave's Killer Bread product in order to estimate the counterfactual market equilibrium price would be fundamentally erroneous and biased, leading to a scientifically invalid result. Mr. Weir's statement that "it would be antithetical to the concept of class definition to suggest that the quantity supplied be anything other than the actual number of units sold by Defendants"[292] reveals a fundamental misunderstanding of this basic issue. The *counterfactual* quantity sold is necessary *not* for use as the quantity used as a "product" in the damages calculation (*i.e.*, in which the *historical* quantity sold is multiplied by the alleged "price premium"), but as an input to accurately estimate the counterfactual price and thus the alleged "price premium."

147. To further illustrate the fallacy and inadequacy of Mr. Weir's approach, it is useful to compare Figures 7a and 7b below. Recall that, as reproduced in Figure 7a, a "but-for"

---

[291] Weir Declaration, ¶¶ 86 – 94.

[292] *Id.*, ¶ 80.

world in which the alleged regulatory technical violation is removed will, according to Mr. Weir's (and the Plaintiff's) theory, cause demand to shift downward; this shift would then lead to a new equilibrium price and quantity ("$P_{BF}$" and "$Q_{BF}$," respectively) for the supposedly "lawful" product. Mr. Weir's approach, however, can be understood as (erroneously) assuming that quantity produced is independent of consumer demand, such that the company could and would continue producing the same quantity no matter how low the resulting market price (due to the alleged drop in consumer demand in the "but-for" world). Thus, as depicted by the red vertical line in Figure 7b below, Mr. Weir's conjoint analysis approach assumes a ***vertical (completely inelastic) supply curve***,[293] which would result in a *lower* "but-for" equilibrium price (*i.e.*, $P_{VS}$ [*i.e.*, price under a vertical supply curve assumption] rather than $P_{BF}$) and, correspondingly, a *higher* alleged "price premium" estimate (*i.e.*, $P_R - P_{VS}$ rather than $P_R - P_{BF}$).

(*Continues on next page*)

---

[293] At his deposition, Mr. Weir claimed that he is *not* assuming a vertical supply curve; Weir Deposition, p. 341. This claim is erroneous. In fact, Mr. Weir testified that he does not see how it would be possible for a reduction in demand to influence manufacturers' supply, which means that his damages approach is in actuality assuming a vertical supply curve; *see id.*, pp. 332 – 333 ("Q. All right. So is it possible that the – if the demand reduces for a given product or a product category, that it would influence the supply that manufacturers and companies would put forth on the market? A. I don't see how that could possibly be the case in a circumstance where the products have already been manufactured and have already been sold."). Similarly, Mr. Weir admitted that his "but-for" world would assume no competitive response; *id.*, p. 272 ("Q. Well, wouldn't you want to test whether or not the competitors and the market would react different to the – to the product without the challenged statement? A. We would have an expectation that there would be no response. But even if you were to engage in that hypothetical, I believe that would be a violation of the but-for construct, and so I don't permit it to happen. In other words, I'm calculating only the economic consequence of Dave's use of the challenged claim, not the economic consequence of Dave's use of the claim versus not using the claim and Oroweat's hypothetical response to that."). *See also id.*, p. 335 ("I am trying to approximate a but-for world that is different from the real world in only one respect, the use of the protein claim. It holds the supply conditions the same. It holds the competitive conditions the same.").

**Figure 7a: New Market Equilibrium in the "But-For" World**



**Figure 7b: New Market Equilibrium in the "But-For" World According to Mr. Weir's Conjoint Analysis Approach (Vertical Supply Assumption)**



148.    As courts have recognized, including when they rejected conjoint surveys and related damages models, the assumption of a "vertical supply curve" (*i.e.*, a constant quantity being sold regardless of price, or a completely inelastic supply curve) is inconsistent with the requirement that damages be based on a plausible market equilibrium.[294]

---

[294] *See, e.g.*, *In re General Motors LLC Ignition Switch Litigation*, 427 F. Supp. 3d 374 (S.D.N.Y. 2019) *391 (noting that market value is understood to mean "the price that a willing buyer would

149.    Similarly, Mr. Weir's proposed analysis would assume that the seller is not "willing," but would instead be "conscripted" (forced) to produce the same amount in the "but-for" world as they did in the actual market, regardless of the seller's costs and no matter how much demand had been reduced.  This unreasonable assumption would lead to an unrealistic and underestimated "but-for" world price, thereby artificially inflating the alleged "price premium" estimate.  As explained in academic research on the use of conjoint analysis, calculating WTP based only on an estimated demand function generally overestimates the alleged "price premium" (if any exists); instead, the alleged "price premium" which should be appropriately calculated based on where the "but-for" demand curve intersects the "but-for" supply curve.[295]

150.    Overall, Mr. Weir's appeal to historical sales (price and quantity) that occurred during the putative class period is *invalid and irrelevant to, and fundamentally fails to incorporate, the appropriate and necessary supply-side factors and equilibrium analysis*.

151.    *Third*, Mr. Weir argues that his approach can be considered "inherently conservative":[296]

> Furthermore, if one were to assume, *arguendo*, that Defendants would not have lowered their price in concert with demand (indicating that Defendants priced above the market clearing price), then the economic outcome would be that many or all of the purchases would not have taken place at all. As such, the price premium(s) determined using conjoint analysis are inherently conservative measures.

In making this argument, Mr. Weir simply makes assertions without providing any evidence.  It is not the case that a firm would only keep the price the same if they had been pricing above the market-clearing price.  If demand were insensitive to price changes or if the alleged technical regulatory violation were not material and did not affect demand, then a change in the protein information listed on the front label or on the NFP would not affect product prices.  Even

---

pay to a willing seller, neither being under compulsion to buy or sell"; concluding that "Boedeker's [Plaintiffs' expert] testimony is insufficient as a matter of law to support the essential element of damages because he assumes that the supply curve is vertical, reimagining sellers as conscripted to produce and sell their products at whatever price consumers are willing to pay").

[295] *See* Allenby et al. (2014a), pp. 649 – 650.

[296] Weir Declaration, ¶ 81.

assuming arguendo that correcting the alleged technical regulatory violation did reduce demand, there is no way to know how many sales would be lost if prices did not change, without accurately estimating a full demand and supply equilibrium system. There is absolutely no basis for assuming, as Mr. Weir does, that the decrease in profits from lost purchases would be higher than from lowering the price that Mr. Weir estimates, without calculating a true market equilibrium. Only the counterfactual price at the actual market equilibrium can be assumed to maximize profits, and therefore simply shifting prices while assuming no change in supply is *not* (contrary to Mr. Weir's assertion) a conservative test.

152.    ***Finally***, it is important to emphasize that Mr. Weir's proposed use of a simulator does not constitute accounting for supply-side factors, reactions, and equilibrium. As explained in the preceding section, Mr. Weir's simulator does not even account for market competition, instead using a highly unrealistic two-product ("50/50") approach. Consequently, Mr. Weir's simulation would not estimate any alleged *market* "price premium."

153.    Even if Mr. Weir were to use an entirely different approach and incorporate the actual competitors in his simulator, using the prices and product characteristics observed during the putative class period, ***doing so would still ignore supply-side equilibrium.*** In particular, such an approach would fail to account for both Dave's Killer Bread's and competitor brands' *reactions* to the alleged change in demand (*i.e.*, due to the change to Dave's packaging) in the counterfactual "but-for" world. Failing to incorporate competitive reaction is a widely-recognized flaw in the kind of conjoint approach proposed by Mr. Weir. In fact, this issue is discussed in the most recent edition of Orme and Chrzan's book on conjoint analysis:[297]

> Allenby et al. (2013) suggest taking this analysis further and incorporating competitive reactions to a brand's feature and pricing changes and finding the market equilibrium price. Competitors may complicate things, however, because they can respond by changing features as well as price.

---

[297] Orme and Chrzan (2021), p. 203. *See also* Orme, Bryan K. (2020), *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, Fourth Edition, Research Publishers LLC, 2020, pp. 81, 92, & 104 – 105.

Marketing simulation in competitive contexts leads to different WTP results depending on the product characteristics and prices for the firm's product as well as competitors. This might cause some concern for analysts and clients alike, as they may not have full confidence about what the base case competitive scenario should look like.

154.    To summarize, Mr. Weir's damages approach fails to incorporate any supply-side factors or equilibrium (dynamic) analysis; therefore, Mr. Weir's approach is fundamentally inadequate to reliably estimate any alleged marketplace "price premium" or damages.  As academic research has demonstrated, Mr. Weir's assumption of no competitive (or no supply-side) reaction to (forecasted or alleged) changes in demand is unrealistic, erroneous, and almost always overstates the value of the product attribute or package statement at issue.[298]

## G.    THE WEIR PROPOSED CONJOINT SURVEY WOULD FAIL TO REPRESENT THE RELEVANT CONSUMER UNIVERSE

155.    A critical criterion in survey design is a proper definition of the consumer universe. For example, Professor McCarthy writes:[299]

> The first step in designing a survey is to determine the "universe" to be studied. The universe is that segment of the population whose perceptions and state of mind are relevant to the issues in the case.  Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.

Relatedly, the first two (of seven) factors listed in the *Manual for Complex Litigation* are:[300]

> (*i*)  the population was properly chosen and defined; and
> (*ii*) the sample chosen was representative of that population.

156.    The survey universe should be neither underinclusive (*i.e.*, exclude relevant segments of the consumer population) nor overinclusive (*i.e.*, include the opinions of irrelevant consumer segments).  Using an *under*inclusive universe biases the results by excluding relevant data, while using an *over*inclusive universe skews the results by introducing irrelevant data.  As Professor Diamond cautions:[301]

---

[298] *See, e.g.*, Allenby et al. (2014a, b).

[299] McCarthy (2007), §32:159.

[300] *Manual for Complex Litigation* (2004), p. 103.

[301] Diamond (2011), p. 379.

If the relevant subset cannot be identified, however, an overbroad sampling frame will reduce the value of the survey. If the sampling frame does not include important groups in the target population, there is generally no way to know how the unrepresented members of the target population would have responded. [FNs omitted]

157.    Mr. Weir states that his survey universe would consist of "California residents, age 18+, who had purchased or considered purchasing Dave's Killer Bread in the past five years."[302] However, for multiple reasons, such a sample of Internet panelists would fail to represent the relevant consumer universe, and would instead be both overinclusive and underinclusive. Consequently, the Weir Proposed Conjoint Survey's sample is flawed and does *not* represent the mindset, perceptions, and purchase decisions of the putative class members. ***Based solely on this flaw alone***, even if all other aspects of Mr. Weir's proposed conjoint survey were proper (they are *not*), it would be impossible to rely on the survey's results to reach any estimates or conclusions.

158.    ***First***, contrary to standard, accepted practice, Mr. Weir will use a fundamentally improper screening procedure that would ***fail to qualify prospective purchasers*** of the disputed products. According to Mr. Weir's stated screening criteria, participants could qualify for the Weir Proposed Conjoint Survey if they had purchased or merely *considered purchasing* Dave's Killer Bread as long as *five years ago* and *had not made a qualifying purchase or even considered purchasing since*, and even if they had no intention to purchase Dave's Killer Bread (or sliced bread products) in the future.[303]

159.    Critically, a survey such as the Weir Proposed Conjoint Survey should only qualify for participation ***potential participants who report being <u>prospective</u> purchasers in the relevant product category***, not past purchasers (or past "considerers") of only the specific product at issue.[304] As courts have also recognized, a probative survey must "rely upon

---

[302] Weir Declaration, ¶ 60.

[303] ████████████████████████████████████████

[304] *See, e.g.*, Jay, E. Deborah (2013), "Ten Truths of False Advertising Surveys," *The Trademark Reporter*, 103(5), 1116 – 1171, p. 1121 ("The proper universe for a consumer perception survey usually consists of potential purchasers (or both past and potential purchasers) of the advertised product or service"; citing also: "William G. Barber, *The Universe in* Diamond & Swann, *Trademark and Deceptive Advertising Surveys supra* note 19, at 27, 36 ('Similar to surveys testing

responses by potential consumers of the products in question."[305]

160.    Indeed, while many of the putative class members who purchased Dave's Killer Bread during the putative class period were likely to be repeat purchasers, at least some would have purchased the disputed products for the first time.  A valid survey must therefore also include such first-time purchasers.  For example, many consumers may not have purchased or considered purchasing *Dave's Killer Bread specifically* in the past; however, they could very well be currently or imminently in the market for Dave's Killer Bread packaged bread, and hence would count as prospective purchasers of the disputed products.

161.    Mr. Weir should have indicated that he would screen in respondents for participation in the main questionnaire if they indicated that they both personally purchased a package of slice bread in the past three months *and* expected to personally purchase a package of sliced bread during the next three months.[306]  Those who indicate that they do *not* expect to purchase such products in the near future—that is, those who are simply not in the market for sliced bread—should *not* be counted as prospective consumers and should be excluded from the main questionnaire.

---

forward confusion in a trademark infringement case, logic dictates that a survey testing whether an advertisement is likely to mislead or deceive should focus on those consumers to whom the ad is directed (i.e., the advertiser's potential customers).)").  Professor McCarthy also notes, regarding likelihood of confusion surveys: "In a traditional case claiming 'forward' confusion, not 'reverse' confusion, the proper universe to survey is the **potential buyers** of the *junior user's* goods or services" [emphasis added]; McCarthy (2007), § 32:159.  Although the Weir Proposed Conjoint Survey is not a perception or trademark confusion survey, the prescription that prospective purchasers of the product at issue be sampled is equally applicable to a conjoint survey.

[305] *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (citing *Dreyfus Fund Inc. & Royal Bank of Canada*, 525 F. Supp. 1108, 1116 (S.D. N.Y. 1981).  *See also, e.g., Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561 (E.D. N.Y. 1999), *571 – 572 ("Thus, the survey universe must be composed of **people having a present purchasing interest in the product being surveyed**.  *See Universal City Studios*, *See Universal City Studios,* 746 F.2d *572 at 118 (universe improper because it **included only former purchasers** of Donkey Kong); *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 661 n. 4 (2d Cir. 1979) (universe improper because although survey participants were former purchasers of hiking boots, **they did not necessarily have any present purchasing interest**)" [emphases added]).

[306] For frequently-purchased products such as packaged sliced bread, it is appropriate to screen for both past *and* prospective purchasers in the category.

162.    Mr. Weir's assertion at his deposition that it is the "researcher's choice"[307] whether to use present purchase intention and that he decided to screen based on historic purchases because "we're dealing with historic sales"[308] is erroneous, fundamentally flawed, and imposes an arbitrary (and nonexistent) standard.  The fact that "historic sales" of Dave's products are accused does *not* justify constructing a consumer universe based on historic purchases.  As recognized by leading authorities, a key goal of consumer surveys is to assess "that segment of the population whose perceptions and *state of mind* are relevant to the issues in the case."[309]  Hence, defining the proper universe in a consumer survey means representing the *mindset* of the population at issue (here, the putative class members) *at or around the time of purchase*,[310] not when they purchased as far back as five years ago.[311]

163.    Overall, the Weir Proposed Conjoint Survey would inappropriately and systematically *exclude* the *most relevant* consumers—those currently considering making an imminent purchase—unless they had also purchased or considered purchasing Dave's Killer Bread during the past five years.  Additionally, by excluding first-time buyers, the Weir Proposed Conjoint would be underinclusive, including only consumers whose answers in his survey would reflect their prior experiences with bread products from Dave's Killer Bread.

---

[307] Weir Deposition, p. 161.

[308] *Ibid*.

[309] McCarthy (2007), § 32:159 (italics added).

[310] *See also* Barber, William G. and Guilio E. Yaquinto (2022), "The Universe," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. and Jerre B. Swann (eds), Chicago, IL: ABA, p. 31 ("Thus, the universe is the group of people whose perceptions the survey is intended to represent. It is crucial to select a universe that corresponds with the group or groups of consumers who *state of mind* is relevant to the particular legal issue involved in the case when designing a survey for a Lanham Act case" [italics added]); Diamond (2011), p. 376 ("The target population consists of all elements (i.e., individuals or other units) whose *characteristics or perceptions* the survey is intended to represent").

[311] At his deposition, Mr. Weir claimed that the person who has purchased bread from many years ago (and no longer has interest in purchasing imminently) "can bring their current feelings to the survey"; Weir Deposition, p. 164.  This would result in these participants providing simply irrelevant answers, as any choices they make in Mr. Weir's proposed survey would *not* reflect their mindset and decision-making at the time they made the relevant purchase (thereby undermining the goal of a proper survey).

164.    *Second*, in violation of well-established principles for defining the consumer universe, the Weir Proposed Conjoint Survey would not only qualify for participation respondents based solely on *past purchase* of Dave's Killer Bread-branded bread, but would also qualify them based on *past **consideration*** of this bread (*i.e.*, even if they *never actually bought it*).  Using past *consideration* as a screening criterion is particularly nonstandard and leading, and the use of the putative class period (which extends back over five years in this litigation) is an excessively long timeframe.  As substantiated by the large body of academic literature on the limitations of human memory,[312] consumers would *not* be able to accurately and reliably recall or reflect on their preferences or considerations for specific branded bread purchases stretching back as far as five years ago.[313]  Many participants are instead likely to simply guess, further contributing to an unrepresentative sample.

165.    Neither relying on past purchase nor on past consideration can result in a proper consumer universe of prospective packaged sliced bread buyers.  As such, the Weir Proposed Conjoint Survey completely fails to represent the mindset of the putative class members in this litigation when they actually bought in the past, or would consider buying in the future, the disputed products.

166.    *Third*, Mr. Weir omits a set of crucial screening questions from his proposed conjoint survey.  Specifically, Mr. Weir intends to force all participants to make choices from the same set of four brands (*i.e.*, Dave's Killer Bread, Oroweat, O Organics, and 365)—without evidently considering whether they would even encounter some of these brands.  As discussed

---

[312] *See, e.g.*, Anderson, John R. (1985), *Cognitive Psychology and its Implications*, New York, NY: W.H. Freeman and Company.  Research shows that memory decays over time even when the event or behavior is important and distinctive.  For example, while only 3% of respondents fail to recall their hospitalization when interviewed within ten weeks of the hospitalization, 42% fail to do so when interviewed after one year.  Cited in Schwarz, Norbert and Daphna Oyserman (1992), "Asking Questions About Behavior: Cognition, Communication, and Questionnaire Construction," *American Journal of Evaluation*, 22(2), 127 – 160.  The behaviors and outcomes at issue in the present case (*e.g.*, purchasing packaged sliced bread) are not more important or unique relative to a hospitalization episode.

[313] *See also, e.g.*, Lehmann, Donald R., Sunil Gupta, Joel H. Steckel, and Sunil Gupta (1998), *Marketing Research*, Reading, MA: Addison-Wesley.

previously, I understand that the O Organics store brand of packaged sliced bread was discontinued in 2022;[314] further, the 365 store brand is found only in Whole Foods retailers. Even if O Organics sliced bread were not discontinued, such products would still be found only in Albertsons Companies' stores (*e.g.*, Albertsons, Safeway, Vons). Mr. Weir fails to include *any* necessary screening question to qualify potential participants who personally shop at Albertsons (or affiliated stores) or Whole Foods. Consequently, the Weir Proposed Conjoint Survey would include participants to whom at least two brands—O Organics and 365—constitute simply *irrelevant* options when making purchase decisions regarding packaged sliced bread.

167.     *In summary*, the Weir Proposed Conjoint Survey relies on consumers' memories of relative distant purchases, potentially qualifying in the survey individuals who are no longer in the market for bread products such as the disputed Dave's Killer Bread products—while excluding first-time buyers and those who *are* in the market for the disputed products— resulting in a simultaneously overinclusive and underinclusive sample. Such participants would likely *not* evaluate the displayed product "profiles" as actual or prospective purchasers would. Hence, whatever perceptions, preferences, and WTP such unrepresentative participants might have regarding Dave's Killer Bread products do *not* reflect those of the relevant consumer universe or the putative class members at the time of purchase. Instead, these unrepresentative participants are likely to "project" or speculate about their preferences[315] in the category based on the limited set of attributes and statements presented in Mr. Weir's CBC task and on other leading survey cues.

---

[314] *See* Letchinger Declaration, ¶ 14.

[315] Consumers routinely make incorrect predictions or projections about their responses to different variables, including their responses to various factors in the marketplace. *See, e.g.*, Wilson and Gilbert (2003); Snell, Gibbs, and Varey (1995), "Intuitive Hedonics: Consumer Beliefs About the Dynamics of Liking," *Journal of Consumer Psychology*, 4(1), 33 – 60; Simonson, Itamar (1990), "The Effect of Purchase Quantity and Timing on Variety-seeking Behavior," *Journal of Marketing Research*, 27(2), 150 – 162; Wilson and Schooler (1991); Kivetz, Ran and Itamar Simonson (2002a), "Earning the Right to Indulge: Effort as a Determinant of Customer Preferences Toward Frequency Program Rewards," *Journal of Marketing Research*, 39(2), 155 – 170 (finalist for the 2007 *William O'Dell Award*, given to the *Journal of Marketing Research* [the major journal on marketing research issues] article that has had the greatest impact on the marketing field in the previous five years); Kivetz, Ran and Anat Keinan (2006), "Repenting Hyperopia: An Analysis of Self-Control Regrets," *Journal of*

**H.    THE WEIR PROPOSED CONJOINT SURVEY'S FATAL FLAWS AND THE FAILURE TO INCORPORATE MARKET COMPETITION OR SUPPLY-SIDE EQUILIBRIUM ANALYSIS RENDER MR. WEIR'S DAMAGES MODEL UNRELIBALE AND INVALID**

168.    Based on his proposed conjoint survey, Mr. Weir plans to estimate so-called "price premium damages"[316] supposedly due to the front label protein statement (but which in reality would inappropriately apply to differences in the presence versus absence of a "5g Protein" statement *anywhere on the packaging*; *see* Section C).  Mr. Weir's conjoint-driven damages calculations are based on the supposed incremental amount that putative class members allegedly paid to acquire a Dave's Killer Bread product displaying the "unlawful" statement that Mr. Weir intends to test in his conjoint survey (compared to a counterfactual Dave's Killer Bread product that would not display "5g Protein" anywhere on the package).[317]  As explained next, the damages theory and estimates proposed by Mr. Weir are completely unsupported, unreliable, and invalid.

169.    ***First***, it is important to reiterate that the Weir Proposed Conjoint Survey is ***premised on an invalid <u>comparison</u>***, as it fails to test the appropriate "but-for" scenario in which Dave's Killer Bread "corrected" the unlawful protein statement not by removing this statement from its front labels, but rather by simply including a %DV for protein (*e.g.*, 3%) on the nutrition label.  Moreover, even under the Plaintiff's interpretation of the theory of liability, Weir's chosen conjoint-based damages estimation method would be based on a comparison to a Dave's Killer Bread product that would apparently ***not display any "5g Protein" statement at all***—despite the

---

*Consumer Research*, 33(2), 273 – 282 (*Finalist*, 2009 *Best Article Award* for a paper published in *JCR* in 2006); Kivetz, Ran and Yuhuang Zheng (2006), "Determinants of Justification and Self-Control," *Journal of Experimental Psychology: General*, 135(4), 572 – 587; Kivetz and Zheng (2006); Kivetz, Ran, Oleg Urminsky, and Yuhuang Zheng (2006), "The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," *Journal of Marketing Research*, 43(1), 39 – 58 (*Finalist*, 2011 *William O'Dell Award*; *Finalist*, 2007 *Paul Green Award*) .

[316] *E.g.*, Weir Declaration, ¶ 100.

[317] *E.g., ibid.*

fact that, according to the FDA, the grams of protein must be displayed on the nutrition label, even if a front label protein statement is not made.[318]

170.    **Second**, it is also important to reiterate that beyond its irrelevance, the Weir Proposed Conjoint Survey itself suffers from multiple fatal (and survey-invalidating) flaws, including: gross violations of marketplace conditions, such as including unjustified attributes and attribute levels (including price) as well as contradictory and confusing product profiles (Subsection D.1.1); presenting the focal attributes out of context and at the expense of multiple relevant attributes (Subsections D.1.2 and D.1.3); reliance on a highly leading design, instructions, and questions (Subsection D.1.4); failure to conduct actual *market* simulations with competition (Section E); failure to incorporate *any* supply-side equilibrium analysis (Section F); and failure to represent the relevant consumer universe (Section G).  There is *no* way to correct Mr. Weir's survey-based estimates of consumer WTP and alleged "price premium" and to reliably use such estimates—as Mr. Weir purports to do—in order to calculate damages or monetary awards that could be held to a reasonable degree of professional certainty.  Because the Weir Proposed Conjoint Survey's severe flaws and one-sided biases would grossly overstate these "price premium damages" (which would not even be attributable to the alleged technical regulatory violation), Mr. Weir's damages estimates, in turn, would also be unreliable, invalid, and artificially inflated.

171.    **Overall**, Mr. Weir's "price premium damages" estimates based on his proposed conjoint survey's results are not only irrelevant but would also be upward biased and completely unscientific, unreliable, and invalid.  My professional opinion is that Mr. Weir's damages model and estimates could *not* be used to reach any valid conclusions regarding any injury allegedly suffered by the putative class members; nor could such estimates be reliably corrected or adjusted to remove the underlying biases.

(*Continues on next page*)

---

[318] *See, e.g.*, 21 C.F.R. § 101.9(c)(7).

### I.     MR. WEIR'S DISCUSSION OF PRODUCT DIFFERENTIATION IS UNSCIENTIFIC AND IRRELEVANT, AND *NONE* OF THE UNDERLYING SOURCES HE CITES SUPPORTS THE NOTION THAT A PROTEIN LABEL STATEMENT IS A DIFFERENTIATOR THAT GENERATES AN ALLEGED "PRICE PREMIUM"

172.     Before describing his proposed "price premium damages" model, Mr. Weir briefly discusses a handful of (*i.e.*, seven) sources that purportedly support his following conclusion:[319]

> Clearly, Defendants appear to understand that the Protein Claim will differentiate the Products from competitors, allowing Defendants to charge a premium for this attribute and derive higher revenues and profits therefrom.

173.     In the interest of brevity—and because Mr. Weir's damages calculations, as he admitted,[320] do not rely on the internal documents and deposition testimony to which he cites in this section of his declaration—I will highlight only a few key points in response to Mr. Weir's use and characterization of these underlying sources.  In short, *none* of the sources Mr. Weir cites are relevant to the alleged technical regulatory violation in this litigation, and none substantiates the notion that the "protein claim" is (or even that it was recognized by Dave's as) a meaningful differentiator that allows Dave's to charge a price premium.

174.     ***First***, it is important to note that ***none*** of the sources cited in the Weir Declaration's "Product Differentiation" section discuss (let alone evaluate or test) the effect of including *versus* omitting a statement about the %DV for protein.  My understanding is that the front label protein statement is allegedly unlawful because the nutrition label did not disclose the %DV for protein; if it had, Dave's would have complied with the FDA's requirement.  Hence, Mr. Weir's cited sources are irrelevant to any theory of liability that depends on a relationship between the front of the disputed packaging and the NFP depicted on the package back.  In fact, ***none*** of the sources cited by Mr. Weir evaluate or test even the effect of including *versus* omitting a *front label* protein statement.

175.     ***Second***, whether or not Dave's was aware of or "understood" a particular statement in a given way (*e.g.*, as an attribute "that allows the consumer to differentiate between

---

[319] Weir Declaration, ¶ 24.

[320] *See, e.g.*, Weir Deposition, pp. 78 – 79.

otherwise similar products"[321]) is *not* relevant to, let alone determinative of, the effects, if any, of this statement on consumers' actual perceptions and purchase decisions. Even if a marketer intends the packaging to have a particular effect on consumers, that does *not* mean that specific label statements will in actuality (*i*) convey a particular message commonly across consumers, or (*ii*) exert a common, material effect on consumers' purchase decisions.[322] For example, Mr. Weir's assertion that "Defendants appear to understand the concept of product differentiation"[323] is irrelevant, speculative, and says nothing about how a protein statement made in the context of the disputed packages: (*i*) influences (if at all) consumers' perceptions or purchase decisions, (*ii*) would be a driver of product differentiation as perceived by consumers, and (*iii*) would result in a higher willingness to pay for the disputed products.

176.    ***Third***, Mr. Weir's citation to a "Dave's Killer Bread Brand Style Guide"[324] in which the brand is characterized as "independent," "disruptive," and "powerfully different"[325] is

---

[321] Weir Declaration, ¶ 13.

[322] The importance of distinguishing marketers' intentions from consumers' actual responses to marketing actions is underscored by the fact that marketing, advertising, and packaging can be, and often are, ineffective in driving purchase behavior. While marketers often attempt to employ best practices and engage in marketing research (including conducting or commissioning surveys), not all marketing actions and advertising make a material impact on consumers' perceptions and purchase decisions. Entire books have been written about effective and ineffective marketing, advertising, and packaging. *See, e.g.*, Gray, Rob (2014), *Great Brand Blunders: The Worst Marketing and Social Media Meltdowns of All Time*, Bath, UK: Crimson Publishing Limited; Haig, Matt (2003), *Brand Failures: The Truth About the 100 Biggest Branding Mistakes of All Time*, Philadelphia, PA: Kogan Page Limited; Kotler, Phillip (2004), *The Ten Deadly Sins of Marketing*, Hoboken, NJ: John Wiley and Sons Inc. Marketing practitioners recognize that marketing actions carry the inherent risk that customers may *not* respond as desired. There are countless examples of marketing, advertising, and packaging claims that have not increased consumers' purchase likelihoods. *See, e.g.*, Bart, Yakov, Andrew T. Stephen, and Miklos Sarvary (2014), "Which Products are Best Suited to Mobile Advertising? A Field Study of Mobile Display Advertising Effects on Consumer Attitudes and Intentions," *Journal of Marketing Research*, 51(3), 270 – 285; Collins, Glenn (1996); "Chief of McDonald's Defends Arch Deluxe to Franchisees," *The New York Times*; Gray (2014), pp. 88 – 91; Haig (2003), pp. 10 – 15 & 29; Yarow, Drake B. (2014), "22 of the Most Epic Product Fails in History," *Business Insider*.

[323] Weir Declaration, ¶ 15.

[324] *Id.*, ¶ 16 (citing to FLO_00000535).

[325] *See* FLO_00000530, p. 6.

---

irrelevant.  The Weir Declaration also points to the fact that the guide identifies the attribute "PROTEIN" with a checkmark as a graphical element,[326] but does not explain how this in any way demonstrates that product is perceived by consumers as a product differentiator.  Moreover, the document merely identifies "[c]ommonly used packaging language,"[327] including several other statements, and does not discuss or place particular significance on any protein label statement.

177.    *Fourth*, Mr. Weir references a "sample sales sign for Plain Awesome Bagels"[328] that lists the "12g Protein" statement first and, according to him, "spotlight the Protein Claim with a different color font – the bold 'DKB Red' color."[329]  However, the Weir Declaration provides *no* information or context surrounding this sample sales sign (which, as Mr. Weir admitted, is *not* the package),[330] and it is unclear whether any California consumers in the marketplace even saw such marketing collateral.  Even if this document had been widely distributed to consumers during the putative class period, there is no evidence (and Mr. Weir points to none) that consumers' exposure to this document influenced their purchase decisions and willingness to pay for the disputed products.

178.    *Fifth*, Mr. Weir observes that "4 GRAMS OF PROTEIN" was a suggested factor in response to an internal email "asking for 'selling points (why consumer should purchase).'"[331]  The cited email thread, a (non-consumer-facing) document which reflects the subjective opinion of one Dave's employee (who does not cite to any empirical research or basis), does not and cannot

---

[326] Weir Declaration, ¶ 17 (citing to FLO_00000570).

[327] *See* FLO_00000530, p. 41.

[328] Weir Declaration, ¶ 18 (citing to FLO_00000715).

[329] *Ibid*.  Note that the displayed bagels packaging itself does *not* place any spotlight on the "12g Protein" claim that sets it apart from the two other claims listed below: "5 Super Grains / Quinoa, Spelt, Rye, Millet, Barley" and "No High Fructose Corn Syrup"; *see* FLO_00000715.

[330] Weir Deposition, p. 74.

[331] Weir Declaration, ¶ 19 (citing to FLO_00001591).  The cited email lists five different statements in response: "USDA ORGANIC/NON-GMO," "80 CALORIES PER SERVING," "15 GRAMS OF WHOLE GRAINS," "4 GRAMS OF PROTEIN," and "3 GRAMS OF FIBER."  *See* FLO_00001590, p. 2.

support a contention that a protein statement on Dave's Killer Bread packaging is perceived by consumers as a differentiating factor.

179.     **Sixth**, Mr. Weir points to a 2017 internal presentation, asserting that:[332]

[…] Defendant purposefully uses a "Killer Marketing Playbook," that among other things prescribes a "Powerful Brand Message at Shelf," which includes emphasizing the protein representations, with the goal of reaching the right consumer with the "RIGHT MESSAGE."

And:[333]

Dave's Killer Bread Point of Sale ("POS") materials also emphasize protein.

180.     However, the 2017 presentation does *not* support Mr. Weir's above conclusions. The "Killer Marketing Playbook" slide does not highlight or even mention anything about protein,[334] and multiple of the POS materials displayed do not, as Mr. Weir characterizes, "emphasize protein."[335]  Even if protein was promoted as one feature (of multiple other features) at the point of sale in stores, there is no information regarding the prevalence of consumers' exposure to such marketing materials, let alone any evidence that consumers relied on such representations in their bread purchases.

181.     **Finally**, the Weir Declaration cites selected excerpts from testimony by Mr. Dan Letchinger, Senior Vice President of Growth Brands at Flowers Foods.[336]  None of these excerpts support the notion that a protein statement differentiated the disputed products from competitors.

---

[332] Weir Declaration, ¶ 20 (citing to FLO_00000527).

[333] Weir Declaration, ¶ 21 (citing to FLO_00000528).

[334] *See* FLO_00000509, p. 19.

[335] Weir Declaration, ¶ 21.  *See* FLO_00000509, p. 20.

[336] Weir Declaration, ¶¶ 22 (citing the following testimony: "[W]e know that for some consumers understanding the total grams of protein in the fresh package bread products that are available at the supermarket may be important to them, and so we felt there was value in communicating, you know, some of the nutritional attributes, you know, in our products, you know, including protein":

The cited excerpts from Mr. Letchinger's testimony merely indicate that: (*i*) Dave's Killer Bread felt that including various nutritional attributes such as whole grains, fiber, Omega-3, and protein may be helpful for some consumers;[337] (*ii*) Dave's Killer Bread believes that the front label *as a whole* "helps attract consumers to the product" and "helps us differentiate from our competitors";[338] (*iii*) Dave's Killer Bread believes that their product packaging *as a whole* "is a way to communicate the uniqueness of the Dave's Killer Bread brand to consumers";[339] and (*iv*) Dave's Killer Bread believes that their "front of pack design"—again, *in general*—is "one of the things that helps us stand out relative to our competitive set."[340]  In fact, Mr. Weir omits the multiple instances in which Mr. Letchinger did *not* agree with the proposition that the front label protein statement constitutes a brand differentiator.  For example, Mr. Letchinger testified as follows:[341]

> Q.  Are front label representations about grams of protein brand differentiators for Dave's Killer Bread products?
> THE WITNESS:  No.
> MS. BACKER:  Q.  Why?
> A.  There are **many things that differentiate our brand from consumers**, and the front of pack claim – well, the front of pack grams of protein as listed there and calculated per the FDA's nitrogen method are just a way of representing the – some of our nutrition attributes. And, you know, when I think about brand differentiators, I go back to all the things that makes the Dave's Killer Bread brand unique: **organic and non-GMO project verified** and **our unique story**, commitment to **second chances**, our killer **taste and texture**. So – and truthfully, **what I define as a brand differentiator may differ from another consumer as not every single consumer is going to be viewing the brand in the same way**.

---

[337] 

[338] *Id.*, p. 141.

[339] *Id.*, pp. 154 – 155.

[340] *Id.*, p. 170.

[341] *Id.*, p. 169 (emphases added; question to the court recorder omitted).

And:[342]

> MS. BACKER: Q. Well, is putting protein front and center one of the ways in which a Dave's Killer Bread product can stand out from products that have nutrition facts buried on the back of the packaging?
>
> THE WITNESS:  You know, when I think about the ways we stand out, it's the uniqueness of our packaging, **look and feel**, and, you know, even just looking at the slide, when we talk about leading with killer **taste and texture**, you know, we talk about being a brand that **innovates**, a brand that **looks different**, you know, it's the **totality of those things** that may help differentiate that's relative to this competition.
>
> But, again, you know, **how we view our difference to the competition may differ from how a consumer views the difference**, knowing that, you know, **consumers are different and consumers, you know, have different motivations for what and why they purchase products at the grocery store**.

182.    Indeed, the above-cited testimony is consistent with the notion that, as I noted previously, a company's views or intentions regarding its differentiators are distinct from the perceptions that consumers in the marketplace actually form.  The question of which label statements on a product package attract greater attention and induce purchase is ultimately an *empirical* question, which cannot be answered by pointing (as Mr. Weir does) to the *opinion* of just one individual.

183.    Moreover, contrary to Mr. Weir's assertion that Dave's purportedly understood or viewed the "protein claim" as a differentiator that allows for charging an alleged price premium,[343] Mr. Letchinger's deposition testimony indicates that Dave's sets its suggested retail prices[344] based

---

[342] 

[343] *See* Weir Declaration, ¶ 24.

[344]

on the cost of goods sold,[345] distribution costs,[346] and Dave's and retailers' "margin requirements" or targets,[347] along with sometimes evaluating competitor product pricing.[348]  By contrast,



184.     Overall, to the extent that Mr. Weir or the Plaintiff would rely on any of the documents cited in the "Product Differentiation" section of the Weir Declaration, these underlying sources do *not* at all support Mr. Weir's conclusions.

185.     I understand that discovery is ongoing and, therefore, reserve the right to supplement and/or revise my opinion and this *Expert Declaration* in response to any further information provided by the parties and/or in light of additional documents or testimony, which may be brought to my attention after the date of my signature below.  This *Expert Declaration* is to be used only for the purpose of this litigation and may not be published, distributed, or used for any other purpose without my prior written consent.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on February 11, 2024 in New York, NY.


_____          _____
February 11, 2024                                                   R. Kivetz
            Date                                                          Dr. Ran Kivetz, Ph.D.

---

consumers are very different and they have different motivations for what guides their purchase and what they would wish to pay for a given product. Q. Did the price of the products change when the grams of protein representation was added to the front label? A. No.").

<u>**EXHIBIT A: CURRICULUM VITAE OF DR. RAN KIVETZ**</u>
*Academic Curriculum Vitae*

Graduate School of Business, Columbia University, 665 West 130th St., NY, NY 10027
Tel: (212) 854-4555 | e-mail:  rk566@columbia.edu

**Education:**

Ph.D., Stanford University, Graduate School of Business
Marketing, September 1996 – June 2000

M.A., Stanford University, Department of Psychology
Psychology, June 2000

B.A., Tel Aviv University
Economics and Psychology, June 1995

**Academic Employment:**

Philip H. Geier, Jr., Professor of Marketing, Columbia University Business School, 2008 – present

Professor of Business, Columbia University Business School, 2006 – 2008

Sidney Taurel Associate Professor of Business, Columbia University Business School, 2004 – 2006

Associate Professor, Columbia University Business School, 2003 – 2004

Assistant Professor, Columbia University Business School, 2000 – 2003

**Publications:**

Weiss, Liad and Ran Kivetz (2019), "Opportunity Cost Overestimation," *Journal of Marketing Research*, 56(3), 518-533.

Simonson, Itamar and Ran Kivetz (2018), "Bringing (Contingent) Loss Aversion Down to Earth – A Comment on Gal & Rucker's Rejection of "Losses Loom Larger Than Gains," *Journal of Consumer Psychology*, 28(3), 517-522.

Kivetz, Ran, Rachel Meng, and Daniel He (2017), "Hyperopia: A Theory of Reverse Self-Control," in *Handbook of Self-Control in Health and Well-Being*, de Ridder, Denise, Marieke Adriaanse, and Kentaro Fujita (eds), Routledge.

Kivetz, Ran and Yuhuang Zheng (2017), "The Effects of Promotions on Hedonic versus Utilitarian Purchases," *Journal of Consumer Psychology*, 27(1), 59-68.

**Publications:** (continued)

Keinan, Anat, Ran Kivetz, and Oded Netzer (2016), "The Functional Alibi," *Journal of the Association for Consumer Research*, Special Issue on the Science of Hedonistic Consumption, 1(4), 479-496. (Lead article)

Rom Schrift, Ran Kivetz, and Oded Netzer (2016), "Complicating Decisions: The Work Ethic Heuristic and the Construction of Effortful Decisions," *Journal of Experimental Psychology: General*, 145(7), 807-829. (Lead article)

Sela, Aner, Itamar Simonson, and Ran Kivetz (2013), "Beating the Market: The Allure of Unintended Value," *Journal of Marketing Research*, 50(6), 691-705.

Gershoff, Andrew, Ran Kivetz, and Anat Keinan (2012), "Consumer Response to Versioning: How Brands' Production Methods Affect Perceptions of Unfairness," *Journal of Consumer Research*, 39(2), 382–398.

Simonson, Itamar and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. and Jerre B. Swann (eds), Chicago, IL: American Bar Association, pp. 243-259.

Keinan, Anat and Ran Kivetz (2011), "Productivity Mindset and the Consumption of Collectable Experiences," *Journal of Consumer Research*, 37(6), 935-950. (*Winner*, 2011 *Ferber Award*)

Schrift, Rom, Oded Netzer, and Ran Kivetz (2011), "Complicating Choice," *Journal of Marketing Research*, 48(2), 308-326. (*Winner*, 2010 *Best Competitive Paper Award*, *Society of Consumer Psychology*)

Urminsky, Oleg and Ran Kivetz (2011), "Scope Insensitivity and the 'Mere Token' Effect," *Journal of Marketing Research*, 48(2), 282-295.

Levav, Jonathan, Ran Kivetz, and K. Cecile Cho (2010), "Motivational Compatibility and Choice Conflict," *Journal of Consumer Research*, 37(3), 429-442.

Keinan, Anat and Ran Kivetz (2008), "Remedying Hyperopia: The Effects of Self-Control Regret on Consumer Behavior," *Journal of Marketing Research*, 45(6), 676-689.

Kivetz, Ran, Oded Netzer, and Rom Schrift (2008), "The Synthesis of Preference: Bridging Behavioral Decision Research and Marketing Science," *Journal of Consumer Psychology*, 18(3), 179-186.

Keinan, Anat and Ran Kivetz (2008), "When Virtue Is a Vice," *Harvard Business Review*, July-August.

**Publications:** (continued)

Kivetz, Ran, "Farsightedness (2007)," in *International Encyclopedia of the Social Sciences*, 2nd Edition, Darity Jr., William (ed.), Detroit: Macmillan/Thomson Gale.

Kivetz, Ran, Oleg Urminsky, and Yuhuang Zheng (2006), "The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," *Journal of Marketing Research*, 43(1), 39-58. (*Finalist*, 2011 *William O'Dell Award*; *Finalist*, 2007 *Paul Green Award*)

Kivetz, Ran and Anat Keinan (2006), "Repenting Hyperopia: An Analysis of Self-Control Regrets," *Journal of Consumer Research*, 33(2), 273-282. (*Finalist*, 2009 *Best Article Award* for a paper published in *JCR* in 2006)

Kivetz, Ran, and Yuhuang Zheng (2006), "Determinants of Justification and Self-Control," *Journal of Experimental Psychology: General*, 135(4), 572-587.

Rottenstreich, Yuval, and Ran Kivetz (2006), "On Decision Making without Likelihood Judgment," *Organizational Behavior and Human Decision Processes*, 101(1), 74-88.

Kivetz, Ran (2005), "Promotion Reactance: The Role of Effort-Reward Congruity," *Journal of Consumer Research*, 31(4), 725-736. (*Winner*, 2005 *Ferber Award*)

Kivetz, Ran, Oded Netzer, and V. Srinivasan (2004), "Alternative Models for Capturing the Compromise Effect," *Journal of Marketing Research*, 41(3), 237-257. (Lead article) (*Finalist*, 2009 *William O'Dell Award*; *Finalist*, 2005 *Paul Green Award*)

Kivetz, Ran, Oded Netzer, and V. Srinivasan (2004), "Extending Compromise Effect Models to Complex Buying Situations and Other Context Effects," *Journal of Marketing Research*, 41(3), 262-268.

Kivetz, Ran (2003), "The Effects of Effort and Intrinsic Motivation on Risky Choice," *Marketing Science*, 22(4), 477-502.

Kivetz, Ran and Itamar Simonson (2003), "The Idiosyncratic Fit Heuristic: Effort Advantage as a Determinant of Consumer Response to Loyalty Programs," *Journal of Marketing Research*, 40(4), 454-467.

Kivetz, Ran and Itamar Simonson (2002b), "Self-Control for the Righteous: Toward A Theory of Pre-Commitment to Indulgence," *Journal of Consumer Research*, 29(2), 199-217. (*Finalist*, 2005 *Best Article Award* for a paper published in *JCR* in 2002)

Kivetz, Ran and Itamar Simonson (2002a), "Earning the Right to Indulge: Effort as a Determinant of Customer Preferences Toward Frequency Program Rewards," *Journal of Marketing Research*, 39(2), 155-170. (*Finalist*, 2007 *William O'Dell Award*)

**Publications:** (continued)

Kivetz, Ran and Itamar Simonson (2000), "The Effects of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37(4), 427-448. (*Finalist*, 2005 *William O'Dell Award*)

Kivetz, Ran (1999), "Advances in Research on Mental Accounting and Reason-Based Choice," *Marketing Letters*, 10(3), 249-266.

**Work Under Review or Under Revision in Peer-Reviewed Journals:**

Kivetz, Ran and Rachel Meng, "Circular Self-Rewards vs. Cash (Dis)Incentives: Motivating Effort, Goal Pursuit, and Positive Habits."

Pocheptsova, Anastasiya, Ran Kivetz, and Ravi Dhar, "Consumer Decisions to Rent versus Buy."

**Manuscripts in Preparation:**

Danziger, Shai, Liat Hadar, Ran Kivetz, and Itzhak Gnizy, "Price Quote Format and Inferred Artisanship and Marketing Orientation."

He, Daniel and Ran Kivetz, "Being in the Moment: The Effects of Ephemeral Communication in Social Media."

Shamis, Asaf and Ran Kivetz, "From Colonialism to Networked Colonialism: Personalized Networked Communications and Habermas's Theory of Modern Society."

**Working Papers:**

"Democracy between Private Space, Public Space, and Cyberspace," with Asaf Shamis.

"The Behavioral Economics of Incentives."

"Exercising Self-Control Through Self-reward," with Rachel Meng.

**Selected Research-In-Progress:**

"The Surprising Robustness of Prospect Theory in the Long Run."

"The Effects of Reward Programs," with Ricardo Montoya and Oded Netzer.

"The Bounded Rationality of Effort-Reward Choices: When Principles Overshadow Expectancies," with Oleg Urminsky.

"The Intersection of Behavioral Economics and Political Science."

"A Republic of Selfies: Personalizing Public Messages in Digital Media," with Asaf Shamis & Daniel He.

"Tie Signaling in Social Media," with Daniel He.

"Consumer Search."

**Academic Honors and Awards:**

Finalist, 2016 William O'Dell Award for the Journal of Marketing Research article published in 2006 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Faculty Fellow of the Institute for Social and Economic Research and Policy, 2002-2015

Ranked by the American Marketing Association as one of the Top 50 most productive scholars in the premier marketing journals during 2010–2014

Finalist, 2014 Best Article Award for the Journal of Consumer Research article published in 2011

Ranked by the American Marketing Association as one of the Top 50 most productive scholars in the premier marketing journals during 2009-2013

Finalist, 2011 William O'Dell Award for the Journal of Marketing Research article published in 2006 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Winner of the 2010 Best Competitive Paper Award granted by the Society of Consumer Psychology

**Academic Honors and Awards:** (continued)

Rated as the fourth most prolific scholar in the leading marketing journals during 1982-2006 (Seggie, S. H. and D. A. Griffith, 2009; "What Does It Take to Get Promoted in Marketing Academia? Understanding Exceptional Publication Productivity in the Leading Marketing Journals," Journal of Marketing, 73(1), 122-132.)

Finalist, 2009 William O'Dell Award for the Journal of Marketing Research article published in 2004 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice."

Finalist, 2009 Best Article Award for the Journal of Consumer Research article published in 2006

Winner of the 2007 Early Contribution Award from the Society of Consumer Psychology

Finalist, 2007 William O'Dell Award for the Journal of Marketing Research article published in 2002 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Finalist, 2007 Paul Green Award for the Journal of Marketing Research article published in 2004 that "demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing"

Winner of the 2005 Ferber Award granted to the "best interdisciplinary dissertation article published in the latest volume of the Journal of Consumer Research"

Finalist, 2005 William O'Dell Award for the Journal of Marketing Research article published in 2000 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Finalist, 2005 Best Article Award for the Journal of Consumer Research article published in 2002

Finalist, 2005 Paul Green Award for the Journal of Marketing Research article published in 2004 that "demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing."

Winner of the 2005 Columbia Business School Dean's Award for Innovation in the Curriculum

Lang Faculty Research Fellowship in Entrepreneurship, 2005

Lang Faculty Research Fellowship in Entrepreneurship, 2004

Outstanding Reviewer Award, Journal of Consumer Research, 2003-2004

**Academic Honors and Awards:** (continued)

Invited as Faculty Presenter, 2004 Association for Consumer Research Doctoral Symposium

Young Scholars Program, Marketing Science Institute, 2003

Research Grant, Columbia Center for Excellence in E-Business, 2003

Seed Grant, Institute for Social and Economic Research and Policy, 2001

Doctoral Consortium Fellow, American Marketing Association, 1999

Ph.D. Merit Award, Stanford Graduate School of Business, 1999

Graduate Fellow and Grant, Stanford Center on Conflict and Negotiation, 1997-1998

Jaedicke Award Scholar (in recognition of outstanding academic performance), Stanford Graduate School of Business, 1996-1997

Dean's Honor List with Distinction, Faculty of Social Sciences (Economics), Tel Aviv University, 1995

******************

**Teaching:**

Winner of the Columbia Business School 2005 Dean's Award for Innovation in the Curriculum

*Ph.D. Courses*

Bridging Behavioral Economics with Marketing Science (Spring 2022)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Economics with Marketing Science (Fall 2019)
Student Evaluation 4.9 on 5-point scale

Bridging Behavioral Economics with Marketing Science (Spring 2018)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Economics with Marketing Science (Spring 2016)
Student Evaluation 4.2 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2013)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2011)
Student Evaluation 4.7 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2008)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2005)
Student Evaluation 4.8 on 5-point scale

Consumer Behavior – I (Fall 2005)
Student Evaluation 4.7 on 5-point scale

Multidisciplinary Approaches to Human Decision Making (Spring 2004)

Bridging Behavioral Decision Research with Marketing Science (Spring 2003)
Student Evaluation 4.8 on 5-point scale

Multidisciplinary Approaches to Human Decision Making (Spring 2002)

Totally Eclectic Seminar in Marketing (Spring 2001)
Student Evaluation 6.2 on 7-point scale

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Teaching:** (continued)

*High-Technology Entrepreneurship (Executive MBA Elective)*

Spring 2023 (1 section) – co-taught with Gary Singer
Student Evaluation 4.5 on 5-point scale

Spring 2019 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2018 (1 section)
Student Evaluation 4.6 on 5-point scale

Spring 2017 (1 section)
Student Evaluation 4.5 on 5-point scale

*High-Technology Entrepreneurship (Executive MBA & MBA Elective)*

Spring 2016 (1 section)
Student Evaluation 4.6 on 5-point scale

Spring 2009 (Master Class: 1 section)
Student Evaluation 4.7 on 5-point scale

Spring 2008 (Master Class: 1 section)
Student Evaluation 4.4 on 5-point scale

*High-Technology Marketing and Entrepreneurship (Executive MBA Elective)*

Spring 2008 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2006 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2005 (1 section)
Student Evaluation 4.9 on 5-point scale

Spring 2004 (1 section)
Student Evaluation 5.0 on 5-point scale

Spring 2003 (1 section)
Student Evaluation 5.0 on 5-point scale

Spring 2001 (1 section)
Student Evaluation 6.5 on 7-point scale

*High-Technology Marketing and Entrepreneurship (MBA Elective)*

Spring 2007 (1 section)
Student Evaluation 4.3 on 5-point scale

Spring 2006 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2004 (1 section)

**Teaching:** (continued)

*High-Technology Marketing and Entrepreneurship (MBA Elective)*

Student Evaluation 4.9 on 5-point scale

Spring 2003 (1 section)
Student Evaluation 4.4 on 5-point scale

Spring 2002 (1 section)
Student Evaluation 6.4 on 7-point scale

Spring 2001 (1 section)
Student Evaluation 6.4 on 7-point scale

*Marketing Strategy and Management (Core Executive MBA Course)*

Fall 2023 (2 sections)
Student Evaluations 4.7 and 4.5 on 5-point scales

Spring 2023 (2 sections)
Student Evaluations 4.1 and 4.3 on 5-point scales

Fall 2022 (2 sections)
Student Evaluations 4.4 and 4.3 on 5-point scales

Spring 2022 (2 sections)
Student Evaluations 4.3 and 4.2 on 5-point scales

Spring 2021 (2 sections)
Student Evaluations 4.1 and 4.1 on 5-point scales

Fall 2020 (2 sections)
Student Evaluations 4.0 and 3.7 on 5-point scales

Spring 2020 (2 sections)
Student Evaluations 3.8 and 3.7 on 5-point scales

Fall 2019 (1 section)
Student Evaluation 4.9 on 5-point scale

Spring 2019 (2 sections)
Student Evaluations 4.2 and 3.2 on 5-point scales

Fall 2018 (1 section)
Student Evaluation 4.8 on 5-point scale

Spring 2016 (1 section)
Student Evaluation 5.0 on 5-point scale

Spring 2012 (2 sections)
Student Evaluations 4.7 and 4.9 on 5-point scales

**Teaching:** (continued)

*Marketing Strategy (Core MBA Course)*

Fall 2023 (3 sections)
Student Evaluations 4.2, 4.0, and 3.9 on 5-point scales

Fall 2013 (3 sections)
Student Evaluations 4.1, 3.8, and 4.1 on 5-point scales

Fall 2012 (3 sections)
Student Evaluations 3.9, 3.1, and 3.2 on 5-point scales

Fall 2011 (3 sections)
Student Evaluations 4.4, 3.8, and 4.1 on 5-point scales

Fall 2010 (3 sections)
Student Evaluations 4.5, 3.7, and 4.2 on 5-point scales

Fall 2009 (3 sections)
Student Evaluations 4.4, 4.3, and 4.2 on 5-point scales

*Marketing Management (Undergraduate Course)*

Fall 2019 (1 section)
Student Evaluations 4.3 on 5-point scale

Spring 2019 (1 section)
Student Evaluations 4.4 on 5-point scale

Fall 2018 (1 section)
Student Evaluations 4.7 on 5-point scale

Spring 2017 (1 section)
Student Evaluations 4.8 on 5-point scale

Spring 2014 (1 section)
Student Evaluations 4.7 on 5-point scale

*The Marketing of a Nation: Israel (Master Class)*

Spring 2009 (1 section)
Student Evaluation 4.8 on 5-point scale

*Columbia Business School Global Immersion Program*

Global Immersion Israel: Leadership & Innovation (March 2018)

*Columbia Business School Executive Education Program*

Design Your Innovation Blueprint (March 2017)

Innovate on Demand (November 2014; November 2015)

Innovation and Entrepreneurship (IE) @Columbia (February 2013; February 2014)

Columbia Senior Executive Program (May 2010; October 2010; May 2011; July 2012)

**Teaching:** (continued)

Marketing and Innovation (June 2013; June 2014; November 2014)

Customer Centricity (May 2010; September 2010; October 2011; February 2012)

New Product Development and Innovation (October 2002; June 2003)

Marketing Management: Strategies, Processes & Tools for Today's Challenges (Sep. 02; Apr. '03)

Marketing Management (April 2002)

Marketing Management in the New Economy (April 2001)

**Main Advisor for:**

Daniel He, Assistant Professor at the National University of Singapore (NUS)

Anat Keinan, Associate Professor at Boston University (formerly Associate Professor at Harvard Business School)

Rachel Meng

Rom Schrift, Associate Professor at Indiana University (formerly Assistant Professor at Wharton; co-advisor with Oded Netzer)

Oleg Urminsky, Full Professor at Chicago Booth School of Business

Yuhuang Zheng, Associate Professor at Tsinghua University

**Doctoral Committee Member for:**

Tamar Avnet, University of Toronto

Josko Brakus, University of Rochester

Cecile Cho, University of California Riverside

Yael Karlinsky-Shichor, Northeastern University

Yaoli Mao, Autodesk, Inc.

Valentina Melnyk, Tilburg University

Anirban Mukhopadhyay, Hong Kong University of Science and Technology (HKUST)

Qitian Ren, Chinese University of Hong Kong (Shenzhen)

Aner Sela, University of Florida

Kavita Srivastava, Indian Institute of Technology

Liad Weiss, University of Wisconsin – Madison

***\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\****

**Conference Publications:**

Danziger, Shai, Liat Hadar, Ran Kivetz, and Itzhak Gnizy (2019), "Price Quote Format and Inferred Artisanship and Marketing Orientation," special session paper presented at Society for Consumer Psychology Conference (SCP), Savannah, GA.

He, Daniel and Ran Kivetz (2017), "Technology-Driven Consumption," special session presented at Society for Consumer Psychology Conference (SCP), San Francisco, CA.

He, Daniel and Ran Kivetz (2016), "Ephemeral Messaging: Intimacy, Spontaneity, and Creativity in Fleeting Experiences," competitive paper presented at Association for Consumer Research Conference (ACR), Berlin, Germany.

Meng, Rachel and Ran Kivetz (2016), "Motivating Choices and Performance: Beyond Monetary Incentives," Association for Consumer Research Conference (ACR), Berlin, Germany.

He, Daniel and Ran Kivetz (2015), "Tie Signaling," in *NA - Advances in Consumer Research* Volume 43, eds. Kristin Diehl and Carolyn Yoon, Duluth, MN: Association for Consumer Research.

Netzer, Oded, Ran Kivetz, and Rom Schrift (2015), "Complicating Decisions: the Effort-Outcome Link and the Construction of Effortful Decision Processes," in *NA - Advances in Consumer Research* Volume 43, eds. Kristin Diehl and Carolyn Yoon, Duluth, MN: Association for Consumer Research.

Weiss, Liad and Ran Kivetz (2014), "Following-Through Opportunities: the Effects of Incidental Versus Inherent Choices," in *NA - Advances in Consumer Research* Volume 42, eds. June Cotte and Stacy Wood, Duluth, MN: Association for Consumer Research.

Simonson, Itamar, Aner Sela, and Ran Kivetz (2013), "Beating the Market: Competitive Mindset and the Allure of Unintended Value," in *NA - Advances in Consumer Research* Volume 41, eds. Simona Botti and Aparna Labroo, Duluth, MN: Association for Consumer Research.

Weiss, Liad and Ran Kivetz (2011), "When Not Redeeming a Coupon Feels Like Missing More Than Its Value," in *E - European Advances in Consumer Research* Volume 9, eds. Alan Bradshaw, Chris Hackley, and Pauline Maclaran, Duluth, MN: Association for Consumer Research.

Schrift, Rom, Ran Kivetz, and Oded Netzer (2011), "Creating the Illusion of Choice Through Selective Information Search and Retrieval," in *NA - Advances in Consumer Research* Volume 39, eds. Rohini Ahluwalia, Tanya L. Chartrand, and Rebecca K. Ratner, Duluth, MN: Association for Consumer Research.

**Conference Publications:** (continued)

Schrift, Rom, Oded Netzer, and Ran Kivetz (2010), "Complicating Choice," in *NA - Advances in Consumer Research* Volume 37, eds. Margaret C. Campbell, Jeff Inman, and Rik Pieters, Duluth, MN: Association for Consumer Research.

Sela, Aner, Itamar Simonson, and Ran Kivetz (2010), "Negative Effects of Explicit Customization on Perceptions of Opportunity," in *NA - Advances in Consumer Research* Volume 37, eds. Margaret C. Campbell, Jeff Inman, and Rik Pieters, Duluth, MN: Association for Consumer Research.

Keinan, Anat, Ran Kivetz, and Oded Netzer (2009), "Functional Alibi," in *NA - Advances in Consumer Research* Volume 36, eds. Ann L. McGill and Sharon Shavitt, Duluth, MN: Association for Consumer Research.

Kivetz, Ran and Anat Keinan (2009), "Hyperopia: A Theory of Reverse Self-Control," in *NA - Advances in Consumer Research* Volume 36, eds. Ann L. McGill and Sharon Shavitt, Duluth, MN: Association for Consumer Research.

Zheng, Yuhuang and Ran Kivetz (2009), "The Differential Promotion Effectiveness on Hedonic Versus Utilitarian Products," in *NA - Advances in Consumer Research* Volume 36, eds. Ann L. McGill and Sharon Shavitt, Duluth, MN: Association for Consumer Research.

Pocheptsova, Anastasiya, Ran Kivetz, and Ravi Dhar (2008), "Consumer Decisions to Rent Vs. Buy," in *NA - Advances in Consumer Research* Volume 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research.

Keinan, Anat and Ran Kivetz (2008), "Productivity Mindset and the Consumption of Collectable Experiences," in *NA - Advances in Consumer Research* Volume 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research.

Levav, Jonathan, Ran Kivetz, and Cecile Cho (2008), "Too Much Fit? How Regulatory Fit Can Turn Us Into Buridan's Asses," in *NA - Advances in Consumer Research* Volume 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research.

Keinan, Anat and Ran Kivetz (2007), "Remedying Hyperopia: the Effects of Self-Control Regret on Consumer Behavior," in *NA - Advances in Consumer Research* Volume 34, eds. Gavan Fitzsimons and Vicki Morwitz, Duluth, MN: Association for Consumer Research.

**Conference Publications:** (continued)

Urminsky, Oleg and Ran Kivetz (2007), "Scope Insensitivity in the Service of the Rational Self: the 'Mere Token' Effect," in *NA - Advances in Consumer Research* Volume 34, eds. Gavan Fitzsimons and Vicki Morwitz, Duluth, MN: Association for Consumer Research.

Zheng, Yuhuang and Ran Kivetz (2007), "Effort, Excellence and Income Stinginess: How Do People Justify Self-Gratification?," in *E - European Advances in Consumer Research* Volume 8, eds. Stefania Borghini, Mary Ann McGrath, and Cele Otnes, Duluth, MN: Association for Consumer Research.

Kivetz, Ran and Drazen Prelect (2006), "Goal Distance and Consumer Choice," in *NA - Advances in Consumer Research* Volume 33, eds. Connie Pechmann and Linda Price, Duluth, MN: Association for Consumer Research.

Kivetz, Ran and Klaus Wertenbroch (2006), "Emerging Perspectives on Self-Control," in *NA - Advances in Consumer Research* Volume 33, eds. Connie Pechmann and Linda Price, Duluth, MN: Association for Consumer Research.

Chernev, Alexander and Ran Kivetz (2005), "Goals and Mindsets in Consumer Choice," in *NA - Advances in Consumer Research*, eds. Gita Menon and Akshay Rao, Volume 32, Provo, UT: Association for Consumer Research.

Kivetz, Ran, Oded Netzer, and V. Srinivasan (2002), "Alternative Models for Capturing the Compromise Effect," in *NA - Advances in Consumer Research*, ed. Punam Anand Keller and Dennis Rook, Volume 30, Provo, UT: Association for Consumer Research.

Kivetz, Ran (2001), "Consumer Preferences Towards Frequency Programs," in *NA - Advances in Consumer Research* Volume 28, eds. Mary C. Gilly and Joan Meyers-Levy, Valdosta, GA : Association for Consumer Research.

Kivetz, Ran and Michal Strahilevitz (2001), "Factors Affecting Consumer Choices Between Hedonic and Utilitarian Options," in *NA - Advances in Consumer Research* Volume 28, eds. Mary C. Gilly and Joan Meyers-Levy, Valdosta, GA : Association for Consumer Research.

Kivetz, Ran (2000), "Hedonic and Utilitarian Motivations in Consumer Choice," in *NA - Advances in Consumer Research* Volume 27, eds. Stephen J. Hoch and Robert J. Meyer, Provo, UT: Association for Consumer Research.

Kivetz, Ran (1999), "Advances in Research on Mental Accounting and Reason-Based Choice," in HEC Symposium on *Advances in Choice Theory*, Conference Summary, Report No. 99-121, Gilles Laurent (ed.), Marketing Science Institute.

**Conference Publications:** (continued)

Chakravarti, Agnish, Susan Chiu, Ran Kivetz, and Itamar Simonson (1999), "Regret and Self-Congratulation From the Head and From the Heart," Advances in Consumer Research, ed. Eric J. Arnould and Linda M. Scott, Volume 26, Provo, UT: Association for Consumer Research.


**Selected Conference Presentations:**

"Self-Rewards and Cash (Dis)Incentives," with Rachel Meng, Marketing Analytics Symposium, Sydney, Australia, February 2020.

"Change – Attention – Shift," with Rachel Meng, 11th Triennial Invitational Choice Symposium, May – June 2019.

"Self-Rewards and Cash (Dis)Incentives," 4th Coller Conference on Behavioral Economics, Tel Aviv, Israel, June 2019.

"Self-Rewards and Cash (Dis)Incentives" with Rachel Meng, INFORMS Marketing Science Conference, Rome, Italy, June 2019.

"Technology-Driven Consumption," with Daniel He, Society for Consumer Psychology Conference (SCP), San Francisco, CA, 2017.

"The Consumption of Digital Live Content: How Live Streaming Enhances Engagement in Uninteresting Content," with Daniel He and Jonathan Hurwitz, Association for Consumer Research Conference (ACR), San Diego, CA, 2017.

"The Compensation-Driven Nature of Monetary Rewards," with Rachel Meng, Society for Consumer Psychology Conference (SCP), San Francisco, CA, 2017.

"Ephemeral Messaging: Intimacy, Spontaneity, and Creativity in Fleeting Experiences," with Daniel He, Association for Consumer Research Conference (ACR), Berlin, Germany, 2016.

"Motivating Choices and Performance: Beyond Monetary Incentives," with Rachel Meng, Association for Consumer Research Conference (ACR), Berlin, Germany, 2016.

"Consumer Decisions to Rent versus Buy," with Anastasiya Pocheptsova and Ravi Dhar, Association for Consumer Research Conference, Berlin, Germany, 2016.

"Motivating Choices and Performance: Beyond Monetary Incentives," with Rachel Meng, Society for Judgment and Decision Making, Boston, Massachusetts, 2016.

**Selected Conference Presentations:** (continued)

"Opportunity Cost Overestimation in Choices among Opportunities versus Alternatives," with Liad Weiss, Society for Judgment and Decision Making, Boston, Massachusetts, 2016.

"Consumer Behavior in Social Media" with Daniel He, Association for Consumer Research Conference, New Orleans, LA, October 2015.

"Illusions of Preference Construction," with Rom Schrift and Oded Netzer, Association for Consumer Research Conference, New Orleans, LA, October 2015.

"Creating the Illusion of Choice through Selective Information Search and Retrieval," with Rom Schrift and Oded Netzer, Association for Consumer Research Conference, St. Louis, MO, October 2011.

"Seeing-Through Opportunities:  The Effects of Incidental versus Inherent Choices" with Liad Weiss, Judgment and Decision Making Conference, Seattle, WA, November 2011.

"The Effects of Reward Programs" with Ricardo Montoya and Oded Netzer, INFORMS Marketing Science Conference, Rice University, Houston, TX, June 2011.

"Complicating Choice," with Rom Schrift and Oded Netzer, Society for Consumer Psychology Conference, St. Pete Beach, FL, February 2010.

"Complicating Choice," with Rom Schrift and Oded Netzer, Judgment and Decision Making Conference, Boston, MA, November 2009.

"Using Survey Controls Effectively," NAD Annual Conference: What's New in Comparative Advertising, Claim Support and Self-Regulation?, New York, NY, October 2009.

"Complicating Choice," with Rom Schrift and Oded Netzer, Association for Consumer Research Conference, Pittsburgh, PA, September 2009.

"Hyperopia: A Theory of Reverse Self-Control," with Anat Keinan, Association for Consumer Research Conference, San Francisco, CA, October, 2008.

"The Functional Alibi," with Anat Keinan and Oded Netzer, Association for Consumer Research Conference, San Francisco, CA, October 2008.

"The Impact of Marketing Promotions on Hedonic versus Utilitarian Purchases," with Yuhuang Zheng, Association for Consumer Research Conference, San Francisco, CA, October 2008.

**Selected Conference Presentations:** (continued)

"The Functional Alibi," with Anat Keinan and Oded Netzer, 11th Biennial Behavioral Decision Research in Management Conference, San Diego, CA, April 2008.

"From Diligence to Hindrance," with Rom Schrift and Oded Netzer, Marketing in Israel Conference, Tel Aviv University, Tel Aviv, Israel, December 2008.

"Hyperopia," University of Pennsylvania (Wharton), Philadelphia, PA, June 2007.

"Consumer Decisions to Rent versus Buy," with Anastasiya Pocheptsova and Ravi Dhar, Association for Consumer Research Conference, Memphis, TN, October 2007.

"Productivity Mindset and the Consumption of Collectable Experiences," with Anat Keinan, Association for Consumer Research Conference, Memphis, TN, October 2007.

"Too Much Fit? How Regulatory Fit Can Turn Us into Buridan's Asses," with Jonathan Levav and K. Cecile Cho, Association for Consumer Research Conference, Memphis, TN, October 2007.

"Remedying Hyperopia: The Effects of Self-Control Regret on Consumer Behavior," with Anat Keinan, 10th Biennial Behavioral Decision Research in Management Conference, Los Angeles, CA, June 2006.

"Scope Insensitivity and The Mere Token Effect," with Oleg Urminsky, 10th Biennial Behavioral Decision Research in Management Conference, Los Angeles, CA, June 2006.

"Hyperopia: A Theory of Reverse Self-Control", Symposium on "Self-Control Processes: New Theoretical and Empirical Directions," Society for Personality and Social Psychology Annual Meeting, Palm Springs, California, 2006.

"The Psychology of Rewards: Principles of Expectancies?," with Oleg Urminsky, Judgment and Decision Making Conference, Toronto, Canada, November 2005.

"Repenting Hyperopia: An Analysis of Self-Control Regrets," with Anat Keinan, Judgment and Decision Making Conference, Toronto, Canada, November 2005.

"Goal Distance and Consumer Choice" (Session Co-Chair), and "The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," with Oleg Urminsky and Yuhuang Zheng, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"Emerging Perspectives on Self-Control" (Session Co-Chair), and "Determinants of Justification and Self-Control," with Yuhuang Zheng, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

**Selected Conference Presentations:** (continued)

"Repenting Hyperopia: An Analysis of Self-Control Regrets," with Anat Keinan, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"Inducing Hyperopia through Inconsequential Early Rewards: A Consumer-Welfare-Enhancing Violation of the Invariance Axiom," with Oleg Urminsky, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"The Effects of Effort and Intrinsic Motivation on Risky Choice," INFORMS Marketing Science Conference, Emory University, Atlanta, GA, June 2005.

"The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," with Oleg Urminsky and Yuhuang Zheng, INFORMS Marketing Science Conference, Emory University, Atlanta, GA, June 2005.

"The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," with Oleg Urminsky and Yuhuang Zheng, Judgment and Decision Making Conference, Minnesota, November 2004.

"The Effects of Effort and Intrinsic Motivation on Risky Choice," Judgment and Decision Making Conference, Minnesota, November 2004.

Invited to present in session on "Goals, Impulses, and Self-Control," Association for Consumer Research Doctoral Symposium, Portland, Oregon, October 2004.

Discussion Leader for special session on "Simple Payments and Complex Rewards…," Association for Consumer Research Conference, Portland, Oregon, October 2004.

"Promotion Reactance: The Role of Effort-Reward Congruity," Association for Consumer Research Conference, Portland, Oregon, October 2004.

"Principles or Probabilities: When Value Overshadows Expected Value," with Oleg Urminsky, Association for Consumer Research Conference, Portland, Oregon, October 2004.

"How do Promotion Programs Affect Consumers' Purchase Decisions: A Behavioral Perspective," with Yuhuang Zheng, INFORMS Marketing Science Conference, Erasmus University, Rotterdam, The Netherlands, June 2004.

Discussion Leader for special session on "Understanding the Evaluation of Future Events," Association for Consumer Research Conference, Toronto, Canada, October 2003.

**Selected Conference Presentations:** (continued)

"Consumer Self-Control and Time-Discounting," with Oleg Urminsky, Judgment and Decision Making Conference, Vancouver, Canada, November 2003.

"Mindsets of Decision Making," with Yuval Rottenstreich, Judgement and Decision Making Conference, Vancouver, Canada, November 2003.

"Consumer Self-Control and Time-Discounting," with Oleg Urminsky, Association for Consumer Research Conference, Toronto, Canada, October 2003.

"The Effects of Effort and Intrinsic Motivation on Risky Choice," Marketing Science Institute Young Scholars Program, Park City, UT, March 2003.

"Does the End Justify the Means? The Impact of Effort on Preferences toward the Certainty and Magnitude of Rewards," Association for Consumer Research Conference, Atlanta, GA, 2002.

"Alternative Models for Capturing the Compromise Effect," with Oded Netzer and V. Srinivasan, Association for Consumer Research Conference, Atlanta, GA, October 2002.

"Alternative Models for Capturing the Compromise Effect," with Oded Netzer and V. Srinivasan, Marketing Science Conference, Alberta, Canada, June 2002.

"Self-Control for the Righteous: Toward a Theory of Pre-Commitment to Indulgence," with Itamar Simonson, Four School Seminar, New York University, May 2002.

"Self-Control for the Righteous: Toward a Theory of Luxury Pre-commitment," with Itamar Simonson, Judgment and Decision Making Conference, Orlando, FL, November 2001.

"The Influence of Hedonic Concreteness on Mood Regulation versus Mood Congruency," with Yifat Kivetz, Association for Consumer Research Conference, Austin, TX, October 2001.

"Self-Control for the Righteous: Toward a Theory of Luxury Pre-commitment," with Itamar Simonson, UC Berkeley Choice Symposium, Monterey, CA, June 2001.

"Consumer Preferences Towards Frequency Programs" (Session Chair), and "The Effects of Effort and Idiosyncratic Fit on Preference Towards Frequency Programs," with Itamar Simonson, Association for Consumer Research Conference, Salt Lake City, Utah, October 2000.

**Selected Conference Presentations:** (continued)

"Consumer Choices between Hedonic and Utilitarian Options" (Session Co-Chair), and "Earning the Right to Indulge: Effort as a Determinant of Customer Preferences Towards Frequency Program Rewards," with Itamar Simonson, ACR Conference, Salt Lake City, Utah, October 2000.

"Hedonic and Utilitarian Motivations in Consumer Choice" (Session Chair), and "The Joyless Consumer: Using Self-Control Strategies to Increase Hedonic Consumption," with Itamar Simonson, Association for Consumer Research Conference, Columbus, Ohio, October 1999.

"The Effects of Incomplete Information on Consumer Choice," with Itamar Simonson, Association for Consumer Research Conference, Columbus, Ohio, October 1999.

"Regret and Self-Congratulation From the Head and From the Heart," with Chakravarti, Agnish, Susan Chiu, and Itamar Simonson, Association for Consumer Research Conference, Montreal, Canada, October 1998.

"Intransitive Consumer Choice: The Effects of Incomplete Information," with Itamar Simonson, HEC Choice Symposium, Groupe HEC, Jouy-en-Josas (Paris), France, July 1998.

"Intransitive Consumer Choice: The Effects of Incomplete Information," with Itamar Simonson, INFORMS Israel, Tel Aviv, Israel, June 1998.

"Intransitive Consumer Choice: The Effects of Incomplete Information," with Itamar Simonson, Boulder-Colorado Behavioral Decision Theory Camp, Boulder, Colorado, October 1997.

"The Psychology of Versioning: Counterfactual Thinking as a Determinant of Fairness Perceptions and Choice," with Andrew Gershoff, ACR Conference, Toronto, Canada, October 2003.


**Selected Invited Talks:**

Vienna University of Economics and Business, forthcoming

INSEAD – Asia Campus, Singapore, forthcoming

Arison School of Business, The Interdisciplinary Center Herzliya (IDC). November 2022

Marketing Analytics Symposium – Sydney (MASS), February 2020

11th Triennial Invitational Choice Symposium, May-June 2019

**Selected Invited Talks:** (continued)

4th Coller Conference on Behavioral Economics, June 2019, Tel Aviv

"Marketing Israel," Israeli-American Council.

Licensing Executives Society (LES) 2012 Winter Meeting. March 2012

American Bar Association Section of Antitrust Law. November 2010

Tel Aviv University, Recanati Graduate School of Business Administration. August 2010

The 2009 NAD Annual Conference: What's New in Comparative Advertising, Claim Support and Self-Regulation? October 2009

New York University psychology department. March 2009

Israel Business Conference. December 2008

Stanford University, Graduate School of Business, marketing department. October 2008

Olin Business School at Washington University. May 2008

Duke University marketing department. April 2008

Yale University marketing department. April 2007

MIT marketing department. September 2006

University of Chicago marketing department. January 2006

Arison School of Business, The Interdisciplinary Center Herzliya (IDC). January 2006

Tilburg University, Faculty of Economics and Business Administration and Tias Business School, Marketing Research Camp. December 2005

Northwestern University (Kellogg), Marketing Research Camp. September 2005

Stanford University, Graduate School of Business, marketing department. May 2005

University of Pennsylvania (Wharton), Philadelphia PA. November 2004

University of Florida marketing department, Winter Research Retreat. March 2004

Marketing Modellers Group, New York. March 2004

Center for the Decision Sciences, Columbia University. April 2003

Young Scholars Program, Marketing Science Institute. March 2003

MIT marketing department. February 2003

University of Chicago marketing department. January 2003

**Selected Invited Talks:** (continued)

School of Business, Rutgers University – Camden Campus. November 2002

Arison School of Business, The Interdisciplinary Center Herzliya (IDC). June 2002

Social Psychology Network, Columbia University. May 2002

Center for the Decision Sciences, Columbia University. April 2002

NYU marketing department. March 2002

UC Berkeley marketing department. November 2001

2001 UC Berkeley Invitational Choice Symposium. June 2001

University of Texas at Austin, marketing research camp. April 2001

MIT marketing department. April 2001

Center for the Decision Sciences, Columbia University. February 2001

Northwestern University, Evanston Illinois. December 1999

Duke University, Durham NC. November 1999

University of Chicago, Chicago Illinois. November 1999

Cornell University, Ithaca NY. November 1999

Dartmouth College, Hanover, New Hampshire. November 1999

University of California, Berkeley, Berkeley CA. October 1999

Yale University, New Haven Connecticut. October 1999

University of Pennsylvania (Wharton), Philadelphia PA. October 1999

Columbia University, New York NY. October 1999

University of Southern California, Los Angeles CA. October 1999

Stanford University Psychology Department, Stanford CA. November 1998

1998 Groupe HEC Invitational Choice Symposium. July 1998

Boulder-Colorado Behavioral Decision Theory Camp, Boulder, Colorado. October 1997.


******************

**External Professional Activities & Service:**

Guest Editor:
*Journal of Marketing Research*

Guest Area/Associate Editor:
*Marketing Science*
*Management Science*
*Association for Consumer Research*

Editorial Boards:
*Journal of Marketing Research*
*Applied Economics Research Bulletin*
*Marketing Letters*

Reviewer:
*Marketing Science, Quantitative Marketing and Economics, Journal of Experimental Psychology: General, Psychological Science, Journal of Consumer Research, Journal of Consumer Psychology, Journal of Marketing, International Journal of Research in Marketing, Organizational Behavior and Human Decision Processes, Journal of Behavioral Decision Making, Journal of Service Research, Journal of Economic Psychology, Association for Consumer Research, Society for Consumer Psychology, Behavioral Decision Research in Management Conference, National Science Foundation.*

Intel Science Talent Search, Advisor for:

Gregg Gefen, Great Neck North High School (Semi-finalist, 2002)

Jukay Hsu, Stuyvesant High School (Semi-finalist, 2001)

******************

**Internal Professional Activities & Service:**

Service to University:

M.S. in Entrepreneurship & Innovation Working Group, 2016

Co-chair of the Provost's Faculty Advisory Committee on Entrepreneurship, 2013-2014

Faculty Fellow of the Institute for Social and Economic Research and Policy (ISERP), 2002-2015

Guest Speaker, Columbia University & Columbia Business School Chicago Alumni Clubs

Panel Discussant, "The Psychology of Money," Columbia University Annual Alumni and Development Officers Retreat, July 15, 2009

Panel Discussant, "The Psychology of Money," GSAS Conversations with Alumni, Columbia University Graduate School of Arts and Sciences, April 20, 2009

Service to Business School:

Member of the Marketing Division Senior Faculty Recruiting Committee, 2018 – present

Junior Faculty Research Liaison Committee, 2015 - 2019

Columbia Business School's Conflict of Interest and Conflict of Commitment Policy Review Committee, 2017

Strategy Creation Committee, 2013 - 2014

Core-Coordinator Committee, 2012 - 2014

Committee on the Structure of the Core, 2012

Faculty Committee on the Core Curriculum, 2011-2012

Committee on Enhancing the Effectiveness of the Core Curriculum, 2011

Faculty Ad-Hoc Committee on Columbia Business School Budget Guidelines, 2009

Columbia Business School Green Committee, 2009

Project Adviser for MBA and Executive MBA Independent Projects, 2002-present

MBA Admissions Committee, 2002 - 2006

Finance (Real Estate) Division Faculty Search Committee, 2003-2004

Management Division Faculty Search Committee, 2001-2002

Student Faculty Academic Affairs Committee (SFAAC), 2000-2001

******************

**Internal Professional Activities & Service:** (continued)

Service to Marketing Division:

Member of the Marketing Division Faculty Recruiting Committee, 2020 – present

Chair of the Marketing Division Communications and Outreach Committee, 2019 – present

Member of the Marketing Division Senior Faculty Recruiting Committee, 2018 – present

Junior Faculty Research Liaison for the Marketing Division, 2015 – 2019

Member of the Marketing Division Faculty Recruiting Committee, 2016 – 2018

Member of the Marketing Division Ph.D. Committee, 2016 – 2018

Chair of the Marketing Division Faculty Recruiting Committee, 2015

Coordinator of the Marketing Strategy Core Course, 2011 – 2014

Chair of the Marketing Division Ph.D. Committee, 2011 – 2013

Co-chair of the Marketing Division Faculty Recruiting Committee, 2010

Member of the Marketing Division Faculty Recruiting Committee, 2002 – 2008

Chair of the Marketing Division Ph.D. Committee, 2006 – 2007

Member of the Marketing Division Ph.D. Committee, 2004 – 2006

Various Sub-committees, 2007 – present

Organizer of Columbia Marketing Research Camp, 2001 and 2002


**Selected Media Reports of Dr. Kivetz's Research (research covered by hundreds of print, electronic, and broadcast media outlets):**

"Losses. Loom. Large. And That, in Short, Explains Your Loss Aversion," *Marketplace*, November 10, 2020.

"Why We're All So Worried About Having Too Little Time," *TIME*, January 30, 2020.

"Use this Simple Psychological Trick if Productivity Culture has Made it Impossible for You to Relax," *Fast Firm*, October 7, 2019.

"Five Below is a Wonderland of Things No One Needs. It's Also One of the Most Successful Retailers in America," *Washington Post*, December 20, 2018.

"New Research From Columbia Business School Sheds Light On Factors Affecting Luxury Versus Practical Purchases," *Markets Insider*, November 15, 2017.

"The Psychology Behind Spending Big," *BBC News*, October 9, 2017.

"There's Power in All Those User Reviews," *The New York Times*, December 7, 2013.

**Selected Media Reports of Dr. Kivetz's Research:** (continued)

"A Closet Filled With Regrets," *The Wall Street Journal*, April 17, 2013.

"Why We Blunder When We Buy," *Chicago Tribune*, July 22, 2011.

"The Business of Weird: Why People Pay for Bizarre Experiences," *TIME*, November 22, 2010.

"The New Abnormal," (Cover Story), *Bloomberg Businessweek*, August 2, 2010.

"Reward, Regret and Consumer Behaviour," *ABC Radio National (Australia)*, July 12, 2010.

"To Achieve Your Goals, Focus on Reasons," *U.S. News & World Report*, July 1, 2010.

"Can a Vacation Help Boost Your Portfolio?" *SmartMoney*, June 25, 2010.

"Reasons—and Ways—to Splurge This Summer," *U.S. News & World Report*, June 23, 2010.

"Field Guide To The Tightwad: Saving Spree," *Psychology Today*, January 1, 2010.

"Club Class," *The Wall Street Journal*, December 3, 2009.

"Don't Work All the Time — You'll Live to Regret It," *Wired Magazine*, July 15, 2009.

"When the Bride Says I Do – to Cash," *The Globe and Mail*, July 9, 2009.

"It Makes Them Sick to Spend - Literally," *The Globe and Mail*, June 8, 2009.

"The Gift-Card Economy," *The Atlantic*, May, 2009.

"Technology Can Save You From Yourself," *Marketplace Public Radio*, April 17, 2009.

"Regret Saving Money," *CNN*, March 26, 2009.

"Oversaving, a Burden for Our Times," *The New York Times*, March 23, 2009.

"Are You a Victim of Saver's Remorse?" *The New York Times*, March 23, 2009.

"Giving in to Temptation," *CNN*, September 20, 2008.

"Splurge Now, Feel Great Later," *ABC News*, July 2008.

"Splurging is Good for Your Health," *The Wall Street Journal*, July 2008.

"Putting a Price on Rewards," *U.S. News & World Report*, June 24, 2007.

"Incentives - Naughty But Nice," *Management Today*, April 1, 2007.

"Hyperopia," *The New York Times*—one of the "Best Ideas in 2006"—Annual Year in Ideas.

**Selected Media Reports of Dr. Kivetz's Research:** (continued)

"Delaying Pleasure Results in Regret," *United Press International*, June 27, 2006.

"Why Cash Incentives Fail," *SalesForceXP*, Feature Story, September Issue, 2005.

"Professors Discover Why Business Loyalty Programs Work," *Sacramento Business Journal*, 8.16.2004.

"An Economics Problem: Joyless Consumers," by Peter Martin, *THE AGE*, January, 2004, Australia.

"Consumers Work Hard for Loyalty Programs", *Newswise*, August 16, 2004.

"Studies Question Value of Mass Customization, Find Consumers Work Hard for Loyalty Programmes," *MadeForOne*, August 23, 2004.

"Consumers Prefer Loyalty Programmes that 'Fit'," *The Wise Marketer*, December 10, 2003.

"Indulgence," *Radio National*, with Geraldine Doogue, March 2, 2003, Australia.

"Betty Crocker Coupon Program Spry After More than 70 Years," by Karren Mills, *Dow Jones Interactive*, February 23, 2002.

"Once a Loyalty Craze, S&H Tries to Remake Magic in Digital Age," by Justin Pope, *The New York Times*, November, 2001.

"Earning the Right to Indulge: Guilt about Consuming Luxury Items Plays an Important Role in Consumer Preference Toward Rewards," *Stanford Business Magazine*, August 14, 2001.

"Study: Luxury Rewards Evoke Consumer Guilt," by Kimberly Hill, *CRM Daily*, August 1, 2001.  Also reported in *E-Commerce Times*, *Yahoo! News*.

"Stanford Business School Research Shows Guilt Plays a Role in What Loyalty Program Rewards Consumers Choose," *Transport News*, July 27, 2001.  Also reported in *Business Wire*, *Yahoo! Finance*, *Sharper Media*, *The Timeshare Beat*.

"Consumers Still Buy When Info Incomplete," *Marketing News*, October 9, 2000.

**Professional Affiliations:**

American Marketing Association

Association for Consumer Research

International Trademark Association

Society for Consumer Psychology

Society for Judgment & Decision Making

### EXHIBIT B: LIST OF CASES IN WHICH DR. RAN KIVETZ PROVIDED SWORN TESTIMONY IN DEPOSITION AND/OR TRIAL DURING THE PAST FOUR YEARS

- *Anne De Lacour, Andrea Wright, and Loree Moran v. Colgate-Palmolive Co., and Tom's Of Maine Inc.*, Case No. 16 Civ. 08364 (RA) (AJP) (S.D. Cal.)

- *Camille Cabrera v. Bayer Healthcare LLC and Bayer Corporation*, Case No. 2:17-cv-08525 (C.D. Cal.)

- *Veda Woodard, Teresa Rizzo-Marino, and Diane Morrison v. Lee Labrada et al.*, Case No. 5:16-cv-00189-JGB-SP (C.D. Cal.)

- *JaM Cellars, Inc. v. The Wine Group LLC,* Case No. 4:19-cv-01878-HSG (N.D. Cal.)

- *Hytera Communications Corp. Ltd. v. Motorola Solutions Inc.*, Case No. 1:17-cv-01794-DCN (N.D. Ohio Eastern Division)

- *The People of the State of California v. Kohl's Department Stores, Inc. et al.*, Case No. BC643037 (Superior Court of the State of California, County of Los Angeles)

- *American Customer Satisfaction Index, LLC v. ForeSee Results, Inc.*, Case No. 2:18-cv-13319 (E.D. Michigan Southern Division); and *CFI Group USA LLC v. Verint Americas Inc.*, Case No. 2:19-cv-12602 (E.D. Michigan)

- *NIKE, Inc. v. Vans, Inc.*, Opposition No. 91253064 (U.S. Patent and Trademark Office, TTAB)

- *Willis et al. v. Colgate-Palmolive Co.*, Case No. 2:19-cv-08542-JGB (C.D. Cal.)

- *In Re: Rock'n Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, Case No. 1:19-md-2903 (W.D.N.Y.)

- *La Fosse et al. v. Sanderson Farms, Inc.*, Case No. 19-CV-06570-RS (N.D. Cal.)

- *In Re: KIND, LLC "Healthy and All Natural Litigation"*, Case No. 1:15-md-02645-NRB (S.D.N.Y.)

- *Ripple Analytics Inc. v. People Center, Inc. d/b/a Rippling*, Case No. 2:20-cv-00894 (E.D. N.Y.)

- *Jerome's Furniture Warehouse v. Ashley Furniture Industries, Inc. et al.*, Case No. 20-cv-1765-RBM-BGS (S.D. Cal.)

- *Cat Brooks and Rasheed Shabazz v. Thomson Reuters Corporation*, Case No. 3:21-cv-01418-EMC (N.D. Cal.)

- *Elizabeth J. VanCleave and Katherine Hassan v. Abbott Laboratories*, Case No. 19CV345045 (Superior Court of the State of California, County of Santa Clara)

- *Masimo Corporation and Cercacor Laboratories, Inc. v. Apple Inc.*, Case No. 8:20-cv-00048-JVS-JDE (C.D. Cal.)

- *In Re: Folgers Coffee Marketing Litigation*, Case No. 4:21-2984-MD-C-BP (W.D. Mo.)

- *District of Columbia v. Beech-Nut Nutrition Company*, Case No. 2021 CA 001292 B (Superior Court of the District of Columbia, Civil Division)

- *Carrum Technologies, LLC v. Ford Motor Company*, Case No. 1:18-cv-01647-RGA (D. Del.)

- *Maker's Mark Distillery, PBC v. Spalding Group, Inc., et al.*, Case No. 3:19-CV-14-GNS-LLK (W.D. Ky.)

- *Delta Air Lines, Inc. v. Marriott International, Inc. et al.*, Case No. 1:20-CV-01125-ELR (N.D. Ga.)

- *Anthony Bush v. Rust-Oleum Corporation*, Case No. 3:20-CV-03268-LB (N.D. Cal.)

- *The PNC Financial Services, Inc. v. Plaid Inc.*, Case No. 2:20-cv-1977 (W.D. Pa.)

- *Illinois Tool Works Inc. v. J-B Weld Company, LLC*, Case No. 3:19-cv-01434-JAM (D. Conn.)

## <u>EXHIBIT C: DOCUMENTS MADE AVAILABLE TO DR. KIVETZ IN CONNECTION WITH PREPARATION OF THIS *EXPERT DECLARATION*</u>

In addition to academic research and articles, and other materials specifically referred to in the enclosed *Expert Declaration*, I received documents produced in the action, and other documents, including, without limitation, the following:

**Filed Documents**

- February 8, 2024 Declaration of Dan Letchinger in Support of Flowers Foods, Inc.'s and Dave's Killer Bread, Inc.'s Opposition to Plaintiff's Motion for Class Certification
- November 17, 2023 Plaintiff's Motion for Class Certification
- November 17, 2023 Declaration of David Swartz in Support of Plaintiff's Motion for Class Certification
- November 17, 2023 Declaration of Kali R. Backer in Support of Plaintiff's Motion for Class Certification (with Exhibits 1 – 49)
- November 17, 2023 Declaration of Kali R. Backer in Support of Plaintiff's Administrative Motion to Consider Whether Another Party's Material Should be Sealed (with Exhibits 1 – 49)
- November 17, 2023 Declaration of Seth Safier in Support of Plaintiff's Motion for Class Certification (with Exhibit A)
- September 14, 2023 Defendants Flowers Foods, Inc. and Dave's Killer Bread, Inc.'s Second Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories (Nos. 6, 7, 8, 10 & 11)
- January 9, 2023 Order Denying Motion to Dismiss
- June 17, 2022 First Amended Class Action Complaint for Violation of the California Consumers Legal Remedies Act; False Advertising; Fraud, Deceit, and/or Misrepresentation; Unfair Business Practices; and Unjust Enrichment (with Exhibits A and B)
- May 20, 2022 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss

**Expert Reports**

- November 17, 2023 Declaration of Colin B. Weir

**Deposition Transcripts**

- January 25, 2024 deposition transcript of the deposition of David Swartz
- January 23, 2024 deposition transcript of the deposition of Colin B. Weir
- November 10, 2023 deposition transcript of the 30(b)(6) deposition of Dan Letchinger

**Other Documents**

- Confidential - AEO - Gutride Safier DKB Oct 23.xlsx
- FLO_00000509
- FLO_00000530
- FLO_00000715
- FLO_00001590
- WEIR0001-WEIR1574
- 2022718 DKB21WGandSeeds 40162_APP.pdf [21 Whole Grains and Seeds]
- 2022707 DKBEpicEverythingBagel 50355_APP.pdf [Epic Everything]
- 68263_2040387_1up.ai [Burger Buns Done Right]
- 71779_2012127_r2_1up.ai [Burger Buns Done Right]

## EXHIBIT D: EXAMPLES OF DAVE'S KILLER BREAD PACKAGING

**Figure D1: Photos of Front, Back, and Sides of a Dave's Killer Bread 21 Whole Grains and Seeds Sliced Bread Package** [351]

 

---

[351] Representations and information on the front and back labels that are omitted from the Weir Proposed Conjoint Survey include: the look and feel of the overall packaging that holds the bread (including colors, formatting, fonts, and aesthetics); the look and feel of the bread itself (including visual cues about texture, identify and distribution of toppings, freshness, and size/thinness/width of slices); the product name (*e.g.*, "21 Whole Grains and Seeds"); the amount of fiber (*e.g.*, "5g Fiber"); the amount of Omega-3 (*e.g.*, "260mg ALA Omega-3"); the net weight (*e.g.*, "Net Wt 27 oz"); the non-GMO certification seal ("Non GMO Project Verified" with butterfly logo); the expiration date (stamped on the front label); the entire Nutrition Facts Panel or nutrition label (including information on number of servings, calories, fats, cholesterol, sodium, carbohydrates, sugars, vitamins and minerals); Whole Grains Council logo; kosher symbol; recycling symbol; ingredients list; and blurb about the product ("With a hearty texture, subtle sweetness, and a seed-coasted crust, '21' is great for toast, sandwiches or even by itself.").

**Figure D1 (cont.): Photos of Front, Back, and Sides of a Dave's Killer Bread 21 Whole Grains and Seeds Sliced Bread Package** [352]




---

[352] Representations and information on the side labels that are omitted from the Weir Proposed Conjoint Survey include: the look and feel of the packaging and bread; the slogans "Made for Greatness" and "Stand Behind Second Chances"; "Spread the Love!"; other representations that emphasize certain features ("No artificial preservatives"; "Always power-packed with whole grains"; "Always Non-GMO"; "Always made with killer taste and texture"); and description a on the brand story and mission (*e.g.*, paragraphs describing Dave Dahl's background and journey, as well as the company's commitment to hiring employees with a criminal background).

**Figure D2: Photos of Front, Back, and Sides of a Dave's Killer Bread Epic Everything Bagels Package** [353]



---

[353] Mr. Weir did not propose a conjoint survey to test bagel or burger bun products. At his deposition, he testified that his design would apply to these other products, with "minor modifications" possibly to the "price range and grams of protein"; Weir Deposition, pp. 246 – 247. Had Mr. Weir tested Dave's bagels product, therefore, such a survey would likewise omit the look and feel of the packaging, as well as the look and feel of the bagels (including visual cues about texture, identify and distribution of toppings, freshness, and size/thinness/width of each bagel). Other (non-challenged) relevant representations include: the product name (*e.g.*, "Epic Everything"); claims about toppings (*e.g.*, "Killer Topping: Flax, Chia, Sesame, Poppy, Garlic, Onion"); the amount of Omega-3 (*e.g.*, "680mg ALA Omega-3"); the net weight (*e.g.*, "Net Wt 16.75 oz"); the non-GMO certification seal; the entire nutrition label (including information on number of servings, calories, fats, cholesterol, sodium, carbohydrates, sugars, vitamins and minerals); Whole Grains Council logo; kosher symbol; recycling symbol; ingredients list; the slogans "Made for Greatness" and "Stand Behind Second Chances"; "Spread the Love!"; other representations that emphasize certain features (*e.g.*, "No artificial preservatives"; "Always power-packed with whole grains"; "Always made with killer taste and texture"); and information about the brand story and mission.

**Figure D2 (cont.): Photos of Front, Back, and Sides of a Dave's Killer Bread Epic Everything Bagels Package**




**Figure D3: Photos of the Front, Back, and Side of a Dave's Killer Bread Burger Buns Done Right Burger Buns Package** [354]



---

[354] Had Mr. Weir tested Dave's burger buns product, his survey would fail to show either the packaging or the burger buns themselves (including visual cues about texture, identify and distribution of toppings, freshness, and size/thinness/width of each bun). Other (non-challenged) relevant representations include: the product name (*e.g.*, "Burger Buns Done Right"); claims about flour (*e.g.*, "No bleached flour"); other brand-specific representations (*e.g.*, "Soft artisan-style burger buns done the DKB way"); the net weight (*e.g.*, "Net Wt 17.6 oz"); the non-GMO certification seal; the entire nutrition label (including information on number of servings, calories, fats, cholesterol, sodium, carbohydrates, sugars, vitamins and minerals); Whole Grains Council logo; kosher symbol; recycling symbol; ingredients list; the slogans "Made for Greatness" and "Stand Behind Second Chances"; other representations that emphasize certain features (*e.g.*, "No artificial preservatives"; "Always power-packed with whole grains"; "Always made with killer taste and texture"); and information about the brand story and mission.

**Figure D3 (cont.): Photos of the Front, Back, and Side of a Dave's Killer Bread Burger Buns Done Right Burger Buns Package**




## EXHIBIT E: EXAMPLES OF OROWEAT AND WHOLE FOODS 365 BREAD PACKAGING

**Figure E1: Photos of the Front, Back, and Side of an Oroweat 22 Whole Grains & Seeds Sliced Bread Package** [355]



---

[355] Purchased at a Safeway store in Santa Rosa, California in January of 2024. Representations and information on the front and back labels that are omitted from the Weir Proposed Conjoint Survey include: the look and feel of the overall packaging that holds the bread (including colors, formatting, fonts, and aesthetics); the look and feel of the bread itself (including visual cues about texture, identify and distribution of toppings, freshness, and size/thinness/width of slices); the product name (*e.g.*, "22 Whole Grains & Seeds"); the amount of fiber (*e.g.*, "4g Fiber per slice"); the net weight (*e.g.*, "Net Wt 1 lb 11 oz"); other call-outs and representations on the front label (*e.g.*, "Plant-Based"; "140 calories"; "0g sat fat"; 220mg sodium"; "4g total sugars"); the non-GMO certification seal; Whole Grains Council logo; and information about the brand (*e.g.*, "The nutritional benefits found in each organic loaf are a product of diverse grains and real ingredients, such as whole wheat grown by North American farmers. We are working hard to reduce the carbon footprint behind each of these freshly baked breads"; "We match 100% of the electricity we use with renewable wind energy credits"; "From seed to slice®, we work to emplower your balanced life across generations").

---

**Figure E1 (cont.): Photos of the Front, Back, and Side of an Oroweat 22 Whole Grains & Seeds Sliced Bread Package** [356]




---

[356] Representations and information on the side labels that are omitted from the Weir Proposed Conjoint Survey include: the look and feel of the overall packaging and bread; the entire nutrition label (including information on number of servings, calories, fats, cholesterol, sodium, carbohydrates, sugars, vitamins and minerals); ingredients list; and other claims (*e.g.*, "We help the earth by incorporating sustainable baking practices").

**Figure E2: Photos of the Front, Back, and Side of a 365 Ancient Grains Sliced Bread Package (from Whole Foods)** [357]





---

[357] Representations and information on the front, side, and back labels that are omitted from the Weir Proposed Conjoint Survey include: the look and feel of the overall packaging that holds the bread (including colors, formatting, fonts, and aesthetics); the look and feel of the bread itself (including visual cues about texture, identify and distribution of toppings, freshness, and size/thinness/width of slices); the product name (*e.g.*, "Ancient Grains"); the expiration date; the number of slices (*e.g.*, "18 slices"); the net weight (*e.g.*, "Net Wt 20 oz"); Whole Grains Council logo; pareve symbol; the entire nutrition label (including information on number of servings, calories, fats, cholesterol, sodium, carbohydrates, sugars, vitamins and minerals); ingredients list; the recycling symbol; and other claims (*e.g.*, "vegan"; "lowfat").