# EXHIBIT 5

## REDACTED

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAVID SWARTZ, | Case No. 4:21-cv-10053-YGR |
| Plaintiff, | |
| v. | |
| DAVE'S KILLER BREAD, INC. AND FLOWERS FOODS, INC., | |
| Defendants. | |

**<u>EXPERT DECLARATION OF JOAO C. DOS SANTOS</u>**

Table of Contents

I.      Experience and Qualifications ........................................................................... 3

II.     Scope of Engagement ....................................................................................... 4

III.    Data and Documents Relied Upon ................................................................... 5

IV.     Overview of the Weir Declaration .................................................................... 6

V.      Summary of Opinions ...................................................................................... 7

VI.     Background ..................................................................................................... 11

    A.      Plaintiff .................................................................................................. 11

    B.      Defendants ............................................................................................. 12

    C.      Products ................................................................................................. 13

VII.    Bases of Opinions .......................................................................................... 13

    A.      The Economics of a Price Premium ....................................................... 13

        i.      Market Equilibrium Prices Are Determined Jointly by Supply and Demand .............. 13

        ii.     Producer Supply ............................................................................... 17

    B.      Analysis of the Correspondence Between Mr. Weir's Proposed Methodology and the
            Alleged Omission ................................................................................... 20

    C.      Mr. Weir's Proposed Fixed Supply Assumption is Economically Unreliable and Mr.
            Weir Fails to Incorporate an Economically Sound Supply Analysis in his Proposed
            Methodology .......................................................................................... 25

        i.      Mr. Weir's Proposed Methodology is Incapable of Determining an Economically Sound
                Estimate of the Alleged Price Premium ............................................. 26

        ii.     Mr. Weir's Proposed Fixed Supply Assumption is not Based on Sound Economic
                Evidence ........................................................................................... 32

        iii.    Academic Research Acknowledges that Mr. Weir's Fixed Supply Assumption Does
                Not Account for Supply ..................................................................... 40

    D.      Mr. Weir's Proposed Methodology Would Not Establish a Common Alleged Price
            Premium From an Economic Perspective ............................................... 46

        i.      The Price of a Product's Characteristics Can Vary – Including as a Percentage of
                Product Prices ................................................................................... 51

        ii.     Individual Retailer Price-Setting Practices May Cause Different Price Changes Given a
                Change in Consumer Demand Attributable to the Alleged Omission ................... 55

    E.      Mr. Weir Fails to Document the Purported Evidence Underlying his Conclusions ...... 59

        i.      Mr. Weir Fails to Document his Analysis Underlying his Price Range ....................... 60

        ii.     Mr. Weir Fails to Document his Consumer Interviews ..................................... 64

        iii.    Mr. Weir Fails to Identify his Economic Basis for Numerous of his Opinions ............ 65

VIII.   Conclusion ..................................................................................................... 69

## I.    Experience and Qualifications

1.    I am an economist and Senior Managing Director in Ankura's Global Disputes and Economics practice and a leader in the firm's Competition and Class Action group. I have more than 25 years of experience in applying economic, statistical, and financial methods to examine a variety of business advisory and commercial litigation issues, including questions related to the design and evaluation of methodologies to assess economic damages in class action disputes. During my professional career, I have led over 100 engagements focused on economic and data-driven analyses, including economic analysis of demand and price, specification of econometric and financial models and simulations, and formulation of statistical tests and sampling plans.

2.    With respect to class certification analyses, I am experienced at applying economic and data-driven methodologies to evaluate a broad range of economic issues, including the determination of common impact on a class-wide basis, proof of injury, analysis of intra-class conflict, and the feasibility of standard approaches to the quantification of economic damages. I have been appointed as an expert in economic damages, data analytics, and statistical methods, and have provided testimony in arbitration proceedings, and state and federal courts.

3.    I hold a Master of Science degree in applied economics from Rutgers University, where my graduate research focused on the integration of geo-referenced data and multinomial logistic and hedonic regression methods. These methods are commonly used to analyze the results of conjoint analyses or to quantify the implicit prices associated with individual product characteristics. I am active in several professional societies relevant to my profession, including the American Economic Association and the American Statistical

Association. I regularly attend conferences and seminars and accrue continuing professional education credits on topics related to selected industries and academic fields, including economics and data science.

4.    **Exhibit 1** is a copy of my CV which provides additional information about my qualifications, including publications and other matters that I have provided expert testimony during the last four years.

## II.    Scope of Engagement

5.    Plaintiff's expert Mr. Colin B. Weir submitted a declaration in this matter on November 17, 2023 concerning a proposed damages model involving the potential quantification and application of an alleged price premium.[1] Counsel for Dave's Killer Bread, Inc. and Flowers Foods, Inc. (collectively hereafter, "Flowers Foods") have engaged me to review, analyze, and comment from an economic perspective on Mr. Weir's opinions in light of my experience and qualifications.

6.    In particular, I consider the economic applicability and reliability of Mr. Weir's proposed damages model as it pertains to:

    (1) Whether Mr. Weir's proposed calculation of economic damages corresponds to Plaintiff's alleged theory of liability in this matter;

    (2) Whether Mr. Weir has proposed a market equilibrium analysis that incorporates supply in his proposed demand-side regression analysis and market simulation for the purposes of potentially estimating the alleged price premium; and

    (3) Mr. Weir's opinions as they relate to the applicability of his proposed price premium calculation across the putative class.

---

[1] Declaration of Colin B. Weir, November 17, 2023 ("Weir Declaration").

7.    I have not been asked, nor do I intend to offer, any legal opinion on any issue. Ankura is compensated for my time at a rate of $790 per hour. My compensation and the amount of Ankura's professional fees in this case are in no way dependent upon, or affected by, the opinions expressed by me nor the outcome of this case.

8.    Work on this matter was performed personally by me or by a team of professionals working directly under my supervision. The opinions and conclusions set forth herein are based on the totality of my experience, totality of the information reviewed, academic research, and data analyses conducted. In determining the opinions set forth in this report, I have employed well-established methods and analyses commonly relied upon by financial and economic experts.[2]

9.    I reserve the right to respond to reports or opinions offered by experts retained in association with this matter. I also reserve the right to revise my analysis or offer other opinions based on: (i) any re-definitions or clarifications of putative class membership; (ii) additional data and documents that may be obtained; and (iii) any other changes that may be appropriate based on other factual developments over the course of the litigation.

## III.    Data and Documents Relied Upon

10.    The documents and information I have relied upon in performing my analysis include certain legal documents (e.g., the First Amended Class Action Complaint, June 17, 2022 ("Complaint"), the Weir Declaration and backup materials, Mr. Weir's deposition transcript in this matter, and other documents produced through discovery.

---

[2] References for the application of scientific data methods in litigation include: *"Litigation Services Handbook: the role of the financial expert,"* 6th edition; and the *"Reference Manual on Scientific Evidence,"* 3rd edition.

11.    Attached as **Exhibit 2** is a complete listing of the documents I relied upon in forming my opinions relating to this matter. I have also relied upon my professional experience and expertise, obtained over many years as a professional economist and litigation support professional.

## IV.    Overview of the Weir Declaration

12.    Mr. Weir proposes to estimate alleged damages by first estimating the alleged price premium attributable to what he describes as the "Claim" or "Protein Claim" which Mr. Weir defines as "prominently displayed labels claiming that the Products contained a specific level of protein per serving."[3] As of this time, based on Mr. Weir's November 17, 2023 declaration and January 23, 2024 deposition testimony, I understand Mr. Weir has not yet completed his study and has not yet calculated a price premium, if any, attributable to the "Claim" or "Protein Claim."[4] I further understand that Mr. Weir testified that the "Claim" or "Protein Claim" he proposes to analyze is the presence of a protein statement (e.g., "5g Protein") on the front label of a product.[5]

13.    Mr. Weir proposes to administer a conjoint survey to consider consumer preferences for various product characteristics including the "Protein Claim" on the at-issue products.[6] Mr. Weir then proposes to analyze the results of his conjoint survey analysis using a

---

[3] Weir Declaration, ¶5.

[4] Deposition of Colin B. Weir, January 23, 2024, 70:1-9.

[5] Deposition of Colin B. Weir, January 23, 2024, 54:5:12. I discuss my understanding of Plaintiff's allegations in this matter and the correspondence between Mr. Weir's proposed damages methodology and Plaintiff's allegations in detail in Section VII.B. below.

[6] Weir Declaration, ¶53.

hierarchical Bayesian regression analysis. The output of a regression analysis of conjoint survey data is intended to reflect measures of consumer preferences or demand.

14.    Mr. Weir then proposes to use his estimates of consumer demand to simulate what he describes as a "market" involving two products: (1) a Dave's Killer Bread product with a protein content statement on the front of the label, and (2) an otherwise identical Dave's Killer Bread product without a protein content statement on the front of the label.[7] Mr. Weir proposes to use his consumer preference estimates to consider a difference in prices such that the simulated "market" is indifferent between the two products, i.e., sales of the two products would be the same.[8] This demand or consumer preference based difference in price is Mr. Weir's proposed measure of a price premium attributable to the protein content statements.[9]

15.    Mr. Weir then proposes to apply his calculation of a potential price premium across the putative class by multiplying his proposed measure of a price premium by sales of the at-issue products to arrive at his measure of alleged economic damages.[10]

## V.    Summary of Opinions

---

[7] Weir Declaration, ¶77.

[8] Weir Declaration, ¶77.

[9] Underlying Mr. Weir's proposed methodology is his proposed assumption that supply is fixed in the but-for world. In Section VII.C below, I describe in detail that Mr. Weir fails to incorporate an economically sound supply analysis in his proposed methodology.

[10] Weir Declaration, ¶102. Mr. Weir assumes that any price premium he would calculate using his proposed methodology would apply across the putative class. In Section VII.D. below, I detail that Mr. Weir has not substantiated his assumption that any price premium he would calculate could be applied across the putative class. To the contrary, differences in market factors impacting market prices of the at-issue products could lead to differences in the existence or magnitude of any alleged price premium, and any alleged economic damages to individual putative class members.

16.   First, I provide a high-level summary of economic principles expressed in standard economic textbooks and research that reflect the following opinions and conclusions:

   a.   Standard economic theory and research identifies that market prices are set jointly by the interaction between supply and demand.

   b.   In order to determine whether a price premium exists and, if so, calculate the amount of the price premium, an economically sound methodology must account for both supply and demand in the but-for world to determine market prices in the but-for world.

17.   Second, I detail my understanding of the alleged conduct and analyze the correspondence between Mr. Weir's proposed damages model and Plaintiff's theory of liability in this matter and explain that:[11]

   a.   I understand the product labels in this case are allegedly unlawful because the front label includes a protein content statement and a properly calculated percent daily value ("%DV") for protein is not included in the nutrition facts panel (hereafter, the "Alleged Omission"). Mr. Weir's proposed analysis of the presence of a protein statement (e.g., "5g Protein") on the front label fails to analyze any alleged price premium attributable to the addition of the %DV in the nutrition facts panel. Thus, it is possible that Mr. Weir would estimate a substantially different measure of alleged damages if he were to consider a but-for world where %DV is added to the nutrition facts panel.

---

[11] As described in more detail below, I understand from Counsel that Plaintiff's theory of liability pertains to the relationship between Flowers Foods' front label protein content statement and the alleged omission of the percent daily value of protein on the nutrition facts panel of the at-issue products calculated using the PDCAAS method.

b. Mr. Weir's proposed methodology fails to differentiate between any change in consumer demand attributable to (i) the front-of-label protein statement he proposes to analyze and (ii) the numerically identical protein information that I understand is always listed in the nutrition facts panel. As a result, from an economic perspective, Mr. Weir's proposed methodology would not adequately isolate the front-of-label protein statement from the listing on the nutrition facts panel that I understand is required in the but-for world, and therefore would not measure an alleged price premium solely attributable to the front-label protein statement.

18. Third, I describe how Mr. Weir's proposed analysis of his conjoint survey results is economically unreliable and incapable of estimating the alleged price premium in this matter because he effectively ignores the impact on supply in the but-for world. Consequently, Mr. Weir has not proposed an economically sound measure of market prices in the but-for world. In particular:

a. Mr. Weir's purported "consideration" of supply amounts to a superficial and inconsequential reference to the supply-side of the market that serves to provide the impression that his methodology analyzes and incorporates market supply, when in fact Mr. Weir ultimately concludes that he can calculate the alleged price premium using his demand-side-only regression analysis and market simulation that does not incorporate an economically sound supply analysis. Therefore, Mr. Weir's proposed analysis is flawed and incomplete, and would result in a likely overstated estimation of a purported price premium for this matter.

b. Mr. Weir's proposed fixed supply assumption is not supported by economically sound evidence. Instead, Mr. Weir purports to support his opinion that he has accounted for supply by making various claims or observations with no identified basis in the field of economics.

c. Economic theory and literature identify that Mr. Weir's proposed fixed supply assumption is economically unsound. Mr. Weir's proposed fixed supply assumption is inconsistent with standard economic theory and research and is contradicted by the views expressed by leading economists and marketing researchers.

19. Fourth, I explain how Mr. Weir fails to establish that his proposed methodology would estimate an alleged price premium applicable across the putative class. Mr. Weir claims without any reliable economic basis that his proposed methodology would determine a common class-wide measure of the alleged price premium. Mr. Weir did not conduct any economically sound analysis to establish that any price premium is common across the putative class and throughout the putative class period. Instead of analyzing whether individualized factors impact the alleged price premium, Mr. Weir's proposed methodology would assume, rather than test, that a common price premium exists. To the contrary, economic research establishes that it is reasonable to expect variation across the putative class for both (1) the existence or (2) the magnitude of any alleged price premia based on various market factors impacting how prices for the at-issue products are set across time, geography, and retailer.

20. Fifth, I detail that Mr. Weir makes various assertions throughout his declaration without documenting the purported information or analysis underlying these assertions in a manner

sufficient to verify the validity of his opinions. Mr. Weir's repeated failure to document the materials underlying his work in this matter renders it impossible to (1) determine the extent to which certain claims made by Mr. Weir are based on generally accepted economic techniques or principles or (2) analyze the degree of error that may underlly his analysis in those instances. As an example, Mr. Weir determines a price range for Dave's Killer Bread and competitor bread products that he substantially relies upon to support his erroneous claim he has appropriately considered supply in his analysis. An attempt to replicate Mr. Weir's purported analysis indicates that his price range determinations are not supported because the data he relies upon identifies numerous bread products with prices falling considerably outside of Mr. Weir's price range, including one brand where all prices were below Mr. Weir's price range.

## VI.    Background

### A.   Plaintiff

21.    I understand that David Swartz ("Mr. Swartz" or "Plaintiff") states he is a resident of Oakland, California who "purchased the Dave's Killer Bread Good Seed Organic Bread and 21 Whole Grains and Seeds Organic Bread on multiple occasions during the last three years from retail stores."[12] I further understand that these retail stores included Safeway and Whole Foods in Oakland, California.[13] I understand that Mr. Swartz made his

---

[12] Declaration of David Swartz in Support of Plaintiff's Motion for Class Certification, November 17, 2023, ¶2; Complaint, ¶9.

[13] Declaration of David Swartz in Support of Plaintiff's Motion for Class Certification, November 17, 2023, ¶2.

purchases "after reading and relying on the Products' front labels that promised '5g PROTEIN' per serving."[14]

**B. Defendants**

22.   Dave's Killer Bread, Inc. ("Dave's Killer Bread") was first introduced in 2005 at the Portland Farmers Market Summer Loaves Festival.[15] Dave's Killer Bread describes that its bread products are "[p]acked with seeds and grains, made with only the very best organic and non-GMO ingredients," and that their "commitment to uncompromising taste, texture, and quality is what makes Dave's Killer Bread different."[16] Dave's Killer Bread can be found in a variety of retailers, such as Safeway, Whole Foods Market, and Sprouts.[17]

23.   Flowers Foods, Inc. owns the Dave's Killer Bread brand.[18] Flowers Floods describes Dave's Killer Bread as "the #1 organic bread brand in the country."[19] Flowers Foods acquired Dave's Killer Bread in 2015.[20]

24.   I refer to Defendants collectively as "Flowers Foods" in this declaration.

---

[14] Declaration of David Swartz in Support of Plaintiff's Motion for Class Certification, November 17, 2023, ¶3.

[15] Dave's Killer Bread, "About Us," available at https://www.daveskillerbread.com/about-us.

[16] Dave's Killer Bread, "About Us," available at https://www.daveskillerbread.com/about-us.

[17] Dave's Killer Bread, "Where to Buy," available at https://www.daveskillerbread.com/locator; Dave's Killer Bread, "Frequently Asked Questions," available at https://www.daveskillerbread.com/faqs.

[18] Flowers Foods, Inc., "Our Family of Brands," available at https://flowersfoods.com/brands/.

[19] Flowers Foods, Inc., "Our Family of Brands," available at https://flowersfoods.com/brands/.

[20] Flowers Foods, Inc., "Flowers Foods Completes Acquisition of Dave's Killer Bread," PR Newswire, September 14, 2015, available at https://www.prnewswire.com/news-releases/flowers-foods-completes-acquisition-of-daves-killer-bread-300142109.html. See also Dave's Killer Bread, "About Us," available at https://www.daveskillerbread.com/about-us.

### C. Products

25.    I understand the products at-issue in this matter are alleged to be the "Dave's Killer Bread products that make protein claims on the front of the product packages."[21] These products include over a dozen different varieties of Dave's Killer Bread breads, bagels, and burger buns that include various grams of protein listed on the front of product packaging ranging from "3g protein" to "13g protein."[22]

## VII.    Bases of Opinions

### A. The Economics of a Price Premium

26.    In general terms, a price premium would be calculated by comparing actual market prices to but-for market prices. In this section, I provide an overview of economic theory and literature that describes how economists model changes in equilibrium market prices. I detail that supply must be properly accounted for to quantify an economically sound model of equilibrium market prices set jointly by supply and demand.

   *i. Market Equilibrium Prices Are Determined Jointly by Supply and Demand*

27.    It is a fundamental principle of economic theory that market prices are set by the interaction between supply and demand.[23] Producers make decisions to maximize profits given their costs and competitive conditions (i.e., willingness to sell), while consumers choose

---

[21] Complaint, ¶22.

[22] Complaint, Exhibit B.

[23] Mankiw, N. Gregory, "Principles of Microeconomics," Cengage Learning, 7th Edition, 2013, Ch. 4.

products to maximize their utility (the benefits consumers receive from products) given their budget constraints (i.e., willingness to pay).[24]

28.    A market equilibrium is determined at the intersection between supply and demand.[25] A market equilibrium reflects both an equilibrium price and equilibrium quantity sold.[26] Thus, in general, a change in consumer demand would lead to a new market equilibrium where both equilibrium prices and equilibrium quantities would be expected to change through the interaction between supply and demand.[27]

29.    The standard model of supply and demand taught in principles of economics courses considers the relationship between product prices and quantities. Under the standard model of supply and demand, the demand curve is downward sloping, reflecting the law of demand: "[o]ther things being equal, when the price of a good rises, the quantity demanded of the good falls, and when the price falls, the quantity demanded rises."[28] Conversely, the supply curve is upward sloping, reflecting the law of supply: "[o]ther things being equal,

---

[24] See, e.g., Carlton, Dennis W. and Jeffrey M. Perloff, "Modern Industrial Organization," Pearson Addison Wesley, 4th Edition, 2005, p. 12; Mankiw, N. Gregory, "Principles of Microeconomics," *Cengage Learning*, 7th Edition, 2013, Ch. 21.

[25] Professor Mankiw describes that in market equilibrium: "the quantity of the good that buyers are willing and able to buy exactly balances the quantity that sellers are willing and able to sell." Mankiw, N. Gregory, "Principles of Microeconomics," Cengage Learning, 7th Edition, 2013, p. 77.

[26] Mankiw, N. Gregory, "Principles of Microeconomics," Cengage Learning, 7th Edition, 2013, p. 77.

[27] For example, if a product experiences a decrease in demand, one might expect a surplus in production where the quantity supplied exceeds the quantity demanded at the original price. This can incentivize producers to set lower prices in order to reach a new market equilibrium where the quantity supplied equals the quantity demanded at a lower equilibrium quantity. Thus, in general, a decrease in demand would be expected to lead to a decrease in both equilibrium prices and equilibrium quantities of products sold.

[28] Mankiw, N. Gregory, "Principles of Microeconomics," Cengage Learning, 7th Edition, 2013, p. 67.

when the price of a good rises, the quantity supplied of the good also rises, and when the price falls, the quantity supplied falls as well."[29]

30.   In **Figure 1**, I illustrate how a market equilibrium would be expected to change given a change in a product characteristic that increases consumer demand using the standard model of supply and demand taught in principles of economics courses.[30] Suppose a hypothetical product initially has a valuable product characteristic, and a market equilibrium is determined at price $P_1$ and quantity $Q_1$. The removal of a valuable feature from the product would lead to a shift to the left in the demand curve. At the original market equilibrium price $P_1$, quantity supplied exceeds quantity demanded and there is a surplus of goods in the market. Thus, the firm is incentivized to reduce prices down to the new intersection of supply and demand such that quantity demanded is equal to quantity supplied at the new equilibrium price $P_2$ and quantity $Q_2$.

---

[29] Mankiw, N. Gregory, "Principles of Microeconomics," Cengage Learning, 7th Edition, 2013, p. 73.

[30] The standard supply and demand model incorporates a variety of simplifying assumptions that are not applicable to markets for products with differentiated product characteristics. Additional factors are relevant in markets for differentiated products that make it difficult to analyze market outcomes visually. The standard supply and demand model nevertheless provides useful insight for considering equilibrium changes given a change in market factors. See, e.g., Cameron, Lisa, Daniel McFadden, and Pablo Robles, "Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition, 2022, p. 25 and endnote 37; Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," Journal of Law and Economics, 2014, pp. 649-650.

**Figure 1: Change in Equilibrium Market Prices Due to a Change in Demand**



31.    In the illustrative example above, one would measure the price premium afforded by the valuable characteristic according to the difference in market prices set with and without the valuable characteristic, or the difference between price $P_1$ and $P_2$. A key aspect of this analysis is that the market price premium is determined by comparing two different market equilibria that reflect differences in both market prices and market quantities.[31] This is because, when faced with a reduction in demand, it is typically profitable for the firm to trade off some loss of sales when it sets its new equilibrium price as opposed to setting

---

[31] There is a difference in the market equilibrium quantity sold after removing the valuable characteristic, measured as the difference between equilibrium quantities $Q_1$ and $Q_2$.

prices even lower to maintain the original quantity of sales $Q_1$ that it achieved prior to the reduction in demand.[32]

### ii. *Producer Supply*

32. Mr. Weir proposes to analyze the results of his conjoint survey to consider consumer preferences, or demand, for various product attributes related to the at-issue products.[33] To determine whether, and to what extent, market equilibrium prices for the at-issue products might change given any change in the product label, it would be necessary for Mr. Weir to combine his model of consumer demand with an economically sound model of producer supply.[34]

33. Modeling supply, and the impact of supply on market prices, involves modeling firms' profit maximizing decisions. A standard assumption is that producers choose prices to maximize profits.[35] A producer sets the price of its products to maximize profits, given its

---

[32] This economic outcome is relevant in the current matter because it indicates that measuring the alleged price premium according to the difference in market price necessary to maintain the same quantity of products sold, as proposed by Mr. Weir, is likely to overstate the alleged price premium. I discuss this in more detail below. In the figure above, the supply curve is assumed to not shift due to the impact of a change in the valuable characteristic. Assuming there is no shift in the supply curve, the equilibrium quantity supplied decreases given a shift in demand due to the law of supply. Mankiw, N. Gregory, "Principles of Microeconomics," Cengage Learning, 7th Edition, 2013, p. 73. This is a simplifying assumption intended to illustrate the basic concept that economists generally predict that equilibrium prices and equilibrium quantities would change given a change in demand. In more comprehensive economic models of differentiated products, like the at-issue products in this matter, additional factors including any change in producer costs or changes in competitor products and prices may result in changes to the supply curve that must be accounted for in order to predict changes in market equilibria.

[33] Mr. Weir proposes to consider consumer demand attributable to various brands, label statements, and prices for bread products. Weir Declaration, ¶53.

[34] See, e.g., Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," Journal of Law and Economics, 2014, pp. 629-630.

[35] Pindyck, Robert S. and Daniel L. Rubinfeld, "Microeconomics," Pearson, 8th Edition, 2013, pp. 464-465.

costs of production and the quantity of products it can expect to sell at a given price. Producer profits can be expressed as:

$$Profit = (Price - Cost) * Quantity$$

34. In other words, profits are calculated as the difference between the price and the cost of producing a product, multiplied by the total quantity of products sold.[36]

35. In general, the quantity sold is a function of multiple market factors that impact producer profits. For instance, the quantity sold may depend on a product's characteristics as well as the prices and characteristics of competing products.[37] Thus, standard economic theory predicts that firms will maximize profits accounting for their costs, their product characteristics, and the prices and characteristics of competitor products.[38]

---

[36] For example, if a firm can sell 100 products at a price of $5 per unit and it costs the firm $3 per unit to produce, then the firm achieves profits of ($5 – $3)*100 = $200.

[37] This is the case for the hierarchical Bayesian multinomial logit model of demand commonly used to statistically analyze the results of conjoint surveys. Orme, Bryan K. and Keith Chrzan, "Becoming an Expert in Conjoint Analysis," Sawtooth Software, 2nd Edition, 2021, pp. 139, 152-153. In a logit model, quantity, or market share, is modeled as a function of a product's characteristics and the prices and characteristics of all other competitor products in the relevant market. See, e.g., Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," Journal of Law and Economics, 2014, p. 635.

[38] See also Cameron, Lisa, Daniel McFadden, and Pablo Robles, "Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition, 2022, endnote 22 ("To see why an analysis of demand for the at-issue product must take into account the relevant competing products, consider the case of substitute products. If a similar product to the at-issue product is introduced into the market, we would expect – all else being equal – that demand for the at-issue product will decline as some consumers shift their purchases to a new product. Thus, to determine demand for the at-issue product, it is necessary to consider substitute products."); Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," Journal of Law and Economics, 2014, p. 646 ("Each firm chooses a price to maximize its profits, given the prices of all other firms.").

36. Costs must be considered in determining equilibrium market prices. A producer must set prices above costs to make a profit. Generally, it would not make economic sense for a producer to set prices below costs and incur losses on units sold. Thus, an economically sound determination of but-for market prices must analyze the impact of producer costs to consider the impact of supply on but-for market prices.

37. Additionally, profits will be impacted by quantity sold. The quantity of sales a producer can expect to achieve is impacted by consumer demand, not only for its own products, but for competitor products. This is because the quantity demanded for a given product will depend on consumers' ability to substitute between a given product and competitor products. Thus, an economically sound model of equilibrium pricing would account for and quantify the impact of competitor products and the prices of competitor products on a firm's pricing decision in order to determine an economically sound estimate of a price premium.[39]

38. Economic research identifies costs and the prices of competitor products as key supply factors that impact market prices.[40] Additional supply elements, such as any unique price-

---

[39] Consider the example provided in Orme (2020) with respect to the value provided by a color monitor compared to a monochrome monitor: "We can illustrate this point using another example. What is your willingness to pay for a color monitor for your laptop computer versus a monochrome screen? Assume we conducted a conjoint analysis including monochrome versus color monitors. If we computed your willingness to pay for color over monochrome, we would likely find that the incremental value of color over monochrome is worth a thousand dollars or more. But how meaningful is this information to a laptop manufacturer given the fact that laptops with color monitors are readily available on the market at quite inexpensive prices?" See Orme, Bryan K., "Getting Started with Conjoint Analysis," Research Publishers LLC, 4th Edition, 2020, p. 87.

[40] See, e.g., Cameron, Lisa, Daniel McFadden, and Pablo Robles, "Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition, 2022, p. 26 ("a market price reflects demand for the product as a whole (not just the attribute level of interest) and the

setting practices of an individual firm, should also be considered and incorporated into an economic model of supply in order to derive an economically sound methodology for quantifying a price premium that adheres to the facts of a particular matter.

**B. Analysis of the Correspondence Between Mr. Weir's Proposed Methodology and the Alleged Omission**

39.    In this section, I detail my understanding of Plaintiff's theory of liability and related allegations and analyze the correspondence between Mr. Weir's proposed methodology and Plaintiff's allegations in this matter.[41] It is necessary to consider the nature of the Alleged Omission in order to appropriately analyze alleged damages in this matter from an economic perspective. Generally, the calculation of economic damages is dependent on the nature of any alleged conduct and the extent to which an expert's characterization of the but-for world aligns with a plaintiff's allegations.[42] Any misalignment between the alleged conduct and an expert's characterization of the but-for world can render an analysis invalid from an economic perspective because any such analysis could fail to correctly identify or calculate economic damages specific to the alleged conduct.

---

demand for competitor products, as well as supply-side considerations such as production costs and the prices of competitors' products.").

[41] I understand from Counsel that Plaintiff's theory of liability pertains to Flowers Foods' front label protein content statement and the alleged omission of the percent daily value of protein on the nutrition facts panel of the at-issue products calculated using the PDCAAS method.

[42] Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," Reference Manual on Scientific Evidence, 3rd Edition, 2011, p. 432.

40. I understand from Counsel that Plaintiff's theory of liability in this matter pertains to Flowers Foods' Alleged Omission of a %DV of protein, calculated using the PDCAAS method, in the nutrition facts panel of the at-issue product labels.[43] Plaintiff alleges:

> "Defendants' front label protein claims, which advertise the Products as containing and providing specific amounts of protein per serving, are unlawful because Defendants did not: (1) calculate the 'corrected amount of protein per serving' based on the quality of the product's protein using the PDCAAS method; and (2) provide a statement of that corrected amount of protein per serving in the NFP, expressed as %DV."[44]

41. I understand that the Alleged Omission can be remedied in at least two ways under Plaintiff's theory: (1) Flowers Foods could remove the protein content statement from the front of the at-issue product labels; or (2) Flowers Foods could add the %DV of protein to the nutrition facts panel of the at-issue product labels.[45]

---

[43] See also Complaint, ¶24; Weir Declaration, ¶5.

[44] Complaint, ¶24.

[45] I understand Plaintiff alleges specifically that Flowers Foods failed to list the %DV of protein on the nutrition facts panel using the PDCAAS method. I also understand that multiple of the at-issue products did not list any figure for the %DV of protein on the nutrition facts panel at some point during the putative class period. See, e.g., Deposition of Dan Letchinger, November 10, 2023, 70:15-20. For these product packages, an appropriate damages methodology could compare a product with no %DV compared to a product that adds %DV to the nutrition facts panel using the PDCAAS method. However, I also understand that multiple at-issue products listed %DV on their nutrition facts panel at different points in time during the putative class period using an alternative methodology to the PDCAAS method. See, e.g., Deposition of Dan Letchinger, November 10, 2023, 92:13-18. For these product packages, the appropriate damages methodology would compare a product with the observed %DV figure to an otherwise identical product that listed %DV using the PDCAAS method. A determination of which damages approach is applicable to a particular purchase of at-issue products would require individualized inquiry to determine whether a putative class member had purchased a product with or without %DV listed on the nutrition facts panel. Moreover, I understand that product packages were updated around mid-2023 to list the %DV of protein on the nutrition facts panel using the PDCAAS method. Deposition of Dan Letchinger, November 10, 2023, 53:5-54:4; 61:16-19. Any determination of alleged damages to putative class members following the sale of at-issue products containing this updated packaging would require individualized inquiry to determine

42.  Mr. Weir proposes analyzing the results of a conjoint survey to estimate an alleged price premium that he would incorporate into his calculation of alleged damages in this matter, if any.[46] Mr. Weir explained that he proposes to estimate alleged damages according to the protein content statements on the front of the packaging of the at-issue products, but does not propose to estimate alleged damages attributable to the addition of %DV to the nutrition facts panel.[47] Mr. Weir therefore considers only one of at least two possible remedies I understand are available to remedy the Alleged Omission in this matter.

43.  From an economic perspective, it is appropriate to analyze the but-for world that is most reasonable to expect to have occurred but-for the Alleged Omission. In this matter, this corresponds to decisions Flowers Foods could be expected to make in the but-for world absent the Alleged Omission. In the field of economics, producers are assumed to make decisions to maximize profits.[48] Thus, from an economic perspective, the appropriate but-for world in this matter corresponds to the remedy to the Alleged Omission that Flowers Foods would have incorporated, for instance, the remedy that would have maximized profits but-for the Alleged Omission. Mr. Weir's proposed but-for world fails to consider this economic reality.

44.  Further, I understand that Flowers Foods has added the %DV for protein to the nutrition facts panel of their products and continues to list protein content on the front label of their

---

whether a putative class member had purchased a product with or without %DV listed on the nutrition facts panel, calculated using the PDCAAS method.

[46] Weir Declaration, ¶¶10, 102.

[47] Weir Declaration, ¶53; Deposition of Colin B. Weir, January 23, 2024, 54:5:12; 59:11-16; 83:8-16; 95:11-21.

[48] See, e.g., Carlton, Dennis W. and Jeffrey M. Perloff, "Modern Industrial Organization," Pearson Addison Wesley, 4th Edition, 2005, p. 12

products.[49] Thus, Mr. Weir's but-for world is inconsistent with Flowers Foods' decision in the actual world.

45.    Mr. Weir's failure to consider alleged damages attributable to the addition of the %DV of protein in the nutrition facts panel renders his analysis economically unsound. There is no economic reason to expect that any price premium attributable to the removal of the front-of-label protein content statement would be the same as the alleged price premium attributable to the addition of %DV information in the nutrition facts panel because consumers may have different demand for these product attributes. Thus, it is possible that Mr. Weir would arrive at a substantially different measure of alleged damages under his characterization of the but-for world compared to a but-for world where %DV was added to the nutrition facts panel.

46.    For instance, if there would be a greater shift in consumer demand due to a change in the front-label protein statement compared to the %DV in the nutrition facts panel (including potentially no significant shift in demand based on the addition of the %DV), then Mr. Weir would likely overstate any alleged damages under his proposed methodology compared to the alternative but-for world where %DV is added to the nutrition facts panel.

47.    Further, I understand Mr. Weir claims his proposed analysis would isolate the alleged price premium attributable specifically to the front-of-label protein statement on the at-issue product labels. Under Mr. Weir's characterization of the but-for world, the at-issue products would no longer list grams of protein on the front of their labels. However, I

---

[49] Defendants Flowers Foods, Inc. and Dave's Killer Bread, Inc.'s Third Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories (Nos. 5, 12 & 13) (Exhibit 3 to the Deposition of Dan Letchinger, November 10, 2023), p. 3; Deposition of Dan Letchinger, November 10, 2023, 51:24-52:1.

understand the same protein content statement would appear in the nutrition facts panel in the but-for world.

48. Mr. Weir testified that he intends to measure only alleged damages attributable to a front-of-label protein statement.[50] Nevertheless, he specifies that he proposes to measure a demand attribute identified as a "Label Statement" with no indication that this statement appears on the front of the packaging as opposed to in the nutrition facts panel.[51] Thus, Mr. Weir has not provided any information in his proposed analysis that would enable him to differentiate between any shift in consumer demand for a front-label protein statement and the same statement of total grams of protein which I understand will always lawfully appear in the nutrition facts panel.[52]

49. Additionally, I understand Mr. Weir asserts that he would isolate alleged damages attributable to a front-label protein statement on the basis that his proposed methodology including his implementation of his proposed market simulation would hold constant the information included in the nutrition facts panel.[53] However, Mr. Weir's proposed demand analysis and market simulation would be based on the data originating from his conjoint survey. Therefore, if Mr. Weir's conjoint survey data does not differentiate between any shift in consumer demand attributable to a protein statement on the front label and a protein

---

[50] Deposition of Colin B. Weir, January 23, 2024, 54:5:12.

[51] I understand from Counsel that the same statement of total grams of protein will always lawfully appear in the nutrition facts panel. Weir Declaration, ¶53.

[52] Deposition of Colin B. Weir, January 23, 2024, 266:23-267:3 ("Q. But you agree that your conjoint survey is location agnostic when it comes to the 5g protein? A. There is not a statement in there about the location of the claim.").

[53] Deposition of Colin B. Weir, January 23, 2024, 218:10-220:3.

statement appearing in the nutrition facts panel, Mr. Weir's proposed demand analysis and market simulation would be similarly unable to differentiate between these attributes.

**C. Mr. Weir's Proposed Fixed Supply Assumption is Economically Unreliable and Mr. Weir Fails to Incorporate an Economically Sound Supply Analysis in his Proposed Methodology**

50.  In this section, I analyze the economic reliability of Mr. Weir's purported supply analysis pertaining to his proposed analysis of his conjoint survey results.

51.  Mr. Weir opines that he considered supply side factors in his proposed conjoint methodology. Mr. Weir's purported analysis of supply includes his observation that "in this litigation, the historic number of units sold is a fact," and that "it would be antithetical to the concept of class definition to suggest that the quantity supplied be anything other than the actual number of units sold by Defendants."[54] Mr. Weir similarly opines that "[a]nother important supply-side factor that I accounted for was the fact that the quantity of the Products supplied is a known quantity, and fixed as a matter of history."[55] Mr. Weir therefore proposes estimating the alleged price premium by assuming that Flowers Foods' supply of the at-issue products is "fixed," i.e., by assuming that the number of at-issue

---

[54] Weir Declaration, ¶80.

[55] Mr. Weir also opines that he "took several steps to ensure that this survey was appropriately designed to measure the true market value of the price premium attributable to the Claim, incorporating the supply side." Mr. Weir's description of his steps includes: (i) "I conducted research of actual retail sales and market data and included these real-world price points in the survey. These real-world transactions occurred at prices that *already* reflect the supply side factors then extant in the marketplace;" (ii) "I also considered that variability in pricing at the retail level showed that Defendants' and retailers' pricing was responsive to changing market forces;" and (iii) "another important supply-side factor that I considered was that, as I discuss below, the market for the Class Products is an 'ordinary' and mature market, subject to competitive pressures that both competitors and retailers identified as risks to their business." Weir Declaration, ¶¶83-86.

products sold in the but-for world is identical to the number of products sold in the actual world.[56]

    i.   *Mr. Weir's Proposed Methodology is Incapable of Determining an Economically Sound Estimate of the Alleged Price Premium*

52.    Mr. Weir's proposal to assume supply is fixed is economically unfounded and inconsistent with standard economic theory and academic literature. Mr. Weir's fixed supply assumption is effectively the same as ignoring supply and assuming one does not need to analyze supply when determining market prices in the but-for world.

53.    Mr. Weir's purported consideration of supply amounts to a superficial and inconsequential reference to the supply-side of the market that serves to provide the impression that his methodology incorporates an economically sound supply analysis, when in fact Mr. Weir ultimately concludes that he can calculate the alleged price premium using his demand-side-only analysis of his conjoint survey results that does not incorporate an economically sound supply analysis.[57]

54.    As detailed in Section VII.A.ii above, standard economic theory identifies that market equilibrium prices are impacted by supply according to factors including costs and the

---

[56] Weir Declaration, ¶80.

[57] The fact that Mr. Weir's analysis is based only on demand and does not account for supply in a manner consistent with economic theory is illustrated by Mr. Weir's testimony regarding his proposed but-for world: "A. So the utility of the product remains the same because if you accept plaintiffs' allegations, the product is worth less because it doesn't make the protein representation in terms of utility but then is worth more by virtue of having a lower price. So it occupies the same space in the market if you accept plaintiffs' theory, and therefore, it's appropriate to hold constant other factors that would otherwise confound and pollute your analysis." Deposition of Colin B. Weir, January 23, 2024, 333:17-334:3. In other words, Mr. Weir characterizes the alleged price premium to be the difference in price necessary for consumer utility of the products to remain the same in the actual and but-for worlds. Consumer utility is a solely demand based measure of the benefits consumers receive from purchasing products that does not account for producer supply.

prices and characteristics of competitor products. Thus, an economically sound analysis of the alleged price premium requires the calculation of but-for equilibrium prices that accounts for the impact of supply ***in the but-for world*** on market prices.

55.    Mr. Weir doesn't offer any analysis of product costs and doesn't consider any quantification of producer profits in his declaration. Mr. Weir therefore proposes a model in which it is feasible to arrive at the economically unreasonable prediction that but-for prices are set such that Flowers Foods or its retailers would be willing to set prices below costs and incur losses on units sold.[58] This view is inconsistent with standard economic theory on profit maximization and I can see no economically sound basis to predict that the but-for market pricing would result in losses on units sold.[59]

---

[58] For example, in deposition, Mr. Weir supposed the alleged price premium was 7% for illustrative purposes, explaining that this would indicate that but-for market prices would therefore be 93% of actual market prices. Deposition of Colin B. Weir, January 23, 2024, 195:4-11. Mr. Weir has not provided any analysis that indicates Flowers Foods' retailers have costs that are lower than 93% of the prices they set for the at-issue products. If it were the case that, e.g., a retailer incurred costs that were 95% of product prices to purchase, stock, and sell the at-issue products, then under Mr. Weir's illustrative example, he would predict that such a retailer would be willing to price the at-issue products below costs and incur losses on units sold.

[59] Mr. Weir indicated in his deposition that it would be no problem in his view if he were to predict but-for prices lower than costs of production. Deposition of Colin B. Weir, January 23, 2024, 344:7-15. Mr. Weir's view is not predicated on an economically sound analysis of firm supply and profit maximization. Instead, Mr. Weir's opinion is predicated on his constraint that the but-for quantity is fixed because products have already been sold. Deposition of Colin B. Weir, January 23, 2024, 345:23. Mr. Weir offers addition economically unsound justifications for his opinion that but-for prices can be below costs, including (1) that there is no guarantee a business is profitable regardless of their intentions; and (2) that there are examples of companies operating at a loss in order to establish themselves in the marketplace. Deposition of Colin B. Weir, January 23, 2024, 348:10-17. First, the relevant question isn't whether, for example, uncertainty in the market might cause a producer to incur losses, but whether or not a producer would knowingly set prices such that it would expect to incur losses on units sold over a multi-year period. Second, Mr. Weir's claim that it is relevant in the current matter that Flowers Foods and its retailers might set prices for Dave's Killer Bread below costs in order to "establish themselves in the marketplace" is not supported by reliable economic evidence in this matter. I understand Flowers Foods is one of the largest producers of bakery foods in the United States, with $4.8 billion in sales in 2022. Flowers Foods, Inc., "About Flowers," available at

56.  Moreover, Mr. Weir's proposed methodology does not incorporate the impact of competition and competitor pricing on Flowers Foods' prices in the but-for world. Mr. Weir's proposed "market simulation" involves only two products – a Dave's Killer Bread product with a front-label protein statement and an otherwise identical Dave's Killer Bread product without a front-label protein statement.[60] Mr. Weir therefore hypothesizes a "market" where only two products exist and there are no competitor products. Moreover, Mr. Weir does not incorporate any analysis of producer profits to consider how competitors would price their products in the but-for world and the corresponding impact this would have on prices for the at-issue products, which is inconsistent with standard economic theory.[61]

57.  Mr. Weir's proposed fixed supply assumption amounts to Mr. Weir assuming he can ignore the impact of supply in the but-for world on market prices and estimate the alleged price premium according to consumer demand alone. The alleged price premium estimated under this proposed methodology is determined by any vertical shift in the demand curve. A vertical shift in demand corresponding to Mr. Weir's proposed estimate of the alleged

---

https://flowersfoods.com/about-flowers/. Moreover, Flowers Foods retailers, including, e.g., Target, Walmart, and Whole Foods Market, are some of the largest established retail outlets in the United States, operating in what Mr. Weir characterizes as a "mature market." Weir Declaration, ¶86. I cannot see any reliable economic justification for the premise that Flowers Foods' retailers might choose to price Dave's Killer Bread at a loss to "establish themselves in the marketplace" against one another, and Mr. Weir has provided no economically sound analysis to the contrary.

[60] Weir Declaration, ¶77.

[61] See, e.g., Hiller, R. Scott, Scott J. Savage, and Donald M. Waldman, "Using aggregate market data to estimate patent value: An application to United States smartphones 2010 to 2015," International Journal of Industrial Organization, 2018, p. 20; Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," Journal of Law and Economics, 2014, pp. 655-656 (identifying market simulations that incorporate competitor products).

price premium reflects consumer "willingness to pay" for a product characteristic.[62]

Willingness to pay reflects "the maximum amount that a buyer will pay for a good," not

the amount buyers actually pay for a good.[63] Consequently, Mr. Weir's proposed fixed

_____

[62] I understand Mr. Weir claims that his proposed analysis would not calculate willingness to pay. Deposition of Colin B. Weir, January 23, 2024, 284:15-16. Mr. Weir's opinion is inconsistent with the documentation for Sawtooth Software's Lighthouse Studio program he proposes to use for his analysis, which characterizes the two product market simulation approach proposed by Mr. Weir as an estimate of willingness to pay: "[t]he two-product market simulation approach that simulates respondents choosing between just two versions of the product: one with and one without the enhanced feature. The price for the enhanced version of the product is adjusted upward via trial-and-error until the shares are distributed 50/50. That price difference that equalizes the shares of preference is taken as WTP." Sawtooth Software, "Understanding Willingness to Pay (WTP)," available at https://sawtoothsoftware.com/help/lighthouse-studio/manual/understanding-willingness-to-pay.html. Moreover, academic literature identifies that a vertical shift in a demand curve, or equivalently a difference in price calculated under the assumption of fixed supply, is a measure of willingness to pay. See, e.g., Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," Journal of Law and Economics, 2014, p. 649, Figure 2 ("The vertical difference between the two demand curves is the change in WTP as the feature is added."). See also Mankiw, N. Gregory, "Principles of Microeconomics," Cengage Learning, 7th Edition, 2013, p. 138 ("Note that the height of the demand curve reflects the buyers' willingness to pay."). See also Cameron, Lisa, Daniel McFadden, and Pablo Robles, "Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition, 2022, p. 26 ("In a number of prior cases, Plaintiffs' experts sought to determine damages based solely on part-worths obtained from conjoint analysis. To the extent that these experts have attempted to characterise this analysis as a survey-based market simulation, it is clearly an economically unsound market simulation that will produce unreliable results (even if one were to assume that the CBC analysis itself was designed and implemented in accordance with relevant scientific standards). In these cases, damages are based solely on a measure referred to as consumer willingness to pay ('WTP') for the misrepresented attribute;" "By holding quantity supplied fixed – as represented by a vertical supply curve […] Plaintiffs' asserted 'market equilibrium' occurs at point Z (where the Plaintiffs' assumed vertical supply curve intersects with the but-for demand curve […] but-for ). In this case, Plaintiffs' asserted "price premium" is given by the vertical difference between points X and Z.").

[63] Mankiw, N. Gregory, "Principles of Microeconomics," Cengage Learning, 7th Edition, 2013, p. 136. Willingness to pay is not the same as what buyers actually pay. This is evidenced by the fact that standard economic textbooks analyze the "consumer welfare" associated with market outcomes, defined as the benefits consumers receive from products or services. Professor Mankiw defines consumer welfare as "the amount a buyer is willing to pay for a good minus the amount the buyer actually pays for it." Mankiw, N. Gregory, "Principles of Microeconomics,"

supply methodology would result in an economically flawed estimation of alleged damages because he proposes estimating the alleged price premium according to a theoretical amount consumers are hypothetically willing to pay, instead of prices consumers would actually pay.[64]

58.   I illustrate the difference between a market price premium calculated as a difference in market equilibrium prices compared to consumer willingness to pay using the standard model of supply and demand taught in principles of economics courses in **Figure 2**.[65] I consider demand for a hypothetical good with and without a valuable characteristic, consistent with Plaintiff's allegations in this matter.

---

Cengage Learning, 7th Edition, 2013, p. 137. Consequently, economists distinguish between a consumer's willingness to pay and the amount a consumer actually pays.

[64] See, e.g., Cameron, Lisa, Daniel McFadden, and Pablo Robles, "Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition, 2022, p. 27 ("It is also important to recognise that the assumed existence of a vertical supply curve (anchored at the level of quantity sold in the actual world) will tend to result in an overestimate of the market price premium[…]").

[65] As described above, the standard supply and demand model incorporates a variety of simplifying assumptions that are not applicable to markets for products with differentiated product characteristics. Additional factors are relevant in markets for differentiated products that make it difficult to analyze market outcomes visually. The standard supply and demand model nevertheless provides useful insight for considering equilibrium changes given a change in market factors.

**Figure 2: Market Price Premium**



59. The price premium attributable to this characteristic can be measured by the difference in price between the product with the valuable characteristic and the product without the valuable characteristic, or the vertical distance between prices $P_1$ and $P_2$. Under the standard model of supply and demand, the removal of a valuable characteristic causes the producer to set price $P_2$ to maximize profits at a lower quantity of sales compared to the product with the valuable characteristic. In comparison, the willingness to pay for the valuable characteristic is given by the vertical shift in the demand curve, or the difference between prices $P_1$ and $P_3$, reflecting the difference in price corresponding to a fixed quantity supplied.

60.    Consequently, standard economic models predict that a price premium attributable to a valuable feature is smaller in magnitude than the willingness to pay for that feature. Mr. Weir's proposal to assume supply is fixed would likely overstate any price premium he might calculate because Mr. Weir fails to account for the likelihood that market forces incentivize producers to set prices for product characteristics at a rate that is less than consumers' willingness to pay for those characteristics.[66]

ii.    *Mr. Weir's Proposed Fixed Supply Assumption is not Based on Sound Economic Evidence*

61.    Mr. Weir does not cite to any economic authority that supports his opinion that a fixed supply assumption is economically sound or applicable to this matter. There is not a single citation to any economic literature in Mr. Weir's discussion of his supply side analysis.[67] Instead, Mr. Weir purports to support his opinion that he has accounted for supply by making various claims or observations with no identified basis in the field of economics.

62.    Mr. Weir's purported analysis of supply for the purposes of estimating the alleged price premium includes: (1) appealing to class definition; (2) identifying that sales of the at-issue products are historical sales that have already occurred; (3) providing misleading commentary on his use of actual market prices; and (4) providing inconsequential

---

[66] See, e.g., Cameron, Lisa, Daniel McFadden, and Pablo Robles, "Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition, 2022, p. 27 ("It is also important to recognise that the assumed existence of a vertical supply curve (anchored at the level of quantity sold in the actual world) will tend to result in an overestimate of the market price premium[…]"). See also Howell, John R., Greg M. Allenby, and Peter E. Rossi, "Feature Valuation Using Equilibrium Conjoint Analysis," Handbook of Marketing Analytics, Edward Elgar Publishing, 2018, p. 630 ("In many cases, the use of WTP and other demand-only measures will overstate the value of product features. This occurs because firms face competitive pressure that limit their ability to capture the full increase in a consumer willingness to pay.").

[67] Weir Declaration, ¶¶80-97.

references to competition and various 10-Ks from bread producers and retailers of the at-issue products.

63. For instance, Mr. Weir claims that "it would be antithetical to the concept of class definition to suggest that the quantity supplied be anything other than the actual number of units sold by Defendants," and that "[a]nother important supply-side factor that I accounted for was the fact that the quantity of the Products supplied is a known quantity, and fixed as a matter of history."[68] Mr. Weir's opinion is economically unreliable and is not based on sound economic theory. Mr. Weir specifically asserts that class definition purportedly supports his position that quantity would be unchanged in the but-for world. Mr. Weir does not identify any economic theory or literature that would establish that a producer's decision to supply products is substantially determined according to the "concept of class definition," and Mr. Weir doesn't offer any basis to claim that it would be "antithetical" to sound economic theory to conclude that the market equilibrium quantity of products sold may change in the but-for world.[69]

64. Mr. Weir's proposal to assume supply is fixed appears to be substantially predicated on his view that he must artificially constrain quantity supplied to be unchanged in the but-for

---

[68] Weir Declaration, ¶¶80, 85

[69] In his deposition, Mr. Weir agreed with the general economic premise that product differentiation, or differences in product features, can lead to changes in the volume of sales. Mr. Weir only claims that this economic fact isn't applicable to the current matter because sales already occurred. Deposition of Colin B. Weir, January 23, 2024, 68:9-19. See also Deposition of Colin B. Weir, January 23, 2024, 69:1-10. For an example of economic research that identifies a change in the volume of sales of products given a change in product labeling, see Kiesel, Kristin and Sofia B. Villas-Boas, "Can information costs affect consumer choice? Nutritional labels in a supermarket experiment," International Journal of Industrial Organization, 2013, p. 158 identifying changes in store sales of microwave popcorn given a change in nutrition shelf labels identifying health claims including "Low calorie" or "Low fat."

world for the purposes of estimating an alleged price premium because sales to the putative class reflect a specific number of products that serve as the basis for alleged economic damages. Such an economically erroneous opinion conflates (1) the calculation of an alleged price premium, and (2) the calculation of alleged economic damages. It is true that the calculation of any alleged economic damages should be calculated relative to the number of at-issue products actually sold. However, the amount of alleged damages corresponding to each unit sold is calculated on the basis of an alleged price premium. An alleged price premium is calculated by comparing market equilibrium prices set jointly by supply and demand in the actual and but-for world – and economic research predicts that supply may change in the but-for world.

65.   Moreover, Mr. Weir's opinion that it would be "antithetical to the concept of class definition" to consider a change in quantity in the but-for world appears to be at odds with Plaintiff's allegations in this matter. Specifically, Plaintiff alleges:

> "Had reasonable consumers been informed of the true amount of protein that the products provided through a statement of the corrected amount of protein per serving, as required by FDA regulations, **they would not have purchased** or would have paid less for the Products."[70]

66.   Plaintiff therefore explicitly proposes the possibility that the but-for quantity of at-issue products may have been lower than the actual quantity of products, inconsistent with Mr. Weir's opinion.

67.   Regarding Mr. Weir's identification that sales are a "known quantity" that is "fixed as a matter of history,"[71] Mr. Weir doesn't cite to any economic authority or offer any reliable

---

[70] Complaint, ¶25. (emphasis added.)

[71] Weir Declaration, ¶85.

economic basis that this observation is relevant to the ultimate determination of an alleged price premium. Mr. Weir doesn't identify any economic theory or research that would identify product sales being a "known quantity" that is "fixed as a matter of history" as an economic factor that should be considered in order to model the supply side of a market.[72] Thus, Mr. Weir has provided no basis in the field of economics from which he can conclude that this observation substantially determines his conclusion that he can effectively ignore supply in his analysis, contrary to standard economic theory and research.

68.  In order to gauge the extent to which Mr. Weir's opinions are based on sound economic theory, one can consider whether it makes economic sense that Flowers Foods', or Flowers' Foods retailers', supply of at-issue products and their decisions to set prices for the at-issue products in the but-for world would be substantially determined on the basis of whether or not their supply decision might be "antithetical to the concept of class definition" with respect to a putative class of consumers, and thus would set prices in order to attain a certain quantity of units sold instead of setting prices to maximize profits.[73]

---

[72] Historical sales of any product will necessarily constitute some actual quantity of sales that is "fixed as a matter of history." Economists routinely conduct academic research utilizing information on past sales. The historical nature of any data used in economic research does not preclude the ability to model changes in market equilibrium prices and quantities given a change in product attributes, despite any sales reflecting a quantity that is "fixed as a matter of history." This view is inherent in Mr. Weir's description that in Lanham Act or intellectual property litigation, "a but-for quantity of sales may need to be determined." Weir Declaration, ¶80. It must also be the case that in Lanham Act or intellectual property litigation, "the historic number of units sold is a fact," and is "fixed as a matter of history." Nevertheless, as Mr. Weir identifies, this does not preclude experts engaged in that sort of litigation from estimating a different quantity of sales in the but-for world.

[73] In his deposition, Mr. Weir claimed that the reference manual on scientific evidence supports his proposed fixed supply assumption. Deposition of Colin B. Weir, January 23, 2024, 34:22-35:5; 276:14-278:13. Mr. Weir is incorrect that his fixed supply assumption is supported by the reference manual on scientific evidence. The economically appropriate consideration of alleged damages compares the actual world to the but-for world absent the Alleged Omission, and calculates alleged damages according to the difference in actual and but-for market prices that

69.  Mr. Weir also claims that he incorporates supply in his analysis because he purports to use actual market prices in his proposed conjoint survey.[74] Mr. Weir proposes to use "real-world price points" in his analysis, opining that: "[t]hese real-world transactions occurred at prices that already reflect the supply side factors then extant in the marketplace."[75]

70.  Mr. Weir's opinion is economically unreliable and misleading because the alleged price premium is calculated according to the difference between actual and but-for market prices, and but-for market prices are impacted by supply in the but-for world. Mr. Weir's proposed use of actual world market prices would not incorporate but-for world supply because this hypothetical but-for world did not actually occur.[76] Mr. Weir must analyze and quantify the impact of supply in the but-for world on market prices to determine an economically sound estimate of the alleged price premium.

---

are quantified according to the difference in market equilibria in the actual and but-for worlds. Because the only difference between the actual and but-for world is the removal of the Alleged Omission, any change in market equilibrium prices and any change in supply are therefore attributable to the alleged harmful act, consistent with the standard damages methodology described by the reference manual on scientific evidence. Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," Reference Manual on Scientific Evidence, 3rd Edition, 2011, p. 432. See also Weir Declaration, ¶80 ("…in a Lanham Act or intellectual property litigation where a but-for quantity of sales may need to be determined…").

[74] As detailed below in Section VII.E.i, Mr. Weir fails to document the purported evidence underlying his determination of these prices and I find that the available evidence is inconsistent with Mr. Weir's range of prices.

[75] Weir Declaration, ¶¶83-84.

[76] See also Tomlin, Jonathan and Robert Zeithammer, "Insight: Product Labeling Class Actions – Identifying the 'Con' in Conjoint Surveys," Bloomberg Law, 2018, pp. 3-4 ("The use of 'real world' prices and transactions in a conjoint survey does not overcome the need to model supply conditions. The price that would have existed 'but-for' the allegedly wrongful conduct at issue determines the price premium. This 'but-for' price is not a 'real world' price that occurred but, instead, is the price that would have occurred in the absence of allegedly wrongful conduct. It follows that a valid estimate of such counterfactual pricing needs to rely on a model of the supply-side, not just on mere observations of what actually transpired in the marketplace.").

71.  Regarding Mr. Weir's citation to various 10-Ks involving bread producers or retailers, none of the information cited by Mr. Weir supports his claim that supply would be fixed in the but-for world. To the contrary, Mr. Weir cites to various statements to support his view that the at-issue products are sold in a competitive environment where Flowers Foods and its retailers "set their prices based upon current market conditions," including through price competition with competitor retailers.[77] The evidence cited by Mr. Weir also describes the possibility that competition can impact sales and indicates that retailer price competition impacts profitability.[78] Thus, the evidence cited by Mr. Weir is consistent with economic literature establishing that supply is impacted by costs, profitability, and the pricing and characteristics of competitors, and these elements of supply should be considered in the but-for world to establish an economically sound estimate of but-for market prices.

72.  The following example illustrates how the implied predictions from Mr. Weir's proposed fixed supply assumption are economically unsound. Suppose there is a hypothetical product that costs $3 per unit to produce. **Figure 3** below considers the market for this hypothetical product assuming a fixed supply curve consistent with Mr. Weir's proposed methodology.[79]

---

[77] Weir Declaration, ¶¶87-95.

[78] See, e.g., Weir Declaration, ¶¶88, 94 (citing Flowers Foods, Inc., Form 10-K Annual Report filed with the US Securities and Exchange Commission, filed February 22, 2023: "Increased competition could result in reduced sales, margins, profits and market share;" citing Albertson's Form 10-K Annual Report filed with the US Securities and Exchange Commission, filed April 25, 2023: "We and our competitors engage in price and non-price competition which, from time to time, has adversely affected our operating margins").

[79] I understand Mr. Weir testified that he is not assuming a vertical supply curve because he's "not using any graphs to make [his] calculation." Deposition of Colin B. Weir, January 23, 2024, 341:10-24. However, Mr. Weir is assuming that Flowers Foods' supply of the at-issue products is given by a fixed quantity of products sold in the actual world. The appropriate visual representation of a supply curve fixed at a particular quantity is a vertical supply curve. Whether

**Figure 3: Mr. Weir's Fixed Supply Assumption**



73.    In the baseline case, demand intersects the fixed supply curve at a price of $7 and the

producer supplies 4 units. Suppose first that there is an increase in demand for this

hypothetical product, leading to a shift to the right in the demand curve. The fixed supply

assumption means that the producer is unwilling to supply a greater quantity of products

---

or not Mr. Weir is actually using a visual representation of his proposed fixed supply assumption
for the purposes of his calculation does not change the fact that his proposed fixed supply model
assumes a vertical supply curve. See, e.g., Cameron, Lisa, Daniel McFadden, and Pablo Robles,
"Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market
Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition,
2022, p. 27 ("…holding quantity supplied fixed – as represented by a vertical supply curve…").

in response to increased demand, and therefore sets the price at $11 even though the producer could increase profits by setting its price at $9 to achieve greater sales.[80]

74.    Alternatively, suppose there is a decrease in demand for this hypothetical product, leading to a shift to the left in the demand curve. The fixed supply assumption means that the producer is unwilling to supply a lower quantity of products in response to decreased demand, and therefore sets the price at $3 even though the producer earns zero profits at this price and could increase profits by setting its price at $5, sacrificing some units sold in order to attain higher profits per unit.[81]

75.    In both instances, the fixed supply assumption implies pricing decisions that are inconsistent with the principle of profit maximization. With increased demand, the supplier could increase profits by setting prices at a lower rate of $9 instead of $11 to achieve greater profits from additional sales. With decreased demand, the supplier could increase profits by setting prices at $5 instead of $3 to achieve greater profits from a lower quantity of sales. Given a large enough shift in the demand curve, the fixed supply assumption can lead to the economically unsound conclusion that a producer would be willing to set prices below costs when faced with decreased demand and incur losses on units sold because the

---

[80] In the illustrative example above, the "Demand Increase" is defined by the equation: $Q = 15 - P$, where $P$ is price and $Q$ is quantity. Profits are calculated as $(P - C) * Q$, where $C$ denotes the cost per unit. Therefore, at a price of $11, profits to the firm are ($11 – $3)*4 = $32. If the producer were to set its price at $9, it would sell a quantity of 6 units according to the demand equation ($Q = 15 - 9 = 6$ units). Therefore, at a price of $9, profits to the firm are ($9 – $3)*6 = $36.

[81] In the illustrative example above, the "Demand Decrease" is defined by the equation: $Q = 7 - P$. At a price of $3, profits to the firm are ($3 – $3)*4 = $0. If the producer were to set its price at $5, it would sell a quantity of 2 units according to the demand equation ($Q = 7 - 5 = 2$ units). Therefore at a price of $5, profits to the firm are ($5 – $3)*2 = $4.

producer is unwilling to sell a different quantity of products in response to changing demand.

76.   Mr. Weir seems to ignore the economically unsound implications of his fixed supply assumption and fails to offer any reliable economic evidence that would suggest his proposed assumption applies in the current matter. A fixed supply assumption would suggest that the actual quantity of at-issue products sold during the putative class period was a predetermined amount and that it was Flowers Foods' strategy to sell exactly this number of units regardless of demand for their products. This implies that Flowers Foods would have been unwilling to change the quantity of products sold and would always set prices to ensure that it sold exactly the quantity of units it happened to sell during the putative class period without regard to its costs or its ability to achieve higher profits. The predictions implied by a fixed supply curve are inconsistent with standard economic theory that firms choose prices to maximize profits.[82]

   iii.   *Academic Research Acknowledges that Mr. Weir's Fixed Supply Assumption Does Not Account for Supply*

77.   Mr. Weir's opinion that his proposed fixed supply assumption reliably incorporates supply is contradicted by the work of leading economists and marketing researchers.

---

[82] Cameron, Lisa, Daniel McFadden, and Pablo Robles, "Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition, 2022, p. 27 ("Moreover, in contrast to an economically sound market simulation – where the but-for market equilibrium price is determined by willing buyers maximising utility and willing sellers maximising profits – this "fixed supply" approach does not allow both sellers to maximise profits and consumers to maximise utility.").

78.    Nobel prize winning economist Professor Daniel McFadden and economists Drs. Lisa Cameron and Pablo Robles explain that Mr. Weir's proposed fixed supply assumption is economically unreliable. Professor McFadden and co-authors explain:

> "In many past product misrepresentation cases, however, experts have generated unreliable damages analyses based on either (i) conjoint analysis alone; or (ii) conjoint analysis in combination with unsupported and economically unrealistic assumptions about the supply side of the market and consumer preferences."[83]

79.    Professor McFadden and co-authors refer specifically to the "economically unrealistic assumptions about the supply side of the market" proposed by Mr. Weir. Professor McFadden and co-authors describe:

> "a number of Plaintiffs' experts have incorrectly claimed that they can calculate this but-for world price using either demand-side information alone, or by combining demand-side information with the assumption that the supply side of the market is fixed as a matter of history. In some cases, courts have accepted this flawed application of economics, rendering decisions that are inconsistent with sound economic analysis."[84]

80.    Professor McFadden and co-authors similarly describe that "some Plaintiffs' experts have put forward purported survey-based 'market simulations' predicated on a market in which the quantity of products supplied is a known quantity and 'fixed as a matter of history'" and explain that the fixed supply-side approach proposed by Mr. Weir "will produce unreliable results – even if one were to assume that the expert conducted her CBC survey

---

[83] Cameron, Lisa, Daniel McFadden, and Pablo Robles, "Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition, 2022, p. 26.

[84] Cameron, Lisa, Daniel McFadden, and Pablo Robles, "Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition, 2022, p. 27.

and obtained demand estimates from that survey data in accordance with relevant scientific standards."[85]

81.    Professor McFadden and co-authors also identify that "[c]onsistent with the economic reasoning explained above, recent court decisions have rejected the unsupported assumption that supply is 'fixed as a matter of history' for estimating the price premium arising from an allegedly undisclosed product defect or deceptive product label."[86]

82.    Professor McFadden and co-authors also explain that the use of actual market prices as proposed by Mr. Weir does not account for supply:

> "other decisions have incorrectly found that conjoint analyses can adequately account for supply-side factors 'when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities sold during the class period'[…] the inclusion of actual market prices in the CBC survey does not somehow transform an analysis that can (at best) measure demand into one that can also capture supply (i.e., the behaviour of willing sellers)."[87]

83.    Professor McFadden and co-authors describe the issue with Mr. Weir's proposed methodology, which effectively equates the alleged price premium to consumers

---

[85] Cameron, Lisa, Daniel McFadden, and Pablo Robles, "Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition, 2022, p. 26.

[86] Cameron, Lisa, Daniel McFadden, and Pablo Robles, "Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition, 2022, p. 27 (citing to Judge Furman's decision in *In re GM LLC Ignition Switch Litigation, 407 F. Supp. 3d 212, (S.D.N.Y., Aug. 6, 2019)*).

[87] Cameron, Lisa, Daniel McFadden, and Pablo Robles, "Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition, 2022, endnote 15.

willingness to pay for the "Protein Claim" statement: "[willingness to pay] is not equivalent to a market price because it only reflects demand-side considerations. In contrast, a market price reflects demand for the product as a whole (not just the attribute level of interest) and the demand for competitor products, as well as supply-side considerations such as production costs and the prices of competitors' products."[88]

84.     Marketing researchers including Professor Greg Allenby[89] have also published multiple articles explaining that methodologies like that proposed by Mr. Weir do not provide an economically sound measure of a price premium attributable to product features. Allenby et al. 2013 describes that "[e]conomic valuation of feature enhancement requires a valid and realistic demand system as well as cost information and assumptions about the set of competitive products."[90]

85.     Allenby et al. 2013 describes that willingness to pay measures like those proposed by Mr. Weir "are not equilibrium outcomes" and "[measure] only a shift in the demand curve and

---

[88] Cameron, Lisa, Daniel McFadden, and Pablo Robles, "Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition, 2022, p. 26.

[89] Mr. Weir proposes to analyze the results of his conjoint survey using hierarchical Bayes regression analysis performed by Sawtooth Software's software. Weir Declaration, ¶64. Sawtooth Software characterizes Professor Allenby as a "legend" in choice research and describes that "[t]he first application of [hierarchical Bayesian Estimation] for estimating part-worth utilities for conjoint models happened in 1994 with the pioneering work of Greg Allenby," and further that "Sawtooth Software (with the generous help of Greg Allenby) was largely responsible for the proliferation of HB estimation for choice models in the industry with the commercial release of the CBC/HB software system." Orme, Bryan K. and Keith Chrzan, "Becoming an Expert in Conjoint Analysis," Sawtooth Software, 2nd Edition, 2021, pp. 152-153, 309.

[90] Allenby, Greg, Jeff Brazell, John Howell, and Peter Rossi, "Using Conjoint Analysis to Determine the Market Value of Product Features," Proceedings of the Sawtooth Software Conference, 2013, p. 349.

not what the change in equilibrium price will be as the feature is added or enhanced."[91]
Allenby et al. 2013 further describes that "[i]n general, the WTP measure will overstate the
change in equilibrium price" corresponding to a change in product features.[92]

86.    Professor Allenby and co-authors explain that "a conjoint survey, in and of itself, is not
adequate to form the basis for equilibrium firm profit calculations"[93] and describe that
simulating a market equilibrium "requires measures of costs, a demand system not only for
the focal product but also for the major competing products, and an equilibrium concept."[94]

87.    Other economists and marketing researchers identify that the fixed supply assumption
methodology proposed by Mr. Weir is unreliable from an economic perspective.

88.    Economist Dr. Jonathan Tomlin and marketing professor Dr. Robert Zeithammer identify
that "[s]ince conjoint survey results only measure demand and do not account for the

---

[91] Allenby, Greg, Jeff Brazell, John Howell, and Peter Rossi, "Using Conjoint Analysis to Determine the Market Value of Product Features," Proceedings of the Sawtooth Software Conference, 2013, p. 342.

[92] The authors illustrate their views using a conjoint survey analysis of digital camera features and describe that "[s]tandard WTP measures are shown to greatly overstate the value of the product feature." Allenby, Greg, Jeff Brazell, John Howell, and Peter Rossi, "Using Conjoint Analysis to Determine the Market Value of Product Features," Proceedings of the Sawtooth Software Conference, 2013, p. 342.

[93] Allenby et al. describe equilibrium profit calculations because the focus of their research is on quantifying the value of patented product features. The quantification of equilibrium profits requires the quantification of equilibrium prices, and therefore the views of Allenby et al. are also applicable to the economically appropriate determination of the alleged price premium in this matter. For example, the authors explain: "[i]n many cases, WTP will overstate the price premium afforded by feature enhancement[…]." Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," Journal of Law and Economics, 2014, p. 649.

[94] Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," Journal of Law and Economics, 2014, p. 630.

supply-side, their results cannot, standing in isolation, measure a price premium."[95] Drs. Tomlin and Zeithammer identify that other experts have similarly put forth the "erroneous argument" that they accounted for supply because they considered actual market prices for the at-issue products.[96] Drs. Tomlin and Zeithammer describe:

> "In order to meaningfully account for supply factors and calculate a price premium, an expert must conduct an empirical analysis that actually adjusts for these factors and their impact on a price premium. Mere lip service to market conditions should not supplant actual analysis of market conditions. The use of 'real world' prices and transactions in a conjoint survey does not overcome the need to model supply conditions. The price that would have existed 'but-for' the allegedly wrongful conduct at issue determines the price premium. This 'but-for' price is not a 'real world' price that occurred but, instead, is the price that would have occurred in the absence of allegedly wrongful conduct. It follows that a valid estimate of such counterfactual pricing needs to rely on a model of the supply-side, not just on mere observations of what actually transpired in the marketplace."[97]

89.    Similarly, Drs. Tomlin and Zeithammer describe the "erroneous argument" that one can account for supply by assuming supply is fixed:

> "Assuming that supply is fixed means assuming that suppliers do not respond to changes in demand in setting the quantity that they sell. Because of this, this assumption does not meaningfully consider supply

---

[95] Tomlin, Jonathan and Robert Zeithammer, "Insight: Product Labeling Class Actions – Identifying the 'Con' in Conjoint Surveys," Bloomberg Law, 2018, p. 3.

[96] Tomlin, Jonathan and Robert Zeithammer, "Insight: Product Labeling Class Actions – Identifying the 'Con' in Conjoint Surveys," Bloomberg Law, 2018, p. 3.

[97] Tomlin, Jonathan and Robert Zeithammer, "Insight: Product Labeling Class Actions – Identifying the 'Con' in Conjoint Surveys," Bloomberg Law, 2018, pp. 3-4.

and leads to a measure of a price premium that is unlikely to comport with any actual impact on pricing of the product labeling at issue."[98]

### D. Mr. Weir's Proposed Methodology Would Not Establish a Common Alleged Price Premium From an Economic Perspective

90.   Mr. Weir claims that his proposed analysis of his conjoint survey results would apply to every putative class member:

> "The price premium can be applied to every sale of the Products, and to every Class Member, respectively. Consumers do not negotiate the price of the Products in one-off transactions. The prices are set by the market. Just as a rising tide lifts all boats, a reduction in demand reduces prices market-wide. This is why the price premium percentage calculated by the conjoint survey will apply to all Class Members market-wide regardless of the absolute price they paid, and regardless of any individual Class Member's subjective valuation of the Products."[99]

91.   Mr. Weir's assertions are economically unfounded. Mr. Weir doesn't cite any economic literature or research that supports his claims. Mr. Weir only provides his *ipse dixit* that any alleged price premium he proposes to calculate would apply across the putative class.

92.   To the contrary, economic research analyzing real-world market prices establishes that the price of a product, or the price of a product's characteristics, can vary over time or across retailers – including as a percentage of product prices.[100] Differences in market factors

---

[98] Tomlin, Jonathan and Robert Zeithammer, "Insight: Product Labeling Class Actions – Identifying the 'Con' in Conjoint Surveys," Bloomberg Law, 2018, p. 4.

[99] Weir Declaration, ¶79.

[100] I understand Mr. Weir proposes accounting for variation in product prices by calculating the alleged price premium as a percentage of product prices. Weir Declaration, ¶¶78, 105. Thus, Mr. Weir would assume that the alleged price premium is a common percentage of product prices. However, Mr. Weir doesn't cite to any economic authority to support this assumption and he provides no reliable economic basis to assert that this would be true. To the contrary, as explained below, economic research analyzing actual market data indicates that the implicit

impacting individual transactions among the putative class could therefore impact both (1) the existence or (2) the magnitude of any alleged economic damages to individual putative class members. Proof of a common alleged price premium therefore would require an economically sound analysis of individualized market factors impacting transactions for the at-issue products to investigate whether or not any alleged price premium Mr. Weir proposes to calculate in this matter applies across the putative class.

93.    There is no *a priori* reason to expect, as Mr. Weir would assume, that a market will determine the same price for a product or the characteristics of that product across an alleged putative class beginning in December 2017 that includes different retail locations serving different consumers across California.[101] Mr. Weir claims that his proposed methodology would apply across the putative class because "prices are set by the market."[102] However, Mr. Weir doesn't actually provide an economically sound analysis of either Flowers Foods' price-setting practices or the price-setting practices of retailers of the at-issue products upon which he could conclude that his proposed analysis of the alleged price premium would apply across the putative class. Moreover, I understand the proposed class period would include sales after Flowers Foods changed its product labels in 2023 to add the %DV of protein in the nutrition facts panel using the PDCAAS method.[103]

---

prices attributable to product characteristics can vary across retailers and across time, including as a percentage of product prices.

[101] Complaint, ¶68.

[102] Weir Declaration, ¶79.

[103] Complaint, ¶68. See Section VII.B.

94. In support of his claim that any price premium would apply to all putative class members, Mr. Weir hypothesizes that any change in demand due to the "Protein Claim" would necessarily be "market-wide," and thus common across the putative class.[104] However, Mr. Weir doesn't cite to any economic literature or research that supports his assertion. In his deposition, Mr. Weir could not identify any academic literature underlying his claim that "a reduction in demand reduces prices market-wide,"[105] and testified that he hasn't done an exhaustive study upon which he can conclude that this would always be the case.[106]

95. From an economic perspective, there is no reason to expect that market prices, or any changes in market prices due to any change in demand attributable to the "Protein Claim," would be common across consumers, even if one considers only products within the same "market." Economic research indicates that prices even for seemingly identical products can be substantially different. As described by Professors Baye, Morgan, and Scholten:

---

[104] Weir Declaration, ¶79. Mr. Weir explained in deposition that his reference to a "market" in this respect refers to "the market as a concept, not a particular market," and further that "[w]e're looking back at Adam Smith's invisible hand of the market." Deposition of Colin B. Weir, January 23, 2024, 326:1-7. Introductory economics students are often taught the concept of "Adam Smith's invisible hand" to describe how market prices and the interaction between supply and demand serve to allocate resources efficiently in various contexts. See, e.g., Mankiw, N. Gregory, "Principles of Microeconomics," Cengage Learning, 7th Edition, 2013, p. 10. Thus, the best I can surmise from Mr. Weir's declaration and testimony is that he would assert that "a reduction in demand reduces prices market-wide" and therefore that any alleged price premium applies across the putative class on the basis of the general "concept" of a market as introduced students learning principles of economics. As noted above, the standard market model of supply and demand taught to introductory economics students involves various assumptions that are not applicable to markets for differentiated products, like the products at issue in this matter. Standard economic theory and literature on differentiated product markets indicates that product prices, and prices of a product's characteristics, can vary across multiple dimensions and there is no economically reliable basis to conclude *a priori* that the "concept" of a "market" as supposed by Mr. Weir would suggest that a single price is set across a market.

[105] Weir Declaration, ¶79.

[106] Deposition of Colin B. Weir, January 23, 2024, 329:7-19.

"[s]imple textbook models of competitive markets for homogeneous products suggest that all-out competition among firms will lead to the so-called 'law of one price.' Yet, empirical studies spanning more than four decades […] reveal that price dispersion is the rule rather than the exception in many homogeneous product markets. The observation that the prices different firms charge for the same product often differ by 30 percent or more led Hal Varian to suggest that 'the law of one price' is no law at all."[107]

96.    I understand that Flowers Foods' products are primarily sold through grocery retailers that subsequently set their own retail prices for the at-issue products.[108] Consequently, economic theory indicates that the market price attributable to the Alleged Omission would be expected to vary according to the supply and demand factors impacting price setting decisions for these different retailers across time.

97.    Consumer demand for the at-issue protein labeling may vary across retailers or across time and incentivize different pricing by retail location.[109] Ollberding et al. (2010) found that consumer use of food labels when deciding to buy food products varied significantly across multiple demographic characteristics. The authors identify that their research "revealed highly discrepant rates of label use for various characteristics including age, sex, education, income, race/ethnicity, language of exam, and length of residence in the United States for

---

[107] Baye, Michael R., John Morgan, and Patrick Scholten, "Information, Search, and Price Dispersion," Forthcoming in Handbook on Economics and Information Systems, 2006, p. 2.

[108] Deposition of Dan Letchinger, November 10, 2023, 175:16-23. Mr. Weir also testified that he understands that prices for bread products are set by retailers including, e.g., Target and Safeway. Deposition of Colin B. Weir, January 23, 2024, 328:23-329:6.

[109] Flowers Foods' Senior Vice President of Growth Brands Dan Letchinger described that consumer habits have changed considerably over time. Deposition of Dan Letchinger, November 10, 2023, 159:22-24. Mr. Letchinger identified: "there are many consumer targets for Dave's Killer Bread, and it varies from, in many cases, market to market and retailer to retailer. So there's no singular consumer target for Dave's Killer Bread." Deposition of Dan Letchinger, November 10, 2023, 160:23-161:2. See also Deposition of Dan Letchinger, November 10, 2023, 163:19-24.

those foreign born," and, e.g., that "participants with higher income […] were more likely to report using the food label and have been consistently observed in previous studies."[110] Differences in demographic characteristics including income across retail locations and across time could incentivize different pricing for the at-issue protein labeling because the products were priced to consumers who may have varied according to the degree at which they actually observed the at-issue features.[111]

98.   Flowers Foods' Senior Vice President of Growth Brands Dan Letchinger also described that Flowers Foods' retailers have different profit margin requirements that they target when purchasing products from Flowers Foods.[112] Any differences in targeted profit margins for the at-issue products across retailers could cause differences in the existence or magnitude of any alleged price premium across putative class members because retailers may not be willing to accept prices below some retailer specific threshold.

99.   In the remainder of this section, I review academic literature that establishes: (1) the price of a product's characteristics can vary over time or across retailers, and (2) individual

---

[110] Ollberding, Nicholas Jay, Randi L. Wolf, and Isobel Contento, "Food Label Use and Its Relation to Dietary Intake among US Adults," Journal of the American Dietic Association, 2010, p. 1,234.

[111] An analysis of some of California's most populous areas indicates that average incomes range from between (1) $39,671 to $50,572 in the Riverside area; (2) $60,697 to $76,445 in the Los Angeles area; and (2) $ 95,972 to $124,398 in the San Francisco area from 2018 to 2022. U.S. Bureau of Economic Analysis, "Per Capita Personal Income in Riverside-San Bernardino-Ontario, CA (MSA) [RIVE106PCPI]," retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/RIVE106PCPI; U.S. Bureau of Economic Analysis, "Per Capita Personal Income in Los Angeles-Long Beach-Anaheim, CA (MSA) [LALBA906PCPI]," retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/LALBA906PCPI; U.S. Bureau of Economic Analysis, "Per Capita Personal Income in San Francisco-Oakland-Hayward, CA (MSA) [SANF806PCPI]," retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/SANF806PCPI.

[112] Deposition of Dan Letchinger, November 10, 2023, 176:13-16; 180:10-18.

retailer price-setting practices may cause different price responses given a change in consumer demand. This academic literature substantiates the view that the existence or magnitude of alleged economic damages in this matter may vary across putative class members.

i.   *The Price of a Product's Characteristics Can Vary – Including as a Percentage of Product Prices*

100.  Analysis by the United States Bureau of Labor Statistics (BLS) identifies that marginal prices of product characteristics can change over time. The BLS conducts various hedonic regression analyses in its calculation of the consumer price index.[113] For example, the BLS calculates a hedonic regression analysis of smartphone characteristics twice per year.[114] The results of the BLS's smartphone hedonic regression analysis indicates that the marginal price of smartphone processor speeds can vary substantially over time as a

---

[113] U.S. Bureau of Labor Statistics, "A Review of Hedonic Price Adjustment Techniques for Products Experiencing Rapid and Complex Quality Change," September 15, 2022, available at https://www.bls.gov/cpi/quality-adjustment/hedonic-price-adjustment-techniques.htm.

[114] U.S. Bureau of Labor Statistics, "A Review of Hedonic Price Adjustment Techniques for Products Experiencing Rapid and Complex Quality Change," September 15, 2022, available at https://www.bls.gov/cpi/quality-adjustment/hedonic-price-adjustment-techniques.htm.

percentage of smartphone prices.[115] **Table 1** below reports estimates from the BLS's smartphone hedonic regression model.[116]

**Table 1: Bureau of Labor Statistics Smartphone Hedonic Regression Model**

|  | Jan. 2018 | Apr. 2018 | Nov. 2018 | Apr. 2019 | Nov. 2019 | Apr. 2020 |
|---|---|---|---|---|---|---|
| **% Change in Price for a One GHz Change in Smartphone Processor Speed** | 22% | 47% | 82% | 103% | 131% | 74% |

101. The BLS's results indicate that the marginal price of smartphone processor speed as a percentage of smartphone prices changed by nearly 500% between January 2018 through April 2020.[117] The BLS commented on these results: "[p]arameter estimates for certain features, like those for processor speed […] changed value significantly from January 2018 to April 2020 highlighting the need for frequent refreshes of the model."[118]

---

[115] U.S. Bureau of Labor Statistics, "A Review of Hedonic Price Adjustment Techniques for Products Experiencing Rapid and Complex Quality Change," September 15, 2022, available at https://www.bls.gov/cpi/quality-adjustment/hedonic-price-adjustment-techniques.htm, Table 1. The BLS conducted a hedonic regression of the logarithm of price on smartphone product characteristics including smartphone processing speed in GHz. The regression coefficients are converted to % change using the formula described in Wooldridge, Jeffrey M., "Introductory Econometrics A Modern Approach," 5th Edition, Cengage Learning, 2012, p. 192. I.e., let $\beta$ denote the regression coefficient estimated by the BLS regression of the natural logarithm of price on cell phone processor speed in GHz and other smartphone characteristics. Professor Wooldridge explains that this regression coefficient can be converted into a percent change in price according to the equation: $\% \ Change \ in \ Price = \ 100 * (e^{\beta} - 1)$.

[116] U.S. Bureau of Labor Statistics, "A Review of Hedonic Price Adjustment Techniques for Products Experiencing Rapid and Complex Quality Change," September 15, 2022, available at https://www.bls.gov/cpi/quality-adjustment/hedonic-price-adjustment-techniques.htm, Table 1.

[117] (131% - 22%)/22% = 497%.

[118] U.S. Bureau of Labor Statistics, "A Review of Hedonic Price Adjustment Techniques for Products Experiencing Rapid and Complex Quality Change," September 15, 2022, available at https://www.bls.gov/cpi/quality-adjustment/hedonic-price-adjustment-techniques.htm.

102. As another example, Professors Berndt and Rappaport conducted a hedonic regression analysis of computer prices from 1976-1999 and calculated different values for product attributes by year.[119]

103. Academic literature on food and beverage products also establishes that the prices of product characteristics can change over time or across retailers.

104. Chang et al. (2010) investigated prices for retail eggs and determined that the implicit prices of egg product characteristics varied significantly across geography.[120] The authors conducted a regression model that measures the implicit prices of egg product characteristics as a percentage of product prices.[121] The authors find: "significant variation exists among geographic locations; price premiums for organic over conventional eggs in Dallas are almost twice as high as those in San Francisco," and in particular: "the implied price premium for organic eggs is about 80% in Dallas but only 30% in San Francisco. Likewise, the price premium for cage-free eggs is about 50% in Dallas but only about 21% in San Francisco."[122] The authors also find that the implicit price of "Natural" eggs is

---

[119] Berndt, Ernst R. and Neal J. Rappaport, "Price and Quality of Desktop and Mobile Personal Computers: A Quarter-Century Historical Overview," *The American Economic Review*, 2001, p. 269 ("To facilitate comparability and feasibility over a quarter-century time frame in the dynamic PC market, here we select only several price-determining characteristics, but we allow parameters on these characteristics to vary annually, thereby permitting a relatively unrestricted impact of changes in characteristics on prices.").

[120] Chang, Jae Bong, Jayson L. Lusk, and F. Bailey Norwood, "The Price of Happy Hens: A Hedonic Analysis of Retail Egg Prices," Journal of Agricultural and Resource Economics, 2010.

[121] Chang, Jae Bong, Jayson L. Lusk, and F. Bailey Norwood, "The Price of Happy Hens: A Hedonic Analysis of Retail Egg Prices," Journal of Agricultural and Resource Economics, 2010, pp. 413, 417.

[122] Chang, Jae Bong, Jayson L. Lusk, and F. Bailey Norwood, "The Price of Happy Hens: A Hedonic Analysis of Retail Egg Prices," Journal of Agricultural and Resource Economics, 2010, pp. 406, 417.

approximately 7% of the product price in Dallas/Ft. Worth, but this implicit price is not statistically significant from zero in San Francisco/Oakland.[123] This result highlights the fact that there can be significant differences in the existence of a price premium across geographies.

105. Chang et al. explain that "[d]ifferences in cost across location or difference in demand can therefore explain differences in estimated implicit prices," and further that "[t]here are many valid reasons to suspect the estimates may differ by location, and this intuition is borne out by statistical tests."[124] Moreover, the authors describe:

> "Differences in price premiums across location may result from differences in demand. For example, Dallas consumers may be willing to pay more for cage-free and organic eggs than San Francisco consumers. However, supply differences could also be a factor."[125]

106. Stanley and Tschirhart (1991) estimated hedonic regression models for breakfast cereals by individual retailer and calculated different implicit prices of cereal product characteristics for each retailer.[126] The authors considered data from multiple retailers "to look for differences in the hedonic price function that may suggest that stores set prices

---

[123] Chang, Jae Bong, Jayson L. Lusk, and F. Bailey Norwood, "The Price of Happy Hens: A Hedonic Analysis of Retail Egg Prices," Journal of Agricultural and Resource Economics, 2010, p. 414.

[124] Chang, Jae Bong, Jayson L. Lusk, and F. Bailey Norwood, "The Price of Happy Hens: A Hedonic Analysis of Retail Egg Prices," Journal of Agricultural and Resource Economics, 2010, p. 412, 416.

[125] Chang, Jae Bong, Jayson L. Lusk, and F. Bailey Norwood, "The Price of Happy Hens: A Hedonic Analysis of Retail Egg Prices," Journal of Agricultural and Resource Economics, 2010, p. 417.

[126] Stanley, Linda R. and John Tschirhart, "Hedonic Prices for a Nondurable Good: The Case of Breakfast Cereals," The Review of Economics and Statistics, 1991, Table 2.

based on the preferences of the customers they serve."[127] For example, the authors describe: "[o]ne Safeway store was located in a high income neighborhood and one in a low income neighborhood; therefore, they may serve different classes of customers."[128] The authors describe that they found "interesting differences across the distinct stores," and that their hedonic regression analysis "may indicate that the control the manufacturers have in price setting may be partially overcome by retail pricing policies that set price according to the demands of the consumers they serve."[129]

ii.  *Individual Retailer Price-Setting Practices May Cause Different Price Changes Given a Change in Consumer Demand Attributable to the Alleged Omission*

107.  A central assumption underlying Mr. Weir's claim that any alleged price premium he would calculate would be applicable across the putative class is his assumption that any change in consumer demand purportedly attributable to the "Protein Claim" will necessarily impact prices, and will do so "market-wide."[130] However, research analyzing real-world retail pricing, including retail pricing in grocery stores, indicates that retailers do not always respond to changes in consumer demand by changing prices. Accordingly, there is no guarantee that all retailers of the at-issue products would change their prices in the but-for world, causing individualized differences in the existence of any alleged price

---

[127] Stanley, Linda R. and John Tschirhart, "Hedonic Prices for a Nondurable Good: The Case of Breakfast Cereals," The Review of Economics and Statistics, 1991, p. 537.

[128] Stanley, Linda R. and John Tschirhart, "Hedonic Prices for a Nondurable Good: The Case of Breakfast Cereals," The Review of Economics and Statistics, 1991, p. 537, fn. 1.

[129] The authors further considered that "the price of a brand of cereal may depend on the assortment of other cereals and substitute products in a specific grocery store." Stanley, Linda R. and John Tschirhart, "Hedonic Prices for a Nondurable Good: The Case of Breakfast Cereals," The Review of Economics and Statistics, 1991, p. 539, fn. 3.

[130] Weir Declaration, ¶79.

premia. This highlights the importance of an economically sound supply analysis when analyzing the existence of any alleged price premium.

108.  For example, Watson et al. (2015) explains that retail managers making current pricing decisions based on historical pricing decisions is "the overwhelming tactic of choice," explained by, e.g., the complexity of changing prices given dynamic changes in demand, or "a desire to retain customer relations and prevent price wars."[131]

109.  Professors Kiesel and Villas-Boas conducted an experiment to add nutrition labels on the shelves of grocery stores to investigate the impact on sales of microwave popcorn. The authors found that their nutrition labels had no statistically significant impact on price, despite the labels impacting sales volumes.[132]

110.  Wood et al. (2021) interviewed 55 fashion retail executives about price setting. They concluded that despite "significant opportunities to adopt data-driven dynamic and responsive approaches to setting and managing price," retailers followed pricing strategies "focused − to varying degrees of importance between retailers − on variations of a cost-plus approach, alignment with competitor pricing and historical pricing, rather than any consistent leveraging of data related to the customer."[133]

---

[131] Watson, Iain, Steve Wood, and John Fernie, "'Passivity': A Model of Grocery Retail Price Decision-Making Practice," European Journal of Marketing, 2015, p. 1,044.

[132] Kiesel, Kristin and Sofia B. Villas-Boas, "Can information costs affect consumer choice? Nutritional labels in a supermarket experiment," International Journal of Industrial Organization, 2013, Table 4, p. 159 ("we regress prices (including promotions) on our labeling treatments. As expected, there is no statistically significant effect on price.").

[133] Wood, Steve, Iain Watson, and Christoph Teller, "Pricing in online fashion retailing: implications for research and practice," Journal of Marketing Management, 2021, pp. 1,235-1,236. See also, Gorodnichenko, Yuriy, Viacheslav Sheremirov, and Oleksandr Talavera, "Price Setting in Online Markets: Does IT Click?," Journal of the European Economic Association, 2018, p. 1 ("We document that although online prices change more frequently than offline prices, they nevertheless exhibit relatively long spells of fixed prices. By many metrics, such as

111.  Arcidiacono et al. (2019) observed the competitive impacts of market entry by analyzing the effects of Walmart Supercenter expansion.[134] Using IRI product sales data, Arcidiacono et al. find "[t]he results indicate that entry causes drops in supermarket revenue of over 16 percent when Walmart locates within 1 mile."[135] Despite the negative impact on consumer demand, the study found no causal relationship with price:

> "While we find large but localized impacts on revenues, we find no evidence that incumbent supermarkets adjust prices in response to Supercenter entry. This result is robust across many dimensions, including a lack of price response preemptively, for individual products, and across brands within a category."[136]

112.  Arcidiacono et al. describe why retailers may choose not to change prices given a decrease in demand for their products due to competition from Walmart: "the explanation most consistent with our findings is that supermarket firms routinely employ 'rule of thumb' cost-plus pricing policies, a form of managerial inattention. Since entry by Walmart does

---

large size and low synchronization of price changes, considerable cross-sectional dispersion, and low sensitivity to predictable or unanticipated changes in demand conditions.").

[134] Arcidiacono, Peter, Paul B. Ellickson, Carl F. Mela, and John D. Singleton, "The Competitive Effects of Entry: Evidence from Supercenter Expansion," American Economic Journal: Applied Economics, 2020.

[135] Arcidiacono, Peter, Paul B. Ellickson, Carl F. Mela, and John D. Singleton, "The Competitive Effects of Entry: Evidence from Supercenter Expansion," American Economic Journal: Applied Economics, 2020, p. 187.

[136] Arcidiacono, Peter, Paul B. Ellickson, Carl F. Mela, and John D. Singleton, "The Competitive Effects of Entry: Evidence from Supercenter Expansion," American Economic Journal: Applied Economics, 2020, p. 203. See also Arcidiacono, Peter, Paul B. Ellickson, Carl F. Mela, and John D. Singleton, "The Competitive Effects of Entry: Evidence from Supercenter Expansion," American Economic Journal: Applied Economics, 2020, p. 177 ("Surprisingly, we find that prices at incumbent supermarkets do not react at all to Supercenter entry—either immediately, preemptively, or over the longer term[…] we extend our empirical approach to UPC-level data, allowing us to examine prices for the same product in the same store before and after Supercenter exposure, and find no evidence for price reactions").

not impact costs, it does not trigger a price reaction from incumbents."[137] The authors

propose the economic reasoning that may underly retailer propensity to engage in cost-plus

pricing as opposed to always changing product prices given any change in consumer

demand:

> "Our results suggest that such 'cost-plus' thinking may influence how
> firms respond to even large-scale changes in their competitive
> environment. In the retail setting, simple rules of thumb might be an
> optimal response to an intractable optimization problem that involves
> monitoring the prices of thousands of products at numerous competitors
> while managing one's own complex supply chain."[138]

113. Given the academic literature cited above that establishes that the prices of product features

can vary over time or across retailers, including as a percentage of product prices, it is

necessary for Mr. Weir to analyze whether individualized differences over time or across

retailers leads to differences in the existence or magnitude of the alleged price premium

across putative class members. Mr. Weir offers no indication that he will undertake any

economically sound analysis as part of his proposed methodology that could test and verify

the existence of a common alleged price premium that can be applied across the putative

---

[137] Arcidiacono, Peter, Paul B. Ellickson, Carl F. Mela, and John D. Singleton, "The Competitive
Effects of Entry: Evidence from Supercenter Expansion," American Economic Journal: Applied
Economics, 2020, p. 178. The authors point to similar findings in other economic research that
indicates: "grocery prices rarely change unless triggered by an accompanying change in costs.
Prices are set with a relatively long duration, aimed at keeping markups within a fairly narrow
target range." Arcidiacono, Peter, Paul B. Ellickson, Carl F. Mela, and John D. Singleton, "The
Competitive Effects of Entry: Evidence from Supercenter Expansion," American Economic
Journal: Applied Economics, 2020, p. 179. The authors further describe: "There is also a body of
survey evidence documenting the ubiquity of cost-plus pricing, particularly amongst retail
firms." Arcidiacono, Peter, Paul B. Ellickson, Carl F. Mela, and John D. Singleton, "The
Competitive Effects of Entry: Evidence from Supercenter Expansion," American Economic
Journal: Applied Economics, 2020, p. 202.

[138] Arcidiacono, Peter, Paul B. Ellickson, Carl F. Mela, and John D. Singleton, "The Competitive
Effects of Entry: Evidence from Supercenter Expansion," American Economic Journal: Applied
Economics, 2020, p. 203.

class. I have not seen any evidence that Mr. Weir proposes to consider, in a manner substantiated by economic theory or research, whether or not the alleged price premium could vary across the putative class in his proposed analysis of his conjoint survey results.[139] Thus, Mr. Weir proposes to assume, rather than test and verify, that the results from his proposed methodology would be applicable across the putative class.

**E.  Mr. Weir Fails to Document the Purported Evidence Underlying his Conclusions**

114.  Mr. Weir makes numerous assertions throughout his report without sufficiently documenting his purported data, analysis, or evidence underlying his opinions in a manner that would allow verification of the validity of his opinions. Given Mr. Weir's repeated failure to document the steps he undertook in his analysis or the specific materials underlying his conclusions, it is not possible to determine the extent to which certain assertions by Mr. Weir are based on generally accepted economic techniques and it is not possible to determine any degree of error that may underlie his analysis of the available evidence.

---

[139] Mr. Weir offers no indication that his proposed methodology would consider how the alleged price premium might have been different across different time periods or across retail locations. Mr. Weir describes a single calculation of his proposed price premium analysis that he would then apply class-wide: "I will compare a benchmark Dave's Killer Bread Product that uses the Claim to an otherwise identical Product that does not use the Claim. I will then use the market simulator to simulate a condition where the price of the second product is reduced to the level where both products obtain equal market acceptance[…] The price premium will equal the difference between the price in the real world and the but-for price that compensates for the change in labeling." Weir Declaration, ¶77.

*i. Mr. Weir Fails to Document his Analysis Underlying his Price Range*

115. As described above, a key component of Mr. Weir's purported consideration of the supply-side includes the use of "real-world price points in the [conjoint] survey."[140] Mr. Weir testified that he considers pricing to be important for his proposed analysis.[141]

116. Mr. Weir claims that the price points in his proposed conjoint survey "were derived from a review of historic, through the register transaction data from Information Resources, Inc. ("IRI"); a market scan of prices presently in the market; the cognitive interviews; and documentary evidence."[142] Mr. Weir stated in deposition that his derivation of price points included a visit to two stores in Massachusetts (though I understand the at-issue products were sold in California) and looking at various websites.[143]

117. However, Mr. Weir did not document any of this analysis.[144] Given Mr. Weir's failure to document any evidence underlying his conclusions, it is not possible to verify the degree to which the various sources he references support his conclusions. Mr. Weir has made it impossible to determine the degree to which his analysis follows generally accepted statistical techniques and has made it impossible to determine the degree of error that may underly his analysis of various sources of pricing information.

---

[140] Weir Declaration, ¶84 ("I conducted research of actual retail sales and market data and included these real-world price points in the survey. These real-world transactions occurred at prices that *already* reflect the supply side factors then extant in the marketplace.").

[141] Deposition of Colin B. Weir, January 23, 2024, 313:7-19.

[142] Weir Declaration, fn. 30.

[143] Deposition of Colin B. Weir, January 23, 2024, 306:17-21; 326:20-327:7.

[144] Mr. Weir testified that he does not possess any documentation that substantiates his analysis of pricing aside from the material in his declaration. Deposition of Colin B. Weir, January 23, 2024, 306:23-307:2 ("And do you have any notes of any of that work? A. Other than what I've put into the report, I have no additional notes.").

118.  Mr. Weir did not document his analysis of IRI data and does not remember what he did to derive information from this data set to inform his range of prices.[145] Mr. Weir did not create any notes or record any information from his review of product prices on the shelves of stores in Massachusetts.[146] Mr. Weir produced no records substantiating the content of his cognitive interviews or the statements from respondents underlying his claim that "[r]espondents reported typically paying above $4 and a max of about $7.50 for a single loaf of bread."[147] And Mr. Weir has not specified what "documentary evidence" he refers to that would permit a review of such evidence to verify whether or not such evidence supports his conclusions, including no documentation of the specific web-pages he reviewed that underly his opinions.

119.  Mr. Weir stated that he determined his price range by analyzing the IRI data.[148] Mr. Weir explained that there could be outliers from his proposed range and that one could "typically" drop outliers which he defines as dropping the lowest and highest 2.5 percentile from the distribution of prices.[149] However, Mr. Weir doesn't know if he actually did this calculation in the current matter.[150] Mr. Weir couldn't recall whether the IRI data he relies

---

[145] See, e.g., Deposition of Colin B. Weir, January 23, 2024, 308:18-22.

[146] Deposition of Colin B. Weir, January 23, 2024, 315:19-316:1 ("Do you have documents that you can share with me that show the pricing you saw when you went to the stores? A. I do not have additional documents other than the declaration which affirms what was in the IRI data and which affirms what was in the exploratory interviews.").

[147] Weir Declaration, ¶42.

[148] Deposition of Colin B. Weir, January 23, 2024, 307:5-6.

[149] Deposition of Colin B. Weir, January 23, 2024, 308:6-13.

[150] Deposition of Colin B. Weir, January 23, 2024, 308:18-22 ("Q. Did you do that calculation here to come up with 4.49 to 7.49? A. I don't know if I did the calculation, per se, but you can sort the data and visualize that, yes.").

upon already provided him with price data, or if he had to calculate prices on the basis of that data.[151] Further, Mr. Weir couldn't recall whether he maintained any spreadsheet underlying any such analysis.[152]

120. Regarding Mr. Weir's analysis of pricing on various websites, Mr. Weir did not document the information he reviewed on those websites, claiming that those websites "would speak for themselves."[153] Mr. Weir doesn't identify any specific webpages that he visited that provided him with pricing information, referring only to his documents reviewed list which identifies home webpages for certain grocery retailers including, e.g., Safeway, Whole Foods Market, and Walmart.[154]

121. I disagree that these home webpages "speak for themselves" as to any economically reliable review of pricing for relevant products in this matter, and it is not possible to replicate Mr. Weir's methodology on the basis of these webpages. Mr. Weir testified that his analysis of webpages included (1) entering a Los Angeles zip code into the website to get California pricing (a zip code he does not remember and did not record),[155] and (2) reviewing prices for Dave's Killer Bread and other brands that were available (including brands he does not remember and did not record).[156] Taking Mr. Weir's reference to Whole Foods Market's webpage as an example, I see no indication that the URL provided by Mr.

---

[151] Deposition of Colin B. Weir, January 23, 2024, 310:11-311:5.

[152] Deposition of Colin B. Weir, January 23, 2024, 311:13-312:1.

[153] Deposition of Colin B. Weir, January 23, 2024, 316:5-6. Mr. Weir additionally testified that his browser search history pertaining to the web searches he made in this matter would probably not exist anymore. Deposition of Colin B. Weir, January 23, 2024, 229:24-230:15.

[154] Deposition of Colin B. Weir, January 23, 2024, 316:15-17.

[155] Deposition of Colin B. Weir, January 23, 2024, 327:10-328:3.

[156] Deposition of Colin B. Weir, January 23, 2024, 317:19-319:5.

Weir can reflect pricing in a particular zip code without navigating to a different "Find a Store" webpage.[157] Moreover, I do not observe that the Whole Foods Market home page lists any information on pricing for Dave's Killer Bread or other brands of products from which Mr. Weir could inform his price range in his proposed analysis.[158] Mr. Weir has not provided any substantive information about what he observed, including which products he reviewed and what the prices were for those products.

122. Although Mr. Weir couldn't recall how he determined his price range from his analysis of IRI data, I determine the price range in the IRI data corresponding to the details Mr. Weir provided regarding the methodology one could "typically" follow, i.e., I consider the price range of products for all brands in the IRI data after dropping the lowest and highest 2.5 percentile from the distribution of prices.[159] I find that prices for all brands in the IRI data

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████

---

[157] Moreover, entering Los Angeles into the Find a Store webpage generates results for 29 different stores corresponding to various zip codes from which Mr. Weir apparently selected to undertake his analysis of pricing. Whole Foods Market, available at https://www.wholefoodsmarket.com/ (accessed January 31, 2024); Whole Foods Market, "Find a Store," available at https://www.wholefoodsmarket.com/stores (accessed January 31, 2024).

[158] Whole Foods Market, available at https://www.wholefoodsmarket.com/ (accessed January 31, 2024).

[159] Confidential - AEO - Gutride Safier DKB Oct 23.xlsx. Mr. Weir explained that his price range pertains to both Dave's Killer Bread products and competitor brand products in the IRI data. Deposition of Colin B. Weir, January 23, 2024, 312:9-19.

[160] Weir Declaration, ¶53.

123.  As an alternative, I consider each brand in the IRI data in isolation and calculate their corresponding price ranges after dropping the lowest and highest 2.5 percentile from each brand-specific distribution of prices. I find (1) prices for ████████████ products ranging from ████████ (2) prices for ██████████ products ranging from ██ ████ and (3) prices for ██████ products ranging ████████████.

124.  Thus, Mr. Weir's purported analysis of prices is ████████████████████ 

125.  Moreover, the IRI data ██████████████████  ████████████████ None of this can be replicated and verified based on the information disclosed to date by Mr. Weir. We are therefore left only with Mr. Weir's claims as to his recollection of the results of his price research.

*ii.  Mr. Weir Fails to Document his Consumer Interviews*

126.  Mr. Weir additionally opines that he conducted "in-depth cognitive interviews with purchasers of Dave's Killer Bread Products as part of [his] work in developing the survey."[162] Mr. Weir references eight phone interviews with California purchasers of

---

[161] Weir Declaration, ¶53.

[162] Weir Declaration, ¶37.

Dave's Killer Bread products and makes various claims as to the content of those interviews, e.g., that "[r]espondents indicated that their views on various bread attributes, including protein (as well as whole grains, organic, fiber, and non-GMO), would not vary based upon the size of the packaging (e.g., single or double loaf), flavor, price, or over the course of the past five years."[163] However, Mr. Weir did not produce any documentation for these interviews, including any transcripts, recordings, or notes on the specific questions he asked and the answers provided by respondents, other than his characterization of the content of these interviews provided in his declaration.[164] It is therefore impossible to verify the content of Mr. Weir's interviews and the validity of the conclusions he derives on the basis of those interviews. Moreover, it is impossible to know whether or not Mr. Weir's interview respondents provided answers contrary to the claims he makes in his declaration or whether Mr. Weir has been comprehensive in his summary of material responses from those interviews.

   *iii. Mr. Weir Fails to Identify his Economic Basis for Numerous of his Opinions*

127.  Mr. Weir's failure to sufficiently document the support underlying his opinions is also reflected in various assertions he makes without any identified economic basis. For example, a central assumption underlying Mr. Weir's determination that he can apply his proposed methodology across the putative class is his contention that "a reduction in demand reduces prices market-wide."[165] Mr. Weir doesn't identify any economic basis underlying this assertion and, as described in detail above, Mr. Weir's opinion is

---

[163] Weir Declaration, ¶¶38-43.

[164] Deposition of Colin B. Weir, January 23, 2024, 34:13-18.

[165] Weir Declaration, ¶79.

contradicted by economic research. In his deposition, Mr. Weir could not identify any academic literature underlying his claim and testified that he hasn't done an exhaustive study upon which he can conclude that it would always be the case that a reduction in demand reduces prices market-wide.[166]

128. As another example, Mr. Weir claims to have appropriately considered supply in his proposed analysis. Although he purports to analyze supply – a fundamental principle in economic theory underlying the determination of market prices – Mr. Weir fails to offer a single citation to any economic literature to substantiate that his purported supply-side analysis is grounded in economic theory and reflected in peer-reviewed economic research.[167]

129. Despite not citing to any economic literature to substantiate his fixed supply assumption in his declaration, Mr. Weir nevertheless claimed in deposition that: "[t]he literature says that you can hold the supply constant and measure on a historic basis the change in value of products that have already been sold."[168] Mr. Weir doesn't specify what literature, or where within that literature one might verify that an economic resource does in fact say "that you can hold the supply constant and measure on a historic basis the change in value of products that have already been sold."

130. Mr. Weir additionally opined that his fixed supply assumption is supported on the basis of (1) academic literature on hedonic regression models, (2) a book by Sawtooth Software's Bryan Orme and Keith Chrzan, and (3) the Hirogaki (2013) article he cites in his

---

[166] Deposition of Colin B. Weir, January 23, 2024, 329:7-19.

[167] Weir Declaration, ¶¶80-97.

[168] Deposition of Colin B. Weir, January 23, 2024, 341:6-9.

declaration.[169] Mr. Weir doesn't identify any specific paper on hedonic regression models, instead referring generally to a relatively vast "category" of economic literature.[170] Mr. Weir doesn't identify any specific excerpts from Sawtooth Software's book, which spans over 300 pages, that substantiates his claims.[171]

131. Mr. Weir's decision not to provide any academic literature citations in his purported consideration of supply in his declaration and to subsequently offer opaque references to academic works generally in his deposition renders it virtually impossible to determine exactly what academic literature he claims substantiates his opinions. If academic literature supported Mr. Weir's assertions, then he should be able to identify the sources and page numbers corresponding to these sources to substantiate what he claims. Instead, Mr. Weir omits references to any academic sources from his discussion of his supply-side considerations in his declaration.

132. Thus, the best one can do is try to surmise the apparent basis for Mr. Weir's opinions – ambiguity which could provide Mr. Weir subsequent opportunities to claim that any resources considered were not in fact what he referred to, or that one might "have their head in the sand"[172] because they did not identify exactly what support he might claim underlies his opinions at a later date.

133. From my review of Mr. Weir's purported support for his opinions, I find that Mr. Weir fails to identify a sound basis in economics that supports his claims. I am not aware of any

---

[169] Deposition of Colin B. Weir, January 23, 2024, 339:20-340:22.

[170] Deposition of Colin B. Weir, January 23, 2024, 340:3-8.

[171] Orme, Bryan K. and Keith Chrzan, "Becoming an Expert in Conjoint Analysis," Sawtooth Software, 2nd Edition, 2021.

[172] Deposition of Colin B. Weir, January 23, 2024, 289:5-8.

academic literature that does in fact say what he claims, i.e., that "you can hold the supply constant and measure on a historic basis the change in value of products that have already been sold"[173] for the purposes of estimating a market equilibrium price premium. Moreover, an analysis of the literature referenced by Mr. Weir indicates that his opinions are unfounded from an economic perspective.

134. First, Mr. Weir's opinion that academic literature in the general category of hedonic regression models supports his methodology reflects a misunderstanding of hedonic regression analysis. Hedonic regression analyses are conducted using actual market data. Consequently, hedonic regression analysis relies on observations of market prices set according to both supply and demand both with and without a product characteristic of interest, and therefore inherently considers market equilibrium prices corresponding to changes in product features.[174] In contrast, Mr. Weir's proposed conjoint survey would consider only consumer preferences or consumer demand without information on producer supply in the but-for world. Thus, it is necessary for Mr. Weir to combine his demand-side-only analysis with a model of supply to quantify a market equilibrium price premium.[175]

135. Second, I do not observe that Mr. Orme or Mr. Chrzan characterize the market simulation proposed by Mr. Weir as a market equilibrium price premium calculation that accounts for supply in their book. To the contrary, Mr. Orme and Mr. Chrzan characterize Mr. Weir's

---

[173] Deposition of Colin B. Weir, January 23, 2024, 341:6-9.

[174] See, e.g., Rosen, Sherwin, "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition," The Journal of Political Economy, 1974, p. 35; Chwelos, P.D., E.R. Berndt, and I.M. Cockburn, "Faster, Smaller, Cheaper: An Hedonic Price Analysis of PDAs," Applied Economics, 2008, p. 2,842.

[175] See, e.g., Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," Journal of Law and Economics, 2014, p. 630.

proposed two-product market simulation as quantifying willingness to pay, or demand, for a particular feature.[176] Moreover, Mr. Orme and Mr. Chrzan endorse the views of Professor Allenby, whose academic work establishes that conjoint survey analysis alone is deficient for quantifying market equilibrium prices given a change in product features and identify that quantifying changes in market equilibrium prices requires incorporating, e.g., costs and competitive supply responses to product feature changes.[177]

136. Third, Hirogaki (2013) doesn't claim to calculate a market price premium determined according to supply and demand. Hirogaki (2013) characterizes its analysis as quantifying consumer preferences and willingness to pay, or demand, and uses a different methodology than Mr. Weir's proposed market simulation as a means of quantifying willingness to pay.[178] The methodology Hirogaki (2013) uses to calculate willingness to pay is a simple, purely demand based calculation based on regression coefficients that measure only consumer utility for product features with no analysis of producer supply.[179]

## VIII.    Conclusion

---

[176] See Orme, Bryan K. and Keith Chrzan, "Becoming an Expert in Conjoint Analysis," Sawtooth Software, 2nd Edition, 2021, p. 203.

[177] See Orme, Bryan K. and Keith Chrzan, "Becoming an Expert in Conjoint Analysis," Sawtooth Software, 2nd Edition, 2021, p. 203; Allenby, Greg, Jeff Brazell, John Howell, and Peter Rossi, "Using Conjoint Analysis to Determine the Market Value of Product Features," Proceedings of the Sawtooth Software Conference, 2013, p. 349, 354.

[178] Hirogaki, Mitsunori, "Estimating Consumers' Willingness to Pay for Health Food Claims: A Conjoint Analysis," International Journal of Innovation, Management and Technology, 2013, p. 544.

[179] Hirogaki, Mitsunori, "Estimating Consumers' Willingness to Pay for Health Food Claims: A Conjoint Analysis," International Journal of Innovation, Management and Technology, 2013, p. 544. See, e.g., Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," Journal of Law and Economics, 2014, p. 648.

137. Mr. Weir's proposed methodology is flawed and unreliable for the purposes of estimating an alleged price premium and alleged damages in this matter from an economic perspective. Mr. Weir's proposed methodology is economically unsound because Mr. Weir fails to analyze Plaintiff's allegations pertaining to Flowers Foods' alleged failure to include the %DV of protein in the nutrition facts panel of the at-issue products. Mr. Weir's proposal to assume supply is fixed as a means of quantifying the alleged price premium is economically unreliable and inconsistent with standard economic theory and research. Moreover, Mr. Weir offers no economically reliable analysis that would establish that a common alleged price premium exists, and his proposed methodology would assume, rather than test, that any alleged price premium is common across the putative class.

138. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this February 12, 2024, at Los Angeles, CA.



_____

Joao C. dos Santos

Exhibit 1

**Exhibit 1. CV of Joao C. dos Santos**

## JOAO DOS SANTOS, M.Sc.
### Senior Managing Director

### Disputes & Investigations; Economic & Statistical Analysis; Data Analytics



515 S. Flower Street, Suite 3500
Los Angeles, CA 90071

+1.213.670.3286 Direct
joao.dossantos@ankura.com

### EDUCATION
M. Sc., Applied Economics,
Rutgers University

B. S., Environmental and
Business Economics, Rutgers
University

G. H. Cook Scholar, G. H. Cook
Honors Program, Rutgers
University

### LANGUAGES
Portuguese

Spanish

### AFFILIATIONS
American Statistical Association

American Economic Association

National Association of Certified
Valuators and Analysts

Association of Certified Fraud
Examiners

American Bar Association

Big Brothers Big Sisters of LA

Constitutional Rights Foundation

Joao C. dos Santos is a Senior Managing Director in Ankura's Global Disputes and Economics practice with more than 25 years of experience in applying economic, financial, statistical and complex database methods to examine a variety of business issues, including dispute resolution, regulatory compliance, and strategic management. He has led over 100 engagements performing economic/financial analyses and valuations; developing statistical tests, sampling frameworks and econometric models; and conducting forensic data investigations.

Joao's experience in disputes and investigations includes: (i) evaluation of Rule 23 class certification requirements, (ii) assessment of materiality and loss causation, (iii) quantification of economic damages, and (iv) forensic investigations of alleged misrepresentations and misconduct. He has directed engagements involving a broad range of litigation and regulatory enforcement matters, including class actions, healthcare, complex commercial disputes, securities and white-collar fraud investigations. He has been qualified as an expert in economic damages, complex data analytics, and statistical methods. He has provided testimony in arbitration proceedings, state and federal courts, and has submitted expert reports to regulatory agencies.

Joao's experience in management consulting engagements includes the application of economic and finance theories and complex database analytics to issues ranging from demand and price analysis to customer relationship management and economic impact studies. He has led various large data analytics engagements to evaluate the potential impact of alternative business, taxation and regulatory scenarios in the U.S., Latin America and Asia.

**JOAO DOS SANTOS**

Experience Includes:

**Class Action Litigation** – Mr. dos Santos is experienced at applying various data-driven techniques such as statistical sampling, big data analytics, and econometric modeling to evaluate economic questions that can arise in class action matters, including the determination of common impact on a class-wide basis, proof of injury, analysis of intra-class conflict, and the feasibility of standard approaches to assess damages.

- *Consumer* – For an automotive company facing class action allegations of price premium related to selected car models, reviewed, analyzed and commented on the feasibility of plaintiffs' proposed analytical framework to quantify class wide economic damages.

- *Consumer* – For an electric utility involved in a consumer class action, evaluated Rule 23 class certification criteria, including representativeness of lead plaintiffs. Work included reconstruction and analysis of billing database spanning a period over 10 years and including more than a million consumer accounts.

- *Consumer* – For pharmaceutical company facing class action allegations of price premium related the alleged mislabel of one of its products, reviewed, analyzed and commented on the feasibility of plaintiffs' proposed economic methodology to quantify class wide economic damages.

- *Consumer* – For an insurance company facing a class action dispute associated with allegations of violation of the Telephone Consumer Protection Act, built and analyzed large relational database of call records and other consumer information to evaluate commonality, typicality and ascertainability. Deliverables included demonstratives and documentation to support settlement negotiation, including estimation of potential economic damages.

- *Product Liability* – For a fertility clinic involved in a class action dispute related to a failure in cryopreservation storage tanks, collected and analyzed data from various databases to assess class certification criteria and estimate potential economic damages.

- *Product Liability* – In a product liability class action dispute against a manufacturer of baby products, developed economic models to evaluate class certification issues and to develop damages scenarios. Work product included presentation used in settlement negotiation.

- *Securities* – For the insurance carrier of a publicly-traded broker-dealer facing a Section10(b) securities class action litigation related to insider trading allegations, estimated potential exposure, evaluated materiality and loss-causation, and performed econometric analysis of similar class action cases to estimate the likely dollar range of settlement.

- *Securities* – For a healthcare services provider involved in a derivative securities fraud claim, developed event studies and multi-trader models to evaluate materiality and loss-causation of alleged misconduct, as well as to calculate range of potential economic damages. Deliverables included expert report and presentation to support mediation and settlement discussions.

- *Property Value Diminution* – For an oil company involved in a class action dispute related to MBTE ground water contamination, developed econometric models to test and quantify the alleged property value diminution resulting from ground water contamination by an underground oil tank. Deliverables included presentation to support mediation discussions.

- *Toxic Tort* – In a class action dispute involving a chemical manufacturer, developed economic study to evaluate the claim of alleged property value diminution resulting from air emissions. Work involved the design of a geo-referenced database tool and hedonic regression model to evaluate the impact on housing value from contamination and perceived health risk.



2

**JOAO DOS SANTOS**

**Statistical Sampling and Econometric Analysis** – Mr. dos Santos has demonstrated experience in applying a broad range of statistical and econometric modeling methods to evaluate questions related to business strategy, compliance, and litigation. He has designed sampling plans and econometric models to create extrapolations and forecasts, as well as to test specific hypotheses. He has evaluated and provided independent opinions regarding the reliability of sampling plans and extrapolations.

- *Healthcare* – For various healthcare payers and providers, was retained as a statistical and data analytics expert to design sampling and extrapolation plans. Work included analysis of claims data, design and selection of statistical samples, review of claims, and extrapolation of results. Deliverables included drafting of expert reports and testimony.

- *Manufacturing* – For a computer hardware company involved in a product liability dispute, developed statistical sampling and extrapolation plan to examine failure rates of computer hard-drives. Work included complex data analysis of manufacturing and product distribution data.

- *Computer Products* – For a manufacturer of printers and printer supplies involved in an intellectual property dispute, developed econometric models to examine product demand and price in the context of allegations of price erosion.

- *Construction* – For an international construction company involved on a major capital project in Latin America, designed statistical sampling plan and evaluated results as part of a contract compliance analysis and cost investigation.

- *Government Contracts* – In various disputes involving government contracts, developed statistical and data analysis to support cost audits and forensic reviews of allowances. Work included review of contracts, design of statistical sampling frameworks, statistical sample selection, analysis and extrapolation of results.

- *Book Publishing* – In breach of contract dispute between a book publisher and a distributor, designed statistical plan to evaluate rate of counterfeiting across various business channels and markets. Work including sample size calculation, sample selection, analysis and extrapolation of results.

- *Pharmaceuticals* – In an intellectual property dispute between two U.S. pharmaceutical companies, analyzed numerous large-scale sales databases and statistical surveys to render expert opinions in an arbitration involving market share determination as part of a joint-licensing agreement for a patented pharmaceutical drug.

- *Financial Services* – For a financial institution facing a challenging document production request, developed statistical sampling framework to evaluate effectiveness of document review process and to estimate error rates and related risk from managed document review process.

- *Financial Services* – For the officers of a company accused of perpetuating a scheme to defraud investors, conducted extensive analysis of Private Investments in Public Equities (PIPEs). Performed econometric analysis to measure the aspects of PIPE transactions that are material to investors, and their respective effects on subject company stock prices.

- *Event Ticket Resale* – For an event ticket resale company involved in a breach of contract dispute, analyzed large historical databases of transaction and customer "click" data to evaluate customer activity patterns. Work included design of statistical sampling and extrapolation plan to validate reliability of data sources and to assess alleged error rates for certain commission payments.



**Healthcare and Life Sciences** – Mr. dos Santos has led investigations related to Medicaid and Medicare false claims and fraud and abuse issues as well as issues related SEC reporting. He has also worked on a variety of complex disputes regarding contractual and claim adjudication issues. His work in this area often encompasses the application of complex data analytics, econometric modeling, and statistical sampling to evaluate questions related to reimbursement, pricing, eligibility, and cost reporting. Mr. dos Santos has also been retained by Life Sciences companies to assist with issues related to complex civil litigation and strategic management.

- *Breach of Contract and Misrepresentation* – For a group of skilled nursing facilities (SNF) facing allegations of improper staffing, examined class-certification criteria and ascertainability of economic damages. Work included statistical analysis of SNF resident data, assessment of opposing expert's proposed analytical framework for determination of common impact and quantification of economic damages.

- *Claims Adjudication* – In an arbitration proceeding between a payer and a provider of healthcare services, (i) conducted forensic review of claims data to examine consistency of adjudication process relative to contractual provisions; (ii) evaluated and responded to assertions of claimant's experts; and (iii) served as neutral statistical expert. Work included statistical sampling and extrapolation, complex database mining, development of claim pricing models.

- *Coverage and Cost-Sharing* – For a healthcare payer facing allegations of denied access to and coverage for services mandated by the ACA, performed data analyses of large relational database of claims to (i) independently examine the adequacy of in-network providers across markets and over time, (ii) evaluate class certification criteria, including assessment of potential need for individualized inquiry, and (iii) quantify potential economic exposure.

- *Unpaid Interest* – For a managed care organization facing allegations of failure to pay interest on Medicaid claims, was retained to evaluate class-certification criteria and assess economic damages. Work included data analyses of structured claims data and documentation to determine whether a systematic approach can be applied to identify class and to calculated alleged owed interest. Deliverables included expert report and testimony.

- *Medicare False Claims* – In a qui tam healthcare fraud investigation, led statistical modeling and complex data analytics initiative to estimate contested fiscal intermediary adjustments and to evaluate DRG upcoding claims. Work included the construction and analysis of large cross-sectional database, specification of regression models, statistical tests and extrapolations.

- *Pharmaceutical Drug Financing* – For a pharmaceutical company involved in a breach of contract dispute regarding the financing of research and development for some pharmaceutical compounds, conducted forensic review, financial modeling, and statistical analyses to evaluate claims of liability and loss-causation, as well as to quantify lost profits. Work product included the analysis of financing terms and financial projections, Monte Carlo simulation of but-for business scenarios and quantification of economic damages.

- *Market Power and Pricing* – As part of a proposed merger, developed economic models to evaluate the potential anticompetitive impact from the transaction. Work included the analysis of market share and market power across different geographic regions and the review of potential price-fixing. Combined geo-referenced mapping software information with provider and patient data to calculate distances to relevant physician locations and test whether certain federal provisions were being met.



**Complex Commercial Litigation** – Mr. dos Santos is experienced at applying complex database analytics, economic, financial and statistical methodologies to evaluate questions related to materiality, loss causation, economic damages and lost profits, in association with a broad range of allegations including breach of contract, misrepresentations and misconduct, competition and intellectual property.

- *Breach of Contract and Competition* – For a beverage company facing charges of breach of contract and anticompetitive behavior, performed analysis of contracts, historical sales, and market conditions. Work included querying of complex databases, economic analyses of demand and price, and quantification of economic damages. Work product included expert report, deposition and trial testimony.

- *Breach of Contract* – For an online university involved in a breach of contract dispute, was retained as the testifying expert to render opinion related to loss causation and lost profits. Work involved forensic database review of transactions and contracts, financial and econometric modeling of the relationship between advertising spend and revenues.

- *International Arbitration* – In post-acquisition dispute involving allegations of misrepresentations and misconduct, directed forensic investigation of transactional, financial, customer relationship, and communication records to evaluate claims of improper revenue recognition, fraud, and FCPA violations. Work included complex data analytics, interviews, electronic document review, and estimation of purchase price adjustment.

- *Financial Fraud* – On behalf of the Department of Justice, conducted complex data analytics of large transactional databases designed to evaluate a target company's daily exposure to particular interest/exchange rate measures (LIBOR/FOREX). Deliverables included calculations of gains or losses resulting from alleged manipulation of specific interest/exchange rates and identification of domestic counterparties.

- *Misconduct and Negligence* – For a minority owner of an oil well in the Gulf of Mexico, quantified exposure to economic damages claims as well as fines and penalties resulting from an explosion at the well and subsequent oil spill. Deliverables included exposure analysis and assistance in arriving at a settlement that resulted in our client's indemnification from future claims stemming from the spill.

- *Bankruptcy* – On behalf of the bankruptcy trustee of a petroleum distributor, directed reconstruction and analysis of historical transactional database of derivative trades to evaluate allegations of management misconduct. Work included financial analysis of futures trading portfolio to examine the relationship between physical stock, trading positions, and prices.

- *Antitrust* – In a dispute involving the sale and distribution of luxury watches, developed econometric models and performed financial analyses to evaluate loss causation and to quantify lost profits related to price discrimination claims under the Robinson-Patman Act. Work included the estimation of elasticities of selected advertising marketing programs, market share analysis, and determination of relevant geographic and product markets.

- *Trade Secrets* – For a hedge fund manager involved in a trade secrets claim, performed complex data analysis and forensic investigation to evaluate claim of misappropriation of proprietary trading algorithms.



**Securities Litigation, Regulatory Enforcement, and White-Collar Fraud** – Mr. dos Santos has extensive experience in conducting econometric, statistical and financial analyses (e.g., event studies, market efficiency tests, trader models, market impact analyses, option pricing, financial modeling, stochastic simulations, and valuations) to examine materiality and loss causation of selected events, and to evaluate economic damages. Furthermore, he is experienced in analyzing trading databases to test patterns and allegations related to insider trading, market manipulation, and trade allocation.

- *Technology* – On behalf of the former general counsel for a software company facing civil and criminal securities-related charges, evaluated the materiality of alleged misrepresentations. Analyses included event studies of stock price reactions to announcements of cash- and non-cash-related surprises and examination of the amount of analyst coverage dedicated to selected topics. Results included complete exoneration of both civil and criminal charges for the defendant.

- *Alternative Investments* – For a large hedge fund involved in a joint investigation by the SEC, NFA and CFTC, conducted database, financial and statistical analyses of historical trading activities and patterns. Work included (i) independent review and forensic testing of historical trading databases for various asset classes; (ii) calculation and comparison of trading costs and execution performance metrics against market benchmarks; and (iii) assessment of reasonableness of selected fund expenses and commissions.

- *Financial Services* – On behalf of the Department of Justice, reconstructed a brokerage's order and trading databases to analyze claims that investors were defrauded by improper trade mark ups and insider trading. Work included identification of improper trade mark ups and falsified records. Deliverables included reports matching transcripts of electronic chats and phone calls with the corresponding order and trading activity to tie conversations to trading losses.

- *Financial Services* – For a financial institution serving as a bond trustee involved in a SEC investigation, reviewed opposing expert's calculations and opinions set forth to object a receiver's motion for approval of settlement amounts. Work involved development of Monte Carlo simulation models to estimate range of economic losses.

- *Financial Services* – For an investment firm involved in a FINRA investigation, conducted forensic review of selected trades and developed financial models to evaluate market impact and transaction costs associated with large volume trade orders. Work included preparation of presentation to support FINRA arbitration and settlement discussions.

- *Financial Fraud* – On behalf of the Department of Justice, conducted complex data analytics of large transactional databases designed to evaluate a target company's daily exposure to particular interest/exchange rate measures (LIBOR/FOREX). Deliverables included calculations of gains or losses resulting from alleged manipulation of specific interest/exchange rates and identification of domestic counterparties.

- *Pharmaceuticals* – In a bankruptcy matter involving a pharmaceutical company, examined the efficiency of the market for a lightly-traded stock and approximated the value of FDA approval. Analyses included event studies to isolate and quantify the effect of particular disclosures, correlation and regression analyses to examine market efficiency, and trader models to estimate the number of shares affected by alleged misrepresentations.



**Labor and Employment** – In labor and employment disputes, Mr. dos Santos is experienced at applying economic and finance methods, big analytics, statistical sampling and hypothesis tests to evaluate the merits of employee claims and to examine certification criteria of purported class members. He has analyzed drivers of promotion, wages, or employment, and quantified economic damages in both single plaintiff and class action matters.

- *Retaliation and Wrongful Termination* – As part of a post-acquisition dispute, evaluated allegations of wrongful termination associated with the suspension and dismissal of the managing director of the acquired firm. Work included analysis of employment and salary history, quantification of potential economic damages, and evaluation of plaintiff's expert opinions.

- *Wrongful Termination and Discrimination* – In a single-plaintiff dispute regarding alleged racial discrimination and wrongful termination, conducted forensic, financial and statistical analyses to evaluate drivers of promotion and wages; and estimated economic damages.

- *Breach of Contract and Wrongful Termination* – For a defense contractor involved in a breach of contract and wrongful termination dispute, conducted forensic review of communications, HR and payroll records, and financial statements to evaluate questions regarding drivers of promotion and wages and to assess alleged economic damages.

- *Meal and Break Violation* – For a construction firm facing claims related to unpaid wages, developed complex relational database of time-keeping, payroll, and geo-referenced employee data. Designed database algorithms and statistical analyses to evaluate class certification criteria and to estimate potential economic damages.

- *Misclassification* – For a retailer involved in a labor and employment class action dispute, developed stratified statistical sampling and extrapolation methodology to sample exempt employees; and designed time and motion study to evaluate types of tasks performed by distinct groups of employees and their required time to completion.

- *Gender Discrimination* – In a labor and employment class action dispute involving a temporary employment agency, performed statistical and database analyses to evaluate alleged wage disparity claim. Work included the development of statistical and database models and drafting of expert report.

- *RIF Analysis* – For a national security laboratory, performed an adverse impact analysis on gender, race and age in connection with a scheduled reduction in force (RIF). Work included review of statistical analysis conducted by an EEOC expert.

- *Regulatory Compliance Study* – For a healthcare agency, developed a time and motion study to evaluate the allocation and classification of time of personnel across various operational processes and healthcare programs. Work included the design of an automated database tool to collect and summarize findings. Deliverables included statistical extrapolation of results, drafting of reports and presentation of results.



**Music, Sports & Entertainment –** Mr. dos Santos has directed various strategic management and privileged consulting engagements involving the music, sports and entertaining industries, including economic impact analyses, contract compliance reviews, valuations, litigation support, and forensic investigations.

- *Royalty Dispute* – For a class action dispute between a music streaming service and song publishers and writers, conducted economic analyses, financial modeling and valuations to quantify unpaid mechanical royalties.

- *Contract Compliance Reviews* – For various music, sports, and entertainment companies, led contract compliance audits and assessments of potential licensing fees dues. Work included review of contractual terms and analysis of various allocation methodologies used over time under various contracts.

- *Breach of Contract* – In a breach of contract dispute regarding the production of a portfolio of film productions, conducted statistical and financial analyses to evaluate the merit of allegations regarding expected financial performance and economic losses.

- *IP Dispute* – For a major entertainment company involved in a trademark ownership rights dispute, conducted complex data analytics and financial analyses of sales and distribution data related merchandising, DVDs, movies and other related materials to assess potential economic exposure.

- *IP Piracy* – For an entertainment company, directed economic study to quantify the financial impact from the purchase of pirated hard copies and illegal downloads of filmed entertainment product. Deliverables included the development of econometric and financial models to estimate lost revenues along various stages of the value chain.

- *Labor & Employment* – For an executive of a major music company contemplating the renewal of a five-year contract, provided valuations related to the stock-based portion of the compensation package. Work product supported negotiation of a multi-million dollar buyout of selected incentive payments.

- *Sales Forecasting* – For a large entertainment company, headed project to forecast sales return reserve levels of returned products. Work included review of reserve allocation models, distribution channel operations, and the development of statistical models to forecast returns.

- *Securities* – For a gaming industry company facing claims asserted under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, conducted financial analysis and modeling of traceable IPO shares to evaluate loss-causation and to estimate potential economic damages.



**Strategic Consulting, Economic and Financial Studies**

- *Regional Economic Impact Study* – For a large U.S. parks and resorts company, conducted economic impact analyses to estimate the potential incremental economic, fiscal, and qualitative social impacts of a proposed expansion of its theme parks in the U.S. and China. Work included the development of input-output macro-economic models to quantify the direct, indirect, and induced economic impacts on selected economic areas resulting from potential investment scenarios. Deliverables included drafting of report and presentation to C-suite officers.

- *Economic Impact Analysis of State and Local Taxation* – For a healthcare company, studied the economic impact and financial risk exposure related to a potential change in state and local tax classification. Work included review of applicable tax rates, development of economic forecasts and simulations.

- *Economic Study and Policy Analysis* – For the U.S. Chamber Institute for Legal Reform, conducted empirical research on the gains and losses that are implied when investors sell or buy securities at what are purported to be artificially inflated prices because of alleged fraud. Work included the development of econometric models and statistical tests, as well as drafting of a white paper.

- *Demand/Price Analysis and Lifecycle Management* – For various U.S. pharmaceutical companies, directed empirical studies to render strategic recommendations on product pricing, marketing and lifecycle management. Work included supervision of primary market research, econometric modeling and financial simulations of product price and market share evolution, review of net present value of alternative strategic options.

- *Strategic Marketing and Customer Relationship Management* – For a major Hong Kong conglomerate, analyzed marketing and operational synergies across subsidiaries and developed recommendations for joint marketing campaigns. Developed statistical and neural-network models to identify marketing opportunities and simulate alternative business scenarios. Developed market research methodology, survey questions, and analyzed survey results. Assessed IT requirements and developed roadmap for group-wide data mining strategy.

- *Mergers and Acquisitions* – For a Native American tribe, performed valuations and created scenario analysis to examine the tax benefits stemming from the potential repurchase of a mine. Work product included discounted cash flow analysis and consultation through due diligence and price negotiations and resulted in a purchase at a favorable price.

- *Database Application Design* – For the Center of Medicare and Medicaid Services (CMS), developed operational strategy to streamline the HCPCS application process. Deliverables included recommendations for process improvements and the development of an automated web-application for processing, managing and improving communication between various stakeholders.

- *Market Share Analysis and Operational Improvement* – For a South American division of leading U.S. snack manufacturer, studied portfolio rationalization opportunities and quantified gains from increased distribution of core SKUs. Conducted market-share analysis and forecasting. Headed task force meetings to assess key operational requirements. Identified opportunities for re-structuring and outsourcing.



**JOAO DOS SANTOS**

**Presentations and Workshops**

- *"Virtual Trials, Depositions and Hearings in the Insurance Coverage Arena and Beyond,"* presented at ABA's Virtual Insurance Coverage Litigation Committee CLE Seminar, March 2021.

- *"Claims Session: The Claims Settlement Process,"* presented at Advisen's Transaction Insurance Insights Conference, NY Law School, NY, NY, February 2019.

- *"Ten Tips to Develop your Expert Witness Expertise,"* presented at ABA's Corporate Counsel Seminar, La Quinta, CA, February 2018.

- *"Fraud and Forensics Panel,"* presented at University of California Irvine's in UCI's Master of Public Accounting Professional Development Seminar, Irvine, CA, November 2017.

- *"Comparison of Labor Executive Orders Between Trump and Obama Administrations,"* presented at the WOOPS 2017 – Strategizing for Dealing with the Government Under the New Administration Conference, Marina Del Rey, CA, September 2017.

- *"Forensic Accounting in Compliance,"* presented at ACA's Annual Compliance Conference, Scottsdale, AZ, September 2011.

- *"Analysis of the Wealth Effects of Shareholder Proposals,"* presented at the Center for Capital Markets' meeting on Shareholder Rights, the 2008 Proxy Season, and the Impact of Shareholder Activism, U.S. Chamber of Commerce, Washington, DC, July 2008.

- *"Class Action Securities Litigation: Review of Recent Developments, Calculation of Damages, and Settlement Estimation,"* presented at the Gallagher Management Liability Niche Annual Conference, Chicago, IL, December 2006.

- *"A Guide to Managing and Analyzing Complex Data Sets,"* presented at the Fraud Section meeting of the California Society of Certified Public Accounts, San Francisco, CA, October 2005.

**Publications and Papers**

- dos Santos. *"Assessing the Impact of the COVID-19 Pandemic on the Reps and Warranties Market,"* Ankura's Perspectives News Letters, April 2020.

- dos Santos and Vranca. *"Blockchain Technology: Emerging Trends in Litigation and Regulatory Enforcement,"* ABA Section of Litigation Expert Witness E-Newsletter, May 2018.

- dos Santos. *"Dial up Analytics: Using Forensic Techniques to Evaluate Class Certification in TPCA Class Actions,"* Forensic Focus, June 2015.

- dos Santos, et al. *"Quantitative Risk Analysis Adds Certainty to the Uncertain Litigation Environment,"* RKCO Advisor, May 2013.

- dos Santos and Song. *"Analysis of the Wealth Effects of Shareholder Proposals – Volumes I & II,"* White Paper, Commissioned by the U.S. Chamber of Commerce, June 2009.

- dos Santos, Joao. *"Managing Urbanization in the Southern Coastal Plain Region of New Jersey: Integrating Landscape Ecology and Economics,"* Master's Thesis, Rutgers University, New Brunswick, NJ, October 1998.



**JOAO DOS SANTOS**

**Recent Expert Testimony, Declarations and Affidavits**

- <u>Antonio Mckinney, et al v. Corsair Gaming, Inc</u>. United States District Court Northern District of California. Case No. 3:22-cv-00312-CRB

- <u>Gulf to Bay Anesthesiology Associates, LLC v. United Healthcare of Florida, Inc., United Healthcare Insurance Co., and UMR, Inc.</u> Circuit Court for the 13th Judicial Court in and for Hillsborough Country, Florida.  Case No. 20-CA-008606

- <u>Lenny & Larry's, LLC v. A&B Ingredients, Inc.</u> Superior Court of the State of California County of Los Angeles. Case No. 19STCV37687

- <u>Judicial Council Coordinated Proceedings: In Re Rechnitz Nursing Facilities</u>. Superior Court of the State of California County of Los Angeles. Case No. JCCP4988 [Lead Case No. BC711982]

- <u>Health Services Network Hospitals, Inc. v. Humana Insurance Company and Humana Health Plan, Inc., Humana Government Business, Inc.</u> American Health Law Association Alternative Dispute Resolution. Case No. AHLA Case No. 7030

- <u>Frederick Scott Levine, et al v. Volvo Cars USA, LLC</u>. In the United States Court for the District of New Jersey. Case No. 2:18-CV-03760

- <u>Paseo Condominiums Fort Myers, Florida and Paseo Condominium Association, Inc</u>. v. Stock Development LLC, et al. Lee County, Florida - Twentieth Circuit Court. Case No. 2018-CA-4742

- <u>Sutter Health, et al v. Health Plan of San Joaquin</u>. JAMS Arbitration. Case No. 1130009155

- <u>Thomas Ellsworth v. American Greetings Corporation</u>, In the Court of Common Pleas Civil Division Cuyahoga County, Ohio. Case No. 19-923088

- <u>Florida Emergency Physicians Kang & Associates, M.D., Inc. et al v. Celtic Insurance Company, D/B/A Ambetter from Sunshine Health</u>. In the Circuit Court for The Seventeenth Judicial Circuit in and for Broward County, Florida. Case No. CACE 19013026 (07)

- <u>Gulf to Bay Anesthesiology Associates, LLC v. United Healthcare of Florida, Inc. and United Healthcare Insurance Co.</u>, Circuit Court for the 13th Judicial Court in and for Hillsborough Country, Florida.  Case 8:18-cv-00233-EAK-AAS

- <u>Adventist Health System / Sunbelt Inc. v. Humana Medical Plan, Inc., et al. American Arbitration Association</u>. Case No. 01-19-0002-6864

- <u>County of Nassau and County of Suffolk v. Purdue Pharma L.P., et al. Supreme Court of the State of New York County of Suffolk</u>. Index Nos. 400008/2017 (Nassau), 400001/2017 (Suffolk)

- <u>The Ministry of Education, et al v. Carter Holt Harvey Ltd., et al</u>. In the High Court of New Zealand, Auckland Registry. CIV-2013-404-1899

- <u>Baptist Hospital of Miami, Inc., et al v. Medica Healthcare Plans, Inc</u>. Miami-Dade County Circuit Court, Florida. Case No. 1:18-CV-25460-RS

- <u>Shaghal, Ltd. V. Children's Network, LLC dba Sprout</u>, JAMS Arbitration. Case No. 1210035113

- <u>iTi, Inc. v. ZICO beverages, LLC</u>, American Arbitration Association. Case No. 07-17-0007-5839

Exhibit 2

**Documents Relied Upon**

**Expert Declarations, Exhibits, and Backup Documents**
Declaration of Colin B. Weir, November 17, 2023

**Published Works**

Allen, Mark A., Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," Reference Manual on Scientific Evidence, 3rd Edition, 2011

Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," Journal of Law and Economics, 2014

Allenby, Greg, Jeff Brazell, John Howell, and Peter Rossi, "Using Conjoint Analysis to Determine the Market Value of Product Features," Proceedings of the Sawtooth Software Conference, 2013

Arcidiacono, Peter, Paul B. Ellickson, Carl F. Mela, and John D. Singleton, "The Competitive Effects of Entry: Evidence from Supercenter Expansion," American Economic Journal: Applied Economics, 2020

Baye, Michael R., John Morgan, and Patrick Scholten, "Information, Search, and Price Dispersion," Forthcoming in Handbook on Economics and Information Systems, 2006

Berndt, Ernst R. and Neal J. Rappaport, "Price and Quality of Desktop and Mobile Personal Computers: A Quarter-Century Historical Overview," The American Economic Review, 2001

Cameron, Lisa, Daniel McFadden, and Pablo Robles, "Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations," International Comparative Legal Guides, Product Liability 2022, 20th Edition, 2022

Carlton, Dennis W. and Jeffrey M. Perloff, "Modern Industrial Organization," Pearson Addison Wesley, 4th Edition, 2005

Chang, Jae Bong, Jayson L. Lusk, and F. Bailey Norwood, "The Price of Happy Hens: A Hedonic Analysis of Retail Egg Prices," Journal of Agricultural and Resource Economics, 2010

Chwelos, P.D., E.R. Berndt, and I.M. Cockburn, "Faster, Smaller, Cheaper: An Hedonic Price Analysis of PDAs," Applied Economics, 2008

Gorodnichenko, Yuriy, Viacheslav Sheremirov, and Oleksandr Talavera, "Price Setting in Online Markets: Does IT Click?," Journal of the European Economic Association, 2018

Hiller, R. Scott, Scott J. Savage, and Donald M. Waldman, "Using aggregate market data to estimate patent value: An application to United States smartphones 2010 to 2015," International Journal of Industrial Organization, 2018

Hirogaki, Mitsunori, "Estimating Consumers' Willingness to Pay for Health Food Claims: A Conjoint Analysis," International Journal of Innovation, Management and Technology, 2013

Howell, John R., Greg M. Allenby, and Peter E. Rossi, "Feature Valuation Using Equilibrium Conjoint Analysis," Handbook of Marketing Analytics, Edward Elgar Publishing, 2018

Kiesel, Kristin and Sofia B. Villas-Boas, "Can information costs affect consumer choice? Nutritional labels in a supermarket experiment," International Journal of Industrial Organization, 2013

Weil, Roman L., Daniel G. Lentz, and Elizabeth A. Evans, "Litigation Services Handbook: The Role of the Financial Expert," 6th Edition, 2017

Mankiw, N. Gregory, "Principles of Microeconomics," Cengage Learning, 7th Edition, 2013

Ollberding, Nicholas Jay, Randi L. Wolf, and Isobel Contento, "Food Label Use and Its Relation to Dietary Intake among US Adults," Journal of the American Dietic Association, 2010

Orme, Bryan K. and Keith Chrzan, "Becoming an Expert in Conjoint Analysis," Sawtooth Software, 2nd Edition, 2021

Orme, Bryan K., "Getting Started with Conjoint Analysis," Research Publishers LLC, 4th Edition, 2020

Pindyck, Robert S. and Daniel L. Rubinfeld, "Microeconomics," Pearson, 8th Edition, 2013

Reference Manual on Scientific Evidence, 3rd edition, 2011

Rosen, Sherwin, "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition," The Journal of Political Economy, 1974

Stanley, Linda R. and John Tschirhart, "Hedonic Prices for a Nondurable Good: The Case of Breakfast Cereals," The Review of Economics and Statistics, 1991

Tomlin, Jonathan and Robert Zeithammer, "Insight: Product Labeling Class Actions – Identifying the 'Con' in Conjoint Surveys," Bloomberg Law, 2018

Watson, Iain, Steve Wood, and John Fernie, "'Passivity': A Model of Grocery Retail Price Decision-Making Practice," European Journal of Marketing, 2015

Wood, Steve, Iain Watson, and Christoph Teller, "Pricing in online fashion retailing: implications for research and practice," Journal of Marketing Management, 2021

Wooldridge, Jeffrey M., "Introductory Econometrics A Modern Approach," 5th Edition, Cengage Learning, 2012

**Deposition Transcripts**

Deposition of Colin B. Weir, January 23, 2024
Deposition of Dan Letchinger, November 10, 2023

**Legal Documents**

Declaration of David Swartz in Support of Plaintiff's Motion for Class Certification, November 17, 2023

Defendants Flowers Foods, Inc. and Dave's Killer Bread, Inc.'s Third Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories

First Amended Class Action Complaint, June 17, 2022

**Internet Sources**

https://www.daveskillerbread.com/about-us
https://flowersfoods.com/about-flowers/
https://www.wholefoodsmarket.com/stores (accessed January 31, 2024)
https://www.bls.gov/cpi/quality-adjustment/hedonic-price-adjustment-techniques.htm
https://flowersfoods.com/brands/
https://fred.stlouisfed.org/series/LALBA906PCPI
https://fred.stlouisfed.org/series/RIVE106PCPI
https://fred.stlouisfed.org/series/SANF806PCPI
https://www.daveskillerbread.com/faqs
https://www.daveskillerbread.com/locator
https://www.prnewswire.com/news-releases/flowers-foods-completes-acquisition-of-daves-killer-bread-300142109.html
https://www.wholefoodsmarket.com/ (accessed January 31, 2024)
https://sawtoothsoftware.com/help/lighthouse-studio/manual/understanding-willingness-to-pay.html

**Data**

Confidential - AEO - Gutride Safier DKB Oct23.xlsx