UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DAVID SWARTZ, as an individual, on behalf
of himself, the general public and those
similarly situated,

                                    Plaintiff,

v.

DAVE'S KILLER BREAD, INC. AND
FLOWERS FOODS, INC.,

                                    Defendants.

CASE NO.: 4:21-cv-10053-YGR

Reply Declaration

of

**COLIN B. WEIR**

March 22, 2024

REFERENCES MATERIALS DESIGNATED "CONFIDENTIAL" AND "HIGHLY

CONFIDENTIAL" UNDER PROTECTIVE ORDER

I, Colin B. Weir, declare as follows:

I am President at Economics and Technology, Inc. ("ETI"), 100 Franklin Street, 6th Floor, Boston, Massachusetts 02110.  ETI is a research and consulting firm specializing in economics, statistics, regulation and public policy.  I am the same Colin B. Weir that issued a declaration in this matter on November 17, 2023 ("Weir Declaration").

## I.  QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.  I hold a Masters of Business Administration, with honors, from the High Technology program at Northeastern University, Boston, Massachusetts.  I hold a Bachelor of Arts degree cum laude in Business Economics from The College of Wooster, Wooster, Ohio.  I have provided expert testimony before federal and state courts, the Federal Communications Commission, and state regulatory commissions, and have contributed research and analysis to numerous ETI publications and expert testimony at the state, federal, and international levels.  I have consulted on a variety of consumer and wholesale products cases, calculating damages relating to food products, health/beauty care products, automobiles, household appliances, herbal remedies, electronics, and computers.  My Statement of Qualifications, which outlines my professional experience, publications, and record of expert testimony during the last four years, is attached hereto as Exhibit 1.  This includes a list of all cases in which, during the previous four years, I have testified as an expert at trial or by deposition.

2.  I have participated in the design, execution and/or determination of the economic suitability of conjoint surveys, or have been found by the court to have expertise in conjoint analysis in numerous litigations.  These cases include, but are not limited to, *Hadley vs. Kellogg; Krommenhock v. Post; Fitzhenry-Russell v. Dr. Pepper; Jones v. Nutiva; Hunter v. Nature's Way; Banks v. Bigelow; Sanchez-Knutson v. Ford Motor Company; Belfiore v. Procter and*



*Gamble; Kurtz v. Kimberly Clark; In re Scotts EZ Seed Litigation; In re: ConAgra Foods; In re: Arris Cable Modem; Martinelli v. Johnson & Johnson; Hudock v. LG; Koenig v. Vizio; Banh v. American Honda; and Kaupelis v. Harbor Freight.*

3.    I received graduate level training in conjoint analysis as part of my MBA.  I take continuing education in advanced conjoint design, execution, and analysis through Sawtooth Software, a leading provider of conjoint analysis software.  In addition, I have more than 15 years of experience using conjoint analysis professionally.

## II.  ENGAGEMENT

4.    I provide this declaration in connection with the case filed by Plaintiff David Swartz ("Swartz" or "Plaintiff") on behalf of himself and all others similarly situated, in the above-captioned action against Defendants Dave's Killer Bread, Inc. and Flower Foods, Inc. (collectively, "Defendants").[1]  I make this declaration based upon my own personal knowledge and, if called as a witness in this action, I would be able to competently testify as to the facts and opinions set forth herein.

5.    I have been advised by Counsel for Plaintiff that Swartz and other class members purchased certain Dave's Killer Breads products[2]  that prominently displayed labels claiming that the Products contained a specific level of protein per serving (hereinafter, "Protein Claim" or "Claim").[3]  Plaintiff alleges that the Defendants' use of the Protein Claim is unlawful because Defendants did not calculate or provide the following additional information, as required by the Food and Drug Administration:

---

[1] First Amended Class Action Complaint, filed June 17, 2022, (the "Complaint").

[2] The products at issue include: Killer Breads: 21 Whole Grains and Seeds, Good Seed, Powerseed, 100% Whole Wheat, Righteous Rye,; Thin Sliced Bread: 21 Whole Grains and Seeds, Good Seed, Powerseed, 100% Whole Wheat, Sprouted Whole Grains; Breakfast Bagels: Epic Everything, Plain Awesome, Cinnamon Raison Remix, Boomin' Berry; Burger Buns: 21 Whole Grains and Seeds Burger Buns, Burger Buns Done Right; (Collectively, the "Products").

[3] *See,* Complaint, at paras 2, 22-25; Exhibit B.



(1) calculate the "corrected amount of protein per serving" based on the quality of the product's protein using the PDCAAS method; and

(2) provide a statement of that corrected amount of protein per serving in the NFP, expressed as %DV."[4]

6.    Plaintiff alleges that the Defendants' failure to comply with the parallel California and FDA requirements and their use of the Protein Claim on the Class Products resulted in members of the class, among other things, paying more for their Products than the actual value received at the time and point of purchase.[5]

7.    Among other things, I have been asked by Counsel for Plaintiff to review and respond to the February 11, 2024 Declaration of Ran Kivetz ("Kivetz Declaration") and the February 12, 2024 Declaration of Joao C. dos Santos ("dos Santos Declaration").

8.    ETI is being compensated at the rate of $850 per hour for my work on this case.  The opinions expressed in this declaration are my own, and my compensation is not dependent upon the substance of these opinions or the outcome of the litigation.

9.    The documents, data and other materials that I relied upon in forming my opinions are identified throughout my report, and in Exhibit 2, attached hereto.  In addition, I have relied upon my educational background and more than 20 years of experience.

### III.  DOS SANTOS AND KIVETZ DO NOT CHALLENGE CONJOINT METHODOLOGY

10.   In the sections below, I will address the specifics of the dos Santos and Kivetz Declarations.  But first, it is notable that dos Santos and Kivetz do not suggest that conjoint analysis is an invalid method -- nor could they.  Conjoint analysis is a time-tested, peer-

---

[4] Complaint, at para 24,

[5] Complaint, at para 25.



reviewed, well-accepted and widely used method. Conjoint analysis has a long history of use in

litigation to determine economic damages, as well as in academia and in industry.[6]  As one

textbook on conjoint describes:

> In short, conjoint analysis, as an overall methodology, is tested, used, and
> relied upon in academia and business.  It has been used in numerous and varied
> product and service segments.  Because widespread acceptance in the scientific

---

[6] *Applying Conjoint Analysis to Legal Disputes: A Case Study*, Wind, Yoram, *et al.*; *When "All Natural" May Not Be*, Analysis Group Forum (Winter 2013) http://www.analysisgroup.com/forums/winter-2013/when-all-natural-may-not-be/ (last accessed August 1, 2016); *see, e.g., Khoday v. Symantec Corp.*, 2014 WL 1281600, at *10 (D. Minn. March 13, 2014); *Sanchez-Knutson v. Ford Motor Company*, 310 F.R.D. 529, 538-39 (S.D. Fl. 2015); *In re: Lenovo Adware Litigation*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016); *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *5, *10-*14 (C.D. Cal. July 24, 2014); *Brown v. Hain Celestial Group, Inc.*, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014); *Microsoft v. Motorola, Inc.*, 904 F.Supp.2d 1109, 1119-20 (W.D. Wa. 2012); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015); *Dzielak v. Maytag*, 2017 WL 1034197, at *6 (D. NJ. March 17, 2017); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1022 & n.6 (N.D. Cal. 2013); *Fitzhenry-Russell v. Dr Pepper Snapple Group, Inc.*, 2018 WL 3126385 (N.D. Cal. June 26, 2018);  *In Re Arris Cable Modem Consumer Litig.*, 2018 WL 3820619, at *25-*31 (N.D. Cal. Aug. 10, 2018); *Hadley v. Kellogg Sales Co.*, 2018 WL 3954587, at *11-*16 (N.D. Cal. Aug. 17, 2018); *Martinelli v. Johnson & Johnson*, 2019 WL 1429653, at *3-4 (E.D. Cal. Mar. 29, 2019); *Krommenhock v. Post Foods, LLC*, 2020 U.S. Dist. LEXIS 40463 (N.D. Cal. Mar. 9, 2020); *Hudock v. LG Elecs. USA, Inc.*, 2020 U.S. Dist. LEXIS 54994 (D. Minn. Mar. 30, 2020); *Koenig v. Vizio, Inc.*, Los Angeles Superior Court Case No. BC702266 (L.A. Super. Ct. Aug. 24, 2020); *Banh v. American Honda Motor Co.*, Inc., 2020 WL 4390371 (C.D. Cal. July 28, 2020); *Kaupelis v. Harbor Freight Tools, Inc.*, 2020 WL 5901116 (C.D. Cal. Sep. 23, 2020); *McMorrow v. Mondelez*, 2021 WL 859137 (S.D. Cal. Mar. 8, 2021); *de Lacour v. Colgate-Palmolive Co.*, 2021 WL 1590208 (S.D.N.Y. Apr. 23, 2021); *Bailey v. Rite Aid Corp.*, 2021 WL 1668003 (N.D. Cal. Apr. 28, 2021) ; *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 563-567 (2020); *Hudock v. LG Elecs. USA, Inc.*, Civil No. 16-1220 (JRT/KMM), 2020 WL 1515233, at *15 (D. Minn. Mar. 30, 2020); *Banh v. American Honda Motor Co.*, Inc., Case No. 2:19-cv-05984-RGK-AS, 2020 WL 4390371, at *17-*19 (C.D. Cal. Jul. 28, 2020); *Koenig v. Vizio, Inc.*, Case No. BC702266 (Cal. Super. Ct. Cnty. L.A. Aug. 24, 2020); *Kaupelis v. Harbor Freight Tools, Inc.*, Case No. 19-1203-JVS (DFMx), 2020 WL 5901116, at *5-*6 (C.D. Cal. Sep. 23, 2020); *McMorrow v. Mondelez Int'l Inc.*, Case No. 17-cv-2327-BAS-JLB, 2021 WL 859137, at *3-*7 (S.D. Cal. Mar. 8, 2021); *Prescod v. Celsius Holdings, Inc.*, Case No. 19STCV09321 (Cal. Super. Ct. Cnty. L.A. Aug. 2, 2021); *Cardenas v. Toyota Motor Corp.*, Case No.: 18-cv-22798, 2021 U.S. Dist. LEXIS 152920, at *21-*23, *52-*65 (S.D. Fla. Aug. 12, 2021); *Bechtel v. Fitness Equipment Svcs., LLC*, No. 1:19-CV-726, 2021 WL 4147766, at *2, *16-*17 (S.D. Ohio Sep. 12, 2021); *Milan v. Clif Bar & Co.*, Case No. 18-cv-02354-JD, 2021 WL 4427427, at *6-*7 (N.D. Cal. Sep. 27, 2021); *Testone v. Barlean's Organic Oils*, Case No. 19-cv-169-JLS (BGS), 2021 WL 4438391, at *5-*6, *15-*17 (S.D. Cal. Sep. 28, 2021); *Johnson v. Nissan N. Am., Inc.*, 2022 WL 2869528, at *5 (N.D. Cal. July 21, 2022); *Sonneveldt v. Mazda Motor of Am., Inc.*, No. 8:19-cv-01298-JLS-KES, 2022 U.S. Dist. LEXIS 219297, at *57 (C.D. Cal. Oct. 21, 2022); *Willis v. Colgate Palmolive Co.*, No. CV 19-8542 JGB (RAOx) (C.D. Cal Jan. 5, 2023), ECF No. 105; *Chapman v. General Motors*, Case No. 2:19-CV-12333-TGB-DRG, 2023 WL 2745161 (E.D. Mich. Mar. 31, 2023); *Gunaratna v. Dennis Gross Cosmetology LLC*, Case No. CV 20-2311-MWF (GJSx), 2023 WL 2628620 (C.D. Cal. Mar. 15, 2023); *Banks v. R.C. Bigalow, Inc.*, No. 20-CV-06208 DDP (RAOx) 2023 U.S. Dist. LEXIS 135167, at *22-23 (C.D. Cal. Jul. 31, 2023) ; *Bush v. Rust-Oleum Corp.*, Case No. 3:20-cv-03268-LB (N.D. Cal. Feb. 5, 2024),  ECF No. 189, Amended Order Granting Motion for Class Certification.



ECONOMICS AND TECHNOLOGY, INC.

community is an important factor in determining the admissibility of expert evidence, this makes conjoint analysis -- again, as an overall methodology -- appealing for litigators who wish to avoid untested methods with limited applicability.[7]

11.  In the Weir Declaration, I set forth a method of calculating price premium damages in this case, including the use of a conjoint survey, the processing of the conjoint results through hierarchical Bayes regression modeling, and the use of a randomized first choice market simulation.

12.  Dos Santos takes no issue with these methods, and notes that they are well established:

> Q.     Okay.  You are not challenging Mr. Weir's selection of hierarchical Bayes to calculate partworths in the conjoint survey.
>
> A.     A conjoint survey, a Bayesian hierarchical regression analysis, simulation analysis, those are all analytical tools that have been well established in academia and research, so I don't have an issue with the tools themselves.
>
> Q.     All right.  Back to Mr. Weir's model, are you challenging Mr. Weir's use of the Randomized First Choice model in his proposed design?
>
> A.     No, I'm not challenging the specific -- again, the application of a tool or general method.  You know, there are a number of aspects of what -- of the overall approach or steps or approaches that Mr. Weir took that, you know, are based or rely on tools that are generally accepted in the industry for economic analyses.[8]

Neither does Kivetz:

> Q.     Sir, are you challenging Mr. Weir's selection of hierarchical Bayes regression to calculate the partworths in the choice-based conjoint?

---

[7] Handbook of Marketing Analytics, Natalie Mizik, Dominique Hanssens (2018) at 573.

[8] Deposition of Joao C. dos Santos, March 15, 2024 ("dos Santos Deposition"), at 71-72, 77-78.



A.    The choice-based conjoint is a -- is a tool, a statistical tool.  You're asking people to make choices and then looking at the choices and trying to get utilities or partworths.  The way these partworths are calculated in the choice-based conjoint is a tool.  Nowadays it's typically hierarchical Bayes.

Q.    Are you challenging Mr. Weir's selection of Sawtooth software to conduct the market simulation?

A.    No, I'm not criticizing his choice of Sawtooth.

Q.    Are you challenging Mr. Weir's use of a randomized first choice model?

A.    No.  As I explained in my report that's just a way to add -- to do a statistical calculation.  That's not the issue here.[9]

13.    Dos Santos has conducted team projects that involved using conjoint, including using conjoint to analyze the marginal impact of a single product attribute on a product.[10]  He acknowledges that conjoint analysis is the subject of academic research, and that there is significant overlap between conjoint analysis and economic analysis in general.[11]  He agrees that businesses use conjoint because it's an accepted methodology, and that pricing decisions would be one use of conjoint by businesses.[12]

14.    Kivetz holds himself out as an expert in conjoint survey research, and teaches conjoint to his MBA and Ph.D students.[13]  He uses Sawtooth software, the same software that I propose to use in this case.[14]

---

[9] Deposition of Ran Kivetz, March 13, 2024 ("Kivetz Deposition"), at 184-185.

[10] Dos Santos Deposition, at 75-76.

[11] *Id.*, at 79.

[12] *Id.*, at 81-83.

[13] Kivetz Deposition, at 29.

[14] *Id.*, at 32.



15.   Instead, dos Santos and Kivetz quibble about the implementation of conjoint methodology.  These criticisms are speculative at best, because neither of Defendants' experts has conducted any empirical work or testing as it relates to the proposed conjoint.  Both have failed to:

- Review the proposed conjoint with potential respondents;

- Interview respondents at all;

- Conduct a conjoint of any kind related to this case.[15]

## IV.  TESTING PLAINTIFF'S THEORY

16.   As background, this case centers on Defendants' use of a front-of-package Protein Claim, which Plaintiff claims is unlawful.  I have been informed that the use of such a claim is only allowed when additional information about the protein in the product is also contained in the Nutrition Facts Panel ("NFP") and that without that additional information, the Protein Claim should not have been made.[16]  I was asked to test the impact of the use versus non-use of the Protein Claim.

17.   Both dos Santos and Kivetz suggest that my damages method of testing the use versus non-use of the Protein Claim does not and cannot measure Plaintiff's theory of liability. They make this argument because they view Plaintiff's theory as being that Defendants could have "cured" their unlawful use of the Protein Claim by adding a compliant % Daily Value ("% DV") for protein to the NFP and in so doing, would not have needed to remove the Protein Claim.  In sum, they argue that I should have proposed to test the addition of the %DV, rather than the non-use of the Claim.

---

[15] *See, e.g.*, dos Santos Deposition, at 41-42; Kivetz Deposition, at 166.

[16] *See* Section II above.



18.  While both experts argue this point vociferously, they both acknowledge that there are two potential "cures" at issue in this case, including the non-use of the Claim.

19.  Dos Santos notes:

> This observation relates to my reading and understanding of the fact that there could be potentially two fixings for the alleged omission and the understanding that Mr. Weir addresses just one of those two possibilities….
>
> One, where you would be eliminating the product label from the front of the package, and another one that you just would include this percentage daily value metric to the NFP…[17]

20.  Kivetz also acknowledges both methods.

> As I said, there are two ways to cure the alleged unlawful conduct.  One way is by adding the percent daily value protein to the back, to the NFP…. And that cures the alleged technical regulatory violation.  There's another way which is by not adding percent daily value, but removing the protein statement on the front.[18]

21.  I offer no opinion as to which method is legally correct or preferable.  But given that Plaintiffs argue for the removal of the Claim, and that Defendants' experts agree that the removal of the claim is indeed one potential cure for the harmful conduct, it is certainly reasonable to test this theory.  There is certainly no "law of economics" that would suggest that the Defendants' preferred % DV test would be any better than Plaintiffs' preferred non-use of the Claim test.  In the Weir Declaration, I proposed to test the use versus non-use of the Claim because that is the theory of the case that Counsel for Plaintiff presented to me, and because it was my assignment to offer a method of testing that theory.

---

[17] Dos Santos Deposition, at 143, 145.

[18] Kivetz Deposition, at 66.



22.   When asked at deposition, I confirmed the nature of the test that I proposed, but noted it was also possible to test the addition of the % DV to the NFP as an alternative, using a similar conjoint model that would be adapted to those details, and the same general price premium/overpayment damages model.  Kivetz makes the bold (incorrect) statement that it is not possible to test the % DV in such a manner.  Kivetz is wrong.

23.   If I was asked to model the addition of the FDA-compliant % DV to the NFP, a conjoint study similar to what I have already proposed could be conducted, with the addition of making available to respondent the NFP, and varying the presence versus absence of the % DV.  I am 100% confident that displaying the NFP in a conjoint survey is technically possible, because I have worked with such a model before.  In the *Milan v. Clif* case which was certified in this district,[19] the conjoint survey used to measure price premium damages included a display of the NFP information.

24.   Despite his protestations that such an adjustment would be impossible, Kivetz ultimately admitted that he too is aware of the use of NFP in conjoint research.

> Q.      So Dr. Kivetz have you ever seen a conjoint that included a nutrition facts panel as part of a product profile?
>
> A.      I may have, yes.
>
> Q.      Do you remember a specific conjoint that you looked at that had a nutrition fact panel as part of the from product profile?
>
> A.      It was not part of a product profile, but there was an ability to click on somewhere on the profile and it would pop up, maybe in the Folgers case, the conjoint analysis there potentially.[20]

---

[19] *Milan v. Clif Bar & Co.*, Case No. 18-cv-02354-JD, 2021 WL 4427427, at *6-*7 (N.D. Cal. Sep. 27, 2021).

[20] Kivetz Deposition, at 119.



25.  At the risk of stating the obvious, if one can include the NFP in a conjoint, one can vary information on that label (such as the % DV).

26.  As such, whether the Court were to approve Plaintiff's non-use of the Claim theory or Defendants' preferred % DV theory, my proposed conjoint analysis can make the required price premium measurement, and my overall damages framework (which calls for applying the price premium to sales of the Product), would remain unchanged.

27.  Below, I respond to a number of other specific issues raised by dos Santos and Kivetz, and do so within the non-use of the Claim framework.  My responses would apply equally if one were to be testing the % DV theory.

## V.  RESPONSE TO DOS SANTOS AND KIVETZ

**My analysis appropriately controls for the supply side**

28.  Defendants' experts' economic criticism of the proposed conjoint can be distilled to one primary complaint.  They claim that I have failed to properly incorporate the supply-side into my analysis.  Dos Santos and Kivetz do acknowledge that I address the supply-side through the price range used in the survey that reflects the actual market prices that prevailed during the Class Period and the fact that the quantity used (or assumed) in the damages calculations reflects the actual quantity of products supplied during the Class Period (the number of units sold being fixed as a matter of history).  Both experts then go on to disparage this method and suggest -- in violation of the Reference Manual on Scientific Evidence[21] and the Supreme Court's decision in *Comcast v. Behrend*[22] -- that I should model a but-for world in which more than the harmful conduct can vary, including the very sales of the challenged Products.

---

[21] Federal Judicial Center, Reference Manual on Scientific Evidence at 432 (3d ed. 2011) ("Reference Manual on Scientific Evidence"), at 432.

[22] I have been advised by counsel that in *Comcast Corp. v. Behrend*, the United States Supreme Court quoted the Reference Manual on Scientific Evidence to explain that "[t]he first step in a damages study is the translation of the



29.   This disagreement about how the supply-side should be modeled in this litigation should not be confused for a failure to model the supply-side at all.  I will first reiterate the nature of the supply-side controls present in the Weir analyses, and then discuss the but-for world dispute.

30.   I worked carefully to ensure that this survey was appropriately designed to measure the true overpayment solely attributable to the Claim.

31.   I designed the conjoint survey based upon economic concepts, and sales and market data.  I also gave consideration as to how the ultimate results of this survey would be interpreted and applied.

32.   One of the most important elements of the survey design was the data on actual sales of the Products in the real-world marketplace during the relevant time period, i.e., IRI data and documentary evidence.  These real-world transactions occurred at prices that *already* reflect the supply-side factors then extant in the marketplace.  I relied upon these historical data in setting the prices used in his conjoint survey, and that are used in the but-for market simulation.  These market prices are reflective of the range of prices at which both the Products and competing products were available during the class period, and reflect both the use and the non-use of the Claim.

33.   While dos Santos argues that the price range is too broad for Dave's Killer Bread, he fails to recognize that the price range covers both Dave's and competitor products, including store brand products such as Whole Food's 365 brands.[23]  Dos Santos acknowledged that conjoint analyses can include the prices for competing products.[24]  And of course, as Kivetz readily

---

legal theory of the harmful event into an analysis of the economic impact of that event." 569 U.S. 27, 38 (2013) (quoting Reference Manual on Scientific Evidence at 432).

[23] Dos Santos actually notes that the available pricing data shows prices that go well below the price range I propose. While there are certainly breads that sell for such low prices, my price range was selected based upon products that were competitors to Dave's and based upon the results of interviews that I conducted that confirmed the range determined by looking at the outlier-adjusted sales data for competitors.

[24] Dos Santos Deposition, at 105.



concedes, store brands are often cheaper. "And 365, what I saw is typically -- it's a store brand by Whole Foods. It typically is cheaper, to the best of my recollection than, yes, than Dave's Killer Bread."[25]

34. I also noted the fact that variability in pricing at the retail level showed that retailers' pricing was responsive to changing market forces.

35. Another important supply-side factor is that, as I explain in the Weir Declaration, the market for the Products was an "ordinary" market, subject to competitive pressures that both Defendants and retailers identified as risks to their business. Neither dos Santos nor Kivetz challenge my conclusions as to the nature of the market.[26]

36. Many major retailers identify a willingness to adjust prices in response to changing economic conditions and consumer preferences.

37. Finally, I gave consideration to the fact that the supply of the Products to the class is fixed as a matter of history. In other words, the supply that is being modeled is that which already existed during the class period. There is no other sensible measure of the quantity supplied to the class than what the class actually purchased. In contrast, dos Santos and Kivetz would model the price premium using some unknown quantity (but where that quantity would be decidedly other than what class members purchased).[27] Figure 1 on the following page highlights the difference between the Weir analysis and dos Santos and Kivetz's perspectives on the matter.

---

[25] Kivetz Deposition, at 146.

[26] Dos Santos Deposition, at 78; Kivetz Deposition, at 186-187.

[27] Dos Santos Deposition, at 138; dos Santos Declaration, at Figures 1-2; Kivetz Deposition, at 188.



Figure 1.

**There is only one sensible but-for construction relevant to this case**

38.   The Reference Manual on Scientific Evidence explains that "[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*."[28]

39.   Indeed, when it comes to a but-for analysis, the economic instructions are quite clear: the but-for world is the same as the real world in **every respect but one**: Defendants'

---

[28] Reference Manual on Scientific Evidence at 432 [emphasis supplied].

ECONOMICS AND TECHNOLOGY, INC.

allegedly wrongful conduct.  This premise is spelled out in the Reference Manual on Scientific

Evidence.

> The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event. In most cases, the analysis considers the difference between the Plaintiffs' economic position if the harmful event had not occurred and the Plaintiffs' actual economic position.
>
> In almost all cases, the damages expert proceeds on the hypothesis that the defendant committed the harmful act and that the act was unlawful. [] The characterization of the harmful event begins with a clear statement of what occurred. The characterization also will include a description of the defendant's proper actions in place of its unlawful actions and a statement about the economic situation absent the wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for scenario).  Damages measurement then determines the Plaintiffs' hypothetical value in the but-for scenario. Economic damages are the difference between that value and the actual value that the plaintiff achieved.
>
> **<u>Because the but-for scenario differs from what actually happened only with respect to the harmful act</u>**, damages measured in this way isolate the loss of value caused by the harmful act and exclude any change in the Plaintiffs' value arising from other sources.[29]

40.  The Reference Manual makes the steps clear:

- Identify the harmful event;

- Assume that Defendants are liable for the harm;

- Generate a clear statement of what occurred and what should have occurred;

- Analyze a but-for scenario to determine the economic damages; and

  - The but-for world differs from what actually happened only with respect to the harmful act.

---

[29] Reference Manual on Scientific Evidence, at 432. [Emphasis supplied]



41. In the Weir Declaration, I set forth details of each of these steps.[30] I noted that Defendants labeled its Products with the Claim (the harmful event). I assumed for purposes of my research that Plaintiffs would prevail on the merits (assume Defendants are liable). I noted the specific details of Plaintiffs' allegations that consumers paid too much as a result of Defendants' conduct (a clear statement of what occurred) and that Defendants should not have used the Protein Claim (a statement of what should have occurred). I then set forth a damages framework to isolate the economic impact of the conduct (analysis of damages) and used a but-for world that was the same as the real world in every respect except the harmful conduct.

42. While dos Santos explicitly agrees with the framework set forth in the Reference Manual,[31] and both experts generally acknowledge the general principle of holding everything constant but-for the harmful conduct,[32] they then both admit that they would be willing to violate this principle, and vary a myriad of factors in the but-for world. For example, Kivetz would allow competitors to change their prices and also whether they would sell more or less of their products.[33] Both Defendants and competitors would be allowed a chance to generally "respond" to the result of the removal of the Claim.[34]

43. By changing the supply conditions in the but-for world, dos Santos and Kivetz would allow another major element of the but-for world to change: the very sales of the Products.[35]

---

[30] *See, e.g.,* Weir Declaration, at paras 5-7, 37 *et seq.*, 98-103.

[31] Dos Santos Deposition, at 48-51.

[32] *See, e.g.*, *Id.*, at 48-51, 85; *see also*, Kivetz Deposition, at 68. "You would want everything else to be the same between the actual world and the world under which the alleged unlawful conduct occurred. And compared to that actual world, the "but for" world, the alternative world or the counterfactual would be the world in which everything is the same but the unlawful -- the alleged unlawful conduct is corrected."

[33] Kivetz Deposition, at 175.

[34] Kivetz Deposition, at 176.

[35] Dos Santos Deposition, at 86-87; Kivetz Deposition, at 188.



44.   One truth about this wrong but-for construction is guaranteed: it will not isolate the
impact of Defendants' harmful conduct.  A but-for market price that is measured, for example, as
a result of the removal of the Protein Claim AND a massive increase in production by
competitors would be unable to identify the economic effect due solely to Defendants' conduct.

45.   Notably, while dos Santos and Kivetz speculate about changes in supply, neither of
them has conducted any empirical analysis of supply that would be relevant to this case.  Dos
Santos testified:

> Q.      Okay.  Have you looked specifically into the timing of defendant's
> supply chain in this case?
>
> A.      No.  As I sit here today within the context of what I've been asked to
> evaluate, no, I have not done that.
>
> Q.      Have you evaluated how responsive defendants are to changes in
> demand?
>
> A.      No, I have not evaluated that.
>
> Q.      So have you determined the slope of the relevant supply curve at issue
> in this case?
>
> A.      At this point, no information has been provided that would allow for
> that determination.
>
> Q.      Are you aware of whether defendants estimated their supply curve
> before producing or selling their products?
>
> A.      No, I'm not aware of whether they did or not.
>
> Q.      Okay.  Are you aware of any document in this case showing defendants
> using a supply curve to set their prices?
>
> A.      No, I don't -- none that have been part of the production, at least that I
> have seen.[36]

---

[36] Dos Santos Deposition, at 113-115, 122.



Kivetz stated:

> Q.      Have you calculated the supply curve that you believe is relevant to this case?
>
> A.      No.[37]

## Historic market prices and quantities reflect the then extant supply conditions

46.   None of the discussion above is to suggest that a calculation of damages based on a but-for market price should not take into account supply-side factors.  Instead, the dispute is about how to account for supply-side factors.  Dos Santos and Kivetz claim that the use of historical real-world market prices cannot be used to consider the supply conditions in the but-for world.  This is incorrect.  In fact, there is no dispute as to the fact that market prices reflect the historic supply conditions.

> Q.      Do you agree that historic market prices reflect both supply and demand factors?
>
> A.      Historical prices are actual prices, and they are expected to represent equilibrium price.
>
> Q.      So do they reflect supply factors?
>
> A.      They -- they reflect both supply and demand.[38]

47.  Dos Santos also agrees that the historic quantity of class purchases is fixed.

> Q.      Would you agree that the number of at-issue products purchased by putative class members in this case is a historical number and therefore fixed?

---

[37] Kivetz Deposition, at 166.

[38] Dos Santos Deposition, at 101.



A.      I agree that the quantity purchased by putative class members is -- is -- happened in the past, so they are -- they are fixed amount.[39]

48.   Despite disparaging the use of price and quantity as methods to integrate the supply side, dos Santos acknowledges that the two core elements of a supply curve are price and quantity.  He noted that his Figure 2 in his report is a typical graph of a supply curve, where the two axes on the chart are price and quantity.[40]

49.   Using a range of historic real-world prices and fixed quantity in the conjoint survey "bakes in" the impact of myriad supply factors as they existed throughout the class period.

50.   As such, for the reasons discussed above, and as I affirm below, I propose to model the supply-side in the but-for as it existed in the real world, using the real-world market-based prices, and the actual quantity supplied to the class.

**The class products must exists in order for class members to receive value in the but-for world**

51.   Yet another reason to use the historic quantity of supply in the analysis is derived from a logical analysis of the concept that Plaintiffs and class members received some sort of value from the Products in the but-for world without the use of the Protein Claim.  In order to receive value from a unit of the challenged Products in the but-for world, a class member logically must possess the product.  And logically, if that person possesses the product in the but-for world, a retailer must have sold it to them.  And if a retailer was able to sell the product to a consumer in the but-for world, Defendants must have manufactured the Products, and (directly or indirectly) sold the Products to retailers.  As a matter of logic, that consumer cannot derive

---

[39] Dos Santos Deposition, at 108.

[40] Dos Santos Deposition, at 114-115; dos Santos Declaration, at Figures 1 and 2.



value from a product in the but-for world if that product does not exist, as Defendants' experts

concede.

Dos Santos:

Q.      Do you believe that class member -- putative class members in this case
would receive value from the products in the "but for" world?

A.      Again, this is assuming that they received some value within the actual
world and that value is constituted of a number of different aspects or
characteristics or features of the product, right?

I would imagine that in a "but for" world there will be some value because
there is a number of characteristics of features of the product that will be there.
In fact, all of them will be there with the exception of the specific feature that,
it's my understanding, Mr. Weir would be attempting to control in the "but for"
world.

Q.      In order for a consumer to receive value from a product, they have to
purchase that product.  Correct?

A.      There's no option of not answering to a transaction, so everything that
I'm saying is within the context of a transaction taking place, that the choice
was made and there is a value that's associated with that transaction.[41]

Kivetz:

Q.       Do you believe that the proposed class members in this case received
value from the products in the "but for" world?

A.      I'm not sure what you mean by value, but my interpretation of that
word is, given everything that I know about this case, all my work in this case,
is yes, if you remove the alleged technical regulatory violation, the putative
class members would still receive value from buying Dave's Killer Bread.

Q.      Would you agree that if a consumer received value from a product in
the "but for" world, that means they actually possess the product?

A.      Well, the "but for" world is a world that is -- it's an analytical
econometric analysis.  It's a counter factual world that doesn't exist in which

---

[41] Dos Santos Deposition, at 89-90.


ECONOMICS AND
TECHNOLOGY, INC.

> Dave's -- the exact Dave's Killer Bread's products are being accused are the same except that the alleged technical regulatory violation is cured and everything else is the same. And then we look at does it change demand does it change their willingness to pay. That's what the conjoint analysis is supposed to do…[42]

52. If the Products must exist in the but-for world for consumers to derive value from them, it would be entirely illogical -- as Dos Santos and Kivetz suggest -- to measure the value received and not received in a world where some or all of the Products do not exist.

**Using the supply side factors from the "real" world in the but-for world makes perfect sense, as a change in Defendants' conduct would not change underlying supply-side factors**

53. As above, the supply side being modeled in the but-for world is the same as in the real world. Supply exists in the but-for world as it did in the real world, as reflected by the myriad prices that consumers paid that were set by the then extant forces of both supply and demand, and in my model, I used that information along with a fixed quantity of product that was actually sold to consumers.

54. As an example, assume that Defendants sell 1-million Products to the class. The analysis I have proposed attempts to determine what is the actual market value of those 1-million Products. It would be inappropriate to try to figure out the value of 900,000 Products or 1.1-million Products. I am trying to figure out the value of the exact 1-million Products sold to the class.

55. In this manner, supply conditions vary in the but-for world, in the same manner in which it did in the real world. There are numerous reasons to use the same supply side factors from the real world in the but-for world.

56. In the but-for world, where we examine the result of a change in Defendants' harmful conduct (e.g., not using the challenged Claim), one must ask whether the change in

---

[42] Kivetz Deposition, at 177-178.



conduct would result in any meaningful impact to the underlying supply factors. The answer is no. It does not cost more to not use a label Claim, so it does not in any way impact the costs of producing the Products.

- The price of materials used in the Products does not change because of the non-use of the Claim;

- The costs of labor to produce the Products does not change because of the non-use of the Claim;

- The costs to ship Products to retailers does not change because of the non-use of the Claim;

- The costs to stock the Products on retail shelves, or to scan the Product at the register does not change because of the non-use of the Claim.

57. Because the underlying supply conditions would not change based upon the challenged conduct, it is reasonable to use the same supply factors in both the real and but-for worlds -- as I have done in this case.

**The conjoint analysis does not calculate "Willingness to Pay"**

58. Defendants' experts assert that conjoint analysis can only calculate "Willingness to Pay" and cannot estimate a marketplace outcome. They assert that "Willingness to Pay" cannot be used to determine a market price overpayment. Dos Santos and Kivetz are wrong.

59. I define "Willingness to Pay" as the maximum amount someone would pay for a particular product or feature. Kivetz agrees.[43]

60. While conjoint analysis can be used in certain circumstances to calculate "Willingness to Pay," that is not the only output of conjoint analysis. As per the Weir

---

[43] Kivetz Deposition, at 169-170.


ECONOMICS AND TECHNOLOGY, INC.

Declaration, I propose to use calculations of a market outcome. I often illustrate the difference between these concepts using the example of Gilligan's Island.[44]

61.  The concept of willingness to pay is akin to asking the wealthy couple, the Howells, "How much would you be willing to pay to get off the island right now, you never have to see Gilligan again, a nice boat ride home to safety?" They would probably give an answer like "untold millions." And that value in and of itself is not particularly useful in determining a market valuation.

62.  If you were to say to the Howells, "There is a boat coming in half an hour and the price of that boat is $5,000, will you purchase that boat ride home?" That begins to tell you something about what will take place in the marketplace.

63.  Now, if you interview the Howells alone, that may not help you establish the market price. But if you interview the Howells and Ginger and Mary Ann and the Professor, then suddenly now you understand the market value for a boat ride off Gilligan's Island, which might be less than the Howells would pay, but might be more than Ginger would pay.

64.  When a conjoint survey contains information about market prices, or proxies therefore, the survey can calculate a marketplace outcome (e.g., the Howells will purchase the boat ride for $5,000) rather than "Willingness to Pay" (e.g., the Howells would pay untold millions to get off of the island).

65.  The conjoint analysis is designed to determine a marketplace overpayment attributable to the Claim and not "Willingness to Pay." The survey includes market-based price points and alternative product selections to simulate a marketplace outcome, including an outside, no-buy option. The survey simply asks people to choose a product at a particular price and whether or not they would buy that product.

---

[44] A version of this illustration was originally used in "Getting Started With Conjoint" by Bryan Orme.



66. The survey is taking information about the marketplace transactions, and then through the market simulator determining whether the market would purchase or not purchase at various price points. In the aggregate, this simulation results in the calculation of a marketplace overpayment measurement.

67. We know the market prices that consumers have already paid for the Products, and the conjoint is determining the likely market price without the use of the Claim (holding all else equal).

68. Kivetz references the concept of "willingness to pay" in his report, but that term can be used in different ways to mean different things. There is a concept in economics called the *willingness to pay of the marginal consumer*, the price point at which the marginal consumer is indifferent as between buying the product or forgoing the purchase altogether. This is the same as the market price, and is fully consistent with the accepted use of conjoint in the academic literature.

69. A relevant court order certified a class based upon a price premium damages theory and a conjoint methodology utilizing calculations of "Willingness to Pay" to measure the market price premium. The order summarizes the defendant's position (which parallels Kivetz's position in this litigation) and dismisses those arguments while explaining how "Willingness to Pay" can be used to determine a market price premium:

> Dial argues that Boedeker's model does not actually measure a market-determined price premium. The price of a product in a competitive market, Dial says, is determined by the intersection of market demand and market supply for a particular transaction at a particular time. Boedeker's model, however, measures only a difference in consumer "willingness to pay" for the challenged attribute, failing to take into consideration any market conditions or other factors that would affect the supply side curve and so influence product price in the market. [...]
>
> Dial's experts' criticism of Boedeker's model perhaps rests on a misunderstanding of what it purports to do. The model does not, as Dial



contends, seek to determine an "average" or a "median" expression of consumer "willingness to pay" for the Dial Complete product without the claimed feature, unconnected to supply side market forces. Rather, Boedeker's model purports to calculate the "Marginal Consumer's Willingness to Pay" for that product in the actual market in which the products with the allegedly false claims were sold. The distinction is important, for, as explained in a brief paper co-authored by Lisa Cameron, Michael Craig, and Nobel Laureate in Economics Daniel McFadden:

*Defendants have argued that WTP ["willingness to pay"] results emerging from the conjoint analysis do not directly address the value of the patents in question. However it is important to note that different research questions require different information about WTP. For example, if the researcher seeks qualitative information about how much consumers value the infringing level(s) of the attribute at issue, he can develop a conjoint survey that provides that average or median consumer WTP . . . .*

*On the other hand, if the researcher wants to assess the price premium associated with the infringing feature, then he will need to develop a conjoint survey that assesses the WTP of the marginal consumer - i.e. the consumer who is indifferent between buying and not buying the infringing product. It is the WTP of the marginal consumer that is equivalent to the price premium associated with the infringing level of the attribute; this marginal consumer can be identified by offering respondents a "no buy" option. (Lisa Cameron, Michael Cragg, & Daniel McFadden, "The Role of Conjoint Surveys in Reasonable Royalty Cases," LAW360 (Oct. 16, 2013), http://www.law360.com/articles/475390/the-role-of- conjoint-surveys-in-reasonable-royalty-cases) (last visited Mar. 24, 2017) (emphasis supplied).*

In the example given, it was appropriate for the authors to directly equate the marginal consumer's "willingness to pay" with the price premium associated with a patented feature of a product, because in such cases it is the value added to the product that is of interest. In this case, however, another step is required to determine a price premium associated with the misrepresented product feature. ***The marginal consumer's willingness to pay for the product without the feature is equivalent to the market price of that product in the actual market into which the set quantity of offending products was sold***, which price must then be subtracted from the market price actually paid for the product with the claimed feature. That calculation will yield the price premium associated with the "Kills 99.99% of Germs" claim.[45]

---

[45] *In re: Dial Complete Marketing and Sales Practices Litigation*, MDL Case No. 11-md-2263-SM, Opinion No. 2017 DNH 051 [emphasis supplied].



70.   As is made plain by the *In re: Dial* order, that output can still be used to determine the price premium attributable to the Claim.  I do offer consumers a "no buy" option in the survey, and as such, can identify the marginal consumer -- and the overpayment due to the Claim -- in the market simulator.[46]

71.   Kivetz's criticisms as to "willingness to pay" are inapposite here because these criticisms center on the concept of *maximum* "willingness to pay," while I propose to calculate something entirely different -- the *willingness to pay of the marginal consumer*.

**Variations in purchase price do not indicate a lack of a price premium, and my analysis controls for such variation in prices**

72.   Dos Santos argues that variations in pricing and pricing strategies prevents the possibility of the existence of any price premium.  Retailers have the discretion to change prices, and do so on a regular basis.  But the existence of variation in retail prices does not mean that a price premium cannot exist.  If dos Santos were correct on this point, virtually no product could command a premium price for any reason, as virtually every product exhibits some sort of retail pricing variation.  And yet, there are nearly endless examples of products that command various premiums even where retail prices vary, e.g., premiums associated with name brands such as Coca-Cola and Mercedes, or food products that carry premiums for attributes such as being organic or locally produced.  Clearly, dos Santos cannot be correct that varying prices would prevent the existence of a premium price.

73.   If one calculates the price premium, or change in value of a product on a percentage basis, it can be applied across varying prices to estimate damages.  As an illustrative example, imagine a pizza chain that sells large pizzas that ostensibly contain 10 slices of pizza, but in actuality, two of the 10 slices are missing, and the pizzas only contain eight slices.  In such a

---

[46] Neither of Defendants' experts suggest that I failed to use the no-buy option.



case, consumers only receive 80% of the value they were promised, or stated in the reverse,

consumers do not receive 20% of what they paid for.  If the pizza chain in question has one store

on the south side of town selling the large pizzas for $15, and another on the north side of town

which sells the same large pizza -- identical in all respects -- for $20, the damages stemming

from the two missing slices is the same 20% of the purchase price at either location.  It is true

that this translates into two different dollar amounts when examining the data granularly ($15 x

20% = $3 at one store, and $20 x 20% = $4 at the other store), but this does not prevent the

calculation of damages using a common method, and using aggregate sales data that reflects the

pricing at both stores.  See Figure 2 below.



| Pizza | Identical Pizza (missing 2 of 10 slices) | Identical Pizza (missing 2 of 10 slices) |
|---|---|---|
| Missing Value | The same 20% | The same 20% |
| Price | $15 | $20 |
| Damages | $3 | $4 |

**Figure 2.**

74.  The fact that one pizza costs more than the other does not alter the fact that, in this

example, both pizzas are short 20% of the value of what was promised.  The premium, expressed



as a percentage, is common to all purchasers that were shorted two slices. While the cash consequences of that premium may be different, the method used to determine the price premium overpayment is also common to all purchasers.

75. Thus, to the extent that any class member experienced a variation in price, the price premium amount expressed as a percentage of the purchase price would raise or lower the overpayment amount in relation to the actual transaction price paid (i.e., the dollar premium paid would go up for those that paid higher prices and down for those that paid less). Such variations in purchase price are reflected in, and captured in the analysis of, the actual underlying transaction data used in the second portion of my damages analyses (the analysis of actual purchase prices).

76. It would be illogical and contrary to economics to suggest that a variation in retail price should first be credited against an element of disputed value in a litigation (in this case the price premium due to the Claim), and only after exhausting that amount, applied to other undisputed elements of the Product (the flavor, packaging, etc.). To demonstrate dos Santos' fallacy, one must ask: to what element of a product does a price variation apply when the product is not subject to litigation? The correct way to analyze the impact of any variations in price or discounts would be to apply any such variation or discount across all elements of value in the Product on a pro rata basis. Any such variations would thus not impact the price premium factor that I will calculate, and is controlled for in my use of actual purchase data.

77. The conjoint also controls for the variations in price through the range of real-world market-based prices used in the survey, reflecting actual variations in the marketplace.

**The conjoint analysis includes competition**

78. Kivetz argues that my proposed market simulation is insufficient because it "does not include competition." Implicit in Kivetz's criticism is the suggestion that in the but-for world, it should be possible for putative class members that actually purchased Dave's Killer



Bread to cancel their actual real-world purchase, and instead switch their purchase over to a competitor.

79.   For the reasons that I have discussed above at length, it is nonsensical to model the price premium in the but-for world where class members purchase less of Dave's Killer Bread Products.  That would not answer the question of the change in value to the class solely attributable to the Defendants' harmful conduct of labeling their Products with the Protein Claim.

80.   Contrary to Kivetz's argument, my model does not ignore competition.  Instead, my model holds competition constant across the real and but for worlds.  As is made plain in the Weir Declaration (and noted by Kivetz and dos Santos) my model does include competitive brands in the conjoint survey and the hierarchical Bayes regression model.  In fact, in this regard, Kivetz complains that I give brand competition too much credit by putting brand as the first attribute in the survey.

81.   Including competition in the conjoint survey, and holding that competition constant in the but-for world is the standard procedure approved by numerous courts when price premium damages are calculated using conjoint analysis (and is economically appropriate where the goal of the analysis is to measure the economic impact of a defendant's harmful acts holding everything else constant).  In the vast majority of cases cited in footnote 6 above, the conjoint analysis uses competition in the survey, but not in the market simulator.[47]

**There is no evidence to suggest that the conjoint survey suffers from focalism bias**

82.   Kivetz suggests that my conjoint survey *may* suffer from focalism bias.  Kivetz himself has not conducted any empirical analysis to determine whether this accusation is true.[48] Kivetz's speculation is wrong.

---

[47] To the extent I am aware, the only deviations from this model in the cases I have cited are those that do not include competitive brands in the survey or the market simulator.  There is no bright line rule requiring brand to be included in the conjoint survey, though as discussed, I have done so here.

[48] Kivetz Deposition, at 166.



83. In the Weir Declaration, I provide citations to documents that suggest that Dave's intended consumers to see the Protein Claim, and to use the Claim to differentiate the Products from competitors. Defendants' experts have noted that, rather than remove the Protein Claim to cure their labeling issue, they affirmatively kept the Claim and instead added the FDA-compliant % DV (indicating that there must be some desire to present the Claim to consumers). Finally, I conducted a number of interviews with Dave's Killer Bread purchasers to gain an understanding of whether protein claims were relevant within the bread purchasing context. As I reported in the Weir Declaration, "All of the respondents indicated that they were aware of protein claims on bread, and that protein claims were a reason they chose to purchase Dave's Killer Bread."

84. As to whether the Protein Claim would draw undue attention in the survey, I would note at the outset that the Protein Claim was placed on every unit of the Class Products within the class definition, and was not hidden away in the fine print. In addition, I proposed to perform a quality control check to see if consumers would be unduly influenced by any element of the survey. It would have been easy enough for Kivetz to run the same quality control check here. Had respondents paid undue attention to the Protein Claim, this quality control step would identify that consumers believed the Protein Claim was the purpose of the study. But Kivetz did not conduct that empirical study, and rested on his speculation instead.

85. In the study, the Protein Claim is not given any undue attention. It is not highlighted or called out. It is presented in the same manner as all other label statements. It is included amongst a randomized list of product label statements that are included in part because they have been identified as purchase drivers of the products, and in part because they serve as distracters, precisely to eliminate the risk of the Protein Claim garnering undue attention. There are no elements of the survey design that would indicate the research purpose that might otherwise draw attention to the Protein Claim.



**Conjoint product combinations need not be fully realistic**

86.   Kivetz claims that some of the product profiles in the conjoint shown to respondents will be unrealistic.  While Kivetz may perceive a lack of realism, such lack of realism is expected and in some cases preferred in conjoint research.

87.   While it may not seem beneficial to a lay person, so-called orthogonal design, where each of the various levels are shown in all combinations to respondents even if they are not fully realistic, is recommended in choice-based conjoint.  As is recommended in a conjoint textbook:

> There are several advantages associated with orthogonal designs. [...] Lastly, they were shown to yield good predictions, even when some profile combinations are not fully realistic.  The predictions made from these designs are not subject to predictive bias.[49]

88.   In another case, Kivetz admitted that orthogonal design is recommended for conjoint analysis.

> Q.  What's orthogonal design within the context of a choice based conjoint survey?
>
> A.  It's a design where the levels of the attributes vary in an independent -- in the design of the profiles of the choice options.  The software from it -- the Sawtooth software, whatever software you're using to generate these prof -- profiles, these choice options, generates them in a way that the values of attributes are independent there from one another.
>
> Q.  Is that the recommended way to do it in a choice based conjoint, with an orthogonal design?
>
> A.  That's the typical way you do it, like -- yes.[50]

---

[49] Applied Conjoint Analysis, Rao, Vithala, at 47-48.

[50] Kivetz Deposition, Exhibit 40 (Kivetz Deposition Transcript in *Willis v. Colgate-Palmolive*), at 97.


ECONOMICS AND
TECHNOLOGY, INC.

89.   Kivetz also ignores a major application of conjoint analysis: the introduction of new products.   Companies routinely will test new products and attributes using conjoint analysis to make design and product release decisions.   Such new products or product attributes would be "unrealistic" to consumers because they do not yet exist.   And yet conjoint is used regularly for this purpose, as dos Santos admits.[51]   As long as the respondents can find the choices to be plausible, the conjoint can return helpful information, even if consumers have never seen a particular product or attribute, or combination of attributes, before.

**Kivetz's criticism that my conjoint survey did not include all possible bread attributes is inconsistent with the conjoint literature**

90.   Kivetz asserts that my conjoint survey omitted key attributes that are important to consumers' purchasing decisions.   However, it is not necessary, nor advisable to include every possible product attribute in a conjoint analysis.[52]

91.   For example, the authors of a study upon which Kivetz relies on opine that it is not necessary to include every potential competing product and product variant in a conjoint analysis.   Instead they recommend including a few major competitors and product features.[53]

92.   In their study of handheld cameras, the authors chose to include four major brands: Canon, Sony, Nikon, and Panasonic.   Likewise my survey included four brands of bread: Dave's, Oroweat, 365, and O Organics.   Kivetz is simply incorrect that a reliable conjoint must include every competing product.

---

[51] Dos Santos Deposition, at 83.

[52] Kivetz raised similar criticisms of omitted attributes in *Willis v. Colgate*, and *de Lacour v. Tom's of Maine*.   In both cases, the court found these criticisms unpersuasive.   *See*, *Willis v. Colgate Palmolive Co.*, No. CV 19-8542 JGB (RAOx) (C.D. Cal Jan. 5, 2023), ECF No. 105; *de Lacour v. Colgate-Palmolive Co.*, 2021 WL 1590208 (S.D.N.Y. Apr. 23, 2021).

[53] Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi (2014), "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, 12(4), 421 – 456 ("Allenby 2014").



93.   The study also included only a short list of possible camera attributes, while omitting several important digital camera attributes, such as power source, SLR, interchangeability of lenses, speed of data transfer, and light performance.   Nonetheless, the authors deem the partial list of attributes acceptable for determining the value of those attributes using conjoint.[54]

94.   One guide on conjoint analysis offers plain advice not to include every possible attribute.  "Do not use too many attributes."[55]  The guide continues:

> It is often tempting for managers, in an attempt to be as exhaustive as possible, to end up with a list of attributes that is too long….Focus on the attributes upon which managerial decisions need to be made.[56]

95.   Moreover, contrary to Kivetz's opinion, in the conjoint literature it is well known that respondents "hold constant" product features that are not included in the survey, which allows the researcher to make appropriate causal inferences.  For example, since the 1970s, General Motors ("GM") has applied conjoint analysis to its line of vehicles to gauge consumer demand for features as diverse as "the Cadillac Northstar engine, OnStar, XM Radio, Bumper to Bumper warranty, as well as many vehicles, such as the Chevrolet Avalanche."[57]  GM relies on conjoint to forecast the market and design new products despite the complexity of its vehicles, precisely because survey respondents are not required to evaluate every possible combination of product attributes for conjoint to produce reliable market-based results.  Consumers hold attributes constant that are not presented for evaluation in the survey, which mimics how consumers make choices in the real marketplace.  This holds true for products as complex as vehicles, computers or financial instruments, as well as in the case of Dave's Killer Bread.

---

[54] *Id.*

[55] Ofek, E., Toubia, O., *Conjoint Analysis: A Do it Yourself Guide*, Harvard Business School, August 2014, at 2.

[56] *Id.*

[57] *Getting Started with Conjoint*, Bryan Orme, (2020), at 153-154.



96.   When asked about the issue at deposition, Kivetz baldly asserted that, even though the literature is clear that conjoint studies are typically self-limited to about 8-10 attributes, a product with many important attributes should simply never be studied using conjoint analysis.

> Q.     All right.  So is there a general practice as to how many attributes it's appropriate to include in a conjoint survey that is a choice-based conjoint survey?
>
> A.     It depends on the product category and the attributes that are in that product category and important or -- or relevant for consumers.  It also -- typically you do not want to use more than 8 or 10 attributes in a choice-based conjoint, actual attributes, not label statements but actual attributes.
>
> Q.     Okay.  And what happens if you want to study a product that has dozens of attributes?  Are you just out of luck and you cannot use a choice-based conjoint or is there something that you do to address that problem?
>
> A.     If a product or product category or service category has dozens of attributes, dozens of relevant attributes for consumers and so on, then you cannot use just a choice-based conjoint.[58]

97.   If Kivetz were correct, conjoint would be ill-suited for all but the most basic of products.  But Kivetz is not correct, and a quick review of conjoint examples reveals that researchers frequently use conjoint to study complex products, and follow the rule of thumb to only include a limited subset of attributes required to meet the study's research objective.  Above I have already cited to the examples of digital cameras and automobiles.  In addition, conjoint has routinely been used to study other complex products, such as computers[59] and smartphones.[60]

---

[58] Kivetz Deposition, at 153-154.

[59] Wahyu Oktri Widyarto, Nugraheni Djamal, Alif Rizki Awali, A Study on Consumer Preference for Laptop Products using Conjoint Analysis and Cluster Analysis, International Journal of Engineering Research and Technology (IJERT), Volume 06, Issue 08 (August 2017), 239-242.

[60] See, e.g, Apple, Inc. v. Samsung Elecs. Co., 2014 WL 976898, at *12 (N.D. Cal. Mar. 6, 2014).



98.   It is worth noting that in other litigations, Kivetz was more honest about the need to not include every attribute of a product in a conjoint, noting that conjoint is a broad discipline, and the need to include specific attributes will be driven by the needs of the particular study, not some bright line rule that requires all attributes.[61]

**It is not a requirement to show pictures of a product or product packaging, or to indicate the location of a claim on the package**

99.   Kivetz suggests that my conjoint design is problematic because it does not show pictures of the product, or the product packaging.  He also asserts that I have failed by not indicating where on the packaging the Protein Claim is made.  On all of these issues, Kivetz is simply wrong.

100. As to pictures of the product or product packaging.  While it is technically possible to include such pictures of products and packaging, it is not only not required, but the *default* method of choice based conjoint analysis is to not include such images.  In Sawtooth Software, the default presentation of attributes and levels for any product is a text-based description.  One conjoint textbook warns against using graphics for an attribute or level unless it will be the general practice to use graphics for every attribute and level, lest the use of an image for one attribute draw undue attention to that attribute.[62,63]  The literature is also very clear on this issue, as many peer reviewed studies use text only, even for food products.[64]

---

[61] Q.  What I'm asking is when performing a conjoint analysis, does every attribute of the product need to be included in the survey or -- or just the attribute being studied?

A.  It depends on what type of conjoint analysis you're doing for what purpose; how are you going to use the conjoint analysis?  I cannot answer it just like that because conjoint analysis can be used for many different -- can be used for different things.

Kivetz Deposition, Exhibit 40 (Kivetz Deposition Transcript in *Willis v. Colgate-Palmolive*), at 77.

[62] *Getting Started with Conjoint*, at 50.

[63] Conjoint experts have reached some consensus that the use of a brand logo or other brand imagery, while other attributes are presented as text is an acceptable compromise, given the general importance of brand.  If there is any



101. As to the issue of the location of the Protein Claim on the packaging generally, it is also uncommon in conjoint studies to indicate the particular location as to where a claim is made.[65]

102. As for the issue of the location of the Protein Claim vis-à-vis the possibility that consumers might confuse the Protein Claim for a listing of the protein in the NFP, it is notable again that Kivetz did not interview consumers and is thus only speculating about possible confusion, because he has no evidence to support his claim. But based upon many other conjoint studies in which I have contributed to the design, including many relating to food products, it is my opinion that such confusion would be unlikely -- I do not recall consumers seeing a label statement in a survey presented as such, and believing that it was instead actually part of the NFP. This makes sense, given that a NFP has a particular look and feel, and the NFP is often labeled as the "Nutrition Facts" (as is the case on Dave's Killer Bread) as opposed to a "label statement."

103. For the reasons above, I believe that the survey design as it exists is sufficient. But it would be possible to make small design changes if I was required to do so. Above, I discussed that it would be possible to include a NFP in addition to the existing attributes. Another small

---

consequence to my choice to use brand logos with other text-based attributes, it would be that consumers may give less importance to the Protein Claim, thus making the survey conservative.

[64] See, e.g. *Free Range, Organic? Polish Consumers Preferences Regarding Information on Farming System and Nutritional Enhancement of Eggs: A Discrete Choice Based Experiment,* Zakowska-Biemans, Sylwia and Agnieszka Tekien, Sustainability 9 (2017): 1999

*Estimating Consumers' Willingness to Pay for Health Food Claims: A Conjoint Analysis*, Mitsunori Hirogaki, International Journal of Innovation, Management and Technology, Vol. 4, No. 6, December 2013.

Wahyu Oktri Widyarto, Nugraheni Djamal, Alif Rizki Awali, A Study on Consumer Preference for Laptop Products using Conjoint Analysis and Cluster Analysis, International Journal of Engineering Research and Technology (IJERT), Volume 06, Issue 08 (August 2017), 239-242.

[65] Many of the literature examples that I have already cited serve as good examples. See, e.g., footnotes 53, 64 *supra*.



possible change would be to change the description of the "label statements" for example, by stating "front label statement."

104. Kivetz also erroneously asserts that my use of the Protein Claim without further clarification would result in a double counting of sorts, in that Kivetz speculates (again without evidence) that in the absence of additional information, the price premium for the Claim would capture not only the premium for the front of pack label claim, but also the protein statement that would be made on the NFP.

105. As I explained at deposition, and as I discuss above in paragraph 95, one of the elegant advantages to conjoint research is that the researcher can "hold constant" elements of the product across the market simulation, including elements of the product that are not expressly included in the survey. In fact, every element of the product not expressly included in the survey itself is held constant when one conducts a market simulation. In other words, the Dave's Products being simulated will receive credit for the value of the NFP in both the real world and the but for world. As such, there would be no double counting in the measurement of the price premium, because the value attributable to the NFP would be held constant, allowing the conjoint to isolate the premium due solely to Defendants' use of the Protein Claim. Though as discussed above, it would certainly be possible, if so required, to separately include the NFP (though this too would be held constant in the simulation).

106. In all instances, I have proposed to conduct standard survey pretesting prior to fielding. Such pretests seek to understand whether respondents would suffer from any confusion as to the operation of the survey, including whether they were confused as to the description of the "label statements." This is the type of work that Kivetz could have done rather than speculate as to potential problems, but chose not to do. When I perform these quality control checks, if the pretest uncovers respondent confusion on this or any other issue, such issues would be addressed before the survey would be fielded.



**The ordering of attributes in my survey follows standard procedures**

107. Kivetz argues that my survey design is deficient because it does not randomize the attributes, and places brand first and price last. This criticism is invalid.

108. As to the issue of brand being shown first and price being shown last, while it is technically possible to shuffle brand and price into random locations, it is standard practice in conjoint studies that include brand and price to list brand first and price last. The conjoint literature is rife with examples, including papers cited by Kivetz himself. For example, the paper about valuing product features that Kivetz cites, which studies digital cameras, lists brand first and price last in the conjoint choice tasks.[66] In fact, every conjoint paper that I have cited in this declaration to this point (if they include brand and price) list brand first and price last.[67] I also spoke with Megan Peitz, CEO of Numerious, Inc. (a firm specializing in discrete choice techniques including Conjoint Analysis) and a former Sawtooth Software instructor, and she confirmed that "brand first, price last" is indeed the standard practice. The Sawtooth Lighthouse Studio software also advises: "If we use the default … Brand will always appear in the top and Price always at the bottom." It also notes that "this seems like a natural presentation order." And this order is not only natural, it is the common form that has been used and approved by courts across the country.[68]

109. As to the issue of randomizing the label statements themselves, I was quite clear that the survey will indeed randomize the order of the label statements. "The label statements will be randomized for each respondent."[69] This eliminates the risk that consumers would pay undue

---

[66] Allenby 2014 (Figures).

[67] See, e.g., footnotes 53, 64 *supra*.

[68] In footnote 6 above, I cite to dozens of cases that approved conjoint in similar circumstances.

[69] Weir Declaration, at para 54.



attention to any particular label statement simply because it would otherwise always be listed first.

**I followed common interview procedures for the cognitive interviews, and despite his complaints, Kivetz generally agrees with the conclusions drawn from these interviews**

110. Kivetz complains at length about the methods underlying the cognitive interviews that I conducted to learn more about what Dave's Killer Bread consumers consider when they shop for bread. These types of exploratory interviews are commonly unscripted because *a priori*, we don't know exactly what consumers will say and what sort of follow up will be needed (as compared to, say, technical pretest interviews that are scripted to make sure that specific questions are asked and answered by all respondents). For example, a loquacious respondent may offer many details simply in response to the welcome at the start of the interview, obviating the need for many follow up questions, while other respondents may need such follow up. A static script might derail the natural flow of the conversation.

111. Kivetz complains about the documentation of the interviews, saying that the contemporaneous notes that I took directly into the draft of my report are insufficient. These types of interviews are not commonly recorded or transcribed in the manner of a deposition. Instead, the interviewer's notes serve as the record of the interviews.

112. Despite his complaints about the interview methodology, Kivetz had little basis to disagree with the conclusions that I drew from them. In fact, to the extent he had knowledge on a particular issue, he agreed with the conclusion. I summarize some of these issues below.[70]

---

[70] The conclusions drawn from the interviews are sourced from the Weir Declaration at paras 40-43. Kivetz's responses are drawn from the Kivetz Deposition, pages 134-139.

ET ECONOMICS AND TECHNOLOGY, INC.

| Weir Interview Conclusion | Kivetz Response |
|---|---|
| "brand and packaging were the starting point for many bread purchases" | I do agree or I am testifying that brand is a -- is a very important -- typically a very important attribute in consumer package goods, including in the bread category. |
| "purchasers… associate and recall the flavor of the bread associated with different brands" | Yes.  Those are purchasers -- the brand, as we discussed, but also the flavor, the taste of the bread that they have already consumed can and oftentimes affects their repurchase behavior. |
| "Interviewees all purchased multiple brands of bread" | I think it's likely that in this category, I don't know what you mean by many, but that there are consumers who buy Dave's bread who would buy also -- either bought or would buy or do buy other -- other brands of bread as well |
| "Interviewees were interested in…Whole Grains" | I think whole grains is one of the product attributes that is likely to be relevant for -- for many or some consumers. |
| "Interviewees were interested in…Fiber" | I don't know. |
| "Interviewees were interested in…Taste/Flavor" | I think the taste of the product and, you know, that can include flavor is -- is important for many consumers. |
| "Interviewees … [had a] preference against non-natural ingredients" | I have not seen evidence for that. |
| "Interviewees were interested in…general 'healthier' preferences" | Yeah, I -- I have -- obviously some aspects of -- of -- of wellness or perceived wellness or health may be relevant to some -- some consumers here. |

113. Kivetz's criticisms about the method of recording and interview style hardly seem relevant when he does not dispute the conclusions of such interviews.

**The proposed survey sample surveys historical purchasers or considerers of Dave's Killer Bread for the analysis of a historic price premium**

114. Kivetz takes issue that my screening criteria, which will determine the sample of respondents who will ultimately take the conjoint survey would fail to represent the relevant



consumer universe. I propose to use respondents that did purchase, or considered purchasing Dave's Killer Bread during the class period. This is because I am trying to conduct the survey to determine a price premium that would be relevant for historic class purchases. Kivetz takes issue with the fact that I would not screen in prospective future purchasers. He suggests that historic purchasers are inappropriate for consideration.

115. As to future purchasers, it is not required to include such purchasers in a survey seeking to model something related to a historic period, but it can be done. It is my opinion that it is a reasonable "researcher's choice" to focus on historic purchasers given the historic nature of the survey and proposed class period.

116. As to ignoring the opinions of historic purchasers in a survey seeking to model something related to a historic period, that technically would also be possible but given the facts and circumstance specific to this litigation, I disagree with Kivetz that this would be preferable to the sampling plan that I have set forth.

**Product Differentiation is the relevant cause of any price premium attributable to the Protein Claim**

117. Kivetz argues that my discussion of product differentiation is "unscientific and irrelevant." In the Weir Declaration, I set forth the concept of product differentiation, which is a mechanism by which companies literally try to make their products different from competitors (or try to avoid being different in a negative way) with the goal of increasing sales or profits. It is the economic principle behind why a premium might arise from the use of the Protein Claim. Kivetz does not dispute this basic principle, and his colleague dos Santos agrees with the concept.

Q.     Could you please describe your understanding of the definition of product differentiation?



A.      Sure.  So as I mentioned to you, in your introductory economics class, we talk about perfectly competitive product or service.  Those would be products that will have no differentiation between themselves, commodities or something of that nature.

A differentiated product is a product that has some characteristic that differentiates it and which allow for, you know, an impact on the demand for -- for it.

Q.      Why do manufacturers typically try to differentiate their products?

A.      As part of a marketing or sales strategy, companies have various optimizing goals, so -- but generally speaking, you would be differentiating a product with the goal of trying to -- optimizing one of your strategic goals. Could be to increase sales, could be to, you know, fight off competition, could be a, you know, a variety of different issues that may be part of the overall strategic management goal.[71]

118. I also cited a number of documents that I believe indicate that the Protein Claim may very well be a differentiating factor that could cause there to be a price premium.  Kivetz disputes my reading of the documents and the conclusion that the Protein Claim could be a differentiating factor.  In many respects, this is an irrelevant dispute, because as Kivetz himself acknowledges, my empirical damages model does not rely in any way on these documents, and the conjoint will determine whether there is indeed a premium.  That said, Kivetz's position is at odds with dos Santos, who agrees with the general principles.

Q.      Okay.  Do you know whether Dave's Killer Bread tries to differentiate its products from its competitors?

A.      I don't know specifically.  I would imagine that they may…

Q.      Would you agree that one way for a manufacturer to differentiate its product would be to put a label claim on that product?

---

[71] Dos Santos Deposition, at 59-61.



A.    I will agree that potentially changes to packaging might be part of a strategy to differentiate the product.[72]

## VI.  RESERVATION OF RIGHTS

119. My testimony is based upon the information and data presently available to me. Additional, different and/or updated data including market research data may be obtained in advance of trial. I therefore reserve the right to amend or modify my testimony.

### VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, and that this declaration was executed at Boston, Massachusetts this 22nd day of March 2024.

_____

Colin B. Weir

---

[72] Dos Santos Deposition, at 64.



**Exhibit 1**

**Statement of Qualifications
of**

**COLIN B. WEIR**

# Statement of Qualifications

## COLIN B. WEIR

Colin B. Weir is President at Economics and Technology, Inc.  Mr. Weir conducts economic, statistical, and regulatory research and analysis, and testifies as an expert witness. Mr. Weir's work involves econometric and statistical analysis, multiple regression, surveys, statistical sampling, micro- and macroeconomic modeling, accounting and other economic analysis.  Such analysis often involves analysis of databases, call detail records, and other voluminous business records.  Mr. Weir is familiar with common statistical and econometric software packages such as STATA and Sawtooth Software.  Mr. Weir assists with analysis of economic, statistical and other evidence; and preparation for depositions, trial and oral examinations.  Mr. Weir has provided expert testimony before federal and state courts, the FCC, and state regulatory commissions, and has contributed research and analysis to numerous ETI publications and testimony at the state, federal, and international levels.  Prior to joining ETI, Mr. Weir worked at Stop and Shop Supermarkets as a cash department head, grocery/receiving clerk, and price-file maintenance head.

Mr. Weir's experience includes work on a variety of issues, including: economic harm and damage calculation; liquidated damages provisions; lost profits; false claims; diminution in value; merger/antitrust analysis; Early Termination Fees (ETFs); Late Fees; determination of Federal Excise Tax burden; and development of macroeconomic analyses quantifying the economic impact of corporate actions upon the US economy and job markets.

Mr. Weir has conducted research and analysis in numerous litigation and regulatory matters on behalf of corporate, government and individual clients, including AT&T, MTS Allstream (Canada), The US Department of Justice, Office of the Attorney General of Illinois, Pennsylvania Department of Revenue,  Thomas v. Global Vision, (class action litigation, Superior Court, County of Alameda), Ayyad v. Sprint (class action litigation,  Superior Court, County of Alameda), Forcellati v. Hylands (class action, U.S. District Court, Central District of California), and Ebin v. Kangadis Foods (class action, U.S. District Court, Southern District of New York).

Mr. Weir holds an MBA with honors from Northeastern University.  He also holds a Bachelor of Arts degree *cum laude* in Business Economics from The College of Wooster.

Mr. Weir is a member of the Boston Economic Club, and a business member of the Boston Bar Association.  Mr. Weir has served on the Board of Trustees of the Waring School, and served as the comptroller for the Sybaris Investment Partnership.

ECONOMICS AND
TECHNOLOGY, INC.

**Publications and Testimony of Colin B. Weir**

Mr. Weir has co-authored the following:

*Interoperability and Spectrum Efficiency: Achieving a Competitive Outcome in the US Wireless Market* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, July 2012.

*The Price Cap LECs' "Broadband Connectivity Plan": Protecting Their Past, Hijacking the Nation's Future* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, September 2011.

*Regulation, Investment and Jobs: How Regulation of Wholesale Markets Can Stimulate Private Sector Broadband Investment and Create Jobs* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of Cbeyond, Inc., Covad Communications Company, Integra Telecom, Inc., PAETEC Holding Corp, and tw telecom inc., February 2010.

*Revisiting Us Broadband Policy: How Re-regulation of Wholesale Services Will Encourage Investment and Stimulate Competition and Innovation in Enterprise Broadband Markets*, (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, February 2010.

*Longstanding Regulatory Tools Confirm BOC Market Power: A Defense of ARMIS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, January 2010.

*Choosing Broadband Competition over Unconstrained Incumbent Market Power: A Response to Bell and TELUS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, April 2009.

*The Role of Regulation in a Competitive Telecom Environment: How Smart Regulation of Essential Wholesale Facilities Stimulates Investment and Promotes Competition* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, March 2009.

*Special Access Overpricing and the US Economy: How Unchecked RBOC Market Power is Costing US Jobs and Impairing US Competitiveness* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, August 2007.

*The AWS Spectrum Auction: A One-Time Opportunity to Introduce Real Competition for Wireless Services in Canada* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, June 2007.

*Comparison of Wireless Service Price Levels in the US and Canada* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of MTS Allstream, May 2007.



*Hold the Phone! Debunking the Myth of Intermodal Alternatives for Business Telecom Users In New York* (with Susan M. Gately and Lee L. Selwyn) Economics and Technology, Inc., prepared for the UNE-L CLEC Coalition, August 2005.

Mr. Weir has submitted the following testimony during the last four years:

**In the United States District Court, Northern District of California**, *Aaron Brand, John Flodin, individually and on behalf of all others similarly situated, v. Central Garden & Pet Company, a Delaware corporation, Breeder's Choice Pet Foods, Inc., and Does 1-50, inclusive*, Case No.: 4:21-cv-01631-JST, on behalf of Fox Law APC, Declaration submitted on March 15, 2024.

**United States District Court, Central District of California**, *Tristan Hurd and Ken Dimicco, individually and on behalf of all others similarly situated, v. G.Skill International Enterprise Co., LTD., G.Skill USA, Inc., Racerspeed, Inc., and Neuteck, Inc.*, Case No. 2:22-cv-00685-SSS-MAR, on behalf of Dovel & Luner, LLP, Declaration submitted on March 15, 2024.

**In the United States District Court for the Western District of Virginia**, *Wendy Prince, individually and on behalf of all others similarly situated, v. Johnson Health Tech Trading, Johnson Health Tech Retail, Inc., and Johnson Health Tech, Inc.*, Civil Action No. 5:22-cv-00035, on behalf of Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on February 29, 2024.

**In the United States District Court, for the Southern District of Ohio, Eastern Division,** *Judy Kirkbride and Beeta Lewis, individually and on behalf of all others similarly situated, v. The Kroger Co.*, Case No. 2:21-cv-00022-ALM-EPD, on behalf of Bursor & Fisher, P.A., Declaration submitted on February 23, 2024.

**United States District Court, for the Southern District of New York,** *Joseph Wolf, Carmen Wolf, on behalf of themselves and those similarly situated, v. Dolgen New York LLC*, Case No.: 7:23-cv-00558-PMH, Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on February 9, 2024; Supplemental Declaration filed March 20, 2024.

**United States District Court, Southern District of California,** *Heather Turrey, Oliver Fiaty, Jordan Hernandez, and Jeffrey Sazon, individually, and on behalf of all others similarly situated, v. Vervent, Inc. fka First Associates Loan Servicing, LLC; Activate Financial, LLC; David Johnson; and Laurence Chiavaro*, Case No. 3:20-cv-00697-DMS-AHG, on behalf of Blood, Hurst, & O'Reardon, LLP, Declaration submitted on February 2, 2024.

**United States District Court, Southern District of California,** *William Lessin and Carol Smalley et al, on behalf of themselves and all others similarly situated, v. Ford Motor Company*, Case No. 19-cv-1082-AJB-WVG , on behalf of McCune Law Group, Declaration submitted on December 1, 2023; Deposition on January 19, 2024.



**United States District Court, Northern District of California,** *Thomas Iglesias, David Salazar, Olivia Thurman, and Bethany Torbert, individually and on behalf of all others similarly situated, v. For Life Products, LLC*, Case No. 3:21-cv-01147-TSH, on behalf of Clarkson Law Firm, Declaration submitted on November 29, 2023; Deposition on January 4, 2024.

**United States District Court, Northern District of California,** *Matthew Sinatro and Shane Winkelbauer, individually and on behalf of all others similarly situated, v. Welch Foods Inc., A Cooperative and Promotion in Motion, Inc.*, Case No. 22-cv-07028-JD, on behalf of Clarkson Law Firm, Declaration submitted on November 20, 2023; Reply Declaration submitted on December 14, 2023; Deposition on December 20, 2023; Supplemental Declaration filed March 5, 2024.

**United States District Court, Northern District of California,** *David Swartz, as an individual, on behalf of himself, the general public and those similarly situated, v. Dave's Killer Bread, Inc., and Flowers Foods, Inc.*, Case No.: 4:21-cv-10053-YGR, on behalf of Gutride Safier, LLP, Declaration submitted on November 17, 2023; Deposition on January 23, 2024.

**United States District Court, District of New Jersey,** *Thomas Niemczyk, individually, and on behalf of a class of similarly situated individuals, Pro Custom Solar LLC, D/B/A Momentum Solar*, Case No. 2:19-cv-07846-ES-MAH; *Herbert Walters, Rick Hill, and Barry Wolford, individually, and on behalf of a class of similarly situated individuals, v. Pro Custom Solar LLC, D/B/A Momentum Solar*, Case No. 2:22-cv-00247-ES-MAH, on behalf of Bursor & Fisher, P.A., Declaration submitted on October 16, 2023.

**United States District Court, Northern District of California,** *Steven C. Johnson, an individual, on behalf of himself and all others similarly situated, v. GLOCK, INC., a Georgia Corporation; Glock Ges.m.b.H, an Austrian entity; John and Jane Does I through V; ABC Corporations I-X, XYZ Partnerships, Sole Proprietorships and/or Joint Ventures I-X, Gun Component Manufacturers I-V*, CASE NO.: 3:20-cv-08807-WHO, on behalf of Lewis and Lewis Trial Lawyers, PLC, Declaration submitted October 12, 2023.

**United States District Court, Northern District of California,** *Kenneth Glassman, individually and on behalf of all others similarly situated, v. Edgewell Personal Care, LLC*, Case No. 3:21-cv-07669-RS, on behalf of Bursor & Fisher, P.A., Declaration submitted on September 14, 2023; Deposition on November 8, 2023; Reply Declaration submitted on February 12, 2024.

**United States District Court, for the Northern District of California, San Francisco,** *Tracy Howard, Adina Ringler, and Trecee Artis on behalf of themselves and those similarly situated, v. Hain Celestial Group, Inc., d/b/a Earth's Best*, Case No. 3:22-cv-00527-VC, on behalf of Gutride Safier LLP, Declaration submitted on September 5, 2023; Deposition on October 12, 2023; Reply Declaration submitted on December 13, 2023.

**Superior Court of the State of California, for the County of Alameda, Northern Division,** *Patricia Bland and Edward White, individually and on behalf of all others similarly situated, v. Premier Nutrition Corporation; and DOES 1-25, inclusive*, Case No. RG19002714, on behalf of Blood, Hurst, & O'Reardon, LLP, Deposition on September 1, 2023.

**United States District Court, Northern District of California,** *Antonio Mckinney, Clint Sundeen, and Joseph Alcantara, each individually and on behalf of all others similarly situated, v. Corsair Gaming, Inc.*, Case No. 3:22-cv-00312-CRB, on behalf of Dovel & Luner, LLP, Declaration submitted on September 1, 2023; Deposition on January 9, 2024.

**United States District Court, Northern District of California,** *Matthew Sinatro, and Jessica Prost, individually and on behalf of all others similarly situated, v. Barilla America, Inc*., Case No: 4:22-cv-03460, on behalf of Clarkson Law Firm, Declaration submitted on August 30, 2023; Reply Declaration submitted on February 7, 2024.

**United States District Court, for the Central District of California,** *Kathleen Cadena, et al., v. American Honda Motor Company, Inc.*, Case No. 2:18-cv-04007-MWF-MAA, on behalf of Gibbs Law Group, LLP, Declaration submitted on August 11, 2023; Deposition on September 27, 2023.

**United States District Court, for the Eastern District of Michigan,** *Edward Pistorio, Paul Murdock, Daniel Przekop, Hasan Aktulga, Sandra and Thomas Kloszewski, Randall Courtney, Corey Gerritsen, Sara Elice, Justin Bagley and Elizabeth Bagley, and Marcus Swindle on behalf of themselves and all others similarly situated, v. FCA US LLC*, Case No.: 2:20-cv-11838-SFC-RSW, on behalf of Capstone Law APC, Declaration submitted on July 31, 2023; Deposition on September 13, 2023.

**United States District Court, District of Minnesota,** *Teeda Barclay, Jay Ovsak, and Nicole Nordick, individually, and on behalf of others similarly situated, v. iFIT Health & Fitness, Inc. f/k/a Icon Health & Fitness, Inc., and Nordictrack, Inc.*, Case No. 0:19-cv-02970-ECT-DTS, on behalf of Markovits, Stock & DeMarco, LLC, Declaration submitted on July 14, 2023; Deposition on August 9, 2023; Declaration submitted on January 2, 2024.

**United States District Court, Eastern District of Michigan, Southern Division,** *Bobby Roe, et al., individually and on behalf of all others similarly situated, v. Ford Motor Company*, Case No. 2:18-cv-12528-LGM-APP, on behalf of Kessler Topaz Meltzer & Check LLP, Declaration submitted on June 28, 2023.

**United States District Court, for the Central District of California, Eastern Division**, *Sarah McCracken, Individually and on behalf of all others similarly situated, v. KSF Acquisition Corporation*, Case No. 5:22-cv-01666, on behalf of Schubert Jonckheer & Kolbe, Declaration submitted on May 24, 2023.

ECONOMICS AND TECHNOLOGY, INC.

**United States District Court, Northern District of California, Oakland Division,** *Jonathan Rusoff and Joseph Gambino, on behalf of themselves and all others similarly situated, v. The Happy Group, Inc., a corporation; and DOES 1 through 10, inclusive*, Case No.: 4: 21-cv-08084-YGR, on behalf of The Wand Law Firm, Declaration submitted on April 11, 2023; Deposition on May 10, 2023; Reply Declaration submitted on July 18, 2023.

**United States District Court, Northern District of Illinois,** *Justin O'Connor, Stanislaw Zielinski, Daniel Fair, Bryan Smith, Jason Steen, William Fiedler, Michael Barcelona, Robert Marino, Brian Dougherty, Susan Heller, Victor M. Orndorff, and Michael McDonald on behalf of themselves and all others similarly situated, v. Ford Motor Company*, Case No. 1:19-cv-05045, on behalf of Milberg Coleman Bryson Phillips Grossman, LLC, Declaration submitted on March 30, 2023; Reply Declaration submitted on June 1, 2023; Deposition on June 15, 2023.

**United States District Court, Northern District of California, Oakland Division,** *In re: Plum Baby Food Litigation*, Case No. 21-cv-00913-YGR, on behalf of Lockridge Grindal Nauen P.L.L.P., Declaration submitted on December 20, 2022; Deposition on February 27, 2023; Declaration submitted on September 29, 2023.

**United States District Court, Northern District of California,** *Lisa M. Moore, individually and on behalf of all others similarly situated, v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC; Pfizer Inc.*, Case No. : 4:20-cv-09077-JSW, on behalf of Clarkson Law Firm and Moon Law APC, Declaration submitted on December 7, 2022; Deposition on April 13, 2023.

**United States District Court, Southern District of California,** *Montiqueno Corbett, Damaris Luciano, and Rob Dobbs, individually and on behalf of all others similarly situated, v. Pharmacare U.S., Inc.*, Case No.: 3:21-cv-00137-GPC-AG, on behalf of Milberg LLC, Declaration submitted on September 30, 2022; Declaration submitted on March 22, 2023; Deposition on April 10, 2023; Supplemental Declaration submitted on April 24, 2023.

**In the United States District Court, for the Eastern District of Texas, Sherman Division,** *William Squires, Jesse Badke, Ahmed Khalil, Michelle Nidever, John Murphy, Kevin Neuer, Nicholas Williams and Donna Sue Scott, on behalf of themselves and all others similarly situated, v. Toyota Motor Corp, Toyota Motor North America, Inc. and Toyota Motor Sales, U.S.A., Inc.*, Case No.: 4:18-cv-00138, on behalf of Berger Montague, P.C., Declaration submitted September 29, 2022; Deposition on October 27, 2022; Reply Declaration submitted December 21, 2022.

**United States District Court, Northern District of California,** *Anthony Bush, individually and on behalf of all others similarly situated, v. Rust-Oleum Corporation* Case No.: 3:20-cv-03268-LB, on behalf of Clarkson Law Firm and Moon Law, Declaration submitted on September 27, 2022; Deposition on February 8, 2023.



**United States District Court, Southern District of California,** *William D. Petterson, individually and on behalf of all others similarly situated, v. Circle K Stores Inc.*, Case No. 3:21-cv-00237-RBM-BGS, on behalf of Bursor & Fisher, P.A., Declaration submitted on September 22, 2022; Deposition on October 11, 2022.

**Superior Court of the State of California, For the County Of Santa Clara,** *Elizabeth J. VanCleave, and Katherine Hassan, individually and on behalf of a class of similarly situated individuals, v. Abbott Laboratories*, Case No. 19CV345045, on behalf of Goldstein, Borgen, Dardarian & Ho, Declaration submitted on September 19, 2022; Reply Declaration submitted on January 10, 2023; Deposition on February 1, 2023.

**United States District Court, Southern District of New York,** *Asher Haft, Robert Fisher, and Cheryl Jones, individually and on behalf of all others similarly situated, v. Haier US Appliance Solutions, Inc. d/b/a GE Appliances*, Case No.: 1:21-cv-00506-GHW, on behalf of Milberg LLC, Declaration submitted on August 12, 2022.

**United States District Court for the District of Delaware,** *Michael Ninivaggi, Jake Mickey and Cailin Nigrelli, individually and on behalf of all others similarly situated, v. University of Delaware*, Case No. 20-cv-1478-SB, and *Hannah Russo, individually and on behalf of all others similarly situated, v. University of Delaware*, Case No. 20-cv-1693-SB, on behalf of Bursor & Fisher, P.A., Declaration submitted on July 1, 2022; Declaration submitted on August 1, 2022; Deposition on August 19, 2022; Reply Declaration submitted September 30, 2022.

**United States District Court, Central District of California,** *Kimberly Banks and Carol Cantwell, on behalf of themselves and all others similarly situated, v. R.C. Bigelow, Inc., a corporation; and DOES 1 through 10, inclusive,* Case No.: 20-cv-06208-DDP (RAOx), on behalf of The Wand Law Firm, Declaration submitted on June 17, 2022; Rebuttal Declaration submitted October 3, 2022; Declaration submitted on March 6, 2024.

**United States District Court, Central District of California,** *Mocha Gunaratna and Renee Camenforte, individually and on behalf of all others similarly situated, v. Dr. Dennis Gross Skincare, LLC, a New York Limited Liability Company*, Case No. 2:20-cv-02311-MWF-GJS, on behalf of Clarkson Law Firm, P.C.; Declaration submitted on March 30, 2022; Deposition on May 20, 2022; Reply Declaration submitted on September 22, 2022.

**Superior Court of the State of California, County of Santa Clara,** *Lance Dutcher, individually and on behalf of all others similarly situated, v. Google LLC, d/b/a YouTube, and YouTube LLC,* Case No. 20CV366905, on behalf of Bursor & Fisher, P.A., Declaration submitted on March 2, 2022; Deposition on May 17, 2022; Reply Declaration submitted on August 2, 2022; Declaration submitted on May 2, 2023.

ECONOMICS AND
TECHNOLOGY, INC.

**United States District Court, Middle District of Tennessee, Nashville Division,** *In re Nissan North America, Inc. Litigation; Lakeita Kemp, individually and on, behalf of all others similarly situated v. Nissan North America, Inc., and Nissan Motor Co., Ltd.*, Cases Nos. 3:19-cv-00843, Case No. 3:19-cv-00854, on behalf of DiCello Levitt Gutzler, Declaration submitted February 28, 2022; Deposition on August 25, 2022; Reply Declaration submitted on November 15, 2022.

**In the Court of Claims, for the State of Ohio,** *Autumn Adams, individually and on behalf of all others similarly situated v. University of Cincinnati*, Case No. 2021-00458JD, on behalf of Bursor & Fisher, P.A., Declaration submitted February 11, 2022; Deposition on August 10, 2022; Reply Declaration submitted on November 16, 2022.

**United States District Court, Northern District of California, San Francisco Division,** *Eric Fishon, individually and on behalf, of all others similarly situated, v. Premier Nutrition Corporation f/k/a Joint Juice, Inc.*, Case No. 3:16-cv-06980-RS, on behalf of Blood, Hurst, & O'Reardon, LLP, Expert Report submitted January 24, 2022; Deposition on March 11, 2022; Oral Testimony and Cross Examination on May 31, 2022.

**Superior Court for the State of California, for the County of Alameda,** *Michelle Moran, an individual on behalf of herself and all others similarly situated, v. S.C. Johnson & Son, Inc.*, Case No.: RG20067897, on behalf of Clarkson Law Firm, P.C.; Declaration submitted on November 12, 2021.

**United States District Court, Eastern District of Michigan,** *Chapman, et al., v. General Motors, LLC*, Case No. 2:19-cv-12333-TGB-DRG, on behalf of Hagens Berman Sobol Shapiro LLP, Declaration submitted on November 10, 2021; Declaration submitted on March 1, 2022; Deposition on April 13, 2022; Reply Declaration submitted on June 16, 2022.

**United States District Court, Central District of California,** *Terry Sonneveldt, Esther Wright Schneider, Michael Bibbo, Alan Meshberg, Brian Hume, Amie Levasseur, Jean Levasseur, Christopher Lacasse, Beth Pickerd, Dan Pickerd, Tim Halwas, Erin Matheny, Lewis Delvecchio, Jon Sowards, Lawrence Bohana, Monika Bohana, David Dennis, Jacqueline S. Aslan, Michael Gilreath, and Renatta Gilreath, individually and on behalf of all others similarly situated, v. Mazda Motor of America, Inc. D/B/A Mazda North American Operations and Mazda Motor Corporation*, Case No.: 8:19-cv-01298-JLS-KES, on behalf of Kessler Topaz Meltzer & Check, LLP, Declaration submitted on November 3, 2021; Declaration submitted on March 11, 2022; Deposition on April 4, 2022; Declaration submitted July 26, 2022.

**United States District Court, Southern District of Texas, Corpus Christi Division,** *Tyler Allen Click, Troy Bowen, Bailey Henderson, Ethan Galan, Luis G. Ochoa Cabrera, Homero Medina, Michael Guidroz, Scott A. Hines, Bryan J. Tomlin, Quentin Alexander, and Jacqueline Bargstedt, individually and on behalf of all others similarly situated, v. General Motors LLC*, Case No. 2:18-cv-00455-NGR, on behalf of Hagens Berman Sobol Shapiro LLP, Declaration submitted on October 12, 2021.



**In the Court of Claims, for the State of Ohio,** *Lawrence Keba, individually and on behalf of all others similarly situated v. Bowling Green University*, Case No. 2020-00639JD, on behalf of Bursor & Fisher, P.A., Declaration submitted September 29, 2021; Reply Declaration submitted on November 26, 2021; Declaration submitted on March 31, 2023.

**In the Court of Claims, for the State of Ohio,** *Mackenzie Weiman and Sarah Baumgartner, on behalf of themselves and all others similarly situated v. Miami University*, Case Nos. 2020-00614JD and 2020-00644JD, on behalf of Bursor & Fisher, P.A., Declaration submitted September 29, 2021; Reply Declaration submitted on November 10, 2021.

**United States District Court, Southern District of New York,** *Eric Fishon and Alicia Pearlman, individually and on behalf of all others similarly situated, v. Peloton Interactive, Inc.*, Case No. 1:19-cv-11711-LJL, on behalf of DiCello Levitt Gutzler and Keller Lenkner, Declaration submitted September 15, 2021; Deposition on October 12, 2021; Reply Declaration submitted on November 1, 2021; Declaration submitted on October 17, 2022; Reply Declaration submitted on November 30, 2022.

**In the Court of Claims, for the State of Ohio,** *Caitlyn Waitt and Jordan Worrell v. Kent State University*, Case No. 2020-00392JD, on behalf of Bursor & Fisher, P.A., Declaration submitted September 15, 2021; Reply Declaration submitted on November 11, 2021.

**United States District Court, Northern District of California,** *Christopher Julian, Mark Pacana, Paul Fiskratti, and Wayne Lewald, on behalf of themselves and all others similarly situated, v. TTE Technology, Inc., dba TCL North America*, Case No. 3:20-cv-02857-EMC, on behalf of Milberg LLC, Declaration submitted on August 27, 2021; Deposition on October 2, 2021.

**United States District Court for the Northern District of California,** *Sherris Minor, as an individual, on beha1f of herself, the general public and those similarly situated, v. Baker Mills, Inc.; and Kodiak Cakes, LLC*, Case No. 20-cv-02901-RS, on behalf of Gutride Safier, LLP, Declaration submitted August 2, 2021; Deposition on September 2, 2021; Reply Declaration submitted on October 18, 2021.

**In the Court of Claims, for the State of Ohio,** *Lily Zahn v. Ohio University*, Case No. 2020-00371JD, and *Gila Duke, individually and on behalf of all others similarly situated, v. Ohio University*, Case No. 2021-00036JD, on behalf of Bursor & Fisher, P.A., Declaration submitted July 30, 2021; Deposition on October 6, 2021; Reply Declaration submitted on December 2, 2021; Oral Testimony and Cross Examination on January 18, 2022.

**In the Court of Claims, for the State of Ohio,** *Brooke Smith, individually and on behalf of all others similarly situated, v. The Ohio State University*, Case No. 2020-00321JD, on behalf of Bursor & Fisher, P.A., Declaration submitted June 24, 2021; Deposition on August 26, 2021; Reply Declaration submitted on September 29, 2021.



**United States District Court, Eastern District of California,** *Felix Obertman, individually and on behalf of all others similarly situated, v. Electrolux Home Products, Inc.*, Case No. 2:19-cv-02487-KJM-AC, on behalf of Bursor & Fisher, P.A., Declaration submitted on June 14, 2021; Reply Declaration submitted on November 18, 2021.

**United States District Court, Central District of California,** *Delaney Sharpe, Erin Weiler, Jenna Leder, and Adriana DiGennaro, on behalf of themselves and all others similarly situated, v. GT's Living Foods, LLC,* Case No. 2:19-cv-10920-FMO-GJS, on behalf of Bursor & Fisher, P.A., Declaration submitted on June 2, 2021; Deposition on June 30, 2021.

**United States District Court, Southern District of New York,** *In re: Elysium Health - ChromaDex Litigation,* Case No. 1:17-cv-07394-LJL, on behalf of Frankfurt Kurnit Klein & Selz PC, Declaration submitted on April 20, 2021; Deposition, on April 26, 2021; Declaration submitted on June 4, 2021.

**United States District Court, Southern District of Texas, Corpus Christi Division,** *Darren Fulton and Craig Jude Broussard, each plaintiff is a citizen of the State of Texas, and each plaintiff individually and on behalf of all others similarly situated, v. Ford Motor Company,* Case No. 2:18-cv-00456, on behalf of Hagens Berman Sobol Shapiro LLP, Declaration submitted on March 15, 2021; Deposition on April 16, 2021; Reply Declaration submitted on July 21, 2021.

**United States District Court, Southern District of California,** *Michael Testone, Collin Shanks, and Lamartine Pierre, on behalf of themselves, all others similarly situated, and the general public,v. Barlean's Organic Oils, LLC,* Case No. 3:19-cv-00169-JLS-BGS, on behalf of Law Offices of Jack Fitzgerald, Declaration submitted on March 1, 2021; Reply Declaration submitted on May 27, 2021; Declaration submitted on February 11, 2022; Deposition on March 25, 2022.

**In The United States District Court, For the District of New Hampshire,** *Derick Ortiz, individually and on behalf of all others similarly situated, v. Sig Sauer, Inc.*, Case No.: 1:19-cv-01025-JL, on behalf of Bursor & Fisher, P.A., Declaration submitted on February 26, 2021; Rebuttal Declaration submitted on July 28, 2021; Supplemental Declaration submitted on August 6, 2021; Declaration submitted on August 13, 2021; Oral Testimony and Cross Examination on May 4, 2022.

**United States District Court, Western District of Washington,** *Tamara Lohr and Ravikiran Sindogi, on behalf of themselves and all others similarly situated, v. Nissan North America, Inc., and Nissan Motor Co., LTD.*, Case No.: 2:16-cv-01023-RSM and United States District Court, Northern District of California, San Francisco Division, *Sherida Johnson, Subrina Seenarain, Chad Loury, Linda Spry, Lisa Sullivan, and April Ahrens on behalf of themselves and all others similarly situated, v. Nissan North America, Inc.*, Case No.: 3:17-cv-00517-WHO, on behalf of Simmons Hanly Conroy LLC; Declaration submitted on February 16, 2021; Deposition on May 5, 2021; Reply Declaration submitted on August 13, 2021.

ECONOMICS AND TECHNOLOGY, INC.

**Superior Court of the State of California, County of Alameda,** *Donna Connary, Zoriana Pawluk-Florio, Adrienne Andry, and Paul Terrecillas, on behalf of themselves and all others similarly situated, v. S.C. Johnson & Son, Inc.*, Case No. RG20061675, on behalf of Feinstein Doyle Payne & Kravec, LLC; Settlement Declaration submitted on February 16, 2021.

**United States District Court, Western District of New York,** *In re: Rock 'N Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, Case MDL No. 1:19-md-2903, on behalf of Beasley Allen Law Firm, Declaration submitted on February 8, 2021; Deposition on March 11, 2021; Brief Reply Declaration submitted on September 24, 2021; Oral Testimony and Cross Examination on September 27, 2021; Reply Declaration submitted on October 13, 2021.

**Superior Court for The State of California, County of Los Angeles,** *Daniel Prescod, individually and on behalf of all others similarly situated, v. Celsius Holdings, Inc. and Does 1 through 10, inclusive*, Case No. 19STCV09321, on behalf of Clarkson Law Firm, P.C.; Declaration submitted on December 23, 2020; Deposition on April 14, 2021; Reply Declaration submitted on July 1, 2021.

**United States District Court, Central District of California,** *Sharon Willis, individually and on behalf of all others similarly situated, v. Colgate-Palmolive Co.*, Case No. 2:19-cv-08542-JGB-RAOx, on behalf of Bursor & Fisher, P.A.; Declaration submitted on December 17, 2020; Deposition on March 30, 2021; Reply Declaration submitted on July 15, 2021.

**United States District Court, Northern District of California,** *Gordon Noboru Yamagata, and Stamatis F. Pelardis, individually and on behalf of all others similarly situated, v. Reckitt Benckiser LLC*, Case No. 3:17-cv-03529-VC, on behalf of Blood, Hurst, & O'Reardon, LLP, Expert Report submitted December 4, 2020; Expert Report submitted December 15, 2020; Deposition on January 19, 2021.

**In the United States Court of Federal Claims,** *Bryndon Fisher, individually and on behalf of all others similarly situated, v. The United States of America,* Case No. 15-1575C, on behalf of Schubert Jonckheer & Kolbe, Declaration submitted on December 3, 2020; Reply Declaration submitted on October 29, 2021.

**United States District Court, for the Southern District of Ohio, Western Division,** *Laura Bechtel and Troy Thoennes, on behalf of themselves and all others similarly situated, v. Fitness Equipment Services, LLC, dba SOLE Fitness*, Case No. 1:19-cv-00726-MRB, on behalf of Markovits, Stock & DeMarco, LLC, Declaration submitted on December 2, 2020; Reply Declaration submitted on June 14, 2021.

ECONOMICS AND TECHNOLOGY, INC.

**United States District Court, Northern District of California,** *Thomas Bailey, on behalf of himself and all others similarly situated, v. Rite Aid Corporation*, Case No. 4:18-cv-06926-YGR, on behalf of Greg Coleman Law, Declaration submitted October 19, 2020; Deposition on December 10, 2020; Reply Declaration submitted on March 16, 2021; Declaration submitted on May 3, 2022.

**United States District Court, Northern District of California,** *Jeremiah Revitch, individually and on behalf of all others similarly situated, v. New Moosejaw, LLC and Navistone, Inc.*, Case No. 3:18-cv-06827-VC, on behalf of Bursor & Fisher P.A., Declaration submitted on September 28, 2020, Deposition on November 20, 2020.

**United States District Court, Southern District of Florida,** *Javier Cardenas, Rodney and Pamela Baker, Michelle Monge, and Kurt Kirton, individually and on behalf of all others similarly situated, v. Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., Toyota Motor Engineering & Manufacturing North America, Inc., and Southeast Toyota Distributors, LLC*, Case No.: 18-cv-22798-CIV-FAM, on behalf of Kessler Topaz Meltzer & Check, LLP, Declaration submitted on September 17, 2020; Declaration submitted on October 20, 2020; Deposition on November 12, 2020; Rebuttal Declaration submitted on November 24, 2020; Supplemental Declaration submitted on December 8, 2020; Rebuttal Declaration filed on December 9, 2020; Supplemental Declaration submitted on February 17, 2023; Oral Testimony and Cross Examination on March 7, 2023.

**United States District Court, Northern District of California,** *Ralph Milan, Sarah Aquino, and Elizabeth Arnold, on behalf of themselves, those similarly situated and the general public, v. Clif Bar & Company,* Case No. 3:18-CV-02354-JD, on behalf of Law Office of Paul K. Joseph, PC, Declaration submitted on September 17, 2020; Deposition on October 23, 2020; Reply Declaration submitted on November 27, 2020; Declaration submitted on March 2, 2021; Declaration submitted on April 9, 2021; Deposition on May 7, 2021.

**Superior Court of The State of California, County of Orange,** *William Brady, on behalf of himself and all others similarly situated, v. Bayer AG; Bayer Corporation; Bayer Healthcare LLC; and Does 1 through 10, inclusive*, Case No. 0-2016-00839608-CU-MC-CXC, on behalf of Wolf Haldenstein Adler Freeman & Herz LLP, Declaration submitted on September 9, 2020; Deposition on December 4, 2020.

**United States District Court, for the Southern District of New York,** *Matthew Chamlin, individually and on behalf of all others similarly situated, v. Johnson & Johnson and McNeil Nutritionals, LLC*, Case No. 1:19-cv-03852-AJN-DCF, on behalf of Bursor & Fisher P.A., Declaration submitted on August 14, 2020.

**United States District Court, Northern District of California, San Francisco Division,** *Daniel Zeiger, Individually, and on Behalf of All Others Similarly Situated, v. Wellpet LLC, A Delaware Corporation*, Case No. 3:17-CV-04056-WHO, on behalf of Gustafson Gluek PLLC, Declaration submitted on June 29, 2020.



**United States District Court, Central District of California, Western Division,** *Roberta Bilbrey, Jimmy Banh, Lawrence Goldman, Mark Peoples, Jamal Samaha, George Quinlan, Kara Drath, Gary Hanna, Sarah Gravlin, Caitlin Kremer, Cindy Ortiz, Alexis Chisari, Robert Moss, Michael Brumer, Dave Jahsman, John Bartholomew, Vimal Lawrence, Kayce Kleehamer, Mark Klein, Brian Klein, Charles Denaro, Adam Pryor, Srikarthik Subbarao, Daniel Allan, Paul Gonzales, Eric Faden, Hamilton Hines, And Kristen Gratton, on behalf of themselves and all others similarly situated, v. American Honda Motor Co., Inc., a California Corporation*, Case No.: 2:19-cv-05984 RGK (ASx), on behalf of Hagens Berman Sobol Shapiro LLP, Declaration submitted on April 9, 2020; Reply Declaration submitted on May 18, 2020; Deposition on June 12, 2020; Declaration submitted July 24, 2020.

**United States District Court, Central District of California,** *Will Kaupelis and Frank Ortega, individually and on behalf of all others similarly situated, v. Harbor Freight Tools, Inc.*, Case No. 8:19-cv-1203-JVS-DFM, on behalf of Bursor & Fisher, P.A., Deposition on May 28, 2020; Reply Declaration submitted on September 8, 2020.

**Superior Court of the State of California, County of Los Angeles,** *Jeffrey Koenig, on behalf of himself and all others similarly situated, v. Vizio, Inc.*, Case No. BC 702266, on behalf of Greg Coleman Law, Deposition on April 30, 2020; Reply Declaration submitted on July 13, 2020; Declaration submitted on August 31, 2021; Deposition on October 15, 2021; Supplemental Declaration submitted on May 2, 2022; Deposition on May 12, 2022; Supplemental Declaration submitted January 16, 2023; Deposition on February 13, 2023.

**United States District Court, Northern District of California, San Francisco Division,** *Jennifer Nemet, Norbert Kahlert, Angela Matt Architect, Inc., Eddie Field, Tonya Dreher, Adam Schell, Bryan Sheffield, Darryl Lecours, Gisbel De La Cruz, Derek Winebaugh, Michael Skena, Melissa St. Croix, Andrew Olson, John Kubala, Brendan Daly, Steven Ferdinand, Ken Galluccio, Steven Rawczak, Mark Miller, Sven Hofmann, Thomas Siehl, III, Adam Schell, Bradley Conner, Benjamin Tyler Dunn, Ingrid Salgado, Michael Bowman, and Jon Mosley, on behalf of themselves and all others similarly situated, v. Volkswagen Group of America, Inc., Volkswagen AG, Audi AG, Audi of America, LLC, Robert Bosch Gmbh, Robert Bosch LLC, Richard Dorenkamp, Heinz-Jakob Neusser, Jens Hadler, Bernd Gottweis, Oliver Schmidt, and Jurgen Peter,* Case No. 3:17-cv-04372-CRB, on behalf of Hagens Berman Sobol Shapiro LLP, Reply Declaration submitted on April 30, 2020; Deposition on July 22, 2020.

**United States District Court, Norther District of California, San Francisco Division,** *Vicky Maldonado and Justin Carter, individually and on behalf of themselves and all others similarly situated, v. Apple Inc., Applecare Service Company, Inc., and Apple CSC, Inc.,* Case No. 3:16-cv-04067-WHO, on behalf of Hagens Berman Sobol Shapiro LLP, Supplemental Declaration submitted on September 14, 2020; Deposition on November 17, 2020.

ECONOMICS AND
TECHNOLOGY, INC.

**United States District Court, District of New Jersey,** *Brian Gozdenovich, on behalf of himself and all others similarly situated, v. AARP, Inc., AARP Services Inc., AARP Insurance Plan, Unitedhealth Group, Inc., and Unitedhealthcare Insurance Company,* Case No. 9:18-cv-81258-DMM, on behalf of Bursor & Fisher, P.A., Declaration submitted on March 26, 2020; Deposition on July 1, 2020; Rebuttal Declaration submitted on July 9, 2020.

**United States District Court, for the Central District of California, Western Division,** *Toya Edwards, on behalf of herself and all others similarly situated, v. Walmart Inc.,* Case No. 1:18-cv-9655, on behalf of Simmons Hanly Conroy LLC, Reply Declaration submitted on June 28, 2021.

**United States District Court, Southern District of California,** *Patrick McMorrow, Marco Ohlin and Melody DiGregorio, on behalf of themselves, all others similarly situated and the general public, v. Mondelez International, Inc.,* Case No. 3:17-cv-02327-BAS-JLB, on behalf of Law Offices of Jack Fitzgerald, Declaration submitted on May 4, 2020; Omnibus Declaration submitted on August 28, 2020; Declaration submitted on May 14, 2021; Rebuttal Declaration submitted on July 2, 2021.

**United States District Court, Central District of California, Western Division,** *Barry Braverman, et al., v. BMW of North America, LLC, et al.,* Case No. 8:16-cv-00966-TJH-SS, on behalf of Hagens Berman Sobol Shapiro LLP, Supplemental Declaration submitted on July 6, 2020.

**United States District Court, Northern District of California,** *Debbie Krommenhock and Stephen Hadley, on behalf of themselves, all others similarly situated, and the general public, v. Post Foods, LLC,* Case No. 3:16-cv-04958-WHO (JSC), on behalf of Law Offices of Jack Fitzgerald, PC, Supplemental Declaration submitted on November 16, 2020; Declaration submitted on January 18, 2021.

**United States District Court, Southern District of New York,** *Anne De Lacour, Andrea Wright, and Loree Moran individually and on behalf of all others similarly situated, v. Colgate-Palmolive Co., and Tom's of Maine Inc.,* Case No. 1:16-cv-08364-RA, on behalf of Bursor & Fisher, P.A., Reply Declaration submitted April 9, 2020; Declaration submitted on July 22, 2022; Deposition on September 9, 2022.

**United States District Court, Northern District of California,** *Stephen Hadley, on behalf of himself, all others similarly situated, and the general public, v. Kellogg Sales Company,* Case No. 5:16-cv-04955-LHK-HRL, on behalf of Law Offices of Jack Fitzgerald, PC, Declaration submitted on July 16, 2020; Declaration submitted on March 10, 2021.

**United States District Court, Northern District of California,** *Sandra McMillion, Jessica Adekoya and Ignacio Perez, on Behalf of Themselves and all Others Similarly Situated, v. Rash Curtis & Associates,* Case No. 16-cv-03396-YGR, on behalf of Bursor & Fisher, P.A., Oral Testimony and Cross Examination May 7 - 8, 2019.



**United States District Court, Eastern District Of New York, Brooklyn Division,** *Reply All Corp., v. Gimlet Media, Inc.,* Case No. 15-cv-04950-WFK-PK, on behalf of Wolf, Greenfield & Sacks, P.C., Deposition on October 16, 2019.

Mr. Weir has provided expert testimony since 2007, served as a consultative expert in numerous proceedings that did not result in testimony, and has contributed research and analysis to numerous additional projects, publications and testimony at the state, federal, and international levels.

ECONOMICS AND TECHNOLOGY, INC.

**Exhibit 2**


**Documents Reviewed**

- First Amended Class Action Complaint, filed June 17, 2022

- Deposition of Dan Letchinger, November 10, 2023

- Defendants' Supplemental Responses to First Set of Interrogatories

- February 11, 2024 Declaration of Ran Kivetz

- February 12, 2024 Declaration of Joao C. dos Santos

- Deposition of Joao C. dos Santos, March 15, 2024 (and Exhibits)

- Deposition of Ran Kivetz, March 13, 2024 (and Exhibits)

- Case, Fair & Oster, Principles of Microeconomics, 9th Edition, 2009

- Sawtooth Software technical papers, available online at

https://sawtoothsoftware.com/resources/technical-papers

- *When "All Natural" May Not Be*, Analysis Group Forum (Winter 2013)

https://www.analysisgroup.com/when-all-natural-may-not-be

- Applying Conjoint Analysis to Legal Disputes: A Case Study, Wind, Yoram, et al.

- Khoday v. Symantec Corp., 2014 WL 1281600, at *10 (D. Minn. March 13, 2014)

- Sanchez-Knutson v. Ford Motor Company, 310 F.R.D. 529, 538-39 (S.D. Fl. 2015)

- In re: Lenovo Adware Litigation, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016)

- Guido v. L'Oreal, USA, Inc., 2014 WL 6603730, at *5, *10-*14 (C.D. Cal. July 24, 2014)

- Brown v. Hain Celestial Group, Inc., 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014)

-  Microsoft v. Motorola, Inc., 904 F.Supp.2d 1109, 1119-20 (W.D. Wa. 2012)

- In re Scotts EZ Seed Litig., 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015)

- Dzielak v. Maytag, 2017 WL 1034197, at *6 (D. NJ. March 17, 2017)

- TV Interactive Data Corp. v. Sony Corp., 929 F. Supp. 2d 1006, 1022 & n.6 (N.D. Cal. 2013)

- Briseno v. ConAgra Foods, Inc., 844 F.3d 1121 (9th Cir. 2017)

- Fitzhenry-Russell v. Dr Pepper Snapple Group, Inc., 2018 WL 3126385 (N.D. Cal. June 26, 2018)

- In Re Arris Cable Modem Consumer Litig., 2018 WL 3820619, at *25-*31 (N.D. Cal. Aug. 10, 2018)

- Hadley v. Kellogg Sales Co., 2018 WL 3954587, at *11-*16 (N.D. Cal. Aug. 17, 2018)

- Martinelli v. Johnson & Johnson, 2019 WL 1429653, at *3-4 (E.D. Cal. Mar. 29, 2019)

- Krommenhock v. Post Foods, LLC, 2020 U.S. Dist. LEXIS 40463 (N.D. Cal. Mar. 9, 2020)

- Hudock v. LG Elecs. USA, Inc., 2020 U.S. Dist. LEXIS 54994 (D. Minn. Mar. 30, 2020)

- Koenig v. Vizio, Inc., Los Angeles Superior Court Case No. BC702266 (L.A. Super. Ct. Aug. 24, 2020)

- Banh v. American Honda Motor Co., Inc., 2020 WL 4390371 (C.D. Cal. July 28, 2020)

- Kaupelis v. Harbor Freight Tools, Inc., Case No. 19-cv-1203-JVS (C.D. Cal. Sep. 23, 2020)

- McMorrow v. Mondelez Int'l Inc., 2021 WL 859137 (S.D. Cal. Mar. 8, 2021)

- de Lacour v. Colgate-Palmolive Co., 2021 WL 1590208 (S.D.N.Y. Apr. 23, 2021)

- Bailey v. Rite Aid Corp., 2021 WL 1668003 (N.D. Cal. Apr. 28, 2021)

- Cardenas v. Toyota Motor Corp., Case No.: 18-cv-22798, 2021 U.S. Dist. LEXIS 152920 (S.D. Fla. Aug. 12, 2021)

- Prescod v. Celsius Holdings, Inc., No. 19STCV09321 (Cal. Super. Ct. Cnty. L.A. Aug 2, 2021)

- Bechtel v. Fitness Equipment Svcs., LLC, No. 1:19-CV-726, 2021 WL 4147766 (S.D. Ohio Sept. 12, 2021)

- Milan v. Clif Bar & Co., 2021 WL 4427427, (N.D. Cal. Sept. 27, 2021)

- Testone v. Barlean's Organic Oils, No. 19-cv-169-JLS (S.D. Cal.), Dkt. No. 98, Order Granting Motion for Class Certification (Sept. 28, 2021)

- Johnson v. Nissan N. Am., Inc., 2022 WL 2869528, at *5 (N.D. Cal. July 21, 2022)

- Sonneveldt v. Mazada, 2022 WL 17357780, Order Granting-in-Part Def's Mot. to Exclude (C.D. Cal. Oct. 21, 2022)

- Willis v. Colgate Palmolive Co., No. CV 19-8542 JGB (RAOx), ECF No. 105 (C.D. Cal Jan. 5, 2023)

- Chapman v. General Motors, Case No. 2:19-CV-12333-TGB-DRG, 2023 WL 2745161 (E.D. Mich. Mar. 31, 2023)

- Gunaratna v. Dennis Gross Cosmetology LLC, Case No. CV 20-2311-MWF (GJSx), 2023 WL 2628620 (C.D. Cal. Mar. 15, 2023)

- Banks v. R.C. Bigalow, Inc., No. 20-CV-06208 DDP (RAOx) (C.D. Cal. Jul. 31, 2023)

- Bush v. Rust-Oleum Corp., Case No. 3:20-cv-03268-LB (N.D. Cal. Feb. 5, 2024), ECF No. 189, Amended Order Granting Motion for Class Certification

- Apple, Inc. v. Samsung Elecs. Co., 2014 WL 976898, at *12 (N.D. Cal. Mar. 6, 2014).

- Comcast Corp. v. Behrend, 569 U.S. 27, 38 (2013)

- In re: Dial Complete Marketing and Sales Practices Litigation, MDL Case No. 11-md-2263-SM, Opinion No. 2017 DNH 051

- *Getting Started with Conjoint*, Bryan Orme, 2020

- Applied Conjoint Analysis, Rao, Vithala

- Estimating Consumers' Willingness to Pay for Health Food Claims: A Conjoint Analysis, Mitsunori Hirogaki, International Journal of Innovation, Management and Technology, Vol. 4, No. 6, December 2013

- Testing Consumer Perception of Nutrient Content Claims Using Conjoint Analysis, Drewnowski, Adam et al., Public Health Nutrition: 13(5)

- Evaluation of Packing Attributes of Orange Juice on Consumers' Intention to Purchase by Conjoint Analysis and Consumer Attitudes Expectation, Gadioli, I. L. et al., Journal of Sensory Studies 28 (2013)

- Bryan Orme, Sawtooth Software, on "Market Simulators for Conjoint Analysis." https://www.sawtoothsoftware.com/download/techpap/introsim.pdf

- Joel Huber et al., 2006. "Dealing with Product Similarity in Conjoint Simulations"

- Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi (2014), "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, 12(4), 421 – 456

- Ofek, E., Toubia, O., *Conjoint Analysis: A Do it Yourself Guide*, Harvard Business School, August 2014

- Wahyu Oktri Widyarto, Nugraheni Djamal, Alif Rizki Awali, A Study on Consumer Preference for Laptop Products using Conjoint Analysis and Cluster Analysis, International Journal of Engineering Research and Technology (IJERT), Volume 06, Issue 08 (August 2017), 239-242

- *Free Range, Organic? Polish Consumers Preferences Regarding Information on Farming System and Nutritional Enhancement of Eggs: A Discrete Choice Based Experiment,* Zakowska-Biemans, Sylwia and Agnieszka Tekien, Sustainability 9 (2017)

-

- 2023 Sawtooth Software Annual User Survey

- Handbook of Marketing Analytics, Natalie Mizik, Dominique Hanssens (2018)

- Reference Manual on Scientific Evidence

- Flowers Foods, Inc., Form 10-K Annual Report

- Grupo Bimbo, Annual Report 2022, 2021, available online at grupobimbo.com/en/investors/reports/annual-reports

- Target Corporation, 10-K Annual Report

- Walmart, Inc. 10-K Annual Report

- Kroger, Co. 10-K Annual Report

- Albertson's Form 10-K Annual Report

- Publix Super Markets, 10-K Annual Report

- daveskillerbread.com

- oroweat.com

- pepperidgefarm.com

- flowersfoods.com

- grupobimbo.com

- bimbobakeriesusa.com

- safeway.com

- wholefoods.com

- walmart.com

- target.com

- albertsons.com

- kroger.com

- ralphs.com

- sawtoothsoftware.com

- dynata.com

- FLO_000000001-9

- FLO_000000024

- FLO_000000032-33

- FLO_000000042-46

- FLO_000000054-63

- FLO_000000077-78

- FLO_000000089-92

- FLO_000000108-109

- FLO_000000111-129

- FLO_000000145-153

- FLO_000000159-161

- FLO_000000509-529

- FLO_00000530 - FLO_00000583

- FLO_00000702 - FLO_00000703

- FLO_00000715

- FLO_00000740

- FLO_00001590-1592

- FLO_00002887-2889

- FLO_00002890-2900

- FLO_00004007-4064

- FLO_00005310

- IRI Data received pursuant to subpoena