# EXHIBIT 4

1 UNITED STATES DISTRICT COURT
2 NORTHERN DISTRICT OF CALIFORNIA
3 OAKLAND DIVISION
4
  -------------------------------
5 DAVID SWARTZ,                      )
6           Plaintiff               )
7 vs.                                ) Case No.
8 DAVE'S KILLER BREAD, INC.,         ) 4:21-CV-10053-YGR
9 and FLOWERS FOODS, INC.,           )
10          Defendants               )
11 -------------------------------
12                CONFIDENTIAL
13
14   VIDEOTAPED DEPOSITION OF COLIN B. WEIR
15           MONDAY, MARCH 24, 2025
16           9:34 A.M. - 3:52 P.M.
17                VERITEXT
18            100 ARCH STREET
19          BOSTON, MASSACHUSETTS
20
21 REPORTED BY:
22 Sandra A. Deschaine, CSR, RPR, CLR, RSA
23 Job No. SF 7217175
24
25 PAGES 1 - 259

Page 1

CONFIDENTIAL

```
 1     APPEARANCES:
 2
 3     ON BEHALF OF THE PLAINTIFF AND WITNESS:
 4     GUTRIDE SAFIER LLP
 5          Hayley Reynolds, Esquire
 6          100 Pine Street, #1250
 7          San Francisco, California 94111
 8          415.639.9090
 9          hayley@gutridesafier.com
10
11     ON BEHALF OF DEFENDANTS:
12     KING & SPALDING LLP
13          Michael Resch, Esquire
14          Sam Diamant, Esquire (via Zoom)
15          50 California Street, Suite 3300
16          San Francisco, California 94111
17          415.318.1200
18          mresch@kslaw.com
19          sdiamant@kslaw.com
20
21     Also Present:
22          Shawn Budd, videographer
23
24
25
```

1       material to consumers or whether they would
2       have relied upon it.
3          Q.   More, do you include anything in
4       your conjoint surveys about the percent daily
5       value, correct?                                   10:59 AM
6          A.   That's correct.
7          Q.   So you're not offering any opinion
8       about the percent daily value in this report;
9       is that correct?
10         A.   To the best of my recollection,           10:59 AM
11      this report does not speak to that.
12         Q.   Those same answers would be true
13      with respect to the Nutrition Facts Panel,
14      correct?
15         A.   Yes, sir.                                 10:59 AM
16         Q.   All right.  Mr. Weir, let me mark
17      as Exhibits 11 and 12 two labels regarding
18      the regular-sliced bread product.
19      (Exhibits 11, Bates number FLO_00000009,
20       photocopies of Dave's Killer Bread 21 Grains    11:00 AM
21       and Seeds bread wrapper, marked for
22       identification.)
23      (Exhibit 12, Bates number FLO_00000058,
24       photocopies of Dave's Killer Bread 21 Grains
25       and Seeds bread wrapper, marked for              11:00 AM

1    statement, and if there was to quantify that
2    price premium; is that correct?
3            MS. REYNOLDS:  Objection, vague.
4       A.   So you could interpret that
5    question, at least to me, in at least two                11:06 AM
6    ways, one of which would be as it relates,
7    for example, to Exhibit 11, where there is a
8    specific 5g protein claim.  And I would say
9    as for this product, yes, 5g would be the
10   subject of what we were studying.                        11:07 AM
11           I believe there are other grams of
12   protein amounts, and so if you were to think
13   of your question as "what is the conjoint
14   studying generally," I would just describe it
15   neutrally as the grams of protein without                11:07 AM
16   reference to a particular number.
17   BY MR. RESCH:
18      Q.   This survey, though, doesn't make
19   any effort to distinguish between products
20   based on whether it had a percent DV for                 11:07 AM
21   protein included on the label or what that
22   percent DV that was included in the label
23   would have been; is that correct?
24      A.   It is correct that the survey does
25   not include the percent DV or what the                   11:07 AM

Page 76

1  percent DV would have been.
2      Q.  So putting aside that Exhibit 13
3  has six grams of protein versus five, I think
4  you've made that clear that that's a
5  distinction, but as to the percent daily                11:08 AM
6  value where Exhibit 11 has no percent daily
7  value, Exhibit 12 has a 10 percent daily
8  value for protein, and Exhibit 13 has a 3
9  percent daily value for protein, they all
10 would have been treated the same in your               11:08 AM
11 survey, correct?
12          MS. REYNOLDS:  Objection to
13      form.
14      A.  It is correct that I would have
15 tested.  I don't think I was asked to test             11:08 AM
16 the 6g protein, but as to the five and I
17 think the four in the regular survey, I would
18 have to refresh my recollection as to the
19 specific numbers, but it is true that what I
20 was asked to measure was the grams of protein          11:08 AM
21 statement.
22 BY MR. RESCH:
23      Q.  So, in other words, if we just
24 compare Exhibit 11 to Exhibit 12 first, Mr.
25 Weir, Exhibit 11 has 5g protein.                        11:09 AM

Page 77

1        MS. REYNOLDS: Objection to form,
2    and just to clarify that the 3g protein
3    statement is on the front label.
4        A.   Again, my conjoint was designed to
5    calculate the historic price premium that            11:17 AM
6    would be the relevant to the class period.
7            It's my understanding that at
8    least this current label would not have been
9    part of the class period.
10   BY MR. RESCH:                                        11:17 AM
11       Q.   Would it have mattered if it was
12   part of the class period for your conjoint
13   study, Mr. Weir?
14       A.   Perhaps yes, perhaps no.  But I'm
15   just indicating that when you're saying I            11:18 AM
16   would do it the same way, you're talking
17   about labels, at least as to this one, that
18   would not have been part of what I was trying
19   to measure.
20       Q.   You were trying to measure any              11:18 AM
21   price premium associated with, in connection
22   with the thin-sliced bread, 3 grams of
23   protein, correct?
24       A.   Yes, sir.
25       Q.   And it didn't matter for your               11:18 AM

1  conjoint whether there was a blank percent DV
2  for protein, a 6 percent DV for protein or a
3  2 percent DV for protein, correct?
4     A.  When you say it didn't matter, I'm
5  happy to say I did not include that                    11:18 AM
6  information as part of the survey.
7     Q.  So the survey would have resulted
8  in the same answer regardless of whether
9  there was a blank percent DV for protein, a 6
10 percent DV for protein or a 2 percent DV for           11:18 AM
11 protein, correct?
12    A.  Yes.
13    Q.  Those same answers apply across
14 the four categories that you looked at,
15 albeit that the grams of protein -- the                11:19 AM
16 number of grams of protein would differ; is
17 that correct?
18    A.  Yes.
19    Q.  You can put those aside for now.
20 I'm going to give these back to the court              11:19 AM
21 reporter so that I don't take them home.  In
22 case we need them again I'll take them back.
23    A.  You can have the bread.
24    Q.  We might need those again.
25    A.  Okay.                                           11:19 AM

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1  grams of protein?

2  A. Yes.

3  Q. And Dave's has no protein

4  statement identified.

5  Do you see that?  11:59 AM

6  A. Understanding that this is an

7  example, that is how this example is

8  presented.

9  Q. And is it your intention that

10  consumers reviewing this would believe that  11:59 AM

11  the Dave's product does not have any protein

12  in it?

13  MS. REYNOLDS: Objection to

14  form.

15  A. I had no intention one way or the  12:00 PM

16  other.

17  BY MR. RESCH:

18  Q. Do you have any understanding as

19  to how consumers -- strike that.

20  Do you have any understanding as  12:00 PM

21  to how respondents of the conjoint survey

22  would view a product profile that did not

23  contain any protein in it?

24  MS. REYNOLDS: Objection to

25  form.  12:00 PM

1  A. I'm not offering an opinion about
2  that one way or the other, other than that
3  this design can allow for a market simulation
4  that would test the economic conditions of
5  what would happen if you have a loaf that                12:00 PM
6  said, for example, five grams of protein and
7  then you take that statement away.
8  BY MR. RESCH:
9  Q. When you say "take that statement
10 away," you mean so that consumers wouldn't               12:00 PM
11 see the five gram protein?
12         MS. REYNOLDS: Objection to
13     form.
14 A. That it would be not be presented
15 as it is on the front of pack of the bread.              12:00 PM
16 BY MR. RESCH:
17 Q. There's nothing in this that says
18 "front of pack," is there, Mr. Weir?
19         MS. REYNOLDS: Objection to
20     form.                                                12:01 PM
21 A. Does not say "front of pack." It
22 does say "label statements."
23 BY MR. RESCH:
24 Q. All right. Now, do you recall,
25 and you can look back at page 18, if you'd               12:01 PM

Page 124

1  that I would not emote about that

2  circumstance because the conjoint is not

3  designed to test the prominence of the

4  statements?

5          I just want to make sure I                    12:02 PM

6  understand your question.

7      Q.  Well, let's take the second part.

8          Is a conjoint survey designed to

9  test the prominence of the statements?

10     A.  No.  All of the attributes are                12:03 PM

11 presented in a neutral way.

12     Q.  So is it fair to say, Mr. Weir,

13 that it's outside the scope of the conjoint

14 what a particular statement has in terms of

15 prominence on a label?                                12:03 PM

16         MS. REYNOLDS:  Objection to

17     form.

18     A.  We are not including in the

19 conjoint an indicia of the prominence on the

20 label.                                                12:03 PM

21 BY MR. RESCH:

22     Q.  And that's common practice for a

23 conjoint, correct?

24     A.  Yes, it is.

25     Q.  And do you agree with me, Mr.                 12:03 PM

Page 126

1  Weir, that the conjoint also is not
2  considering the placement of the statement?
3          MS. REYNOLDS:  Objection to
4      form.
5      A.   That is also something that is not    12:03 PM
6  directly indicated, although, again, they are
7  identified in terms of the label statements
8  as being label statements.
9  BY MR. RESCH:
10     Q.   Right.  And would you agree with      12:04 PM
11 me, Mr. Weir, that it is outside the scope of
12 the conjoint where -- to consider where a
13 particular statement is placed on a label?
14         MS. REYNOLDS:  Objection to form.
15     A.   It is correct that I am not trying    12:04 PM
16 to identify the placement of the label as
17 part of the survey.
18 BY MR. RESCH:
19     Q.   And that's standard practice for
20 conjoints, correct?                             12:04 PM
21     A.   Yes, it is.
22         MR. RESCH:  All right.  Let's take
23     a break.
24         THE VIDEOGRAPHER:  The time is
25     12:04.  We're off the record.              12:04 PM

Page 127

1    meaning, not unexpectedly as the price

2    increases, the part-worth score for that

3    price will reduce?

4         A.   I would agree with that.  I

5    would just caution you, you referenced the                01:33 PM

6    ID row 78 where you have the 40.65.  And

7    then the next row, ID 211 has 191.  And what

8    I'm saying is, you can't compare the

9    magnitude of those two numbers in a

10   meaningful way.                                           01:34 PM

11        Q.   I'm just comparing across the row.

12        A.   That's fine.  I just to make sure

13   that --

14        Q.   You're comfortable comparing

15   across the row, correct?                                  01:34 PM

16        A.   Across the row for a single

17   attribute and the composite levels, yes.

18        Q.   Okay.  So let's go to, as an

19   example, respondent 213, the third one down.

20             Do you see that?                                01:34 PM

21        A.   Okay.  Yes.

22        Q.   And I'd like to focus on the

23   protein.  And for this there's a 4 gram

24   protein, a 5 gram protein and a blank

25   protein, correct, those are the three levels             01:34 PM

Page 161

1    for that attribute?

2        A.   Yes.

3        Q.   All right.  And am I reading this

4    correctly, Mr. Weir, and as you would read

5    it, that for respondent 213, they much          01:34 PM

6    preferred 4 gram protein over 5 grams of

7    protein?

8        A.   So I would agree with you at a

9    high level, but I would suggest that I would

10   not put too much stock into any one             01:35 PM

11   individual's -- individual part-worth

12   measurements out of the context of the

13   totality of the sample.

14       Q.   But that's a fair reading as to

15   that respondent, correct?                       01:35 PM

16       A.   If I can just finish my

17   explanation.

18            Because each respondent is only

19   getting 12 choices, you could wind up with a

20   circumstance where when the person, for         01:35 PM

21   example -- let's see.

22            So this person has a stronger

23   preference for the Dave's Killer Bread brand

24   than others.  And so they might say, I would

25   prefer to have Dave's Killer Bread regardless   01:36 PM

1   the simulator you could have more than just

2   two products that you're comparing, meaning

3   rows one and two, you're able to add

4   additional products, correct?

5           A.   Yes.  Again, I wouldn't believe                01:49 PM

6   that that would be the appropriate method for

7   calculating something very specific as we are

8   in this case, but it is a flexible tool.  And

9   if one wants to model multiple products, for

10  example, if you were to look at my hit rate            01:49 PM

11  simulation, you would see that mirroring the

12  choice task, there are three products in that

13  simulation.

14          Q.   Did you run any simulations

15  varying any of the attributes or attribute             01:50 PM

16  levels other than protein?

17          A.   I told you before that I did that

18  as part of the hit rate calculations and as

19  part of the interaction effect and Model

20  Explorer calculations generally.  So I don't           01:50 PM

21  know --

22          Q.   You didn't, as a result of those,

23  come up with what the price of a product with

24  another one of the attributes varied in the

25  protein-held constant though, as I understand          01:50 PM

1  it?
2          A.   Right.  I thought that was asked
3  and answered before when I said that because
4  it was not part of the scope of my assignment
5  or the nature of what's at issue in the case,        01:50 PM
6  that I did not conduct those simulations.
7          Q.   You're able to do that, though,
8  right, Mr. Weir?
9          A.   I would have the technical
10 capability to do it, yes.                            01:51 PM
11         Q.   Is it fair to say that from your
12 perspective, the price premium analysis,
13 therefore, could be similarly done for any of
14 the other attributes that were included in
15 the conjoint survey?                                 01:51 PM
16              MS. REYNOLDS:  Objection to
17      form.
18         A.   As a technical matter, yes, it can
19 be.
20              Given that I designed this survey      01:51 PM
21 with the research objective of measuring the
22 impact of the grams of protein claim and not
23 with respect to the other claims, I don't
24 know whether the results for those others
25 claims would be of probative value in terms          01:51 PM

CONFIDENTIAL

REPORTER'S CERTIFICATE

I, Sandra A. Deschaine, Registered Professional Reporter and Notary Public within and for the Commonwealth of Massachusetts at large, do hereby certify that the videotaped deposition of Colin B. Weir, in the matter of DAVID SWARTZ VS. DAVE'S KILLER BREAD, INC., AND FLOWERS FOODS, INC., at the offices Veritext, 101 Arch Street, Boston, Massachusetts, on March 24, 2025, taken and transcribed by me; that the witness provided satisfactory evidence of identification as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts; that the transcript produced by me is a true record of the proceedings to the best of my ability; that the witness is reading and signing; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action, on this 26th of March 2025.

*[Signature: Sandra C. Deschaine]*

Sandra A. Deschaine
Registered Professional Reporter

My Commission Expires:
July 3, 2031