# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

DAVID SWARTZ, as an individual, on
behalf of himself, the general public and
those similarly situated,

       Plaintiff,

   v.

DAVE'S KILLER BREAD, INC. AND
FLOWERS FOODS, INC.,

       Defendant.

Case No. 4:21-cv-10053-YGR

Honorable Yvonne Gonzalez Rogers

# EXPERT REPORT OF DR. RAN KIVETZ

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – UNDER PROTECTIVE ORDER**

# TABLE OF CONTENTS

ASSIGNMENT AND QUALIFICATIONS ............................................................................... 1

EXECUTIVE SUMMARY ...................................................................................................... 3

Opinion 1: The Weir Conjoint Survey Fails to Isolate the Alleged Unlawful Conduct ..... 4

Opinion 2: The Weir Conjoint Survey Generated Invalid Price Premium Estimates, as Demonstrated by Mr. Weir's Own Data and by My Choice Experiment .............. 5

Opinion 3: Four Additional Surveys Demonstrate that the Front-of-Package Protein Statement is Not Material to Consumers and Did Not Cause Class Members to Pay a Price Premium ......................................................................................... 7

Opinion 4: Three Surveys Demonstrate that the Absence of the %DV for Protein on the Nutrition Label is Not Material to Consumers and Did Not Cause Class Members to Pay a Price Premium ............................................................................................. 8

OPINION 1: THE WEIR CONJOINT SURVEY FAILS TO ISOLATE THE ALLEGED UNLAWFUL CONDUCT ........................................................................................ 8

A.   Nothing in Mr. Weir's Conjoint Survey, Data, or Simulation, or Analysis Isolates the Challenged Front-of-Package Protein Statement ................................. 9

B:   Nothing in Mr. Weir's Conjoint Survey, Data, Simulation, or Analysis Addresses the Materiality of the %DV for Protein ............................................. 14

OPINION 2: THE WEIR CONJOINT SURVEY GENERATED INVALID PRICE PREMIUM ESTIMATES, AS DEMONSTRATED BY MR. WEIR'S OWN DATA AND BY MY CHOICE EXPERIMENT .......................................................... 14

A.   The Weir Conjoint Survey Failed to Show any Packaging ................................. 15

B.   The Weir Conjoint Survey Omitted Numerous Attributes and Representations .. 17

C:   The Weir Conjoint Survey Misrepresented the Appearance and Prominence of Relevant Product Aspects, Resulting in Invalid Price Premia Estimates ............ 19

D:   The Weir Conjoint Survey's Repeated Stimuli Presentation and Instructions Exacerbated its Flaws, Further Contributing to Invalid Price Premium Estimates ............................................................................................................ 27

E:   My Choice Experiment Demonstrates that the Front-of-Package Protein Statement is *Not* Material and Did *Not* Cause Class Members to Pay an Alleged Price Premium ......................................................................................... 28

     *Choice Experiment Methodology* ......................................................................... 29

     *Choice Experiment Findings and Conclusions* .................................................... 38

OPINION 3: FOUR ADDITIONAL SURVEYS DEMONSTRATE THAT THE FRONT-OF-PACKAGE PROTEIN STATEMENT IS NOT MATERIAL AND DID NOT CAUSE CLASS MEMBERS TO PAY AN ALLEGED PRICE PREMIUM ........... 42

A:   Surveys' Methodology ......................................................................................... 42

B:      Surveys' Findings and Conclusions ...................................................... 51

**OPINION 4: THREE SURVEYS DEMONSTRATE THAT THE ABSENCE OF THE %DV FOR PROTEIN ON THE NUTRITION LABEL IS NOT MATERIAL AND DID NOT CAUSE CLASS MEMBERS TO PAY AN ALLEGED PRICE PREMIUM** .............................................................................................. 55

A:      Surveys' Methodology ............................................................................ 55

B:      Surveys' Findings and Conclusions ...................................................... 56

**CONCLUSION** ......................................................................................................... 57

**EXHIBIT LIST** ....................................................................................................... 60

**ENDNOTES** ............................................................................................................. 63

## ASSIGNMENT AND QUALIFICATIONS

1.      My name is Dr. Ran Kivetz.  I am the Philip H. Geier Professor of Marketing at Columbia University Business School.  I earned a Ph.D. in Business from Stanford University, Graduate School of Business; a Master's degree in Psychology from the Stanford University Psychology Department; and a Bachelor's degree from Tel Aviv University with majors in Economics and Psychology.  An updated copy of my curriculum vitae, which includes a complete list of my publications, is attached as Exhibit A.

2.      My field of expertise encompasses consumer psychology and behavior; survey methods, including conjoint analysis; marketing management; behavioral economics; human judgment, perception, and decision making; the marketing of high-technology products; consumer and sales incentives; advertising; and branding.

3.      I have conducted, supervised, and evaluated well over 1,000 marketing research surveys, including many related to consumer behavior and decision making, conjoint analysis, likelihood of confusion or deception, sales promotions, marketing strategies, branding, trademark, and advertising-related issues.  I have designed conjoint studies and have published scholarly peer-reviewed research on conjoint analysis methods; routinely teach conjoint analysis to MBA, executive MBA, and PhD students at Columbia University; and have evaluated and analyzed dozens of conjoint surveys, including by conducting simulations using the Sawtooth Lighthouse program utilized by the Plaintiff's expert in this matter.

4.      My opinions and testimony have been favorably cited and relied upon by courts across the United States.[1]  An updated list of cases in which I provided sworn testimony at trial and/or by deposition during the past four years is included in Exhibit B.

5.      I have been asked by counsel for the Defendants, Dave's Killer Bread, Inc. and Flowers Foods, Inc. ("Dave's Killer Bread" or "Dave's"), to:

(*i*)      evaluate the February 17, 2025 Amended Declaration of Colin B. Weir (the "Weir Amended Declaration"), submitted on behalf of the Plaintiff, regarding the conjoint survey he conducted (the "Weir Conjoint Survey") and his

accompanying approach to calculate damages solely attributable to the alleged unlawful conduct;[2] and

(*ii*)      evaluate whether the alleged unlawful conduct caused class members[3] to purchase, or to pay a higher price (*i.e.*, an alleged price premium) for, the Dave's products at issue (the "Products").[4]

6.      By "alleged unlawful conduct," I refer to the Plaintiff's allegation that Dave's failed to comply with applicable FDA requirements because it specified the total amount of protein (*e.g.*, "5g Protein") on the front label of the Products (the "front-of-package protein statement") *without also* indicating the amount of protein expressed as a percent daily value ("%DV for protein") on the Nutrition Facts Panel ("NFP" or "nutrition label"), calculated using the PDCAAS method.[5]

7.      As part of my work in this case, I conducted eight (8) empirical consumer surveys to determine, among other things, whether the alleged unlawful conduct caused class members to purchase or pay an alleged price premium for the Products. Five (5) of my surveys tested the effect, if any, of the *presence* of the front-of-package protein statement on the Products (*i.e.*, holding constant the absence of a corresponding %DV on the nutrition label); the remaining three (3) surveys tested the effect, if any, of the *absence* of a PDCAAS-calculated "%DV" for protein on the nutrition label of the Products (*i.e.*, holding constant the presence of the front-of-package protein statement).

8.      My analyses are based on, inter alia, the brands, products, packaging, advertising, and websites relevant to the market for bread/bakery products; existing scientific research and treatises regarding survey design, consumer behavior, and decision making; academic literature and general principles of marketing and psychology; internal research conducted by Dave's in the normal course of business; third-party industry research; deposition testimonies; and other publicly available websites and sources. I also visited several online stores across northern, central, and southern California that sell packaged bread and bakery products, including Dave's products. In conducting my analysis, I reviewed certain documents, including, but not limited to, documents that were made available to me in connection with the preparation of this Expert

Report dated April 7, 2025 ("Expert Report").[6]  Those documents are referenced herein and/or listed in Exhibit C.

9.      I previously provided an Expert Declaration in this matter on February 11, 2024 ("Expert Declaration"). I incorporate by reference in this Expert Report the analyses and conclusions in my Expert Declaration.  That Expert Declaration also sets forth my background and qualifications in greater detail.

10.      I am being compensated in this matter at a rate of $950 an hour.  My compensation does not depend in any way on my opinion or the outcome of this matter.

11.      I have personal knowledge of the matters set forth in this report and, if called to testify at a hearing or trial in this matter, would so state.

12.      Any, and all, of the opinions expressed herein are held to a reasonable degree of professional certainty.  The information on which I relied consists of the type of information that is reasonably relied upon in my field of expertise.

## EXECUTIVE SUMMARY

13.      I understand that the Plaintiff alleges that Dave's Killer Bread did not comply with FDA regulations because its product packaging included front label statements specifying the amount of protein in the product (*e.g.*, "5g Protein")[7] *while* at the same time not including a statement of the %DV for protein (calculated using the PDCAAS method) in the nutrition label.[8] According to the Plaintiff, this alleged unlawful conduct was material to consumers and caused them to pay a price premium.[9]

14.      My understanding is that the Plaintiff is alleging that the front-of-package protein statement at issue is a technical regulatory violation, and allegedly "unlawful," specifically due to the nutrition label's failure to disclose the PDCAAS-calculated %DV for protein.  I understand that the Plaintiff does *not* challenge the lawfulness of the protein statement in the Products' nutrition label, which also only discloses the number of grams of protein contained in the product.

Dr. Kivetz Expert Report                    3                    Case No. 4:21-CV-10053-YGR
Highly Confidential – Attorneys' Eyes Only

15.     Based on the materials on which I have relied, the scientific analyses I have conducted (which include eight empirical consumer surveys), and my background and expertise, I have reached the following conclusions.

**Opinion 1: The Weir Conjoint Survey Fails to Isolate the Alleged Unlawful Conduct**

16.     Even assuming that the Weir Conjoint Survey did not suffer from multiple fatal, invalidating flaws (which it does), it would still fail because it does not isolate any purported price premium solely attributable to the alleged unlawful conduct.

17.     **Nothing in Mr. Weir's conjoint survey, data, simulation, or analysis isolates the challenged front-of-package protein statement.**  The survey, which Mr. Weir conceded did not tell participants where any label statement appears, failed to distinguish the front-of-package protein statement from the (lawful and required) protein statement on the nutrition label.  As a result, survey participants reasonably would have believed that the protein "label statement" referred to any statement on the label, including the protein statement in the nutrition label.  This is especially true since the product profiles presented to survey participants were not limited to front label statements, instead including statements that were only found on the Products' side label, like "No Artificial Ingredients," or that were only found on the nutrition label, like "0g Trans Fat".  Hence, a product profile without a protein statement in the Weir Conjoint Survey would likely indicate to participants that the entire label (including the nutrition label) lacked any protein statement.  Mr. Weir acknowledged that his survey did not address this issue and instead expected participants to "take at face value" what they saw (or did not see) for protein.

18.     Participants also could very reasonably have believed that a lack of a protein statement in the product profiles meant a lack of *protein* in the product.  Notably, Mr. Weir conceded that his survey did not speak to participants' interpretations.  Overall, nothing in Mr. Weir's data, simulator, or analysis isolates the front-of-package protein statement or can account for the protein statement on the nutrition label that was never shown or described to participants.

19.     **Nothing in Mr. Weir's conjoint survey, data, or simulation analyzes the materiality of including the %DV for protein.**  Mr. Weir acknowledged that he did not study the materiality of the %DV for protein, and there is nothing in the data or his analysis that

addresses the %DV for protein.  Indeed, as Mr. Weir admitted, his survey would estimate the same price premium for a challenged Dave's product (with a front-of-package protein statement but without a %DV for protein) as for a non-challenged Dave's product (*e.g.*, with a front-of-package protein statement and *with* the PDCAAS-calculated %DV for protein).

### Opinion 2: The Weir Conjoint Survey Generated Invalid Price Premium Estimates, as Demonstrated by Mr. Weir's Own Data and by My Choice Experiment

20.     Mr. Weir's survey is highly unrealistic, deviating from marketplace conditions in multiple ways and artificially inflating consumers' valuation for the protein statement.  The choice experiment I designed and conducted, which corrects for some of the conjoint survey's major flaws, demonstrates its invalidity and the absence of a price premium due to the front-of-package protein statement.

21.     **The Weir Conjoint Survey failed to show any packaging.**  Despite the importance of packaging appearance and the visual appeal of the bread itself, Mr. Weir did not show participants *any* packaging or bread product, and he ignored the reality of consumers' exposure to the nutrition label.

22.     **The Weir Conjoint Survey omitted numerous relevant attributes and representations.**  Mr. Weir forced participants to focus on a limited number of label statements while excluding numerous (non-challenged) relevant attributes and representations on which consumers (including the named Plaintiff) can and do rely in the marketplace.  Omitting relevant information severely distorts marketplace conditions and invalidates any survey-based estimates.

23.     **The Weir Conjoint Survey misrepresented the appearance and prominence of relevant product aspects, resulting in invalid price premium estimates.**  The survey concealed from participants major aspects that distinguish among different bread products and brands in the real world, including: (*i*) the product form (*e.g.*, sliced bread is different in form, size, texture, and other aspects from bagels or burger buns); (*ii*) separate product lines within the same brand (*e.g.*, different variants of Dave's sliced bread); and (*iii*) the location, prominence, and frequency of different label statements.  Mr. Weir's survey would have estimated the same price premium for a

protein statement regardless of whether it appeared in large font on the front, in small font on the side/back, or multiple times on the front.

24. Given that the conjoint task's artificial stimuli presentation, it is unsurprising that the data reveal many price premium estimates—both for the protein and *other* statements—whose relative magnitudes are questionable (*e.g.*, where "3g Protein" on thin-sliced bread received a higher price premium than "11g Protein" on bagels; where a statement in small font on the side/back panel received a higher price premium than more prominent statements on the front).

25. **The Weir Conjoint Survey's repeated stimuli presentation and instructions exacerbated the survey's flaws, further contributing to invalid price premium estimates.** The survey's design, along with the multiple assumptions participants were instructed to make, overly sensitized participants to the protein statement across repeated (12) conjoint tasks, guaranteeing their attention to, and inflating the price premium estimate for, this feature.

26. **My choice experiment demonstrates that the front-of-package protein statement is *not* material and did *not* cause class members to pay an alleged price premium.** Unlike the Weir Conjoint Survey, my choice experiment: (*i*) showed participants realistic, 3-dimensional packaging of bread products, just as consumers shopping in the real world would see them; (*ii*) showed the complete set of label statements, imagery, and other representations; (*iii*) did not distort the prominence, location, or frequency of label statements; and (*iv*) presented two separate groups of participants with a *single* choice between three breads, including Dave's.

27. *Methodology.* Following a gold standard, well-accepted "test-control" (cause-effect) experimental research design methodology, I examined consumer choices of sliced bread among participants randomly assigned to the "test group" (shown a "triplet" of three bread products, one of which was an at-issue Dave's "21 Whole Grains and Seeds" product) compared to participants randomly assigned to the "control group" (shown a corresponding "triplet," except that the front-of-package protein statement was removed from the Dave's product).

28. *Findings and conclusions.* There was no statistically significant difference between the two groups in choice shares of Dave's bread (42.1% and 47.1% of test versus control group participants, respectively, selected Dave's over the two competitor options—meaning that a

statistically insignificant number of additional consumers selected Dave's when the protein statement was removed). This means that the front-of-package protein statement had no effect whatsoever on (*i.e.*, was not material to) consumers' choices of the Products. The lack of materiality of the front-of-package protein statement necessarily means that its associated price premium is *zero*, because a positive price premium cannot be attributed to a statement that is immaterial to consumers.

## Opinion 3: Four Additional Surveys Demonstrate that the Front-of-Package Protein Statement is Not Material to Consumers and Did Not Cause Class Members to Pay a Price Premium

29. I conducted four additional surveys examining whether the front-of-package protein statement on Dave's sliced bread, bagels, and burger buns has a material effect on consumers' likelihood of purchasing, and willingness to pay for, these products.

30. **Surveys' Methodology.** Each of my surveys followed the same gold standard experimental design methodology as in the choice experiment, but focused on measuring consumers' likelihood of purchasing, along with willingness to pay for, the Products. In each survey, test group participants were shown a 3-dimensional, 360-degree image of an actual (single) Dave's sliced bread, bagels, or burger buns package with the front-of-package protein statement, while control group participants were shown an identical package image, except with the front-of-package protein statement *removed*.

31. **Surveys' Findings and Conclusions.** In each survey, neither participants' purchase likelihood nor average willingness-to-pay (WTP) for the Products differed, as a statistical matter, between the test and control groups. For example, the average WTP for the Dave's "Epic Everything" bagels package was $5.12 among test group participants compared to $5.25 among control group participants.

32. These results unambiguously demonstrate that the front-of-package protein statement does not materially affect consumers' purchase decisions or willingness to pay, and therefore does not command any price premium.

**Opinion 4: Three Surveys Demonstrate that the Absence of the %DV for Protein on the Nutrition Label is Not Material to Consumers and Did Not Cause Class Members to Pay a Price Premium**

33.    **Surveys' Methodology.**  I conducted three other surveys following a substantially similar methodology to my four purchase likelihood "front-of-pack" surveys, with one key exception: the control stimuli retained the front-of-package protein statement while *adding* the (PDCAAS-calculated) %DV for protein on the nutrition facts label (*i.e.*, 3%, 8%, and 4% for the tested sliced bread, bagel, and burger bun products, respectively).

34.    **Surveys' Findings and Conclusions.**  The results of these three surveys demonstrate that "curing" the alleged unlawful conduct by adding the %DV for protein to the nutrition label does *not* affect consumers' likelihood of purchasing the at-issue Dave's sliced bread, bagels, or burger buns.  Therefore, the absence of a %DV for protein did *not* cause class members to purchase, or pay any price premium for, these products.

**OPINION 1: THE WEIR CONJOINT SURVEY FAILS TO ISOLATE THE ALLEGED UNLAWFUL CONDUCT**

35.    In his amended declaration, Mr. Weir reports the results of a choice-based conjoint ("CBC") survey that he conducted to try and "calculate any price premium damages (wherein consumers would receive the value of the price premium they paid solely as a result of Defendants' conduct of labeling its Products with the Protein Claim)."[10]  By "Protein Claim," Mr. Weir refers to the challenged *front-of-package protein statement*.[11]

36.    Mr. Weir applied the same conjoint survey "template" to four survey versions, each corresponding to a different product category (*i.e.*, regular sliced bread, thin sliced bread, bagels, and burger buns).[12]  Because these four versions used the same methodology and asked essentially the same questions (except as applied to the respective product category), I refer to them collectively as the "Weir Conjoint Survey."

37.    As a threshold matter, even if all other aspects of the Weir Conjoint Survey were proper (which they were *not*, as explained in Opinion 2), the survey is fundamentally irrelevant because it fails to estimate the price premium (and measure damages) solely attributable to the alleged unlawful conduct.

## A. Nothing in Mr. Weir's Conjoint Survey, Data, or Simulation, or Analysis Isolates the Challenged Front-of-Package Protein Statement

38.     For the three reasons below, Mr. Weir's survey did not estimate price premiums solely attributable to the presence (vs. absence) of the front-of-package protein statement.

39.     Reason No. 1: *Mr. Weir's survey failed to distinguish the front-of-package protein statement from the protein statement on the nutrition label.* The survey did not allow participants to see any packaging and did not refer to any nutrition label or to a protein amount on that label. Instead, Mr. Weir presented "product profiles" that listed a generic protein statement (*e.g.*, "5g Protein") described to participants as a so-called "label statement" appearing "on the packaging,"[13] without mentioning (as Mr. Weir admitted)[14] where this statement actually appears.

40.     As a result, survey participants reasonably would have believed that the protein "label statement" referred to any statement on the label, including the protein statement in the nutrition label, and that a product profile without a protein statement means that the entire label lacked any such statement. This is especially true given Mr. Weir's decision to include nutrition label statements like "0g Trans Fat" and "70 calories," (as well as statements that only appeared on the Products' side label, like "No Artificial Ingredients"), which was likely to further indicate to participants that the various "label statements" in the choice task (including the protein statement) are not limited to the front label. In the case of "0g Trans Fat," based on my review of the Product labels,[15] this statement only ever appeared on the *nutrition label* (and never on the front) of the Products.

41.     Because participants have no reason to believe that the protein label statement is specific to the front label (as opposed to the entire label), this means that the Weir Conjoint Survey measured a supposed price premium for the presence versus ***total absence*** of a protein "label statement" (*i.e.*, "5g Protein" vs. *no [mention of] protein at all*). Indeed, at his merits-phase deposition, Mr. Weir testified that he believes his survey participants were taking "at face value" what they saw (or did not see) for protein, and that a product "profile" (*e.g.*, a Dave's regular sliced bread) without a given label statement means that the product in question does not have that statement on its label.[16]

42.    However, I understand that even if Dave's removed the front-of-package protein statement, *a protein statement quantifying the total amount of protein would still lawfully appear on the nutrition label*.  In fact, I understand that FDA regulations *require* that a protein amount (*e.g.*, "5g") be displayed on the nutrition label (if the product contains protein), even if a protein statement is never made on the front label or anywhere else on the package.[17]

43.    Therefore, any consumers who saw the nutrition label on the Products—as the named Plaintiff asserted he did[18]—could have read a protein statement "claiming that the Products contained a specific level of protein per serving"[19] (in Mr. Weir's words), regardless of whether Dave's had retained or removed the front-of-pack protein statement.[20]  To the extent that survey participants believed that a product shown without a protein "label statement" simply did not have that statement on the package, as Mr. Weir testified,[21] such a belief would be untrue. Mr. Weir does not and cannot know based on his survey whether participants did or did not interpret a protein "label statement" to apply to *any* statement specifying the number of grams of protein on the label, including on the nutrition label.

44.    <u>Reason No. 2</u>: *Because participants were exposed to certain bread profiles with a protein statement and other profiles without this statement, they could also very well have believed that the products without a protein statement have no protein.*  Otherwise, why would the protein statement be "missing" from the product profile?

45.    For example, a participant seeing the "triplet" sliced bread profiles in Figure 1 below—which shows an Oroweat product with "4g Protein," a Dave's product without any protein statement, and a 365 product with "5g Protein"—could easily have believed that the Dave's product did *not contain* 5 grams of protein (or that it had no protein at all).  Such an interpretation: (*i*) would be completely erroneous (because four out of five lines of Dave's regular sliced bread products *did* actually contain 5 grams of protein, as disclosed on the nutrition label, and the Dave's 100% Whole Wheat product contained 4 grams of protein); (*ii*) would be **irrelevant** to the allegations in this matter (which has to do with whether consumers valued and paid an alleged price premium for the presence of a *front-of-package protein label statement*, not about whether consumers valued and paid an alleged price premium for the *presence of actual*

*protein* in the product); and (*iii*) would further invalidate Mr. Weir's estimated valuation for the inclusion of his protein statement.

**Figure 1: Sample CBC Choice Task in the Weir Conjoint Survey** [22]



46.     The notion that participants would have uniformly assumed that a product profile with "5g Protein" means that the product displays that statement on the front label, while a profile without "5g Protein" means that the product does not display that statement on the front, *but still displays it on the nutrition label and still contains 5g protein*, is implausible. Mr. Weir can point to nothing in his survey or its data to show that participants would interpret a "missing" protein statement to mean that a product's package lacked *a front label statement* about the amount of protein instead of interpreting it to mean that the product itself lacked protein. As he conceded, he is not offering any opinion about, nor did his survey speak to, participants' interpretations.[23]

47.     <u>Reason No. 3</u>: *Mr. Weir's failure to isolate the effect of the presence of the front-of-package protein label statement extends to his analysis of the conjoint data.*  Mr. Weir's price premium analysis is only as good as the data from his survey, consistent with a principle known as "garbage in, garbage out" ("GIGO").[24]  In particular, Mr. Weir's "simulation" compared "a benchmark Dave's Killer Bread Product that uses the Claim to an otherwise identical Product that does not use the Claim."[25]  But this "simulation" relies on the flawed data from his survey, which did not isolate the front-of-package protein label statement (vs. either the protein statement on the nutrition label or the presence of actual protein in the product).  In addition, Mr. Weir's "simulation" is *premised on the <u>wrong</u> comparison*, because a Dave's product without any "claim[]that the Products contained a specific level of protein per serving"[26] **does not and would never exist**, due to what I understand to be the FDA-mandated disclosure of this information on the nutrition label.

48.     Mr. Weir's claim that he addressed this issue by simply "holding constant" in his simulator the nutrition label between the real world and the "but-for" world[27] is nonsensical and does *not* address the issue at all.  As shown below, *the simulator has no way whatsoever to address the nutrition label; it is entirely dependent on the data from the conjoint survey.*  There is no way for Mr. Weir to disentangle either the appearance of the protein statement on the front label from its appearance on the nutrition label, or the presence of a protein *label statement* from the presence of *protein as an ingredient* in the bread product, because *his survey never even specified this information to participants, and never tested how participants interpreted a "missing" protein statement*.

49.     Having examined the actual conjoint data and run Mr. Weir's own simulations in his simulator, there is nothing in his simulator that accounts for, or could possibly account for, the disclosure of protein on the nutrition label.  For example, Figure 2 below shows a screenshot of the product configuration and results of one of Mr. Weir's simulations, which compared a hypothetical Dave's product with a "4g Protein" label statement (Product "A") to an otherwise identical, "but-for" product without a "4g Protein" statement (Product "B").  The only attributes and label statements in the simulator are those from the conjoint survey (*i.e.*, labeled in Figure 2

as "Brand," "Protein," "Organic," "No Artificial Ingredients," "Fiber," "NON-GMO," "No High Fructose Corn Syrup," and "Whole Grains").

**Figure 2: Screenshot of a Sample Simulation in Sawtooth Lighthouse Using Mr. Weir's Simulator (Regular Sliced Dave's Bread With vs. Without "4g Protein")** [28]



50.     As Figure 2 makes clear, the nutrition label is not referenced anywhere in the simulator; indeed, the *only* place that mentions anything about protein is in the configuration (and results) contrasting a Dave's product with "4g Protein" with an otherwise identical Dave's product with a "blank" protein statement (*see* red ovals in Figure 2).  Nor does the absence of information about the nutrition label in both the "benchmark" and "but-for" simulated Dave's products serve to somehow "account for" the presence and amount of protein as actually disclosed on that label.

51.     Consequently, the "but-for" product modeled by Mr. Weir in his simulator is not in fact "an otherwise identical Product that does not use the Claim,"[29] but instead a product that does not use a protein statement *anywhere* on the label (and/or a product that does not even contain any protein).  In other words, Mr. Weir's simulator tested an impossible "but-for" product that would

have never existed, because there is no world in which Dave's could have omitted the amount of protein on the nutrition label.

## B:  Nothing in Mr. Weir's Conjoint Survey, Data, Simulation, or Analysis Addresses the Materiality of the %DV for Protein

52.     As Mr. Weir acknowledged at his deposition, he did not study whether the absence of the %DV for protein on the nutrition label is material to consumers, and there is nothing in his survey, data, or analysis that address the %DV for protein.[30]  Despite the centrality of the %DV for protein in this litigation, the Weir Conjoint Survey did not show participants a nutrition label at all.

53.     At his merits-phase deposition, Mr. Weir conceded that his survey would have generated the same alleged "price premia" estimates for a Dave's product with a front-of-package protein statement (*e.g.*, "5g Protein") "regardless of whether there was a blank percent DV for protein, a 6 percent DV for protein or a 2 percent DV for protein."[31]  In other words, by Mr. Weir's own admission, his conjoint survey would have estimated the exact same amount of monetary damages for a challenged, allegedly unlawful Dave's product as for a Dave's product that I understand would be "lawful" (*i.e.*, that has a protein statement on the front label *with* the corresponding PDCAAS-calculated %DV for protein on the nutrition label).

54.     Unlike Mr. Weir, in my empirical consumer surveys, I directly tested not only the presence of the front-of-package protein statement (*see* Opinions 2E and 3), but also the *absence* of the %DV for protein (*see* Opinion 4).

## OPINION 2: THE WEIR CONJOINT SURVEY GENERATED INVALID PRICE PREMIUM ESTIMATES, AS DEMONSTRATED BY MR. WEIR'S OWN DATA AND BY MY CHOICE EXPERIMENT

55.     As recognized by scholars and industry practitioners in the field of conjoint analysis,[32] valid and reliable CBC study requires not only careful design and sophisticated econometric modeling, but also necessitates sufficient consideration of the methodological challenges given the particular facts of a case (*e.g.*, the products, packaging, and challenged claims at issue).  When such challenges are insurmountable (*e.g.*, there are too many relevant product attributes to realistically capture), a CBC survey would be *inappropriate* to conduct, and

the survey practitioner should turn to other research methodologies. For example, a textbook chapter on conjoint analyses used in litigation states:[33]

> Conjoint analysis is a method that requires careful survey design and data analytics to provide reliable results. Furthermore, while conjoint analysis can be helpful for understanding consumer behavior, decision-making drivers, and consumers' valuations of products and product attributes, the method itself is **not automatically the best methodology** for all scenarios in which a researcher seeks to understand consumer purchase decisions. […] If these [method-specific guidelines and] standards are ignored, the validity of conjoint surveys becomes questionable and may lead to outcomes that **neither the academic research community nor courts are willing to accept**. [Emphases added]

56.     Even setting aside Mr. Weir's failure to isolate the alleged unlawful conduct, one fatal flaw in Mr. Weir's executed conjoint survey is that it is highly unrealistic, dramatically deviating from marketplace reality in multiple ways and artificially inflating (and thereby invalidating) consumers' valuation—and alleged price premiums for—the protein statement.

57.     Failure to replicate essential marketplace conditions—for example, by inadequately or inaccurately (or not at all) representing the Products' packaging or claims, or by excluding attributes that are important to consumers—frequently induces severe demand effects[34] and focalism,[35] such that participants are cued to focus on specific aspects they may not otherwise consider, to ignore other aspects they otherwise would consider, and to perceive certain included aspects or statements in the choice task as more important purchase factors than they otherwise would in reality.

58.     My choice experiment, which corrects for some of the Weir Conjoint Survey's major flaws, demonstrates both the invalidity of Mr. Weir's survey and the absence of any price premium due to the front-of-package protein statement.

## A. The Weir Conjoint Survey Failed to Show any Packaging

59.     Mr. Weir did not show participants any packages of bread, and his "product profiles" deviate dramatically from how consumers would ever encounter and buy bread at the store (*cf.* Figures 3a vs. 3b below). Despite the fact that the visual appeal of Dave's packaging (including its transparency, which allows consumers to discern the look and feel of the bread itself) is a prominent factor that drives many consumers' purchase decisions, as supported by both

academic literature and the results of my eight empirical surveys,[36] the Weir Conjoint Survey did not display any imagery other than standalone brand logos.

**Figure 3a: Front and Back/Side Views of an Actual Dave's Sliced Bread Product Package (Shown in the Kivetz Surveys)**

**Figure 3b: Hypothetical "Profile" of a Dave's Bread Product as Shown in the Weir Conjoint Survey**



$5.99



60.     When a study only shows participants a written list of product descriptions (or displays an unrealistic visual representation of the product), the salient visual cues that consumers actually use in their purchasing decisions are artificially excluded or distorted, inflating the measured importance of the focal attribute or statement. For example, academic writing on conjoint analysis has found that estimates from conjoint surveys can be highly sensitive to "image realism."[37] A recent chapter from the *Cambridge Handbook of Marketing and the Law* notes:[38]

[F]or many product categories a reliable conjoint survey should at least in part create a realistic decision-making setting. Researchers have added realism to their studies by, for example, using images or video, or allowing for interaction with the

stimuli to better understand characteristics such as start-up times on electronic devices. [FN omitted]

61.    Indeed, one of the conjoint studies cited in the Weir Amended Declaration noted, as a key limitation of the research, the fact that "the test messages were presented in text format and were not integrated with graphics, labels or logos,"[39] and that the "[p]lacement of nutrition content claims relative to other advertising copy may well influence consumer response."[40] Even Mr. Weir himself acknowledged the importance of packaging, stating that his cognitive interviews (of eight respondents) for the regular sliced bread survey version—the underlying data for which were never disclosed—revealed that "brand and packaging were the starting point for many bread purchases";[41] *yet, participants in his CBC survey never saw any packaging at all*.

62.    It is important to reiterate that a highly problematic consequence of Mr. Weir's failure to show participants any packaging is that the survey fails to distinguish the front-of-package protein statement from the protein statement on the nutrition label.

## B. The Weir Conjoint Survey Omitted Numerous Attributes and Representations

63.    Although a proper conjoint survey need not (and cannot) include every possible feature, authorities in conjoint analysis agree that features which are *most relevant* to accurately simulating the market and consumers' real-world choices (*e.g.*, the most important attributes and representations) must be included. As Befurt and colleagues (2023) caution in their chapter on conjoint surveys used in litigation:[42]

> The selection of product attributes should include the most salient drivers of consumers' choice processes in the real world. That is, "the menus of products and their descriptions [should be] designed to realistically mimic a market experience." In fact, a frequent critique leveled against conjoint surveys is the risk of bias arising from turning respondents' attention toward attributes that stand out from more typical, realistic, and salient decision-making drivers. […]

64.    Mr. Weir's limited set of label statements do not include "the most salient drivers of consumers' choice processes in the real world," because they exclude many (non-challenged) relevant bread attributes and representations that are plausible differentiators and purchase motivators for consumers.[43] Exhibit D shows examples of real world product packaging for Dave's as well as for the two (non-discontinued) competing brands that were (mis)represented in

Mr. Weir's regular sliced bread survey version (*i.e.*, Oroweat and 365), all of which feature a wide range of *non*-challenged claims and representations that participants were prevented from seeing and considering in the weir Conjoint Survey.

65.     In the case of Dave's regular sliced bread products, such omitted information includes, but is not limited to:

- *any* depiction of the **nutrition label**, including its disclosure of the total grams of protein;

- *any* depiction of the visual appearance of the packaging (*e.g.*, the design, formatting, colors, aesthetics, imagery, and "look and feel" of the package);

- *any* depiction of the visual appearance of the bread themselves, as seen through the transparent packaging, which can convey important information to a consumer about the type of bread (*e.g.*, multigrain, sourdough, rye, sprouted, etc.), the texture, the presence of any toppings (*e.g.*, seeds, nuts), the shape, the thickness, and the freshness;[44]

- *any* depiction of the actual product name (*e.g.*, "21 Whole Grains and Seeds");

- *any* information about the flavor or type/variety of bread (*e.g.*, whole grain, multigrain, sourdough, rye, sprouted, etc.) or flour (*e.g.*, bleached, enriched, etc.);[45]

- *any* information about the brand's heritage, story, or mission/vision (*e.g.*, language printed on both sides of Dave's packaging informs consumers about the founder's story and the brand's commitment to "second chances" through employing individuals with a criminal background—which is a major differentiator for Dave's in the marketplace);[46]

- *any* information about the number of slices of bread in the package;[47]

- *any* depiction of the size and location of different label statements and imagery;

- *any* information about the amount (in grams) of fiber (instead including only the label statement "Good Source of Fiber"—despite the fact that at least some consumers may perceive all breads to be a relatively "good" source of fiber);

- *any* information about the amount of carbohydrates (which I understand are high in bread products in general);[48]

- *any* information about the amount of other ingredients such as sugar, saturated fat, cholesterol, and sodium (instead, Mr. Weir included in his bagels survey the nutrition label statement "0g Trans Fat");

- *any* information about other toppings, such as seeds, oats, or nuts;

- *any* information about the expiration date (which can be informative to consumers of a bread's freshness).

66.     Mr. Weir's conjoint survey essentially placed "blinders" on participants by constraining the factors they can weigh in their choices, while artificially highlighting and forcing participants to focus on a narrow set of label statements (including the protein statement).[49]  The choices that his participants faced are akin to a scenario in which prospective car purchasers are asked to choose among different car models but are informed only about the cars' brands, prices, and whether or not each car has a cupholder.  When forced to make tradeoffs among a limited, non-representative attribute set, it is not surprising that a consumer would suddenly attach considerable "value" for having a cupholder—even though that consumer may not have otherwise thought or cared about a cupholder.  Such a "cupholder effect" would not reflect consumers' actual valuation of this feature in the real world, but would instead be an artifact of the "tunnel vision" created by presenting consumers with a highly constrained and unrealistic choice task.

## C:  The Weir Conjoint Survey Misrepresented the Appearance and Prominence of Relevant Product Aspects, Resulting in Invalid Price Premia Estimates

67.     The Weir Conjoint Survey concealed from participants multiple major aspects that distinguish between different bread products and brands.  Far from presenting attributes and statements in what Mr. Weir claimed to be a "neutral way,"[50] this is a serious distortion of marketplace reality.

68.     *The product profiles were the same across Mr. Weir's four survey versions*.  As Figure 4 below illustrates, Mr. Weir's "product profiles" appeared essentially identical across the four survey versions, despite the basic product form being a key distinguishing aesthetic factor (*e.g.*, sliced bread is fundamentally different in size, texture, and other aspects than bagels or burger buns).  Nor did the conjoint survey differentiate among separate product lines or versions within the same brand (*e.g.*, a Dave's "21 Whole Grains and Seeds" product would be treated as equivalent to a Dave's "Good Seed" product, even though these two packages and the sliced bread themselves look different).  By comparison, unlike Mr. Weir's CBC survey, my eight empirical surveys did *not* leave up to participants' imaginations what the specific products looked like (*see* top row in Figure 4).

**Figure 4: Actual Dave's Packaging as Shown in the Kivetz Surveys (*Top*) vs. "Profiles" of a Dave's Product as Shown in the Weir Conjoint Survey (*Bottom*)** [51]

## Kivetz Surveys

| **Regular Sliced Bread** *(21 Whole Grains)* | **Regular Sliced Bread** *(Good Seed)* | **Bagels** *(Epic Everything)* | **Burger Buns** *(Burger Buns Done Right)* |
|---|---|---|---|

   

## Weir Conjoint Survey

   

69.    _The Weir Conjoint Survey artificially equated the label statements included in the choice tasks._  Mr. Weir unrealistically presented all statements in text format with the same font typeface and font size.  As he testified, his survey does not account for or test the prominence or placement of different statements.[52]  For example, the protein statement (_e.g._, "5g Protein")—which in actuality appeared in varying sizes across the front labels of Dave's products—was misrepresented to participants as being comparable in size, location, typeface, and prominence to all other label statements in the survey, such as a USDA organic claim.  This led participants to overweigh claims that are less conspicuous (_i.e._, on the actual disputed packages) relative to more prominent claims.

70.    In fact, as Figure 5 below illustrates, Mr. Weir's conjoint survey is insensitive to, and would have estimated the same price premium for, a protein statement that appears on hypothetical versions of a Dave's package in different sizes (_cf., e.g._, Figure 5a [largest font on the center of the front label] vs. 5c [small font on the side panel]), on different locations (_cf., e.g._, Figure 5a [front] vs. 5d [back]), and with different frequencies (_cf., e.g._, Figure 5a [appearing once on the front] vs. 5b [appearing three times on the front]).

(_Continues on next page_)

**Figure 5: Four Hypothetical Dave's Packages for Which Mr. Weir's Conjoint Analysis Would Obtain the Same Price Premium for "5g Protein"** [53]

**5a: "5g Protein" (Front Center)**



**5b: "5g Protein" (Front Multiple)**



**5c: "5g Protein" (Left Side)**



**5d: "5g Protein" (Back)**



71.    *Mr. Weir's own data and simulator demonstrate the fundamental flaws in his methodology, as highlighted in this Expert Report*.  I calculated the alleged price premium estimates that Mr. Weir's model attributed for the various label statements that both appeared in the conjoint survey and that actually appeared on the at-issue Dave's packaging.  Because the survey improperly equated all label statements in terms of prominence, location, and frequency, it is not surprising that the data generated many combinations of price premium estimates—both for the focal protein statement and for *other* (non-protein) statements included in the survey—whose relative magnitudes are highly questionable when considering how the product packaging appeared in the actual marketplace.  For example:[54]

- Mr. Weir obtained a *higher* price premium for "3g Protein" on Dave's thin-sliced bread (3.58%) than for both "5g Protein" on Dave's regular sliced bread (3.47%) and "11g Protein" (over 3.5 times more grams of protein) on Dave's bagels (3.47%) (*see* Figure 6a, top row);

- Mr. Weir obtained a *higher* price premium for "6g Protein" on Dave's burger buns (5.61%) than for "13g Protein" (over twice as many grams of protein) on Dave's bagels (5.21%) (*see* Figure 6a, bottom row);

(*Continues on next page*)

**Figure 6a: Mr. Weir's Questionable Price Premium Estimates (Grams of Protein)** [55]

<u>Thin Sliced</u> *(3g Protein)*    <u>Regular</u> *(5g Protein)*    <u>Bagels</u> *(11g Protein)*

  

<u>Burger Buns</u> *(6g Protein)*    <u>Bagels</u> *(13g Protein)*

 

- According to the regular sliced bread version of Mr. Weir's survey, "No Artificial Ingredients" and "No High Fructose Corn Syrup"—two statements that appeared on the *side* of Dave's packaging (and that may have gone unnoticed by at least some consumers in the marketplace)—received *higher* "price premia" estimates than did the front-label claims "USDA Organic" and "NON-GMO" (*see* Figure 6b);

**Figure 6b: Mr. Weir's Questionable Price Premium Estimates (Regular Sliced Bread)** [56]



- According to the thin-sliced bread version of Mr. Weir's survey, "No High Fructose Corn Syrup"—a statement on the *side* of Dave's packaging—received a *higher* "price premium" estimate than "USDA Organic,"[57] "NON-GMO," "12g Whole Grains," and "70 Calories," *each* of which appeared on the front label and with greater prominence (*see* Figure 6c);

**Figure 6c: Mr. Weir's Questionable Price Premium Estimates (Thin Sliced Bread)** [58]



- According to the bagels version of Mr. Weir's survey: (*i*) "No High Fructose Corn Syrup"—which appeared on the *side* of the "Epic Everything" product line[59]—received a *higher* "price premium" estimate than did the front-label claims "USDA Organic" and "NON-GMO"; and (*ii*) "0g Trans Fat"—which appeared only on the nutrition label (back) of Dave's packaging—received a *higher* "price premium" than did the front-label claim "NON-GMO" and nearly as high as "560mg Omega-3" (*see* Figure 6d).

**Figure 6d: Mr. Weir's Questionable Price Premium Estimates (Bagels)** [60]



## D: **The Weir Conjoint Survey's Repeated Stimuli Presentation and Instructions Exacerbated its Flaws, Further Contributing to Invalid Price Premium Estimates**

72.     Participants in Mr. Weir's survey made a series of choices after viewing *both* bread profiles *with* a protein statement like "5g Protein," as well as bread profiles *without* a protein statement. This "within-subjects" design[61] overly sensitized participants to the protein statement across repeated (12) conjoint tasks, thereby guaranteeing participants' attention to, and inflating the associated price premium estimate for, this feature. Over the course of multiple

repetitive choices, participants could easily infer that if the number of grams of protein were not important, then the researcher would not create a survey that: (*i*) highlights the same set of label statements (one of which is a statement like "5g Protein") over and over; and (*ii*) focuses on a narrow set of attributes and statements at the expense of many other attributes, features, and representations (which consumers encounter and rely on when purchasing in the category).

73.     The multiple assumptions that participants were *repeatedly* asked to make during the conjoint exercise (*e.g.*, that any features not shown are the same across all possible options; that all options are the same size; that all options are in their choice of flavor/variety)[62] are also contrived and excessive,[63] exacerbating the survey's focalism bias.  The appropriate context is *not* an artificial "laboratory" where participants are directed to base their answers only on the information displayed in the choice tasks, when many consumers would otherwise: (*i*) base their purchases on other factors excluded from these choice tasks; and (*ii*) would *not* base their purchases on the attributes and statements displayed in the survey (*e.g.*, some consumers may not even notice or pay attention to the amount of protein).  Likewise, forcing participants to focus on the subset of attributes included in the conjoint task before the choice task has even begun[64] induced participants to treat the attributes in the conjoint as important.

**E:  My Choice Experiment Demonstrates that the Front-of-Package Protein Statement is *Not* Material and Did *Not* Cause Class Members to Pay an Alleged Price Premium**

74.     I designed and conducted a *choice experiment* that serves to further evaluate Mr. Weir's conjoint survey by correcting for the major flaws discussed in Opinions 2A through 2D.

75.     That is, unlike the Weir Conjoint Survey, my choice experiment: (*i*) showed participants realistic packaging of bread products (including the actual bread) as consumers shopping in the real world would see them, thereby closely approximating marketplace conditions; (*ii*)  did not force participants to focus on a narrow set of attributes and statements, but instead exposed them to a complete set of label claims, representations, imagery, and other product attributes that consumers would encounter in the real world; (*iii*) did not falsely equate or misrepresent the prominence and location of any label statements or other package representations; (*iv*) did not force participants to repeatedly choose among hypothetical bread

"profiles" (thereby exposing them to profiles that either have or do not have a protein statement, and likely causing many participants to erroneously believe that profiles without a protein statement actually *lack any protein* in the bread), and (*v*) instead presented two separate groups of participants with a single choice between three (realistic) sliced breads, including Dave's.

***Choice Experiment Methodology***

76.     *General experimental design*.  I employed a gold standard "test" versus "control" (cause-effect) experimental research design that followed well-established survey standards.[65] This experimental design has been used in countless consumer research studies, including in the many hundreds of academic, consulting, and litigation studies that I have conducted.  Such an experiment allows measuring the outcome of interest (*e.g.*, choice of a disputed product) among "*test group*" participants, who are shown a stimulus in which the at-issue aspect is present (*e.g.*, a Dave's product package with the alleged unlawful conduct), compared to "*control group*" participants, who are shown a corresponding stimulus in which the at-issue aspect is remedied (*e.g.*, an otherwise identical Dave's product package without the alleged unlawful conduct).  By including a control condition, the surveys account for survey "noise" or error.[66]

77.     The specific format of my choice experiment is likewise well-accepted in the literature[67] and has been used in thousands of market research studies that I and my colleagues have conducted over the past 30 years.  Instead of Mr. Weir's "within-subjects" design, I measured participants' choices using a "*between-subjects*" research design-—where separate groups of participants are exposed to just one level of the tested variable (*e.g.* the presence vs. absence of the front-of-package protein statement)—which allows for testing whether the variable at issue has a causal, material effect on consumer choice.

78.     Indeed, consistent with the experiment I conducted here and in hundreds of other studies, Professor Steckel and his colleagues describe the design of a standard choice experiment:[68]

> After the randomized group assignment, a choice experiment presents respondents with the **at-issue product along with, say, two competitor products**. Respondents in the test group see the at-issue product with the at-issue attribute (e.g. trademark or allegedly misleading statement), while the respondents in the control group are shown the at-issue product with the at-issue attribute replaced with a "placebo" or "but-for" claim or attribute. That is, the adjusted phrase or logo or shape is one that

plaintiffs do not find to be deceptive or confusing to consumers, or infringing on a patent or a trademark or trade dress.[69] […]

> In such an experiment, the "dependent measure" would be the choices respondents make – specifically, the **share of respondents choosing the at-issue product**. To assess whether the at-issue attribute has a material effect on consumers' purchase decisions, we would compare the share of respondents choosing the at-issue product in each of the two groups. [Emphases added]

As the authors observe, such experimental designs are capable of assessing the (im)materiality of an at-issue claim, as well as whether or not that claim commands any alleged price premium:[70]

> For example, if there is no statistically significant difference in the share, the at-issue attribute, product feature, trademark, or product claim **has no material impact on consumer choice** (and, as a corollary, the **price premium on the at-issue attribute is zero**). […]

> If one finds a result with no statistical significance, the choice experiment has essentially killed two birds with one stone: The results imply **lack of materiality and thus no liability, as well as zero damages**. [Emphases added]

79. *General procedure*. Participants in my choice experiment (administered in March 2025) were members of the InnovateMR online panel. Like the other seven surveys I conducted, I excluded individuals who started any of these other surveys.[71]

80. The experiment was conducted in a double-blind manner.[72] Upon launching it, I first verified the quality of the data and programming logic based on a small sample of participants (*i.e.*, what is typically referred to as a "soft launch" or "pretest" in the industry). No errors were found, and no changes were made after the initial or "soft" launch. All the data were reviewed for any indications of irregularities based on length of interview (*i.e.*, time taken to complete the survey) and gibberish responses. Participants who spent less than two minutes or more than 60 minutes or who provided "gibberish" responses were excluded from the sample.

81. The final sample in the choice experiment consisted of 413 participants.

82. Exhibits E.1, E.2, E.3, and E.4 attach, respectively: the screener and main questionnaire; screenshots of the survey; images of the test and control stimuli from multiple angles; and the package flats used to create the 360-degree images of the test and control stimuli.

83. *Screening and sampling procedure*. Qualified participants consisted of adult California residents who had both: (*i*) personally purchased, in the *past* three months, a package

of sliced bread; *and* (*ii*) think that they will, during the *next* three months, personally purchase a package of sliced bread.[73]  To qualify for the main questionnaire, among multiple additional screening criteria (including quality assurance checks),[74] participants were also required to take the survey on either their laptop or desktop computer (*not* on their smartphone).

84.     A representative universe was constructed using quotas for age and gender; these quotas were derived from "screening quotas" (or "click balancing") that allowed the panel to screen for qualified participants in proportion to the gender and age distribution of the population in California according to the U.S. census.[75]

85.     *Stimuli presentation*.  Participants who were randomly assigned to the "test" condition viewed a "triplet" of three sliced bread products, displayed horizontally on a single row: (*i*) an original, challenged Dave's product package that displayed the front-of-package protein statement (specifically, the "21 Whole Grains and Seeds" product);[76] (*ii*) an Oroweat product package (specifically, the "22 Whole Grains & Seeds" product); and (*iii*) a Whole Foods 365 product package (specifically, the "Ancient Grains" product).  Hence, the three brands I showed participants—Dave's, Oroweat, and Whole Foods 365—are the same three (non-discontinued) brands used in the Weir Conjoint Survey.[77]

86.     The order in which the three bread products were displayed was randomized, such that each participant was randomly assigned to one of six possible triplet combinations.[78]

87.     Participants randomly assigned to the "control" group viewed one of the same six triplet combinations, except that the front-of-package protein statement was removed from the Dave's product.  The Oroweat and 365 products were identical across test and control groups.

88.     All participants read an introduction[79] and the following instructions:[80]

On the next screen, we will show you some product packages.  After you have viewed the packages, we will ask you some questions.  For each question, if you don't know or don't have an answer, please don't guess.  Just indicate that you "don't know" or "don't have an answer" by <u>selecting, or typing in, the words "don't know"</u> and then continue to the next question.  There are no right or wrong answers.

89.     The next screen displayed the following:

***Please read the following instructions CAREFULLY!***

*Please maximize your screen, if you haven't done so already.*

Imagine that you are going to purchase a package of sliced bread.

Below are three packages of sliced bread products. The price of each product is shown under its image.

When you continue to the next screens, you will be able to view each of these packages separately, including from all sides, and to zoom in or out.

After you examine each of the three product packages, you will be asked to choose the product that you **most** prefer. Please examine the packages just as you would if you were considering buying packaged sliced bread. Take as much time as you would normally do when considering buying packaged sliced bread.

(Please click "NEXT" when you are ready to continue.)

The sentences "Imagine that you are going to purchase a package of sliced bread" and "After you examine each of the three product packages, you will be asked to choose the product that you **most** prefer" were based on the instructions that Mr. Weir provided to his survey participants.[81]

90.     Below the above instructions, participants were shown a large non-clickable image corresponding to the condition and triplet to which they were randomly assigned. Specifically, similar to how shoppers would encounter different sliced breads as they approach the shelf in the packaged bread aisle, the image showed three bread products (Dave's, Oroweat, and Whole Foods 365), with a price listed directly below the corresponding product: $5.99 for the Dave's "21 Whole Grains and Seeds" sliced bread; $5.99 for the Oroweat "22 Whole Grains & Seeds" sliced bread; and $4.49 for the Whole Foods 365 "Ancient Grains" sliced bread.

91.     I chose these prices because: (*i*) they correspond to two of the price levels used in the regular bread version of the Weir Conjoint Survey;[82] and, conditional on matching one of Mr. Weir's price levels, (*ii*) they most closely reflected marketplace reality based on an analysis of current in-store prices for the specific bread products tested across major California retailers.[83]

92.     As one example, Figure 7 shows how the three breads appeared for participants assigned to the Oroweat-365-Dave's triplet.

**Figure 7: Image of Oroweat-365-Dave's Triplet (with Price Information)** [84]





$5.99                    $4.49                    $5.99

93.     Next, similar to how consumers encounter bread products in the actual marketplace, participants were exposed sequentially (*i.e.*, on separate screens) to each of the three bread products; participants viewed the breads according to their order in the assigned triplet, within a 360-degree interface that allowed participants to examine each package from all sides and angles.  Specifically, for each package, participants could rotate the image in any direction[85] to view other sides of the package, zoom in/out to enlarge/reduce the package, and/or move the package horizontally or vertically (without rotation).  All participants were given instructions for how to navigate the 360-degree interface, which appeared for each of the three bread products presented.[86]  For each bread package, participants could only advance to the next screen after 25 seconds had elapsed.

94.     Figures 8a and 8b depict a zoomed-in, rotated front view of the "test" and control" Dave's package, respectively.  Figures 9 and 10 depict zoomed-in, rotated front views of the Oroweat and 365 packages, respectively, which were identical in the test and control conditions. Exhibit I.3 shows each brand's package from multiple angles (front, back, sides, top, and bottom). The 360-degree models of the Dave's, Oroweat, and 365 bread products were constructed to mirror how they appeared in the real world, based on physical product samples (as well as , in the case of Dave's, the underlying package flat produced in this litigation).

95.     Except for the Dave's packaging stimuli shown to participants, the surveys' test and control conditions were identical in all aspects.

**Figure 8a: Rotated, Zoomed Front View of the "Test" Dave's "21" Package** [87]

**Figure 8b: Rotated, Zoomed Front View of the "Control" Dave's "21" Package** [88]

 

**Figure 9: Rotated, Zoomed Front View of the Oroweat Package**     **Figure 10: Rotated, Zoomed Front View of the 365 (Whole Foods) Package**

 

96.     *Choice of Bread.*  Participants who indicated being able to clearly view "all three packages"[89] proceeded to the next screen.  That screen displayed, again, the three bread products that participants just examined and asked the key (closed-ended) "choice" question (Q.30; reproduced in Figure 11 below), using Mr. Weir's own question wording:[90]

> Q.30.   **If these were your only options, and you had to choose a package of sliced bread, which would you choose?**  (Please select an answer.)

97.     The price of each bread was re-displayed below the corresponding image.  Under these prices, a "Select" button appeared that participants clicked on to indicate their chosen bread, mimicking the general formatting of the Weir Conjoint Survey's interface.  At any time while answering the above-mentioned Question 30, participants could click on any of the three breads to view the 360-degree image again, which opened a pop-up window on the same screen (with the same ability to interact with the stimulus as when they viewed it previously).[91]

**Figure 11: Screenshot of Choice Question as Shown to Test Group Participants Assigned to a Oroweat-365-Dave's Triplet** [92]



98.     *Willingness to buy (or not buy).*  After participants chose the bread they most prefer, they were asked a "willingness to buy" question (Q.31) that mimicked the corresponding question in the Weir Conjoint Survey (*i.e.*, by using substantially similar language and formatting):[93]

> Q.31.   Given what you know about the market, including other **packages of sliced bread** available to you at your choice of retailer, would you or would you not be **willing** to purchase the product that you chose above?  (Please select an answer.)
>
> o   Yes, I would buy
> o   No, I would not buy

Figure 12 reproduces a sample screenshot of how this question appeared to participants.

**Figure 12: Screenshot of "Willingness to Buy" Question** [94]



99.  *Reasons for willingness to (not) buy*.  I included two open-ended questions that asked participants why they would (or would not) be willing to buy the bread they just chose:[95]

Q.40.  You said that you would [**not**] be willing to purchase the product that you chose above.

What makes you say that you would [**not**] be willing to purchase this product? Please type your answer below.  Please be specific and include details.

Q.41.   Any other reason or reasons why you would [**not**] be willing to purchase this product?  Please type your answer below.  Please be specific and include details.

```

```

100.   _Experiment end._  Finally, participants were asked a series of additional quality assurance questions, after which they were thanked.[96]

101.   _Control stimuli._  The control stimulus in this choice experiment was designed to "cure" the alleged unlawful conduct by specifically removing the challenged front-of-package protein statement from the Products' labels (_see_ Figures 8a vs. 8b).  Because a front-of-package protein statement is not at issue in non-Dave's products (_i.e._, in the Oroweat and 365 sliced bread packages shown to participants), I revised only the _Dave's_ sliced bread product to construct a proper control.

102.   If the Plaintiff is correct that displaying the total number of grams of protein on the front label of the Dave's products was a material factor that motivated class members to purchase and pay a prime premium for the Products, then a statistically significantly higher percentage of participants should choose the Dave's bread—over the two competitor options—in the test condition compared to in the control condition.  Conversely, to the extent that the at-issue front-of-package protein statement is _not_ a material factor and does _not_ influence consumers' preferences, choices, and willingness-to-pay with respect to the Products, then statistically indistinguishable levels of choice shares, as well as willingness to buy, in the test and control conditions should be observed.

**_Choice Experiment Findings and Conclusions_**

103.   I analyzed the entire set of answers for each participant in the choice experiment. Exhibit I.6 provides tables with the coding results of the verbatim responses to Q.40/Q.41 (reasons for willingness to buy/not buy).  Exhibit I.7 attaches the raw data.

104.   _Choice of bread and willingness to buy._  Table 1 below shows the percentage (and number) of participants who: (_i_) chose each of the three bread products in Question 30, the key

closed-ended choice question; and (*ii*) chose each of these products while also expressing a willingness to buy their chosen product (based on their answer to Q.31).

**Table 1: Choice Shares of Dave's and Competitor Breads**

| | Dave's | | Oroweat | | 365 (Whole Foods) | |
|---|---|---|---|---|---|---|
| |  | |  | |  | |
| | **Test** *(FOP Claim on Dave's Present)* *(n = 209)* | **Control** *(FOP Claim on Dave's Absent)* *(n = 204)* | **Test** *(FOP Claim on Dave's Present)* *(n = 209)* | **Control** *(FOP Claim on Dave's Absent)* *(n = 204)* | **Test** *(FOP Claim on Dave's Present)* *(n = 209)* | **Control** *(FOP Claim on Dave's Absent)* *(n = 204)* |
| % Choosing Bread (Q.30) | **42.1% (88)** | **47.1% (96)** | 33.5% (70) | 24.5% (50) | 24.4% (51) | 28.4% (58) |
| % Choosing and Willing to Buy Bread (Q.30/Q.31) | **40.7% (85)** | **44.6% (91)** | 28.2% (59) | 21.6% (44) | 19.6% (41) | 22.5% (46) |

105.    As shown in Table 1, the choice shares of the Dave's product were similar across test and control group participants.  Specifically, based on their answers to Question 30, 42.1% and 47.1% of test group and control group participants, respectively, selected the Dave's bread product over the two competitor bread products (Oroweat and Whole Foods 365).  The −5.0% difference between the test and control groups in the proportion choosing the Dave's option (*i.e.*, 42.1% − 47.1%) was ***statistically indistinguishable from zero***.  Specifically, a $\chi^2$ ("chi-squared" or "chi-square") statistical test[97] comparing these proportions yields a $\chi^2$ statistic (with one "degree of freedom" or "*df*") that equals 1.03 with a *p*-value of greater than .31 (*i.e.*, $\chi^2 = 1.03$, $df = 1$, $p > .31$, *n.s.*).

106.    This means that there is *no statistically significant* difference[98] between the test group versus the control group in the dependent variable (here, choice of the Dave's product).  Consequently, the isolated variable being investigated (here, the presence vs. absence of the front-

of-package protein statement, "5g Protein") does not have a causal effect on, or is *immaterial to*, consumers' likelihood of choosing the at-issue Dave's bread product. Such a result disconfirms, or refutes, the Plaintiff's hypothesis, according to which consumers would be significantly *less* likely, as a statistical matter, to choose the Dave's bread had Dave's removed the "5g Protein" claim from the front label of its packaging.

107.    Unsurprisingly, given the leading nature of Mr. Weir's "willingness to buy" question—which asked if participants were merely *willing* to purchase the product they just selected—the vast majority of test and control group participants (88.5% and 88.7%, respectively) answered in the affirmative. When considering the choice shares of Dave's among participants in the test versus control group who also indicated that they would buy the product they chose, the results are similar (*see* Table 1): 40.7% and 44.6% of test and control participants, respectively, both selected the Dave's bread and said they would be willing to buy that bread. This −3.9% difference between the two groups (*i.e.*, 40.7% − 44.6%) was likewise statistically indistinguishable from zero ($\chi^2 = .65$, $df = 1$, $p > .41$, *n.s.*).[99]

108.    It is important to note that the type of cause-effect ("test-control") experimental design that I used was designed to directly assess the *materiality* (or immateriality) of a claim or aspect at issue to consumers, not to quantify the *magnitude* of an alleged price premium if a premium is found to exist. To the extent that an experiment or survey like the one I conducted detects no statistically significant difference between the test and control conditions—which signifies a *lack of materiality* of the isolated variable at issue—then this immateriality necessarily also means that the alleged price premium is *zero*, because a positive "price premium" cannot be attributed to a claim that is immaterial to consumers.[100]

109.    Consider, for example, the −5.0% percentage point difference in the proportion of participants in the test group (*i.e.*, 42.1%) versus control group (*i.e.*, 47.1%) who selected the Dave's bread. The fact that this −5.0 percentage point difference was statistically indistinguishable from zero means that one cannot somehow conclude that consumers are more likely to choose Dave's when the front-of-package protein statement is absent; and it certainly cannot be translated into a price premium (or *negative* price premium, in this case) of −5.0% or any other price

premium or discount. Instead, the only scientifically valid interpretation of this finding is that the presence of the front-of-package protein statement made no difference whatsoever to consumers' choices of Dave's sliced bread, and therefore commanded *no* price premium.

110. *Reasons for willingness to (not) buy*. Because the "reasons" questions (Q.40 & Q.41) were open-ended (*i.e.*, participants typed in their responses without being given any answer choices), I developed a coding frame with different response categories. Two independent coders classified participants' verbatim responses into the various categories outlined in my coding frame. These coders were "blind" to (unaware of) the purpose and sponsor of the survey (and to the condition to which participants were randomly assigned).

111. As summarized in Table 1 of Exhibit I.6, both test and control group participants provided a variety of reasons in favor of why they would be willing to buy their chosen product, including: brand equity/familiarity (47.8% vs. 40.7%, respectively); (non-protein) ingredients (*e.g.*, grains, fiber, seeds, etc.; 38.3% vs. 41.2%); price/value (27.3% vs. 27.5%); general health/nutrition (25.8% vs. 25.0%); packaging/product appearance (25.4% vs. 21.6%); and general taste/flavor (19.6% vs. 17.6%). By contrast, only a minority of test and control groups (7.2% and 4.4%, respectively) mentioned protein as a reason for being willing to buy.[101]

112. ***Overall***, the results of the choice experiment, which used a proper, non-leading between-subjects study with realistic stimuli that displayed the full packaging and bread (thereby correcting for some, albeit not all, of the Weir Conjoint Survey's major flaws), are clear: The at-issue front-of-package protein statement *did not affect (or increase) class members' likelihood of choosing, or buying, the at-issue Dave's product.* Accordingly, this choice experiment demonstrates that the front-of-package protein statement ***did not cause class members to pay an alleged price premium.***

(*Continues on next page*)

## OPINION 3: FOUR ADDITIONAL SURVEYS DEMONSTRATE THAT THE FRONT-OF-PACKAGE PROTEIN STATEMENT IS NOT MATERIAL AND DID NOT CAUSE CLASS MEMBERS TO PAY AN ALLEGED PRICE PREMIUM

### A: Surveys' Methodology

113.     I conducted an additional four surveys to further test the effect, if any, of the front-of-package protein statement on the at-issue Dave's sliced bread, bagels, and burger buns.  Like my choice experiment but *unlike* Mr. Weir's product profiles, each of these surveys showed participants realistic packaging (in which the actual bread was visible) that could be rotated and enlarged from all sides and angles.

114.     *General experimental design.*  My four additional "front-of-pack" surveys used the same gold standard experimental design as in the choice experiment, but focused on measuring consumers' likelihood of purchasing, along with willingness to pay for, the Products.  In each survey, only one (test or control) Dave's product was shown, and participants were asked to indicate, among other things, the likelihood that they would purchase the displayed product.

115.     Like the choice experiment discussed in Opinion 2E, the types of "purchase likelihood" experiments I conducted are standard, well-accepted in the field, and routinely used in academic, industry, and litigation settings.  Indeed, a chapter in a recent textbook, *The Cambridge Handbook of Marketing and the Law*, provides the following exemplar of a "materiality" survey that measures purchase likelihood, consistent with the surveys I conducted in this matter:[102]

> An expert at this stage might conduct a survey experiment to **isolate the effect of the at-issue label and packaging on the purchase** of Yogi Green Tea Kombucha. After screening for qualified past and prospective purchasers, the expert would randomly assign respondents to two experimental groups. One group, the [test] group, would view the original Yogi Green Tea Kombucha packaging, and the other group, the [control] group, would view the same package but with an alteration that tests the allegations of the case. [...] Both groups of respondents would then be asked about their likelihood of purchasing the tea product. In a properly designed experiment among the relevant population, **any significant difference between groups would demonstrate the impact of the at-issue claim on consumers' purchase intent. Conversely, such a study could show that the at-issue claim is not at all material to consumers' decisions**, which may aid an argument about what drives the purchase decisions of the "reasonable consumer." [Emphases added]

116.    *General procedure*.  Participants in these four surveys were members of the InnovateMR online panel.  The surveys followed the same general procedure as in the choice experiments, including with respect to the screening criteria, the double-blind procedure, the "soft launch" or pretest, and data review and exclusion criteria.

117.    I tested the following Dave's products: "21 Whole Grains & Seeds" sliced bread; "Good Seed" sliced bread; "Epic Everything" bagels; and "Burger Buns Done Right."  The "21" sliced bread survey was administered in January 2024 with a sample of 407 participants; the "Good Seed" sliced bread survey was administered in February 2025 with a sample of 415 participants; and both the bagels and burger buns surveys were administered in February and March of 2025 with a sample of 411 participants each.

118.    The surveys were identical in all aspects, except for the key screening questions (*i.e.*, which, like those used in my choice experiment, qualified potential respondents for participation based on past and future purchases in the relevant product category—that is, a package of sliced bread, bagels, or burger buns), the stimuli shown, and the price ranges provided in the willingness-to-pay (WTP) question.[103]

119.    The surveys' screener and main questionnaire are attached as Exhibits F.1 through I.1.  Screenshots of each survey are presented in Exhibits F.2 through I.2.  Images of both the test and control stimuli used in each survey from multiple angles are shown in Exhibits F.3 through I.3.  The package flats used to create the 3-dimensional, 360-degree images of the test and control stimuli are shown in Exhibits F.4 through I.4.

120.    *Stimuli presentation*.  In each of the four surveys, participants who were randomly assigned to the "test" group viewed an original, challenged Dave's product package that displayed the front-of-package protein statement.  In contrast, participants randomly assigned to the "control" group viewed a revised, otherwise identical Dave's package except that the front-of-package protein statement was removed.  All participants read an introduction[104] and the following instructions:[105]

On the next screen, we will show you a package of a product that you may or may not have seen before. After you have viewed the package, we will ask you some questions. For each question, if you don't know or don't have an answer, please don't guess. Just indicate that you "don't know" or "don't have an answer" by <u>selecting, or typing in, the words "don't know"</u> and then continue to the next question. There are no right or wrong answers.

Please examine the package, just as you would if you were considering buying such a product. Take as much time as you would normally do when considering buying such a product.

121.    On the next screen, participants were shown either the test or control package to which they were randomly assigned. As in the choice experiment, the 360-degree interface allowed participants to examine the package from all sides and angles, similar to how consumers could view the package in the marketplace.

122.    Figures 13 through 16 below depict front views of the "test" and "control" Dave's package shown in each of the four front-of-pack surveys.[106] These screenshots are sample static images, but participants were able to rotate and zoom the package images in any direction and manner they wished (including turning the package to the back to view the nutrition label, which displayed, among other things, the number of grams of protein).[107]

123.    Only after 30 seconds had elapsed could participants advance to the next screen, which asked them whether they were able to clearly view the package;[108] participants were then told that they will be asked "a few questions about the [sliced bread / bagels / burger buns] package"[109] they just examined.

124.    Except for the packages shown to participants, the surveys' test and control conditions were identical in all aspects, including the procedure and questions.

(*Continues on next page*)

**Figure 13a: Front View of "Test" (*i.e.*, Challenged) "21" Package**

**Figure 13b: Front View of "Control" (*i.e.*, Revised) "21" Package**





**Figure 14a: Front View of "Test" (*i.e.*, Challenged) "Good Seed" Package**

**Figure 14b: Front View of "Control" (*i.e.*, Revised) "Good Seed" Package**





**Figure 15a: Front View of "Test" (*i.e.*, Challenged) "Epic Everything" Package**  **Figure 15b: Front View of "Control" (*i.e.*, Revised) "Epic Everything" Package**



**Figure 16a: Front View of "Test" (*i.e.*, Challenged) "Burger Buns Done Right" Package**

**Figure 16b: Front View of "Control" (*i.e.*, Revised) "Burger Buns Done Right" Package**






125. *Purchase likelihood.* All participants (who indicated they were able to clearly view the package) were asked a standard *closed-ended* purchase likelihood question (Q.30). At any time while answering this question, participants could click on a link to view the 360-degree image again, which would open a pop-up window on the same screen (with the same ability to interact with the stimulus as when they viewed it initially). For the surveys that tested the "Good Seed," "Epic Everything," and "Burger Buns Done Right" product, Question 30 read:[110]

---

Q30.   Now, here is the first question.  Feel free to examine the package at any time.

This question has six answer choices, which are shown on the screen below.

Please read the entire question before answering.

Assume that the price of the package of [sliced bread / bagels / burger buns] that you just examined is comparable to the price of other packages of [sliced bread / bagels / burger buns] available in stores.  If you were at the store thinking of buying [sliced bread / bagels / burger buns] and you saw the product that you just examined, how likely would you be to buy this product?

Would you say that you *definitely would buy this product, probably would buy this product, may or may not buy this product, probably would <u>not</u> buy this product, definitely would <u>not</u> buy this product, or don't know*?

*If you would like to view the package again, please click <u>here</u>.*

(Please select an answer.)

- o   Definitely would buy this product
- o   Probably would buy this product
- o   May or may not buy this product
- o   Probably would <u>not</u> buy this product
- o   Definitely would <u>not</u> buy this product
- o   Don't know

For the survey that tested the Dave's "21 Whole Grains and Seeds" product, participants were asked the same purchase likelihood question, except that they were instructed to assume that the price of the package of sliced bread they just examined is $6.79.[111]

126.   *Purchase reasons.*  Participants who selected any of the answers except for "Don't know" in Question 30 were asked two standard *open-ended* questions:[112]

Q.40.   What makes you say that you **(INSERT ANSWER FROM Q.30A/Q.30B)**? Please type your answer below.  Please be specific and include details.

Q.41.   Any other reason or reasons why you **(INSERT ANSWER FROM Q.30A/Q.30B)**?  Please type your answer below.  Please be specific and include details.

127.   *Willingness-to-Pay (WTP).*   Except for the survey that tested the Dave's "21 Whole Grains and Seeds" product, participants in the other three surveys were then asked a standard "willingness to pay" (WTP) question (Q.50).[113]   Specifically, they were informed about the typical price range for the relevant product category,[114] and were asked to indicate the highest price they would be willing to pay for the specific product they saw.   At any point while answering this question, participants could click on a link to view the 360-degree package image again, which would open a pop-up window on the same screen (with the same ability to interact with the stimulus as when they viewed it initially).   Participants could either type in a price (using the dollars and cents fields),[115] or they could select "Don't know":[116]

Q50.   Typical prices of a [24- to 27-oz / 5- or 6-count / 8-count] package of [sliced bread / bagels / burger buns] range <u>between [$2.$^{00}$ and $9.$^{00}$ / $3.$^{00}$ and $7.$^{00}$ / $3.$^{00}$ and $8.$^{00}$]</u>.

Considering again the **package of [sliced bread / bagels / burger buns] you just examined**, <u>**what is the highest price you would pay for the product you just saw**</u>? Enter the price in U.S. dollars and cents.

*If you would like to view the package again, please click **here**.*

_____ dollars   and   _____ cents

___ Don't know **[single response]**

128.   *Survey end.*   Finally, participants were asked a series of additional quality assurance questions, after which they were thanked.[117]

129.   *Control stimuli.*   The control stimuli were designed to "cure" the alleged unlawful conduct—specifically, by removing the at-issue front-of-package protein statement (*see* Figures 13 through 16).   If the Plaintiff is correct that displaying the total number of grams of protein on the front label of the Products is a material factor that influenced consumers to purchase the products, then a statistically significantly higher percentage of participants should indicate that they would definitely or probably purchase the Dave's product in the test condition compared to in the control condition.   Moreover, "test" participants assigned to the test condition should report a statistically significantly higher willingness-to-pay (WTP) for the product compared to "control" participants.   Conversely, to the extent that the at-issue front-of-package protein

statement is *not* a material factor and does *not* influence consumers' preferences and purchase decisions, then statistically indistinguishable levels of purchase intentions and willingness-to-pay (WTP) in the test and control conditions should be observed.

B: <u>Surveys' Findings and Conclusions</u>

130.    I analyzed the entire set of answers for each participant in each of the four surveys. Exhibits F.6 through I.6 provide tables with the coding results of the verbatim responses to Q.40/Q.41 (purchase reasons).  Exhibits F.7 through I.7 attach the raw data.

131.    *Purchase likelihood (Q.30A/B).*  Table 2 below shows the percentage (and number) of participants who selected various answer choices in Question 30, the key closed-ended purchase likelihood question, for each of the four surveys.

132.    As shown in Table 2, the purchase likelihood responses were similar across test and control group participants for each of the four surveys.  For example, in the survey testing the Dave's "Epic Everything" Bagel product—which contains the highest total grams of protein (13g)—74.9% and 78.4% of test group and control group participants, respectively, answered that they "definitely would buy" or "probably would buy" the Dave's bagels product they examined.

133.    The −3.5% difference between the test and control groups in the percent indicating a "top 2 box" purchase likelihood (*i.e.*, 74.9% − 78.4%) was ***statistically indistinguishable from zero*** ($\chi^2 = .70$, *df* = 1, *p* > .40, *n.s.*).[118]  Consequently, the isolated variable being investigated (here, the presence vs. absence of the front-of-package protein statement) does not have a causal effect on, or is *immaterial to*, consumers' likelihood of purchasing the Products.

134.    Similar patterns of results were found for the three surveys testing the Dave's "21 Whole Grains and Seeds,"[119] "Good Seed,"[120] and "Burger Buns Done Right" products.[121]

(*Continues on next page*)

**Table 2: Percent of Participants Selecting Various Answer Choices in the Purchase Likelihood Question (Q.30) Reported Across the Four Kivetz Purchase Likelihood "Front-of-Package" Surveys**

| | Sliced Bread ("21") | | Sliced Bread ("Good Seed") | | Bagels Survey | | Burger Buns Survey | |
|---|---|---|---|---|---|---|---|---|
| |  | |  | |  | |  | |
| | **Test** *(Front-of-Pack Claim **Present**)* *(n = 205)* | **Control** *(Front-of-Pack Claim **Absent**)* *(n = 202)* | **Test** *(Front-of-Pack Claim **Present**)* *(n = 205)* | **Control** *(Front-of-Pack Claim **Absent**)* *(n = 210)* | **Test** *(Front-of-Pack Claim **Present**)* *(n = 203)* | **Control** *(Front-of-Pack Claim **Absent**)* *(n = 208)* | **Test** *(Front-of-Pack Claim **Present**)* *(n = 204)* | **Control** *(Front-of-Pack Claim **Absent**)* *(n = 207)* |
| Definitely would buy this product | 25.4% (52) | 22.8% (46) | 36.1% (74) | 32.9% (69) | 37.4% (76) | 37.5% (78) | 39.7% (81) | 39.6% (82) |
| Probably would buy this product | 28.3% (58) | 23.3% (47) | 32.7% (67) | 32.9% (69) | 37.4% (76) | 40.9% (85) | 39.7% (81) | 36.2% (75) |
| May or may not buy this product | 19.5% (40) | 22.8% (46) | 20.0% (41) | 22.9% (48) | 17.7% (36) | 12.0% (25) | 15.7% (32) | 15.9% (33) |
| Probably would <u>not</u> buy this product | 15.1% (31) | 17.3% (35) | 9.3% (19) | 8.6% (18) | 6.4% (13) | 4.3% (9) | 3.4% (7) | 6.3% (13) |
| Definitely would <u>not</u> buy this product | 11.7% (24) | 13.9% (28) | 2.0% (4) | 2.9% (6) | 1.0% (2) | 5.3% (11) | 1.5% (3) | 1.9% (4) |
| Don't know | 0% (0) | 0% (0) | 0% (0) | 0% (0) | 0% (0) | 0% (0) | 0% (0) | 0% (0) |

135.    Taken together, the results of my four purchase likelihood surveys unequivocally demonstrate that the presence (vs. absence) of the front-of-package protein statement did *not* increase or affect consumers' likelihood of purchasing the Products.  This lack of materiality by necessity means that there can be no alleged price premium paid by consumers due to the front-of-package protein statement—that is, the alleged price premium is *zero (0%)*.

136.    *Purchase reasons (Q.40/Q.41)*.  As the findings from all four surveys show (*see* Tables 1 and 2 in each of Exhibits F.6 through I.6), participants provided a variety of reasons for purchasing the at-issue Dave's products—the majority of which did *not relate* to the amount or presence of protein.  Again taking as an example the survey testing Dave's "Epic Everything" bagels product, test group participants mentioned such positive purchase reasons as: brand equity or familiarity (36.9% of test participants); general health/nutrition impressions (28.6%); (non-protein) ingredients (*e.g.*, fiber, omega-3, grains; 25.1%); the general taste or flavor (25.1%); packaging or product appearance (*e.g.*, like the package design/colors, how the bread/bagel looks; 21.2%); and multiple other reasons that are *not* related to protein or the alleged unlawful conduct.[122]  Similar patterns of results were found in the three surveys testing the "21 Whole Grains and Seeds," "Good Seed," and "Burger Buns Done Right" products.[123]

137.    Participants' explanations of their purchase decisions indicate that the amount (or presence) of protein was not a material factor in class members' decisions to purchase the Products.  *First*, only a minority of test group participants in each survey mentioned, as reason in favor of purchasing the at-issue Dave's product, anything related to protein (3.9%, 7.3%, 14.3%, and 8.8% in the "21 Whole Grains and Seeds," "Good Seed," "Epic Everything Bagels," and "Burger Buns Done Right" surveys, respectively).[124]  Among control group participants (who were shown a package without the front-of-package protein statement), 1.5%, 3.3%, 7.7%, and 2.9% mentioned protein as a reason for purchase.[125]  This pattern suggests that even if Dave's were to "cure" the alleged unlawful conduct by removing the front-of-package protein statement altogether, at least some consumers would notice the amount of protein disclosed in the nutrition label.  *Second*, *no* control group participants (0%) in any of the four surveys provided a (negative

or neutral) reason against buying the "control" Dave's product due to a lack of protein or not having enough protein.[126]

138.    _Willingness-to-Pay (WTP)_.  Three of the four purchase likelihood "front-of-package" surveys included a final substantive question, which asked about willingness to pay.[127] As can be seen in Table 3 below, and consistent with consumers' purchase likelihoods, participants' stated WTP demonstrate that they are _not_ willing to pay more for the Products when the front-of-package protein statement is present (_i.e._, in the test group) compared to when it is absent (_i.e._, in the control group).

**Table 3: Average Willingness-to-Pay (Q.50) Reported Across the Kivetz "Front-of-Package" Purchase Likelihood Surveys**

| Sliced Bread ("Good Seed") | | Bagels Survey | | Burger Buns Survey | |
|---|---|---|---|---|---|
|  | |  | |  | |
| **Test**<br>(_FOP Statement_<br>**_Present_**)<br>(_n_ = 205) | **Control**<br>(_FOP Statement_<br>**_Absent_**)<br>(_n_ = 210) | **Test**<br>(_FOP Statement_<br>**_Present_**)<br>(_n_ = 203) | **Control**<br>(_FOP Statement_<br>**_Absent_**)<br>(_n_ = 208) | **Test**<br>(_FOP Statement_<br>**_Present_**)<br>(_n_ = 204) | **Control**<br>(_FOP Statement_<br>**_Absent_**)<br>(_n_ = 207) |
| $5.16 | $5.16 | $5.12 | $5.25 | $5.00 | $5.19 |
| $t(389) = -0.01, p > .98, n.s.$ | | $t(385) = -1.12, p > .26, n.s.$ | | $t(391) = -1.29, p > .19, n.s.$ | |

139.    For example, in the bagels survey, participants' average WTP for the Dave's "Epic Everything" bagels package was $5.12 (SD = $1.18) in the test condition versus $5.25 (SD = $1.21) in the control condition.[128]  This difference in WTP between the test and control groups, consisting of 14 cents in favor of the control, was **_statistically indistinguishable from zero_** ($t(385) = -1.12, p > .26, n.s.$).  Likewise, as shown in Table 3, for the surveys testing the "Good Seed" and "Burger Buns Done Right" products, participants in the control group did _not_ indicate a lower average WTP than those in the test group (and, in fact, had either the same or even a

slightly *higher* average WTP); in each case, the difference in WTP between the test and control conditions was again statistically indistinguishable from zero.

140.     It is important to reiterate that if a difference in average WTP between the test and control groups is *not* statistically significant, that insignificant difference cannot be translated into any alleged price premium (*e.g.*, the 14 cents difference in favor of the control found in the Bagels Survey cannot be interpreted to mean that the front-of-package protein statement caused a "negative price premium" of 14 cents).

141.     Overall, consistent with the findings for consumers' purchase likelihoods, the surveys show that the front-of-package protein statement does not (materially) increase consumers' WTP for the Products.  Consequently, and necessarily, the at-issue statement could not have caused class members to pay any alleged price premium (*i.e.*, the alleged price premium due to this statement is *0%*).

## OPINION 4: THREE SURVEYS DEMONSTRATE THAT THE ABSENCE OF THE %DV FOR PROTEIN ON THE NUTRITION LABEL IS NOT MATERIAL AND DID NOT CAUSE CLASS MEMBERS TO PAY AN ALLEGED PRICE PREMIUM

142.     I conducted another three surveys that address the *absence* of the PDCAAS-calculated %DV for protein on the nutrition label of Dave's packaging.

### A:  Surveys' Methodology

143.     These three surveys followed a substantially similar methodology to the four purchase likelihood "front-of-pack" surveys described in Opinion 3, with two notable exceptions: (*i*) the control stimuli retained the front-of-package protein statement while *adding* the (PDCAAS-calculated) %DV for protein on the nutrition facts label (*i.e.*, 3%, 8%, and 4% for the tested sliced bread, bagel, and burger bun products, respectively); and (*ii*) each survey included a "purchase considerations" set of questions at the beginning of the main questionnaire.[129]

144.     Again, unlike participants who saw Mr. Weir's product profiles, participants in each of my three %DV surveys viewed and could manipulate a realistic product package from all sides and angles.  In fact, after presenting in each survey a 3-dimensional, 360-degree image of a single Dave's product, I conservatively (*i.e.*, erring in favor of the Plaintiff) presented again the

same package but with a default back-facing view, in order to ensure participants' exposure to the nutrition label and the %DV for protein.

145. The sliced bread survey was administered in December 2023 using the InnovateMR panel; the bagels survey was administered in December 2023 and January 2024 using the Dynata panel; and the burger buns survey was administered in January 2024 using the Dynata panel.

**B: Surveys' Findings and Conclusions**

146. Table 4 summarizes the main findings of these three surveys. Exhibits J, K, and L contain their respective underlying materials and results.

147. Overall, the results of the three Kivetz %DV Surveys unambiguously demonstrate that adding the %DV for protein to the nutrition label does *not* decrease consumers' likelihood of purchasing the at-issue Dave's sliced bread, bagel, or burger bun products.[130] In each survey, there was no statistically significant difference between the test and control groups in terms of indicating a "top 2 box" purchase likelihood (*i.e.*, in terms of answering that they "definitely would buy" or "probably would buy" the Dave's product they examined).[131] Participants' reasons for purchase similarly indicate that protein was not a material factor in class members' decisions to purchase the Products.[132] Therefore, the absence of a %DV for protein on the nutrition facts label of the at-issue Dave's products did *not* cause class members to purchase—or pay any alleged price premium for—these products.

*(Continues on next page)*

**Table 4: Percent of Participants Selecting Various Answer Choices in the Purchase Likelihood Question (Q.30) Across the Three Kivetz Purchase Likelihood "%DV" Surveys**

| | Bread ("21") Survey | | Bagels Survey | | Burger Buns Survey | |
|---|---|---|---|---|---|---|
| |  | |  | |  | |
| | **Test** *(%DV Absent)* *(n = 204)* | **Control** *(%DV Present)* *(n = 203)* | **Test** *(%DV Absent)* *(n = 201)* | **Control** *(%DV Present)* *(n = 208)* | **Test** *(%DV Absent)* *(n = 204)* | **Control** *(%DV Present)* *(n = 203)* |
| Definitely would buy this product | 23.5% (48) | 26.1% (53) | 32.8% (66) | 40.4% (84) | 20.6% (42) | 23.6% (48) |
| Probably would buy this product | 27.0% (55) | 18.2% (37) | 35.3% (71) | 29.8% (62) | 32.8% (67) | 33.0% (67) |
| May or may not buy this product | 22.1% (45) | 24.1% (49) | 22.4% (45) | 19.2% (40) | 27.0% (55) | 19.7% (40) |
| Probably would not buy this product | 16.7% (34) | 17.7% (36) | 6.0% (12) | 7.7% (16) | 13.2% (27) | 15.3% (31) |
| Definitely would not buy this product | 10.8% (22) | 13.8% (28) | 3.5% (7) | 2.4% (5) | 6.4% (13) | 8.4% (17) |
| Don't know | 0% (0) | 0% (0) | 0% (0) | 0.5% (1) | 0% (0) | 0% (0) |

## CONCLUSION

148.    For the reasons explained in Opinions 1 and 2, the Weir Conjoint Survey suffers from multiple fatal methodological and analytical deficiencies that artificially inflated, and invalidated, his price premium estimates.  While I have focused on the most severe flaws, it is important to note that Mr. Weir's survey also suffered from other deficiencies, including but not limited to: (*i*) the lack of a proper supply side analysis (which requires incorporating an equilibrium analysis, as recognized by leading conjoint scholars and industry practitioners); and (*ii*) a failure to represent the relevant consumer universe.[133]

149.    Because the Weir Conjoint Survey's flaws and one-sided biases invalidated the alleged price premium estimates obtained for the protein statement—estimates that cannot even

be attributed to the alleged unlawful conduct—Mr. Weir's resulting damages estimates are also artificially inflated, unreliable, and invalid.  As Professor Bucklin and Dr. Simon state in a recent textbook chapter on marketing analysis in class certification:[134]

> The defendant's experts, Dr. William E. Wecker and Dr. Ran Kivetz, identified two principal limitations with the use of market simulation to estimate a but-for price in this case.  The first was that the validity of the market simulation results rests on the validity of the underlying data and associated demand estimates.  **To the extent that the underlying conjoint analysis – from which data were generated and then used for demand-side calculations – was unreliable, the resulting damage calculations would also be unreliable**.  [Emphasis added]

150.    By contrast, as summarized in Figure 17 below, empirical data from my eight (8) consumer surveys—which correct for various flaws in Mr. Weir's survey—directly and unambiguously demonstrate the lack of materiality of, and therefore the absence of any "price premium" attributable to, both the presence of the front-of-package protein statement and the absence of the %DV for protein.

### Figure 17: The Eight Kivetz Consumer Materiality Surveys



151.    Collectively, my eight surveys show, among other findings, that the alleged unlawful conduct did not affect consumers' choices of, likelihood of purchasing, or willingness

to pay for theProducts.  This means that class members would have been equally likely to choose and purchase Dave's products even if Dave's had remedied the alleged unlawful conduct. Therefore, ***the alleged unlawful conduct did <u>not</u> cause class members to pay <u>any</u> price premium (i.e., the price premium is <u>zero</u>), and did not cause consumers to suffer any economic injury***.

152.    I understand that discovery is ongoing and, therefore, reserve the right to supplement and/or revise my opinion and this Expert Report in response to any further information provided by the parties and/or in light of additional documents or testimony, which may be brought to my attention after the date of my signature below.  This Expert Report is to be used only for the purpose of this litigation and may not be published, distributed, or used for any other purpose without my prior written consent.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on April 7, 2025 in Tel Aviv, Israel.


_____          _____
April 7, 2025

Date                                     Dr. Ran Kivetz, Ph.D

# **EXHIBIT LIST**

**Exhibit A:** Curriculum Vitae of Dr. Ran Kivetz

**Exhibit B:** List of Cases in Which Dr. Ran Kivetz Provided Sworn Testimony in Deposition and/or Trial During the Past Four Years

**Exhibit C:** Documents Made Available to Dr. Kivetz in Connection with Preparation of this Expert Report

**Exhibit D:** Examples of Dave's Killer Bread, Oroweat, and Whole Foods 365 Bread Packaging

**Exhibit E:** Kivetz Choice Experiment
>   Exhibit E.1: Survey Screener and Main Questionnaire (Choice Experiment)
>   Exhibit E.2: Survey Screenshots (Choice Experiment)
>   Exhibit E.3: Screenshots of the Front, Back, Sides, Top, and Bottom of the "Test" and "Control" Triplets and Dave's Packages (Choice Experiment)
>   Exhibit E.4: Package Flats Used to Create the 360-Degree Image of the "Test" and "Control" Dave's, Oroweat, and Whole Foods 365 Packages (Choice Experiment)
>   Exhibit E.5: Distribution of Participants by Age and Gender (Choice Experiment)
>   Exhibit E.6: Coded Results (Choice Experiment)
>   Exhibit E.7: Raw Data (Choice Experiment)

**Exhibit F:** Kivetz Sliced Bread ("21") Front-of-Pack Survey
>   Exhibit F.1: Survey Screener and Main Questionnaire (Sliced Bread ["21"] Front-of-Pack Survey)
>   Exhibit F.2: Survey Screenshots (Sliced Bread ["21"] Front-of-Pack Survey)
>   Exhibit F.3: Screenshots of the Front, Back, Sides, Top, and Bottom of the "Test" and "Control" Dave's Packages (Sliced Bread ["21"] Front-of-Pack Survey)
>   Exhibit F.4: Package Flats Used to Create the 360-Degree Image of the "Test" and "Control" Dave's Packages (Sliced Bread ["21"] Front-of-Pack Survey)
>   Exhibit F.5: Distribution of Participants by Age and Gender (Sliced Bread ["21"] Front-of-Pack Survey)
>   Exhibit F.6: Coded Results (Sliced Bread ["21"] Front-of-Pack Survey)
>   Exhibit F.7: Raw Data (Sliced Bread ["21"] Front-of-Pack Survey)

**Exhibit G:** Kivetz Sliced Bread (Good Seed) Front-of-Pack Survey
>   Exhibit G.1: Survey Screener and Main Questionnaire (Sliced Bread [Good Seed] Front-of-Pack Survey)
>   Exhibit G.2: Survey Screenshots (Sliced Bread [Good Seed] Front-of-Pack Survey)
>   Exhibit G.3: Screenshots of the Front, Back, Sides, Top, and Bottom of the "Test" and "Control" Dave's Packages (Sliced Bread [Good Seed] Front-of-Pack Survey)

Exhibit G.4: Package Flats Used to Create the 360-Degree Image of the "Test" and "Control" Dave's Packages (Sliced Bread [Good Seed] Front-of-Pack Survey)

Exhibit G.5: Distribution of Participants by Age and Gender (Sliced Bread [Good Seed] Front-of-Pack Survey)

Exhibit G.6: Coded Results (Sliced Bread [Good Seed] Front-of-Pack Survey)

Exhibit G.7: Raw Data (Sliced Bread [Good Seed] Front-of-Pack Survey)

Exhibit H: Kivetz Bagels Front-of-Pack Survey

Exhibit H.1: Survey Screener and Main Questionnaire (Bagels Front-of-Pack Survey)

Exhibit H.2: Survey Screenshots (Bagels Front-of-Pack Survey)

Exhibit H.3: Screenshots of the Front, Back, Sides, Top, and Bottom of the "Test" and "Control" Dave's Packages (Bagels Front-of-Pack Survey)

Exhibit H.4: Package Flats Used to Create the 360-Degree Image of the "Test" and "Control" Dave's Packages (Bagels Front-of-Pack Survey)

Exhibit H.5: Distribution of Participants by Age and Gender (Bagels Front-of-Pack Survey)

Exhibit H.6: Coded Results (Bagels Front-of-Pack Survey)

Exhibit H.7: Raw Data (Bagels Front-of-Pack Survey)

Exhibit I: Kivetz Burger Buns Front-of-Pack Survey

Exhibit I.1: Survey Screener and Main Questionnaire (Burger Buns Front-of-Pack Survey)

Exhibit I.2: Survey Screenshots (Burger Buns Front-of-Pack Survey)

Exhibit I.3: Screenshots of the Front, Back, Sides, Top, and Bottom of the "Test" and "Control" Dave's Packages (Burger Buns Front-of-Pack Survey)

Exhibit I.4: Package Flats Used to Create the 360-Degree Image of the "Test" and "Control" Dave's Packages (Burger Buns Front-of-Pack Survey)

Exhibit I.5: Distribution of Participants by Age and Gender (Burger Buns Front-of-Pack Survey)

Exhibit I.6: Coded Results (Burger Buns Front-of-Pack Survey)

Exhibit I.7: Raw Data (Burger Buns Front-of-Pack Survey)

Exhibit J: Kivetz Sliced Bread %DV Survey

Exhibit J.1: Survey Screener and Main Questionnaire (Sliced Bread %DV Survey)

Exhibit J.2: Survey Screenshots (Sliced Bread %DV Survey)

Exhibit J.3: Screenshots of the Front, Back, Sides, Top, and Bottom of the "Test" and "Control" Dave's Packages (Sliced Bread %DV Survey)

Exhibit J.4: Package Flats Used to Create the 360-Degree Image of the "Test" and "Control" Dave's Packages (Sliced Bread %DV Survey)

Exhibit J.5: Distribution of Participants by Age and Gender (Sliced Bread %DV Survey)

Exhibit J.6: Coded Results (Sliced Bread %DV Survey)

Exhibit J.7: Raw Data (Sliced Bread %DV Survey)

Exhibit K: Kivetz Bagels %DV Survey

Exhibit K.1: Survey Screener and Main Questionnaire (Bagels %DV Survey)

Exhibit K.2: Survey Screenshots (Bagels %DV Survey)

Exhibit K.3: Screenshots of the Front, Back, Sides, Top, and Bottom of the "Test" and "Control" Dave's Packages (Bagels %DV Survey)

Exhibit K.4: Package Flats Used to Create the 360-Degree Image of the "Test" and "Control" Dave's Packages (Bagels %DV Survey)

Exhibit K.5: Distribution of Participants by Age and Gender (Bagels %DV Survey)

Exhibit K.6: Coded Results (Bagels %DV Survey)

Exhibit K.7: Raw Data (Bagels %DV Survey)

Exhibit L: Kivetz Burger Buns %DV Survey

Exhibit L.1: Survey Screener and Main Questionnaire (Burger Buns %DV Survey)

Exhibit L.2: Survey Screenshots (Burger Buns %DV Survey)

Exhibit L.3: Screenshots of the Front, Back, Sides, Top, and Bottom of the "Test" and "Control" Dave's Packages (Burger Buns %DV Survey)

Exhibit L.4: Package Flats Used to Create the 360-Degree Image of the "Test" and "Control" Dave's Packages (Burger Buns %DV Survey)

Exhibit L.5: Distribution of Participants by Age and Gender (Burger Buns %DV Survey)

Exhibit L.6: Coded Results (Burger Buns %DV Survey)

Exhibit L.7: Raw Data (Burger Buns %DV Survey)

Exhibit M: Summary of In-Store Prices at Major California Retailers

# **ENDNOTES**

[1] *See, e.g., California v. Kohl's Department Stores, Inc. et al.*, No. BC643037 (Cal. Superior Court L.A. Cnty Jul. 13, 2021) ("As carefully reviewed by Kohl's rebuttal expert, Ran Kivetz, Ph.D., who the Court found highly competent and entirely credible based on his outstanding academic credentials, his thorough research into Dr. Compeau's reports and his appearance and candor while testifying"; and "[t]he Court accepts as entirely credible and supported by sound scientific analysis, the conclusion of Dr. Kivetz, that none of the articles referenced in Dr. Compeau's reports provide valid scientific evidence for [Dr. Compeau's] opinion [.]"); *Yates et al. v. Traeger Pellet Grills, LLC*, 2:19-CV-00723-DAK-CMR (D. Utah, July 1, 2024) (denying summary judgment on materiality based on my testimony, noting that "While Plaintiffs have evidence of materiality from past Traeger studies, Traeger has submitted evidence of lack of materiality. Traeger's expert witness, Dr. Kivetz, conducted two consumer surveys with over 800 participants on precisely this question. The surveys conclusively showed that the alleged misrepresentations were not material to the buying decisions of consumers."); *Flodin v. Central Garden & Pet Co.*, 21-cv-01631-JST, 2024 WL 4565340, at *10 (N.D. Cal. Oct. 23, 2024) (quoting my testimony regarding the plaintiff's expert's conjoint analysis in denying motion for class certification); *Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F.Supp.2d 1009, 1019 (N.D. Ill., 2013) (upholding the methodology, questions, and coding of my survey and denying Bissell's motion to exclude my expert report); *Masimo Corp. v. Apple Inc.*, No. SACV2000048JVSJDEX, 2023 WL 3432167, at *4 (C.D. Cal. May 4, 2023) (citing to my testimony as evidence that the Plaintiffs' alleged business and marketing trade secrets were generally known prior to the alleged misappropriation at issue); Pretrial Conference in *Beef Products, Inc., et al. v. American Broadcasting Companies, Inc., et al.*, No. 12-292 (Union Cnty Cir. Court, First Judicial Circuit, S.D. 2017) (denying motion to exclude my testimony).

[2] In my February 11, 2024 Expert Declaration, I discussed other aspects of Mr. Weir's declaration at the class certification phase, including: (*i*) that Mr. Weir's eight "cognitive interviews" are unscientific, undisclosed, unrepresentative, and uninformative, and neither these interviews nor his proposed "pretesting" can validate whether the proposed conjoint survey is realistic, non-leading, or unbiased (*see* Subsection D.3); (*ii*) that Mr. Weir's discussion of product differentiation is unscientific and irrelevant, and *none* of the underlying sources he cites supports the notion that a protein label statement is a differentiator that generates an alleged price premium (*see* Section I); and (*iii*) that the three conjoint analysis journal articles Mr. Weir cites to defend his conjoint approach do not in fact justify his approach in this litigation (*see* Section D). Because these three aspects appear in nearly identical form in Mr. Weir's merits-phase declaration, in the interest of brevity, will not discuss these aspects in this Expert Report but instead incorporate by reference my analyses and conclusions from my February 11, 2024 Expert Declaration.

[3] The class is defined as "All persons in the State of California who purchased the Products between December 29, 2017 and September 5, 2023"; September 20, 2024 "Order Denying Defendants' Motion to Dismiss for Lack of Standing; Denying Motion to Intervene; Granting Plaintiff's Motion for Class Certification; and Denying Defendants' Motion to Strike the Declaration of Colin B. Weir" ("September 20, 2024 Order"), p. 12.

[4] The Products consist of: five varieties of Dave's "Killer Breads" (21 Whole Grains and Seeds, Good Seed, Powerseed, 100% Whole Wheat, Righteous Rye); four varieties of Dave's "Thin Sliced Bread" (21 Whole Grains and Seeds Thin-Sliced, Good Seed Thin-Sliced, Powerseed Thin-Sliced, Sprouted Whole Grains Thin-Sliced); four varieties of Dave's "Breakfast Bagels" (Epic Everything, Plain Awesome, Cinnamon Raisin Remix, Boomin' Berry); and two varieties of Dave's "Burger Buns" (21 Whole Grains and Seeds, Burger Buns Done Right); *see, e.g.*, September 20, 2024 Order, p. 19.

[5] *See, e.g.*, First Amended Complaint, ¶¶ 4 – 6. The PDCAAS method refers to "Protein Digestibility Corrected Amino Acid Score"; *see id.*, ¶ 4. *See also* Plaintiff's Class Certification Motion, p. 1.

[6] I received research assistance from support staff at my direction and guidance.

[7] The exact number of grams of protein in the Products ranged from 3g (in Dave's thin-sliced breads) to 13g protein (in Dave's Epic Everything bagels).

[8] *See, e.g.*, First Amended Complaint, ¶¶ 4 – 6. The PDCAAS method refers to "Protein Digestibility Corrected Amino Acid Score"; *see id.*, ¶ 4. *See also* Plaintiff's Class Certification Motion, p. 1. In particular, the FDA regulation that the Plaintiff accuses Dave's Killer Bread of violating is 21 C.F.R. § 101.9(c)(7)(i) & (ii); *see, e.g.*, Plaintiff's Class Certification Motion, p. 1 ("FDA regulations *prohibit* manufacturers from making *any* protein claims on a product unless the manufacturer has: (1) calculated the 'corrected amount of protein per serving' based on the *quality* of the product's protein using the Protein Digestibility Corrected Amino Acid Score ('PDCAAS'); and (2) provided a statement of that corrected amount of protein expressed as a percent daily value ('%DV') in the nutrition facts panel ('NFP'), which Defendants never did").

[9] *E.g.*, Plaintiff's Class Certification Motion, p. 18.

[10] Weir Amended Declaration, ¶ 13.

[11] *See id.*, ¶ 5 ("I have been advised by Counsel for Plaintiff that Swartz and other class members purchased certain Dave's Killer Breads products that prominently displayed labels claiming that the Products contained a specific level of protein per serving (hereinafter, 'Protein Claim' or 'Claim')").

[12] *Id.*, ¶ 54.

[13] *See, e.g., id.*, Exhibit 3.

[14] *See, e.g.*, January 23, 2024 Weir Deposition, p. 213. *See also* March 24, 2025 Weir Deposition, pp. 126 – 127 (agreeing that his survey did not test the prominence or placement of label statements).

[15] *See, e.g.*, FLO_00000009 ("21" sliced bread), FLO_00001062 ("Good Seed" sliced bread), FLO_00000032 ("Powerseed" sliced bread), FLO_00000002 ("100% Whole Wheat" sliced bread), FLO_00000042 ("Righteous Rye" sliced bread), FLO_00000065 ("21" thin-sliced bread), FLO_00000026 – 7 ("Good Seed" thin-sliced bread), FLO_00002623 ("Powerseed" thin-sliced bread), FLO_00000047 ("Sprouted Whole Grains" thin-sliced bread), FLO_00000022 ("Epic Everything" bagels), FLO_00000030 ("Plain Awesome" bagels), FLO_00000019 ("Cinnamon Raisin Remix" bagels), FLO_00000013 ("Bloomin' Berry" bagels), FLO_00000010 ("21" burger buns), FLO_00000015 ("Burger Buns Done Right").

[16] "Q. Okay. And so the respondent's supposed to take at face value that the Oroweat has a protein statement on its label and the 365 has a protein statement on its label, but not the Dave's Killer Bread, [it] does not have it on its label, correct? A. In this particular example, yes."); March 24, 2025 Weir Deposition, pp. 214 – 215. *See also id.*, pp. 210 – 211 (*e.g.*, "Q. So you are telling the respondents to take at face value that the 5 gram protein statement appears on the 365 and the Dave's Killer Bread label, but does not appear on the O Organics label, correct? A. Yes.").

[17] *See, e.g.*, 21 C.F.R. § 101.9(c)(7).

[18] *See* First Amended Complaint, ¶¶ 62 – 63; Swartz Deposition, pp. 91 – 92.

[19] Weir Amended Declaration, ¶ 5.

[20] Indeed, at his deposition, the named Plaintiff, Mr. Swartz, testified that if the front label had not displayed "5g Protein," he would still have looked at the nutrition label on the back and would have seen the 5 grams of protein there; Swartz Deposition, pp. 150 – 151.

[21] March 24, 2025 Weir Deposition, pp. 214 – 215.

[22] Weir Amended Declaration, Exhibit 3, p. 83 (red rectangles added).

[23] When asked how respondents of his survey would view a product profile that did not contain a protein "label statement," Mr. Weir testified that he was "not offering an opinion about that one way or the other"; March 24, 2025 Weir Deposition, p. 124. Mr. Weir further testified that he is "asking [respondents] to take at face value what they see here. I'm not telling them to believe any particular thing about the products"; *id*., p. 210.

[24] *See, e.g.*, https://www.oxfordreference.com/view/10.1093/oi/authority.20110803095842747 ("Used to express the idea that in computing and other spheres, incorrect or poor quality input will always produce faulty output (often abbreviated as *GIGO*). The saying is recorded from the mid 20th century.").

[25] Weir Amended Declaration, ¶ 89.

[26] *Id.*, ¶ 5.

[27] *See, e.g.*, January 23, 2024 Weir Deposition, pp. 54 – 55, 92, & 219; *see also* March 24, 2025 Weir Deposition, p. 169. The "but-for" world refers to the counterfactual world in which Dave's had remedied the alleged unlawful conduct (*e.g.*, by removing the front-of-package protein statement).

[28] Screenshot from the simulator produced by Mr. Weir. *See also* March 24, 2025 Weir Deposition, Exhibit 21 ("Choice Simulator – 45681GS").

[29] Weir Amended Declaration, ¶ 89.

[30] *See, e.g.*, March 24, 2025 Weir Deposition, pp. 70 (agreeing that his report does not speak to the percent daily value or to the Nutrition Facts Panel), 76 – 77 (acknowledging that the survey does not include the percent DV or what the percent DV would have been), & 95 (agreeing that his conjoint surveys "don't in any way test whether the percent daily value is material to consumers").

[31] *Id.*, p. 86 ("Q. So the survey would have resulted in the same answer regardless of whether there was a blank percent DV for protein, a 6 percent DV for protein or a 2 percent DV for protein, correct? A. Yes. Q. Those same answers apply across the four categories that you looked at, albeit that the grams of protein – the number of grams of protein would differ; is that correct? A. Yes."). *See also id.*, pp. 77 – 78 (noting that his survey would have treated sliced bread labels with no %DV for protein versus with 10% DV for protein the same).

[32] Reiterating that "there is no substitute for *careful* conjoint design," one peer-reviewed article on conjoint analysis cautions that "careful studies make all the difference between realistic predictions of demand and useless results"; Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi (2014b), "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, 12(4), 421 – 456, pp. 432 & 433 [emphasis added]. Another industry guide writes: "Conjoint analysis addresses big issues with specific answers. As a result, **when it fails, it often fails spectacularly**. [...] **Conjoint failures are generally the result of researchers who fail to properly design their conjoint studies or correctly interpret the output**. Powerful, user-friendly software gives us opportunities to make mistakes we may not even be aware of" [emphases added]; McCullough, Dick (2002), "A User's Guide to Conjoint Analysis," *Marketing Research*, 14(2), 18 – 23; Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi (2014a), "Valuation of Patented Product Features," *The Journal of Law and Economics*, 57(3), 629 – 663; Orme, Bryan K. (2010), *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research (2nd Ed.)*, Madison, WI: Research Publishers LLC.

[33] Befurt, Rene, Niall MacMenamin, and Aylar Pour Mohammed (2023), "Use of Conjoint Analysis in Litigation," in *The Cambridge Handbook of Marketing and the Law*, Gersen, Jacob E. and Joel H. Steckel (eds.), New York, NY: Cambridge University Press, pp. 221 & 235.

[34] "*Demand effects*" (also referred to as "demand characteristics") refer to the phenomenon whereby survey participants use cues provided by the survey's questions, answer choices, and/or stimuli to figure out the purpose of the study and provide the answers expected by the researcher. *See, e.g.*, Orme, Martin T.

(1962), "On the Social Psychology of the Psychological Experiment," *American Psychologist*, 17(11), 776 – 783; Darley, William K. and Jeen-Su Lim (1993), "Demand Artifacts in Consumer Research: An Alternative Perspective," *Journal of Consumer Research*, 20(3), 489 – 495; *see also* Simonson and Kivetz (2012). The participants then tend to provide (what they perceive as) the expected answers, to make sure that the results "come out right." Courts have recognized the importance of demand effects, and such problems have contributed to the rejection of surveys. *See, e.g.*, *In Re: KIND LLC "Healthy and All Natural Litigation,"* 15-md-02645 (NRB) (S.D.N.Y. Sep. 2022); *Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033, 2000, U.S. Dist. S.D. Indiana; *Kargo Global, Inc. v. Advance Magazine Publishers, Inc*., "Opinion & Order," No. 06 Civ. 550 (U.S. SDNY; Aug. 2007); *Government Employees Insurance Company v. Google Inc., et al.,* East. Dist. of Virginia, 2005 U.S. Dist. LEXIS 18642, 77 U.S.P.Q.2D (BNA) 1841; *THOIP v. The Walt Disney Co. et al*., OPINION AND ORDER(No. 08 Civ. 6823, S.D. NY, Feb. 2010). Although I am not an attorney or an expert on legal matters, I find it useful to refer to legal authorities and prior court decisions to illustrate the types of issues and principles that have come up in connection with the evaluation of consumer surveys.

[35] Research in psychology indicates that when survey participants are manipulated to focus on specific aspects, such aspects receive more attention and weight than they do under real marketplace conditions. Diverse lines of research have provided evidence for such a **"focusing illusion"** or **"focalism" bias**, which causes survey participants to focus too much on the information that is presented to them and not enough on the effects of other (less salient or unavailable) information. *See, e.g.*, Schkade, David and Daniel Kahneman (1998), "Does Living in California Make People Happy? A Focusing Illusion in Judgments of Life Satisfaction," *Psychological Science*, 9(5), 340 – 346; Kahneman, Daniel, Alan B. Krueger, David Schkade, Norbert Schwarz, and Arthur A. Stone (2006), "Would You Be Happier If You Were Richer? A Focusing Illusion," *Science,* 312(5782), 1908 – 1910; Wilson, Timothy D., Thalia Wheatley, Jonathan M. Meyers, Daniel T. Gilbert, and Danny Axsom (2000), "Focalism: A Source of Durability Bias in Affective Forecasting," *Journal of Personality and Social Psychology*, 78(5), 821 – 836; *see also* Kivetz, Ran and Itamar Simonson (2000), "The Effects of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37(4), 427 – 448 (this article was a finalist for the 2005 *O'Dell Award* for the article that has had the greatest impact on the marketing field in the previous five years); Huber, Joel (1997), "What We Have Learned from 20 Years of Conjoint Research," *Research Paper Series*, Sequim, WA: Sawtooth Software, Inc., p. 10 ("Simply mentioning an attribute increases its importance, raising the specter of attributes appearing important that otherwise would be ignored in the market choices.").

[36] Considerable research in marketing and consumer behavior has established the importance of packaging and product appearance in consumer perceptions and purchases of CPGs. *See, e.g.*, Winer, Russ and Ravi Dhar (2011), *Marketing Management* (4th ed.), Upper Saddle River, NJ: Pearson Prentice Hall; Creusen, Marielle E. H. and Jan P. L. Schoormans (2005), "The Different Roles of Product Appearance in Consumer Choice," *Journal of Product Innovation Management*, 22(1), 64 – 81; Bloch, Peter H. (1995), "Seeking the Ideal Form: Product Design and Consumer Response," *Journal of Marketing*, 59(3), 16 – 29; Underwood, Robert L. and Noreen M. Klein (2002), "Packaging as Brand Communication: Effects of Product Pictures on Consumer Responses to the Package and Brand," *Journal of Marketing Theory and Practice*, 10(4), 58 – 68; Kotler, Philip and Kevin L. Keller (2009), *Marketing Management*, 13th Ed., Upper Saddle River, NJ: Pearson Prentice Hall. Consistent with the academic literature, participants' purchase explanations from my eight empirical surveys mentioned the visual appeal and packaging appearance as a reason to buy the Products.

[37] *See* Hauser, John R., Felix Eggers, and Matthew Selove (2019), "The Strategic Implications of Scale in Choice-Based Conjoint Analysis," *Marketing Science*, 38(6), 1059 – 1081. For example, the authors of this article write: "Our results suggest that when equilibrium prices are used to replace WTP calculations, equilibrium-price estimates are extremely sensitive to craft. **Image realism**, incentive alignment, and likely other seemingly minor craft investments have impacts in the range of tens to hundreds of millions of dollars" (emphasis added); p. 1075; *see also* p. 1059 ("We demonstrate empirically that **image realism**

and incentive alignment affect scale sufficiently to change strategic decisions and affect patent/copyright valuations by hundreds of millions of dollars [emphases added]").

[38] Befurt et al. (2023), p. 232.

[39] Drewnowski, Adam, Howard Moskowitz, Michele Reisner, and Bert Krieger (2010), "Testing Consumer Perception of Nutrient Content Claims Using Conjoint Analysis," *Public Health Nutrition*, 13(5), 688 – 694, p. 693.

[40] *Ibid*.

[41] Weir Amended Declaration, ¶ 43.

[42] Befurt et al. (2023), p. 230. While it may be reasonable to omit certain *non*-important attributes, the logistical benefits of including fewer attributes *cannot* justify the exclusion of important attributes, which fundamentally biases the results. *See also, e.g.*, Chapman (2013) ("Clients often want to know 'Which attributes are most important?' but CA [conjoint analysis] can only answer this with regard to the relative utilities of the attributes and features tested. Including (or omitting) a very popular or unpopular level on one attribute will alter the 'importance' of every other attribute!") *See also, e.g.*, Huber (1997), p. 10.

[43] Contrary to Mr. Weir's assertion (Weir Amended Declaration, ¶ 60 & FN 30), the goal of including other attributes is *not* to "disguise" the research purpose from participants or to give them "distractor attributes" that are "believable and understandable." Rather, the goal is to ***accurately represent a real market and realistic products***, and thereby simulate the tradeoffs, choices, and WTP that consumers would reveal in the actual, relevant marketplace.

[44] Indeed, the named Plaintiff himself testified that his purchases of sliced bread (including Dave's) were motivated by not only attributes such as organic and non-GMO project verified (*see, e.g.*, Swartz Deposition, pp. 87, 126 – 127, & 138), but also the toppings (*e.g.*, seeds) visible on the bread itself. *See, e.g., id.*, pp. 125 – 126. Mr. Swartz also testified that his choice of which bread to buy was driven by his daughter's preferences and willingness to eat with respect to taste, flavor, and texture; *see, e.g., id.*, p. 80.

[45] In fact, despite the fact that "Taste/Flavors" was identified by interviewees in Mr. Weir's own limited "cognitive interviews" (*see* Weir Amended Declaration, ¶¶ 43 & 48), the survey explicitly (and unrealistically) instructed participants to assume that "[a]ll packages of regular sliced bread are available in your choice of flavor/variety"; Weir Amended Declaration, Exhibit 3, p. 75.

[46] *See, e.g.*, https://www.daveskillerbread.com/history; https://www.daveskillerbread.com/secondchances.

[47] In fact, the survey explicitly (and unrealistically) instructed participants to assume that "[a]ll packages of regular sliced bread are the same size and contain the same number of bread slices"; Weir Amended Declaration, Exhibit 3, p. 75.

[48] *See, e.g.*, https://www.medicalnewstoday.com/articles/161547.

[49] Mr. Weir's blanket directive that participants should assume (among other things) that "Any features not shown in the exercise are assumed to be the same across the possible product choices presented" (*see* Weir Amended Declaration, Exhibit 3, p. 75) fails to address the issue of omitted attributes. For consumers in the marketplace, all bread products are *not* their preferred flavor/variety, and trading flavor and other features is a key aspect of consumers' product valuations and purchase decisions.

[50] March 24, 2025 Weir Deposition, p. 126.

[51] Screenshots of Mr. Weir's "profiles" taken from Weir Amended Declaration, Exhibit 3. The bagels profile was modified to replace the Sara Lee with the Dave's brand; *see id.*, p. 105.

[52] *See* March 24, 2025 Weir Deposition, pp. 126 – 127.

[53] I added red ovals to highlight the "5g Protein" label statement.

[54] For illustration purposes, I added colored ovals in each figure.

[55] *See, e.g.*, https://www.safeway.com/shop/product-details.960050655.html ("21" thin sliced); Exhibit F.3 ("21" regular sliced); https://www.safeway.com/shop/product-details.960331210.html (Boomin' Berry); Exhibit I.3 ("Burger Buns Done Right"); Exhibit H.3 ("Epic Everything" bagels).

[56] *See, e.g.*, Exhibit F.3.

[57] At his deposition, Mr. Weir agreed that his survey does not identify which of the two "USDA Organic" statements it is testing; March 24, 2025 Weir Deposition, p. 207 ("Q. And your survey doesn't identify which of those two organic statements it's testing; is that correct? A. Agreed" [objection omitted]).

[58] *See, e.g.*, https://www.walmart.com/ip/Dave-s-Killer-Bread-21-Whole-Grains-and-Seeds-Thin-Sliced-Organic-Bread-Loaf-20-5-oz/170476642 (with location set to Burbank, CA).

[59] The Weir Conjoint Survey included the label statement "560mg Omega-3," while the Omega-3 label statement on the Dave's Epic Everything bagels is "680mg ALA OMEGA-3." Note that "No High Fructose Corn Syrup" appeared on the *front* labels of the three other Dave's bagels products; *see, e.g.*, FLO_00000030 ("Plain Awesome," April 2022); FLO_00000019 ("Cinnamon Raisin Remix," March 2021); FLO_00000013 ("Boomin' Berry," April 2022). However, because the Weir Conjoint Survey did not distinguish for participants the locations of any of the "label statements" in the choice task, the survey would generate the *same* "price premium" attributable to "No High Fructose Corn Syrup" regardless of whether it had appeared on the front (as it did on three variants Dave's bagels) or whether it only appeared on the side (as it did on the Epic Everything variant).

[60] *See, e.g.*, Exhibit H.3 (screenshots of the "Epic Everything" bagels product).

[61] That is, a research design in which participants provide a response to an outcome variable or measure (*e.g.*, choice of a bread product) while being exposed to different *levels* of a tested variable (*e.g.*, whether a certain claim is present vs. absent on a label). A major drawback of such a design is that it reveals to participants the factor being investigated and the research hypothesis. *See, e.g.*, Kahneman, Daniel and Amos Tversky (1996), "On the Reality of Cognitive Illusions," *Psychological Review*, 103(3), 582 – 591; Kivetz and Simonson (2000).

[62] For example, in the regular sliced bread version, participants were told to assume: "Any features not shown in the exercise are assumed to be the same across the possible product choices present"; "All packages of regular sliced bread are the same size and contain the same number of bread slices"; "All packages of regular sliced bread are available in your choice of flavor/variety"; "Each package of regular sliced bread is offered by the same retailer, so any preference you may have for a particular retailer should not matter"; Weir Amended Declaration, Exhibit 3, p. 75. Corresponding instructions were displayed for the other three survey versions.

[63] For example, Mr. Weir's directive that participants assume that any features not shown in the choice task are the same is ***repeated three different times in close succession***. *See id.*, pp. 75 – 76 & 81.

[64] *See, e.g., id.*, pp. 76 – 79.

[65] *E.g.*, *Manual for Complex Litigation* (2004), Federal Judicial Center, Fourth, Section 11.493, p. 103; Diamond, Shari Seidman (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, 3rd ed., Washington, D.C.: The National Academies Press.

[66] Most surveys involve a level of "noise," whereby some responses are obtained due to factors that are irrelevant to the issue being studied, such as guessing behavior, "yea-saying," preexisting beliefs, or packaging elements that are not at issue. Thus, it is important to include a control that accounts for such survey "noise." *See also, e.g.*, Diamond (2011).

[67] Indeed, in their chapter on choice experiments conducted in the context of litigation, Professor Steckel and colleagues (2023) write that compared to conjoint analysis, "[i]f the research question is one of causation, a simple choice experiment can be an effective and more direct method to isolate the effect of a particular feature on consumers' purchase decisions regarding a complex product with many salient features"; Steckel, Joel H., Rebecca Kirk Fair, Kristina Shampanier, and Anne Cai, "Choice Experiments: Reducing Complexity and Measuring Behavior Rather than Perception," in *The Cambridge Handbook of Marketing and the Law*, Gersen, Jacob E. and Joel H. Steckel (eds.), New York, NY: Cambridge University Press, p. 211.

[68] Steckel et al. (2023), p. 212.

[69] Alternatively, removing the allegedly deceptive or at-issue claim is also routinely done. In the present matter, completely removing the front-of-package claim from the at-issue Dave's product packaging was conservative.

[70] Steckel et al. (2023), pp. 212 & 216. *See also, e.g., id.*, p. 218.

[71] The eight surveys I conducted in this matter were independent of each other and had a combined total of 3,280 (unique) participants. Each survey included a sample of over 400 participants (over 200 participants in the test group and over 200 participants in the control group); such a sample is sufficiently large to adequately represent the relevant consumer universe, as well as to detect differences, if any exist, between the test and control groups' responses. Typically, for a survey conducted for purposes of litigation, an expert should make sure that in each condition (test and control) there are at least 100 respondents. *See, e.g.*, Jay, E. Deborah (2013), "Ten Truths of False Advertising Surveys," *The Trademark Reporter*, 103(5), 1116 – 1171. The criterion for judging the adequacy of a sample size is the *confidence interval* of the sample's estimate (*e.g.*, the CI of the percentage of customers who provide a particular response). The 95% confidence interval of a percentage of consumers (*e.g.*, who have a particular purchase likelihood) based on a sample of respondents means that there is a 95% likelihood that the actual percentage of consumers in the entire population who have the same purchase likelihood lies within that confidence interval. The confidence interval is narrower when the estimate's standard error is smaller, and the standard error is smaller when the sample size is larger. *See, e.g.*, Kaye, David H. and David A. Freedman (2000), *Reference Guide on Statistics*, in *Reference Manual on Scientific Evidence*, Federal Judicial Center, p. 119).

[72] Both the survey participants and the online survey panel firm were unaware of the purpose of the surveys and the identity of their sponsor. Similarly, the two independent coders who classified participants' verbatim (open-ended) responses were "blind" to the purpose and sponsor of each survey, as well as to the condition (test or control) to which participants were randomly assigned.

[73] *See* Exhibit E.1, Q.9 & Q.10 (survey questionnaire with programming logic).

[74] That is, participants must: pass a CAPTCHA test; select California as their state of residence; be at least 18 years old; match the gender, age, and state panel data; complete the survey on a desktop or laptop; indicate that neither they nor anyone in their household work for a marketing consulting firm, marketing research firm, advertising agency or public relations firm, a TV or radio station, a magazine or newspaper, or a company that manufactures, sells, or distributes food products; agree that if they typically wear eyeglasses or contact lenses when using the device they are taking the survey on, then they will wear them during the survey; pass three additional quality-assurance attention checks, which asked them to select a particular response to a list of options, type a specific word into a question, and select a particular "correct" answer to a question toward the end of the survey; indicate that they did not particulate in any similar market research survey (*e.g.*, another survey about bread products) in the past three months; and indicate at the end that they complied with the survey's various instructions when taking the survey. *See* Exhibit E.1.

[75] More generally, to properly construct the relevant universe for each product category tested across my eight surveys (*i.e.*, sliced bread, bagels, and burger buns), "screening quotas" using "click balancing"

were first employed by screening for qualified participants in proportion to the known gender and age distribution of the population in California, based on gender and age brackets obtained in the U.S. census. After deriving the relevant age and gender composition, "hard quotas" were employed in subsequent surveys that screened for representative consumers in the same product category.

[76] I chose to test the Dave's "21 Whole Grains and Seeds" product because I understand that it is by far the top-selling line of bread product sold by Dave's during the class period. *See, e.g.*, Weir Amended Declaration, ¶ 116 & Table 2 ("Summary of Sales Data"); "Confidential - AEO - Gutride Safier DKB Oct 23.xlsx."

[77] I did not use the O Organics brand, which I understand is an Albertsons store brand that discontinued its packaged (regular) sliced bread products in 2022; *see* February 8, 2024 Declaration of Dan Letchinger in Support of Flowers Foods, Inc.'s and Dave's Killer Bread, Inc.'s Opposition to Plaintiff's Motion for Class Certification ("Letchinger Declaration"), ¶ 14. Further, while Dave's frequently appears together alongside Oroweat (*e.g.*, at Albertsons-branded grocery chains across California) and alongside 365 (specifically at Whole Foods grocery chains across California), to the best of my knowledge, Oroweat is *not* sold at Whole Foods stores in California. *See, e.g.*, Exhibit M. However, because Mr. Weir nevertheless had participants in his survey choose among sets of bread "profiles" that displayed the Whole Foods 365 brand alongside Oroweat, I also did so in my choice experiment, which largely mimicked the Weir Conjoint Survey *except for* correcting a handful of its major flaws.

[78] Specifically, these triplets consisted of the following presentation orders for the three breads (*i.e.*, left, middle, right): (*1*) Daves's-Oroweat-365; (*2*) Dave's-365-Oroweat; (*3*) Oroweat-Dave's-365; (*4*) Oroweat-365-Dave's; (*5*) 365-Dave's-Oroweat; and (*6*) 365-Oroweat-Dave's.

[79] *See* Exhibit E.1, Q.18 ("Thank you for participating in this study. It is very important that, during this survey, you do not search for any information on the Internet, you do not open another Internet browser, site, or tab, and you do not review any materials that are not part of this survey. Also, please complete this survey without stopping in the middle, and make sure <u>not</u> to consult anyone about this survey.").

[80] *See ibid.*

[81] *See, e.g.*, Weir Amended Declaration, Exhibit 3, p. 74 ("Now imagine that you are going to purchase a **package of regular sliced bread**. […] First, you will be shown three packages of regular sliced bread with different attributes and prices. You will be asked to choose the product with the set of attributes and price shown that you **most** prefer." [Emphases in the original]).

[82] Mr. Weir used the following price levels for the version of his conjoint survey that attempted to test regular sliced bread: $4.49, $4.99, $5.49, $5.99, $6.49, $6.99, and $7.49. *See, e.g., id.*, p. 18.

[83] *See* Exhibit M. Note that my analysis of in-store prices for the Whole Foods 365 bread indicated that it was consistently sold at $3.99 at all of the sampled Whole Foods stores across northern, central, and southern California. However, because $4.49 was the lowest price for regular sliced bread that Mr. Weir used in his conjoint survey, I set the price for the 365 product at $4.49.

[84] Not to scale (the images appeared considerably larger in the survey). *See* Exhibits E.2 and E.3 for screenshots of the survey and triplet images, respectively.

[85] On a laptop or desktop, the mouse cursor appeared as an open hand when hovering over the image and turned into a closed hand when clicking down on (*i.e.*, "grabbing") the image.

[86] *See* Exhibit E.1 (Q.20, Q.21, & Q.22). The instructions were displayed a total of three times and were prefaced each time with the line "Below is the [**first package** / **second package** / **third package**] of sliced bread (it may take a moment for the image to load)."

[87] I added a red oval to highlight the **presence** of the challenged front-of-package protein statement.

[88] I added a red oval to highlight the **absence** of the challenged front-of-package protein statement.

[89] *See* Exhibit E.1 (Q.23A/B). Those who indicated that they were not able to clearly view "all three packages" were terminated from the survey.

[90] Emphasis in the original. *See* Exhibit E.2 for screenshots of the experiment. The "choice" question in Mr. Weir's regular sliced bread survey version asked: "**If these were your only options, and you had to choose a package of regular sliced bread, which would you choose?**" [emphasis in the original]; Weir Amended Declaration, Exhibit 3, p. 83. I omitted the superfluous adjective "regular" before "sliced bread."

[91] Allowing participants to re-examine, if they wish, any of the three bread products while making their choice reflects marketplace conditions, as shoppers in the real world can freely pick up a product from the shelf while making their selection.

[92] *See* Exhibit E.2 for screenshots of the experiment.

[93] *See* Exhibit E.1 (Q.31). Note that because Mr. Weir failed to counterbalance (rotate) the "Yes" and "No" answer choices in his "willingness to buy" question, I did not rotate these options in Question 31. I also bolded the same phrases (*e.g.*, the word "willing") as Mr. Weir did in his conjoint survey. The Weir Conjoint Survey's "willingness to buy" question asked: "given what you know about the market, including other **packages of regular sliced bread** available to you at your choice of retailer, would you or would you not be **willing** to purchase the product that you chose above with the brand, labels and price shown?"; *see* Weir Amended Declaration, Exhibit 3, p. 83.

[94] *See* Exhibit E.2. The respondent's selected bread appeared as a (static) blue "Selected" button.

[95] *See* Exhibit E.1 (Q.40 & Q.41). While answering Question 40, participants saw the image of their assigned triplet, Question 30, Question 31, and their (uneditable) answers they previously provided to Questions 30 and 31 on the same screen. While answering Question 41, participants additionally saw Question 40 and their (uneditable) answer they provided to Question 40. Question 41 could be left blank. Emphasis (*i.e.*, the bolding of "not") in the original.

[96] *See ibid.* (Q.60 – Q.72). Participants who did not pass the quality assurance questions (Q.60, Q.62A/B, and Q.70A/B) were terminated from the survey.

[97] A $\chi^2$ test is a statistical test that is commonly used to assess whether any differences (of any size) observed between sets of data with categorical (binary) variables are due to chance or rather due to a relationship (or effect) between the variables being investigated.

[98] In statistical hypothesis testing, statistical significance is a measure of the likelihood that a study's result would have occurred under the "null hypothesis" (*i.e.*, under the default position that no association exists between or among specified groups/variables beyond that due to random chance). When a result has statistical significance or is "statistically significant," the researcher can reliably conclude that such a result is likely *not* caused by chance. The standard in consumer behavior, marketing, communications, psychology, and other scientific research is that a statistic is considered statistically significant when its corresponding *p*-value is smaller than a significance level of .05 (*i.e.*, a less than 5% probability of a difference this large occurring by chance). When the *p*-value of an observed effect (or observed difference) falls *below* the significance level threshold (typically below .05), the researcher can reject the null hypothesis (*i.e.*, of no effect) and conclude that because the result is unlikely to have occurred by chance, the effect exists among (and generalizes to) the population being studied. On the other hand, **when the *p*-value exceeds the significance level threshold (typically when *p* > .05), the researcher cannot reject the null hypothesis, meaning that any observed differences are likely due to random chance alone (rather than any systematic effect or relationship between the studied variables).**

[99] Similarly, 28.2% and 21.6% of test and control participants, respectively, both selected the Oroweat bread and said they would be willing to buy it ($\chi^2 = 2.45$, $df = 1$, $p > .11$, *n.s.*); 19.6% and 22.5% of test

and control participants, respectively, both selected the Whole Foods 365 bread and said they would be willing to buy it ($\chi^2$ = .53, $df$ = 1, $p$ > .46, *n.s.*).

[100] To the extent that a positive "price premium" for the claim at issue were to exist in reality, then the materiality survey should detect a statistically significant difference between the test and control conditions (but would not be able to a quantify the magnitude of that "price premium"). *See also, e.g.*, Steckel et al. (2023), pp. 212 ("[...] if there is no statistically significant difference in the share, the at-issue attribute, product feature, trademark, or product claim has no material impact on consumer choice (and, as a corollary, the price premium on the at-issue attribute is zero)") & 216 ("If one finds a result with no statistical significance, the choice experiment has essentially killed two birds with one stone: The results imply lack of materiality and thus no liability, as well as zero damages.").

[101] Note that because participants could still reference the image of the triplet (which showed only the front view of the three breads) *while* answering the "reasons" questions, it would have been easy for participants to simply "parrot" protein as a reason to buy.

[102] O'Laughlin, Laura and Catherine Tucker (2023), "The Purchase Funnel and Litigation," in *The Cambridge Handbook of Marketing and the Law*, Gersen, Jacob E. and Joel H. Steckel (eds.), New York, NY: Cambridge University Press, p. 19. *See also, e.g.*, Steckel et al. (2023), p. 212 ("In an experiment in which the dependent measure is likelihood of purchase (e.g. on a 0–10 scale), we would compare the mean likelihood of purchase between the two groups and assess whether there is a statistically significant difference," and noting that "Experiments using likelihood of purchase as the dependent measure have been accepted by courts.").

[103] The WTP question (Q.50) is detailed subsequently and was asked in three of these four surveys. The price ranges provided to participants in Q.50 reflect the typical price range observed at major California retailers for the relevant product category at the time of survey administration. *See* Exhibit M.

[104] *See* Exhibits F.1 through I.1, Q.18 ("Thank you for participating in this study. It is very important that, during this survey, you do not search for any information on the Internet, you do not open another Internet browser, site, or tab, and you do not review any materials that are not part of this survey. Also, please complete this survey without stopping in the middle, and make sure <u>not</u> to consult anyone about this survey.").

[105] *See ibid.*

[106] I added red ovals to indicate the presence and absence of the front-of-package protein statement in the test and control conditions, respectively. *See* Exhibits F.1 through I.1 (Q.22).

[107] The package variants I tested did not include any "%DV" for protein on the nutrition label. Any expiration dates that appeared on the front label reflected the format in which they appeared in the marketplace; I adjusted the exact dates based on when each survey was administered. The actual Dave's "21 Whole Grains and Seeds," "Good Seed," and "Burger Buns Done Right" products displayed the current-selling price on the front label; because the surveys testing these products asked a question about willingness-to-pay (WTP), I therefore removed any price information from both the test and control packaging.

[108] *See* Exhibits F.1 through I.1 (Q.23A/B: "Were you or weren't you able to clearly view the package?"). The order in which the two answer choices appeared was rotated across participants, such that half of the participants saw "Yes, I was" as the first option, followed by "No, I wasn't" (Q.23A), while the remaining half saw the options in the reverse order (Q.23B). Those who indicated that they were not able to clearly view the package were terminated from the survey.

[109] *See ibid.* (Q.24).

[110] *See* Exhibits F.1 through I.1 (Q.30A/B). The first five answer choices were rotated, such that half the participants in each condition saw the order of answer choices shown (Q.30A; affirmative purchase options listed first), while the remaining half saw the options in reverse order (*i.e.*, Q.30B; negative purchase options listed first).

[111] Based on an analysis of current in-store prices for the Dave's "21" product at major retailers across California. *See* Exhibit M.

[112] *See* Exhibits F.1 through I.1 (Q.40 & Q.41). While answering Question 41, participants saw both Question 40 and their (uneditable) answer they previously provided to Question 40 on the same screen. Question 41 could be left blank.

[113] *See ibid.* (Q.50).

[114] I determined the typical price range based on an analysis of current in-store prices for the corresponding product category (including Dave's and competitor brands) sold in major retailers across northern, central, and southern California. *See* Exhibit M for a comprehensive tabulation.

[115] If a participant did not type in a whole number between 0 and 99 in the "dollars" or "cents" field, then the participant would see the following error message: "Please type in a whole number (no decimals) between 0 and 99." Participants could leave the "cents" field blank, but they had to enter a value in the "dollars" field.

[116] *See* Exhibits F.1 through I.1 (Q.50).

[117] *See ibid.* (Q.60 – Q.72). Participants who did not pass the quality assurance questions (Q.60, Q.62A/B, and Q.70A/B) were terminated from the survey.

[118] In addition, there was *no* statistically significant difference between the test and control groups in the likelihood of answering "definitely would buy this product" (37.4% vs. 37.5%; $\chi^2 = .0002$, $df = 1$, $p > .98$, *n.s.*), "probably would buy this product" (37.4% vs. 40.9%; $\chi^2 = .51$, $df = 1$, $p > .47$, *n.s.*), and "may or may not buy this product" (17.7% vs. 12.0%; $\chi^2 = 2.65$, $df = 1$, $p > .10$, *n.s.*). Similarly, there was no statistically significant difference between the 7.4% and 9.6% of test group and control group participants, respectively, who indicated a "bottom 2" purchase likelihood (*i.e.*, answered that they "definitely would <u>not</u> buy" or "probably would <u>not</u> buy" the product; $\chi^2 = .65$, $df = 1$, $p > .41$, *n.s.*).

[119] "Top 2" box ("definitely would" or "probably would" buy): 53.7% vs. 46.0% ($\chi^2 = 2.36$, $df = 1$, $p > .12$, *n.s.*); "definitely would buy": 25.4% vs. 22.8% ($\chi^2 = .37$, $df = 1$, $p > .54$, *n.s.*); "probably would buy": 28.3% vs. 23.3% ($\chi^2 = 1.34$, $df = 1$, $p > .24$, *n.s.*); "bottom 2" box ("definitely would <u>not</u>" or "probably would <u>not</u> buy"): 26.8% vs. 31.2% ($\chi^2 = .94$, $df = 1$, $p > .33$, *n.s.*).

[120] "Top 2" box ("definitely would" or "probably would" buy): 68.8% vs. 65.7% ($\chi^2 = .44$, $df = 1$, $p > .50$, *n.s.*); "definitely would buy": 36.1% vs. 32.9% ($\chi^2 = .48$, $df = 1$, $p > .48$, *n.s.*); "probably would buy": 32.7% vs. 32.9% ($\chi^2 = .001$, $df = 1$, $p > .96$, *n.s.*); "bottom 2" box ("definitely would <u>not</u>" or "probably would <u>not</u> buy"): 11.2% vs. 11.4% ($\chi^2 = .005$, $df = 1$, $p > .94$, *n.s.*).

[121] "Top 2" box ("definitely would" or "probably would" buy): 79.4% vs. 75.8% ($\chi^2 = .75$, $df = 1$, $p > .38$, *n.s.*); "definitely would buy": 39.7% vs. 39.6% ($\chi^2 = .0004$, $df = 1$, $p > .98$, *n.s.*); "probably would buy": 39.7% vs. 36.2% ($\chi^2 = .53$, $df = 1$, $p > .46$, *n.s.*); "bottom 2" box ("definitely would <u>not</u>" or "probably would <u>not</u> buy"): 4.9% vs. 8.2% ($\chi^2 = 1.83$, $df = 1$, $p > .17$, *n.s.*).

[122] *See* Exhibit H.6, Table 1.

[123] *See* Table 1 of Exhibits F.6, G.6, and I.6, respectively. For example, test group participants identified such positive purchase reasons as: aspects related to brand equity/familiarity (23.4% ["21" sliced bread], 31.7% ["Good Seed" sliced bread], 41.2% [burger buns]); general health/nutrition (27.3% ["21" sliced bread], 33.2% ["Good Seed" sliced bread], 21.1% [burger buns]); (non-protein) ingredients (21.5% ["21"

sliced bread], 25.4% ["Good Seed" sliced bread], 23.0% [burger buns]); packaging/product appearance (8.3% ["21" sliced bread], 14.1% ["Good Seed" sliced bread], 23.5% [burger buns]); general taste/flavor (12.2% ["21" sliced bread], 18.5% ["Good Seed" sliced bread], 15.7% [burger buns]).

[124] *See ibid.*

[125] *See ibid.*

[126] *See id.*, Table 2.

[127] The sliced bread survey testing the "21 Whole Grains and Seeds" product (which was conducted prior to the other three "front-of-pack" surveys described in this section and focused on measuring purchase likelihood) did not ask a WTP question because the price of the product was displayed on the front of the package—replicating marketplace reality. In the actual marketplace, the price appeared on the front labels of the "21 Whole Grains and Seeds," "Good Seed," and "Burger Buns Done Right" products (the price did not appear on the "Epic Everything" bagels product). However, to generalize my findings regarding consumers' WTP across the Products, I included the WTP question for my subsequently-conducted "front-of-pack" surveys, while removing any price information that otherwise would have appeared on the front labels of the "Good Seed" sliced bread and "Burger Buns Done Right" products.

[128] In analyzing WTP for each survey, I first excluded outliers based on a standard cutoff of two standard deviations below and above the average in each condition. The findings and conclusions remain the same regardless of whether the outliers are included in or excluded from the analysis.

[129] Prior to seeing a product package, participants were asked to list their considerations when deciding which sliced bread, bagels, or burger buns to buy; *see* Exhibit J.1, K.1, and L.1, respectively. As the coded results summarized in Table 1 of Exhibits J.6, K.6, and L.6 demonstrate, participants in each of the three surveys provided a variety of purchase considerations when buying in the category. These considerations include, for example, price/value (49.9% [sliced bread], 50.1% [bagels], 54.3% [burger buns]); bread/flour type (*e.g.*, regular/white, whole grain, etc.; 49.9% [sliced bread], 45.0% [bagels], 27.5% [burger buns]); freshness/expiration (37.1% [sliced bread], 45.5% [bagels], 35.6% [burger buns]); brand equity/familiarity (29.2% [sliced bread], 29.8% [bagels], 21.4% [burger buns]); general taste/flavor (23.1% [sliced bread], 39.4% [bagels], 19.4% [burger buns]); (non-protein) ingredients (18.4% [sliced bread], 14.4% [bagels], 33.9% [burger buns]); texture (16.2% [sliced bread], 21.3% [bagels], 29.0% [burger buns]); and multiple other considerations that do not refer to protein. Only a minority of participants in each survey (1.7%, 1.0%, and 0.1% in the sliced bread, bagels, and burger buns surveys, respectively) mentioned considerations that relate to protein. Overall, these results indicate that concerns about the amount or presence of protein—let alone the %DV for protein—are not important or general considerations for consumers when they decide which sliced bread, bagels, or burger buns to buy.

[130] The Bagels %DV Survey also included a WTP question (Q.50). The average WTP for the Dave's bagel product did *not* differ, as a statistical matter, between the test and control groups (test: $5.01; control: $5.08; $t(365) = -0.56$, $p > 57$, *n.s.*; after excluding outliers based on a standard cutoff of two standard deviations below and above the average in each condition (the findings remain the same regardless of whether outliers are excluded from the analysis). Thus, adding the %DV for protein on the nutrition label does *not* decrease consumers' willingness to pay for the at-issue product.

[131] That is, the 6.2%, −2.0%, and −3.2% differences between the test group and control groups in the percentages of participants indicating a "top 2" purchase likelihood was each statistically indistinguishable from zero (Sliced Bread Survey: 50.5% [test] vs. 44.3% [control]; $\chi^2 = 1.55$, $df = 1$, $p > .21$, *n.s.*; Bagels Survey: 68.2% vs. 70.2%; $\chi^2 = .20$, $df = 1$, $p > .65$, *n.s.*; Burger Buns Survey: 53.4% vs. 56.7%; $\chi^2 = .43$, $df = 1$, $p > .51$, *n.s.*). In addition, there was *no* statistically significant difference between the test and control groups in the likelihood of answering "definitely would buy this product" (Sliced Bread Survey: 23.5% vs. 26.1%; $\chi^2 = .36$, $df = 1$, $p > .54$, *n.s.*; Bagels Survey: 32.8% vs. 40.4%; $\chi^2 = 2.51$, $df = 1$, $p > .11$, *n.s.*; Burger Buns Survey: 20.6% vs. 23.6%; $\chi^2 = .55$, $df = 1$, $p > .45$, *n.s.*) or in the likelihood of answering that they

"definitely would <u>not</u> buy" or "probably would <u>not</u> buy" the product (Sliced Bread Survey: 27.5% vs. 31.5%; $\chi^2 = .81$, $df = 1$, $p > .36$, *n.s.*; Bagels Survey: 9.5% vs. 10.1%; $\chi^2 = .05$, $df = 1$, $p > .82$, *n.s.*; Burger Buns Survey: 19.6% vs. 23.6%; $\chi^2 = .98$, $df = 1$, $p > .32$, *n.s.*).

[132] As shown in Tables 2 and 3 in each of Exhibits J.6 through L.6, participants provided a variety of reasons for purchasing the at-issue Dave's products that, like in the five "front-of-pack" surveys, did *not relate* to the amount or presence of protein. For example, test group participants identified such positive purchase reasons as: aspects related to brand equity/familiarity (18.1% [sliced bread], 33.3% [bagels], 26.5% [burger buns]); general health/nutrition (19.6% [sliced bread], 19.4% [bagels], 11.3% [burger buns]); (non-protein) ingredients (19.6% [sliced bread], 26.9% [bagels], 20.6% [burger buns]); and packaging/product appearance (12.7% [sliced bread], 18.4% [bagels], 16.2% [burger buns]). Only a minority of test group participants in each survey (3.4%, 10.0%, and 4.9% in the sliced bread, bagels, and burger buns surveys, respectively) mentioned protein as a positive purchase reason, and *no* participants in any survey mentioned the %DV for protein.

[133] *See* my February 11, 2024 Expert Declaration, Sections F and G, respectively.

[134] Bucklin, Randolph E. and Peter Simon (2023), "Marketing Analysis in Class Certification," in *The Cambridge Handbook of Marketing and the Law*, Gersen, Jacob E. and Joel H. Steckel (eds.), New York, NY: Cambridge University Press, p. 267.