# EXHIBIT 1

1            UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3


4   DAVID SWARTZ, as an individual,
    on behalf of himself, the
5   general public, and those
    similarly situated,
6
              Plaintiffs,
7
      vs.                    Case No. 4:21-cv-10053-YGR
8
    DAVE'S KILLER BREAD, INC.,
9   and FLOWERS FOODS, INC.,          **CONFIDENTIAL**

10            Defendants.
    _____/
11

12    DEPOSITION OF RAN KIVETZ, Ph.D.

13   TAKEN REMOTELY BY VIDEOCONFERENCE

14          March 13, 2024

15


16      - CONFIDENTIAL -

17      **CERTIFIED COPY**

18


19  STENOGRAPHICALLY REPORTED BY:
    MARY ANN PAYONK, CSR NO. 13431
20

21

22

23
                NOGARA REPORTING SERVICE
24          150 Sutter Street, P.O. Box 538
            San Francisco, California 94105
25                 (415) 398-1889

1          BE IT REMEMBERED that pursuant to Notice of

2   Deposition on March 13, 2024, commencing at 9:00 a.m.

3   Pacific via Zoom Videoconference before me, MARY ANN

4   PAYONK, a Certified Shorthand Reporter in and for the

5   State of California, remotely appeared

6                    RAN KIVETZ, Ph.D.

7   called as a witness by the Plaintiff herein who, being

8   by me first duly sworn, was thereupon examined and

9   testified as hereinafter set forth.

10               REMOTE APPEARANCES OF COUNSEL

11  FOR PLAINTIFF:

12  GUTRIDE SAFIER LLP

13  ANTHONY J. PATEK, ESQ.

14  100 Pine Street, Suite 1250

15  San Francisco, CA 94111

16

17  FOR DEFENDANTS DAVE'S KILLER BREAD, INC. AND FLOWERS

18  FOODS, INC.:

19  MICHAEL L. RESCH, ESQ.

20  KING & SPALDING LLP

21  50 California Street, Suite 3300

22  San Francisco, CA 94111

23

24  ALSO IN ATTENDANCE:  David Ho, Nogara Reporting Service

25

1    THE REPORTER:  Let me first give you my

2    California license number, which is 13431.  And now I'll

3    swear the witness.

4          (The witness was sworn.)

5          ATTORNEY PATEK:  Okay.  And just to state

6    appearances for the record, this is Anthony Patek of

7    Gutride Safier appearing on behalf of plaintiffs.

8          ATTORNEY RESCH:  Mike Resch on behalf of

9    defendants.

10   RAN KIVETZ, Ph.D.,

11          called as a witness, having been duly

12          sworn, was examined and testified as

13          follows:

14                    EXAMINATION

15   BY ATTORNEY PATEK:

16   Q.      And, Dr. Kivetz, good morning.

17   A.      Good morning.

18   Q.      Okay.  Do me a favor and just state and spell

19   your name for the record, please.

20   A.      Yes, sure.  My first name is Ran, R-A-N.  And

21   last name is Kivetz, K-I-V-E-T-Z.

22   Q.      Okay.  And do you understand why you're here

23   today?

24   A.      Yes.

25   Q.      Okay.  And what is your understanding of why

1          So -- but as footnote 6 says, the results of

2    these four surveys unambiguously demonstrate, among

3    other things, that the alleged technical regulatory

4    violation does not materially increase consumers'

5    likelihood of purchasing the disputed products.  It does

6    not materially increase the willingness to pay for the

7    disputed Dave's products; and therefore, it could not

8    drive any sort of price premium.

9          But again, that -- my understanding is I'm --

10   I just disclosed it so you know what I've -- you know

11   that I've done it.  But my understanding is it's not

12   part of the motion practice or not part of the class

13   certification in this specific case.

14         It's relevant, actually, in my opinion, to

15   issues that we're discussing now or -- or -- or to class

16   cert, but -- but my understanding is it will not be

17   used.

18   BY ATTORNEY PATEK:

19   Q.        Okay.  So I just want to clarify, so -- and I

20   understand that the surveys have not been submitted.

21   The -- the surveys that were referenced in note 6 of

22   your report have not yet been submitted for

23   consideration in this case, but I just want to clarify.

24         Did those surveys produce a damages

25   calculation that you intend to introduce at a later

1  date?

2          ATTORNEY RESCH:  Object to form.

3  A.          These surveys, I had indicated and I'm

4  indicating to you I'm more than happy and ready to

5  provide you with those surveys, the -- the surveys, the

6  data, everything.  More than happy to provide that to

7  you.

8          These surveys did not measure a -- a market

9  price premium using the proper equilibrium.  They did

10  not measure damages.  These were not surveys that were

11  intended to obtain a market, or an alleged market price

12  premium that should be measured based on an equilibrium

13  analysis between supply and demand.  They were what you

14  might call materiality surveys.

15          But because they unambiguously demonstrate

16  that the alleged technical regulatory violation or the

17  alleged unlawful conduct does not cause consumers to be

18  more likely to purchase the product, does not cause

19  consumers to be more willing to pay for the product,

20  that -- that means there's no price premium.

21  BY ATTORNEY PATEK:

22  Q.          Okay.  So again, I just -- you know, imagine

23  that I'm the judge in this case.  And I'm just trying to

24  figure out what kind of evidence is going to be coming

25  forth down the road.

1          Will the materiality surveys that you did be

2   introduced later as proposed measures of damages in this

3   case?

4          ATTORNEY RESCH:   Object to form.

5   A.         I'm not a lawyer, and it's up to the attorneys

6   and -- and obviously, the -- the honorable judge to

7   decide what -- what -- what they want to do with -- with

8   the evidence and my work.

9          These surveys do not measure an alleged price

10  premium, which must be estimated using a demand and

11  supply equilibrium analysis, which Mr. Weir did not at

12  all conduct in this case.

13         They do not measure, estimate a -- a number

14  of -- of -- of damages.  However, because these surveys

15  show lack of materiality, they show that correcting or

16  curing, if you will, removing, if you will, the alleged

17  unlawful conduct or the alleged technical regulatory

18  violation does not decrease the likelihood or consumers'

19  intention to buy the product, does not decrease the

20  willingness to pay of consumers for the product.

21         That necessarily means that consumers -- that

22  the putative class members will not be paying any

23  alleged price premium.

24         So the Court or -- or the -- or the attorneys

25  for either party might -- you know, for -- for the

1    defendant might find it relevant for damages.  That's

2    not for me to decide as an expert in my subject matter.

3    BY ATTORNEY PATEK:

4    Q.        Okay.  As an economics expert, if I understand

5    correctly, you're saying that the results of the studies

6    indicate to you that the price premium and thus, the

7    damages in this case, even if the defendant is found

8    liable, would be zero.

9    A.        I have not analyzed or opined, not even in --

10   in footnote 6 in my current expert declaration, about

11   the level of damages or the damages being zero.

12            What I have said in footnote 6 and what I'm

13   testifying to you and to the Court and both parties now

14   is that these surveys, which I would be glad to give

15   you -- and I understand these surveys and the results

16   are not being used, are not being relied on by the

17   defendant in this stage of the case, in -- in the class

18   certification part or motion for class certification

19   part of the case, but just to disclose that I did do

20   surveys, and because I want you to know what I did.

21            And I definitely don't want anyone, heaven

22   forbid, to say oh, Ran did surveys but didn't tell us.

23   So I had footnote 6 to let you and the Court know that I

24   conducted four surveys, and I -- as I wrote in footnote

25   6.

1          And I'm telling you that these four surveys

2   unambiguously show that the technical -- that the

3   alleged technical regulatory violation or -- or the

4   alleged unlawful conduct, it does not change or increase

5   consumers' likelihood of buying the product or intention

6   to buy the product.  It does not change or increase

7   consumers' willingness to pay for the disputed products.

8   And therefore, by definition, it means that the alleged

9   unlawful conduct did not drive a market -- an alleged

10  market price premium.

11         But I -- these surveys do not measure, do not

12  estimate the level of an alleged price premium.  They

13  just look at, as a threshold matter, we can say based on

14  the results that there is no alleged price premium in

15  the marketplace.  They didn't even measure the level.

16         If it was -- if it was more than zero, they

17  would not measure that.  And I'm not opining about

18  damages at this point in terms of measuring, in terms of

19  quantifying damages.

20         Of course, I'm evaluating Mr. Weir's proposed

21  conjoint and his proposed damages opinion.  That, I am

22  doing in my current expert declaration.

23  Q.        All right.  And so going back to some

24  testimony you provided earlier, I believe you provided a

25  summary of your understanding of the theory of liability

1    in this case.

2           So -- so just to -- so first of all, have you

3    reviewed the Complaint in this case?

4           ATTORNEY RESCH:  Anthony, let me say we're

5    going about an hour and 20 minutes, so whenever --

6    whenever you want to --

7           ATTORNEY PATEK:  If you guys want to take a

8    break, now's a fine time.

9           ATTORNEY RESCH:  Okay.  Whenever is

10   convenient.  I just know both from Mary Ann's

11   perspective and from mine as well, if we -- you know, I

12   don't mind going a little longer than an hour but, you

13   know, just --

14          ATTORNEY PATEK:  Yeah, I just lost track.  So

15   is now -- do you want to break now, Dr. Kivetz?

16          THE WITNESS:  That's fine with me.

17          ATTORNEY PATEK:  Okay, yeah, let's go ahead

18   and let's take like five minutes.

19          ATTORNEY RESCH:  Sure.

20        (Recess taken.)

21   BY ATTORNEY PATEK:

22   Q.       Okay, so just a reminder that you're still

23   under oath.  You understand that, Dr. Kivetz?

24   A.       Yes.

25   Q.       All right.  So have you reviewed the Complaint

1                    REPORTER'S CERTIFICATE

2          I, MARY ANN PAYONK, shorthand reporter and

3   Notary Public, CA CSR No. 13431, do hereby certify that

4   the witness whose deposition is hereinbefore set forth

5   was sworn by agreement of all parties, that the

6   proceedings were reported stenographically by me, and

7   that this transcript is a true, correct, and full record

8   of the testimony given.

9          Further, that if the foregoing pertains to

10  the original transcript of a deposition in a Federal

11  Case, before completion of the proceedings, review

12  of the transcript [ ] was [X] was not requested.

13         I further certify that I am not related to

14  any of the parties to this action by blood or by

15  marriage, and that I am in no way interested in the

16  outcome of this matter.

17         IN WITNESS WHEREOF, I have hereunto set my

18  hand this 21st day of March, 2024.

19

20         *Mary Ann Payonk*

21         MARY ANN PAYONK, CSR #13431

22

23

24

25

1         UNITED STATES DISTRICT COURT

2     FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4  DAVID SWARTZ, as an individual,
    on behalf of himself, the
5  general public, and those
    similarly situated,
6

7         Plaintiffs,

8   vs.           Case No. 4:21-cv-10053-YGR

9  DAVE'S KILLER BREAD, INC.,
    and FLOWERS FOODS, INC.,  **CERTIFIED COPY**

10        Defendants.
    _____/
11

12    REMOTE VIDEO DEPOSITION OF

13      RAN KIVETZ, Ph.D.

14    Thursday, June 26, 2025

15

16      - CONFIDENTIAL -

17

18

19  STENOGRAPHICALLY REPORTED BY:
    JOAN F. MARTIN, CSR #6036
20

21

22

23

24        NOGARA REPORTING SERVICE
    150 Sutter Street, P.O. Box 538
25    San Francisco, California 94105
         (415) 398-1889

1                           I N D E X

2                                        Page Number

3        EXAMINATION BY MS. REYNOLDS              6

4

5                      ---oOo---

6

7                   E X H I B I T S

8    Plaintiffs'

9      110   Plaintiffs' Notice of Deposition of      7
             Defendants' Expert Dr. Ran Kivetz
10
       111   2024 Swartz Order on Class              95
11           Certification

12     112   Image of Sara Lee Deluxe Bagels label   113

13                     ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

1         BE IT REMEMBERED THAT, pursuant to Notice

2   of Taking Remote Deposition, and on Thursday, the

3   26th day of June, 2025, commencing at the hour of

4   7:59 a.m. Pacific Daylight Time, via Zoom

5   videoconference, before me, JOAN F. MARTIN, a

6   Certified Shorthand Reporter of the State of

7   California, personally remotely appeared

8              RAN KIVETZ, Ph.D.,

9   called as a witness by the Plaintiffs, having been

10  by me first duly sworn, was examined and testified

11  as hereinafter set forth.

12              ---oOo---

13           APPEARANCES OF COUNSEL

14  Representing Plaintiffs:

15     GUTRIDE SAFIER LLP
        BY: HAYLEY A. REYNOLDS, Attorney at Law
16     100 Pine Street, Suite 1250
        San Francisco, California 94111
17     hayley@gutridesafier.com

18  Representing Defendants:

19     KING & SPALDING LLP
        BY: MICHAEL L. RESCH, Attorney at Law
20     50 California Street, Suite 3300
        San Francisco, California 94111
21     mresch@kslaw.com

22  Also in remote attendance:

23     Peter DeFrank, Dan DeFrank Video Productions
        David Ho, Nogara Reporting Service Exhibit
24           Technician

25              ---oOo---

| | | |
|---|---|---|
| 1 | of the data you did after receiving Dr. Dennis's | 08:42:59 |
| 2 | rebuttal? | 08:42:59 |
| 3 | A. I don't know -- I'm not -- I wouldn't not | 08:43:02 |
| 4 | say it's siloing the data. It's essentially | 08:43:06 |
| 5 | testing -- not essentially; it's testing | 08:43:09 |
| 6 | Dr. Dennis's speculation or, quote/unquote, theory, | 08:43:12 |
| 7 | and it's essentially testing for an interaction | 08:43:14 |
| 8 | that, by the way, Mr. Weir's conjoint cannot test, | 08:43:19 |
| 9 | does not test for. I can explain why. | 08:43:23 |
| 10 | But I do not recall, and I do not believe | 08:43:25 |
| 11 | I did any other analysis of my data following | 08:43:31 |
| 12 | Dr. Dennis's rebuttal, as I sit here now. If | 08:43:34 |
| 13 | something comes to mind, I will let you know, of | 08:43:36 |
| 14 | course. | 08:43:37 |
| 15 | Q. Have you done any work in this case to | 08:43:41 |
| 16 | calculate the damages that would be appropriate if | 08:43:43 |
| 17 | the defendant is found liable for the alleged | 08:43:46 |
| 18 | unlawful practices? | 08:43:49 |
| 19 | A. Well, I've conducted eight surveys; five | 08:43:54 |
| 20 | of them are front-of-pack surveys, front-of-pack | 08:43:57 |
| 21 | protein statement. Each one of them, again and | 08:44:00 |
| 22 | again, finds lack of materiality for the | 08:44:03 |
| 23 | front-of-pack statement, lack of materiality for | 08:44:05 |
| 24 | the alleged unlawful conduct, which is corrected in | 08:44:15 |
| 25 | one of the two ways you can correct for it. That's | 08:44:18 |

| | | |
|---|---|---|
| 1 | my understanding. | 08:44:19 |
| 2 | And in each of these five surveys, across | 08:44:21 |
| 3 | these five surveys, in each one there's a lack of | 08:44:24 |
| 4 | materiality.  It does not drive likely to buy the | 08:44:28 |
| 5 | product.  It does not drive a greater willingness | 08:44:30 |
| 6 | to pay for the product.  And, therefore, my | 08:44:32 |
| 7 | surveys, unequivocally, rigorously show that | 08:44:38 |
| 8 | there's no price premium, no alleged price premium | 08:44:42 |
| 9 | paid by consumers due to the alleged unlawful | 08:44:47 |
| 10 | conduct. | 08:44:48 |
| 11 | And that would mean, therefore -- I'm not | 08:44:52 |
| 12 | a lawyer, not a fact-finder, not the honorable | 08:44:56 |
| 13 | judge, but my understanding is that they were not | 08:44:59 |
| 14 | -- consumers were not harmed, were not damaged. | 08:45:04 |
| 15 | Q.  Did you estimate a price premium | 08:45:06 |
| 16 | associated with any part of the Dave's Killer Bread | 08:45:07 |
| 17 | label? | 08:45:10 |
| 18 | A.  I used Mr. Weir's conjoint, which I think | 08:45:17 |
| 19 | is -- as he executed it, the conjoint that he | 08:45:22 |
| 20 | actually executed.  And the data from the conjoint | 08:45:25 |
| 21 | that he actually executes bears this out, shows | 08:45:28 |
| 22 | this.  I can explain why I say this, that it is a | 08:45:32 |
| 23 | fairly flawed conjoint for this case, for this | 08:45:37 |
| 24 | particular case. | 08:45:38 |
| 25 | But I did reanalyze his data, and I both, | 08:45:43 |

| | | |
|---|---|---|
| 1 | what we call in academic lingo, "recovered" his | 08:45:46 |
| 2 | estimate, so I replicated, basically, his -- I | 08:45:49 |
| 3 | found, using his simulator, how he got to his price | 08:45:54 |
| 4 | premium, alleged price-premium estimates that he's | 08:45:58 |
| 5 | reporting for the front-of-pack -- what he says is | 08:46:01 |
| 6 | the front-of-pack statement.  It's not really the | 08:46:04 |
| 7 | front-of-pack statement.  We don't know what it is. | 08:46:07 |
| 8 | But I found his alleged price premium, and | 08:46:11 |
| 9 | then I used the same simulator, the same method | 08:46:14 |
| 10 | that he used, which I think is improper, but I used | 08:46:16 |
| 11 | it to calculate the -- what would be, according to | 08:46:22 |
| 12 | him, according to his data and his method, the | 08:46:26 |
| 13 | price premiums for other statements or | 08:46:28 |
| 14 | presentations, or even claims on Dave's Killer | 08:46:35 |
| 15 | Bread, that he included in his conjoint, because he | 08:46:39 |
| 16 | had excluded a lot.  But those that he included, I | 08:46:43 |
| 17 | did calculate those, and I report that in my expert | 08:46:45 |
| 18 | report. | 08:46:48 |
| 19 | Q.  You've described your surveys as | 08:47:17 |
| 20 | materiality surveys.  What is a "materiality | 08:47:22 |
| 21 | survey"? | 08:47:23 |
| 22 | A.  A materiality survey is a -- as I've | 08:47:29 |
| 23 | conducted them in this case, is an experiment. | 08:47:34 |
| 24 | It's a causal experiment, a test-versus-control, or | 08:47:38 |
| 25 | cause-and-effect experiment that tests and | 08:47:42 |

| | | |
|---|---|---|
| 1 | measures, in a scientific, rigorous way, standard | 08:47:49 |
| 2 | way, whether a statement, for example, on the | 08:47:52 |
| 3 | package, whether a representation, for example, on | 08:47:58 |
| 4 | a package, as in our case, is material. | 08:48:02 |
| 5 | Does it make -- does it have a causal | 08:48:04 |
| 6 | effect, material effect on consumers' purchase | 08:48:10 |
| 7 | decisions, likely to buying the product, a | 08:48:14 |
| 8 | consumer's willingness to pay for the product. | 08:48:16 |
| 9 | Does it make a difference?  Does it move the needle | 08:48:18 |
| 10 | or not? | 08:48:20 |
| 11 | Q.  What does it mean for -- if a claim is | 08:48:25 |
| 12 | material? | 08:48:25 |
| 13 | MR. RESCH:  Objection to form.  Vague. | 08:48:33 |
| 14 | THE WITNESS:  Do you mean in a -- based on | 08:48:40 |
| 15 | a finding in a materiality survey, or in general? | 08:48:44 |
| 16 | Or I can answer as best as I understand.  I don't | 08:48:47 |
| 17 | want to -- | 08:48:48 |
| 18 | MS. REYNOLDS:  Q.  Well, let's see. | 08:48:50 |
| 19 | So you -- do you have a different | 08:48:53 |
| 20 | understanding of "materiality," in general, versus | 08:48:58 |
| 21 | "materiality" that is determined by a survey? | 08:49:01 |
| 22 | MR. RESCH:  Same objection. | 08:49:05 |
| 23 | THE WITNESS:  No.  The survey tests | 08:49:08 |
| 24 | materiality using the sample, representative | 08:49:14 |
| 25 | sample, supposed to test that, and whether that | 08:49:18 |

| | | |
|---|---|---|
| 1 | MS. REYNOLDS: David, can you -- I think | 11:21:38 |
| 2 | you should have this now, the Sara Lee exhibit? | 11:21:41 |
| 3 | MR. HO: Coming right on. | 11:22:40 |
| 4 | MS. REYNOLDS: Thank you. | 11:22:41 |
| 5 | (Plaintiffs' Exhibit 112 marked | 11:22:43 |
| 6 | for identification.) | 11:22:43 |
| 7 | (Link for viewing placed in the | 11:22:43 |
| 8 | Chat window.) | 11:22:43 |
| 9 | MR. RESCH: Dr. Kivetz, the next exhibit | 11:23:29 |
| 10 | is up. | 11:23:29 |
| 11 | THE WITNESS: Oh, thank you. | 11:23:30 |
| 12 | I see the exhibit. Thank you. | 11:23:31 |
| 13 | MS. REYNOLDS: So for the record, this is | 11:23:33 |
| 14 | a Sara Lee label that we obtained online, and it's | 11:23:38 |
| 15 | for a Deluxe Bagels Plain product. I'll represent | 11:23:42 |
| 16 | to you that I obtained this from an online shopping | 11:23:45 |
| 17 | website. | 11:23:46 |
| 18 | Q. Do you see there on the top where it says | 11:23:51 |
| 19 | "0g trans fat" on the front label? | 11:23:54 |
| 20 | A. I see in the top. Yes. | 11:23:57 |
| 21 | Q. So do you agree that "0g trans fat" can | 11:23:59 |
| 22 | and does appear on the front label of certain | 11:24:03 |
| 23 | products? | 11:24:04 |
| 24 | A. I -- of course, it can. The notion that | 11:24:11 |
| 25 | it does -- I don't recall if Sara Lee was one of | 11:24:16 |

| | | |
|---|---|---|
| 1 | don't see '5 grams protein,' that could mean | 11:25:38 |
| 2 | there's no protein in the product." | 11:25:39 |
| 3 | And I -- I explained that in my report. | 11:25:43 |
| 4 | Q. Did you conduct any consumer interviews to | 11:25:51 |
| 5 | determine if there was any confusion about where | 11:25:54 |
| 6 | the statements being tested appeared in Mr. Weir's | 11:25:56 |
| 7 | conjoint survey design? | 11:25:58 |
| 8 | A. I did something better than that, more -- | 11:26:02 |
| 9 | more dispositive than that. I not only evaluated | 11:26:06 |
| 10 | Mr. Weir's method and actual stimuli that he | 11:26:11 |
| 11 | actually launched and collected the data for, and | 11:26:14 |
| 12 | actual profiles and actual statements, and so on | 11:26:17 |
| 13 | and so forth, when I did my analysis and wrote my | 11:26:20 |
| 14 | report, but I also actually analyzed his data, | 11:26:23 |
| 15 | unlike Dr. Dennis, who opined about my report but | 11:26:27 |
| 16 | did not analyze my data. | 11:26:29 |
| 17 | I took Mr. Weir's data, and we ran his | 11:26:33 |
| 18 | simulator and calculated, according to his method, | 11:26:35 |
| 19 | the alleged, quote/unquote, "price premiums" -- I | 11:26:39 |
| 20 | don't agree that they're real price premiums -- for | 11:26:41 |
| 21 | different statements on his -- in his survey. | 11:26:44 |
| 22 | And I found, as I explained, detailed in | 11:26:46 |
| 23 | my report, that there are statements that appear in | 11:26:49 |
| 24 | small font on the side, or statements that appear | 11:26:52 |
| 25 | only on the back, or only in small side -- font on | 11:26:56 |

1   STATE OF CALIFORNIA      )
                              ss.
2   COUNTY OF SAN FRANCISCO )

3          I, JOAN MARTIN, shorthand reporter

4   California CSR No. 13431, do hereby certify that

5   the witness whose deposition is hereinbefore set

6   forth was sworn by agreement of all parties, that

7   the proceedings were reported stenographically by

8   me, and that this transcript is a true, correct,

9   and full record of the testimony given.

10         Further, that if the foregoing pertains to

11  the original transcript of a deposition in a Federal

12  Case, before completion of the proceedings, review

13  of the transcript [ ] was [ ] was not requested.

14         I further certify that I am not related to

15  any of the parties to this action by blood or by

16  marriage, and that I am in no way interested in the

17  outcome of this matter.

18         IN WITNESS WHEREOF, I have hereunto set

19  my hand this 10th day of July, 2025.

20

21

22

23         JOAN F. MARTIN, CSR No. 6036

24

25