# EXHIBIT 21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DAVID SWARTZ, as an individual, on behalf of himself, the general public, and those similarly situated,<br><br>      Plaintiff,<br><br>  v.<br><br>DAVE'S KILLER BREAD, INC. AND FLOWER'S FOODS, INC.,<br><br>     Defendants. | Case No.: 4:21-cv-10053-YGR |
| | |

**REBUTTAL DECLARATION AND EXPERT REPORT OF**

**J. MICHAEL DENNIS, PH.D.**

**MAY 20, 2025**

1

## REBUTTAL DECLARATION AND EXPERT REPORT OF J. MICHAEL DENNIS, PH.D.

I, J. Michael Dennis, Ph.D., declare as follows:

1.      I have been retained by counsel for the Plaintiff in the above-captioned matter. I understand that that the Defendants are Dave's Killer Bread, Inc. and Flowers Foods, Inc., (collectively "Defendants").

2.       If called upon to testify, I would and could testify competently to all such subject matter in this Rebuttal Declaration and Expert Report.

3.      Plaintiff's counsel has retained my services at the hourly rate of $600. My compensation is not contingent on the results of my work or any outcome of the litigation.

4.      My expert opinions stated in this Rebuttal Declaration and Expert Report are my opinions and only my opinions. I have based my opinions on my background, education, training and experience, in addition to various materials reasonably relied upon by experts in my field.

## SUMMARY OF QUALIFICATIONS

5.      I have attached a true and correct copy of my curriculum vitae. **Exhibit A** sets forth accurate statements concerning my background, education, training, and experience concerning my expertise in the field of survey research and marketing research. The following summarizes relevant or notable qualifications related to the opinions expressed in this Declaration and Expert Report.

6.      I have been personally involved in the design and conduct of hundreds of statistical surveys using the internet mode of data collection over the last 25 years, including the kind of consumer surveys and analysis described in this report.

2

7.     Designing and conducting surveys about the opinions, perceptions, attitudes, preferences, and values of consumers, voters, members of associations, and citizens is a service that I have provided for my clients for more than 25 years. I have designed and conducted consumer surveys that have been accepted by courts in the following cases:

- *Price [Miles] v. Philip Morris*, Case No. 00 L 0112 (Circuit Court, Third Judicial Court, Madison County, Illinois)
- *Zill v. Sprint*, Case No. RG03114147 (Superior Court of the State of California, County of Alameda)
- *Ebin v. Kangadis Food Inc.*, Case No. 1:13-cv-02311 (S.D.N.Y.)
- *Sachs and Alden v. Toyota Motor Corp.*, Case No. BC443701 (Superior Court of the State of California, County of Los Angeles)
- *Avram v. Samsung Elecs. America, Inc. and Lowe's Home Ctrs.*, Case No. 2:11-cv-6973 (KM)(SCM) (D.N.J.)
- *Geanacopoulos v. Philip Morris, USA*, Civil Action No. 98-6002-BLSI (Superior Court for the Commonwealth of Massachusetts)
- *Scotts EZ Seed Litig.*, Case No. 12-CV-4727 (VB)(PED) (S.D.N.Y.)
- *Dzielak v Whirlpool*, Case No. 12-cv-00090 (D.N.J.)
- *Pettit v. Procter & Gamble [RE: Flushable Wipes]*, Case No. 3:15-CV-02150-RS (N.D. Cal.)
- *Fitzhenry-Russell, et al. v. Dr. Pepper Snapple Grp., Inc., et al.*, Case Nos. 5:17-cv-00564-NC (lead); 5:17-02341-NC (consolidated) (N.D. Cal.)
- *Theodore Broomfield, et al. v. Craft Brew Alliance, Inc., et al.*, Case No. 5:17-cv-01027-BLF (N.D. Cal.)
- *Benson v. Newell Brands, Inc., et al.*, Case No. 19-cv-06836 (N.D. Ill)
- *Patrick McMorrow, et al. v. Mondelez Int'l, Inc.*, Case No. 3:17-cv-2327-BAS-JLB (S.D. Cal.)
- *Sharpe v. A & W Concentrate Co.*, Case No. 19-cv-00768 (BMC) (E.D.N.Y.)
- *Montera et al. v. Premier Nutrition Corp.*, Case No. 3:16-CV-06980 RS (N.D. Cal, San Francisco Div.)
- *Sharon Willis et al. v. Colgate-Palmolive Co.*, Case No. 19-8542 JGB (RAOx) (C.D. Cal)
- *Anne De Lacour et al. v. Colgate-Palmolive Co., and Tom's of Maine Inc.*, Case No. 16 Civ. 8364 (RA) (AJP) (S.D.N.Y)
- *Kimberly Banks et al. v. R.C. Bigelow, Inc.*, Case No. 20-cv-06208 DDP (RAOx) (C.D. Cal.)
- *Tamika Miller et al. v. Travel Guard Group, Inc.*, Case No. 3:21-cv-09751-TLT (N.D. Cal.)
- *Lisa Vizcarra v. Unilever United States, Inc.*, Case No. 4:20-cv-02777-YGR (N.D. Cal.)
- *Lisa M. Moore et al. v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, Case No. 4:20-cv-09077-JSW (N.D. Cal.)

- *Anthony Bush v. Rust-Oleum Corporation*, Case No. 20-cv-03268-LB (N.D. Cal.)
- *Camille Cabrera v. Bayer Healthcare LLC, et al.,* Case No. 2:17-cv-08525-JAK-JPR (C.D. Cal.)
- *Montiqueno Corbett et al. v. Pharmacare U.S., Inc.*, Case No. 3:21-cv-00137-JES-AHG (C.D. Cal.)
- *In RE: Folgers Coffee Litigation*, Case No. 21-2984-MD-W-BP (W.D. Mo)
- *Matthew Sinatro et al. v. Barilla America, Inc.*, Case No. 3:22-cv-03460 (N.D. Cal.)
- *Cadena et al. v. American Honda Motor Company, Inc.,* Case No. 2:18-cv-04007-MWF-MAA . (C.D. Cal.)

8.      I have designed and conducted consumer perception surveys in, for example, *Price v. Philip Morris*; *Zill v. Sprint; Otto v. Abbott Laboratories*; *Ebin v. Kangadis*; *Scotts EZ Seed Litigation*; *Pettit v. Procter & Gamble [RE: Flushable Wipes]*; *Theodore Broomfield, et al. v. Craft Brew Alliance, Inc.*; *Yamagata et al. v. Reckitt Benckiser LLC*; *Benson v. Newell Brands, Inc.*; *Sharpe v. A & W Concentrate Company*; *Montera v. Premier Nutrition Corp.*; *Hall v. Marriott*; *Corbett v. Pharmacare*; *IN RE: Folgers Coffee Litigation*; and *Sinatro et al. v. Barilla America, Inc.*

9.      I have also participated in the design and execution of studies using conjoint methodology and analysis in the context of litigations. These cases include, but are not limited to, *Brown v. The American Tobacco Company*; *Craft v. Philip Morris*; *Jones v. Nutiva*; *Hunter v. Nature's Way*; *Fitzhenry-Russell v. Dr. Pepper Snapple Group*; *Brenner v. Procter & Gamble Co.*; *De Lacour v. Colgate-Palmolive Co. and Tom's of Maine Inc.*; *Martinelli v. Johnson & Johnson and McNeil Nutritionals*; *Willis v. Colgate Palmolive*; *Cabrera v. Bayer Healthcare*; *McMorrow, et al. v. Mondelez International Inc*; *Sinatro et al. v. Barilla America, Inc.*; *Corbett v. Pharmacare USA*, and *Cadena et al. v. American Honda Motor Company, Inc.*[1]

---

[1] I have also participated in the design and execution of price premium studies using non-conjoint approaches in, for example, *Price [Miles] v. Philip Morris*; *Zill v. Sprint*; *Ebin v. Kangadis Food Inc.*; *Sachs and Alden v. Toyota Motor Corporation*; *Avram v. Samsung Electronics America, Inc.*

10.     I have testified on more than ninety occasions as an expert witness since 2002, including at deposition or trial. My attached current curriculum vitae (Exhibit A) lists my testimony at deposition and trial in the last four years.

11.     During the period 2000 to 2013, I managed all the online panel research conducted by Knowledge Networks (acquired by GfK in January 2012) on behalf of federally funded principal investigators who conducted health, economic, social, and political research. Knowledge Networks was the first company in the U.S. to use random selection of households (called "probability sampling") to online public opinion and marketing surveys. When I began at Knowledge Networks as the Vice President of Operations and Survey Research in 2000, I was responsible for leading survey research for the company and for developing the probability based KnowledgePanel, which was the core company asset for Knowledge Networks. As part of the start-up of Knowledge Networks, I also designed and implemented approximately 20 internally funded surveys in the areas of health, finance, public policy, and consumer research, and oversaw the scientific direction and operational management of the construction of KnowledgePanel.

12.     In 2001, I founded the client-facing business unit "Government & Academic Research" for Knowledge Networks. In the role of Managing Director, I oversaw a staff of more than 50 researchers. I advised clients on the design of all phases of their survey research projects, including sample design, questionnaire design, quality control procedures, and data analysis. The research I conducted has had to meet the high-quality standards maintained by federal sponsors of statistical surveys funded by agencies such as the U.S. Centers for Disease Control and Prevention, the Environmental Protection Agency, and the National Science Foundation. I have been the

---

*and Lowe's Home Centers*; *Geanacopoulos v. Philip Morris, USA*; *Scotts EZ Seed Litigation*; *Dzielak v Whirlpool*; and *Cabrera v. Bayer Healthcare LLC.*

principal investigator for studies funded by the U.S. National Science Foundation. My opinions have been quoted in The Wall Street Journal, The New York Times, Crain's Chicago Business, and Business Week.

13.    Before joining Knowledge Networks, I was a Senior Scientist at Abt Associates, which was and still is one of the country's leading social science research firms. While at Abt Associates, I managed the data collection for the largest random digit dialing telephone survey in the United States, the National Immunization Survey, which was funded by the U.S. Centers for Disease Control and Prevention with management support from the National Center for Health Statistics. I also led other survey studies funded by the National Institute on Alcohol Abuse and Alcoholism, the National Cancer Institute, the Social Security Administration, and the White House Office of National Drug Control Policy.

14.    I am currently a Senior Vice President at NORC in Chicago, IL. I lead the online panel survey research business for NORC. NORC is one of the premier survey research organizations in the United States. Affiliated with the University of Chicago, NORC has conducted research for Federal, foundation, and academic clients for 75 years, and is responsible for some of the most prestigious survey projects in the U.S, including the General Social Survey and the Survey of Consumer Finance. Prior to joining NORC in December 2014, I was a Managing Director at GfK (which acquired my employer Knowledge Networks in 2012). At the time, GfK was the fifth largest market research firm worldwide, offering research services in 90 countries.

15.    I have worked as a survey research expert for more than 20 years, authoring more than 60 articles, conference and seminar papers, or book chapters. I am recognized as an expert in survey research methods. I am a frequent speaker at the annual meetings of the American Association for Public Opinion Research ("AAPOR") and the American Statistical Association.

In recognition of my expertise in online surveys, I was appointed to be a member of the AAPOR Task Force on Online Panels that published recommendations for researchers regarding online surveys.

16.    Most recently, I have been NORC's Director for two significant studies regarding the 2020 general elections in the U.S. First, I was the NORC Director for the *2020 Facebook Election Research Project*, which continues with post-election analyses. While funded by Facebook, the study was led by university-based academics. I directed all aspects of sampling and survey data collection for five-waves of data collection in a longitudinal study of approximately 300,000 U.S. adults, with surveys conducted both before and after the November 2020 general elections. The study provided statistical evidence of the extent to which, if any, that social media has an impact on our U.S. politics, democratic institutions, and elections. The initial batch of publications were published in a special edition of Science (July 27, 2023).

17.    I was also the NORC Director for the *America in One Room* (A1R) projects in 2019 (prior to the 2020 general election in the U.S.) and the 2021 climate change study in preparation for the recent Glasgow Summit on Climate Change. Funded by Helena Project and conducted under the supervision of Professors James Fishkin and Larry Diamond from the Center for Deliberative Democracy at Stanford University, I directed the deliberative polls. The 2019 deliberative polls were chronicled in a special pull-out section of The New York Times on October 2, 2019 (Sunday edition).[2] I was interviewed by CNN, The New York Times, other media outlets, and the film documentary director.

---

[2] *See https://en.wikipedia.org/wiki/America_in_One_Room*. Badger, Emily; Quealy, Kevin. "These 526 Voters Represent All of America. And They Spent a Weekend Together". The New York Times. Retrieved 2 October 2019. President Obama recommended The New York Times article in a tweet.

18. In the 2020-2021 timeframe, my research focus had been in directing more than twenty survey studies related to Covid-19 for the U.S. Centers for Disease Control and Prevention, AARP, Boston University, and other organizations. I also led NORC's initiative to create a partnership agreement with AARP, resulting in the June 2021 launch of Foresight 50+ research solutions.[3]

## **BACKGROUND**

19. I understand that Plaintiff has alleged that Defendants' unlawful protein claims (such as such as "5g PROTEIN" on the front labels of both the Dave's Killer Bread ("DKB") 21 Whole Grains and Seeds bread and the Dave's Killer Bread Good Seed bread) caused Plaintiff and members of the class to pay a price premium for the Products (henceforth, "DKB products" or simply "Products").[4]

## **SCOPE OF MY REBUTTAL REPORT**

20. I was asked by Plaintiff's counsel to respond to and comment on Defendants' expert report authored by Dr. Ran Kivetz (signed April 7, 2025) with respect to the consumer surveys he conducted (henceforth, "Kivetz Report" and "Kivetz Surveys").

---

[3] *https://www.norc.org/Research/Capabilities/Pages/Foresight50.aspx.*
[4] First Amended Class Action Complaint, ¶¶ 1-8. Henceforth, by reference to "Products," I am referring to all Dave's Killer Bread, Inc. and Flowers Foods, Inc. products which made a front label protein claim and fail to include the statement of the corrected amount of protein per serving expressed as the percent of daily value in the Nutrition Facts Panel during the class period, including the Product listed attached as Exhibit A to the Court's order granting class certification. See ECF 139 at 5, n. 5 (Order granting class certification).

8

## DESCRIPTION OF DR. KIVETZ'S CONSUMER SURVEYS

21.    Dr. Kivetz conducted three consumer surveys. I shall refer to them as the "Choice Experiment Survey," the "Front-of-Pack (FOP) Materiality Survey," and the "Nutrition Facts Panel (NFP) Materiality Survey."

22.    In the *first* survey (the "Choice Experiment Survey"), Dr. Kivetz attempted to evaluate Mr. Weir's conjoint survey by using an alternative approach – a choice experiment survey – as distinct from the conjoint survey conducted by Mr. Weir.

23.    In the *second* survey, Dr. Kivetz tested four DKB Products (¶ 117) to measure the effect on consumers' likelihood of purchasing and willingness to pay for the Products, if any, by removing the challenged front-of-package protein statement. I shall refer to the second set of surveys as the *"FOP Materiality Survey"* since its purpose is to the measure the materiality of the "front-of-pack" ("FOP") challenged claims.

24.    In the *third* survey, Dr. Kivetz tested three DKB Products to measure the effect on consumers' likelihood of purchasing the Products, if any, by *adding* the % Daily Value ("%DV") for protein on the Nutrition Facts Panel. I shall refer to this third set of surveys as the *"NFP Materiality Survey"* since its purpose is to measure the materiality of adding additional information about the %DV for protein to the Nutrition Facts Panel.

25.    In the below, I describe separately the methodology and conclusions reached by Dr. Kivetz for his three sets of surveys.

26.    **Methodology of Dr. Kivetz's Choice Experiment Survey**.[5] Dr. Kivetz used an experimental test-control, between-subjects design.[6] (All of Dr. Kivetz's surveys documented in his expert report follow this design.) The randomly assigned test group respondents were exposed to product packaging having the challenged protein claims, while the control group respondents were exposed to product packaging _not having_ the challenged protein claims. By this experimental procedure, Dr. Kivetz attempted to determine whether the presence or absence of the front-panel protein claims had a material impact on consumers' purchasing decisions.

27.    Dr. Kivetz hypothesized that, if the Plaintiff's allegations have merit, his choice experiment survey would find that consumers in the test group would have a statistically higher percentage of respondents preferring to purchase the DKB Product (having the protein claim), compared to consumers in the control group that were presented the DKB Product without the challenged protein claim.

28.    Dr. Kivetz's choice survey interviewed adult California residents who both purchased a package of sliced bread in the past three months and think they will purchase a package of sliced bread in the next three months.[7] The Kivetz Survey used quality control questions to identify and remove inattentive and guessing respondents and also removed respondents who reported using a mobile/smartphone device or tablet to take the survey.

29.    Qualified and eligible respondents were randomly assigned to either the test group (with the DKB protein claims _kept in place_ on the DKB product packaging) or control group (with the DKB protein claims _removed_ from the DKB product packaging). The control group stimuli,

---

[5] Kivetz Report, ¶¶ 74-102.
[6] _See_, e.g., Kivetz Report, ¶ 27.
[7] Kivetz Report, ¶ 83.

therefore, were designed to "cure" the unlawful product packaging by removing the challenged protein claim.

30.     For each of the two groups – test and control – the Kivetz Survey created six unique "triplets." Each triplet consisted of a randomly ordered presentation of three branded products:  (i) an original DKB Product package (specifically, the "21 Whole Grains and Seeds" product); (ii) an Oroweat product package (specifically, the "22 Whole Grains & Seeds" product); and (iii) a Whole Foods 365 product package (specifically, the "Ancient Grains" product).

31.     Respondents in the test group were assigned to one of six "triplets" including the DKB Product with the challenged protein claim. Similarly, respondents in the control group were assigned to one of six "triplets" including the DKB Product, but this time the challenged protein claim was removed. Only the DKB Product was modified to remove the protein claims for creating a control product.

32.     Respondents had the opportunity to view the three presented products (including the side panels) comprising their assigned triplet and also to view the price for each presented product. After having had the opportunity to review the products, respondents were asked to decide which of the three products they would choose. Below is a screenshot from the Kivetz Report of a test group choice question (having the DKB litigated protein claim). Respondents were asked to answer one choice question.

33.     After making a choice, test and control respondents were asked a closed-ended question, asking respondents if they would or would not "be willing to purchase the product" that they had just selected.

34.     After indicating a willingness or lack of willingness to purchase the product, the Kivetz Survey asked two open-ended questions to find out respondents' reasons for their

11

willingness to buy or not buy the product that they had just selected. Respondents typed out their reasons in their own words.

35.     **Results and Findings of Dr. Kivetz's Choice Experiment Survey**.[8]  Dr. Kivetz concluded that test and control group respondents had statistically indistinguishable rates for choosing the DKB Product over the two competitors, which Dr. Kivetz interpreted to mean that the challenged protein claim is not material to consumers and, in his words, "necessarily means that the alleged price premium is **zero.**"[9]

36.     With respect to his two open-ended questions about consumers' reasons for buying or not buying the products, Dr. Kivetz determined that relatively few respondents specifically mentioned "protein," while many more respondents mentioned brand, ingredients, and health reasons.[10]

---

[8] Kivetz Report, ¶¶ 103-112.
[9] Kivetz Report, ¶ 108. Emphasis in original.
[10] In ¶ 103, Dr. Kivetz mistakenly refers to Exhibit I.6 when referring to the coded results for the open-ended questions from the Choice Survey and to Exhibit I.6 for the raw data. The correct references are to Exhibit E.6 and Exhibit E.7.

**Exhibit 1: Screenshot Example of One of Dr. Kivetz's Choice Questions as Shown to Test Group Participants**



37.     **Methodology of Dr. Kivetz's Front-of-Pack (FOP) Materiality Survey.**[11]  Dr. Kivetz also conducted a test-control survey experimental survey focusing on measuring

---

[11] Kivetz Report, ¶¶ 113-129.

consumers' likelihood of purchasing and willingness to pay for the DKB Products. For each tested DKB product, only one DKB product – either a test product *with* the challenged protein claim or a control group *without* the challenged protein claim -- was shown to respondents. Participants were asked to indicate, among other things, the likelihood that they would purchase the displayed product.

38.     Dr. Kivetz hypothesized that, if the Plaintiff's allegations have merit, his FOP Materiality Survey would find that consumers in the test group would have a statistically higher percentage of respondents indicating that they would "definitely would buy" or "probably would buy" the DKB Product, compared to the control group that viewed the product packaging with protein claims removed. If there are no statistically significant differences in the purchase likelihood rates for the test versus control groups, then there is evidence that the challenged protein claims are not material to consumers' purchasing decisions. Dr. Kivetz's hypothesis is the same, *ceteris paribus*, in comparing the results of the test and control groups for his willingness- to-pay-question.

39.     The FOP Materiality Survey tested four DKB Products: "21 Whole Grains & Seeds" sliced bread; "Good Seed" sliced bread; "Epic Everything" bagels; and "Burger Buns Done Right."

40.     Dr. Kivetz changed the screening procedure, compared to the Choice Survey, by asking respondents specifically about their past purchases and future purchases of the types of products tested in FOP Materiality Survey:  sliced bread, bagels, and buns.

41.     As in the Choice Survey, respondents were randomly assigned to either the test or control group for a product category (i.e., sliced bread, bagels, or buns) for which they indicated both past purchasing and future purchasing. Once again, the test group viewed an original DKB

14

Product packaging with the challenged protein claims, while the control group viewed otherwise identical DKB Product packaging with the challenged protein claim removed.

42.     Below are screen shots of the front panel to illustrate the difference in the front panel packaging for the test group (with the protein claim) and control group (without the protein claim), as indicated by the red oval pointing to the area of distinction on the packaging.

15

**Exhibit 2A: Example of "Test" Front Panel**

**Exhibit 2B: Example of "Control" Front Panel**





43.    After viewing the product packaging and confirming that they were able to view the packaging, respondents were then asked a purchase likelihood question about the product that they had been shown on a previous screen. The purchase likelihood question revealed the price of the product ($6.79) or instructed respondents to "[A]ssume that the price of the package of [PRODUCT CATEGORY] that you just examined is comparable to the price of other packages of [PRODUCT CATEGORY] available in stores." Respondents had the option to click on a hyperlink to view the product packaging again. Respondents had the option to select the "Don't know" answer option. An example of a purchase likelihood question from the FOP Materiality Survey is shown below.

17

**Exhibit 3:  Example of a Purchase Likelihood Question from the Kivetz FOP Materiality Survey**



Now, here is the first question. Feel free to examine the package at any time.

This question has six answer choices, which are shown on the screen below.

Please read the entire question before answering.

Assume that the price of the package of sliced bread that you just examined is $6.79. If you were at the store thinking of buying sliced bread and you saw the product that you just examined, how likely would you be to buy this product?

Would you say that you *definitely would buy this product, probably would buy this product, may or may not buy this product, probably would not buy this product, definitely would not buy this product, or don't know?*

*If you would like to view the package again, please click **here**.*

(Please select an answer.)

○ Definitely would buy this product
○ Probably would buy this product
○ May or may not buy this product
○ Probably would not buy this product
○ Definitely would not buy this product
○ Don't know

44.     For respondents that did not answer "Don't know" to the purchase likelihood question, the survey asked two open-ended questions, instructing respondents to type their answers about "What makes you say that?" and "And any other reason or reasons…."

45.     Except for respondents assigned to the DKB "21 Whole Grains and Seeds" product, participants assigned to the other three products were then asked a "willingness to pay" (WTP) question, instructing respondents to type in a response in dollars and cents the highest price that they would be willing to pay for the products. The FOP Materiality Survey provided a price range for "typical prices" for the product category (e.g., burger buns).

18

46.    **Results and Findings of Dr. Kivetz's FOP Materiality Survey**.[12]  Dr. Kivetz found that test and control group respondents had statistically indistinguishable rates for indicating a positive probability ("definitely" or "probably") of purchasing the DKB Products. Similarly, Dr. Kivetz found that the test and control groups had statistically indistinguishable average willingness to pay for the DKB Products. Dr. Kivetz interpreted the result to mean that the challenged protein claim is not material to consumers and, in his words, "the alleged price premium due to this [protein] statement is **zero.**"[13]

47.    **Methodology of Dr. Kivetz's Nutrition Facts Panel (NFP) Materiality Survey.**[14]  Dr. Kivetz also conducted a test-control experimental survey similar to the FOP Materiality Survey but focusing on whether the presence or absence of specific information on the Nutrition Facts Panel is material to consumers. In contrast to the FOP Materiality survey, Dr. Kivetz created for the Nutrition Facts Panel Materiality Survey a control group package that: (i) *retained* the front-of-pack protein claims and (ii) *added* the PDCAAS-calculated "%DV" for protein on the Nutrition Facts Panel (e.g., "3%"). The test group package also had the front-of-pack protein claim, but did not have the added %DV information on a modified Nutrition Facts Panel. Below is an example from the NFP Materiality Survey showing the addition of the %DV information for protein for the control group, with a red oval pointing to the addition.

---

[12] Kivetz Report, ¶¶ 130-141.
[13] Kivetz Report, ¶ 114. Emphasis in original.
[14] Kivetz Report, ¶¶ 143-145.

**Exhibit 4: Example of Control Group Packaging for the NFP Materiality Survey[15]**



48.     Also, in contrast to the FOP Materiality Survey, the NFP Materiality Survey

---

[15] Exhibit J.1, p. 54 in the Kivetz Report. The treatment group package did not have the %DV information. I added the red oval to make clear to the reader the addition of %DV information for the control group. I cropped the image for ease of presentation for the reader.

included a "purchase considerations" set of questions at the beginning of the main questionnaire. Dr. Kivetz conducted the NFP Materiality Survey testing three DKB Products.

49.     Dr. Kivetz hypothesized that, if Plaintiff's allegations have merit, his NFP Materiality Survey would find that adding the %DV for protein on the Nutrition Facts Panel on the at-issue products would *decrease* consumers' likelihood of purchasing the DKB Products. Conversely, according to Dr. Kivetz, if the test and control groups were to have statistically indistinguishable purchase likelihood rates, then the addition of %DV information on the Nutrition Facts Panel is not material to consumers.

50.     **Results and Findings of Dr. Kivetz's "Nutrition Facts Panel (NFP) Materiality Survey."[16]** Dr. Kivetz found that test and control group respondents had statistically indistinguishable rates for indicating a positive probability ("definitely" or "probably") of purchasing the DKB Products. Dr. Kivetz concluded that adding the %DV information did not decrease purchase likelihood, which he interpreted to mean that the absence of the %DV for protein on the Nutrition Facts Panel *did not cause* class members to pay any price premium.

---

[16] Kivetz Report, ¶¶ 146-147.

## SUMMARY OF OPINIONS REBUTTING DR. KIVETZ'S SURVEYS

51.     My criticisms of the Kivetz Surveys speak to the flawed foundations of his methodology that apply to all of his surveys.

52.     **Overview of the Foundational Criticisms**: Briefly, the foundational criticisms are:

          a.     The Kivetz Surveys are based on a misapplication of the experimental test-control methodology, resulting in a research tautology and guaranteeing that the study results would be in Defendants' favor. All his data are contaminated because of his research design. As a result, none of his findings regarding consumers' product choices, purchase likelihood and willingness to pay are reliable.

          b.     The Kivetz Surveys are based on the wrong underlying methodology:  A choice-based conjoint survey is the more reliable and generally accepted methodology for determining whether proposed class members paid a price premium because of alleged deceptive advertising.

          c.     The Kivetz Surveys are both *underinclusive* and *overinclusive* with respect to sampling the correct population. The Kivetz Surveys excluded consumers that should have been included, and included consumers that should have been excluded.

          d.     The Kivetz Surveys are statistically underpowered because of the small number of interviews he collected, making it improbable that Dr. Kivetz would be able to detect any statistically significant differences between the test and control groups.

          e.     Dr. Kivetz implies that his survey findings, based on his open-ended survey questions, undermine Plaintiff's allegations when in fact they do not.

f.     The data from Dr. Kivetz's open-ended survey questions are unreliable and are not appropriately used for quantitative analysis.

53.     Below is a fuller discussion of each foundational criticism.

54.     **The Kivetz Surveys are fatally flawed because his survey data are contaminated by responses based on pre-existing brand loyalties and opinions. Dr. Kivetz failed to control for consumers' pre-existing impressions, preferences, and brand loyalties. His purchase likelihood and willingness-to-pay questions measure only pre-existing loyalties to the DKB brand and other tested brands, failing to isolate any impact of Defendants' use of the challenged protein claim.**

55.     My criticisms are based on Dr. Kivetz's specific implementations within the experimental test-control framework, first and foremost, and secondly, for his conclusion that his simple choice survey can be used to invalidate the substantially more sophisticated and mainstream approach of choice-based conjoint design and analysis.

56.     Because Dr. Kivetz did not conduct a conjoint survey that experimentally controls for the effect of brand loyalties on consumers' purchasing decisions – instead choosing to use a simple choice experiment – Dr. Kivetz did not control for the effect of consumer's pre-existing preferences, opinions, and knowledge about the DKB, Whole Foods, and Oroweat brands that he tested in his Choice Experiment Survey.

23

57.     In a conjoint survey, like the one conducted by Plaintiff's damages expert, respondents are presented product alternatives selected from a pool of hundreds of alternatives, including products where the challenged protein claim is either present or absent on displayed DKB a*nd non-DKB branded products*. In a conjoint survey, respondents have the opportunity over 12 or more choices to reveal whether and to what extent they have a preference for products having the challenged protein claim, even when shown on non-DKB products. In Dr. Kivetz's simple choice survey, respondents had a single opportunity to make a product selection without *ever* being shown the litigated protein claim on a non-DKB product:  If assigned to the "test" group, the respondents were shown three products, one of which had the DKB branding and the litigated protein claim. If assigned to the "control" group, the respondents again saw the same DKB-branded product but *without* the litigated protein claim.

58.     The problem for Dr. Kivetz is that there is no evidence to indicate that *his control group respondents answering his purchase likelihood questions relied on anything besides the presentation of brand* on the product stimuli in answering the purchase likelihood question. There is no evidence that control group respondents *even* noticed that the control group DKB image had been manipulated to remove the protein claim. Furthermore, there is no reason why control group respondents should have suspected that the product packaging had been manipulated.

59.    Dr. Kivetz did not prepare his respondents to understand that his displayed products might not be found in the real marketplace and would be sourced from different combinations of attributes and levels. In actuality, he altered the control group stimulus so that it no longer represented a product in the real world. He did so by removing the challenged protein claim from the control stimulus. Had he informed his respondents that they would be examining products not found in the real world and seeing products made up of different combinations of attributes and levels (like what is done commonly in a conjoint survey), respondents would have viewed his product concepts with the expectation that the displayed products could have various label claims that were not present in the real-world products – or potentially have a label claim removed.

60.    Below is the simple instruction that Dr. Kivetz gave his respondents prior to showing them the assigned product stimuli. Dr. Kivetz did not explain to respondents that the displayed products might not be found in the real world and would reflect different combinations of attributes and levels that are not present in the real world.

25

**Exhibit 5: Dr. Kivetz's Survey Screen in the Choice Experiment Survey Shown Prior to the Test/Control Product Stimuli**

> ## _Please read the following instructions CAREFULLY!_
>
> _Please maximize your screen, if you haven't done so already._
>
> Imagine that you are going to purchase a package of sliced bread.
>
> Below are three packages of sliced bread products. The price of each product is shown under its image.
>
> When you continue to the next screens, you will be able to view each of these packages separately, including from all sides, and to zoom in or out.
>
> After you examine each of the three product packages, you will be asked to choose the product that you **most** prefer. Please examine the packages just as you would if you were considering buying packaged sliced bread. Take as much time as you would normally do when considering buying packaged sliced bread.
>
> (Please click "NEXT" when you are ready to continue.)

61.     The contrast with a properly conducted conjoint survey could not be starker, where the conjoint designer takes care to explain to respondents that the displayed products will have different attributes and levels. The conjoint survey informs respondents to expect product alternatives with different combinations of attributes – something that Dr. Kivetz does not do.[17]

62.     Mr. Weir's amended expert report (February 7, 2025), demonstrates the proper technique used in a conjoint survey to prepare respondents to make choices.[18] In the warm-up screens before the choice tasks, Mr. Weir's survey first made clear that respondents would see products with different attributes and prices and reinforced the communication that the products would have different combinations of features, as shown below. Respondents were informed upfront to expect the unexpected, unlike in Dr. Kivetz's surveys. I put the relevant part in a green border to help the reader locate Mr. Weir's instruction.

26

**Exhibit 6:   An Introductory Screen for the Weir Conjoint Survey**

Now imagine that you are going to purchase a **package of regular sliced bread.**

The following questions will involve a series of exercises. In each exercise, you will make **two** choices.

- First, you will be shown three packages of regular sliced bread with different attributes and prices. You will be asked to choose the product with the set of attributes and price shown that you **most** prefer.

- You will next be asked whether, given what you know about the market, including other **packages of regular sliced bread** available to you at your choice of retailer, would you or would you not be **willing** to purchase the package of regular sliced bread that you chose above wtih the brand, labels and price shown?

Mr. Weir also made sure to give respondents information about the different attributes that they

would be seeing in the survey, as shown below – which is something Dr. Kivetz did not do.

---

[17] Mr. Weir's Amended Expert Report, February 7, 2025, Exhibit 3.
[18] Mr. Weir's Amended Expert Report, February 7, 2025, Exhibit 3.

**Exhibit 7:   A Second Introductory Screen for the Weir Conjoint Survey**

The packages of regular sliced bread that will be shown to you include one or more features within each of the following categories:

- Brand
- Label Statements
- Price

Other than the features within each of the above categories, **please assume that all other attributes will be the same across the packages of regular sliced bread you will be shown.**

We will now introduce you to the attributes that will vary in the products among which you will be asked to choose.

63.    After this screen, Mr. Weir's survey informed respondents about the levels of each attribute, with a separate screen describing each attribute. Again, this is something that Dr. Kivetz did not do in his surveys.

64.    Unlike the case with the Kivetz Choice Experiment Survey, respondents in Mr. Weir's survey were made aware that there could be different combinations of attributes and levels, preventing respondents from assuming that each branded product is just like the branded products that they are accustomed to seeing in stores and just like the products for which they have already developed likes, dislikes, and opinions. In the Kivetz Surveys, Dr. Kivetz failed to make his respondents aware, and by this omission, did nothing to prevent respondents from relying exclusively on their pre-existing impressions and preferences towards the brands.

28

65.    Similarly, with respect to Dr. Kivetz's two materiality surveys, Dr. Kivetz failed to conduct a survey that experimentally controlled for the effect of brand loyalties on consumers' purchasing decisions. Dr. Kivetz's materiality surveys did not control for the effect of brand loyalty because Dr. Kivetz retained the DKB branding on the test and control group stimuli, making it impossible to distinguish between the effects of pre-existing brand preferences versus preferences related to presence or absence of the challenged protein claim. There is no evidence to indicate that his control group respondents answering his purchase likelihood and willing-to-pay questions relied on anything besides the presentation of brand on the product stimuli.

66.    Many of Dr. Kivetz's Choice Experiment survey respondents demonstrated through answering the open-ended questions that they had pre-existing preferences regarding the tested DKB, Whole Foods, and Oroweat branded products. The survey provided respondents the opportunity to write out in their own words why they selected the product they did in the Kivetz Choice Experiment Survey. The most frequently mentioned reasons for selecting the product regarded *brand equity and familiarity* (at 44.3% of the total sample) with the displayed brands (whether DKB, Whole Foods, or Oroweat), reflecting how respondents had already had pre-existing impressions and preferences towards the three tested brands before taking a Kivetz survey.[19]

67.    The coded results for the open-ended survey questions for the two materiality surveys also demonstrate that the most frequently cited reasons for being "definitely" or "probably" willing to buy the selected product regard brand equity and familiarity.[20]

---

[19] Kivetz Report, Exhibit E.6, pp. 1-2.
[20] *See* Exhibits F.6, G.6, H.6, I.6 for the FOP Materiality Survey, Kivetz Report. For instance, for the Sliced Bread ["21"] Front-of-Pack Survey), 22.6% of respondents typed in an answer consistent with their having relied on their brand loyalty and/or familiarity with the products as

68.    Another frequently cited set of reasons involved "general taste" and "flavor," again reflecting prior experience with the products themselves.[21] Along with packaging appeal, the most dominant reasons for consumers' purchasing decisions involve factors that guaranteed that Dr. Kivetz's survey respondents would base their survey answers on pre-existing brand loyalties and prior experience with the displayed products, not on the fine-tuned manipulations that Dr. Kivetz made to the control group packaging (by removing the challenged protein claim).

69.    As indicated by the responses made to Dr. Kivetz's open-ended survey questions, Dr. Kivetz's survey respondents are not only past purchasers in the sliced bread product category covered by the Kivetz Surveys. These respondents had established preferences and opinions about the displayed products *prior to taking the survey* and *independent of their reaction to the control group product stimulus*.

70.    In my expert opinion, because of their having formed their brand loyalties and opinions already about the displayed products in the Kivetz Surveys, these respondents were *inoculated* in a way that prevented them from even noticing that the protein claims had been removed from the DKB product packaging for the control groups. I describe below the basis for my opinion.

71.    Publications in the popular science and medical journals are commonly based on the experimental method which involves the random assignment of study participants to "control"

---

the reason for why the are "definitely" or "probably" willing to purchase the product they selected. This 22.6% share is far higher than the shares of respondents indicating that they had actually examined the product packaging in his survey (10.3% for "Packaging/Product Appearance"). Kivetz Report, Exhibit F.6, pp. 1-2.

[21] *See*, for instance, Exhibit E.6 for the coded results to the open-ended questions for the Choice Experiment. In addition to the 44.3% that relied on "brand equity/familiarity," 18.6% wrote in an answer consistent with "general taste/flavor." Kivetz Report, Exhibit E.6, p. 3.

and "test" groups. Such studies can take the form of assigning study participants to receive either the experimental treatment or the "placebo" in order to evaluate the effectiveness of the treatment (relative to the placebo). The experimental method has been essential for testing the effectiveness and side effects of vaccines for Covid-19, and for testing new life-saving therapies and medical devices, for the treatment of HIV, and even in social experiments such as the negative income tax experiment or in evaluations of anti-poverty and early childhood federal programmatic interventions.

72.    Those experiments have in common massive investments in the treatment arm of the experiments. The negative income tax experiment in Stockton, California gave randomly selected residents $500 per month for two years without any conditions. The hypothesis was that the intervention would improve participants' job prospects, financial stability and overall well-being. Or, in another example perhaps more familiar to the court, thousands of study participants were recruited to participate in experiments for the Covid-19 vaccines from Pfizer, Moderna, and Johnson & Johnson's Janssen, with samples of participants randomized into treatment (administered the vaccine) and control groups (not administered the vaccine but receiving a placebo). Through such an experimental design, the researcher can be confident that any outcome differences are the result of the treatment intervention (if the experiment is conducted with rigor).

73.    Dr. Kivetz attempts to leverage this established tradition of experimental design – but the effort is misapplied and fails. Dr. Kivetz's intervention in his treatment arm is far too insignificant to produce any effect in his participants, in my expert opinion. In fact, there were not any changes to the treatment group stimulus at all. More critically, he did not launch any serious, substantive interventions in his control group. He modified slightly some of the content of the product packaging – removing the protein claim – for products already familiar to his respondents.

His experiment was predestined to result in results favorable to the Defendant (by showing no statistical impact resulting from the removal of the protein claim). He surveyed consumers already inoculated against and resistant to his intervention that amounted to minor changes to packaging that the respondents have already considered in the past.

74.     Imagine if, for the testing trials for the Covid-19 vaccines, that Pfizer, Moderna, or Johnson & Johnson selected study participants that were *already immunized against Covid-19*. These study participants, because of their buildup of antibodies, would be at low risk of contracting Covid-19 regardless of whether they were assigned to the treatment or control groups. When both groups are found by the "experiment" to have statistically similar incidence rates of contracting Covid-19, the researcher would be unjustified to claim that the tested vaccine is ineffective. The reason why is that the *entire sample* – both treatment and control groups – had immunological resistance.

75.     Would scientific peer reviewers consider such trials conclusive when both treatment and control groups had already developed elevated anti-bodies resistant to Covid-19 – the very target of the tested vaccines? Of course not. Scientific peer reviewers would be correct to conclude that the research design ensured a biased and predictable result: That both treatment and control groups would report similar efficacy rates.

76.     This is the primary explanation why the test and control group results for the Kivetz Surveys are nearly identical (with some exceptions to be discussed later). The control group respondents had no reason to suspect that Dr. Kivetz had digitally altered a product package with which they were already familiar and about which they had formed pre-existing opinions and preferences about the DKB brand.

77.     Dr. Kivetz reads too much into the fact his surveys found statistically similar

materiality and WTP rates for the test and control group products. The respondents were reacting to product stimuli that by all appearances were the same as the branded products previously experienced when shopping. Respondents did not have any cause to suspect that the researcher would edit the familiar DKB-branded control group packaging by removing the challenged protein claim.

78.     The Kivetz Surveys did not control for consumers' pre-existing brand loyalties and orientations vis-à-vis the DKB Products and other featured brands – which could have been done through a well-designed conjoint survey such as the one conducted by Plaintiff's damages expert. Instead of controlling for preexisting brand loyalties, the Kivetz Surveys *activate* those pre-existing orientations by displaying DKB-branded Products and other featured brands to the respondents. By failing to de-brand the featured Products, the design of the Kivetz Surveys results in a systematic distortion in his data.[22] Dr. Kivetz ignores the "noise that *systematically* distorts the pattern of response, as for example, when consumers have preexisting views about the product and respond based on those views rather than responding to the content" being tested (e.g., the

---

[22] The relevant literature is unambiguous about the threat of respondents' preconceptions when conducting test-control surveys like Dr. Kivetz's.

> Inevitably every human subject brings various preconceptions to any survey…. Preconceptions are not generated by the survey but by the respondent's own past, and as such would also influence that consumer's real-world perceptions and behaviors…[T]he design of evidentiary surveys often must take into account such preconceptions. The underlying reason is that human beings incorporate not only the clues that are presented by survey (resulting in survey artifacts), but also the preconceptions they bring to the survey. (Rappeport, p. 222)

"A general principle in choosing control groups is to address the research question of whether the survey results are likely to be affected by the preconceptions of the respondents." Rappeport, Mike. 2012. "Design Issues for Controls." In S.S. Diamond and J.B. Swann (editors), <u>Trademark and Deceptive Advertising Surveys</u>. American Bar Association, p.225.

challenged protein claim).[23]

79.    In the same essay cited by Dr. Kivetz (published in The Cambridge Handbook of Marketing and the Law) to justify his use of a choice experiment to evaluate the merits of the conjoint survey conducted by Plaintiff's damages expert, the authors recommend that the products featured in the survey be "anonymized" if the "at-issue claims are too widely associated with the brands, or if specific attributes or claims are being tested apart from the brand effect."[24] Dr. Kivetz did not "anonymize" the products in his survey. He did not do so even though the Defendants' advertising and marketing was designed to attract health-conscious consumers who value protein in their foods, as well as fiber and whole grains. The Defendants' target market consisted of upscale, nutrition-conscious consumers who "try to make the best possible food choices" and who "look for foods that 'include' the good stuff: whole grains, fiber, **protein**, etc."[25]

---

[23] S.S. Diamond, "Control Foundations: Rationales and Approaches." In S.S. Diamond and J.B. Swann (editors), Trademark and Deceptive Advertising Surveys. American Bar Association. p.201. Diamond's essay and other essays in the edited volume emphasize the potential impact of pre-existing opinions, attitudes, and preferences on consumers' responses to marketing surveys. In my expert opinion, these essays tend to underestimate the impact of pre-existing orientations to brands with respect to the appropriate selection of control stimuli. Control stimuli containing the branding elements of existing products necessarily trigger in respondents pre-existing orientations to the branded products.

[24] The complete quotation is as follows:

> In addition to determining whether the appropriate dependent measure is share of choice or likelihood of purchase, designing a choice experiment can involve a number of other considerations, depending on the nature of the product or allegations. For example, the brands of the products shown could be anonymized, if the at-issue claims are too widely associated with the brands, or if specific attributes or claims are being tested apart from the brand effect.

Joel H. Steckel, Rebecca Kirk Fair, Kristina Shampanier, and Anne Cai, 2023, "Choice Experiments: Reducing Complexity and Measuring Behavior Rather than Perception," in The Cambridge Handbook of Marketing and the Law, Gersen, Jacob E. and Joel H. Steckel (eds.), New York, NY: Cambridge University Press, p. 393 of the E-book version.

[25] Emphasis added. See "DKB Consumer Targets" (FLO_0001672) for documentation on

80.    Furthermore, as emphasized by the authors of the "Choice Experiments" chapter in *The Cambridge Handbook*, the products in the Kivetz Surveys should have been "anonymized" (or in my language, "de-branded") because a specific claim (i.e., the protein claim) was being tested apart from the brand effect.[26]

81.    Dr. Kivetz unreasonably accepts the premise that respondents seeing his control packaging (without the challenged protein claim or with the DV% added to the Nutrition Facts Panel) would be capable of updating their reasons for purchasing the DKB Products simply because he made minor modifications to the Product packaging in a context where respondents did not have any basis for expecting any changes to have been made. A far more realistic premise is to recognize that a short experience of participating in an online consumer survey is unlikely to reverse years and potentially decades of consumers' prior exposure to DKB Products with the protein claim and to the non-DKB products, developing pre-existing impressions of the tested products.

82.    As a result, Dr. Kivetz cannot state with any confidence that his survey respondents based their answers on the stimuli he displayed. The foundation for the Kivetz Survey experiments is undermined because he cannot exclude the possibility that respondents were not basing their answers on the provided stimuli but instead were relying on years of prior exposure to DKB-branded packaging (as well as to Oroweat and Whole Foods packaging for the Choice Experiment)

_____

Defendants' target consumer market.

[26] Steckel et al., 2023, "Choice Experiments: Reducing Complexity and Measuring Behavior Rather than Perception," <u>The Cambridge Handbook of Marketing and the Law</u>, p. 393. In his expert report, Dr. Kivetz explains that his assignment was to "evaluate whether the alleged unlawful conduct caused class members to purchase, or to pay a higher price (*i.e.*, an alleged price premium) for, the Dave's products at issue (the "Products")." Kivetz Report, ¶ 5(ii). Dr. Kivetz did not describe his assignment to include the evaluation of the impact of brand on purchasing decisions.

having the challenged protein claim. These previously formed brand-specific attitudes, opinions, and preferences can blunt respondents' sensitivity (similar to how a vaccine can help its recipient resist a potential disease) to subtle changes made to the control group stimulus.[27]

83.    **The Kivetz Surveys are based on the wrong underlying methodology:  A choice-based conjoint survey is the more reliable and generally accepted methodology for determining whether proposed class members paid a price premium because of alleged deceptive advertising.**

84.    Dr. Kivetz's stated ambition in conducting his Choice Experiment Survey was to help evaluate the choice-based conjoint survey conducted by Plaintiffs' damages expert, Mr. Colin Weir. Dr. Kivetz opined that his conducted choice experiment "demonstrates [Mr. Weir's conjoint survey] invalidity and the absence of a price premium due to the front-of-package protein statement."[28]

85.    Dr. Kivetz relies on passages in an essay published in The Cambridge Handbook of Marketing and the Law[29] as the basis for his position that a simple choice experiment can be used to invalidate a conjoint survey that has already estimated a price premium solely attributable to a  claim.[30] However, the essay Dr. Kivetz cites does not cover this use case where a conjoint

---

[27] "Brands represent enormously valuable pieces of legal property, **capable of influencing consumer behavior**, being bought and sold, and providing the security of sustained future revenues to their owner." [Emphasis added.] Kevin Lane Keller, "Measuring Brand Equity," in Rajiv Grover and Marco Vriens, The Handbook of Marketing Research: Uses, Misuses, and Future Advances, Chapter 26.

[28] Kivetz Report, ¶ 20.

[29] Joel H. Steckel, et al., "Choice Experiments: Reducing Complexity and Measuring Behavior Rather than Perception," p. 393 of the E-book version.

[30] In the Kivetz Report ¶ 78,  Dr. Kivetz quotes this passage from Steckel et al. in their chapter "Choice Experiments" in The Cambridge Handbook of Marketing and the Law (p. 395 in the e-book):

survey has already been conducted. The passages Dr. Kivetz cites refer to the use of a simple choice experiment being conducted to help inform a decision about whether the more costly and sophisticated conjoint survey and analysis should be conducted. Nowhere in the cited chapter do the authors opine that a simple choice experiment can be legitimately used to "demonstrate" that a previously conducted conjoint survey is "invalid" or that a previously estimated price premium is in error.

86.    Dr. Kivetz misapplied the cited passages. The actual use case in front of the Court is that Plaintiff and Defendants have proffered survey-based findings based on alternative approaches for assessing the challenged protein claim, with Mr. Weir's conjoint survey designed to quantify the price premium and the Kivetz Survey designed to determine whether or not the protein claim is material.[31] In my professional opinion, Dr. Kivetz is displaying an unscientific attitude by arguing that his small-sample, simple choice experiment should be exclusively privileged over previously conducted research – Mr. Weir's conjoint survey and analysis – in light of the fact that conjoint surveys and analysis are widely accepted by the courts for measuring price

---

For example, if there is no statistically significant difference in the share, the at-issue attribute, product feature, trademark, or product claim **has no material impact on consumer choice** (and, as a corollary, the **price premium on the at-issue attribute is zero**). […]

If one finds a result with no statistical significance, the choice experiment has essentially killed two birds with one stone: The results imply **lack of materiality and thus no liability**, as well as zero damages. [Emphases added]

[31] Mr. Weir's conjoint survey is designed to estimate the market-clearing price for the at-issue Products in the but-for world where Defendants did not use the challenged protein claim in its marketing. By estimating a positive price premium, Mr. Weir's conjoint survey and analysis is supportive of the conclusion that the challenged protein claim is material to consumers. The Kivetz Survey is not designed to estimate the market-clearing price in the but-for world, but explicitly designed to address whether or not the protein claim was material to consumers.

premia in advertising cases. Moreover, conjoint surveys and analysis are routinely used in commercial market research by Fortune 500 companies to make business decisions regarding pricing, product line extensions, product packaging design, research and development spending, etc.[32]

87.    My own expert opinion, as I explain further below, is that Dr. Kivetz's Choice Experiment Survey, as well as his materiality surveys, should be disregarded because (i) the Kivetz Surveys are statistically underpowered, with insufficient sample sizes for precise survey estimates; (ii) the Kivetz Surveys are fatally flawed because of the failure to control for consumers' pre-existing brand loyalties and preconceptions about the tested products; (iii) the choice-based conjoint survey approach used by Plaintiff is widely accepted by the courts and market researchers as the more sophisticated and reliable approach (compared to simple choice experiment) for quantifying any damages solely attributable to the challenged protein claim.

88.    The evidence that Dr. Kivetz used an inferior approach is found in his own admission that his own choice and materiality surveys are incapable of quantifying any price premium by consumers resulting from the alleged deception.[33] Using a simple five-point Likert

---

[32] Later in my export report, I provide examples of the use of conjoint surveys and analysis in the litigation context and by the private and public sector.

[33] Kivetz explained that his surveys cannot measure price premia:

> It is important to note that the type of cause-effect ("test-control") experimental design that I used was designed to directly assess the *materiality* (or immateriality) of a claim or aspect at issue to consumers, not to quantify the *magnitude* of an alleged price premium if a premium is found to exist. (Kivetz Report, para 108.)

The Kivetz Surveys attempt to measure "purchase likelihood," not price premia, resulting from the challenged protein claim, as explained by Dr. Kivetz:

> My four additional "front-of-pack" surveys used the same gold standard experimental design as in the choice experiment, but focused on measuring

scale question to measure purchase likelihood (which is what Dr. Kivetz did), when the conjoint survey methodology is available for quantifying economic utility for the challenged protein claims, is akin to bringing calvary to an armed conflict when armored tanks and fighter jets are available.

89.     Dr. Kivetz claims that a well conducted experimental materiality survey, like the ones he suggests he conducted, can be used to invalidate a conjoint analysis by purportedly demonstrating that there is not any materiality attributable to the alleged deception. This is specious reasoning, in my expert opinion. Below I explain the basis for my opinion.

90.     Specifically, choice-based conjoint is a standard marketing research technique for quantifying consumer preferences for products and for the component features that make up a product.[34] Conjoint analysis can be used to break down the value of a conceptual feature (*i.e.*, claims on product packaging) into its component parts (*i.e.*, the specific protein claim).

91.     Conjoint survey and analysis methodology has been widely accepted by courts as being capable of measuring the price premium associated with challenged labeling representations in class actions in accordance with the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).[35] I personally have employed choice-based conjoint survey methodology in my previously

---

consumers' likelihood of purchasing, along with willingness to pay for, the Products. In each survey, only one (test or control) Dave's product was shown, and participants were asked to indicate, among other things, the likelihood that they would purchase the displayed product. (Kivetz Report, para 114.)

[34] Orme, 2014. "Conjoint analysis broadly refers to any decompositional method that estimates the structure of a consumer's preferences (*e.g.*, part worths, importance weights, ideal points) given his/her overall evaluations of a set of alternatives that are pre-specified in terms of levels of different attributes." *See* P. Green and V. Srinivasan, 1978, "Conjoint Analysis in Consumer Research: Issues and Outlook," *Journal of Consumer Research*, 5, pp. 103-123.

[35] *See, e.g., Lytle v. Nutramax Laboratories, Inc.,* 99 F.4th 557, 579 (9th Cir. 2024) ("[C]onjoint analysis is a well-accepted technique that is frequently used to establish damages in CLRA actions."); *In re Univ. of S. California Tuition & Fees COVID-19 Refund Litig.*, 695 F. Supp. 3d 1128, 1146-1151 (C.D. Cal. 2023) (finding "no-basis" to exclude conjoint analysis for COVID-19

conducted price premium surveys accepted by courts.[36] Choice-based conjoint is the most widely

used type of conjoint survey.[37] Over 18,000 conjoint surveys are estimated to take place each year

in commercial applications.[38] Conjoint surveys are also used widely in industry and government.[39]

---

tuition refund case); *Dzielak v. Whirlpool Corp.*, No. 2:12-0089 (KM)(JBC), 2017 WL 1034197, at *6-8 (D.N.J. Mar. 17, 2017) (finding related methodology "passes muster under the *Daubert* considerations," including its "relationship to other established reliable techniques (particularly, the conjoint analysis technique of which it is a part)"); *In re: Lenovo Adware Litig.*, No. 15-md-02624-RMW, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) (certifying class where damages model was based on conjoint analysis); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1027-31 (C.D. Cal. 2015) (concluding an expert's "conjoint analysis is, at this stage, sufficiently reliable to be used in calculating class-wide damages"); *Guido v. L'Oreal USA, Inc.*, No. 2:11-cv-01067-CAS (JCx), 2014 WL 6603730, at *4-8 (C.D. Cal. July 24, 2014) (collecting cases and finding conjoint analysis satisfied class certification requirements of *Comcast*); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1020-26 (N.D. Cal. 2013) (denying motion to exclude conjoint analysis) *Microsoft Corp. v. Motorola, Inc.*, 904 F. Supp. 2d 1109, 1119-20 (W.D. Wash. 2012) (conjoint analysis survey was "admissible as relevant under FRE 401 and 402 and . . . sufficiently reliable under FRE 702 and *Daubert*"); *see also Khoday v. Symantec Corp.*, No. 11-180 (JRT/TNL), 2014 WL 1281600, at *10 (D. Minn. March 13, 2014); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 538-39 (S.D. Fl. 2015); *Brown v. Hain Celestial Grp.*, No. C 11-03082 LB, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017).

[36] *See, e.g., Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*; *De Lacour v. Colgate-Palmolive Co. and Tom's of Maine Inc.*; *McMorrow v. Mondelez Int'l, Inc.*; *Cabrera v. Bayer Healthcare*; *Sharpe v. A & W Concentrate Co.*; *Cadena v. American Honda Co.*

[37] For technical information about the choice-based conjoint methodology that I propose to use, *see* generally the Sawtooth Software technical papers on choice-based conjoint available at http://www.sawtoothsoftware.com/support/technical-papers. *See also* Orme, 2014; Orme and Chrzan, 2017), Sawtooth Software Technical Paper Series, 2009, 2017, and other references listed in my Attachment B.

[38] Orme, 2014, p. 143. Wittink and Cattin estimate that about 400 conjoint analysis applications took place per year in the 1980s. D.R. Wittink and P. Cattin, 1989, "Commercial Use of Conjoint Analysis: An Update," Journal of Marketing 53(July):91-96. Green and Srinivasan observe that that part of the reason for conjoint's growing popularity in the 1980s was the result of the introduction of microcomputer packages for performing conjoint analyses. P.E. Green and V. Srinivasan, 1990, "Conjoint Analysis in Marketing: New Developments with Implications for Research and Practice," Journal of Marketing (October):3-19.

[39] While conjoint surveys and analyses have been common in market research since the 1980s for product development and other purposes, it is increasingly used in the public sector. For instance, the Food and Drug Administration uses the approach in regulatory benefit-risk assessments. (F. Reed Johnson and Mo Zhou, 2016, "Patient Preferences in Regulatory Benefit-Risk Assessments: A US Perspective). In another example, public health planners are increasingly using choice-based

92.     Dr. Kivetz could have attempted to use the more sophisticated and rigorous approach of choice-based conjoint analysis, correcting what he perceives are the errors purportedly made by Mr. Weir. But instead he designed and conducted flawed experimental design surveys that do not measure a price premium, have sample sizes so small that there was little to no chance of detecting any statistically significant differences in the results between his test and control groups, and failed to de-brand the product stimuli, assuring that respondents would rely on their pre-existing brand loyalties in answering his purchase likelihood and WTP questions (reducing the likelihood that control group respondents would even notice the removal of the challenged protein claim).

93.     **The Kivetz Surveys are both _underinclusive_ and _overinclusive_ with respect to sampling the correct universe. The Kivetz Surveys excluded consumers that should have been included, and included consumers that should have been excluded.**

94.     An improperly specified sample design leads to sourcing respondents whose answers are not generalizable to the target population.[40] In this instance, the target population consists of potential class members, and it was Dr. Kivetz's responsibility to interview a sample of consumers whose answers could be generalized to the proposed class. Dr. Kivetz's sample design, in my expert opinion, failed to provide a representative sample whose survey answers can be generalized to the proposed class. His errors are in two directions, as described below.

---

conjoint to collect public input in health service planning, healthcare finance debates, and the treatment choices of individual patients, among other uses. Charles E. Cunningham, Ken Deal, and Yvonne Chen, December 2010, "Adaptive Choice-Based Conjoint Analysis: A New Patient-Centered Approach to the Assessment of Health Service Preferences."

[40] Professor Diamond Diamond, Shari Seidman, "Reference Guide on Survey Research" in *Reference Manual on Scientific Evidence*, Third Edition, National Academies Press, 2011, pp. 359-423, at p. 377-378.

95.     First, Dr. Kivetz's sample plan failed on the grounds of having an *underinclusive* sample. An underinclusive sample is one that is missing relevant members of the target population.[41] To illustrate, a survey sample intended to be projectable to all U.S. adults that have purchased domestic airline tickets for personal use in the past year would be considered underinclusive if the sample frame was comprised exclusively of United Airlines Mileage Plus members. The sample would be skewed in the direction of underrepresenting persons who fly on other airlines and those who fly less often, among other biases.

96.     The samples in the Kivetz Surveys are underinclusive because he excluded all respondents who use a mobile phone or tablet to take his online surveys. Only those respondents taking the survey on a desktop or laptop were eligible for his survey.[42] In my personal experience, respondents using mobile devices and tablets make up 50% or more of online respondents taking surveys as members of opt-in panels used by Dr. Kivetz for this survey. Dr. Kivetz made the decision on the basis of his opinion that he would rather have a desktop/laptop sample that could more effectively view his product images than obtain a sample that represents the U.S. online population. The complication for Dr. Kivetz is that it is unknowable whether the exclusion of the mobile/tablet users resulted in a systematic bias in his sample.

97.     Dr. Kivetz's sample is underinclusive in a second sense that he required his respondents to be both past purchasers and potential future purchasers. Because both conditions

---

[41] *Ibid.*, p. 378. An "underinclusive sample" uses a sample frame that "excludes part of the target population."

[42] Kivetz Report, ¶ 83. Respondents were terminated from the survey if they selected any of these options in answering the question "Which of the following devices are you using right now to take this survey?":  "Tablet (such as an iPad, Android tablet, etc.)," "Smartphone," "Cell phone (not a smartphone)," or "Other mobile device." Kivetz Expert Report, Exhibit E.1, p.3. In contrast, Mr. Weir's conjoint survey did not exclude mobile users from his survey sample. His list of screening criteria is presented in his February 17, 2025 Amended Declaration, ¶ 56.

must be satisfied, Dr. Kivetz left out some past purchasers – that is, class members – because he disqualified past purchasers that no longer are interested in purchasing sliced bread.[43]

98.    Second, Dr. Kivetz's sample plan failed on the grounds of having an *overinclusive* sample.[44] The definition of an overinclusive sample is that the sample includes individuals that are not members of the target population, potentially resulting in a database of survey responses that are not generalizable to the target population. To illustrate, suppose a researcher sought to conduct a survey of consumers who purchased premium women's handbags (such as from Gucci or Louis Vuitton) in the past four years. The survey sample would be overinclusive if the survey screener allowed respondents to take the main survey because they had purchased at least one handbag in the past four years, regardless of the brand and cost of the handbag. The sample would likely include many respondents who cannot afford to purchase a premium handbag or have no interest in spending that much money on a handbag. The results of the survey are likely to be skewed in the direction of reflecting the views of people who are not members of the target population. In this case, the survey results would not be relevant to addressing the issues in the litigation.

99.    Dr. Kivetz's survey samples are overinclusive because, unlike Mr. Weir in his conjoint survey,  he did not limit the sample to consumers who have purchased DKB products.[45] He simply required respondents to have purchased *any brand* of sliced bread in the past three months and be potentially a purchaser of sliced bread in the next three months.

---

[43] Kivetz Report, ¶ 83.
[44] According to Dr. Diamond in her "Reference Guide on Survey Research," an "overinclusive sample" is one that "includes individuals who are not members of the target population" (p. 378).
[45] Mr. Weir appropriately put in place an eligibility requirement for past purchasing of a DKB product. Amended Report, para 56.

100.    Mr. Kivetz, contrary to the recommendations by Professor Diamond, did not ask his respondents whether they had purchased DKB products, making it impossible for an analysis of a subset of his respondents that are likely class members. Professor Diamond reached a specific conclusion for this type of failure by the testifying expert:

> If the survey expert can demonstrate that a sufficiently large (and representative) subset of respondents in the survey was drawn from the appropriate sampling frame, the responses obtained from that subset can be examined, and inferences about the relevant population can be drawn based on that subset. If the relevant subset cannot be identified, however, an overbroad sampling frame will reduce the value of the survey. If the sampling frame does not include important groups in the target population, there is generally no way to know how the unrepresented members of the target population would have responded.[46]

101.    Dr. Kivetz's approach for sampling provides no assurances that he surveyed the relevant population. Professor Diamond observed, I believe appropriately, that "[A] survey that provides information about a wholly irrelevant population is itself irrelevant."[47]

102.    Moreover, Dr. Kivetz could have asked survey questions – but did not ask – to identify respondents who have purchased sliced break in the subcategory of sliced break products occupied by DKB:  that is, upscale, whole-grain bread products for the health and nutrition conscious who will spend more for quality products. Dr. Kivetz did not ask questions that would enable him to screen out, for instance, respondents who are budget conscious and who tend to purchase less nutritious, lower-priced white breads such as Wonder Classic White Bread or Sara Lee Classic White Bread. The DKB target market, based on documents made available through discovery, confirms that DKB sought to market its products to upscale, health conscious

---

[46] Professor Diamond, "Reference Guide on Survey Research," p. 379.
[47] *Ibid.*, p. 377.

consumers who prioritize nutrition in their bread products.[48] The sampling approach used by Dr. Kivetz fails to take into account the DKB's target market, surveying consumers that are unlikely to have had purchased DKB products in the past or be willing to purchase them in the future.

103.    In fact, we have no idea which of Dr. Kivetz's respondents are past purchasers of DKB Products. We do not know if he had *any* consumers who would qualify as class members because he did not ask his respondents about which brands they had purchased in the past.

104.    **The Kivetz Surveys are statistically underpowered because of the small number of interviews he collected.**

105.    According to Dr. Kivetz's analyses, the Kivetz Surveys failed to identify statistically significant differences between the test and control groups in the purchase likelihood

---

[48] In the document "DKB Consumer Targets" (FLO_0001672), Defendants target market consists of four consumers segments, the first three of which are described below as upscale health and nutritious conscious consumers who are not budget conscious from the source document. [Emphasis added.]

> 1st tier— The "Good Lifers."
> Females aged 25-54, knowledgeable of food ingredients, always read labels. **Educated, minimum income of $70K**, **not concerned by the higher price point**. This group mindfully eats healthy but doesn't take themselves too seriously. Tries to make the **best possible food choices**, organic when possible, but not organic-exclusive. Wants the best product for herself and her family.
>
> 2nd Tier— Millennials.
> View food as **vehicle for nutrition**, will spend more for quality products. Will stand behind brands that support causes. Care about food "free from" the bad stuff.
>
> 3rd Tier— Baby Boomers.
> They are being told by healthcare professionals to eat healthier. They look for foods that "include" the good stuff: **whole grains, fiber, protein**, etc.

Additional discovery supporting the characterization of DKB's target consumers as upscale and health and nutrition conscious include DKB's "Brand Vision" document FLO_00002720-2733 and the marketing research conducted by InsightsNow entitled "Brand Fingerprint: Quantitative Section," FLO_00016976-16993.

and willingness-to-pay scores. In addition to factors described above that account for his failure to detect statistically significant differences, another factor is that Dr. Kivetz used small interview sample sizes.

106.    As background, surveys are conducted with samples of a population. Because not every member of the population is surveyed, the results of the interviewed sample are extrapolated to the entire population. The concept of *sampling margin of error* is based on the assumption that the selected sample might not be a fully representative microcosm of the population because of random chance. The methodology section of polls typically will state the sampling margin of error for a survey statistic (e.g., 50% of the interviews have X or Y opinion) in terms of having 95% confidence that the actual survey statistic is +/- 3 to 5 percentage points. The larger the sample size and the smaller the population size, the lower the sampling margin of error and therefore more precise the survey estimates. When Dr. Kivetz conducted his statistical tests of significance in comparing the results of the test and control groups, he appropriately took into account the sampling margin of error.

107.    The Kivetz Surveys had interview sample sizes for the test and controls groups ranging between n=204 to 209 interviews for the Choice Experiment Survey; n=202 to 210 interviews for the Front-of-Pack Materiality Survey; and n=201 to 208 interviews for the Nutrition Facts Panel Materiality Survey.

108.    There are recognized minimally acceptable standards in survey research for sample sizes. The Associated Press, for instance, publishes a standard for polls that seek to be covered by The AP wire, recommending an interview sample size of at least 500 interviews in total for opinion

surveys.[49] The Kivetz Surveys fail that minimal guideline. He collected only about 40% of the recommended minimum sample size. Most attitudinal surveys conducted for publication and rigorous research have far more than the minimum standard of 500 interviews.[50] Typically, surveys of the U.S. population will have at least n=1,000 interviews when conducted by reputable research firms like the Gallup.[51]

109.    The small sizes used by Dr. Kivetz resulted in imprecise survey estimates. The sampling margin of error (95% Confidence) is 6.76 percentage points for n=210 interviews (the largest number of interviews obtained in a Kivetz Survey) for a 50% survey statistic where the population size is postulated at 1,000,000 adults.[52] This means that, once taking into account sampling error, the actual survey result is likely to be between 43.2% and 56.8% with 95% confidence – a potential range of almost 14 percentage points. In contrast, if Dr. Kivetz had surveyed n=1,000, the sampling margin of error would have been reduced from 6.76 to 3.1 percentage points, meaning that the actual survey result is likely to be between 46.9% and 53.1% -- a much smaller range of only about 6 percentage points.

110.    The increase in sample size can be the difference between detecting versus not detecting a statistically significant difference in results between the test and control groups. For instance, the results from the Front-of-Pack Materiality Survey for the Sliced Bread ("21") product

---

[49] The Associated Press Stylebook, "Polls and Surveys," July 5, 2018.

[50] Mr. Weir, Plaintiff's damages expert, exceeded n=300 interviews for each of his conjoint surveys conducted in this litigation, surpassing the recommended sample size for conjoint surveys, as explained in his Amended Report (¶¶ 71-72).

[51] The typical sample size for a Gallup poll which is designed to represent this general population is 1,000 national adults. Frank Newport, Lydia Saad, David Moore, 1997, "How Polls Are Conducted," in Where America Stands, John Wiley & Sons, Inc.

[52] The 1,000,000 population size estimate is conservative. The width of a confidence interval does not change meaningfully if I were to postulate a population size of 10,000,000 or more.

indicate that 53.7% of test respondents and 46.1% of control respondents would definitely or probably purchase the product.[53] Because the interviewed sample sizes are relatively small (n=205 for the test; n=202 for the control), this 7.6 percentage point delta was insufficiently large to be deemed "statistically significant." However, if these results had been obtained with n=1,000 interviews for the test and control groups, the 7.6 percentage point delta would have been considered statistically significant.[54]

111.    Dr. Kivetz was able to consider all the test-control results as statistically indistinguishable because he collected a modest number of interviews for each tested product, in my expert opinion.

112.    **Dr. Kivetz implies that his survey findings, based on his open-ended survey questions, undermine Plaintiffs' allegations when in fact they do not.**

113.    Dr. Kivetz emphasizes that his respondents have a "variety of reasons" for selecting the DKB-branded product in his Choice Experiment Survey and for being "definitely" or "probably" willing to purchase the DKB products in his materiality surveys.[55]

114.    Dr. Kivetz is ignoring the fact that variance in responses is normal; unanimity in responses in surveys is elusive and not to be expected, in my experience in conducting thousands of surveys since the early 1990s. Further, individual reasons for justifying purchase behavior are irrelevant to damages in this case because, as Mr. Weir points out, "a consumer's individual

---

[53] Kivetz Report, ¶ Table 2.
[54] At n=1,000 interviews, the sampling margin of error with 95% confidence would have been 3.09 percentage points. Applying the sampling margin of error for the n=1,000 scenario, the test group result would likely have been between 50.6 percent and 56.8%, while the control group result would likely have been between 43.0% and 49.2%. The ranges for the two survey estimates (once sampling margin of error is applied) do not overlap, meaning that statistically there is high probability that the two survey results are significantly different.
[55] Kivetz Report, ¶ 111, ¶ 136, footnote 132 on p. 75.

reasons for purchase do not change the price paid by that individual."[56] Furthermore, Plaintiff is not arguing that class members value exclusively the protein claim.

115.    At a minimum, Dr. Kivetz should have cautioned his readers to appreciate the limitations of the open-ended survey question format. While open-ended survey questions can have utility in some contexts, there are well known limitations particularly when used in self-administered online surveys for which an interviewer (by definition) is not available to probe the respondents to clarify their responses and motivate the respondent to provide a complete response. Open-ended questions have a tendency to produce under-estimates of phenomena and can suffer from bias resulting from the subjectivity required to code the verbatim responses (to make possible quantitative analyses). I will elaborate on these limitations.

116.    Dr. Kivetz's use of the open-ended survey format is contradicted by nearly all professional survey research experts who recognize that closed-ended questions are more appropriate for scientifically rigorous, quantitative survey research, while open-ended survey questions have more utility for qualitative research.[57]

---

[56] Mr. Weir's Amended Report, ¶ 123.

[57] *See* "As a general rule survey researchers prefer closed questions because they are easier to process and reduce coder variability." Bradburn, N. M., Sudman, S., & Wansink, B. 2004. *Asking Questions: A Practical Guide to   Questionnaire Design*, p. 167. Schuman, H. & Presser, S. 1981. Questions and Answers in Attitude Surveys, New York: Academic Press. Schuman and Presser refer to the "triumph of closed questions" over open-ended questions, p. 79. Schuman and Presser summarize the results of their experiment using closed versus open-ended questions as follows in an experiment where interviewers probed respondents to clarify their responses to open-ended questions: "[W]e think the closed form of the question is superior because it separates types of responses that were often indistinguishable in the open coding…. Whatever the advantages of the open question for assessing salience and for avoiding social desirability effects—and we have been unable to discover firm evidence that either of these advantages actually occurs—there seem to be even greater disadvantages arising from vagueness of expression by respondents, frequent failures to probe adequately by interviewers, and occasional misunderstanding by coders. All this is avoided in closed questions, where respondents are in essence asked to code themselves, with minimal intervention by third parties," p. 104. Schuman and Presser's experiment used

117.    Dr. Kivetz's approach – the use of open-ended survey questions – is not a reliable question format to answer the research question of whether the challenged protein claims were a factor in consumers' purchase decisions, even if such research question were relevant to Plaintiff's claims. Below I explain why the survey research industry prefers closed-ended survey questions over open-ended survey questions for quantitative research, especially in the context of self-administered online surveys for which an actual professional interviewer cannot probe respondents to clarify their responses to open-ended questions.

118.    The hallmark of open-ended questions is that respondents must be sufficiently motivated, literate, and expressive to comply with the survey's request to articulate their thoughts in writing. Respondents vary significantly on these three dimensions, leading to uneven accuracy and depth in responses. Respondents lacking in motivation, literacy, or expressiveness in written language are predictably less likely to provide responses useful for analysis.[58] In answering an

---

professional interviewers to administer the surveys, as opposed to the kind of self-administered survey standardly conducted online in recent decades. With professional interviewers, the respondents providing vague or incomplete responses to open-ended survey questions can be probed and asked to clarify their responses.

[58] Non-response bias (that is, the bias in data when the responders and non-responders are different on the population characteristics being measured) can happen from open-ended surveys because of chronic non-response to the open-ended questions. Borg, I. 2005, Who writes what kinds of comments? Some new findings, in A. I. Kraut (Chair), Grappling with write-in comments in a web-enabled survey world, Symposium conducted at the 20th annual conference of the Society for Industrial and Organizational Psychology, Los Angeles, California; Poncheri, R. M., Lindberg, J. T., Thompson, L. F., & Surface, E. A. 2008, A comment on employee surveys: Negativity bias in open-ended responses, Organizational Research Methods, 11, 614-630. Bias from open-ended survey questions can also happen from a tendency for respondents with more negative attitudes to be more likely to respond to open-ended survey questions, while more satisfied respondents are less likely to take the effort to respond to open-ended survey questions. McNeely, R. L. 1990, Do respondents who pen comments onto mail surveys differ from other respondents? A research note on the human services job satisfaction literature, Journal of Sociology & Social Welfare, 17(4), 127-137; *see also* Bernard C.K. Choi and Anita W.P. Pak, January 2005, Preventing Chronic Disease. 2(1): A13. A Catalog of Biases in Questionnaires "Open-ended questions can result in data with differential quality. Also, respondents are likely to be unwilling to take the time to answer

open-ended question, respondents might be unmotivated or unable to articulate why they would or would not be likely to purchase a product (as in the materiality surveys conducted by Dr. Kivetz). As a result, the respondents that do have more motivation because of the strength of their opinions and preferences are over-represented in responses to open-ended questions. Similarly, respondents having more education and/or expressive ability are also over-represented in responses to open-ended questions. In contrast, respondents answering well-constructed, closed-ended survey questions are not required to muster significant motivation or be comfortable with writing responses in order to comply with the survey task.

119. In my expert opinion, the open-ended survey data from the Kivetz Surveys cannot be relied on to support any assessment of the role of the challenged protein claims in causing consumers to purchase the DKB Products. I explain below.

120. In their textbook *Asking Questions*, Bradburn *et al.* set forth a "Checklist of Major Points" for questionnaire design, the first point of which is:

> Use open-ended questions sparingly; they are primarily useful for development work, to explore a topic in depth, and to obtain quotable material. Close-ended questions are more difficult to construct, but they are easier to analyze and generate less unwanted interviewer and coder variance.[59]

121. Because text-based verbatim responses are not useful on their own for quantitative analysis, researchers develop coding schemes to categorize the verbatim responses into categories. The process of developing the coding schemes and then actually coding the verbatim responses into buckets meant to reflect similar responses are widely criticized as a subjective exercise that

---

them."
[59] Bradburn, N. M., Sudman, S., & Wansink, B. 2004. *Asking Questions: A Practical Guide to Questionnaire Design*, p. 167.

can introduce researcher bias.[60] In contrast, respondents answering closed-ended or choice-based conjoint questions provide unambiguous selections that require no further interpretation by the researcher in order to be useful for quantitative analysis.

122.    Open-ended survey questions may have merit for qualitative and quasi-qualitative research, but they are not suitable for quantitative measurements of a population characteristic. Experts in the field and the *Reference Manual on Scientific Evidence* agree that "open-ended questions are more appropriate when a survey is attempting to gauge what comes first to a respondent's mind but closed-ended questions are more suitable for assessing choices between well-identified options or obtaining ratings on a clear set of alternatives."[61]

123.    In summary, questions using an open-ended format are not reliable for producing accurate quantitative information to inform an assessment of a reasonable consumer's reasons for purchasing the Defendant's products. Answers to Dr. Kivetz's open-ended questions do not provide quantitative insights regarding the economic value of the challenged protein claim. Moreover, answers to the open-ended questions are, because of the limitations of the question format, tend to be vague, imprecisely worded and incomplete, and also are unrepresentative of consumers' opinions.

124.    Finally, I note that I have historically eschewed the use of open-ended survey questions in my litigation research practice when the goal is to have an accurate quantitative measurement of opinions and perceptions. Instead, I have used the closed-ended question format

---

[60] Mistakes in coding answers to open-ended questions is endemic. *See* Arthur Lupia, Challenges and Opportunities in Open-Ended Coding. Available at https://iriss.stanford.edu/sites/default/files/lupia_slides.pdf.

[61] Federal Judicial Center, <u>Reference Manual on Scientific Evidence</u>, p. 394 (3d ed. 2011). H. Schuman & S. Presser. 1981. <u>Questions and Answers in Attitude Surveys</u>.

in my consumer surveys prepared in the context of litigation – rather than unreliable open-ended questions – including but not limited to the following cases: *Miles v. Philip Morris*, *Zill v. Sprint*, *Kangadis v. Ebin*, *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, *Bowling v. Johnson & Johnson*, *Cabrera v. Bayer Healthcare LLC.*, *Willis v. Colgate-Palmolive Co.*, *Broomfield v. Craft Brew Alliance, Inc.*, *Sharpe v. A&W Concentrate Co.*, *Benson v. Newell Brands, Inc.*, *Fishon v. Premier Nutritionals*, *Maeda v. Kennedy Endeavors, Inc.*, *Hall v. Marriott*, *Banks v. R.C. Bigelow, Inc.*, *Bush v. Rust-Oleum Corporation*, *Miller v. Travel Guard Group, Inc.*, *Corbett v. Pharmacare USA*, *Sinatro v. Barilla America, Inc.*, and *IN RE: Folgers Coffee Litigation*.


## **RESERVATION OF RIGHTS**


125.   The facts and data that I considered for developing the surveys and my opinions in this report are cited herein. I reserve rights to amend my opinions and this report if new information is made available to me.

53

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed in E. Palo Alto, California on May 20, 2025.

_____

J. MICHAEL DENNIS, PH. D

# EXHIBIT A

# CURRICULUM VITAE OF
# J. MICHAEL DENNIS, PH.D.

# CV FOR J. MICHAEL DENNIS

Phone: (650) 288-1930          274 Redwood Shores Parkway, #529
JMDSTAT@gmail.com          Redwood City, CA 94065

Education

| | | | |
|---|---|---|---|
| University of Texas, Austin | Government | B.A. | 1984 |
| University of Texas, Austin | Government | M.A. | 1986 |
| University of Chicago | Political Science | Ph.D. | 1992 |

Employment

| | |
|---|---|
| 2015-Present | Senior Vice President, NORC |
| 2014-Present | President and Owner, JMDSTAT Consulting Inc. |
| 2012-2014 | Managing Director, GfK Custom Research LLC (GfK acquired Knowledge Networks in January 2012) |
| 2009-2011 | Executive Vice President, Knowledge Networks |
| 2007- 2008 | Senior Vice President, Knowledge Networks, Inc |
| 2001-2006 | Vice President and Managing Director, Knowledge Networks, Inc |
| 2000-2001 | Vice President of Operations and Survey Research, Knowledge Networks, Inc. |
| 1999-2000 | Senior Scientist, Abt Associates Inc. |
| 1998-1999 | Senior Survey Director, Abt Associates Inc. |
| 1992-1998 | Survey Director, Abt Associates Inc |
| 1989-1992 | Research Assistant, Political Science Department, University of Chicago |

Notable Past Projects

- 2020 Facebook Election Research Project, 2020-Present, NORC Director. Funded by Facebook Technologies, NORC's study director a national study examining the impact of social media on U.S. politics, democratic institutions, and elections.
- America in One Room (A1R), 2019, NORC Director. Funded by Helena Project and conducted under the supervision of Professors James Fishkin and Larry Diamond from the Center for Deliberative Democracy at Stanford University.
- Time-Sharing Experiments for the Social Sciences (TESS), 2016-2020, Co-Investigator, Funded by the National Science Foundation (Award No. 1628057). NORC's study director for approximately 140 hundred social science experiments funded by the TESS program.
- Demonstration of a Feasibility of Improving Scientific Literacy and Lifelong Learning through a Just-in-Time Dissemination Process, 2016-Present, Co-Investigator, Funded by National Aeronautics and Space Administration (NASA), (Grant No. F041712). NORC's director of the five-year survey project funded by NASA in collaboration with researchers from the Institute for Social Research, University of Michigan.
- GenForward Panel, 2016-Present. NORC Director, funded by John D. & Catherine T. MacArthur Foundation. NORC's study director for the University of Chicago polling panel of young adults in collaboration with the Black Youth Project and the Associated Press-NORC Center for Public Affairs Research.
- Connecting Health and Technology, 2013-2014, GfK Director, Funded by the American Legacy Foundation. GfK's Study Director responsible for the survey design and management of a custom panel study of 10,000 U.S. teens and young adults measuring the effectiveness of the Legacy "Truth" smoking prevention media campaign.
- Google Screenwise Research Panel 2011-2014, Director. Knowledge Networks' and later GfK's study director responsible for the design and implementation of a new custom panel of broadband households measuring how consumers use the internet.
- Time-Sharing Experiments for the Social Sciences (TESS), 2012-2016, Co-Investigator, Funded by the National Science Foundation (Award No. 1227179). Knowledge Networks/GfK's study director for more than two hundred social science experiments funded by the TESS program.

- American National Elections Studies 2007-2009 Panel Study, Knowledge Networks Principal Investigator, Funded by the National Science Foundation.   The Knowledge Networks study director responsible for sampling, data collection methodology, and project management for a longitudinal study of approximately 2,500 households during the historic 2008 Presidential election.
- National Annenberg Election Survey 2007-2009, Knowledge Networks Director, Annenberg Public Policy Center, University of Pennsylvania.  The Knowledge Networks study director responsible for project management for large-scale tracking study (20K interviews per wave) of the U.S. electorate during the historic 2008 Presidential election.
- National Immunization Survey, Abt Associates Data Collection Director, 1997-2000, Funded by the U.S. Centers for Disease Control and Prevention.  Responsible for the data collection for the U.S. Federal government's largest random digit dialing telephone survey with approximately 1M households contacted each year.
- Project Network (First Followup), Abt Associates Project Director, Funded by the U.S. Social Security Administration.  Led the project management team for this in-person field study.
- Estimation of the Number of Hard Core Drug Users in the U.S., Office of National Drug Control Policy
- Access to Kidney Transplantation, Agency for Health Care Policy and Research.  Led the survey project management team for this in-person field study testing an experimental method for estimating hard core drug use.
- A Case Control Study of Stomach Cancer in Poland and Polish Americans, National Cancer Institute
- The Prevalence of Alcohol and Other Drug Abuse and Dependence in Short Term General Hospitals and the Impact of Abuse and Dependence on Hospital Utilization, Charges and Costs, National Institute of Alcohol Abuse and Alcoholism


Expert Witness in Litigation: Testifying at Deposition or Trial in the Last 4 Years

1. February 26, 2021. Expert Deposition. Sharon Willis et al. v. Colgate-Palmolive Co. U.S. District Court, Central District of California (Civil Action 2:19-CV-08542-JGB-RAO).
2. March 15, 2021. Expert Deposition. Sharpe et al. v. A & W Concentrate Company and Keurig Dr. Pepper Inc. (E.D.N.Y.) (Civil Action No. 19-cv-00768 (BMC)).
3. July 1, 2021. Expert Deposition. Sharpe et al. v. GT's Living Foods, LLC. U.S. District Court, Central District of California. Civil Action 2:19-CV-10920-FMO-GJS.
4. July 12, 2021. Expert Deposition. Vizcarra et al. v. Unilever United States, Inc. U.S. District Court for the Northern District of California (Case No. 4:20-cv-02777-YGR).
5. August 23, 2021. Expert Deposition. State of New Mexico v. Solvay Pharmaceuticals, Inc., Abbott Products, Inc., Abbott Laboratories, Abbvie Inc. State of New Mexico, County of Santa Fe (Case No. D-101-CV-2019-01897).
6. August 24, 2021. Expert Deposition. Minor et al. v. Baker Mills, Inc. and Kodiak Cakes, LLC. U.S. District Court for the Northern District of California (Case No. 20-cv-02901-RS).
7. September 20, 2021. Expert Deposition. Senne et al. v. Office of the Commissioner of Baseball, et al. U.S. District Court for the Northern District of California (Case No. 3:2014-cv-00608).
8. October 8, 2021. Expert Deposition. Fishon et al. v. Peloton Interactive, Inc. United States District Court, Southern District of New York (Case No. 1:19-CV-11711-LJL).
9. October 25, 2021. Expert Deposition. IN RE KIND LLC "Healthy and All Natural" Litigation. United States District Court, Southern District of New York (15-MD-2645 (WHP)).
10. October 26, 2021. Expert Deposition. IN RE: FCA US LLC Monostable Electronic Gearshift Litigation. United States District Court, Eastern District of Michigan Southern Division (Case No. 16-md-02744).
11. November 4, 2021. Expert Deposition.  IN RE: FISHER-PRICE ROCK 'N PLAY SLEEPER MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION, United States District Court, Western District of New York (Case No. 1:19-md-2903).
12. November 29, 2021. Expert Deposition. Sharpe et al. v. A & W Concentrate Company and Keurig Dr. Pepper Inc. (E.D.N.Y.) (Civil Action No. 19-cv-00768 (BMC)).
13. March 10, 2022. Expert Deposition. Montera [Fishon] et al. v. Premier Nutrition Corp. U.S. District for the Northern District of California, San Francisco Division (Case No. 3:16-CV-06980 RS).
14. March 24, 2022. Expert Deposition. Testone et al. v. Barlean's Organic Oils, LLC. U.S. District for the Southern District of California (Case No: 19-cv-0169-JLS-BGS).

15. May 27, 2022. Trial Testimony. Montera [Fishon] et al. v. Premier Nutrition Corp. U.S. District for the Northern District of California, San Francisco Division (Case No. 3:16-CV-06980 RS).
16. June 17, 2022. Expert Deposition. Hall v. Marriott International, Inc. U.S. District for the Southern District of California (Case No.: 3:19-cv-01715-JLS-AHG).
17. September 9, 2022. Trial Testimony. IN RE: FCA US LLC Monostable Electronic Gearshift Litigation. United States District Court, Eastern District of Michigan Southern Division (Case No. 16-md-02744).
18. September 19, 2022. Expert Deposition. Anne De Lacour et al. v. Colgate-Palmolive Co., and Tom's of Maine Inc.  United States District Court, Southern District of New York (16 Civ. 8364 (RA) (AJP)).
19. January 24, 2023. Expert Deposition. IN RE: FOLGERS COFFEE MARKETING LITIGATION. U.S. District for the Western District of Missouri (Civil Action No.: 21-2984-MD-C-BP).
20. January 29, 2023. Expert Deposition. Bush et al. v Rust-Oleum Corp., U.S. District for the Northern District of California (Case No. 3:20-cv-03268-LB).
21. April 3, 2023. Expert Deposition. Freeman v. MAM USA Corp., U.S. District for the Northern District of Illinois, Eastern Division (Case No.: 1:20-cv-01834).
22. April 6, 2023. Expert Deposition. Barbera v. Olé Mexican Foods Inc., U.S. District for the Central District of California (Case No.: 5:20-cv-02324-JGB (SPx)).
23. April 14, 2023. Expert Deposition. Corbett et al. v. Pharmacare U.S., Inc., U.S. District for the Central District of California (Case No.: 3:21-cv-00137-JES-AHG).
24. April 21, 2023. Expert Deposition. Moore v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC, Pfizer Inc., U.S. District Court for the Northern District of California (Case No.: 4:20-cv-09077-JSW).
25. May 25, 2023. Expert Deposition. Rusoff v. The Happy Group, Inc., U.S. District Court for the Northern District of California (Case No.: 4:21-cv-08084-YGR).
26. July 14, 2023. Expert Deposition. Miller et al. v. Travel Guard Group, Inc., AIG Travel, Inc., and National Union Fire Insurance Company of Pittsburgh, PA, U.S. District for the Northern District of California (Case No. 3:21-cv-09751-TLT).
27. September 22, 2023. Expert Deposition. Patane et al. v. Nestle Waters North America, Inc., U.S. District Court of Connecticut (Case No. 3:17-CV-01381 (JAM).
28. October 6, 2023. Expert Deposition. Cadena et al. v. American Honda Motor Company, Inc., U.S. District for the Central District of California (Case No.: 2:18-cv-04007-MWF-MAA).
29. October 16, 2023. Expert Deposition. Howard et al. v. Hain Celestial Group, Inc., U.S. District Court for the Northern District of California (Case No.: 3:22-cv-527-VC).
30. November 16, 2023. Expert Deposition. Glassman et al. v. Edgewell Personal Care, LLC., U.S. District Court for the Northern District of California (Case No.: 3:21-cv-07669-RS).
31. January 11, 2024. Expert Deposition. Iglesias et al. v. For Life Products, LLC., U.S. District Court for the Northern District of California (Case No.: 3:21-cv-01147-TSH).
32. March 14, 2024. Expert Deposition. Banks et al. v. R.C. Bigelow, Inc., U.S. District for the Central District of California (Case No. 20-cv-06208 DDP (RAOx)).
33. July 24, 2024. Expert Deposition. Sunderland et al. v. Pharmacare, U.S. and Pharmacare Laboratories PTY LTD., U.S. District Court for the Southern District of California (Case No.: 23cv1318-JES (AHG)).
34. August 2, 2024. Expert Deposition.  Favell et al. v. University of Southern California, U.S. District Court for the Central District of California, Western Division (Case No.: 2:23-cv-00846-SPG-MAR).
35. October 14, 2024. Expert Deposition. VanCleave et al. v. Abbott Laboratories, Superior Court of the State of California, County of Santa Clara (Case No.: 19CV345045).
36. November 13, 2024. Expert Deposition. Wallenstein et al. v. Mondelez International, U.S. District Court for the Northern District of California (Case No.: 3:22-cv-06033).
37. February 5, 2024. Testimony at Trial. VanCleave et al. v. Abbott Laboratories, Superior Court of the State of California, County of Santa Clara (Case No.: 19CV345045).


Dissertation

"The Politics of Kidney Transplantation," Department of Political Science, University of Chicago, June 1992.  Chair:  Professor Jon Elster.  Published at https://sites.google.com/site/jmichaeldennis/home.


Publications

Fulton, B., Bilgen, I., Pineau, V., Liebert, L., King, D., & Dennis, M. 2022. "Evaluating Nonresponse Bias for a Hypernetwork Sample Generated from a Probability-Based Household Panel." Journal of Quantitative Methods, 6(2).

Michaels, Stuart, Vicki Pineau, Becky Reimer, Nadarajasundaram Ganesh, and J. Michael Dennis. 2019. Test of a Hybrid Method of Sampling the LGBT Population: Web Respondent Driven Sampling with Seeds from a Probability Sample. Journal of Official Statistics 35(4):731-752.

Cantrell J, Hair E. C., Smith, A., Bennett M., Rath, J.M., Thomas, R.K., Fahimi, M., Dennis, J.M., and Vallone, D. 2018. Recruiting and Retaining Youth and Young Adults: Challenges and Opportunities in Survey Research for Tobacco Control. Tobacco Control 27(2).

Josh Pasek, S. Mo Jang, Curtiss L. Cobb III, J. Michael Dennis, and Charles DiSogra. 2015. Can Marketing Data Aid Survey Research? Examining Accuracy and Completeness in Consumer-File Data. Public Opinion Quarterly. 78 (4): 889-916.

DiSogra, Charles. Curtiss Cobb, Elisa Chan, and J. Michael Dennis. 2011. "Calibrating Non-Probability Internet Samples with Probability Samples Using Early Adopter Characteristics." Joint Statistical Meetings: 4501-4515.

Baker, Reginald, Stephen J. Blumberg, J. Michael Brick, et al. 2010. AAPOR Report on Online Panels. Public Opinion Quarterly 74(4):711-781.

Sanders, Alan R., Douglas F. Levinson, Jubao Duan, et al. 2010. The Internet-based MGS2 Control Sample: Self Report of Mental Illness. American Journal of Psychiatry 167(7) 854-865.

Timothy Heeren, Erika M. Edwards, J. Michael Dennis, Sergei Rodkin, Ralph W. Hingson, and David L. Rosenbloom. 2008. "A Comparison of Results from an Alcohol Survey of a Pre-recruited Internet Panel and The National Epidemiological Survey on Alcohol and Related Conditions." Alcoholism: Clinical and Experimental Research 32(2): 1-8.

J. Michael Dennis and Rick Li. 2007. More Honest Answers to Surveys? A Study of Data Collection Mode Effects. Journal of Online Research 10(7):1-15.

Tom W. Smith and J. Michael Dennis. 2005. "Online versus In-Person: Experiments with Mode, Format, and Question Wordings." Public Opinion Pros, December. Available at www.publicopinionpros.com/from_field/2005/dec/smithkn.asp.

Etzel Cardeña, J. Michael Dennis, Mark Winkel, and Linda J. Skitka. 2005. "A Snapshot of Terror: Acute Posttraumatic Responses to the September 11 Attack." Journal of Post-Traumatic Stress 6(2):69-84.

William E. Schlenger, Juesta M. Caddell, Lori Ebert, B. Kathleen Jordan, Kathryn M. Rourke, David Wilson, Lisa Thalji, J. Michael Dennis, John A. Fairbank, Richard A. Kulka. 2002. "Psychological Reactions to Terrorist Attacks: Findings from the National Study of Americans' Reactions to September 11." Journal of the American Medical Association, 288(5): 1235-1244.

J. Michael Dennis. 2001. "Are Internet Panels Creating Professional Respondents?" Marketing Research Summer: 484-488.

J. Michael Dennis, Martin Frankel, Nancy A. Mathiowetz, Candice Saulsberry, Philip J. Smith, K.P. Srinath, Ann-Sofi Rodén, and Robert A. Wright. 1999. "Analysis of RDD Interviews by the Number of Call Attempts: The National Immunization Survey." Proceedings of the Section on Survey Research Methods, American Statistical Association.

J. Michael Dennis, Victor G. Coronado, Martin Frankel, Ann-Sofi Rodén, Candice Saulsberry, Howard Speizer, and Robert A. Wright. 1998. "The Use of an Intranet to Manage a Telephone Survey." Proceedings of the Section on Survey Research Methods, American Statistical Association.

4

Paul Buckley, J. Michael Dennis, Candice Saulsberry, Victor G. Coronado, Trena Ezzati-Rice, Edmond Maes, Ann-Sofi Rodén, and Robert A. Wright. 1998. "Managing 78 Simultaneous RDD Samples." Proceedings of the Section on Survey Research Methods, American Statistical Association.

Alan J. White, Ronald J. Ozminkowski, Andrea Hassol, J. Michael Dennis, and Michael Murphy. "The Effects of New York State's Ban on Multiple Listing for Cadaveric Kidney Transplantation." Health Services Research 33 (June, 1998).

Alan J. White, Ronald J. Ozminkowski, Andrea Hassol, J. Michael Dennis, and Michael Murphy. "The Relationship Between Multiple Listing and Cadaveric Kidney Transplantation and the Effects of a Multiple Listing Ban." Transplantation Reviews, II (April 1997): 76-84.

J. Michael Dennis, Ph.D. "Scarce Medical Resources: Hemodialysis and Kidney Transplantation," in Jon Elster, ed., Local Justice in America, New York, NY: Russell Sage Foundation, 1995.

J. Michael Dennis, Patricia Hanson, Ernest E. Hodge, Ruud A.F. Krom, Robert M. Veatch, "An Evaluation of the Ethics of Presumed Consent and a Proposal Based on Required Response," UNOS Update 10 (February, 1994): 10-15-18.

J. Michael Dennis. "Surgeons Under Surveillance: Dialysis and Transplantation in the U.S.," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London: Pinter, 1994.

J. Michael Dennis. "The Colour of Genes in the U.S.," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London: Pinter, 1994.

J. Michael Dennis. "Three Countries, Three Systems," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London: Pinter, 1994.

Michael P. Battaglia, Mary Cay Burich, J. Michael Dennis, Marcia Russell, Hal Yahoo, Page Chapel, "The Prevalence of Alcohol and Other Drug Abuse and Dependence in Short-Term General Hospitals," 1993 Proceedings of the International Conference on Establishment Surveys, American Statistical Association (1993): 569-572.

J. Michael Dennis. "Government Regulations 'Politicizing' Transplantation," Nephrology News & Issues 6 (September 1992): 48.

J. Michael Dennis. "A Review of Centralized-Rule Making in American Transplantation," Transplantation Reviews 6 (April 1992): 130-137.

Selected Papers

Dennis, J. Michael, John Dombrowski, Kathleen Hall Jamieson, Josh Pasek and Kenneth Winneg. Disentangling Mode Effects and Mode Differences in Recruitment: Randomizing Survey Mode at the Margins and Testing Discontinuities. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research.

Bilgen, Ipek, J. Michael Dennis, Nada Ganesh, Edward Mulrow, Vicki Pineau, Mark Watts and Michael Yang. Estimation Methods for Combining Probability and Nonprobability Samples. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Stephanie Jwo, Rosalind Koff, Stuart Michaels, Vicki Pineau and Becky Reimer. Comparing Two RDS Approaches to Extend the Reach of a Probability-Based Panel. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research..

J. Michael Dennis. Panel-based Probability Alternatives for Sampling Racial and Ethnic Minorities. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

5

Ipek Bilgen, J. Michael Dennis, and Nada Ganesh. Examination of Nonresponse Follow-up (NRFU) Impact on AmeriSpeak Panel Data Quality and Study Estimates. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

David Sterrett, Dan Malato, Jennifer Benz, Ipek Bilgen, J. Michael Dennis, and Vicki Pineau. Exploring the Methodological Tradeoffs of Mixed-Mode Surveys with an Experimental Design.   Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Ipek Bilgen, J. Michael Dennis, and Tom Smith.  Comparing the Probability-Based AmeriSpeak Panel and the In-Person 2016 General Social Survey: Mode, Device, Item Wording Experiments. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Nadarajasundaram Ganesh, Vicki Pineau, J. Michael Dennis. 2017. Managing Respondent Burden for a Household Panel using Permanent Random Number Sampling.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Pineau, Vicki, J. Michael Dennis, Stuart Michaels, Sherry Emery, Nadarajasundaram Ganesh. 2017. Surveying Rare or Hidden Populations Using a Probability-based Household Panel. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Pineau, Vicki, Paul J. Lavrakas, and J. Michael Dennis.  2017.  Deploying a Total Survey Error (TSE) and Total Survey Quality (TSQ) Assessment of the AmeriSpeak® Panel.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Reimer, Becky, Jennifer Benz, Trevor Tompson, Liz Kantor, Rosalind Koff, J. Michael Dennis, Emily Swanson, David Pace, 2017. Testing A New Methodology for Exit Polling: A National, Panel-based Experiment. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Malato, Dan, Jennifer Benz, Trevor Tompson, J. Michael Dennis, Vicki Pineau, Nadarajasundaram Ganesh.  2017. Impact of Mixed-Mode Recruitment and Data Collection on Sample Representativeness and Survey Estimates for a Probability-based Household Panel.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Barron, Martin and J. Michael Dennis. 2016. Multi-Client Household Panel Quality:  The Case of AmeriSpeak." Presented at the 2016 Annual Meeting of the American Association for Public Opinion Research.

Ganesh, N., J. Michel Dennis, and Paul J. Lavrakas. 2016.  Using Nonresponse Follow-up Recruitment to Help Build a Probability-based Research Panel.  Presented at the 2016 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Angela Fontes, Kean Chew, Paul J. Lavrakas, Nada Ganesh. 2015. "Boosting Probability-Based Web Survey Response Rates via Nonresponse Follow-Up." Presented at the 2015 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Kathleen Connolley, and Stephanie Jwo.  "Online Survey Sampling Solutions for Studies of LGB."  Presented at the 2013 Chicago Annual Workshop on Biomeasures Collection in Population-Based Health and Aging Research hosted by the Chicago Core on Biomeasures in Population-Based Health and Aging Research (CCBAR), October 17, 2013.

Dennis, J. Michael, Curtiss Cobb III.  "How Far Have We Come? The Lingering Digital Divide and Its Impact on the Representativeness of Internet Surveys."  Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Curtiss Cobb III, Michael Lawrence, and Jordon Peugh. "The Prevalence and Impact of Self-Selection Bias and Panel Conditioning on Smoker Studies Using Established Internet Panels." Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.

6

Pasek, Josh, J. Michael Dennis, and Curtiss Cobb III. "Consumer File Ancillary Data and Nonresponse Adjustment: Assessing the Consistency of Estimates Across Weighting Strategies."  Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.   Submitted for publication.

Pasek, Josh. Seung Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. "Can Microtargeting Improve Survey Sampling?  An Assessment of Accuracy and Bias in Consumer File Marketing Data." Presented at the 2012 Annual Meeting of the American Political Science Association.

Disogra, Charles. J. Michael Dennis and Mansour Fahimi. 2012 "Using Ancillary Information in National ABS Samples to Recruit Hard-to-Reach Young Adults and Hispanics." Presented at the 2012 Hard to Reach Conference sponsored by the American Statistical Association.

Lavrakas, Paul J. J. Michael Dennis, Jordan Peugh, Jeffrey Shand-Lubbers, Elissa Lee, Owen Charlebois and Mike Murakami. 2012 "An Experimental Investigation of the Effects of Noncontingent and Contingent Incentives in Recruiting a Long-Term Panel: Testing a Leverage Salience Theory Hypothesis." Presented at the 2012 Midwest Association for Public Opinion Research.

Pasek, Josh. Seung Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. 2012  "How Accurate is Micro-Targeting? An Assessment of Marketing Data Bias for Political and Survey Purposes." Presented at the 2012Annual Conference of the American Association for Public Opinion Research and the 2012 Annual Conference of the American Political Science Association.

Dennis, J. Michael. Charles DiSogra and Erlina Hendarwan. 2012. "Using Ancillary Information to Stratify and Target Young Adults and Hispanics in National ABS Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research and the 2012 Hard to Reach Conference.

Pasek, Josh. S. Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. 2012. "The Public According to Marketers: Imputing National Demographics From Marketing Data Linked to Address-Based Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Shand-Lubbers, Jeff. J. Michael Dennis, Jordon Peugh, Liz Brisson and Zabe Bent. 2012 "The Use of Online Methodology to Inform Public Policy Planning: A Case Study from San Francisco." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Lavrakas, Paul. J. Michael Dennis, Jordon Peugh, Jeff Shand-Lubbers, Elissa Lee and Owen Charlebois. 2012. "Investigating Non-response Bias in a Non-response Bias Study." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Lavrakas, Paul. J. Michael Dennis, Jordon Peugh, Jeff Shand-Lubbers, Elissa Lee and Owen Charlebois. 2012. "Experimenting with Non-contingent and Contingent Incentives in a Media Measurement Panel." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

DiSogra, Charles. Curtiss Cobb, Elisa Chan, and J. Michael Dennis. 2012 "Using Probability-Based Online Samples to Calibrate Non-Probability Opt-in Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Dennis, J. Michael. Yelena Kruse, and Trevor Tompson. 2011. "Examination of Panel Conditioning Effects in a Web-Based 2007-2008 Election Study." Presented at the 2011 Annual Conference of the American Association for Public Opinion Research.

Zukin, Cliff, Jessica Godofsky, Carl Van Horn, Wendy Mansfield, and J. M. Dennis. 2011. "Can a Non-Probability Sample Ever be Useful for Representing a Population? Comparing Probability and Non-Probability Samples of Recent College Graduates."  Presented at the 2011 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/docs/aapor2011/aapor11-can-a-non-probability-sample.pdf

7

Baker, Reg. Stephen Blumberg, J. Michael Brick, Mick P. Couper, Melanie Courtright, J. Michael Dennis, Don Dillman, Martin R. Frankel, Philip Garland, Robert M. Groves, Courtney Kenned, Jon Krosnick, Sunghee Lee, Paul J. Lavrakas, Michael Link, Linda Piekarski, Kumar Rao, Douglas Rivers, Randall K. Thomas, and Dan Zahs. 2010 "AAPOR Report on Online Panels." The Final Report of the AAPOR Online Panel Task Force.  Prepared for the American Association for Public Opinion Research,  March, 2010.

Dennis, J. Michael, "Using Ancillary Data Available for Address-Based Sampling to Measure Self-Selection Bias" Paper presented to the International Workshop on Using Multi-level Data from Sample Frames, Auxiliary Databases, Paradata and Related Sources to Detect and Adjust for Nonresponse Bias in Surveys, Chicago, June, 2011.

Dennis, J. Michael, Jordon Peugh, and Pat Graham. 2010. "KnowledgePanel Calibration: Using KnowledgePanel to Improve the Sample Representativeness and Accuracy of Opt-in Panel Data." Available at http://www.knowledgenetworks.com/ganp/docs/KN-Calibration-Research-Note-2010-03-02.pdf

Dennis, J. Michael. 2010. "KnowledgePanel®: Processes & Procedures Contributing to Sample Representativeness & Tests for Self-Selection Bias."  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael, and Charles A. DiSogra. 2010. "Does Providing Internet Access to Non-Internet Households Affect Reported Media Behavior for Latinos and Non-Latinos?  Results from a Six-Month Longitudinal Survey." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

DiSogra, Charles, J. Michael Dennis, and Mansour Fahimi. 2010. "On the Quality of Ancillary Data Available for Address-Based Sampling." Presented at the 2010 Joint Statistical Meetings, Vancover.  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Kruse, Yelena, Erlina Hendarwan, J. Michael Dennis, and Charles A. DiSogra. 2010. "Analysis of Late Responders to Probability-based Web Panel Recruitment and Panel Surveys." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Garrett, Joe, J. Michael Dennis, and Charles A. DiSogra. 2010. "Non-response Bias: Recent Findings from Address-based Panel Recruitment." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research.  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael, Larry Osborn, and Karen Semans. March 2009. "Comparison Study of Early Adopter Attitudes and Online Behavior in Probability and Non-Probability Web Panels."  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael. 2009. "Description of Within-Panel Survey Sampling Methodology: The Knowledge Networks Approach."  Available at http://www.knowledgenetworks.com/ganp/docs/KN-Within-Panel-Survey-Sampling-Methodology.pdf.

Dennis, J. Michael, Trevor Tompson, Mike Henderson, and Yelena Kruse. 2009. "Measures of Non-Traditional Media Consumption During the 2008 Presidential Campaign."  Presented at the 2009 Annual Meeting of Midwest AAPOR, November 21, 2009.

Dennis, J. Michael, and Trevor Tompson. 2009. "Web Panel Studies of the 2008 Election: New Opportunities for Causal Analysis of Dynamic Change in the Electorate." Presented at the 2009 Annual Conference of the American Association for Public Opinion Research.  Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Kruse, Yelena, Mario Callegaro, J. Michael Dennis, Stefan Subias, Mike Lawrence, Charles DiSogra, and Trevor Tompson. 2009. "Panel Conditioning and Attrition in the AP-Yahoo! News Election Panel Study." Presented at the

8

2009 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

J. Michael Dennis, Rick Li and Joe Hadfield. 2007. "Results of a Within-Panel Survey Experiment of Data Collection Mode Effects Using the General Social Survey's National Priority Battery." Presented at the 2007 Annual Conference of the American Association for Public Opinion Research.

J. Michael Dennis and Rick Li. 2005. "Results from a Knowledge Networks' Question Wording Experiment for Political Party Identification." Available at http://www.knowledgenetworks.com/ganp/docs/kn-party-id-experiment-022805.pdf

J. Michael Dennis, Cindy Chatt, Rick Li, Alicia Motta-Stanko, Paul Pulliam. 2005. "Data Collection Mode Effects Controlling for Sample Origins in a Panel Survey: Telephone versus Internet." Available at http://www.knowledgenetworks.com/ganp/rtimode.html.

J. Michael Dennis and Rick Li. 2004. "Health Condition Prevalence Rates Between National Health Interview Survey (NHIS) and Knowledge Networks (KN)." Available at http://www.knowledgenetworks.com/ganp/docs/KNvsNHIS2.pdf

J. Michael Dennis and Rick Li. 2004. "Weighting Procedures Used for the Veterans Administration Prescription Medication Study." Available at http://www.knowledgenetworks.com/ganp/docs/061604_Weighting-Description.pdf

J.Michael Dennis, Rick Li, and Cindy Chatt, 2004. "Benchmarking Knowledge Networks' Web-Enabled Panel Survey of Selected GSS Questions Against GSS In-Person Interviews." Knowledge Networks Report, February 2004. Available at http://www.knowledgenetworks.com/ganp/docs/GSS02-DK-Rates-on-KN-Panel-v3.pdf

Vicky Pineau and J. Michael Dennis. 2004. "Methodology for Probability-Based Recruitment for a Web-Enabled Panel." Knowledge Networks Report

J. Michael Dennis. 2003. "Panel Attrition Impact: A Comparison of Responses to Attitudinal and Knowledge Questions about HIV Between Follow-up and Cross-Sectional Samples." Available at http://www.knowledgenetworks.com/ganp/docs/HIV-Study-Panel-Attrition-Impact-Research-Note-2003.pdf

J. Michael Dennis, Rick Li, J.R. DeShazo and Trudy Ann Cameron. 2003. "Correcting for Sample Bias in Internet Panel Surveys based on RDD Sampling." Presented at the Joint Statistical Meetings, August 2003

Dennis, J. Michael, Rick Li. 2003. "Effects of Panel Attrition on Survey Estimates." Presented at the 2003 Annual Conference for the American Association for Public Opinion Research.


Selected Workshops, Expert Panels, and Seminars

Workshop Participant. Mapping the Global Online Probability based Panel Landscape. RISCAPE Workshop. Amsterdam, Netherlands.  December 11-12, 2019.

Member, Expert Panel.  New Direction for the National Household Travel Survey. Sponsored by the Federal Highway Administration. 2018-Present.

Featured Speaker.  AARP "Think In" on Surveys of Asian Americans and Pacific Islanders.  July 23-24, 2018. Washington, DC.

Expert Panel Participant, National Survey of Family Growth, U.S. Centers for Disease Control and Prevention, April 30, 2018 – May 1, 2018.

Panel Participant and Featured Speaker.  "Workshop:  Harnessing Technology to

Reduce Attrition in Panel Surveys." Inter-American Development Bank.  Washington DC, October 2, 2017.

Featured Speaker.  Briefing Congress on the Legal Services Corporation New Report on *The Justice Gap: Measuring the Unmet Civil Legal Needs of Low-Income Americans.*  Russell Senate Building, Washington DC, June 14, 2017.

Panel Participant in an Invited Panel Session entitled "Better, Faster, Smarter – Maintaining Research Quality in a World of Intense Budget Pressure."  Annual Meeting of the Southern Association for Public Opinion.  October 10, 2013.

 "The NCRM Network of Methodological Innovation Web surveys for the general population: How, why and when?"  Workshop hosted by the University of Essex, Colchester, UK.  Presented the paper "Recommendations for Establishing a National Online Panel in the UK."  June 6-7, 2013.

"The Data Collection of the Future Has Already Started."  Seminar hosted by Willem Saris, RECSM, Universitat Pompeu Fabra in Barcelona.  Presented the paper  "Best Practices for Population-Based Online Surveys: Review of U.S. Methods Research."  July 2011.

"An International Workshop on Using Multi-level Data from Sample Frames, Auxiliary Databases, Paradata and Related Sources to Detect and Adjust for Nonresponse Bias in Surveys."  Sponsored by the National Science Foundation and hosted by NORC in Chicago.  June 2011.

"Innovative Survey Methods Workshop." Sponsored by the U.S. Department of Homeland Security and the Institute for Homeland Security Solutions.  December 2009.

"Sample Representativeness:  Implications for Administering and Testing Stated Preference Surveys."  Sponsored by EPA Cooperative Agreement CR83299-01 with the National Center for Environmental Economics, U.S. Environmental Protection Agency.  Hosted by the Resources for the Future. October 2, 2006.

"Recurring Surveys: Issues and Opportunities." Sponsored by the National Science Foundation. March 28-29, 2003.

Selected Guest Lecturer Assignments

George Washington University, University of California, Irvine, University of California, Berkeley, University of Michigan, University of Maryland, University of Pennsylvania, University of Southern California (USC), University of Texas, Austin, Stanford University.

Educational Honors
Century Fellowship, University of Chicago (1985-1988)
Phi Beta Kappa, University of Texas (1984-1985)
Honors in Government, University of Texas (1984)
Chapter President, Pi Sigma Alpha, University of Texas (1983-1984)
William Jennings Bryan Essay Winner, College of Liberal Arts, University of Texas (1983 and 1984)


Affiliations

American Association for Public Opinion Research (1992-), American Statistical Association, Member, AAPOR Online Task Force Report (2009-2010),  Chairman, Presumed Consent Subcommittee, Ethics Committee, UNOS (1992-1995), Member of Ethics Committee, the United Network for Organ Sharing (1992-1995), Member of Region 7, the United Network for Organ Sharing (1992-1995), American Political Science Association (1985-1994)