# EXHIBIT D
# REDACTED
## (Proposed Redactions Submitted Under Seal)

```
 1                 UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

 4   DAVID SWARTZ, as an individual,
     on behalf of himself, the
 5   general public, and those
     similarly situated,
 6
                 Plaintiffs,
 7
        vs.                       ÁÁ  Case No. 4:21-cv-10053-YGR
 8
     DAVE'S KILLER BREAD, INC.,
 9   and FLOWERS FOODS, INC.,

10               Defendants.
     _____/
11

12        DEPOSITION OF VALERIE WAYLAND

13      TAKEN REMOTELY BY VIDEOCONFERENCE

14         Friday, November 15, 2024

15              CERTIFIED COPY

16           ÁÁ- CONFIDENTIAL -

17

18


19   STENOGRAPHICALLY REPORTED BY:
     MARY ANN PAYONK, CSR NO. 13431
20

21

22

23
              NOGARA REPORTING SERVICE
24        150 Sutter Street, P.O. Box 538
            San Francisco, California 94105
25                 (415) 398-1889
```

**CONFIDENTIAL**

```
 1                    INDEX TO EXAMINATION
 2   VALERIE WAYLAND                                    PAGE
 3        Examination by Attorney Backer                  5
 4
 5                     INDEX TO EXHIBITS
 6   Exhibit No. 73   Dave's Killer Bread,               19
 7                    Plaintiff's Third Amended
 8                    Notice of 30(b)(6) Deposition
 9   Exhibit No. 74   DKB Amended Complaint              28
10   Exhibit No. 75   Document titled Good Seed One      35
11                    Loaf
12   Exhibit No. 76   Letchinger declaration             74
13   Exhibit No. 77   ███████████ 2/1/2017               95
14                    PDCAAS analysis
15   Exhibit No. 78   February 2917 ███████████          96
16                    PDCAAS report
17   Exhibit No. 79   2/8/2017 email chain              105
18   Exhibit No. 80   21 CFR 101.9                      119
19   Exhibit No. 81   3/18/2020 email chain             133
20   Exhibit No. 82   January 2018 email chain          154
21   Exhibit No. 83   12/10/2018 email                  165
22   Exhibit No. 84   3/5/2021 email                    212
23
24
25
```

1  those communications, but I understand that you've made
2  your point on the record.
3  BY ATTORNEY BACKER:
4      Q.   So let's begin with the question that I asked.
5           Are you currently employed?
6      A.   Yes, I am.
7      Q.   And what's the name of the company that you
8  work for?
9      A.   Flowers Bakeries LLC.
10     Q.   Okay.  And when did you first start working
11 for Flowers Bakeries?
12     A.   I began my employment with Flowers in 1994.
13     Q.   Okay.  And what was your initial job title?
14     A.   I believe it was technical services manager.
15     Q.   And what is your current job title?
16     A.   Director, corporate regulatory compliance.
17     Q.   And how long have you held that title?
18     A.   Current title?  I've held that for
19 approximately four years.
20     Q.   And what are your duties in that role?
21     A.   In that role, I'm responsible for the
22 regulatory compliance for the product.  It does not go
23 into safety issues.  It's all about the product, so it's
24 compliance with the product, information that's on the
25 labels, like kosher certifications, statements.  But

1   it's all compliance with the product itself.
2       Q.   And compliance with FDA regulations?
3       A.   FDA regulations or compliance with any other
4   regulations that surround the product.  So if there's
5   organic certifications or kosher certifications,
6   anything that's on the product label.
7       Q.   Do you report to anyone?
8       A.   Yes, I do.
9       Q.   Who?
10      A.   I report to Molly Schmidt, and she is the
11  senior VP of quality, regulatory, and food safety.
12      Q.   And does anyone report to you?
13      A.   Yes.
14      Q.   Who?
15      A.   I have four direct -- three direct reports.
16  Do you need their titles?
17      Q.   Yes, please.
18      A.   The first one is Clemente Arellano, and he is
19  a compliance coordinator.  I have LaShay Singletary, and
20  she is a labeling coordinator.  And I have Tracy
21  Oscatharp Barnes, and she is a labeling coordinator
22  also.
23      Q.   What was your job title before you became
24  director of corporate regulatory compliance?
25      A.   I was director of regulatory compliance.

1    FLO20851. Let's mark this as Plaintiff's Exhibit 81.

2    It's Bates marked FLO20851 through 55.

3        (Exhibit No. 81 was marked for identification.)

4        THE WITNESS: I have the document.

5    BY ATTORNEY BACKER:

6       Q. What is this document?

7       A. This document appears to be a series of emails

8    disseminated throughout the organization.

9       Q. And the last email is dated March 18, 2020,

10   right?

11       A. The very top email, yes.

12       Q. And that email was written by you?

13       A. Yes. My signature's on the email.

14       Q. Was it created in the ordinary course of

15   business?

16       A. Yes.

17       Q. Now, the first email responds to some other

18   emails that were from about three years earlier, in

19   2017, right?

20       A. Yes, in June of 2017.

21       Q. And if you go down to the first email in the

22   chain, generally what is happening here -- or actually,

23   why don't you go ahead and review the first email in the

24   chain.

25       A. Okay, I've read it.

1     referenced.
2              In this particular case with Liman stating
3     that she had sent information to AIB, I cannot assume
4     that she was requesting a 100-gram report.
5         Q.   All right.  So Ms. Liu goes on to state:  As I
6     know we cannot make any protein claim on the bag because
7     the wheat protein we use in the products has low PDCAAS
8     numbers that couldn't meet the claim requirement.
9              See that?
10        A.   I do see that.
11        Q.   Then Monique in here asks for clarification,
12    right?  And generally, she says that Ms. Liu is talking
13    about -- she asks if Ms. Liu is talking about the grams
14    of protein, right?
15             ATTORNEY RESCH:  Objection, document speaks
16    for itself.
17        A.   It shows here that Monique does ask the
18    question regarding the grams of protein on the bags.
19    BY ATTORNEY BACKER:
20        Q.   Okay.  Then the same day, Ms. Liu responds,
21    and she says:  In US, if we want to claim protein, we
22    need to claim as percent daily value, which we couldn't
23    meet the requirement after calculation.  We can still
24    put gram of protein on the bag, but that is not claim --
25    claimed protein.

1        Do you see that?

2    A.  I do see that.

3    Q.  So did you ever discuss that issue with her?

4    A.  I do not recall discussing that issue with

5 her.

6    Q.  Are you aware of anyone else from regulatory

7 discussing that issue with her?

8        ATTORNEY RESCH:  Object to form.

9    A.  In 2017, the discussions regarding regulatory

10 issues would have been with me, and I did not have a

11 conversation with Liman regarding this.

12 BY ATTORNEY BACKER:

13   Q.  All right.  So Liman asks Andrea Bouma to

14 weigh in.  And who is Andrea Bouma?

15   A.  Andrea's working in a product innovation

16 manager category at that time.  Capacity, I'm sorry, not

17 category.

18   Q.  And you worked with her, right?

19   A.  Yes, I did.

20   Q.  Was she one of your direct reports at the

21 time?

22   A.  No, she was not.

23   Q.  Who did she report to?

24   A.  I don't know specifically who she reported to.

25 I don't know her reporting structure at the time.

1   Q.   So Andrea writes: Placing the gram amount of
2  a nutrient on the front of the pack label does not
3  automatically make it a nutritional claim here in the
4  US.
5        See that?
6   A.   Yes, I see that.
7   Q.   Then she says she'll defer to our Flowers
8  regulatory guru, Val Wayland, on Canada, right?
9        See that?
10  A.   I see that.
11  Q.   Did she ask you to confirm the regulatory
12 differences and similarities for front of the pack
13 nutrient information, including protein for Canada?
14  A.   Yes.
15  Q.   Right?
16  A.   For Canada, yes.
17  Q.   What did you do to conform those similarities
18 and differences between US and Canadian regulations?
19       ATTORNEY RESCH:  Object to form.
20  A.   So given that this is from 2017, I can't tell
21 you what specifically I did.  But if I'm looking at this
22 email, there are citations in the email with regards to
23 the CFIA, which are the Canadian regulatory -- the
24 labeling regulations.
25  Q.   Did you consult US regulations?

1   A.   So you asked me what we did to review the
2   information.  Just I'm not clear on specifically -- we
3   have talked about the whole review process and what is
4   done and the information that's used to compare, so were
5   you asking me something different than that?
6   BY ATTORNEY BACKER:
7   Q.   I'm asking specifically what the regulatory
8   group did.
9   A.   In reviewing product labels for Dave's Killer
10  Bread?
11  Q.   The protein statements that were on the front
12  of the pack for Dave's Killer Bread products.
13  A.   So in reviewing the Dave's Killer Bread
14  labels, any statements on the front of pack would have
15  been reviewed for accuracy, and any labels that were
16  approved would have been approved based on the
17  information that we had on file that reflected that
18  information that was captured.
19  Q.   Did you ever have any concerns that a grams of
20  protein statement could be a protein claim that would
21  require a percent of daily value for protein?
22  A.   No, I did not.
23  Q.   Why not?
24  A.   Because the statement of fact on protein,
25  which is just a restatement of what is in the nutrition

1  facts panel, is not a claim as defined by FDA
2  regulations, which specifically state that claims have
3  to characterize the level of a nutrient in a product
4  with statements like high, good source, low in some
5  cases. But the statement just restating what was in the
6  nutrition facts panel was not considered a claim.
7      Q.  So why did Dave's Killer Bread and Flowers add
8  a percent of daily value to the labels in 2023?
9      A.  Well, in 2023 we voluntarily added percent DV.
10 So when we acquired the business in 2016, 2017, there
11 was information on the product label that we looked at,
12 and we updated labels based on what we thought should be
13 on the label.
14     We saw that there was a percent DV on the
15 product label that did not need to be required -- it was
16 not required to be on the label, so we took it off the
17 label.
18     Q.  Why did you add it back on?
19     A.  We added it back on once we had validated
20 information that the information that was presented on
21 the label was indeed a valid percent DV for the product.
22     So in 2017, there was a value on the label
23 that had not been validated and it was not required.  In
24 2023, we now had valid information that we had gone and
25 obtained and we were able to voluntarily include the

```
 1   was not a protein claim?
 2        A.   So the statement of grams on the nutrition
 3   facts label, per FDA regulation and per FDA guidance,
 4   per FDA training, per FDA information on their website,
 5   is not a claim.
 6        Q.   Move to strike as nonresponsive.
 7             I'm asking who at Flowers and Dave's Killer
 8   Bread decided that a grams of protein statement was not
 9   a protein claim.
10             ATTORNEY RESCH:  Object to form.  Asked and
11   answered.
12        A.   So the review of product labels is a
13   collaborative effort again, as I've stated.  And when
14   looking at the FDA regulations as a whole and
15   understanding what is a claim and what is not a claim,
16   it is clear that per FDA regulation, a statement, a pure
17   statement that doesn't quantify or imply a specific
18   health benefit or quantity of the product in
19   relationship to claims is not a claim.
20   BY ATTORNEY BACKER:
21        Q.   Does the company still believe that today?
22        A.   Yes, we do.
23        Q.   So going back to the email chain we were
24   discussing, Dan Letchinger responds to Andrea Bouma's or
25   Andrea Bouma's email, right?
```

```
 1          Q.   Well, you were aware that somebody at AIB
 2   disagreed with your take that a statement like 10 grams
 3   of protein per serving was not a protein claim, right?
 4               ATTORNEY RESCH:   Objection.   Asked and
 5   answered.   Form.
 6          A.   I don't know that anyone at AIB knew that I
 7   disagreed with their take.   I know that I disagreed with
 8   the statement that was made regarding that particular
 9   statement made by that particular person sending out the
10   newsletter.
11   BY ATTORNEY BACKER:
12          Q.   All right.  So further in this email, you go
13   on to state:   We have previously discussed this subject
14   at length and decided that protein callouts on the DKB
15   items in the current format would not constitute a
16   claim.
17               See that?
18          A.   I do see that.
19          Q.   Who's "we"?
20          A.   Since this is a conversation email between
21   myself and Dan Letchinger, my assumption would be that
22   this "we" is myself and Dan Letchinger.
23          Q.   Did you discuss it with anyone else?
24               ATTORNEY RESCH:   Object to form.
25          A.   This email chain as a whole shows
```

```
 1    conversations between numerous people that have all
 2    concurred that just stating the grams of protein on the
 3    product label is not a claim.
 4    BY ATTORNEY BACKER:
 5        Q.   Well, I'm asking about your discussions
 6    referenced here.  Are you referring to -- who --
 7             (Audio distortion - reporter clarification.)
 8    BY ATTORNEY BACKER:
 9        Q.   I'm asking about the discussions that you
10    referenced in your email to Dan Letchinger.
11             Who is a part of the discussions?
12        A.   So going back to 2018, I don't know
13    specifically who the "we" is other than Dan Letchinger
14    and myself, because the email is a conversation between
15    Dan and me.
16        Q.   So it's fair to say that you and Dan decided
17    that protein callouts on DK items -- DKB items would not
18    constitute a claim.
19             ATTORNEY RESCH:  Objection, misstates
20    testimony.  Form.
21        A.   There's no language here that says we decided.
22    It says we have previously discussed.
23    BY ATTORNEY BACKER:
24        Q.   And what does it say after "discussed"?
25        A.   It says we have previously discussed this
```

1   subject at length and declared that protein callouts --
2   callouts on the DKB items in the current format would
3   not constitute a claim.
4           Q.   So if "we" refers to you and Dan, sounds a
5   whole lot like you and Dan were the ones who decided
6   that a statement like 10 grams of protein per serving
7   was not a protein claim.
8                ATTORNEY RESCH:   Objection, argumentative.
9   Form.
10          A.   So I've mentioned earlier that any statements
11  or changes to a product label, information on a product
12  label, that information is reviewed, discussed, approved
13  collaboratively.
14               In the body of this email, there's discussions
15  of other people between themselves regarding that
16  statement that this is not a claim as used on the DKB
17  product label.
18  BY ATTORNEY BACKER:
19          Q.   Okay.   And who was involved with that?
20               ATTORNEY RESCH:   Object to form.
21          A.   Well, if I scroll down through the label, I
22  see Liman, Andrea, and Monique and the people that they
23  have copied.
24  BY ATTORNEY BACKER:
25          Q.   Who had the ultimate call?

```
1                ATTORNEY RESCH:  Objection, lacks foundation.
2   Vague.
3        A.    So labeling changes, new labels, information
4   on product labels is a collaborative effort within
5   Flowers.  So the labels are reviewed by R&D, by
6   purchasing, procurement, regulatory.  All of those folks
7   have a part in -- in determining what is on the product
8   label.
9   BY ATTORNEY BACKER:
10       Q.    Does Flowers rely on the procurement folks to
11  make regulatory decisions?
12               ATTORNEY RESCH:  Objection, vague.
13       A.    So the collaborative process that is used,
14  everyone brings their level of expertise.  So if there
15  were regulatory concern, then Flowers would rely on the
16  regulatory experts on the call.  If procurement is on
17  the call, or in the discussion, I should say, then they
18  would be speaking to other aspects of the product label,
19  not regulatory aspects.
20  BY ATTORNEY BACKER:
21       Q.    Okay. And the question of whether a statement
22  like 10 grams of protein per serving is a protein claim
23  or not, that's a regulatory question.
24              Fair?
25       A.    That would be a question that would be posed
```

```
1              REPORTER'S CERTIFICATE

2              I, MARY ANN PAYONK, shorthand reporter and

3   Notary Public, CA CSR No. 13431, do hereby certify that

4   the witness whose deposition is hereinbefore set forth

5   was sworn by agreement of all parties, that the

6   proceedings were reported stenographically by me, and

7   that this transcript is a true, correct, and full record

8   of the testimony given.

9              Further, that if the foregoing pertains to

10  the original transcript of a deposition in a Federal

11  Case, before completion of the proceedings, review

12  of the transcript [ ] was [X] was not requested.

13             I further certify that I am not related to

14  any of the parties to this action by blood or by

15  marriage, and that I am in no way interested in the

16  outcome of this matter.

17             IN WITNESS WHEREOF, I have hereunto set my

18  hand this 2nd day of December, 2024.

19

20             [signature: Mary Ann Payonk]

21             MARY ANN PAYONK, CSR #13431
```