# EXHIBIT F

1                UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4   DAVID SWARTZ, as an individual,
    on behalf of himself, the
5   general public, and those
    similarly situated,
6
                  Plaintiffs,
7
       vs.                      Case No. 4:21-cv-10053-YGR
8
    DAVE'S KILLER BREAD, INC.,
9   and FLOWERS FOODS, INC.,        **CONFIDENTIAL**

10                Defendants.
    _____/
11

12        REMOTE DEPOSITION OF

13         LaSHAY SINGLETARY

14      TUESDAY, FEBRUARY 27, 2024

15         **CERTIFIED COPY**

16

17

18   CONFIDENTIAL PROCEEDINGS PURSUANT TO PROTECTIVE ORDER

19

20

21

22      Reported by: CONNIE McCARTHY, CSR 13173, RMR, CRR

23

24             NOGARA REPORTING SERVICE
           150 Sutter Street, P.O. Box 538
           San Francisco, California 94105
25                (415) 398-1889

1    asked you a question and that question is pending,

2    I'll ask that you give me the answer before we take

3    the break.  Does that make sense?

4         A.   Yes.

5         Q.   Okay.  Is there any reason you can think of

6    that you cannot provide complete and accurate

7    responses to my questions today such as any type of

8    medication or anything else that's going on?

9         A.   No.

10        Q.   Okay.  Where are you currently employed?

11        A.   The location?

12        Q.   Thank you for clarifying.  What company are

13   you currently employed with?

14        A.   Flowers bakeries.

15        Q.   And where is that located?

16        A.   Thomasville, Georgia.

17        Q.   And what is your current role at Flowers?

18        A.   My job title?

19        Q.   Yes.

20        A.   Nutrition Labeling Coordinator II.

21        Q.   How long have you had that title?

22        A.   Approximately 16 years has been the same

23   position.  Although I have been analyst, coordinator.

24   That's kind of evolved.  But it's still the same

25   position that I've held.

1      Q.   And what does that role entail?

2      A.   I create the ingredient and nutrition facts

3   panels, and maintain those as well.

4      Q.   What does it mean to create the ingredient

5   panel?

6           MR. RESCH:  Objection, vague.

7           THE WITNESS:  You -- R&D provides a

8   finalized formula, and I process it and create an

9   ingredients statement that will be used on packaging.

10  BY MS. REYNOLDS:

11     Q.   And what does it mean, to process that

12  formula?

13     A.   To take the formula and analyze the

14  ingredients and quantities in that formula.  And we

15  have a system that, you know, that we just plug the

16  information into and it does some calculations to

17  list the ingredients and the predominance of how they

18  should be labeled on the ingredient statement.

19     Q.   What is the name of that system?

20     A.   We use an Excel spreadsheet that we call

21  IS File.

22     Q.   And so what is it that's in that IS File

23  that makes it so that it can create that ingredients

24  statement -- and let me rephrase that a little bit.

25  If I open an Excel sheet right now and I put in some

Case 4:21-cv-10053-YGR   Document 186-7   Filed 08/05/25   Page 5 of 18

1          MR. RESCH:  Objection, asked and answered.

2          THE WITNESS:  Another example that just

3    came to mind is low fat.  You may have to list out

4    additional fats.

5    BY MS. REYNOLDS:

6         Q.   Any other examples?

7         A.   Not that I can think of.

8         Q.   Okay, I think now's a good time for a

9    break.  Can we come back in, let's say, 10 minutes?

10          MR. RESCH:  Yep.

11          MS. REYNOLDS:  Okay.  Thank you.

12          COURT REPORTER:  Off the record.  Thank

13   you.

14          (Recess)

15          MS. REYNOLDS:  Okay, we'll go back on the

16   record here.  David, if you could pull up what will

17   be Exhibit 31, ending in 984.

18          (Whereupon, Exhibit No. 31 was designated

19   for identification)

20   BY MS. REYNOLDS:

21         Q.   Okay, Miss Singletary, if you'll go ahead

22   and click that link.  Let me know when you have the

23   document up.

24         A.   Okay, it's up.

25         Q.   Okay.  Go ahead and scroll through that.

Case 4:21-cv-10053-YGR   Document 186-7   Filed 08/05/25   Page 6 of 18

1    Let me know when you're ready.

2         A.    Okay.

3               Okay.

4         Q.    Okay.  Miss Singletary, have you seen this

5    document before?

6         A.    Yes.

7         Q.    What is this document?

8         A.    It is an email.

9         Q.    And I'll represent to you that this is a

10   document that was produced in this litigation.  Does

11   this appear to be a true and correct copy of the

12   document?

13        A.    Yes.

14        Q.    Did you meet with anyone at Flowers in

15   preparation for today's deposition?

16        A.    Yes.

17        Q.    Who did you meet with?

18        A.    Outside and inside counsel of Flowers.

19        Q.    And who were those people?

20        A.    Mike, Sam, and Robbie.

21        Q.    And that's Mike Resch, Robbie -- remind me

22   of his last name?

23              MR. RESCH:  Stubley.

24              MS. REYNOLDS:  Thank you.

25   BY MS. REYNOLDS:

Case 4:21-cv-10053-YGR   Document 186-7   Filed 08/05/25   Page 7 of 18

1    Q.   And Sam Diamant; is that right?

2    A.   Yes.  And Melissa Leonard as well.

3    Q.   How long did you meet for?

4    A.   We've met twice.  And yesterday for about

5    five hours.

6    Q.   Did you review documents in those meetings?

7    A.   Yes.

8    Q.   Did you review this document in that

9    meeting?

10         MR. RESCH:  Objection.  I think you need to

11   ask if it refreshed her recollection, any of the

12   documents.  Otherwise, the documents are privileged,

13   that may have been communicated and discussed with

14   counsel.

15   BY MS. REYNOLDS:

16   Q.   Did those documents that you reviewed

17   refresh your recollection?

18   A.   Yes.

19   Q.   Did you review this document?

20   A.   Yes.

21   Q.   Okay.  Do you see on the second page

22   an email from you to Liman dated January 26 at

23   9:57 a.m.?  And the kind of maybe third or fourth

24   sentence there says, Also, since there are no protein

25   claims, then we don't need PDCAAS values and the

1    percent DV for protein should not be included on the

2    product label.

3           Do you see that?

4    A.    Yes.

5    Q.    Before the break we were talking about

6    special circumstances that change what would be

7    required in the nutrition facts panel.  Do you

8    remember that?

9    A.    Yes.

10   Q.    Is a protein claim one of the special

11   circumstances that would change what is required in

12   the nutrition facts panel?

13          MR. RESCH:  Objection, vague.  Misstates

14   the prior testimony.

15          MS. REYNOLDS:  Speaking objection.

16   BY MS. REYNOLDS:

17   Q.    Go ahead.

18          MR. RESCH:  It's not a speaking objection.

19          MS. REYNOLDS:  Another one, another

20   speaking objection.

21   BY MS. REYNOLDS:

22   Q.    Go ahead.

23   A.    I'm sorry, can you repeat the question?

24   Q.    Yes.  Is a protein claim one of the special

25   circumstances that would change what is required in a

1    nutrition facts panel?

2              MR. RESCH:  Same objections.

3              THE WITNESS:  Yes.

4    BY MS. REYNOLDS:

5         Q.   What would change about the nutrition facts

6    panel requirements if there was a protein claim on a

7    product?

8              MR. RESCH:  Objection, lacks foundation.

9    Vague.

10             THE WITNESS:  The percent daily value for

11   protein would need to be -- need to be listed on the

12   nutrition facts panel.

13   BY MS. REYNOLDS:

14        Q.   And what are some examples of protein

15   claims?

16             MR. RESCH:  Objection, vague.  Lacks

17   foundation.

18             THE WITNESS:  An example would be, "Good

19   source of protein."

20   BY MS. REYNOLDS:

21        Q.   Can you think of any other examples?

22             MR. RESCH:  Same objection.

23             THE WITNESS:  "Excellent source of

24   protein."

25   BY MS. REYNOLDS:

1    Q.    Any others?

2         MR. RESCH:  Same objections.

3         THE WITNESS:  I don't know of any others.

4    BY MS. REYNOLDS:

5    Q.    Would "high in protein" be a protein claim?

6         MR. RESCH:  Objection, lacks foundation.

7    Vague.  Also speculation.  Calls for legal

8    conclusion.

9         MS. REYNOLDS:  You can just say objection

10   to form and all of those objections will be

11   preserved.

12   BY MS. REYNOLDS:

13   Q.    Now, would "high in protein" be a protein

14   claim?

15        MR. RESCH:  Same objections.

16        THE WITNESS:  I don't know.

17   BY MS. REYNOLDS:

18   Q.    How would you find out?

19   A.    I would ask.

20   Q.    Who would you ask?

21   A.    Today, I would ask Valerie Wayland.

22   Q.    And in 2018, who would you have asked?

23   A.    Sandi Evans.

24   Q.    You say in this email, We don't need PDCAAS

25   values.

```
 1              What is a PDCAAS value?

 2      A.    I'm not sure what that means.

 3      Q.    What did it mean in this email when you

 4   wrote it?

 5      A.    It was analytical information that I was

 6   directed that would be needed, so I asked R&D to

 7   provide that information.

 8      Q.    Who directed you that you would need that

 9   information?

10      A.    Sandi Evans.

11      Q.    What do you mean bring analytical

12   information?

13      A.    Analytical meaning a lab test, a physical

14   product.

15      Q.    Is a PDCAAS value something that you would

16   expect to receive for all Dave's Killer Bread

17   products?

18              MR. RESCH:  Objection, vague.

19              THE WITNESS:  I don't think so, no.

20   BY MS. REYNOLDS:

21      Q.    Do you know how protein is calculated for

22   the nutrition facts panel?

23      A.    Could you be more specific on your

24   question?

25      Q.    In 2018, did you know how protein was
```

1  calculated for nutrition facts panels?

2      A.   It was sent to AIB, a third party, and was

3  calculated by them.

4      Q.   But they did not provide PDCAAS values; is

5  that right?

6      A.   Correct.

7      Q.   Do you know what they were providing?

8      A.   The 100 gram report that they do for all

9  products.

10     Q.   Right.  My question is:  They didn't

11  provide PDCAAS.  Do you know what they were providing

12  instead of PDCAAS?

13         MR. RESCH:  Objection, asked and answered.

14  Vague.

15         THE WITNESS:  No.

16  BY MS. REYNOLDS:

17     Q.   Do you know how the percent daily value for

18  protein is calculated?

19     A.   No.

20     Q.   If you look at the email, Liman responds to

21  that 9:57 a.m. email at 2:36 p.m. on the same day.

22  She says, I have a question about the protein claims.

23  We put protein number on the front of bag.  For

24  example, 12 grams protein.  So doesn't that mean

25  claims?

1           MR. RESCH:  That was not read accurately.

2    BY MS. REYNOLDS:

3        Q.   Doesn't this mean claims?

4             If -- and then you respond --

5             MR. RESCH:  Still not accurate, Hayley.

6    It's just a little bit of a --

7             MS. REYNOLDS:  For the record, speaking

8    objection.

9    BY MS. REYNOLDS:

10       Q.   Then you respond, If I understood

11   correctly, calling out 12 grams of protein is okay

12   and not an actual claim.

13            Is that right?

14       A.   Yes.

15       Q.   Okay.  Your email says, If I understood

16   correctly.  What is that understanding based on?

17       A.   Based on the direction that I was provided.

18       Q.   Where did you receive that direction?

19       A.   Sandi Evans.

20       Q.   Did anything else inform this email in

21   which you say 12 g of protein is not an actual claim?

22       A.   Not that I know of.

23       Q.   Okay.  Can we pull up the next exhibit,

24   which will be Exhibit 32?  And that ends in 970.

25   //

1           (Whereupon, Exhibit No. 32 was designated

2      for identification)

3      BY MS. REYNOLDS:

4           Q.   Adding, and click on that.  And let me know

5      when you have it open.

6           A.   Okay, it's open.

7           Q.   Okay.  Go ahead and look over that and let

8      me know when you're ready.

9           A.   Okay, I've read it.

10          Q.   Have you seen this document before?

11          A.   Yes.

12          Q.   What is this document?

13          A.   An email.

14          Q.   And I'll represent to you that this was

15     produced in litigation.  Does it appear to be a true

16     and correct copy of the email exchange?

17          A.   Yes.

18          Q.   Did you review this document yesterday?

19          MR. RESCH:  Objection, calls for privileged

20     information.  Instruct the witness not to answer.

21     BY MS. REYNOLDS:

22          Q.   Yesterday you mentioned that you reviewed

23     documents that refreshed your recollection.  Is this

24     one of the documents that you reviewed?

25          MR. RESCH:  Same objection.  An instruction

1    to Sandi Evans; is that right?

2        A.    Yes.

3        Q.    And then Sandi Evans responds, saying,

4    Also, since there are no protein, quote, claims, then

5    we don't need PDCAAS values and the percent DV for

6    protein should not be included on the product label.

7            Do you see that?

8        A.    Yes.

9        Q.    Okay.  So is it correct then, just as you

10   just said, you get a question like this, you ask

11   Sandi and then you reported that information back to

12   Liman.  Is that what happened here between these two

13   email chains?

14       A.    Yes.

15       Q.    Okay.  Do you recall any other times where

16   the question of whether to include a percent daily

17   value for protein in the nutrition facts panel was

18   discussed?

19       A.    I do not.

20       Q.    Do Dave's Killer Bread products currently

21   have a percent daily value for protein in the

22   nutrition facts panel?

23       A.    They are in the process of adding it.

24       Q.    Prior -- or when did that process start?

25   Do you know?

1    Exhibit 31, where you and Liman are discussing the

2    requirement to include a percent daily value for

3    protein, and you said, if I understood correctly,

4    calling out 12 g of protein is okay and not an actual

5    claim, and that was in an email in 2018.

6              MR. RESCH:  Sorry, can you just give us a

7    second to pull that up, Hayley?

8              MS. REYNOLDS:  Sure.

9              MR. RESCH:  It's Exhibit 31.  And what's

10   the Bates label?

11             MS. REYNOLDS:  984 is the ending.

12             MR. RESCH:  One second.

13             Do you have that up?

14             THE WITNESS:  I do.

15             MR. RESCH:  Okay, thank you.

16             MS. REYNOLDS:  Uh-huh.

17   BY MS. REYNOLDS:

18        Q.   Okay, so I was just referencing back to the

19   statement that 12 g of protein is not an actual

20   claim.  And that was what you said in 2018.  Today,

21   is your understanding that 12 g of protein is not an

22   actual claim?

23             MR. RESCH:  Objection, lacks foundation.

24   Vague.

25             THE WITNESS:  To my understanding, that's

1    not a claim.

2    BY MS. REYNOLDS:

3         Q.    Do you have an understanding of why the

4    percent daily value for protein is now included in

5    the nutrition facts panel for --

6         A.    That was -- sorry -- that was the direction

7    that I was provided.  I was asked to add that to the

8    nutrition facts panels.  It was a company decision.

9         Q.    Who provided you that direction?

10        A.    Valerie Wayland.

11        Q.    And when she provided that direction, did

12   she say why the change was being made?

13             MR. RESCH:  I'll caution the witness not to

14   disclose any privileged information that may have

15   been communicated by Miss Wayland.  You can answer.

16             THE WITNESS:  I'm honestly not sure.  I'm

17   not sure.

18   BY MS. REYNOLDS:

19        Q.    Do you recall when she told you about this

20   change?

21        A.    2023.

22        Q.    Do you recall when in 2023?

23        A.    I don't know exactly when.

24        Q.    Was it the summer?

25        A.    The summer or after.  I think.

```
 1                    REPORTER CERTIFICATE

 2

 3              I, the undersigned, a Certified Shorthand

 4     Reporter of the State of California, do hereby

 5     certify:  That the foregoing proceedings were taken

 6     before me remotely at the time and place herein set

 7     forth; that any witnesses in the foregoing

 8     proceedings, prior to testifying, were duly sworn;

 9     that a record of the proceedings was made by me using

10     machine shorthand which was thereafter transcribed

11     under my direction; that the foregoing transcript is

12     a true record of the testimony given to the best of

13     my ability.

14              Further, that if the foregoing pertains to

15     the original transcript of a deposition in a Federal

16     Case, before completion of the proceedings, review

17     of the transcript [ ] was [X] was not requested.

18              I further certify I am neither financially

19     interested in the action nor a relative or employee

20     of any attorney or party to this action.

21     IN WITNESS WHEREOF, I have this date subscribed my

22     name.

23     Dated:  March 15, 2024

24                               _____
                                 CONNIE McCARTHY, RMR, CRR
25                               CSR No. 13173
```