MICHAEL L. RESCH (SBN 202909)
mresch@kslaw.com
LIVIA M. KISER (SBN 285411)
lkiser@kslaw.com
SAMUEL R. DIAMANT (SBN 288738)
sdiamant@kslaw.com
KELLY L. PERIGOE (SBN 268872)
kperigoe@kslaw.com
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, California 94111
Telephone: (415) 318-1200

REBECCA L. PARADIS (admitted *pro hac vice*)
rparadis@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006
Telephone: (202) 737-0500

QUYEN L. TA (SBN 229956)
quyen.ta@skadden.com
SKADDEN, ARPS, SLATE, MEAGHERS & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Telephone: (650) 470-4500

*Attorneys for Defendants*
*Dave's Killer Bread, Inc. and Flowers Foods, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| DAVID SWARTZ, | Case No. 4:21-cv-10053-YGR |
| Plaintiff, | Honorable Yvonne Gonzalez Rogers |
| v. | **DEFENDANTS DAVE'S KILLER BREAD, INC.'S AND FLOWERS FOODS, INC.'S REPLY IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF COLIN B. WEIR** |
| DAVE'S KILLER BREAD, INC. AND FLOWERS FOODS, INC., | |
| Defendants. | Hearing Date:    December 9, 2025 |
| | Hearing Time:    2:00 pm |
| | Courtroom:    Courtroom 1, 4th Floor |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     ARGUMENT ......................................................................................................... 3

        A.      Weir's Testimony is Irrelevant ................................................................. 3

                1.      Swartz Cannot Meet His Burden to Show Relevance ................................... 3

                2.      Swartz "Holding Constant" Argument Fails ................................... 6

                3.      Swartz Cannot Avoid the Relevancy Requirement ................................... 9

        B.      Weir's Testimony is Unreliable ................................................................. 10

                1.      Weir's Surveys Generated Irrational Results ................................... 10

                2.      Weir's Surveys Omitted Key Attributes ................................... 11

                3.      Swartz Cannot Avoid the Reliability Requirement ................................... 14

III.    CONCLUSION .................................................................................................... 15

DEFS.' REPLY ISO MOTION TO EXCLUDE WEIR                    CASE NO. 4:21-cv-10053-YGR

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Active Sports Lifestyle USA LLC v. Old Navy, LLC,*
2013 WL 11239385 (C.D. Cal. Nov. 21, 2013)...................................................... 10

*Adams v. Target Corp.,*
2014 WL 12558858 (C.D. Cal. Nov. 25, 2014)...................................................... 14

*Apple, Inc. v. Samsung Elecs. Co., Ltd.,*
2014 WL 794328 (N.D. Cal. Feb. 25, 2014) ......................................................... 13

*City of Pomona v. SQM N. Am. Corp.,*
750 F.3d 1036 (9th Cir. 2014)................................................................................ 10

*Daubert v. Merrell Dow Pharms.,*
509 U.S. 579 (1983) ........................................................................ 1, 3, 10, 13

*Engilis v. Monsanto Co.,*
2025 WL 2315898 (9th Cir. Aug. 12, 2025)................................................. 1, 10, 15

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.,*
618 F.3d 1025 (9th Cir. 2010)................................................................................ 10

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.,*
103 F. Supp. 2d 268 (S.D.N.Y. 2000)..................................................................... 11

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.,*
609 F. Supp. 3d 942 (N.D. Cal. Jun. 28, 2022)...................................................... 13

*Keith v. Volpe,*
858 F.2d 467 (9th Cir. 1988).................................................................................. 10

*Lust By & Through Lust v. Merrell Dow Pharms., Inc.,*
89 F.3d 594 (9th Cir. 1996)...................................................................................... 4

*MacDougall v. Am. Honda Motor Co.,*
2021 WL 6101256 (9th Cir. Dec. 21, 2021) .......................................................... 10

*McMorrow v. Mondelez Int'l, Inc.,*
2020 WL 1157191 (S.D. Cal. Mar. 9, 2020) ........................................................... 6

*Noohi v. Johnson & Johnson Consumer Inc.,*
146 F.4th 854 (9th Cir. 2025) .......................................................................... 1, 15

*Oracle Am., Inc. v. Google Inc.,*
2012 WL 850705 (N.D. Cal. Mar. 13, 2012)..................................................*passim*

ii

*Spin Master, Ltd. v. Zobmondo Entm't, LLC*,
  2012 WL 8134012 (C.D. Cal. Apr. 27, 2012) .......................................................... 10

*TV Interactive Data Corp. v. Sony Corp.*,
  929 F. Supp. 2d 1006 (N.D. Cal. 2013) ................................................................. 13

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  500 F. Supp. 3d 940 (N.D. Cal. 2020), *aff'd sub nom. Schell v. Volkswagen
  AG*, 2022 WL 187841 (9th Cir. Jan. 20, 2022) ........................................ 1, 9, 11, 14

*Weaver v. Champion Petfoods USA Inc.*,
  2019 WL 7370374 (E.D. Wis. Dec. 31, 2019) ................................................... 6, 14

*Wendt v. Host Int'l, Inc.*,
  125 F.3d 806 (9th Cir. 1997) .............................................................................. 10

**Other Authorities**

Fed. R. Evid. 702 ................................................................................................ *passim*

1    I.    **INTRODUCTION**

2        Flowers' Motion to Exclude the Testimony of Colin B. Weir identified core deficiencies in

3    Weir's surveys that render his opinion irrelevant and unreliable, and thus inadmissible, under

4    *Daubert*. Swartz's Opposition (Dkt. 185) ("Opp.") largely rests on the Court's class certification

5    order, but the inquiry was less rigorous at the class certification stage (and Weir had not conducted

6    his surveys at the time of the order). *See Noohi v. Johnson & Johnson Consumer Inc*., 146 F.4th

7    854, 867 (9th Cir. 2025). And, since then, Weir has made critical admissions about his surveys,

8    while his study—now conducted—lays bare the fatal flaws in his analysis.

9        Swartz falls back on the *ipse dixit* that these methodological flaws—made evident through

10   the data now available from Weir's surveys—go to weight not admissibility, but that is incorrect.

11   Recent amendments to Rule 702 emphasize the need for rigorous scrutiny of expert methodology

12   precisely because "'many courts' had erroneously held 'that the critical questions of the sufficiency

13   of an expert's basis, and the application of the expert's methodology, are questions of weight and

14   not admissibility.'" *Engilis v. Monsanto Co.,* -- F.4th --, 2025 WL 2315898, at *5 (9th Cir. Aug. 12,

15   2025) (citing Fed. R. Evid. 702 (2023) committee note). While conjoint surveys are not per se

16   unreliable, they are not appropriate for every case. And courts routinely exclude testimony based

17   on unreliable conjoint surveys under *Daubert* principles, *see, e.g. Oracle Am., Inc. v. Google Inc*.,

18   2012 WL 850705, at *10-11 (N.D. Cal. Mar. 13, 2012), including in other cases where the plaintiff

19   relied on Weir's damages testimony, *see, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales

20   Pracs., & Prods. Liab. Litig.*, 500 F. Supp. 3d 940, 950 (N.D. Cal. 2020), *aff'd sub nom. Schell v.

21   Volkswagen AG*, 2022 WL 187841, at *1 (9th Cir. Jan. 20, 2022).

22       Here, too, the Court should exercise *Daubert*'s gatekeeping function and exclude Weir's

23   opinions for all of the following reasons:

24       ***First***, Weir's purported testimony is irrelevant because his study does not test the front-

25   label theory as Swartz promised it would to obtain class certification. Weir has now admitted that

26   his surveys, as conducted, do ***not*** consider the location or prominence of the statements included in

27   those surveys. *See* Declaration of Michael L. Resch in support of Defendants' Motion to Exclude

28   Expert Testimony of Colin B. Weir ("Resch MTE Decl."), Exhibit ("Ex.") 4, (Dkt. 178-5), Mar.,

1

24, 2025 Weir Deposition Transcript ("2025 Weir Transcript") at 126-25-127:6, 127:10-17. Accordingly, there is no way to tell what (the front label protein statement, the NFP protein statement, or the protein content) influenced respondents' answers. Swartz also has now admitted that Weir's surveys include statements that **do not appear** on the front-of-pack ("FOP") and that **do appear** on the nutrition facts panel ("NFP") (*i.e.,* "0g trans fat", "70 calories")—contrary to what the Court understood at class certification. Opp. at 2.  Moreover, now that Weir has conducted and produced data from his simulation, we know that the simulation **does not (and cannot)** hold the NFP constant because the NFP is not an input in the simulation. Swartz cannot plug this analytical hole by contending (without basis) that it is the survey **respondents** who held the NFP constant. While respondents may have been instructed to hold other issues constant, it would have been impossible for a respondent to conclude that three products with different protein label statements had identical NFPs, especially when they were never shown the NFPs.

Because it is now clear that Weir's study does not distinguish between a price premium associated with a FOP protein statement and one associated with an NFP protein statement, it fails to test any price premium associated with the front-label statement because the identical statement is **always in the NFP**. It is required by law to be there, and therefore, it always will be there.

**Second**, Weir's surveys are unreliable as evidenced by the fact that they found higher price premia for less prominent label statements and for lower amounts of protein across certain products. The surveys also fail completely to test numerous attributes identified as important by both Weir's interviewees (such as whole grain, fiber, calories, taste, flavor) and even Swartz himself (such as the omitted %DV for protein). Swartz's excuse, that too many attributes would overwhelm a conjoint survey, does not hold water. Flowers' expert, Dr. Kivetz was able to construct a reliable choice experiment that included all those variables by showing 360-degree images of packaging, and he found no price premium at all. Resch MTE Decl., Ex. 5 (Dkt. 178-6), Expert Report of Dr. Ran Kivetz ("Kivetz Report") ¶¶ 74-112. The *failure to test* or justify the omission of attributes that Swartz and Weir deemed important to consumer's purchasing behaviors means the surveys are not reliable for purposes of measuring a price premium. This failure, coupled with the irrational results arising from failing to show respondents the actual packaging, indicates that respondents were

1   largely confused by the survey and renders Weir's testimony both unreliable and inadmissible. *See*

2   *id. Oracle*, 2012 WL 850705, at *10-11 (expert opinion based on conjoint survey was unreliable

3   due to omission of key attributes and showing of irrational results).

4       As Weir's testimony is not relevant or reliable, the Court should exclude it in full.

5   **II.    ARGUMENT**

6       Flowers moves to exclude Weir's testimony under Rule 702 and *Daubert* because it is both

7   irrelevant and unreliable; either alone warrants exclusion. Swartz's efforts to reframe these

8   threshold admissibility issues as mere questions of weight also fails, as even the cases he cites

9   confirm that these relevance and reliability inquiries are not optional—they are gatekeeping

10  standards that the Court must rigorously apply.[1]

11      **A.    Weir's Testimony is Irrelevant**

12      Swartz concedes that *Daubert* requires expert testimony to be relevant (*i.e.*, connected to

13  the facts at issue), Opp. at 9, but cannot demonstrate that the surveys actually test his front label

14  theory. Weir concedes that the surveys do not address where the protein statement appears on the

15  label, which means that the surveys fail to distinguish between the front protein statement (the

16  alleged source of harm) and the legally-required, exact same protein statement in the NFP. That

17  admission alone defeats relevance and renders his testimony inadmissible. Moreover, the Court

18  previously allowed Weir to proceed based on the understanding that Weir would isolate and test

19  front label statements. Swartz now admits that the surveys include various statements found on the

20  back and sides of the label. As a result, he has failed to study the impact of the FOP protein

21  statement, rendering his survey results irrelevant to what he needed to test. And his efforts to avoid

22  the consequence of that failure by invoking an illogical argument about "holding constant" untested

23  attributes or lowering the bar for showing relevancy must be rejected.

24      **1.    Swartz Cannot Meet His Burden to Show Relevance**

25      Flowers' motion cites key flaws in Weir's surveys, as conducted, that render his testimony

26  irrelevant and, thus, inadmissible under Rule 702 and *Daubert*. The admissions in Swartz's

27  ───────────────

28  [1] Swartz also states that "motions must clearly specify the paragraphs or portions of the report that the party seeks to exclude." Opp. at 5 (citing this Court's Standing Order). But as Flowers' Motion makes clear, Flowers moves to exclude the entirety of Weir's report.

1    opposition only confirm that Weir's testimony must be excluded.

2        ***First***, Flowers motion explained that Weir fails to distinguish between the front label protein

3    statement and the identical, legally-required NFP protein statement. Defendants' Motion to Exclude

4    Expert Testimony of Colin B. Weir ("Motion") at 10. Swartz claims that the Court already disposed

5    of this argument at the class certification stage, Opp. at 6, but that is not true, nor could it be under

6    governing law. As explained in Flowers' motion, the Court allowed Weir's surveys to proceed

7    based on the premise that they would *only* test front label statements (and not NFP statements). *See*

8    Sept. 20, 204 Order Granting Class Certification at 7:24-26 (explaining that the conjoint survey

9    tested the alleged unlawful conduct because the protein statement "is provided alongside other

10   claims that appear on the front of packages" and "there are no other claims in the survey that are

11   typically included in a NFP"). But it is now clear that Weir failed to conduct surveys consistent

12   with the premise on which the Court allowed him to proceed.

13       Weir has now frankly admitted that his surveys do not test for label placement. 2025 Weir

14   Transcript at 127:10-17 ("It is correct that I am not trying to identify the placement of the label as

15   part of the survey."); *see also id*. at 126:25-127:6. Additionally, nothing in his surveys tells

16   respondents that the statements being tested are front label statements. *See* Resch MTE Decl., Ex.

17   3 (178-4), Amended Declaration of Colin B. Weir ("Weir Decl.") at Exhibit 3 (telling respondents

18   that "[s]ome of the packages of regular sliced bread you will see will have one or more of these

19   **label statements**") (emphasis in original); *id*. (listing the statements as only "**label statements**" in

20   the actual surveys") (emphasis added).

21       Moreover, Swartz ***admits*** that Weir's surveys include other NFP label statements (*i.e.*, "0g

22   trans fat", "70 calories"). *See* Opp. at 2 (stating only that "the overwhelming majority" of the

23   statements never appear in the NFP). Despite recognizing that Weir's surveys ***do*** include lawful

24   NFP statements, Swartz argues that "there is no evidence" that respondents believed that the "5g"

25   protein statement was the NFP protein statement as opposed to the front label protein statement.

26   Opp. at 2; *see also id*. at 8. But it is Swartz's burden, not Flowers', to establish that the surveys

27   measured what they were intended to measure. *See Lust By & Through Lust v. Merrell Dow*

28   *Pharms., Inc*., 89 F.3d 594, 598 (9th Cir. 1996) (The proponent of expert testimony "has the burden

4

of proving admissibility."). Swartz has no evidence to provide because Weir did not in any way assess respondents' understanding of this extremely essential point, or whether they believed they were viewing front label statement as compared to (identical) nutrition facts that *always* appear on the NFP as required by law. *See* Declaration of Michael Resch in support of Defendants' Motion for Summary Judgment ("Resch MSJ Decl."), Ex. R, Declaration of Dan Letchinger ¶ 5 (Dkt. 176-20). Because Weir failed to show respondents any actual packaging, there is no evidence respondents knew that any of the products even made a front label protein content statement.

Swartz also acknowledges that the surveys list statements that do not appear on the front of Dave's Killer Bread packages. *See* Opp. at 13 (explaining that some statements in the surveys only appear on the FOP of competitor's labels); *see also* 2025 Weir Transcript at 124:17-22. Instead, he argues that it somehow should be enough that the statements appear on other products' front labels at some point, somewhere. Opp. at 7-8. But that only increases the confusion over what part of the label is being measured and certainly does not provide the necessary clarity to respondents because there is no common understanding of what information is expected on a front label. Unlike the NFP, which must include a standard list of statements and always includes a protein content statement, the items that consistently appear on a front label are the brand and product names—other front label statements vary. Swartz does not, and cannot, explain how respondents could know which statement was being referenced (the FOP statement vs. non-FOP statement) where such statements appear in different places for different products and no packaging was provided for respondents to see for themselves.

***Second***, Flowers also explained that Weir's testimony is irrelevant because respondents could have reasonably interpreted the protein statement in Weir's surveys to represent the presence or absence of protein *in the product* as opposed to any statement regarding protein. Motion at 12. That would mean respondents responded to Weir's surveys with the *protein content* (as opposed to the *protein statement* in mind), which is not at issue in this case. Swartz offers no evidence to rebut this point. Instead, he claims that the single survey response that Flowers provides (which directly shows such confusion) is insufficient. Opp. at 10. And he argues that—even if Flowers is correct—any such confusion simply does not "matter" because Flowers does "not offer any reason why" it

does "matter." *Id.* As an initial matter, Plaintiff's response inappropriately tries again to shift the burden to Flowers and ignores the fundamental requirement that Swartz (not Flowers) establish the reliability of his expert's methodology. The absence of any meaningful response confirms he cannot show what (if anything) respondents understood about the protein statement being tested— including what they assumed about a profile that did not mention protein at all. And, in any event, Flowers does explain in its motion, and below in Section 2, why this confusion renders Weir's surveys irrelevant and unreliable. Specifically, if the "label statements" include a protein statement for two choices, but not the third, then the protein content is not a variable that respondents could hold constant. As such, Weir's survey does not measure the value of the front label protein content statement as he promised at class certification but rather the value of any protein content statement on the label (including the NFP) *and* the value of the actual protein content of the product.

In sum, Weir purports to measure the price premium associated with the front label protein statement. In real life, however, that statement appears in more than one location on the package. And because Weir testified that his surveys purposely did not specify where the statement appears—there is no way to tell what (the front label protein statement, the NFP protein statement, or the protein content) influenced respondents' answers. Accordingly, Weir's study does not provide any  way to calculate any purported change in price based on removing the front label statement. Weir's testimony has been excluded in the past where the conjoint survey on which it relied was not relevant to the theory of the case. *See Weaver v. Champion Petfoods USA Inc.,* 2019 WL 7370374, *3-*4, *6 (E.D. Wis. Dec. 31, 2019) (excluding Weir's opinion because it was founded on a conjoint survey that failed to "actually test Plaintiff's theory of the case"); *McMorrow v. Mondelez Int'l, Inc.*, 2020 WL 1157191, at *6, *8-9 (S.D. Cal. Mar. 9, 2020) (granting motion to exclude Weir because the proposed conjoint survey did not properly isolate the term "nutritious").[2] The Court should do the same here.

## 2.    Swartz "Holding Constant" Argument Fails

Throughout this case, Swartz and Weir have repeatedly maintained that the simulator holds

---

[2] These conjoint surveys were excluded based on *Comcast* but involved a similar relevance failure which underscores that courts routinely reject survey evidence when it fails to measure the actual conduct at issue.

constant all non-tested attributes, such as the NFP protein statement. *See*, *e.g.,* Resch MTE Decl., Ex. 2 (Dkt. 178-3), Sept. 3, 2024 Hearing Transcript at 30:4-8 (Swartz's counsel stating that Weir "explains why he doesn't have to provide information about the nutrition facts panel to be able to hold the value of the claim in the nutrition facts panel constant."); Declaration of Hayley Reynolds in support of Class Certification, Ex. E (Dkt. 117-5), Weir Transcript at 219:10-220:3 (Weir stating that "we put the label statement in the survey . . and then we hold the value of the nutrition facts panel constant in the market simulator."). Now that he has been confronted with Dr. Kivetz's testimony that the actual simulator in this case "has no way whatsoever to address the nutritional label" (Kivetz Report ¶¶ 48-49), Swartz argues that the simulator's inability to hold the NFP constant "is beside the point" because (he now claims) "it is *respondents* that hold constant product features that are not included in the survey" (Opp. at 8). This pivot is problematic for Swartz, because as explained through the illustrative example below, respondents can do no such thing.



DEFS.' REPLY ISO MOTION TO EXCLUDE WEIR                    CASE NO. 4:21-cv-10053-YGR

Take the image above from Weir's survey, for example. Under Swartz's theory: (1) because the NFP protein statements are not included in the profile, a respondent would be expected to assume that the NFP protein statements for all three products were the same; and (2) the simulator would ensure that the NFP protein statement for Daves's was held the same in the "but-for" world as in the real-world.

This theory fails at the first step. There is no number a respondent could choose to hold constant in his or her mind without rendering the survey non-sensical. Any protein content the respondent assumed for the NFP protein statement—*e.g.*, 0g, 4g, or 5g of protein—necessarily would **contradict** at least one of the label statements being tested. The below table illustrates a scenario in which the respondent attempts to follow Weir's instruction to hold the NFP protein statement constant at "4g Protein" across all three product profiles:

|  | Oroweat | Dave's Killer Bread | 365 (Whole Foods) |
|---|---|---|---|
| Tested Label Statement | 4g Protein | (None Listed) | 5g Protein |
| Swartz' Step 1: Respondents purportedly holding the NFP protein statement the same across product profiles in their minds | 4g Protein | 4g Protein | 4g Protein |

In other words, the magic "hold-constant" fix Weir offers to cure his study's flaws after the fact is impossible to implement. Put another way, Swartz would have this Court believe that respondents interpreted the survey to mean that there were conflicting amounts of protein identified in different places on the label. Not surprisingly, Swartz offers no explanation for how his "hold-constant" instruction to respondents would be implemented. He claims that Weir "pre-tested the survey design to ensure respondents understood the questions." Opp. at 12. But that pre-test clearly never addressed this issue because Weir frankly admitted he never even considered how respondents should (or did) view a product profile that did not list protein. 2025 Weir Transcript at 123:9-123:16; 123:17-124:7.

As to the second step, Swartz is forced to concede that it depends on the first step. *See* Opp. at 8 (arguing "the simulation did not depend on" the utilized "platform's capacity to analyze nutrition labels" but rather on "*respondents* . . . hold[ing] constant product features that are not included in the survey") (emphasis added). On this point, Kivetz agrees: The market simulator is

"entirely dependent on the data from the conjoint survey[s]." Kivetz Report ¶¶ 48-49; *see also* Ex. 6 (Dkt. 178-7) (Simulator Screenshot for a sample simulation in Lighthouse for the 4g protein statement using Weir's Simulator for the Regular-Sliced Survey). Because it would have been impossible for respondents to hold the NFP constant in any internally consistent way, the market simulator does not and cannot hold the NFP constant either. *Id.*

Swartz's increased reliance on this flawed and unsupported "hold-constant" argument only further highlights why Weir's testimony is unreliable and fails to pass Rule 702 muster. The *In Re Volkswagen* case, where Weir also proffered damages testimony, is instructive on this exact point. 500 F. Supp. 3d at 950. There, the court excluded the conjoint survey because, among other things, the at-issue attribute of the car (*i.e.*, low emissions) was not properly isolated due to improper directions to respondents. *Id*. For example, respondents were asked to consider "a potential reduction in other performance measures under vague circumstances that might or might not arise." *Id*. Because it was "impossible to know" how much the "phrasing of the survey" affected responses, the court determined that there was not sufficient evidence "that survey respondents could reliably determine how much they would pay for a vehicle." *Id*. at 950, n. 7. The case for exclusion is even stronger here given that the "phrasing of" Weir's surveys require respondents to consider *impossible* (and not just "vague") circumstances. *Id*. at 950. At this stage of case, we now have the survey data and the simulator output—and both clearly show that Weir's study does not and cannot isolate the front-label statement from the NFP.

### 3.    Swartz Cannot Avoid the Relevancy Requirement

Having presented a study that fails to address any issue bearing on liability or restitution, Swartz attempts to downplay *Daubert*'s relevancy requirement by relying on the unsupported suggestion that relevancy is somehow "a 'minimal' standard." *See* Opp. at 5. But none of the cases on which he relies refers to *Daubert*'s relevancy requirement as "minimal." *See id*. Indeed, the recent amendments to Rule 702 have only reinforced the relevancy analysis as part of the court's role as gatekeeper. *See* Fed. R. Evid. 702 (2023) (amending the rule to require proffered expert testimony to meet the admissibility requirements of Rule 702, including that it will "help the trier of fact understand the evidence or to determine a fact at issue," by a "*preponderance of the*

1   *evidence*") (emphasis added).

2          Swartz next attempts to reframe Flowers' relevancy argument as a challenge to Weir's

3   methodology, which (he again claims) goes to weight and not admissibility. *See* Opp. at 5. But

4   relevance does not go to weight—it is a separate **threshold** issue. *Engilis,* 2025 WL 2315898, at *4

5   ("a district court discharges its 'gatekeeping role' under Rule 702 by 'ensur[ing] that any and all

6   scientific testimony or evidence admitted is . . . relevant'") (citing *Daubert v. Merrell Dow*

7   *Pharms.*, 509 U.S. 579, 589, 597 (1983)). As Swartz's own cases explain, relevance is independent

8   from reliability. "[T]he trial court must assure that the expert testimony *both* rests on a reliable

9   foundation *and is relevant* to the task at hand." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d

10  1036, 1043-44, 1049 (9th Cir. 2014) (cleaned up); *see also Fortune Dynamic, Inc. v. Victoria's*

11  *Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010); *Wendt v. Host Int'l, Inc.*,

12  125 F.3d 806, 814 (9th Cir. 1997); *Active Sports Lifestyle USA LLC v. Old Navy*, LLC, 2013 WL

13  11239385, at *14-16 (C.D. Cal. Nov. 21, 2013); *Spin Master, Ltd. v. Zobmondo Entm't, LLC,* 2012

14  WL 8134012, at *20 (C.D. Cal. Apr. 27, 2012); *MacDougall v. Am. Honda Motor Co.*, 2021 WL

15  6101256, at *1 (9th Cir. Dec. 21, 2021).[3]

16         As explained above, Weir's surveys are irrelevant because they demonstrably **do not**

17  calculate a price premium attributable to the challenged statements and/or omissions.

18         **B.      Weir's Testimony is Unreliable**

19         As to the lack of reliability of Weir's opinions, Swartz similarly offers no meaningful

20  response. He asks the Court to ignore the irrational survey results (like even higher price premiums

21  for less protein) and his omission of key attributes that he (and Swartz) contend are important to

22  consumers, arguing now that they should not matter. But under *Daubert* and Rule 702, they do. *See*

23  Motion at 14 (citing *Oracle*, 2012 WL 850705, at *10-11). Swartz has failed to demonstrate that

24  Weir's testimony rests on a sound methodological foundation. *Engilis* 2025 WL 2315898, at *5.

25  His testimony thus should be excluded in full.

26         **1.      Weir's Surveys Generated Irrational Results**

27

28  _____
    [3] The other case Swartz cites pre-dates *Daubert*. *E.g. Keith v. Volpe*, 858 F.2d 467, 480–81 (9th
    Cir. 1988).

1   Swartz argues that there is no evidentiary support to Flowers' argument that Weir's results

2   are illogical. Opp. at 13, 16. But in assessing reliability, "a resort to common sense is not

3   inappropriate," and courts have excluded expert testimony where conjoint surveys generated results

4   that defy common sense. *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d

5   268, 286 (S.D.N.Y. 2000); *see also Oracle*, 2012 WL 850705, at *10; *In re Volkswagen*, 500 F.

6   Supp. 3d at 950. For example, it defies common sense that tiny side-label statements (like "'No

7   Artificial Ingredients' and 'No High Fructose Corn Syrup") would receive higher price premium

8   than prominent FOP statements (like "Organic" and "non-GMO"). Motion at 19. This is especially

9   true when considering the well-known popularity of organic and non-GMO products, for which

10  even Plaintiff testified to having a strong preference. Resch MTE Decl., Ex. 1 (Dkt. 178-2), Jan.

11  25, 2024 Swartz Deposition Transcript at 86:15-89:1; 87:2-17; 126:3-127:4, 137:21-138:6; 138:20-

12  139:5; 133:11-134:8. Plaintiff in response only argues that "No High Fructose Corn Syrup" and

13  "No Artificial Ingredients" are not "necessarily side label statements," Opp. at 13, even though they

14  only appear on the side label of Flowers' products. They also argue that there is no support that

15  organic and non-GMO products are popular (*see* Opp. at 13), but provide no evidence to the

16  contrary.

17  Similarly, it also defies common sense that a higher protein amount would receive a lower

18  price premium, where Swartz's entire case is based on the notion that more protein is worth more.

19  Opp. at 14. Plaintiff's only response is that consumers value protein differently in different

20  products. But that reasoning is circular because there is no support for it besides Weir's (flawed)

21  conjoint analyses. And while Weir suggests that interviewees from his cognitive interviews all

22  stated that "protein content" was a reason they chose to purchase the at-issue products, he does not

23  explain how (or if) that reasoning changed depending on the product category. Weir Decl. ¶ 43-44,

24  48-49. Again, this is Swartz's burden, and he offers no support for the reliability of Weir's surveys

25  besides his own say-so.

26  **2.    Weir's Surveys Omitted Key Attributes**

27  Swartz admits that Weir did not test the very factors that Dave's Killer Bread consumers

28  "directly told [him]" were important to their purchasing decision across all product categories. Opp.

at 17. Instead, he attempts to salvage Weir's methodology by pointing out that these factors were tested on *at least one* product category. But that is irrelevant—and misleading—given that Weir himself confirmed in his declaration that consumers cited these factors as influential across all product categories: regular sliced bread, thin-sliced bread, bagels, and burger buns. *See* Weir Decl. ¶ 47-48 ("I recently conducted additional cognitive interviews to understand the factors influencing consumer choices for Defendants' thin slice bread, bagels and burger buns (eight each) . . . The findings of these cognitive surveys were similar to the previous interviews focused on Defendants' Killer Breads. Interviewees were interested and aware of a variety of the same label claims, as well as some additional claims, including: Whole Grains; Organic; Fiber; Protein content; Calories; Taste/Flavors; Preference against non-natural ingredients; and General 'healthier' preferences"); *see id*. at ¶¶ 41-43; *see also* Motion at 17. If Weir determined—based on interviews with actual Dave's Killer Bread purchasers (Weir Decl. ¶¶ 41, 47)—that these claims were important to consumer decision-making across all product categories, then under *Oracle* and basic principles of sound survey design, he was obligated to test those features on all the product categories, or at the very least, justify their exclusion. 2012 WL 850705, at *10–11. But Weir did neither.

   Faced with the undeniable fact that Weir failed to account for key consumer-identified attributes across all product categories, Swartz once again defaults to numerous deflections. This time, he argues that Dr. Kivetz did not test whether the omitted attributes "would have changed the price premium." Opp. at 16. Yet again, Swartz inappropriately attempts to put the burden back on Flowers. It is his responsibility to show that the omitted attributes would not have affected the price premium for the protein statement—not Flowers'. Swartz clearly cannot meet that burden. Next, Swartz argues that a conjoint survey does not need to test all product attributes. Opp. at 12. While that may be true, a conjoint survey must include *key* attributes or at the very least a justification for their omission. *See Oracle*, 2012 WL 850705, at *10–11; *see also supra* at X. And in any event, Flowers' expert, Dr. Kivetz, was able to construct a reliable choice experiment that included all of the product's attributes by showing 360-degree images of packaging, and he found no price premium at all. Kivetz Report ¶¶ 74-112. Lastly, Swartz also attempts to somehow distinguish Weir's improper selection of attributes from the expert in *Oracle*'s improper selection of attributes

12

by suggesting that Weir "provided reasoning for his carefully chosen attributes." Opp. at 18. But while Weir may explain why he *chose* certain statements for certain surveys, he does not explain anywhere why he *omitted* others (or why that omission was appropriate). As a prominent example, Weir simply fails to test the omitted %DV for protein on the NFP which, Swartz alleges, made the label unlawful and led consumers to either to not purchases or to have paid less for the products. *See* First Amended Complaint (Dkt. 37) ¶¶ 3, 5, 23, 38, 40, 63. Weir provides no rationale for that decision.

Although Swartz devotes considerable space to retracing the steps Weir took in conducting his survey (Opp. at 12-13)—none of that salvages the unreliability of his methods. The relevant inquiry under *Daubert* and *Oracle* is not just what Weir did, but also what he failed to do. Critically, he did not measure attributes that he deemed important through pretest interviews, nor did he isolate the price premium attributable to the FOP protein statement. As the court in *Oracle* recognized, such gaps in methodology raise serious doubts about the credibility of the analysis. 2012 WL 850705, at *10–11. And when those failures are paired with inconsistent results, like they are here, *supra* at 11, exclusion under *Daubert* is not just warranted—it is necessary. *Id*.

Swartz's attempt to sidestep the clear holding of *Oracle* is also unavailing. The cases he cites do nothing to undermine *Oracle*'s core principle: that conjoint surveys yielding irrational results or omitting key attributes are fundamentally unreliable and should be excluded. In fact, even Swartz's own cases acknowledge that *Oracle* remains good law and is not limited to the patent context as he claims. *See, e.g., In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 1021, n. 66 (N.D. Cal. Jun. 28, 2022) (acknowledging *Oracle*'s holding but finding that it did not apply because the expert did not "omit[] . . . some key or critical variable"); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1026 (N.D. Cal. 2013) (acknowledging *Oracle*'s holding but finding that it did not apply because the expert provided "a principled basis" for choosing the features that would be tested that had "similar values relative to other features."); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 WL 794328, at *72 n.10 (N.D. Cal. Feb. 25, 2014) (acknowledging *Oracle*'s holding but finding that it did not apply because "there are no irrational results that stem from the surveys in this case."). *Oracle* is also properly applied in the willingness

1    to pay context, despite Swartz suggesting otherwise. *See, e.g.*, *Adams v. Target Corp.*, 2014 WL

2    12558858, at *3 (C.D. Cal. Nov. 25, 2014) (citing "concerns" over the reliability of results from a

3    conjoint analysis purporting to measure willingness to pay for the size of a water slide and stating

4    "conjoint analysis is not effective when the features that it focuses on are artificial because the

5    analysis does not reflect real-world consumer behavior" (citing *Oracle*, 2012 WL 850705)). In

6    similar fashion, Weir is properly excluded because his surveys generated irrational results and

7    omitted key features.

8            Nor can Swartz fix this problem by contending that respondents were instructed to "hold

9    constant" any of the omitted attributes. Because, as set forth above, *supra* at 7-9, that instruction

10   would have been impossible for respondents to follow, and is itself an irrational ask, Weir's reliance

11   on the instruction to defend the soundness of his methodology only proves its unreliability.

### 3.    Swartz Cannot Avoid the Reliability Requirement

13           Unable to defend the *specific* surveys conducted in this case, Swartz  makes the sweeping

14   assertion that conjoint surveys are *per se* reliable. *See* Opp. at 12 ("The Ninth Circuit and this Court

15   have recognized that conjoint surveys are reliable methods of calculating classwide damages.").

16   But that position ignores *Daubert*'s requirements and that courts routinely exclude conjoint

17   analyses when they are methodologically unsound. *See e.g.*, *Oracle*, 2012 WL 850705, at *10-*11.

18   Weir himself has served as an expert in other cases where a conjoint survey was excluded due to

19   its unreliability. For example, in *In re Volkswagen*, the Court excluded Weir's damages calculation

20   based on a conjoint survey that was unreliable because, among other things, it (1) failed to isolate

21   the premium of the at-issue feature (*i.e.*, low emissions); and (2) showed irrational results (*i.e.*,

22   results suggesting "certain consumers value a $2,000 navigation system in a $16,000 vehicle at

23   $9,000"). *See In re Volkswagen*, 500 F. Supp. 3d. at 949-50. Similarly, in *Weaver*, the court

24   excluded Weir's damages calculations based on a damages survey (but not a conjoint survey) that

25   was unreliable due to various flaws. *Weaver v. Champion Petfoods USA Inc.*, 2019 WL 7370374

26   at *5-*6 (E.D. Wis. Dec. 31, 2019).

27           As the above cases illustrate, just because conjoint analyses *can* offer acceptable damages

28   model (if appropriate for the case and conducted properly), that does not mean they always do. The

1    recent amendment to Rule 702 reinforces this point. As the Ninth Circuit in *Engilis* explained,

2    "[b]efore the amendment, many courts had erroneously held that the critical questions of the

3    sufficiency of an expert's basis, and the application of the expert's methodology, are questions of

4    weight and not admissibility."  2025 WL 2315898, at *5 (cleaned up). However, "[p]roperly

5    applied, Rule 702 requires that challenges to an expert's opinion go to the weight of the evidence

6    only if a court first finds it more likely than not that an expert has a sufficient basis to support an

7    opinion." *Id.* The amendment makes clear that the inquiry requires an opinion-specific analysis:

8    "each expert opinion must stay within the bounds of what can be concluded from a reliable

9    application of the expert's basis and methodology." *Id.* Swartz asks this Court to do precisely what

10   the amendment dictates not to do—bless Weir's opinion without regard to whether the study he

11   conducted actually gives him a sufficient basis to support that opinion (it does not) and erroneously

12   hold that the sufficiency question is a question of weight and not admissibility (it is not).

13        Indeed, even the case that Swartz cites repeatedly for the notion that conjoint surveys are

14   always admissible–*Noohi v. Johnson & Johnson Consumer Inc.*—recognized that "a poorly

15   conducted survey might produce responses that inflate damages." 146 F.4th at  867. And the Court

16   in *Noohi* only admitted the testimony of Plaintiff's damages expert because the expert recognized

17   and purported to address the inherent risks of a conjoint survey (specifically the risks of "induc[ing]

18   bias in respondents" or reflecting "survey conditions that might not accurately replicate the

19   conditions faced by consumers in stores.") by carefully crafting non-leading prompts and avoiding

20   poorly-framed prompts. *Id*. at 867. But here, Weir does not recognize (much less address) these

21   risks at all—rather he, and Swartz, argue they do not matter. As the court in *Noohi* recognized, if

22   the damages expert's "execution of the survey f[a]ll[s] short" of addressing these risks, then a

23   defendant could explore this failure in a renewed motion—just as Flowers does here. *Id*. at 867.

24   **III.    <u>CONCLUSION</u>**

25        For the foregoing reasons, Flowers respectfully requests that the Court exclude Weir's

26   testimony in its entirety.

27

28

Dated: October 10, 2025                    KING & SPALDING LLP

                                  By:  /s/ Samuel R. Diamant
                                       Michael L. Resch
                                       Livia M. Kiser
                                       Samuel R. Diamant
                                       Kelly L. Perigoe
                                       Rebecca L. Paradis
                                       Quyen L. Ta

                                       *Attorneys for Defendants
                                       Dave's Killer Bread, Inc.
                                       and Flowers Foods, Inc.*